**DEFENSE COUNSEL**

SUMMARIZED

# RECORD OF TRIAL

(and accompanying papers)

**of**

ZIER, JEREMY, M.

<span>(*Name: Last, First, Middle Initial*)</span>

<span>(*Social Security Number*)</span>

Senior Master Sergeant (E-8)

<span>(*Rank*)</span>

Air Force Public Affairs Agency (AETC)

<span>(*Unit/Command Name*)</span>

United States Air Force

<span>(*Branch of Service*)</span>

JBSA-Randolph, TX

<span>(*Station or Ship*)</span>

**By**

**SPECIAL**     **COURT-MARTIAL**

Convened by     **COMMANDER**

<span>(*Title of Convening Authority*)</span>

AIR FORCE PUBLIC AFFAIRS AGENCY (AETC)

**Tried at**

JBSA-Randolph, TX     **on**     10 August 2020 – 14 August 2020

<span>(*Place or Places of Trial*)</span>     <span>(*Date or Dates of Trial*)</span>

Volume 1 of 4 Volumes

**EXHIBITS**
**PROSECUTION EXHIBITS**
**DEFENSE EXHIBITS**

**Personal Data – Privacy Act of 1974 (5 U.S.C. 552a)**

# ENTRY OF JUDGMENT
# IN THE CASE OF
*United States v. Senior Master Sergeant Jeremy M. Zier*

**Date**: 2 September 2020                **Sentence/Acquittal Date**: 14 August 2020

**Name of Accused**: Jeremy M. Zier            **Grade**: E-8        **SSN**:

**Organization**: Air Force Public Affairs Agency, JBSA-Randolph, TX (AETC)

**Convening Command**: 502d Security Forces Group, JBSA-Randolph, TX (AETC)

**Court-Martial Type**: Special Court-Martial

**Sentencing Forum**: Members                **Enlisted Members**: No

Findings and Sentence (as modified by the convening authority action or other court ruling, if any):

| Charge(s) | Arraigned Offense(s) | Pleas | Findings |
|---|---|---|---|
| CHARGE I | Art 92 | NG | G |
| Spec: 092-C2 | Who knew of his duties at or near Pamukkale, Republic of Turkey, between on or about 1 April 2015 and on or about 30 April 2015, was derelict in the performance of those duties in that he willfully failed to maintain professional relationships with subordinate Airmen, as it was his duty to do, by wrongfully removing his clothing, such that he was completely nude, while he was in a hot tub with several Airmen who were junior in rank to him. | NG | G |
| CHARGE II | Art 120 | NG | G |
| Spec 1: 120-DB | Did, at or near Pamukkale, Republic of Turkey, between on or about 1 April 2015 and on or about 30 April 2015, touch directly the genitalia and inner thigh of C.F., by causing bodily harm to her, to wit: touching, directly her genitalia and inner thigh, with an intent to gratify his sexual desire, without her consent. | NG | G |
| Spec 2: 120-4D | Did, at or near, Charleston, South Carolina, on or about 7 December 2019, touch the buttocks of E.P. with his hand, with an intent to gratify his sexual desire, without her consent. | NG | NG |
| Spec 3: 120-4D | Did, at or near, San Antonio, Texas, on or about 13 December 2019, touch the buttocks of T.W. with his hand, with an intent to gratify his sexual desire, without her consent. | NG | NG |

**Total Confinement**: N/A                **Total Fine**: N/A

**Days of Pretrial Confinement Credit**: 0        **Days of Judicially Ordered Credit**: N/A

**Punitive Discharge**: N/A                **Reduction in Pay Grade**: E-7

**Forfeitures of Pay and/or Allowances**: N/A

The information herein is FOR OFFICIAL USE ONLY (FOUO) and must be protected under the Freedom of Information Act (5 U.S.C. 552) and/or the Privacy Act of 1974 (5 U.S.C. 552a). Unauthorized disclosure or misuse of the PERSONAL INFORMATION may result in disciplinary action, criminal, and/or civil penalties.

ENTRY OF JUDGMENT IN THE CASE OF *United States v. Senior Master Sergeant Jeremy M. Zier*

**Hard Labor without Confinement**:  N/A                **Restriction**:  N/A

**Deferments**:  On 24 August 2020, the accused requested deferment of the adjudged reduction in rank until the date of this judgement.  On 1 September 2020, the convening authority denied this request.

**Waiver of Automatic Forfeitures**:  N/A

**Convening Authority Action on Military Judge Suspension Recommendation**: N/A

**Reprimand**:  No

**This judgment reflects the result of the court-martial, as modified by any post-trial actions, rulings, or orders, if any, and is hereby entered into the record on 2 September 2020.**

PENDLETON.STERL
ING.C.1259353102

Digitally signed by
PENDLETON.STERLING.C.1259353
102
Date: 2020.09.02 19:58:57 -04'00'

STERLING C. PENDLETON, Colonel, USAF
Military Judge

2 Attachments:
1.  Statement of Trial Results, dated 14 August 2020, 4 pps
2.  Convening Authority Decision on Action, dated 1 September 2020, 1 pg

ENTRY OF JUDGMENT IN THE CASE OF *United States v. Senior Master Sergeant Jeremy M. Zier*

1st Ind., Entry of Judgment, Senior Master Sergeant Jeremy M. Zier, dated 3 September 2020

FROM:  502 SFG/JA                                                        3 September 2020

MEMORANDUM FOR:  ALL REVIEWING AUTHORITIES

The following criminal indexing is required, following Entry of Judgment, according to the references listed:

DNA Processing Required Under 10 U.S.C. § 1565 and DoDI 5505.14:  Yes

Firearm Prohibition Triggered Under 18 U.S.C. § 922:  No

Domestic Violence Conviction Under 18 U.S.C. § 922(g)(9):  No

Sex Offender Notification in accordance with DoDI 1325.07:  Yes

Fingerprint Card and Final Disposition in accordance with DoDI 5505.11:  Yes

WILLIAMS.JA
RAI.A.1286532000
Digitally signed by
WILLIAMS.JA RAI.A.1286532000
Date: 2020.09.03 13:56:49
-05'00'

JA RAI A. WILLIAMS, Lt Col, USAF
Staff Judge Advocate

Distribution:

1 – Col Sterling C. Pendleton (MJ), 5 Washington Cir., Joint Base San Antonio-
     Randolph, TX 78150
1 – TSgt Mary I. Staats-Walker (CR), 182 Thornell Ave., Bldg. 566, Joint Base Langley-Eustis,
     VA 23665
1 – Capt Edward S. Coleman (TC), 1 Washington Cir. Ste. 6, Joint Base San Antonio-
     Randolph, TX 78150
1 – Maj John M. Malek (TC), 345 Davis Ave., Barksdale AFB, LA 71110
1 – Mr. Lance Wood (DC), 177 N. Church Ave., #1100 Tucson, AZ 85701
1 – Capt J. Dillon Emmanuel (DC), 702 8th St., Bldg. 604, Whiteman AFB, MO 65305
1 – Capt Megan Teeple (SVC), 205 S. Davis St., Bldg. 246, Joint Base-Charleston, SC 29404
1 – 2d Lt E.P. (VIC)
1 – Ms. T.W. (VIC)
1 – AFPAA/CC, 555 E Street East, Bldg. T-581, Joint Base San Antonio-Randolph, TX 78150
1 – 502 SFG/SJA, 1 Washington Cir. Ste. 6, Joint Base San Antonio-
     Randolph, TX 78150
1 – 502 ABW/SJA, 2080 Wilson Way, Joint Base San Antonio-Fort Sam Houston, TX 78234
1 – 802 FSS/DPMPE, 1561 Stewart St, Ste. 1, Joint Base San Antonio-Lackland, TX 78236
1 – 502 CPTS FMFPM, 1561 Stewart St, Ste. 1, Joint Base San Antonio-Lackland, TX 78236
1 – AFOSI, Det 404 OL-A, 5 Washington Cir. Ste. 1, Joint Base San Antonio-
     Randolph, TX 78150
1 – AFOSI/XIW, 27130 Telegraph Rd, Quantico, VA 22314
1 – 902 SF/CC, 925 3rd St W., Joint Base San Antonio-Randolph, TX 78150

US v. Zier Military Record of Trial and Appellate Extracts 000004 of 902

ENTRY OF JUDGMENT IN THE CASE OF *United States v. Senior Master Sergeant Jeremy M. Zier*

1 – 902 SF/S2I, 925 3rd St W., Joint Base San Antonio-Randolph, TX 78150
1 – 902 SFS/S5, 925 3rd St W., Joint Base San Antonio-Randolph, TX 78150
* 1 – HQ AFSFC/SFC, 1517 Billy Mitchell Blvd., Bldg. 954, Joint Base San Antonio -Lackland, TX 78236
1 – AF Trial Judiciary, Clerk of Court, 1500 W. Perimeter Road, Ste. 1150, Joint Base Andrews NAF, Washington MD 20762
* 1 – AFLOA/JAJM, 1500 W. Perimeter Road, Ste. 1130, Joint Base Andrews NAF, Washington MD 20762
1 – HQ AFPC/DP2SSM (DEERS), 550 C St West, Joint Base San Antonio-Randolph, TX 78150
1 – HQ AFPC/DP1ORM (ARMS), 550 C St West, Ste 21, Joint Base San Antonio-Randolph, TX 78150
1 – DFAS/IN-JFLTBA, (Dept 3300), 8899 E. 56th St, Indianapolis IN 46249
1 – U.S. Army Criminal Investigations Laboratory, ATTN: CODIS Lab, 4930 N. 31st St, Forest Park GA 30297

* Recipients of unexpurgated Entry of Judgement.

Attachments 1 and 2 to the Expurgated Entry of Judgment, dated 14 August 2020, is located within volume 1 of the Record of Trial.

# STATEMENT OF TRIAL RESULTS
## IN THE CASE OF
*United States v.* SMSgt Jeremy M. Zier

**Date**: 14 August 2020        **Sentence/Acquittal Date**: 14 August 2020

**Name of Accused**: Jeremy M. Zier      **Grade**: E-8     **SSN**:

**Organization**: Air Force Public Affairs Agency, JBSA-Randolph, TX

**Convening Command**: 502d Security Forces Group, JBSA-Randolph, TX (AETC)

**Court-Martial Type**: Special Court-Martial

**Sentencing Forum**: Members       **Enlisted Members**: No

Summary of charge(s), specification(s), pleas, and findings:

| Charge(s) | Arraigned Offense(s) | Pleas | Findings |
|---|---|---|---|
| CHARGE I | | NG | G |
| Spec: 092-C2 | Who knew of his duties at or near Pamukkale, Republic of Turkey, between on or about 1 April 2015 and on or about 30 April 2015, was derelict in the performance of those duties in that he willfully failed to maintain professional relationships with subordinate Airmen, as it was his duty to do, by wrongfully removing his clothing, such that he was completely nude, while he was in a hot tub with several Airmen who were junior in rank to him. | NG | G |
| CHARGE II | | NG | G |
| Spec 1: 120-DB | Did, at or near Pamukkale, Republic of Turkey, between on or about 1 April 2015 and on or about 30 April 2015, touch directly the genitalia and inner thigh of C.F., by causing bodily harm to her, to wit: touching, directly her genitalia and inner thigh, with an intent to gratify his sexual desire, without her consent. | NG | G |
| Spec 2: 120-4D | Did, at or near, Charleston, South Carolina, on or about 7 December 2019, touch the buttocks of E.P. with his hand, with an intent to gratify his sexual desire, without her consent. | NG | NG |
| Spec 3: 120-4D | Did, at or near San Antonio, Texas, on or about 13 December 2019, touch the buttocks of T.W. with his hand, with an intent to gratify his sexual desire, without her consent. | NG | NG |

The information herein is FOR OFFICIAL USE ONLY (FOUO) and must be protected under the Freedom of Information Act (5 U.S.C. 552) and/or the Privacy Act of 1974 (5 U.S.C. 552a). Unauthorized disclosure or misuse of the PERSONAL INFORMATION may result in disciplinary action, criminal, and/or civil penalties.

STATEMENT OF TRIAL RESULTS IN THE CASE OF *United States v. SMSgt Jeremy M. Zier*

**Total Adjudged Confinement:** N/A                    **Total Fine:** N/A

**Days of Pretrial Confinement Credit:** 0            **Days of Judicially Ordered Credit:** N/A

**Punitive Discharge:** N/A                            **Reduction in Pay Grade:** E-7

**Forfeitures of Pay and/or Allowances:** N/A

**Hard Labor without Confinement:** N/A                **Restriction:** N/A

**Reprimand:** No                                      **Plea Agreement/PTA Involved:** No

**Plea Agreement/PTA Limitations on Punishment:** N/A

**Military Judge Suspension Recommendation:** No


STERLING C. PENDLETON, Colonel, USAF
Military Judge

**Page 2 of 4**

**CORRECTED COPY – DESTROY ALL OTHERS**

STATEMENT OF TRIAL RESULTS IN THE CASE OF *United States v. SMSgt Jeremy M. Zier*

1st Ind., Statement of Trial Results, SMSgt Jeremy M. Zier, dated 14 August 2020.

FROM: 502 SFG/JA                                    21 August 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

The following criminal indexing is required, following the completion of the Statement of Trial Results, according to the references listed:

DNA Processing Required Under 10 U.S.C. § 1565 and DoDI 5505.14:  Yes

Firearm Prohibition Triggered Under 18 U.S.C. § 922:  No

Domestic Violence Conviction Under 18 U.S.C. § 922(g)(9):  No

Sex Offender Notification in accordance with DoDI 1325.07:  Yes

Fingerprint Card and Final Disposition in accordance with DoDI 5505.11:  Yes




JA RAI A. WILLIAMS, Lt Col, USAF
Staff Judge Advocate


Distribution:

1 – Col Sterling C. Pendleton (MJ), 5 Washington Cir., Joint Base San Antonio-
   Randolph, TX 78150
1 – TSgt Mary I. Staats-Walker (CR), 182 Thornell Ave., Bldg. 566, Joint Base Langley-Eustis,
   VA 23665
1 – Capt Edward S. Coleman (TC), 1 Washington Cir. Ste. 6, Joint Base San Antonio-
   Randolph, TX 78150
1 – Maj John M. Malek (TC), 345 Davis Ave., Barksdale AFB, LA 71110
1 – Mr. Lance Wood (DC), 177 N. Church Ave., #1100 Tucson, AZ 85701
1 – Capt J. Dillon Emmanuel (DC), 702 8th St., Bldg. 604, Whiteman AFB, MO 65305
1 – Capt Megan Teeple (SVC), 205 S. Davis St., Bldg. 246, Joint Base-Charleston, SC 29404
1 – 2d Lt E.P. (VIC)
1 – Ms. T.W. (VIC)
1 – AFPAA/CC, 555 E Street East, Bldg. T-581, Joint Base San Antonio-Randolph, TX 78150
1 – 502 SFG/SJA, 1 Washington Cir. Ste. 6, Joint Base San Antonio-
   Randolph, TX 78150
1 – 502 ABW/SJA, 2080 Wilson Way, Joint Base San Antonio-Fort Sam Houston, TX 78234
1 – 802 FSS/DPMPE, 1561 Stewart St, Ste. 1, Joint Base San Antonio-Lackland, TX 78236
1 – 502 CPTS FMFPM, 1561 Stewart St, Ste. 1, Joint Base San Antonio-Lackland, TX 78236
1 – AFOSI, Det 404 OL-A, 5 Washington Cir. Ste. 1, Joint Base San Antonio-
   Randolph, TX 78150
1 – AFOSI/X1W, 27130 Telegraph Rd, Quantico, VA 22314
1 – 902 SF/CC, 925 3rd St W., Joint Base San Antonio-Randolph, TX 78150
1 – 902 SF/S2I, 925 3rd St W., Joint Base San Antonio-Randolph, TX 78150
1 – 902 SFS/S5, 925 3rd St W., Joint Base San Antonio-Randolph, TX 78150


Page 3 of 4

**CORRECTED COPY – DESTROY ALL OTHERS**

STATEMENT OF TRIAL RESULTS IN THE CASE OF *United States v. SMSgt Jeremy M. Zier*

*1 – HQ AFSFC/SFC, 1517 Billy Mitchell Blvd., Bldg. 954, Joint Base San Antonio -Lackland, TX
   78236

1 – AF Trial Judiciary, Clerk of Court, 1500 W. Perimeter Road, Ste. 1150, Joint Base Andrews
   NAF, Washington MD 20762

*1 – AFLOA/JAJM, 1500 W. Perimeter Road, Ste. 1130, Joint Base Andrews NAF, Washington MD
   20762

*Recipients of unexpurgated Statement of Trial Results.

**Page 4 of 4**




**DEPARTMENT OF THE AIR FORCE**
**502D SECURITY FORCES GROUP**
**JOINT BASE SAN ANTONIO - RANDOLPH**

1 Sep 20

MEMORANDUM FOR MILITARY JUDGE STERLING C. PENDLETON

FROM: 502 SFG/CC

SUBJECT: Convening Authority Decision on Action – *United States v. SMSgt Jeremy M. Zier*

1. In the case of SENIOR MASTER SERGEANT JEREMY M. ZIER, Air Force Public Affairs Agency, the sentence adjudged is approved and will be executed. The accused requested relief from the adjudged reduction in grade in the form of deferment, commutation, or suspension. The accused's request for relief is denied.

2. Prior to coming to this decision, I consulted with my Staff Judge Advocate. Before taking action, I considered matters timely submitted by the accused under R.C.M. 1106 and the victim under R.C.M. 1106A. The accused did not submit matters in rebuttal.

/JAMES H. MASONER, Colonel, USAF
Commander

*Mission ~ Wingman ~ Partners*

STATEMENT OF TRIAL RESULTS IN THE CASE OF *United States v. SMSgt Jeremy M. Zier*

1st Ind., Statement of Trial Results, SMSgt Jeremy M. Zier, dated 14 August 2020.

FROM: 502 SFG/JA                                                    14 August 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

The following criminal indexing is required, following the completion of the Statement of Trial Results, according to the references listed:

DNA Processing Required Under 10 U.S.C. § 1565 and DoDI 5505.14:  Yes

Firearm Prohibition Triggered Under 18 U.S.C. § 922:  No

Domestic Violence Conviction Under 18 U.S.C. § 922(g)(9):  No

Sex Offender Notification in accordance with DoDI 1325.07:  Yes

Fingerprint Card and Final Disposition in accordance with DoDI 5505.11:  Yes

JA RAI A. WILLIAMS, Lt Col, USAF
Staff Judge Advocate

Distribution:

1 – Col Sterling C. Pendleton (MJ), 5 Washington Cir., Joint Base San Antonio-
  Randolph, TX 79150
1 – TSgt Mary I. Staats-Walker (CR), 182 Thornell Ave, Bldg 566, Joint Base Langley-Eustis
  VA 23665
1 – Capt Edward S. Coleman (TC), 1 Washington Circle Ste. 6, Joint Base San Antonio-
  Randolph, TX 79150
1 – Maj John M. Malek (TC), 1 Washington Circle Ste. 6, Joint Base San Antonio-
  Randolph, TX 79150
1 – Mr. Lance Wood (DC), 177 N. Church Ave., #1100 Tucson, AZ 85701
1 – Capt J. Dillon Emmanuel (DC), 702 8th St., Bldg. 604, Whiteman AFB, MO 65305
1 – Capt Megan Teeple (SVC), 205 S. Davis St., Bldg. 246, JB-Charleston, SC 29404
1 – 2d Lt E.P. (VIC)
1 – Ms. T.W. (VIC)
1 – AFPAA/CC, 555 E Street East, Bldg. T-581, JBSA-Randolph, TX 78150
1 – 502 SFG/SJA, 1 Washington Circle Ste. 6, Joint Base San Antonio-
  Randolph, TX 79150
1 – 502 ABW/SJA, 2080 Wilson Way, Fort Sam Houston, TX 78234
1 – 802 FSS/DPMPE, 1561 Stewart St, Ste 1, Joint Base San Antonio-Lackland, TX 78236
1 – 502 CPTS FMFPM, 1561 Stewart St, Ste 1, Joint Base San Antonio-Lackland, TX 78236
1 – AFOSI, Det 404 OL-A, 5 Washington Cir., Joint Base San Antonio-
  Randolph, TX 79150
1 – AFOSI/XIW, 27130 Telegraph Rd, Quantico, VA 22314
1 – 902 SF/CC, 925 3rd St W., Joint Base San Antonio-Randolph, TX 78150
1 – 902 SF/S2I, 925 3rd St W., Joint Base San Antonio-Randolph, TX 78150
1 – 902 SFS/S5, 925 3rd St W., Joint Base San Antonio-Randolph, TX 78150
*1 – HQ AFSFC/SFC, 1517 Billy Mitchell Blvd., Bldg. 954, JBSA-Lackland, TX 78236

Page 3 of 4

STATEMENT OF TRIAL RESULTS IN THE CASE OF *United States v. SMSgt Jeremy M. Zier*

1 – AF Trial Judiciary, Clerk of Court, 1500 W. Perimeter Road, Ste 1150, Joint Base Andrews NAF, Washington MD 20762

*1 – AFLOA/JAJM, 1500 W. Perimeter Road, Ste 1130, Joint Base Andrews NAF, Washington MD 20762

*Recipients of unexpurgated Statement of Trial Results.

**Page 4 of 4**

**CHARGE SHEET**

| I. PERSONAL DATA | | | | |
|---|---|---|---|---|
| 1. NAME OF ACCUSED *(Last, First, MI)* ZIER, JEREMY M. | [491810] | 2. SSN | 3. GRADE OR RANK SMSgt | 4. PAY GRADE E-8 |

| 5 UNIT OR ORGANIZATION | 6. CURRENT SERVICE | |
|---|---|---|
| Air Force Public Affairs Agency (AETC) Joint Base San Antonio - Randolph, TX 78150 | a. INITIAL DATE 30 Jun 2017 | b. TERM 4 |

| 7. PAY PER MONTH | | | 8. NATURE OF RESTRAINT OF ACCUSED | 9. DATE(S) IMPOSED |
|---|---|---|---|---|
| a. BASIC | b. SEA/FOREIGN DUTY | c. TOTAL | NONE | |
| $5,787.90 | $0.00 | $5,787.90 | | |

**II. CHARGES AND SPECIFICATIONS**

10.
CHARGE I:  Violation of the UCMJ, Article 92

Specification: In that SENIOR MASTER SERGEANT JEREMY M. ZIER, Air Force Public Affairs Agency, Joint Base San Antonio - Randolph, Texas, who knew of his duties at or near Pamukkale, Republic of Turkey, between on or about 1 April 2015 and on or about 30 April 2015, was derelict in the performance of those duties in that he willfully failed to maintain professional relationships with subordinate Airmen, as it was his duty to do, by wrongfully removing his clothing, such that he was completely nude, while he was in a hot tub with several Airmen who were junior in rank to him.

CHARGE II:  Violation of the UCMJ, Article 120

Specification 1: In that SENIOR MASTER SERGEANT JEREMY M. ZIER, Air Force Public Affairs Agency, Joint Base San Antonio - Randolph, Texas, did, at or near Pamukkale, Republic of Turkey, between on or about 1 April 2015 and on or about 30 April 2015, touch directly the genitalia and inner thigh of C          F          , by causing bodily harm to her, to wit: touching, directly her genitalia and inner thigh, with an intent to gratify his sexual desire, without her consent.

**III. PREFERRAL**

| 11a. NAME OF ACCUSER *(Last, First, MI)* VICIAN, TODD M. | b. GRADE Colonel | c. ORGANIZATION OF ACCUSER Air Force Public Affairs Agency |
|---|---|---|
| d. SIGNATURE OF ACCUSER | | e. DATE 24 March 2020 |

AFFIDAVIT:  Before me, the undersigned, authorized by law to administer oath in cases of this character, personally appeared the above named accuser this 24 day of March, 2020, and signed the foregoing charges and specifications under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she either has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

| EDWARD S. COLEMAN | 502d Security Forces Group |
|---|---|
| *Typed Name of Officer* | *Organization of Officer* |
| Captain | Assistant Staff Judge Advocate |
| *Grade* | *Official Capacity to Administer Oath (See R.C.M. 307(b)(1) - must be commissioned officer)* |
| | |
| *Signature* | |

**DD FORM 458, MAY 2000**          PREVIOUS EDITION IS OBSOLETE          **PAGE 1**

12.

On _24 March_____ , 20 _20_ , the accused was informed of the charges against him/her and of the name(s) of the accuser(s) known to me *(See R.C.M. 308(a)).  (See R.C.M. 308 if notification cannot be made.)*

| TODD M. VICIAN | Air Force Public Affairs Agency |
|---|---|
| *Type Name of Immediate Commander* | *Organization of Immediate Commander* |
| Colonel | |

_____
*Signature*

---

**IV. RECEIPT BY SUMMARY COURT MARTIAL CONVENING AUTHORITY**

13.

The sworn charges were received at _1256_ hours, _24 March_____ , 20 _20_ , at _502d Security Forces Group_

_JBSA-Randolph, Texas 78150_                                          FOR THE 1        Commander
*Officer Exercising Summary Court-Martial Jurisdiction (See R.C.M. 403)*

| BENJAMIN F. MARTIN | Staff Judge Advocate |
|---|---|
| *Type Name of Officer* | *Official Capacity of Officer Signing* |
| Lieutenant Colonel | |

_____
*Signature*

---

**V. REFERRAL, SERVICE OF CHARGES**

| 14a. DESIGNATION OF COMMAND OF CONVENING AUTHORITY | b. PLACE | c. DATE |
|---|---|---|
| 502d Security Forces Group (AETC) | JBSA-Randolph, Texas | 25 March 2020 |

Referred for trial to the _special_____ court-martial board convened by _Special Order AB-1_

_dated_____ , _25 March_____ 20 _20_ subject to the following instructions: [2]  _none_

XX  FOR THE COMMANDER  XX
*Command or Order*

| BENJAMIN F. MARTIN | Staff Judge Advocate |
|---|---|
| *Typed Name of Officer* | *Official Capacity of Officer Signing* |
| Lieutenant Colonel | |

_____
*Signature*

---

15.

On _27 March_____ , 20 _20_ , I (caused to be) served a copy hereof on XXXXXXX the above named accused.

| EDWARD S. COLEMAN | Captain |
|---|---|
| | *Grade or Rank of Trial Counsel* |

_____
*Signature*

---

*FOOTNOTES: 1 - When an appropriate commander signs personally, inapplicable words are stricken.*
*2 - See R.C.M. 601(e) concerning instructions, if none, so state.*

**DD FORM 458 (BACK), MAY 2000**                ZIER 491810                **PAGE 2**

## CHARGE SHEET
*(Continuation)*

### CHARGES AND SPECIFICATIONS

Specification 2: In that SENIOR MASTER SERGEANT JEREMY M. ZIER, Air Force Public Affairs Agency, Joint Base San Antonio - Randolph, Texas, did, at or near, Charleston, South Carolina, on or about 7 December 2019, touch the buttocks of E    P    with his hand, with an intent to gratify his sexual desire, without her consent.

Specification 3: In that SENIOR MASTER SERGEANT JEREMY M. ZIER, Air Force Public Affairs Agency, Joint Base San Antonio - Randolph, Texas, did at or near San Antonio, Texas, on or about 13 December 2019, touch the buttocks of T    W    with his hand, with an intent to gratify his sexual desire, without her consent.

| 1. NAME OF ACCUSED *(Last, First, MI)* | 2. SSN |
|---|---|
| ZIER, JEREMY M. | |

**DD Form 458 Continuation (EG)**

**PAGE 3**

Special Order AB-2 dated 3 January 2019, was the last Special Order of this headquarters published in Fiscal Year 19

<div align="center">

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS, 502D SECURITY FORCES GROUP (AETC)**
**JOINT BASE SAN ANTONIO-RANDOLPH, TEXAS 78150**

</div>

SPECIAL ORDER                                         25 March 2020
AB-1

Pursuant to authority contained in Special Order G-20-001, Department of the Air Force, dated 5 December 2019, a special court-martial is hereby convened. It may proceed at Joint Base San Antonio-Randolph, Texas, to try such persons as may be properly brought before it. The court will be constituted as follows:

MEMBERS

| | | | |
|---|---|---|---|
| **COLONEL ANDREW C. LATTIMORE | AETC | AETC | THIS STATION |
| **COLONEL NICOLE H. FRANCIS | AFPC | HAF | THIS STATION |
| **LIEUTENANT COLONEL VIRGINIA S. WALKER | 99 FTS | AETC | THIS STATION |
| **MAJOR CASSANDRA H. RICHARDSON | AFPC | HAF | THIS STATION |
| **CAPTAIN JEFFERY A. RUEBEN | AFRS | AETC | THIS STATION |
| **CAPTAIN JENNIFER L. GUION | AFRS | AETC | THIS STATION |
| **SECOND LIEUTENANT NORMA GHANEM | AFMAA | HAF | THIS STATION |
| **SECOND LIEUTENANT HAI Y. RICKE | AFMAA | HAF | THIS STATION |
| **CHIEF MASTER SERGEANT JAMIE SANTIAGO | AFPC | HAF | THIS STATION |
| **CHIEF MASTER SERGEANT CLINTON L. WILKERSON | AFPC | HAF | THIS STATION |
| **CHIEF MASTER SERGEANT HARLEY DAVIS | AFPC | HAF | THIS STATION |
| **CHIEF MASTER SERGEANT DAVID P. ARNETT | AETC | AETC | THIS STATION |

**With concurrence of the commander concerned.

The military judge is authorized to impanel alternate members only if, after the exercise of challenges for cause, excess members remain.

JEFFREY F. CARTER, Colonel, USAF
Commander

FOR THE COMMANDER

BENJAMIN F. MARTIN, Lt Col, USAF
Staff Judge Advocate

DISTRIBUTION
- 1 – Each Individual
- 1 – Each Organization
- 1 – Central Docketing Office
- 1 – 502 SFG/JA

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS, 502D SECURITY FORCES GROUP (AETC)**
**JOINT BASE SAN ANTONIO-RANDOLPH, TEXAS 78150**

SPECIAL ORDER                                                31 July 2020
AB-2

The following members are detailed to the special court-martial convened by Special Order AB-1, this
headquarters, dated 25 March 2020, vice MAJOR CASSANDRA H. RICHARDSON, AND SECOND
LIEUTENANT NORMA GHANEM, relieved.

**LIEUTENANT COLONEL SAMMUEL C. BERENGUER    560 FTS    AETC    THIS STATION
**1ST LIEUTENANT KATELYN C. KOHN            AFPC       AFPC    THIS STATION

**With concurrence of the commander concerned.


                                        JAMES H. MASONER, Colonel, USAF
                                        Commander, 502d Security Forces Group

FOR THE COMMANDER



BENJAMIN F. MARTIN, Lt Col, USAF        DISTRIBUTION
Staff Judge Advocate                    - 1 – Each Individual
                                        - 1 – Each Organization
                                        - 1 – Central Docketing Office
                                        - 1 – 502 SFG/JA



**DEPARTMENT OF THE AIR FORCE**
AIR FORCE LEⷢAL OPERATIONS AⷢENCⷤ (AFLOA)
WHITEMAN AIR FORCE BASE, MISSOURI

26 June 2020

MEMORANDUM FOR  MILITARY JUDGE
                TRIAL COUNSEL

FROM:  AFLOA/ADC (Capt Jamesian D. Emmanuel)

SUBJECT:  Notice of Pleas and Forum – *United States v. SMSgt Jeremy M. Zier*

1.  At this time, SMSgt Zier intends to plead as follows:

    a.  To the Charges and Specifications:  Not Guilty.

2.  SMSgt Zier elects to be tried by a panel consisting of officer members.

3.  If SMSgt Zier elects to change the forum prior to trial, the Defense will notify the Court and the Government.


*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel

**<u>Certificate of Service</u>**

I hereby certify that I sent a copy of this Notice of Pleas and Forum to the Military Judge and Trial Counsel on 26 June 2020 via email.

*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel

# EXHIBITS

# EXHIBIT INDEX

### *United States v. SENIOR MASTER SERGEANT JEREMY M. ZIER*

Air Force Public Affairs Agency (AETC)

Held
10-14 August 2020

at
Joint Base San Antonio-Randolph, Texas

## PROSECUTION EXHIBITS

| Exhibit Number | Prosecution Exhibit Description | Page Offered | Page Admitted | Page Rejected |
|---|---|---|---|---|
| 1 | One Page Photograph of Four Females, undated | 28 | 28 | -- |
| 2 | Uber Receipt, 7 December 19, 1 page | 28 | 28 | -- |
| 3 | One Page Photograph of Hotel and Springs, undated | 28 | 28 | -- |
| 4 | One Page Photograph of Hot Tub, undated | 28 | 28 | -- |
| 5 | One Page Photograph of Hotel Room, undated | 28 | 28 | -- |
| 6 | Personal Data Sheet, 10 August 2020, 1 page | 145 | 145 | -- |
| 7 | EPRs, various dates, 44 pages | 145 | 145 | -- |

## DEFENSE EXHIBITS

| Exhibit Letter | Defense Exhibit Description | Page Offered | Page Admitted | Page Rejected |
|---|---|---|---|---|
| A | A Photograph of Two Individuals, 1 page, undated | 28 | 28 | -- |
| B | Photograph of a Woman Holding a Child, 1 page, undated | 28 | 28 | -- |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| | | | | |
|---|---|---|---|---|
| C | Photograph of Three Individuals, 1 page | 28 | 28 | -- |
| D | Index, 5 pages | 146 | 146 | -- |
| E | SMSgt Zier's Personal Statement, 6 pages | 146 | 146 | -- |
| F | Character Letter from Ofc Shawn Weismiller, 6 July 2020, 1 page | 146 | 146 | -- |
| G | Character Letter from David Clark, 29 June 2020, 2 pages | 146 | 146 | -- |
| H | Character Letter from Douglas Lefforge, 17 June 2020, 2 pages | 146 | 146 | -- |
| I | Character Letter from Jeremy Webster, 6 July 2020, 1 page | 146 | 146 | -- |
| J | Character Letter from Renee Tyron, 30 June 2020, 2 pages | 146 | 146 | -- |
| K | Character Letter from Stephen Faulisi, 16 June 2020, 2 pages | 146 | 146 | -- |
| L | Character Letter from Timothy Bailey, 29 June 2020, 2 pages | 146 | 146 | -- |
| M | Character Letter from Bradley Gildea, 21 June 2020, 1 page | 146 | 146 | -- |
| N | Character Letter from Lawrence Cox, 21 July 2020, 2 pages | 146 | 146 | -- |
| O | Character Letter from Christopher Moore, 21 July 2020, 1 page | 146 | 146 | -- |
| P | Character Letter from David Steele, 23 July 2020, 1 page | 146 | 146 | -- |
| Q | Character Letter from Auburn Braithwaite, 1 July 2020, 2 pages | 146 | 146 | -- |
| R | Character Letter from James Lotz, 22 July 2020, 1 page | 146 | 146 | -- |
| S | Character Letter from Lt Col Johnston, 30 June 2020, 2 pages | 146 | 146 | -- |
| T | Character Letter from Major Anderson, 24 July 2020, 2 pages | 146 | 146 | -- |
| U | Character Letter from Capt Morales, 29 June 2020, 2 pages | 146 | 146 | -- |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| | | | | |
|---|---|---|---|---|
| V | Character Letter from Capt Pardini, 26 June 2020, 1 page | 146 | 146 | -- |
| W | Character Letter from CMSgt Victor, 23 July 2020, 1 page | 146 | 146 | -- |
| X | Character Letter from CMSgt David, 24 June 2020, 1 page | 146 | 146 | -- |
| Y | Character Letter from CMSgt Suddeth, 29 June 2020, 2 pages | 146 | 146 | -- |
| Z | Character Letter from SMSgt Martin, 22 June 2020, 2 pages | 146 | 146 | -- |
| AA | Character Letter from MSgt Kin, 27 June 2020, 2 pages | 146 | 146 | -- |
| BB | Character Letter from MSgt Dickens, 28 June 2020, 2 pages | 146 | 146 | -- |
| CC | Character Letter from MSgt Robertson, 25 June 2020, 2 pages | 146 | 146 | -- |
| DD | Character Letter from MSgt M. Dickens, 25 June 2020, 1 page | 146 | 146 | -- |
| EE | Family and Military Photographs, undated, 7 pages | 146 | 146 | -- |
| FF | Bronze Star Medal, 3 Dec 2007 | 146 | 146 | -- |
| GG | Air Force Achievement Medal, 1 June 2000, 1 page | 146 | 146 | -- |
| HH | Air Force Achievement Medal, 31 Jan 2001, 1 page | 146 | 146 | -- |
| II | Air Force Achievement Medal, 30 March 2001, 1 page | 146 | 146 | -- |
| JJ | Air Force Achievement Medal, 27 March 2020, 1 page | 146 | 146 | -- |
| KK | Air Force Achievement Medal, 14 July 2020, 1 page | 146 | 146 | -- |
| LL | Air Force Commendation Medal, 20 April 2002, 1 page | 146 | 146 | -- |
| MM | Air Force Commendation Medal, 2 July 2010, 1 page | 146 | 146 | -- |
| NN | Air Force Commendation Medal, 14 November 2011, 1 page | 146 | 146 | -- |

FOR OFFICIAL USE ONLY

ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| | | | | |
|---|---|---|---|---|
| OO | Air Force Commendation Medal, 13 August 2019, 1 page | 146 | 146 | -- |
| PP | Meritorious Service Medal, 19 July 2013, 1 page | 146 | 146 | -- |
| QQ | Meritorious Service Medal, 5 October 2017, 1 page | 146 | 146 | -- |
| RR | Meritorious Service Medal, 25 May 2018, 1 page | 146 | 146 | -- |
| SS | Joint Service Achievement Medal, 22 May 2003, 1 page | 146 | 146 | -- |
| TT | Joint Service Achievement Medal, 1 February 2005, 1 page | 146 | 146 | -- |
| UU | Joint Service Commendation Medal, 1 July 2005, 1 page | 146 | 146 | -- |
| VV | Defense Meritorious Service Medal, 22 July 2015, 1 page | 146 | 146 | -- |
| WW | Letter of Appreciation from Col Ward, undated, 1 page | 146 | 146 | -- |
| XX | Letter of Appreciation from CMSgt Johnson, 7 August 1998, 1 page | 146 | 146 | -- |
| YY | Letter of Appreciation from Brig Gen Soligan, 1 March 1999, 1 page | 146 | 146 | -- |
| ZZ | Letter of Appreciation from Brig Gen Soligan, 1 March 1999, 1 page | 146 | 146 | -- |
| AAA | Letter of Appreciation from Brig Gen Soligan, 19 March 1999, 1 page | 146 | 146 | -- |
| BBB | Letter of Appreciation from Brig Gen Soligan, 9 June 1999, 1 page | 146 | 146 | -- |
| CCC | Letter of Appreciation from Brig Gen Diehl, 12 July 2000, 1 page | 146 | 146 | -- |
| DDD | Letter of Appreciation from Brig Gen Diehl, 7 September 2000, 1 page | 146 | 146 | -- |
| EEE | Letter of Appreciation from Gen Robertson, 16 March 2001, 1 page | 146 | 146 | -- |
| FFF | Letter of Appreciation from Maj Gen Williams, 1 April 2001, 1 page | 146 | 146 | -- |
| GGG | Letter of Appreciation from Maj Gen Williams, 18 April 2001, 1 page | 146 | 146 | -- |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| HHH | Letter of Appreciation from CMSgt Holbeck, 14 May 2001, 1 page | 146 | 146 | -- |
|-----|----------------------------------------------------------------|-----|-----|-----|
| III | Letter of Appreciation from Gen Robertson, 15 May 2001, 1 page | 146 | 146 | -- |
| JJJ | Letter of Appreciation from Brig Gen Diehl, 18 April 2001, 1 page | 146 | 146 | -- |
| KKK | Letter from Col Lord, 5 June 2001, 1 page | 146 | 146 | -- |
| LLL | Letter from Brig Gen Diehl, 17 July 2001, 1 page | 146 | 146 | -- |
| MMM | Letter from Brig Gen Diehl, 28 July 2001, 1 page | 146 | 146 | -- |
| NNN | Letter of Appreciation from Maj Gen (Sel) Hodges, 11 July 2002, 1 page | 146 | 146 | -- |
| OOO | Letter of Appreciation from Sgt Major Tilley, 26 February 2003, 1 page | 146 | 146 | -- |
| PPP | Letter of Appreciation from Brig Gen Sealock, 12 May 2003, 1 page | 146 | 146 | -- |
| QQQ | Letter of Appreciation, 3 June 2003, 1 page | 146 | 146 | -- |
| RRR | Letter of Appreciation, 16 October 2003 and 23 October 2004, 1 page | 146 | 146 | -- |
| SSS | Letter from Col Woodward, 16 May 2005, 1 page | 146 | 146 | -- |
| TTT | Letter of Appreciation from Maj Gen Wurster, 18 May 2005, 1 page | 146 | 146 | -- |
| UUU | Letter of Appreciation from Brig Gen Flynn, 2 June 2005, 1 page | 146 | 146 | -- |
| VVV | Letter of Appreciation from Maj Gen Parker, undated, 1 page | 146 | 146 | -- |
| WWW | Recognition for Being on the Deans List, undated, 1 page | 146 | 146 | -- |
| XXX | Letter of Appreciation from Gen Rice, 20 April 2011, 1 page | 146 | 146 | -- |
| YYY | Letter of Appreciation from Lt English, 11 June 1998, 1 page | 146 | 146 | -- |
| ZZZ | Letter of Appreciation from Col Conroy, 9 October 1998, 1 page | 146 | 146 | -- |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| | | | | |
|---|---|---|---|---|
| AAAA | Recommendation for Air Force Achievement Medal, undated, 1 page | 146 | 146 | -- |
| BBBB | Letter of Appreciation from Rhea Law, 24 February 1999, 2 pages | 146 | 146 | -- |
| CCCC | Letter of Appreciation from Lt Col Cash, 15 March 1999, 1 page | 146 | 146 | -- |
| DDDD | Congratulations Letter from Col Diehl, undated, 1 page | 146 | 146 | -- |
| EEEE | Letter of Appreciation from SMSgt Stewart, 17 March 2000, 1 page | 146 | 146 | -- |
| FFFF | Letter of Recommendation from Col Isaac, 4 November 2000, 1 page | 146 | 146 | -- |
| GGGG | Letter of Appreciation from Col Ward, 13 October 2000, 1 page | 146 | 146 | -- |
| HHHH | Letter of Appreciation from Lt Col Volavcheck, undated, 1 page | 146 | 146 | -- |
| IIII | Letter of Appreciation from Col McCoy, 26 March 2001, 1 page | 146 | 146 | -- |
| JJJJ | Letter of Appreciation from Brig Gen Diehl, 24 May 2001, 1 page | 146 | 146 | -- |
| KKKK | Letter of Appreciation from Laura Simpson, 20 June 2001, 1 page | 146 | 146 | -- |
| LLLL | Letter of Appreciation from Col Worthing, 4 September 2002, 1 page | 146 | 146 | -- |
| MMMM | Letter of Appreciation from Maj Gen (Sel) Hodges, 25 September 2002, 1 page | 146 | 146 | -- |
| NNNN | Letter of Appreciation from Major Skinner, 18 November 2002, 1 page | 146 | 146 | -- |
| OOOO | Letter of Appreciation from Maj Gen (Sel) Hodges, 18 December 2002, 1 page | 146 | 146 | -- |
| PPPP | Letter of Appreciation from Hap Luz, 3 June 2003, 1 page | 146 | 146 | -- |
| QQQQ | Letter of Appreciation from Cheryl Tyo, 20 November 2003, 1 page | 146 | 146 | -- |
| RRRR | Letter of Appreciation from Leo Smith, 28 June 2004, 1 page | 146 | 146 | -- |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| SSSS | Letter of Appreciation from Justin Gates, 13 May 2005, 1 page | 146 | 146 | -- |
|------|---------------------------------------------------------------|-----|-----|-----|
| TTTT | Letter of Appreciation from Gwen Parmley, 24 August 2006, 1 page | 146 | 146 | -- |
| UUUU | Letter of Appreciation from Elena Furnari, 11 September 2006, 1 page | 146 | 146 | -- |
| VVVV | Letter of Appreciation, 15 August 2006, 1 page | 146 | 146 | -- |
| WWWW | Letter of Appreciation, 7 October 2006, 1 page | 146 | 146 | -- |
| XXXX | Letter of Appreciation from Maj McKee, October  2006, 1 page | 146 | 146 | -- |
| YYYY | Letter of Appreciation, 17 November 2006, 1 page | 146 | 146 | -- |
| ZZZZ | Letter of Appreciation from TSgt Murphy, 14 January 2008, 1 page | 146 | 146 | -- |
| AAAAA | Letter of Appreciation from Lt Col Karns, 12 September 12, 1 page | 146 | 146 | -- |
| BBBBB | 81 TRW Certificate for Outstanding Leadership and Dedication, 1 page | 146 | 146 | -- |
| CCCCC | Certificate for Support Flight Performer of the Month, July 1999, 1 page | 146 | 146 | -- |
| DDDDD | Certificate of Appreciation for Support at the Airfest, 1999, 1 page | 146 | 146 | -- |
| EEEEE | Certificate of Appreciation for Support to Partnership in Education, 1998-1999, 1 page | 146 | 146 | -- |
| FFFFF | Certificate of Commendation in Support to AF Sergeants Association, 2000, 1 page | 146 | 146 | -- |
| GGGGG | Certificate of Appreciation, 20 July 2000, 1 page | 146 | 146 | -- |
| HHHHH | Certificate of Achievement as Performer of the Month, October 2000, 1 page | 146 | 146 | -- |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| | | | | |
|---|---|---|---|---|
| IIIII | Certificate of Appreciation for Support to the Hops Marathon, 10 December 2000, 1 page | 146 | 146 | -- |
| JJJJJ | Certificate of Appreciation for Support the Special Olympics, January 2001, 1 page | 146 | 146 | -- |
| KKKKK | Certificate of Appreciation for Support to Super Bowl XXXV, 24 January 2001, 1 page | 146 | 146 | -- |
| LLLLL | Certificate of Appreciation from Brig Gen Diehl, 15 February 2001, 1 page | 146 | 146 | -- |
| MMMMM | Certificate of Appreciation from SSgt Woodruff. Undated, 1 page | 146 | 146 | -- |
| NNNNN | Certificate of Appreciation from Maj Hartford, 15 May 2002, 1 page | 146 | 146 | -- |
| OOOOO | Award of Excellence from Lamar Hammer, 6 Sep 2002, 1 page | 146 | 146 | -- |
| PPPPP | Certificate of Appreciation from Gen Holland, 9 June 2003, 1 page | 146 | 146 | -- |
| QQQQQ | Certificate of Appreciation from Gen Brown, 1 June 2004, 1 page | 146 | 146 | -- |
| RRRRR | Meritorious Service Certificate in Support of Combat Operations, 2007 | 146 | 146 | -- |
| SSSSS | Certificate of Recognition from Gen Lichte, 10 August 2008, 1 page | 146 | 146 | -- |
| TTTTT | Certificate of Appreciation from Lt Col Dollesin, September 2009, 1 page | 146 | 146 | -- |
| UUUUU | Air Force Combat Action Medal, 23 October 2009, 1 page | 146 | 146 | -- |
| VVVVV | Certificate of Recognition from CMSgt McVicar, 15 Dec 2009, 1 pg | 146 | 146 | -- |
| WWWWW | Certificate of Appreciation for Emerald Warrior, 2011, 1 page | 146 | 146 | -- |
| XXXXX | Certificate for AVA Awards Gold Winner, 2011, 1 page | 146 | 146 | -- |
| YYYYY | Certificate for Promotion to Chief Master Sergeant, undated, 1 page | 146 | 146 | -- |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| | | | | |
|---|---|---|---|---|
| ZZZZZ | Certificate of Training for AFJROTC 2 Year Program, 5 August 1997, 1 pg | 146 | 146 | -- |
| AAAAAA | Video Production/Documentation Course Diploma, 25 June 1998, 1 pg | 146 | 146 | -- |
| BBBBBB | Certificate of Completion for Intro to Media Composer Editing, 29 Sep 99 | 146 | 146 | -- |
| CCCCCC | Certificate of Completion for Intro to Media Composer Effects, 9 Jun 2000 | 146 | 146 | -- |
| DDDDDD | Certificate of Completion for Advanced Techniques for Media Composer. 13 Jun 00, 1 page | 146 | 146 | -- |
| EEEEE | MacDill AFB Honor Guard Certificate of Training, undated, 1 page | 146 | 146 | -- |
| FFFFFF | Certificate of Training for Block III Equipment Custodian Training, 5 January 2001, 1 page | 146 | 146 | -- |
| GGGGGG | Electronic Imaging Course Diploma, 12 June 2001, 1 page | 146 | 146 | -- |
| HHHHHH | Certificate of Training for Visual Information Craftsmen Course, 14 Nov 02, 1 page | 146 | 146 | -- |
| IIIIII | Certificate of Completion for Advanced Media Composer Effects, 10 November 2004, 1 page | 146 | 146 | -- |
| JJJJJJ | Syracuse University Certificate of Completion for Military Motion Media, 8 Aug 05 - 11 May 06, 1 pg | 146 | 146 | -- |
| KKKKKK | Certificate of Achievement for Patrol Rifle Instructor Training, 2-4 Oct 06, 1 pg | 146 | 146 | -- |
| LLLLLL | Certificate of Training for Combat Lifesaver Course, 18-21 Mar 07, 1 pg | 146 | 146 | -- |
| MMMMMM | Certificate of Training for Ml 14 Up-Armored HMMWV, I Mar 07, 1 page | 146 | 146 | -- |
| NNNNNN | Certificate of Training for Emergency Parachute Training, 22 Jan 2008, 1 pg | 146 | 146 | -- |
| OOOOOO | Certificate of Training for Combat Skills Training, 22 Feb-22 Mar 07 | 146 | 146 | -- |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| | | | | |
|---|---|---|---|---|
| PPPPPP | Certificate of Training for Combat Survival Training Course, 8 Feb 2008, 1 pg | 146 | 146 | -- |
| QQQQQQ | Certificate of Training for Water Survival Training Course, 14 Feb 2008, 1 pg | 146 | 146 | -- |
| RRRRRR | Certificate of Training for USAF Public Affairs/Multimedia Leadership Course, 21 Mar 2008, 1 page | 146 | 146 | -- |
| SSSSSS | Certificate of Training for Combat Lifesaver Course, 28 Sep - 1 Oct 08, 1 page | 146 | 146 | -- |
| TTTTTT | Certificate of Training for Combat Skills Training, 20 Sep-17 Oct 08, 1 page | 146 | 146 | -- |
| UUUUUU | Certificate of Training for Remote Weapon Systems, 14-15 Dec 08, 1 page | 146 | 146 | -- |
| VVVVVV | Certificate of Completion for NCOA, 17 Dec 2009, 1 page | 146 | 146 | -- |
| WWWWWW | Certificate of Training for Combat Camera Leadership Course, 14 Jan 11, 1 page | 146 | 146 | -- |
| XXXXXX | Certificate of Completion for Location Lighting Workshop, 3-9 Jul 11, 1 page | 146 | 146 | -- |
| YYYYYY | Certificate of Completion for Air Force Public Affairs Management Workshop, 12 - 16 Sep 11, 1 page | 146 | 146 | -- |
| ZZZZZZ | Certificate of Completion for Military Newsvideo Workshop, undated, 1 pg | 146 | 146 | -- |
| AAAAAAA | Certificate of Completion for USAF Senior Noncommissioned Officer Distance Learning Course, 17 Jan 12 | 146 | 146 | -- |
| BBBBBBB | Certificate of Completion for Senior Enlisted Professional Military Education Course, 8 Mar 12, 1 page | 146 | 146 | -- |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| | | | | |
|---|---|---|---|---|
| CCCCCCC | Certificate of Training for Visual Information Management, 15 Aug 12, 1 page | 146 | 146 | -- |
| DDDDDDD | Certificate of Training for Joint Contingency Public Affairs Course, 21 July 2017, 1 page | 146 | 146 | -- |
| EEEEEEE | CCAF Diploma for Associates in Applied Science, Audiovisual Production Services, 20 Aug 03, 1 pg | 146 | 146 | -- |
| FFFFFFF | Hillsborough Community College Associate in Arts Diploma, 10 May 04, 1 page | 146 | 146 | -- |
| GGGGGGG | Ashford University Diploma, Bachelor of Arts, Journalism and Mass Communication, 28 Jul 14, 1 pg | 146 | 146 | -- |
| HHHHHHH | Newspaper photo of SMSgt Zier as the youngest member of the mess, undated, 1 page | 146 | 146 | -- |
| IIIIIII | Newspaper Photo of SMSgt Zier volunteering and Newspaper Clipping Recognizing SMSgt Zier for Military Citizen of the Year Awards Banquet, undated, 1 page | 146 | 146 | -- |
| JJJJJJJ | Newspaper Clipping of SMSgt Zier being Recognized as Diamond Sharp, undated, 1 page | 146 | 146 | -- |
| KKKKKKK | 6 CS Commander's Award, Dec 2000 | 146 | 146 | -- |
| LLLLLLL | 6 CS Airman of the Year Award, 1999 | 146 | 146 | -- |
| MMMMMMM | 6 CS Airman of the Year Award, 2000 | 146 | 146 | -- |
| NNNNNNN | 6 AR W Airman of the Year Award, 2000, 1 page | 146 | 146 | -- |
| OOOOOOO | Airman Leadership School John L. Levitow Award, undated, 1 page | 146 | 146 | -- |
| PPPPPPP | MacDill AFB Honor Guard Appreciation Award, Feb 00-May 02, 1 page | 146 | 146 | -- |
| QQQQQQQ | AFSA Certificate of Commendation, 19 May 2001, 1 page | 146 | 146 | -- |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| | | | | |
|---|---|---|---|---|
| RRRRRRR | Headquarters AFPAA NCO of the Year Award, 2011, 1 page | 146 | 146 | -- |
| SSSSSSS | Incirlik First Sergeants Counsel Appreciation Plaque, Dec 14 - May 15, 1 page | 146 | 146 | -- |
| TTTTTTT | AFN Europe Senior NCO of the Year Certificate, 2014, 1 page | 146 | 146 | -- |
| UUUUUUU | SAF/PA Appreciation Plaque, 24 Jul 15-15 Sep 17, 1 page | 146 | 146 | -- |
| VVVVVVV | HQ SNCO ofthe Year Award, 2018 | 146 | 146 | -- |
| WWWWWWW | SNCO of the Year Award, 2018 | 146 | 146 | -- |
| XXXXXXX | SNCO Captain Lance P. Sijan Leadership Award, 2019, 1 page | 146 | 146 | -- |
| YYYYYYY | Coins, undated, 11 pages | 146 | 146 | -- |

## APPELLATE EXHIBITS

| Exhibit Number | Exhibit Description | Marked Page |
|---|---|---|
| I | Defense Motion for Appropriate Relief to Compel a Confidential Expert in Forensic Psychology, 18 May 20, 20 pgs | 8 |
| II | Government Response to Defense Motion for Appropriate Relief to Compel a Confidential Expert in Forensic Psychology, 22 May 20, 13 pages | 8 |
| III | Ruling - Defense Motion for Appropriate Relief to Compel a Confidential Expert in Forensic Psychology, dated 4 June 2020, 5 pages | 8 |
| IV | Defense Objection and Motion in Limine MRE 404 Evidence, 12 June 20, 8 pages | 8 |
| V | Government Response to Defense Objection and Motion in Limine MRE 404(b) Evidence | 8 |
| VI | Military Judge's Ruling on Defense Motion in Limine - 404(b), dated 10 August, 10 pages | 27 |
| VII | 502 SFG/CC Enlisted Court Members Excusal, 10 Aug 20, 1 pg | 16 |
| VIII | 502 SFG/CC Replacing Panel Members Memorandum, 5 August 2020, 1 page | 18 |
| IX | Flyer, undated, 1 page | 18 |
| X | Photograph of Lieutenant P____, undated, 1 page | 23 |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| XI | Court Member Generator, 10 August 2020, 2 pages | 25 |
|---|---|---|
| XII | Question from Lieutenant Colonel Berenguer, undated, 1 page | 44 |
| XIII | Question from Colonel Francis, undated, 1 page | 70 |
| XIV | Question from Lieutenant Colonel Berenguer, undated, 1 page | 73 |
| XV | A1C Siena Mackiewicz Handwritten Letter to MSgt Zier, 6 April 2015, 1 page | 82 |
| XVI | Question from Captain Rueben, undated, 1 page | 102 |
| XVII | Questionnaire from 2d Lt Ricke, undated, 1 page | 102 |
| XVIII | Findings Worksheet, undated, 2 pages | 124 |
| XIX | Burden of Proof Chart, undated, 1 page | 123 |
| XX | Member's Questionnaire, undated, 1 page | 136 |
| XXI | Sentence Worksheet, undated, 1 page | 162 |
| XXII | Sentencing Instructions, undated, 9 pages | 163 |
| XXIII | Post-Trial and Appellate Rights Advisement, 8 Aug 20, 11 pgs | 168 |

FOR OFFICIAL USE ONLY

ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

# PROSECUTION EXHIBITS



Government Ex __|__ for Identification Offered
Page 28 Accepted/Rejected Page 28



## Trip Details

**12/7/19, 10:33 PM**                                   **$72.99**
Nissan Rogue NKG180



**Receipt**

 **Your trip with Ryan**

**Need help with this trip?**

### Change star rating

I want to change my driver's rating.

**Edit rating**



Page 1 of 1          Government Ex _3_ for Identification Offered
                     Page _28_ Accepted/Rejected Page _28_



**Page 1 of 1**

Government Ex 4 for Identification Offered
Page 28 Accepted/Rejected Page 28



**PERSONAL DATA SHEET**

DATE PREPARED: 10 Aug 20

NAME OF ACCUSED: JEREMY M. ZIER

ORGANIZATION: Air Force Public Affairs Agency    Rank: Senior Master Sergeant

SSAN:                                              DATE OF RANK: 1 Oct 16

PAY GRADE: E-8                                     DATE OF BIRTH:

TOTAL ACTIVE FEDERAL MILITARY SERVICE             LENGTH OF SERVICE: 23 years
DATE: 6 Aug 97

AIR FORCE SPECIALTY CODE: Q3N090                  MILITARY TEST SCORES:
                                                  ADMIN: 71      ELECT: 85
                                                  GEN: 80        MECH: 73

BASIC PAY: $5,787.00                              HARDSHIP DUTY PAY: None

INITIAL DATE OF CURRENT SERVICE: 30 Jan 17        HOSTILE FIRE PAY: None

TERM OF CURRENT SERVICE: 4 years                  IMMINENT DANGER PAY: None

PRIOR SERVICE: None
                                                  SPECIAL PAY AND BONUSES: $240
OVERSEAS SERVICE (OCONUS): Ramstein, Germany (20 Sept 17 – 28 May 18)
                           Incirlik, Turkey (23 Jul 13 – 22 Jul 15)

COMBAT SERVICE: April 07 - 4 Oct 07 – Joint Special Operations Task Force - Iraq 2;
17 Nov 08 - 20 Mar 09 – Naval Special Warfare Task Unit - Ramadi

NATURE OF PRETRIAL RESTRAINT: None

MARITAL STATUS: Married                           NUMBER OF DEPENDENTS: 3

NUMBER OF PREVIOUS COURT-MARTIAL
CONVICTIONS: 0

NUMBER OF PREVIOUS ARTICLE 15 ACTIONS: 0

AWARDS AND DECORATIONS: Bronze Star Medal, Defense Meritorious Service Medal, Meritorious Service Medal with two bronze oak leaf clusters, Joint Service Commendation Medal, Air Force Commendation Medal with three bronze oak leaf clusters, Joint Service Achievement Medal with one bronze oak leaf cluster, Air Force Achievement Medal with four bronze oak leaf clusters, Air Force Combat Action Medal, Meritorious Unit Award, Air Force Outstanding Unit Award with 3 Bronze Oak leaf clusters, Air Force Organizational Excellence Award, Combat Readiness Medal, National Defense Service Medal, Iraq Campaign Medal with one bronze oak leaf cluster, Global War on Terrorism Expeditionary Medal, Global War on Terrorism Service Medal, Sea Service Deployment Ribbon, Nuclear Deterrence Operations Service Medal, Air Force Overseas Ribbon Short Tour, Air Expeditionary Service Ribbon with one bronze oak leaf cluster, Air Force Longevity

**Personal Data – Privacy Act of 1974 (5 U.S.C. 552a)**

Service Award with one silver oak leaf cluster, United States Air Force Noncommissioned Officer Professional Military Education Ribbon with two bronze oak leaf cluster, Air Force Training Ribbon.

APDS PROCESSED

## ENLISTED PERFORMANCE REPORT (AB thru TSGT)

**I. RATEE IDENTIFICATION DATA** *(Read AFI 36-2403 carefully before completing any item)*

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | A1C | 3V033 |

| 5. ORGANIZATION, COMMAND, AND LOCATION | 6a. PAS CODE | 6b. SRID |
|---|---|---|
| 6th Communications Squadron (AMC), MacDill AFB FL | MA1LFFLC | 1L1EF |

| 7. PERIOD OF REPORT | | 8. NO. DAYS SUPERVISION | 9. REASON FOR REPORT |
|---|---|---|---|
| From: 6 Aug 97 | Thru: 5 Apr 99 | 278 | Initial |

**II. JOB DESCRIPTION**

**1. DUTY TITLE**

VISUAL INFORMATION PRODUCTION APPRENTICE

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES**

Conducts quality control and schedules job assignments for the video section. Provides video support including Hi-8MM, 1/2 VHS/SVHS and 3/4 Umatic editing, and video teleconference services for 6th Air Refueling Wing (6 ARW), United States Central Command, United States Special Operations Command (USSOCOM), and tenant organizations assigned to MacDill AFB FL. Applies video concepts of editing, documentation, duplication, composition, story boarding, and lighting techniques to studio and location productions. Performs operational preventive maintenance inspections on video cameras and equipment. Facilitator for 6 ARW video teleconferencing system. Schedules and programs weekly broadcasting in support of the base Commander's Access Channel. Provides audio visual services in support of command-level presentations. **ADDITIONAL DUTY:** Flight Safety Representative.

**III. EVALUATION OF PERFORMANCE**

**1. HOW WELL DOES RATEE PERFORM ASSIGNED DUTIES?** *(Consider quality, quantity, and timeliness of duties performed)*

| ☐ Inefficient. An unprofessional performer. | ☐ Good performer. Performs routine duties satisfactorily. | ☐ Excellent performer. Consistently produces high quality work. | ☒ The exception. Absolutely superior in all areas. |
|---|---|---|---|

**2. HOW MUCH DOES RATEE KNOW ABOUT PRIMARY DUTIES?** *(Consider whether ratee has technical expertise and is able to apply the knowledge)*

| ☐ Does not have the basic knowledge necessary to perform duties. | ☐ Has adequate technical knowledge to satisfactorily perform duties. | ☐ Extensive knowledge of all primary duties and related positions. | ☒ Excels in knowledge of all related positions. Mastered all duties. |
|---|---|---|---|

**3. HOW WELL DOES RATEE COMPLY WITH STANDARDS?** *(Consider dress and appearance, weight and fitness, customs, and courtesies)*

| ☐ Fails to meet minimum standards. | ☐ Meets Air Force standards. | ☐ Sets the example for others to follow. | ☒ Exemplifies top military standards. |
|---|---|---|---|

**4. HOW IS RATEE'S CONDUCT ON/OFF DUTY?** *(Consider financial responsibility, respect for authority, support for organizational activities, and maintenance of government facilities)*

| ☐ Unacceptable. | ☐ Acceptable. | ☐ Sets the example for others. | ☒ Exemplifies the standard of conduct. |
|---|---|---|---|

**5. HOW WELL DOES RATEE SUPERVISE/LEAD?** *(Consider how well member sets and enforces standards, displays initiative and self-confidence, provides guidance and feedback, and fosters teamwork)*

| ☐ Ineffective. | ☐ Effective. Obtains satisfactory results. | ☐ Highly effective. | ☒ Exceptionally effective leader. |
|---|---|---|---|

**6. HOW WELL DOES RATEE COMPLY WITH INDIVIDUAL TRAINING REQUIREMENTS?** *(Consider upgrade training, professional military education, proficiency/qualification, and contingency)*

| ☐ Does not comply with minimum training requirements. | ☐ Complies with most training requirements. | ☐ Complies with all training requirements. | ☒ Consistently exceeds all training requirements. |
|---|---|---|---|

**7. HOW WELL DOES RATEE COMMUNICATE WITH OTHERS?** *(Consider ratee's verbal and written skills)*

| ☐ Unable to express thoughts clearly. Lacks organization. | ☐ Organizes and expresses thoughts satisfactorily. | ☐ Consistently able to organize and express ideas clearly and concisely. | ☒ Highly skilled writer and communicator. |
|---|---|---|---|

AF FORM 910, JUN 95 (EF-V2) (PerFORM PRO)    PREVIOUS EDITIONS ARE OBSOLETE.

"Certified True Copy," E-8, Christman, Zachary W.L10334627B ... First Sergeant, AFPAA, __ Apr 20

Digitally signed by CHRISTMAN.ZACHARY W.L10334627B

"Certified True Copy," E-8, Christman, Zachary CHRISTMAN.ZACH [Digitally signed] First Sergeant, AFPAA, __ Apr 20

## IV. PROMOTION RECOMMENDATION  *(Compare this ratee with others of the same grade and AFS)*

| RECOMMENDATION | NOT RECOMMENDED | NOT RECOMMENDED AT THIS TIME | CONSIDER | READY | IMMEDIATE PROMOTION |
|---|---|---|---|---|---|
| RATER'S RECOMMENDATION | 1 | 2 | 3 | 4 | ☒ |
| INDORSER'S RECOMMENDATION | 1 | 2 | 3 | 4 | ☒ |

## V. RATER'S COMMENTS

- Outstanding airman; responsible, mature, and motivated; exemplifies visual information (VI) professional
- Four-star supporter of unified commands; highly effective videographer and presentation technician
  -- Selected to document USSOCOM Commander, General Schoomaker's parachute jump--first-class job!
  -- Lead technician for Florida Chapter Civil Air Patrol USSOCOM's presentation; significant event for 300 cadets and staff members; personally praised by Admiral Suggs, Deputy Commander, USSOCOM
- Documented F-16 aircraft mishap at Avon Park Bombing Range; provided 24-hour standby support
  -- Produced official footage for Air Force Investigation Board--direct impact on success of investigation
- Captured a variety of wing events to include 6 ARW Sport's Day, Beach Fest '98, and 6th Support Group Change of Command Ceremony; footage highlighted on the base Commander's Access Channel
  -- Outstanding efforts did not go unnoticed--presented coin by Brig Gen Soligan, 6 ARW Commander
- Key videographer for 6 ARW Operational Readiness Exercise CRIMSON TIDE--captured action footage of personnel accomplishing war tasks; outstanding visual feedback for the Exercise Evaluation Team
- A future all-star; unlimited potential; promote to senior airman below-the-zone as soon as eligible!

I certify that in accordance with AFI 36-2403 an initial feedback session was conducted on **12 Aug 98**, and a midterm feedback session was conducted on **15 Jan 99**. *(If not accomplished, state the reason.)*

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| FRED WILLIAMSON III, SSgt, USAF<br>6th Communications Squadron (AMC)<br>MacDill AFB FL | NCOIC, Video Production | 5 Apr '99 |
| | SSN | SIGNATURE |

## VI. INDORSER'S COMMENTS
☒ CONCUR   ☐ NONCONCUR

- Dynamic video presentation specialist; quickly assumed role as front-line operator for high-profile events
  -- Produced MacDill AFB Retired Activities Office video for Air Force-level conference--a huge success; video became most requested item at conclusion of conference; presented letter of appreciation
- A leader in the local community; judged Junior Reserve Officer Training Corps cadet drill meet at Bloomington High School and briefed VI Center video operations to Riverview High School students
- An up-and-coming superstar--he's already performing like a senior airman; promote him below-the-zone!

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| HARVEY J. JOHNSON, MSgt, USAF<br>6th Communications Squadron (AMC)<br>MacDill AFB FL | Chief, Visual Information Production | 5 Apr 99 |
| | SSN | SIGNATURE |

## INSTRUCTIONS

*Reports written by a senior rater or the Chief Master Sergeant of the Air Force (CMSAF) will not be indorsed.*

*Reports written by colonels or civilians (GM-15 or higher) do not require an indorser; however, indorsement is permitted unless prohibited by the instruction above.*

*When the rater's rater is not at least a MSgt or civilian (GS-07 or higher), the indorser is the next official in the rating chain serving in the grade of MSgt or higher, or a civilian in the grade of GS-07 or higher.*

*When the final evaluator (rater or indorser) is not an Air Force officer or a DAF civilian, an Air Force advisor review is required.*

## VII. COMMANDER'S REVIEW

| ☒ CONCUR | ☐ NONCONCUR  *(Attach AF Form 77)* | SIGNATURE |
|---|---|---|

AF FORM 910, JUN 85  *(REVERSE) (EF-V2)  (PerFORM PRO)*

US v. Zier Military Record of Trial and Appellate Extracts 000044 of 902

**ENLISTED PERFORMANCE REPORT** *(AB thru TSGT)*  ~~AFPC PROCESSED~~

## I. RATEE IDENTIFICATION DATA *(Read AFI 36-2403 carefully before completing any item)*

| 1. NAME (last, First, Middle Initial) | | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|---|
| ZIER, JEREMY M. | | | SRA | 3V033 |

| 5. ORGANIZATION, COMMAND, AND LOCATION | 6a. PAS CODE | 6b. SRID |
|---|---|---|
| 6th Communications Squadron (AMC), MacDill AFB FL | MA1LFFLC | 1L1EF |

| 7. PERIOD OF REPORT | 8. NO. DAYS SUPERVISION | 9. REASON FOR REPORT |
|---|---|---|
| From: 6 Apr 1999  Thru: 5 Apr 2000 | 323 | Annual |

## II. JOB DESCRIPTION

**1. DUTY TITLE**
VISUAL INFO PROD APPRENTICE

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES**
Provides video support, including Hi-8MM, 1/2 VHS/SVHS, and 3/4 Umatic editing for 6th Air Refueling Wing, United States Central Command, United States Special Operations Command (USSOCOM), and tenant organizations assigned to MacDill AFB. Ensures video coverage of staged or spontaneous events. Applies video concepts of editing, documentation, duplication, composition, story boarding, and lighting techniques for studio and location productions. Operates cameras, lighting, and associated equipment. Assists in selecting shooting locations. Performs preventive maintenance inspections on video cameras and equipment. Schedules and programs weekly broadcasting in support of MacDill's Commander's Access Channel, CATV 19. **ADDITIONAL DUTY:** Visual Information mobility team member; provides in-the-field video documentation, editing, and duplication capability for contingencies and exercises.

## III. EVALUATION OF PERFORMANCE

**1. HOW WELL DOES RATEE PERFORM ASSIGNED DUTIES?** *(Consider quality, quantity, and timeliness of duties performed)*

| ☐ Inefficient. An unprofessional performer. | ☐ Good performer. Performs routine duties satisfactorily. | ☐ Excellent performer. Consistently produces high quality work. | ☒ The exception. Absolutely superior in all areas. |
|---|---|---|---|

**2. HOW MUCH DOES RATEE KNOW ABOUT PRIMARY DUTIES?** *(Consider whether ratee has technical expertise and is able to apply the knowledge)*

| ☐ Does not have the basic knowledge necessary to perform duties. | ☐ Has adequate technical knowledge to satisfactorily perform duties. | ☐ Extensive knowledge of all primary duties and related positions. | ☒ Excels in knowledge of all related positions. Mastered all duties. |
|---|---|---|---|

**3. HOW WELL DOES RATEE COMPLY WITH STANDARDS?** *(Consider dress and appearance, weight and fitness, customs, and courtesies)*

| ☐ Fails to meet minimum standards. | ☐ Meets Air Force standards. | ☐ Sets the example for others to follow. | ☒ Exemplifies top military standards. |
|---|---|---|---|

**4. HOW IS RATEE'S CONDUCT ON/OFF DUTY?** *(Consider financial responsibility, respect for authority, support for organizational activities, and maintenance of government facilities)*

| ☐ Unacceptable. | ☐ Acceptable. | ☐ Sets the example for others. | ☒ Exemplifies the standard of conduct. |
|---|---|---|---|

**5. HOW WELL DOES RATEE SUPERVISE/LEAD?** *(Consider how well member sets and enforces standards, displays initiative and self-confidence, provides guidance and feedback, and fosters teamwork)*

| ☐ Ineffective. | ☐ Effective. Obtains satisfactory results. | ☐ Highly effective. | ☒ Exceptionally effective leader. |
|---|---|---|---|

**6. HOW WELL DOES RATEE COMPLY WITH INDIVIDUAL TRAINING REQUIREMENTS?** *(Consider upgrade training, professional military education, proficiency/qualification, and contingency)*

| ☐ Does not comply with minimum training requirements. | ☐ Complies with most training requirements. | ☐ Complies with all training requirements. | ☒ Consistently exceeds all training requirements. |
|---|---|---|---|

**7. HOW WELL DOES RATEE COMMUNICATE WITH OTHERS?** *(Consider ratee's verbal and written skills)*

| ☐ Unable to express thoughts clearly. Lacks organization. | ☐ Organizes and expresses thoughts satisfactorily. | ☐ Consistently able to organize and express ideas clearly and concisely. | ☒ Highly skilled writer and communicator. |
|---|---|---|---|

AF FORM 910, 19991201 *(EF-V1)*          PREVIOUS EDITIONS ARE OBSOLETE.

"Certified True Copy," E-8, Christman, Zachary W, 1033462275, 1st Sergeant, AFPAA, __ Apr 20

CHRISTMAN,ZACH Digitally signed by CHRISTMAN.ZACHARY.W.1033462275 Date: 2020-04-14 18:47 -04'00'

US v. Zier Military Record of Trial and Appellate Extracts 000045 of 902

## IV. PROMOTION RECOMMENDATION *(Compare this ratee with others of the same grade and AFS)*

| RECOMMENDATION | NOT RECOMMENDED | NOT RECOMMENDED AT THIS TIME | CONSIDER | READY | IMMEDIATE PROMOTION |
|---|---|---|---|---|---|
| RATER'S RECOMMENDATION | 1 | 2 | 3 | 4 | ☒ |
| INDORSER'S RECOMMENDATION | 1 | 2 | 3 | 4 | ☒ |

## V. RATER'S COMMENTS

- Outstanding airman--my best and the flight's best!  A natural leader with unlimited potential--he does it all
- First choice to document USSOCOM Commanders, General Schoomaker's parachute jump and to produce retirement video for USSOCOM Deputy Commander, Admiral Suggs; super job--received CINC's coin!
- Personal presentation specialist for 21st Air Force Commander, Lieutenant General Bailey's Tampa visit -- Quickly set up and operated traveling multimedia projection system; over 300 members in attendance
- Lead videographer for United States Coast Guard Marine Safety Office infrared camera training video -- Simplified training program on equipment; eliminated need for formal training--saved countless dollars
- Wing presentation specialist for 555th Tactical Fighter Wing's, Aviano AB, Italy historic MacDill reunion -- Documented operational support and final retreat; expert multimedia operator for two prestigious events
- Talented video producer; finalized MacDill hurricane preparation video--landmark video is the first of its kind; accurately portrayed personnel responsibilities for proper hurricane evacuation and survivability
- Dynamic community supporter--Vietnam Memorial ceremony participant; USAF recruiter's assistant; Veterans Day elementary school speaker; true-blue ambassador! Promote to SSgt at earliest opportunity!

I certify that in accordance with AFI 36-2403 an initial feedback session was conducted on **26 May 1999** , and a midterm feedback session was conducted on **16 Dec 1999** . *(If not accomplished, state the reason).*

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| JASON W. WRIGHT, SSgt, USAF<br>6th Communications Squadron (AMC)<br>MacDill AFB FL | Assistant Chief, Visual Information Maintenance | 14 Apr 00 |
| | SSN    SIGNATURE | |

## VI. INDORSER'S COMMENTS                     ☒ CONCUR          NONCONCUR

- Simply the best!  6th Communications Squadron Airman of the Year for 1999; outstanding young leader! -- Selected for below-the-zone promotion to senior airman; 6 SPTG Airman of the Quarter, Oct-Dec 99
- Requested, by name, to cover US Secretary of Defense (SECDEF) William S. Cohen's visit to MacDill -- Flawless performance during this high-profile, pressure event; presented SECDEF coin and photograph
- Volunteered for 90-day TDY to Aviano AB, Italy--only 3VOX3 in command to do so; created video highlighting Fuels Operations for "Best in USAFE" Team--Aviano won!  Promote to SSgt now, he's ready!

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| JEFFREY T. FEWELL, SMSgt, USAF<br>6th Communications Squadron (AMC)<br>MacDill AFB FL | Superintendent, Support Flight | 14 Apr 00 |
| | SSN    SIGNATURE | |

## INSTRUCTIONS

*Reports written by a senior rater or the Chief Master Sergeant of the Air Force (CMSAF) will not be indorsed.*

*Reports written by colonels or civilians (GM-15 or higher) do not require an indorser; however, indorsement is permitted unless prohibited by the instruction above.*

*When the rater's rater is not at least a MSgt or civilian (GS-07 or higher), the indorser is the next official in the rating chain serving in the grade of MSgt or higher, or a civilian in the grade of GS-07 or higher.*

*When the final evaluator (rater or indorser) is not an Air Force officer or a DAF civilian, an Air Force advisor review is required.*

## VII. COMMANDER'S REVIEW

| ☒ CONCUR | | NONCONCUR *(Attach AF Form 77)* | SIGNATURE |
|---|---|---|---|

AF FORM 910, 19991201 *(REVERSE) (EF-V1)*

"Certified True Copy," E-8, Christman, Zachary CHRISTMAN.ZACHARY Sergeant, AFPAA, __ Apr 20

Digitally signed by CHRISTMAN.ZACHARY ARYW-0898462878 Date: 2020.04.14 17:15:31 -05'00'

US v. Zier Military Record of Trial and Appellate Extracts 000046 of 902

PROCESSED

## ENLISTED PERFORMANCE REPORT (AB thru TSGT)

**I. RATEE IDENTIFICATION DATA** (Read AFI 36-2406 carefully before completing any item.)

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | SRA | 3V033 |

| 5. ORGANIZATION, COMMAND, AND LOCATION | 5a. PAS CODE | 5b. SRID |
|---|---|---|
| 6th Communications Squadron (AMC), MacDill AFB FL | MA1LFFLC | 1L1EF |

| 7. PERIOD OF REPORT | | 8. NO DAYS SUPERVISION | 9. REASON FOR REPORT |
|---|---|---|---|
| From: 6 Apr 2000 | Thru: 5 Apr 2001 | 365 | Annual |

**II. JOB DESCRIPTION**

**1. DUTY TITLE**

VISUAL INFORMATION PRODUCTION JOURNEYMAN

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES**

Provides first-class visual information (VI) support for 6th Air Mobility Wing (6 AMW); two war-fighting commander in chiefs (CINCs): United States Central Command (USCENTCOM) and United States Special Operations Command (USSOCOM); and 49 tenant units. Delivers computerized multimedia presentations for events presided over by high-ranking officials to include the Secretary of Defense. Applies video concepts of documenting, editing, and story boarding for location productions. Operates cameras and other equipment. Performs preventive maintenance inspections on video equipment. Programs weekly broadcasting in support of the Commander's Access Channel, CATV 19. ADDITIONAL DUTIES: Member of Base Honor Guard Team and Air Expeditionary Force worldwide-deployable VI Team. When deployed, provides air damage reconnaissance imagery and raw video footage to multinational forces.

**III. EVALUATION OF PERFORMANCE**

**1. HOW WELL DOES RATEE PERFORM ASSIGNED DUTIES?** (Consider quality, quantity, and timeliness of duties performed)

| Inefficient. An unprofessional performer | Good performer. Performs routine duties satisfactorily. | Excellent performer. Consistently produces high quality work. | ☒ The exception. Absolutely superior in all areas. |
|---|---|---|---|

**2. HOW MUCH DOES RATEE KNOW ABOUT PRIMARY DUTIES?** (Consider whether ratee has technical expertise and is able to apply the knowledge)

| Does not have the basic knowledge necessary to perform duties. | Has adequate technical knowledge to satisfactorily perform duties. | Extensive knowledge of all primary duties and related positions. | ☒ Excels in knowledge of all related positions. Mastered all duties. |
|---|---|---|---|

**3. HOW WELL DOES RATEE COMPLY WITH STANDARDS?** (Consider dress and appearance, weight and fitness, customs, and courtesies)

| Fails to meet minimum standards. | Meets Air Force standards. | Sets the example for others to follow | ☒ Exemplifies top military standards. |
|---|---|---|---|

**4. HOW IS RATEE'S CONDUCT ON/OFF DUTY?** (Consider financial responsibility, respect for authority, support for organizational activities, and maintenance of government facilities)

| Unacceptable. | Acceptable. | Sets the example for others. | ☒ Exemplifies the standard of conduct. |
|---|---|---|---|

**5. HOW WELL DOES RATEE SUPERVISE/LEAD?** (Consider how well member sets and enforces standards, displays initiative and self-confidence, provides guidance and feedback, and fosters teamwork)

| Ineffective. | Effective. Obtains satisfactory results. | Highly effective | ☒ Exceptionally effective leader. |
|---|---|---|---|

**6. HOW WELL DOES RATEE COMPLY WITH INDIVIDUAL TRAINING REQUIREMENTS?** (Consider upgrade training, professional military education, proficiency/qualification, and contingency)

| Does not comply with minimum training requirements. | Complies with most training requirements. | Complies with all training requirements. | ☒ Consistently exceeds all training requirements. |
|---|---|---|---|

**7. HOW WELL DOES RATEE COMMUNICATE WITH OTHERS?** (Consider ratee's verbal and written skills)

| Unable to express thoughts clearly. Lacks organization. | Organizes and expresses thoughts satisfactorily. | Consistently able to organize and express ideas clearly and concisely. | ☒ Highly skilled writer and communicator. |
|---|---|---|---|

AF FORM 910, 20000601 (EF-V1)    PREVIOUS EDITIONS ARE OBSOLETE    FOR OFFICIAL USE ONLY (When filled in)

"Certified True Copy," E-8, Christman, Zachary

CHRISTMAN.ZACH ARY.H16934662273 Digitally signed by CHRISTMAN.ZACHARY.H16934662273 Date: 2020.04.14 13:12:48 -05'00'

First Sergeant, AFPAA, __ Apr 20

Page 5 of 44

"Certified True Copy," E-8, Christman, Zachary CHRISTMAN.ZACHARY.First Sergeant, AFPAA, __ Apr 20
CHRISTMAN.ZACHARY.Digitally signed by
ARY.W.1053402278 Date: 2000.04.14 12:18:00 -05'00'

## IV. PROMOTION RECOMMENDATION (Compare this ratee with officers of the same grade and AFS)

RATEE NAME: ZIER, JEREMY M.

| RECOMMENDATION | NOT RECOMMENDED | NOT RECOMMENDED AT THIS TIME | CONSIDER | READY | IMMEDIATE PROMOTION |
|---|---|---|---|---|---|
| RATER'S RECOMMENDATION | 1 | 2 | 3 | 4 | ☒ |
| ADDITIONAL RATER'S RECOMMENDATION | 1 | 2 | 3 | 4 | ☒ |

### V. RATER'S COMMENTS

- #1! Simply put, Jeremy is the best! Hard-charging, multitalented airman; never settles for second best!
- Wing commander's choice to document gruesome F-16/Cessna accident crash site in Sarasota, Florida
  -- Top-notch coverage enabled officials to study the wreckage and possibly prevent future tragedies
- Key member of CORONA South 2001 team! Assisted with flawless set-up of $137,000 of specialized video equipment; made certain the excellence of the AF's premier 4-star conference was unmatched
  --Efforts recognized by Air Force Chief of Staff, General Ryan; conference support rated "best ever"
- When only the best will do . . . handpicked to videotape USSOCOM CINC's "farewell" dinner
  -- After USSOCOM audiovisual (A/V) technicians experienced difficulties troubleshooting several audio and video malfunctions; SrA Zier "saved the day" by isolating the problem to two faulty cables
  -- Guaranteed CINC's farewell tribute went off without a glitch; received the coveted CINC coin!
- Outshines peers! 6th Communications Squadron (6 CS) Airman of the Quarter, Oct-Dec '00, and two-time 6 CS Airman of the Year; outstanding role model--selected as member of Base Honor Guard
- Extraordinary leadership abilities! STEP promote to SSgt, then select for officer training school!

Last performance feedback was accomplished on: 12 Oct 2000    (Consistent with the direction in AFI 36-2406.)
(If not accomplished, state the reason.)

| NAME, GRADE, BR OF SVC, ORGN, CMND & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| HARVEY J. JOHNSON, MSgt, USAF<br>6th Communications Squadron (AMC)<br>MacDill AFB FL | Chief, Visual Information Production | | 19 APR 2001 |
| | SSN | SIGNATURE | |

### VI. ADDITIONAL RATER'S COMMENTS

☒ CONCUR    ☐ NONCONCUR

- Pure platinum! Selected as 6 AMW's Airman of the Year for 2000--#1 of 854 airmen; HQ AMC's Communications and Information Professional of the Year; Air Force Sergeant's Association Airman of the Year, 2000; and Greater Tampa Chamber of Commerce Military Citizen of the Year, 2000--awesome!
- #1 choice of USCENTCOM staff to cover organization's change of command and retirement ceremonies
- Super Air Force Ambassador--spoke at three local schools on the importance/meaning of Veterans' Day
- MacDill's #1 airman! STEP promote to SSgt, then select for officer training school--he's a natural leader!

| NAME, GRADE, BR OF SVC, ORGN, CMND & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| MAYBELLINE COLEMAN, SMSgt, USAF<br>6th Communications Squadron (AMC)<br>MacDill AFB FL | Chief, Publishing and Information Technology | | 19 Apr 2001 |
| | SSN | SIGNATURE | |

### INSTRUCTIONS

Reports written by a senior rater or the Chief Master Sergeant of the Air Force (CMSAF) will not be endorsed.

Reports written by colonels or civilians (GS-15 or higher) do not require an additional rater; however, endorsement is permitted unless prohibited by the instruction above.

When the rater's rater is not at least a MSgt or civilian (GS-07 or higher), the additional rater is the next official in the rating chain serving in the grade of MSgt or higher, or a civilian in the grade of GS-07 or higher.

When the final evaluator (rater or additional rater) is not an Air Force officer or a DAF civilian, an Air Force advisor review is required.

All evaluators enter only last four numbers of SSN.

### VII. COMMANDER'S REVIEW

| ☒ CONCUR | | ☐ NONCONCUR (Attach AF Form 77) | SIGNATURE |
|---|---|---|---|

AF FORM 910, 20000601 (REVERSE) (EF-V1)    FOR OFFICIAL USE ONLY (When filled in)

Page 6 of 44

"Certified True Copy," E-8, Christman, Zachary W., First Sergeant, AFPAA, __ Apr 20

CHRISTMAN,ZACH Digitally signed by
ARY.W.10334652278 CHRISTMAN,ZACHARY.W.10334652278
Date: 2020.04.16 16:58:05 -05'00'

## ENLISTED PERFORMANCE REPORT (AB thru TSGT)

**I. RATEE IDENTIFICATION DATA** (Read AFI 36 2406 carefully before completing any item.)

| 1. NAME (Last, First, Middle Initial) ZIER, JEREMY M. | 2. SSN | 3. GRADE SSGT | 4. DAFSC 3V033 |
|---|---|---|---|

| 5. ORGANIZATION, COMMAND, AND LOCATION 6th Communications Squadron (AMC), MacDill AFB FL | 6a. PAS CODE MA1LFFLC | 6b. SRID 1L1EF |
|---|---|---|

| 7. PERIOD OF REPORT From: 6 Apr 2001 Thru: 5 Apr 2002 | 8. NO. DAYS SUPERVISION 364 | 9. REASON FOR REPORT Annual |
|---|---|---|

**II. JOB DESCRIPTION**

1. DUTY TITLE
**VISUAL INFORMATION PRODUCTION JOURNEYMAN**

2. KEY DUTIES, TASKS, AND RESPONSIBILITIES
Provides first-class visual information (VI) support for 6th Air Mobility Wing (6 AMW), two war-fighting commanders in chief of United States Central Command and United States Special Operations Command, and 49 tenant units. Delivers computerized multimedia presentations for events presided over by high-ranking officials to include the Secretary of Defense. Applies video concepts of documenting, editing, duplication, and story boarding for location productions. Operates cameras and other equipment. Performs preventive maintenance inspections on video equipment. Programs and updates weekly broadcasting in support of the Commander's Access Channel, CATV 19. ADDITIONAL DUTIES: Member of Base Honor Guard team and Air Expeditionary Force worldwide-deployable VI team. When deployed, provides air damage reconnaissance imagery and raw video footage to multinational forces.

**III. EVALUATION OF PERFORMANCE**

**1. HOW WELL DOES RATEE PERFORM ASSIGNED DUTIES?** (Consider quality, quantity, and timeliness of duties performed)

| Inefficient. An unprofessional performer. | Good performer. Performs routine duties satisfactorily. | Excellent performer. Consistently produces high quality work. | ☒ The exception. Absolutely superior in all areas. |
|---|---|---|---|

**2. HOW MUCH DOES RATEE KNOW ABOUT PRIMARY DUTIES?** (Consider whether ratee has technical expertise and is able to apply the knowledge)

| Does not have the basic knowledge necessary to perform duties. | Has adequate technical knowledge to satisfactorily perform duties. | Extensive knowledge of all primary duties and related positions. | ☒ Excels in knowledge of all related positions. Mastered all duties. |
|---|---|---|---|

**3. HOW WELL DOES RATEE COMPLY WITH STANDARDS?** (Consider dress and appearance, weight and fitness, customs, and courtesies)

| Fails to meet minimum standards. | Meets Air Force standards. | Sets the example for others to follow. | ☒ Exemplifies top military standards. |
|---|---|---|---|

**4. HOW IS RATEE'S CONDUCT ON/OFF DUTY?** (Consider financial responsibility, respect for authority, support for organizational activities, and maintenance of government facilities)

| Unacceptable. | Acceptable. | Sets the example for others. | ☒ Exemplifies the standard of conduct. |
|---|---|---|---|

**5. HOW WELL DOES RATEE SUPERVISE/LEAD?** (Consider how well member sets and enforces standards, displays initiative and self-confidence, provides guidance and feedback, and fosters teamwork)

| Ineffective. | Effective. Obtains satisfactory results. | Highly effective. | ☒ Exceptionally effective leader. |
|---|---|---|---|

**6. HOW WELL DOES RATEE COMPLY WITH INDIVIDUAL TRAINING REQUIREMENTS?** (Consider upgrade training, professional military education, proficiency/qualification, and contingency)

| Does not comply with minimum training requirements. | Complies with most training requirements. | Complies with all training requirements. | ☒ Consistently exceeds all training requirements. |
|---|---|---|---|

**7. HOW WELL DOES RATEE COMMUNICATE WITH OTHERS?** (Consider ratee's verbal and written skills)

| Unable to express thoughts clearly. Lacks organization. | Organizes and expresses thoughts satisfactorily. | Consistently able to organize and express ideas clearly and concisely. | ☒ Highly skilled writer and communicator. |
|---|---|---|---|

AF FORM 910, 20000601 (EF-V2)    PREVIOUS EDITIONS ARE OBSOLETE.    FOR OFFICIAL USE ONLY (When filled in)

US v. Zier Military Record of Trial and Appellate Extracts 000049 of 902

| IV. PROMOTION RECOMMENDATION *(Compare this ratee with others of the same grade and AFS)* | | | | RATEE NAME: ZIER, JEREMY M. | |
|---|---|---|---|---|---|
| RECOMMENDATION | NOT RECOMMENDED | NOT RECOMMENDED AT THIS TIME | CONSIDER | READY | IMMEDIATE PROMOTION |
| RATER'S RECOMMENDATION | 1 | 2 | 3 | 4 | ☒ |
| ADDITIONAL RATER'S RECOMMENDATION | 1 | 2 | 3 | 4 | ☒ |

**V. RATER'S COMMENTS**

- The best I've seen--bar none!  SSgt Zier puts his signature of excellence on every project he undertakes
- When only the best will do!  Selected to capture the 6 AMW/CC change of command/farewell dinner
  -- Masterfully edited the event's footage; provided a flawless visual recording; archived for future use
- Video expert!  Skillfully produced a Drug Enforcement for Youth (DEFY) program video in record time
  -- Magnificently documented a full week of events and edited after duty hours; impressive final product!
- Meticulously documented the Tampa Bay Buccaneers visit; raised morale of troops after 9-11 attacks
  -- Illustrated and reconfirmed the strong commitment and partnership between MacDill and the community
- Volunteered to represent the squadron on base Honor Guard team; a full-time Bravo team member
  -- Participated in numerous funerals, weddings, and colors ceremonies; covered all of Southwest Florida
- Talented videographer!  Produced a stunning Christmas video; masterpiece of unforgettable memories
  -- Built morale, camaraderie, and lifted troops spirits in wake of 9-11 tragedy and shadows of war
- Selected to attend AF Sergeant's Association Conference; coined by Chief Master Sergeant of the AF
- All-star performer; professionalism and integrity mark his ability for future leadership--select for OTS!

Last performance feedback was accomplished on: 12 Oct 2001    *(Consistent with the firaction in AF 36-2406.)*
*(If not accomplished, state the reason.)*

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE  Chief, Visual Information Production | | DATE  15 Apr 2002 |
|---|---|---|---|
| HARVEY J. JOHNSON, MSgt, USAF  6th Communications Squadron (AMC)  MacDill AFB FL | SSN | SIGNATURE | |

**VI. ADDITIONAL RATER'S COMMENTS**     ☒ CONCUR  /  ☐ NONCONCUR

- Simply the best!  Top graduate of Airmen Leadership School; John L. Levitow Award winner--awesome!
- Expertly produced a video of 6th Medical Group's Phase 5 program; lauded as best in Air Force--superb
- Selected by 6 AMW's command chief to attend the Phoenix Strip Conference at AMC--that's impressive!
- Completed 24 credit hours and passed two CLEP tests in management; maintained a 3.9 GPA; outstanding
- Super role model!  Veterans Day speaker at local middle and high schools; also Booster Club Secretary
- SSgt Zier is as good as they come!  Highly recommend selection for OTS--promote to TSgt at earliest!

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE  Chief, Publishing and Information Technology | | DATE  15 Apr 2002 |
|---|---|---|---|
| MAYBELLINE COLEMAN, SMSgt, USAF  6th Communications Squadron (AMC)  MacDill AFB FL | SSN | SIGNATURE | |

*INSTRUCTIONS*

*Reports written by a senior rater or the Chief Master Sergeant of the Air Force (CMSAF) will not be endorsed.*

*Reports written by colonels or civilians (GS-15 or higher) do not require an additional rater; however, endorsement is permitted unless prohibited by the instruction above.*

*When the rater's rater is out of at least a MSgt or civilian (GS-07 or higher), the additional rater is the next official in the rating chain serving in the grade of MSgt or higher, or a civilian in the grade of GS-07 or higher.*

*When the final evaluator (rater or additional rater) is not an Air Force officer or a DAF civilian, an Air Force advisor review is required.*

*All evaluators enter only last four numbers of SSN.*

**VII. COMMANDER'S REVIEW**

☒ CONCUR    ☐ NONCONCUR  *(Attach AF Form 77)*    SIGNATURE

AF FORM 910. 20000801  *(REVERSE) (EF-V2)*                     FOR OFFICIAL USE ONLY *(When filled in)*

"Certified True Copy," E-8, Christman, Zachary First Sergeant, AFPAA, ___ Apr 20

CHRISTMAN.ZACH ARY.IN703363327 8  Digitally signed by CHRISTMAN.ZACHary.IN703363327 Date 2020.04.14 ... -04'00'

MAY 0 8 2003

## ENLISTED PERFORMANCE REPORT (A8 thru TSGT)

**MILPDS UPDATED**

### I. RATEE IDENTIFICATION DATA (Read AFI 36-2406 carefully before completing any item.)

| 1. NAME (Last, First, Middle Initial) ZIER, JEREMY M. | 2. SSN | 3. GRADE SSGT | 4. DAFSC 3V053 |
|---|---|---|---|

| 5. ORGANIZATION, COMMAND, AND LOCATION Center for Intelligence & Information Operations, HQ U.S. Special Operations Command, MacDill AFB, FL | 6a. PAS CODE MA3DFNP1 | 6b. SRID U11DC |
|---|---|---|

| 7. PERIOD OF REPORT From: 6 Apr 2002  Thru: 5 Apr 2003 | 8. NO. DAYS SUPERVISION 330 | 9. REASON FOR REPORT Annual |
|---|---|---|

### II. JOB DESCRIPTION

**1. DUTY TITLE**
Video Production Technician

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES**
Responsible for all video collection, editing and production for the U.S. Special Operations Command Joint Intelligence Center (SOCJIC). Responsible for the integration of all still photograph and motion video products utilized in SOCJIC intelligence production. Provides technical assistance in determining acquisition requirements for video production systems. Responsible for the operation and maintenance of more than $450,000 worth of video production and editing systems. Documents all video production data and archives material for future use and historical reference. Assists as the alternate joint worldwide intelligence communication system video teleconferencing scheduler, operator, and trainer.
ADDITIONAL DUTIES: Fire Marshall and Safety NCO

### III. EVALUATION OF PERFORMANCE

**1. HOW WELL DOES RATEE PERFORM ASSIGNED DUTIES?** (Consider quality, quantity, and timeliness of duties performed)

| ☐ Inefficient. An unprofessional performer. | ☐ Good performer. Performs routine duties satisfactorily. | ☐ Excellent performer. Consistently produces high quality work. | ☒ The exception. Absolutely superior in all areas. |
|---|---|---|---|

**2. HOW MUCH DOES RATEE KNOW ABOUT PRIMARY DUTIES?** (Consider whether ratee has technical expertise and is able to apply the knowledge)

| ☐ Does not have the basic knowledge necessary to perform duties. | ☐ Has adequate technical knowledge to satisfactorily perform duties. | ☐ Extensive knowledge of all primary duties and related positions. | ☒ Excels in knowledge of all related positions. Mastered all duties. |
|---|---|---|---|

**3. HOW WELL DOES RATEE COMPLY WITH STANDARDS?** (Consider dress and appearance, weight and fitness, customs, and courtesies)

| ☐ Fails to meet minimum standards. | ☐ Meets Air Force standards. | ☐ Sets the example for others to follow. | ☒ Exemplifies top military standards. |
|---|---|---|---|

**4. HOW IS RATEE'S CONDUCT ON/OFF DUTY?** (Consider financial responsibility, respect for authority, support for organizational activities, and maintenance of government facilities)

| ☐ Unacceptable. | ☐ Acceptable. | ☐ Sets the example for others. | ☒ Exemplifies the standard of conduct. |
|---|---|---|---|

**5. HOW WELL DOES RATEE SUPERVISE/LEAD?** (Consider how well member sets and enforces standards, displays initiative and self-confidence, provides guidance and feedback, and fosters teamwork)

| ☐ Ineffective. | ☐ Effective. Obtains satisfactory results. | ☐ Highly effective. | ☒ Exceptionally effective leader. |
|---|---|---|---|

**6. HOW WELL DOES RATEE COMPLY WITH INDIVIDUAL TRAINING REQUIREMENTS?** (Consider upgrade training, professional military education, proficiency/qualification, and contingency)

| ☐ Does not comply with minimum training requirements. | ☐ Complies with most training requirements. | ☐ Complies with all training requirements. | ☒ Consistently exceeds all training requirements. |
|---|---|---|---|

**7. HOW WELL DOES RATEE COMMUNICATE WITH OTHERS?** (Consider ratee's verbal and written skills)

| ☐ Unable to express thoughts clearly. Lacks organization. | ☐ Organizes and expresses thoughts satisfactorily. | ☐ Consistently able to organize and express ideas clearly and concisely. | ☒ Highly skilled writer and communicator. |
|---|---|---|---|

AF FORM 910, 20000601 (EF-V2)    PREVIOUS EDITIONS ARE OBSOLETE.    FOR OFFICIAL USE ONLY (When filled in)

(left margin) "Certified True Copy," E-8, Christman, Zachary W. CHRISTMAN.ZACH ARY.W.1034662278 ... First Sergeant, AFPAA, __ Apr 20

Page 9 of 44

| IV. PROMOTION RECOMMENDATION *(Compare this ratee with others of the same grade and AFS)* | | | | RATEE NAME: ZIER, JEREMY M. | |
|---|---|---|---|---|---|
| RECOMMENDATION | NOT RECOMMENDED | NOT RECOMMENDED AT THIS TIME | CONSIDER | READY | IMMEDIATE PROMOTION |
| RATER'S RECOMMENDATION | 1 | 2 | 3 | 4 | ☒ |
| ADDITIONAL RATER'S RECOMMENDATION | 1 | 2 | 3 | 4 | ☒ |

**V. RATER'S COMMENTS**

- Highly motivated, SSgt Zier puts his signature of excellence on all his projects, he is the best of the best
- Aggressively reorganized USSOCOM video branch; relocated assets with zero downtime from production
  -- Acquired $55,000 upgrade to non-linear editing system creating more efficient turnaround on projects
- Provided exceptional video support on Sergeant Major of the Army (SMA) Jack L. Tilley visit to MacDill
  -- Video footage of event was aired by local networks--coined by SMA Tilley for his professionalism
- Team player, his extensive audio-visual skills were utilized by U.S. Central Command (USCENTCOM)
  -- Spearheaded the efforts for the purchase and implementation of a unique 10K lumen presentation system
     for which he received glowing remarks from the USCENTCOM Commander, General Tommy Franks
- Selflessly volunteered for TDY to Incirlik AB, Turkey in support of Operation NORTHERN WATCH
  -- Provided security for coalition commander ensuring 100% authentication of people entering complex
- Directed and produced a complicated 4 camera live production that aired to 1,000 people in attendance of
  the Air Force 55th birthday celebration; 6 AMW/CC said "Production was the best I've seen in my career"
- Big Brother lunch mentor, true professional on and off duty, promote to TSgt, then select to OTS program!

Last performance feedback was accomplished on:    8 Oct 2002    *(Consistent with the direction in AFI 36-2406.)*
*(If not accomplished, state the reason.)*

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| STEVEN W. HUFF, MSgt, USAF | NCOIC, Multimedia Branch | | 5 Apr 2003 |
| HQ U.S. Special Operations Command MacDill AFB, FL | SSN | SIGNATURE | |

**VI. ADDITIONAL RATER'S COMMENTS** ☒ CONCUR    NONCONCUR

- Top of his field, selected by senior USSOCOM leadership to create a new video representing the command
  -- Created a superb product in minimal time saving the command more than $40,000 in production costs
- Artistically edited Medal of Honor video of Capt "Rocky" Versace; praised by family for exact portrayal
- Air Force Ambassador--judged multiple JROTC drill meets, Veterans Day speaker to many local schools
- Continually strived for self-improvement, maintained 3.8 GPA while completing 12 hours at local college
- SSgt Zier routinely exceeded set expectations, highly recommended NCO, promote to TSgt at earliest!

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| MARGARET D. BANKS, GG-13, DAFC | Chief, Operations Division | | 30 Apr 2003 |
| HQ U.S. Special Operations Command MacDill AFB, FL | SSN | SIGNATURE | |

**INSTRUCTIONS**

*Reports written by a senior rater or the Chief Master Sergeant of the Air Force (CMSAF) will not be endorsed.*

*Reports written by colonels or civilians (GS-15 or higher) do not require an additional rater; however, endorsement is permitted unless prohibited by the instruction above.*

*When the rater's rater is not at least a MSgt or civilian (GS-07 or higher), the additional rater is the next official in the rating chain serving in the grade of MSgt or higher, or a civilian in the grade of GS-07 or higher.*

*When the final evaluator (rater or additional rater) is not an Air Force officer or a DAF civilian, an Air Force advisor review is required.*

*All evaluators enter only last four numbers of SSN.*

| VII. COMMANDER'S REVIEW | | | | |
|---|---|---|---|---|
| ☒ CONCUR | | NONCONCUR *(Attach AF Form 77)* | SIGNATURE | |

AF FORM 910, 20000601  *(REVERSE) (EF-V1)*    **FOR OFFICIAL USE ONLY** *(When filled in)*

"Certified True Copy," E-8, Christman, Zachary CHRISTMAN.ZACH ARY.WH.1083402278 Digitally signed by CHRISTMAN.ZACHARY.WH.108340 2278 Date 2009.04.14 12:13:00 -05'00' Master Sergeant, AFPAA,___ Apr 20

MILPDS UPDATE    AUG 0 6 2004

## ENLISTED PERFORMANCE REPORT (AB thru TSGT)

**I. RATEE IDENTIFICATION DATA** *(Read AFI 36-2406 carefully before completing any item.)*

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY, M | | SSGT | 3V073 |

| 5. ORGANIZATION, COMMAND, AND LOCATION | 6a. PAS CODE | 6b. SRID |
|---|---|---|
| Center for Command Support, HQ U.S. Special Operations Command, MacDill AFB FL | MA3DFNP1 | U11CS |

| 7. PERIOD OF REPORT | | 8. NO DAYS SUPERVISION | 9. REASON FOR REPORT |
|---|---|---|---|
| From 06 Apr 2003 | Thru: 05 Apr 2004 | 366 | Annual |

**II. JOB DESCRIPTION**

**1. DUTY TITLE**

Video Production Technician

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES**

Responsible for all video collection, editing and production for the United States Special Operations Command Center for Command Support (SOCS). Responsible for the integration of all still photograph and motion video products utilized in all HQ USSOCOM Video and Multi-media Productions. Provides technical assistance in determining acquisition requirements for video production systems. Responsible for the operation and maintenance of more than $500,000 worth of video production and non-linear editing systems. Documents all video production data and archives material for future use and historical reference. ADDITIONAL DUTIES: Fire Marshall and Joint Service Color Guard

**III. EVALUATION OF PERFORMANCE**

**1. HOW WELL DOES RATEE PERFORM ASSIGNED DUTIES?** *(Consider quality, quantity, and timeliness of duties performed)*

| ☐ Inefficient. An unprofessional performer. | ☐ Good performer. Performs routine duties satisfactorily. | ☐ Excellent performer. Consistently produces high quality work. | ☒ The exception. Absolutely superior in all areas. |
|---|---|---|---|

**2. HOW MUCH DOES RATEE KNOW ABOUT PRIMARY DUTIES?** *(Consider whether ratee has technical expertise and is able to apply the knowledge)*

| ☐ Does not have the basic knowledge necessary to perform duties. | ☐ Has adequate technical knowledge to satisfactorily perform duties | ☐ Extensive knowledge of all primary duties and related positions. | ☒ Excels in knowledge of all related positions. Masters all duties. |
|---|---|---|---|

**3. HOW WELL DOES RATEE COMPLY WITH STANDARDS?** *(Consider dress and appearance, weight and fitness, customs, and courtesies)*

| ☐ Fails to meet minimum standards | ☐ Meets Air Force standards. | ☐ Sets the example for others to follow. | ☒ Exemplifies top military standards. |
|---|---|---|---|

**4. HOW IS RATEE'S CONDUCT ON/OFF DUTY?** *(Consider financial responsibility, respect for authority, support for organizational activities, and maintenance of government facilities)*

| ☐ Unacceptable. | ☐ Acceptable. | ☐ Sets the example for others. | ☒ Exemplifies the standard of conduct. |
|---|---|---|---|

**5. HOW WELL DOES RATEE SUPERVISE/LEAD?** *(Consider how well member sets and enforces standards, displays initiative and self-confidence, provides guidance and feedback, and fosters teamwork)*

| ☐ Ineffective. | ☐ Effective. Obtains satisfactory results. | ☐ Highly effective. | ☒ Exceptionally effective leader. |
|---|---|---|---|

**6. HOW WELL DOES RATEE COMPLY WITH INDIVIDUAL TRAINING REQUIREMENTS?** *(Consider upgrade training, professional military education, proficiency/qualification, and contingency)*

| ☐ Does not comply with minimum training requirements | ☐ Complies with most training requirements. | ☐ Complies with all training requirements | ☒ Consistently exceeds all training requirements. |
|---|---|---|---|

**7. HOW WELL DOES RATEE COMMUNICATE WITH OTHERS?** *(Consider ratee's verbal and written skills)*

| ☐ Unable to express thoughts clearly. Lacks organization. | ☐ Organizes and expresses thoughts satisfactorily. | ☐ Consistently able to organize and express ideas clearly and concisely | ☒ Highly skilled writer and communicator. |
|---|---|---|---|

AF FORM 910, 20000601  (IMT-V1)        PREVIOUS EDITIONS ARE OBSOLETE.        FOR OFFICIAL USE ONLY (When filled in)

"Certified True Copy," E-8, Christman, Zachary ARY, 1.0334532278 Sergeant, AFPAA, Apr 20

Digitally signed by CHRISTMAN.ZACHARY.1033453278

US v. Zier Military Record of Trial and Appellate Extracts 000053 of 902

| IV. PROMOTION RECOMMENDATION *(Compare this ratee with others of the same grade and AFS)* | | | RATEE NAME: ZIER, JEREMY, M | | |
|---|---|---|---|---|---|
| RECOMMENDATION | NOT RECOMMENDED | NOT RECOMMENDED THIS TIME | CONSIDER | READY | IMMEDIATE PROMOTION |
| RATER'S RECOMMENDATION | 1 ☐ | 2 ☐ | 3 ☐ | 4 ☐ | 5 ☒ |
| ADDITIONAL RATER'S RECOMMENDATION | 1 ☐ | 2 ☐ | 3 ☐ | 4 ☐ | 5 ☒ |

**V. RATER'S COMMENTS**

- Hard charging NCO, SSgt Zier always performs above pay grade in highly demanding Joint Unified Command
- Spearheaded video project to highlight USSOCOM's 2003 Bull Simons Award Winner, highly successful
  -- Documentary received glowing remarks by all in attendance, received JSAM for efforts, very impressive!
- Dedicated Team Player, stepped in as A/V technician when command presentations had manning shortfall
  -- Outlined and documented A/V requirements for highly visible USSOCOM Board of Directors Conference
- Took lead in editing and creating visually stimulating videos for highly successful new command briefing
  -- Videos helped to create innovative multimedia briefing; Sen. John Warner proclaimed, "Best I have seen!"
- Cross utilized as graphics technician, routinely fills in and provide support during extremely busy times
- Assisted Wing VI center during AF 56 B-Day live TV switch, expert knowledge allowed for flawless evening
- Assisted with the completion of over 1500 diverse visual information products during the 2003 SOF Week
- Volunteered to represent the Joint Service Color Guard, presents positive image of command in public forums
- Led command during annual Air Force Assistance Fund Drive, insured command met and exceeded fiscal goal
- Stands above contemporaries--mission focused, highly talented and career driven--Retain and promote now!

Last performance feedback was accomplished on: __16 Nov 2003__ *(Consistent with the direction in AFI 36-2406. If not accomplished, state the reason.)*

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE NCOIC, Video Production Section | DATE |
|---|---|---|
| Ricky L. Millikan, TSgt, USAF HQ U.S. Special Operations Command MacDill AFB, FL | | 29 Jul 2004 |
| | SSN    SIGNATURE | |

| VI. ADDITIONAL RATER'S COMMENTS | ☒ CONCUR | ☐ NONCONCUR |
|---|---|---|

- Leader in section, quality controls products and services to ensure high quality and integrity is maintained
- Resourceful, acquired an additional $150,000 over budget to acquire new state-of-the art video equipment
  -- Career Oriented--finished CCAF Degree and graduated with honors from community college with 3.6 GPA
- Super Role Model! Selflessly gives time and energy to multiple high school and middle school activities
  -- Selected to represent Air Force at National JROTC Drill Meet--attended by over 3500 cadets from 37 states
- Extraordinary growth potential--top quality, administrator and manager--ready for increased responsibility!

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE Chief, Visual Information Sevices Branch | DATE |
|---|---|---|
| Ellison B. Carter, GS-12, DAFC HQ U.S. Special Operations Command MacDill AFB, FL | | 29 Jul 2004 |
| | SSN    SIGNATURE | |

**INSTRUCTIONS**

Reports written by a senior rater or the Chief Master Sergeant of the Air Force (CMSAF) will not be endorsed.
Reports written by colonels or civilians (GS-15 or higher) do not require an additional rater; however, endorsement is permitted unless prohibited by the instruction above.
When the rater's rater is not at least a MSgt or civilian (GS-07 or higher), the additional rater is the next official in the rating chain serving in the grade of MSgt or higher, or a civilian in the grade of GS-07 or higher.
When the final evaluator (rater or additional rater) is not an Air Force officer, enlisted, or DAF civilian, an Air Force advisor review is required.
All evaluators enter only last four numbers of SSN.

| VII. COMMANDER'S REVIEW | | | |
|---|---|---|---|
| ☒ CONCUR | ☐ NONCONCUR *(Attach AF Form 77)* | SIGNATURE | |

AF FORM 910, 20000601   *(REVERSE) (IMT-V1)*                    FOR OFFICIAL USE ONLY   *(When filled in)*

"Certified True Copy," E-8, Christman, Zachary, HQ, 1st Sergeant, AFPAA, __ Apr 20

CHRISTMAN.ZACH CHRISTMAN.ZACHARY.W... Digitally signed by 4034482228 ...

**MILFDS UPDATED**    MAY 0 3 2005

## ENLISTED PERFORMANCE REPORT (AB thru TSGT)

### I. RATEE IDENTIFICATION DATA  (Read AFI 36-2406 carefully before completing any item.)

| 1 NAME (Last, First, Middle Initial) | 2. SSN | 3 GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY, M | | SSGT | 3V073 |

| 5. ORGANIZATION, COMMAND, AND LOCATION | 6a. PAS CODE | 6b. SRID |
|---|---|---|
| Center for Command Support, HQ U.S. Special Operations Command, MacDill AFB FL | MA3DFNP1 | U11DC |

| 7. PERIOD OF REPORT | | 8. NO DAYS SUPERVISION | 9. REASON FOR REPORT |
|---|---|---|---|
| From 06 Apr 2004 | Thru. 05 Apr 2005 | 365 | Annual |

### II. JOB DESCRIPTION

**1. DUTY TITLE**

Video Production Technician

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES**

Responsible for all video collection, editing and production for the United States Special Operations Command Center for Command Support (SOCS). Responsible for the integration of all still photograph and motion video products utilized in all HQ USSOCOM Video and Multi-media Productions. Provides technical assistance in determining acquisition requirements for video production systems. Responsible for the operation and maintenance of more than $500,000 worth of video production and non-linear editing systems. Documents all video production data and archives material for future use and historical reference. ADDITIONAL DUTIES: Fire Marshall and Joint Service Color Guard

### III. EVALUATION OF PERFORMANCE

**1. HOW WELL DOES RATEE PERFORM ASSIGNED DUTIES?**  (Consider quality, quantity, and timeliness of duties performed)

| ☐ Inefficient. An unprofessional performer. | ☐ Good performer. Performs routine duties satisfactorily. | ☐ Excellent performer. Consistently produces high quality work. | ☒ The exception. Absolutely superior in all areas. |
|---|---|---|---|

**2. HOW MUCH DOES RATEE KNOW ABOUT PRIMARY DUTIES?**  (Consider whether ratee has technical expertise and is able to apply the knowledge)

| ☐ Does not have the basic knowledge necessary to perform duties. | ☐ Has adequate technical knowledge to satisfactorily perform duties. | ☐ Extensive knowledge of all primary duties and related positions. | ☒ Excels in knowledge of all related positions. Masters all duties. |
|---|---|---|---|

**3. HOW WELL DOES RATEE COMPLY WITH STANDARDS?**  (Consider dress and appearance, weight and fitness, customs, and courtesies)

| ☐ Fails to meet minimum standards. | ☐ Meets Air Force standards. | ☐ Sets the example for others to follow. | ☒ Exemplifies top military standards. |
|---|---|---|---|

**4. HOW IS RATEE'S CONDUCT ON/OFF DUTY?**  (Consider financial responsibility, respect for authority, support for organizational activities, and maintenance of government facilities)

| ☐ Unacceptable. | ☐ Acceptable. | ☐ Sets the example for others. | ☒ Exemplifies the standard of conduct. |
|---|---|---|---|

**5. HOW WELL DOES RATEE SUPERVISE/LEAD?**  (Consider how well member sets and enforces standards, displays initiative and self-confidence, provides guidance and feedback, and fosters teamwork)

| ☐ Ineffective. | ☐ Effective. Obtains satisfactory results. | ☐ Highly effective. | ☒ Exceptionally effective leader. |
|---|---|---|---|

**6. HOW WELL DOES RATEE COMPLY WITH INDIVIDUAL TRAINING REQUIREMENTS?**  (Consider upgrade training, professional military education, proficiency/qualification, and contingency)

| ☐ Does not comply with minimum training requirements. | ☐ Complies with most training requirements. | ☐ Complies with all training requirements. | ☒ Consistently exceeds all training requirements. |
|---|---|---|---|

**7. HOW WELL DOES RATEE COMMUNICATE WITH OTHERS?**  (Consider ratee's verbal and written skills)

| ☐ Unable to express thoughts clearly. Lacks organization. | ☐ Organizes and expresses thoughts satisfactorily. | ☐ Consistently able to organize and express ideas clearly and concisely. | ☒ Highly skilled writer and communicator. |
|---|---|---|---|

AF FORM 910, 20000601  (IMT-V1)    PREVIOUS EDITIONS ARE OBSOLETE    FOR OFFICIAL USE ONLY (When filled in)

"Certified True Copy," E-8, Christman, Zachary CHRISTMAN ZACH Digitally signed by CHRISTMAN.ZACHARY.ARY.W+1093462978 1093462978 Date: 2020.04.14 12:21:46 -05:00 First Sergeant, AFPAA, __ Apr 20

US v. Zier Military Record of Trial and Appellate Extracts 000055 of 902

**IV. PROMOTION RECOMMENDATION**
*(Compare this ratee with others of the same grade and AFS)*

RATEE NAME: **ZIER, JEREMY, M**

| RECOMMENDATION | NOT RECOMMENDED | NOT RECOMMENDED THIS TIME | CONSIDER | READY | IMMEDIATE PROMOTION |
|---|---|---|---|---|---|
| **RATER'S RECOMMENDATION** | 1 ☐ | 2 ☐ | 3 ☐ | 4 ☐ | 5 ☒ |
| **ADDITIONAL RATER'S RECOMMENDATION** | 1 ☐ | 2 ☐ | 3 ☐ | 4 ☐ | 5 ☒ |

**V. RATER'S COMMENTS**

- Energetic, industrious, and conscientious individual--proven himself time after time to be a top performer
- Coordinated video project to highlight USSOCOM's 2004 Bull Simons Award Winner, well received product
  -- Documentary praised by all in attendance, including the award recipient, SGM Tabata, very impressive!
- Dedicated Team Player, coordinated new video collection procedures with all USSOCOM components
  -- Collected materials to update and enhance the current USSOCOM stock footage video collection.
- Opened a dialogue between components to understand all USSOCOM visual information needs.
- Assisted in countless hours of video collection in adverse conditions supporting the "Combat Convoy" video.
  -- Video increases awareness of convoy threats and procedures and will result in fewer convoy deaths.
- Cross utilized as graphics technician, routinely fills in and provide support during extremely busy times
- Produced a three minute video that is currently utilized by General Brown during his public briefings.
- Assisted with the completion of over 1500 diverse visual information products during the 2004 SOF Week
- Volunteered to represent the Joint Service Color Guard, presents positive image of command in public forums
- Exceptional professional competence; extraordinary growth potential--ready for immediate promotion!

Last performance feedback was accomplished on: __16 Nov 2004__    *(Consistent with the direction in AFI 36-2406. If not accomplished, state the reason.)*

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| Ricky L. Millikan, TSgt, USAF<br>HQ U.S. Special Operations Command<br>MacDill AFB, FL | NCOIC, Video Production Section | 08 Apr 2005 |
| | SSN | SIGNATURE |

**VI. ADDITIONAL RATER'S COMMENTS**    ☒ CONCUR  ✓  off ☐ NONCONCUR

- Provided video support for the USSOCOM Parachute Team at several high profile events.
  -- Produced and edited an introductory video used at Raymond James Stadium during the Army/Navy game '04
  -- Documented Parachute Team's involvement at 2004 Key West Air Show showcasing our unique mission.
- Outstanding Example -- Voluntarily gives time and energy to multiple high school and middle school activities
  -- Selected as a judge for the National JROTC Drill Meet--attended by over 3500 cadets from 37 states
- I rely on SSgt Zier to provide "4 Star" service with little supervision; he delivers every time--promote!

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| Ellison B. Carter, GS-12, DAFC<br>HQ U.S. Special Operations Command<br>MacDill AFB, FL | Chief, Visual Information Sevices Branch | 08 Apr 2005 |
| | SSN | SIGNATURE |

**INSTRUCTIONS**

*Reports written by a senior rater or the Chief Master Sergeant of the Air Force (CMSAF) will not be endorsed.*
*Reports written by colonels or civilians (GS-15 or higher) do not require an additional rater; however, endorsement is permitted unless prohibited by the instruction above.*
*When the rater's rater is at least a MSgt or civilian (GS-07 or higher), the additional rater is the next official in the rating chain serving in the grade of MSgt or higher, or a civilian in the grade of GS-07 or higher.*
*When the final evaluator (rater or additional rater) is not an Air Force officer, enlisted, or DAF civilian, an Air Force advisor review is required.*
*All evaluators enter only fast four numbers of SSN.*

**VII. COMMANDER'S REVIEW**

☒ CONCUR    off ☐ NONCONCUR    *(Attach AF Form 77)*    SIGNATURE

AF FORM 910, 20000501    *(REVERSE) (IMT-V1)*    FOR OFFICIAL USE ONLY  (When filled in)

*(Left margin, vertical text:)* "Certified True Copy," E-8, Christman, Zachary CHRISTMAN.ZACH ARY.W.1033462276 Digitally signed by CHRISTMAN.ZACHARY.W.1033462276 Date: 2005.04.14 12:33:03 -05'00'  First Sergeant, AFPAA, __ Apr 20

**ENLISTED PERFORMANCE REPORT** *(AB thru TSGT)*  OCT 1 2 2006

## I. RATEE IDENTIFICATION DATA *(Read AFI 36-2406 carefully before completing any item.)*

| 1. NAME *(Last, First, Middle Initial)* | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | SSGT | 3V053 |

| 5. ORGANIZATION, COMMAND, AND LOCATION | 6a. PAS CODE | 6b. SRID |
|---|---|---|
| 1st Combat Camera Squadron (AMC), Charleston AFB SC | CL1LFVYZ | 1LPCI |

| 7. PERIOD OF REPORT | | 8. NO. DAYS SUPERVISION | 9. REASON FOR REPORT |
|---|---|---|---|
| From: 06 Apr 2005 | Thru: 10 Oct 2006 | 120 | Annual |

## II. JOB DESCRIPTION

**1. DUTY TITLE**

COMBAT VIDEOGRAPHY CRAFTSMAN

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES**

Directly supervises one videographer. Deploys within 6-hours notice to provide imagery acquisition, editing and theater-level imagery management in support of operations and exercises worldwide. Collects, digitizes, edits and distributes aircraft Weapon Systems Video for the United States and multinational aircraft throughout an area of responsibility. Operates deployable digital video cameras, lighting, satellite transmission systems and related equipment in austere environments under extreme conditions. Coordinates and determines optimum camera and microphone placement, prepares outlines, develops story treatments, conducts field interviews, reviews footage and edits master video clips ensuring thorough documentation of significant historic events. Acquires and disseminates visual information products in support of the President, Secretary of Defense, DOD, JCS, Unified Commands, Air Force, Air Mobility Command and 21st Expeditionary Mobility Task Force.

## III. EVALUATION OF PERFORMANCE

**1. HOW WELL DOES RATEE PERFORM ASSIGNED DUTIES?** *(Consider quality, quantity, and timeliness of duties performed)*

| Inefficient. An unprofessional performer. | Good performer. Performs routine duties satisfactorily. | Excellent performer. Consistently produces high quality work. | ☒ The exception. Absolutely superior in all areas. |
|---|---|---|---|

**2. HOW MUCH DOES RATEE KNOW ABOUT PRIMARY DUTIES?** *(Consider whether ratee has technical expertise and is able to apply the knowledge)*

| Does not have the basic knowledge necessary to perform duties. | Has adequate technical knowledge to satisfactorily perform duties. | Extensive knowledge of all primary duties and related positions. | ☒ Excels in knowledge of all related positions. Masters all duties. |
|---|---|---|---|

**3. HOW WELL DOES RATEE COMPLY WITH STANDARDS?** *(Consider dress and appearance, weight and fitness, customs, and courtesies)*

| Fails to meet minimum standards. | Meets Air Force standards. | Sets the example for others to follow. | ☒ Exemplifies top military standards. |
|---|---|---|---|

**4. HOW IS RATEE'S CONDUCT ON/OFF DUTY?** *(Consider financial responsibility, respect for authority, support for organizational activities, and maintenance of government facilities)*

| Unacceptable. | Acceptable. | Sets the example for others. | ☒ Exemplifies the standard of conduct. |
|---|---|---|---|

**5. HOW WELL DOES RATEE SUPERVISE/LEAD?** *(Consider how well member sets and enforces standards, displays initiative and self-confidence, provides guidance and feedback, and fosters teamwork)*

| Ineffective. | Effective. Obtains satisfactory results. | Highly effective. | ☒ Exceptionally effective leader. |
|---|---|---|---|

**6. HOW WELL DOES RATEE COMPLY WITH INDIVIDUAL TRAINING REQUIREMENTS?** *(Consider upgrade training, professional military education, proficiency/qualification, and contingency)*

| Does not comply with minimum training requirements. | Complies with most training requirements. | Complies with all training requirements. | ☒ Consistently exceeds all training requirements. |
|---|---|---|---|

**7. HOW WELL DOES RATEE COMMUNICATE WITH OTHERS?** *(Consider ratee's verbal and written skills)*

| Unable to express thoughts clearly. Lacks organization. | Organizes and expresses thoughts satisfactorily. | Consistently able to organize and express ideas clearly and concisely. | ☒ Highly skilled writer and communicator. |
|---|---|---|---|

AF IMT 910, 20000601, V2    PREVIOUS EDITIONS ARE OBSOLETE.    FOR OFFICIAL USE ONLY *(When filled in)*

"Certified True Copy," E-8, Christman, Zachary/First Sergeant, AFPAA,__ Apr 20

CHRISTMAN ZACH Digitally signed by CHRISTMAN.ZACHARY.W.1103545276
ARY.W.1103545276 Date: 2020.04.14 12:44:08 -05'00'

US v. Zier Military Record of Trial and Appellate Extracts 000057 of 902

| IV. PROMOTION RECOMMENDATION *(Compare this ratee with others of the same grade and AFS)* | | | RATEE NAME: ZIER, JEREMY M. | | |
|---|---|---|---|---|---|
| RECOMMENDATION | NOT RECOMMENDED | NOT RECOMMENDED THIS TIME | CONSIDER | READY | IMMEDIATE PROMOTION |
| RATER'S RECOMMENDATION | 1 ☐ | 2 ☐ | 3 ☐ | 4 ☐ | 5 ☒ |
| ADDITIONAL RATER'S RECOMMENDATION | 1 ☐ | 2 ☐ | 3 ☐ | 4 ☐ | 5 ☒ |

**V. RATER'S COMMENTS**

- One of four AF Videographers to attend 2005 Military Motion Media Studies Program, Syracuse University
-- Maintained an excellent 3.4 GPA while producing over nine complete productions during intensive course
- Created public service announcement about alternative travel; reduced night-time crime on 21K student campus
- Outstanding Airman--selected ahead of peers for aerial videography pgm; one of only 37 video aircrew in AF
-- Completed rigorous aircrew ground training ahead of schedule; filled critical world-wide mobility position
- Trained/equipped for Crisis Response team to deploy world-wide within six hours---ready for any contingency
- Produced exemplary short form news feature about Syracuse's Red Cross 2005 Dome Donation Day food drive
-- Additional publicity created from story increased food donations; benefited over 10K local families in need
- Brilliantly supported multiple events at USSOCOM 2005 International Special Operations Forces (SOF) week
-- Products delivered to representatives of 70 nations; received USSOCOM Commander's coin for excellence
- Wing POC--coordinated audio/visual support for 2006 Air Force Ball; event enjoyed by 500 fellow Airmen
- Community supporter! Coordinated 35 mbr school painting team; saved tax payers $6K; lauded by Principal
- Esprit de Corps; performed 10 Joint Service Color Guard details; instilled pride in USSOCOM--promote now!

| Last performance feedback was accomplished on: | 14 Jul 2006 | *(Consistent with the direction in AFI 36-2406. If not accomplished, state the reason.)* |
|---|---|---|

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| MICHAEL J. HASENAUER, TSgt, USAF 1st Combat Camera Squadron (AMC) Charleston AFB SC | Combat Videographer | 11 Oct 2006 |
| | SSN    SIGNATURE | |

| VI. ADDITIONAL RATER'S COMMENTS | ☒ CONCUR   ☐ NONCONCUR |
|---|---|

- Technical Advisor; assisted Disney Productions with technical accuracy during making of SOF mission video
-- Expertise ensured on-time completion; provided future SOF equipment requirements to industry executives
- Combat Camera ambassador! Provided opposing forces support to 437th Security Forces Sq instructors
-- Trained members from 437 APS on expeditionary combat skills--prepared 48 troops for hostile fire zones
- Cooperative spirit--visited local veterans administration hospital patients; fostered goodwill for past/present
- Mission minded NCO; succeeds at all tasks, ready for more challenging roles--must be promoted immediately!

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| TIMOTHY E. LANCASTER, MSgt, USAF 1st Combat Camera Squadron (AMC) Charleston AFB SC | NCOIC, Combat Video Element | 11 Oct 2006 |
| | SSN | |

**INSTRUCTIONS**

Reports written by a senior rater or the Chief Master Sergeant of the Air Force (CMSAF) will not be endorsed.
Reports written by colonels or civilians (GS-15 or higher) do not require an additional rater; however, endorsement is permitted unless prohibited by the instruction above.
When the rater's rater is not at least a MSgt or civilian (GS-07 or higher), the additional rater is the next official in the rating chain serving in the grade of MSgt or higher, or a civilian in the grade of GS-07 or higher.
When the final evaluator (rater or additional rater) is not an Air Force officer, enlisted, or DAF civilian, an Air Force advisor review is required.
All evaluators enter only last four numbers of SSN.

| VII. COMMANDER'S REVIEW | | | |
|---|---|---|---|
| ☒ CONCUR | ☐ NONCONCUR *(Attach AF Form 77)* | SIGNATURE | |

| AF IMT 910, 20000801, V2 | *(REVERSE)* | | FOR OFFICIAL USE ONLY *(When filled in)* |
|---|---|---|---|

"Certified True Copy," E-8, Christman, ZacharyCHRISTMAN.ZACH Digitally signed by CHRISTMAN.ZACHARY.W.105948 ARY.W.1059482278 2022.04.14 12:39:42 -05'00'    Apr 20

US v. Zier Military Record of Trial and Appellate Extracts 000058 of 902

OCT 1 6 2007    OCT 1 6 :

## ENLISTED PERFORMANCE REPORT (AB thru TSGT)

**I. RATEE IDENTIFICATION DATA** *(Read AFI 36-2406 carefully before completing any item.)*

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | SSGT | X3N052 |

| 5. ORGANIZATION, COMMAND, AND LOCATION | 6a. PAS CODE | 6b. SRID |
|---|---|---|
| 1st Combat Camera Squadron (AMC), Charleston AFB SC | CL1LFVYZ | 1LPCH |

| 7. PERIOD OF REPORT | | 8. NO. DAYS SUPERVISION | 9. REASON FOR REPORT |
|---|---|---|---|
| From: 11 Oct 2006 | Thru: 11 Oct 2007 | 365 | Annual |

**II. JOB DESCRIPTION**

1. DUTY TITLE

### AERIAL COMBAT VIDEOGRAPHY CRAFTSMAN

2. KEY DUTIES, TASKS, AND RESPONSIBILITIES

Deploys within 6-hours notice to provide ground imagery acquisition, editing and theater-level imagery management in support of operations and exercises worldwide. Collects, digitizes, edits and distributes video for the United States and Multinational aircraft throughout Area of Responsibility. Operates deployable digital video cameras, lighting, satellite transmission system and related equipment in austere environments under extreme conditions. Coordinates and determines optimum camera and microphone placement, prepares outlines, develops story treatments, conducts field interviews, reviews footage and edits master video clips ensuring thorough documentation of significant historic events. Acquires and disseminates visual information products in support of the President, Secretary of Defense, Department of Defense, Joint Chiefs of Staff, Unified Commands, AF, AMC and 612st Contingency Response Wing requirements. ADDITIONAL DUTY: Sq Safety NCO.

**III. EVALUATION OF PERFORMANCE**

1. HOW WELL DOES RATEE PERFORM ASSIGNED DUTIES? *(Consider quality, quantity, and timeliness of duties performed)*

| Inefficient. An unprofessional performer. | Good performer. Performs routine duties satisfactorily. | Excellent performer. Consistently produces high quality work. | ☒ The exception. Absolutely superior in all areas. |
|---|---|---|---|

2. HOW MUCH DOES RATEE KNOW ABOUT PRIMARY DUTIES? *(Consider whether ratee has technical expertise and is able to apply the knowledge)*

| Does not have the basic knowledge necessary to perform duties. | Has adequate technical knowledge to satisfactorily perform duties. | Extensive knowledge of all primary duties and related positions. | ☒ Excels in knowledge of all related positions. Masters all duties. |
|---|---|---|---|

3. HOW WELL DOES RATEE COMPLY WITH STANDARDS? *(Consider dress and appearance, weight and fitness, customs, and courtesies)*

| Fails to meet minimum standards. | Meets Air Force standards. | Sets the example for others to follow. | ☒ Exemplifies top military standards. |
|---|---|---|---|

4. HOW IS RATEE'S CONDUCT ON/OFF DUTY? *(Consider financial responsibility, respect for authority, support for organizational activities, and maintenance of government facilities)*

| Unacceptable. | Acceptable. | Sets the example for others. | ☒ Exemplifies the standard of conduct. |
|---|---|---|---|

5. HOW WELL DOES RATEE SUPERVISE/LEAD? *(Consider how well member sets and enforces standards, displays initiative and self-confidence, provides guidance and feedback, and fosters teamwork)*

| Ineffective. | Effective. Obtains satisfactory results. | Highly effective. | ☒ Exceptionally effective leader. |
|---|---|---|---|

6. HOW WELL DOES RATEE COMPLY WITH INDIVIDUAL TRAINING REQUIREMENTS? *(Consider upgrade training, professional military education, proficiency/qualification, and contingency)*

| Does not comply with minimum training requirements. | Complies with most training requirements. | Complies with all training requirements. | ☒ Consistently exceeds all training requirements. |
|---|---|---|---|

7. HOW WELL DOES RATEE COMMUNICATE WITH OTHERS? *(Consider ratee's verbal and written skills)*

| Unable to express thoughts clearly. Lacks organization. | Organizes and expresses thoughts satisfactorily. | Consistently able to organize and express ideas clearly and concisely | ☒ Highly skilled writer and communicator. |
|---|---|---|---|

AF IMT 910, 20000601, V2    PREVIOUS EDITIONS ARE OBSOLETE.    FOR OFFICIAL USE ONLY (When filled in)

"Certified True Copy," E-8, Christman, Zachary W. ... First Sergeant, AFPAA, __ Apr 20
CHRISTMAN,ZACH CHRISTMAN.ZACHARY.W.1033462278

## IV. PROMOTION RECOMMENDATION
*(Compare this ratee with others of the same grade and AFSI)*

RATEE NAME: **ZIER, JEREMY M.**

| RECOMMENDATION | NOT RECOMMENDED | NOT RECOMMENDED THIS TIME | CONSIDER | READY | IMMEDIATE PROMOTION |
|---|---|---|---|---|---|
| RATER'S RECOMMENDATION | 1 ☐ | 2 ☐ | 3 ☐ | 4 ☐ | 5 ☒ |
| ADDITIONAL RATER'S RECOMMENDATION | 1 ☐ | 2 ☐ | 3 ☐ | 4 ☐ | 5 ☒ |

### V. RATER'S COMMENTS
- Excelled during 39-day Army Combat Skills Training; filled critical joint Combat Camera Task Force rqmt
- Joint ComCam team mbr; single-handedly supported over 4,600 task force personnel--ensured 100% coverage
- Documented 18 classified tactical missions; provided senior leaders near real-time cmbt situational awareness
- Carefully taped four memorial services for fallen soldiers; provided priceless memories for comrades/families
- Completed rigorous 2-wk advanced "live fire" weapons tactics course--prepared for hostile OIF deployment
- Superb Safety NCO; briefed 120 sq pers on 101 Critical days of Summer mishap prevention; no unit losses
- Recorded IED factories/equip; evidence of enemy ops/tactics; provided US/Iraqi gov't imagery for intel briefs
- Doc'd terrorist execution venue; revealed callous brutality; aired int'l; video viewed at highest lvl's of MNC-I
  -- Provided tactical data for future strategic planning; informed HQ Task Force of deadly terrorist techniques
- Dedicated Staff Sergeant; completed aerial videographer training 25% faster than peers, 100% mission ready
- Committed to welfare of squadron--organized holiday party for over 150 personnel; fostered unit cohesiveness
- Active member of 437th Wing First Six Association; championed unit issues affecting health/morale/welfare
- Hard charging!  Front-line leader; takes on responsibilities above pay-grade--sterling choice for promotion!

Last performance feedback was accomplished on: **13 Apr 2007**    *(Consistent with the direction in AFI 36-2406. If not accomplished, state the reason.)*

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| MICHAEL JAMES HASENAUER, TSgt, USAF<br>1st Combat Camera Squadron (AMC)<br>Charleston AFB SC | Combat Videography Craftsman | OCT 12 2007 |
| | SSN    SIGNATURE | |

### VI. ADDITIONAL RATER'S COMMENTS
☒ CONCUR    ☐ NONCONCUR

- Documented raid of insurgent safe-house/weapons cache; footage highlighted disrupted terrorist logistics route
- Captured hard-hitting footage of US Special Forces within Iraq; detailed extensive counter-terrorism night-ops
  -- Vital images provided MNC-I/CC timely intel to monitor insurgent activity/evaluate battlefield effectiveness
- Steadfast acquisition skills; recorded three US soldiers during search of abandoned Iraqi chemical complex
  -- Discovered improvised explosive device--initiated immediate area evacuation; saved lives of 4-man team
- Performs at TSgt level; unmatched motivation energizes peers/subordinates into action--rock-solid promotion!

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| TIMOTHY E. LANCASTER, MSgt, USAF<br>1st Combat Camera Squadron (AMC)<br>Charleston AFB SC | NCOIC, Combat Video Element | OCT 12 2007 |
| | SSN    SIGNATURE | |

### INSTRUCTIONS
Reports written by a senior rater or the Chief Master Sergeant of the Air Force (CMSAF) will not be endorsed.
Reports written by colonels or civilians (GS-15 or higher) do not require an additional rater; however, endorsement is permitted unless prohibited by the instruction above.
When the rater's rater is not at least a MSgt or civilian (GS-07 or higher), the additional rater is the next official in the rating chain serving in the grade of MSgt or higher, or a civilian in the grade of GS-07 or higher.
When the final evaluator (rater or additional rater) is not an Air Force officer, enlisted, or DAF civilian, an Air Force advisor review is required
All evaluators enter only last four numbers of SSN.

### VII. COMMANDER'S REVIEW
☒ CONCUR    ☐ NONCONCUR  (Attach AF Form 77)    SIGNATURE

AF IMT 910, 20000601, V2    (REVERSE)    FOR OFFICIAL USE ONLY  (When filled in)

"Certified True Copy," E-8, Christman, Zachary A., First Sergeant, AFPAA, __ Apr 20
CHRISTMAN ZACH

## ENLISTED PERFORMANCE REPORT (AB thru TSgt)

**I. RATEE IDENTIFICATION DATA** (Refer to AFI 36-2406 for instructions on completing this form)

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | TSgt | X3N052 |

| 5. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 6. PAS CODE | 7. SRID |
|---|---|---|
| 1st Combat Camera Squadron (AFPAA), Charleston AFB SC (AD) | CL12FVYZ | PAZ01 |

| 8. PERIOD OF REPORT | | 9. NO. DAYS SUPERVISION | 10. REASON FOR REPORT |
|---|---|---|---|
| From: 11 Oct 2007  Thru: 10 Oct 2008 | | 318 | Annual |

**II. JOB DESCRIPTION**

| 1. DUTY TITLE | 2. SIGNIFICANT ADDITIONAL DUTY(S) |
|---|---|
| AERIAL COMBAT VIDEOGRAPHY CRAFTSMAN | Flight Training Monitor |

**3. KEY DUTIES, TASKS, AND RESPONSIBILITIES** (Limit text to 4 lines)
- Deploys w/6-hours notice; provides video acquisition, editing/AOR imagery mgt in spt of ops/exs worldwide
- Operates digital video cameras, lighting, satellite transmission systems/related equipment in austere conditions
- Responsible for the training of 50 videographers in documentation, broadcasting and post-production/editing
- Acquires/disseminates visual information products in support of the President, DoD, JCS and AF requirements

**III. PERFORMANCE ASSESSMENT**

**1. PRIMARY/ADDITIONAL DUTIES** (For SSgt/TSgt also consider Supervisory, Leadership and Technical Abilities)
Consider Adapting, Learning, Quality, Timeliness, Professional Growth and Communication Skills  (Limit text to 4 lines)

| Does Not Meet | Meets | Above Average | ☒ Clearly Exceeds |
|---|---|---|---|

- Chosen combat camera rep at PA ldrshp conf; built fundamental relations; expertise bridged PA/ComCam gap
- Documented last 15K-lb bomb drop by special ops sq--captured historic final blast of Vietnam-era weaponry
- Lead redeployment mgr for five MOBEXs; organized pax/equip trans for 15-man team--ensured msn success
- Instructed video journalism/editing techniques--14 Amn certified 4 mos ahead of schedule--improved readiness

**2. STANDARDS, CONDUCT, CHARACTER & MILITARY BEARING** (For SSgt/TSgt also consider Enforcement of Standards and Customs & Courtesies)
Consider Dress & Appearance, Personal/Professional Conduct On/Off Duty (Limit text to 2 lines)

| Does Not Meet | Meets | Above Average | ☒ Clearly Exceeds |
|---|---|---|---|

- Elected Sq Booster Club President--led/organized 6 fundraisers earning 5K; funded 3 events/bolstered morale
- Enterprising First Six mbr; dedicated 48 hours to Ginn Tribute Golf Tournament--key to raising $11K for assoc

**3. FITNESS** (Maintains Air Force Physical Fitness Standards)  (For referrals, limit text to 1 line)

| ☒ Does Not Meet | Meets | Exempt |
|---|---|---|

**4. TRAINING REQUIREMENTS** (For SSgt/TSgt also consider PME, Off-duty Education, Technical Growth, Upgrade Training)
Consider Upgrade, Ancillary, OJT and Readiness  (Limit text to 2 lines)

| Does Not Meet | Meets | Above Average | ☒ Clearly Exceeds |
|---|---|---|---|

- Completed combat/water survival tng--acquired SERE techniques/skills necessary to survive in combat zones
- Selected to attend National Assoc of Broadcasters trade show--identified $85K in video equip modernization

**5. TEAMWORK/FOLLOWERSHIP** (For SSgt/TSgt also consider Leadership, Team Accomplishments, Recognition/Reward Others)
Consider Team Building, Support of Team, Followership (Limit text to 2 lines)

| Does Not Meet | Meets | Above Average | ☒ Clearly Exceeds |
|---|---|---|---|

- Forward thinker!  Initiated wkly peer review; focused on uncontrolled action--exceeded video flight tng rqmts
- Volunteered for combat camera air show booth; viewed by 100K pers--showcased ComCam's role in GWOT

**6. OTHER COMMENTS**
Consider Promotion, Future Duty/Assignment/Education Recommendations and Safety, Security & Human Relations  (Limit text to 2 lines)

- Led inspection of 50 OJT records incorporating new 3N CFETP--standardized/improved shop's tng/readiness
- Outstanding NCO; takes the lead/tackles all challenges--lynchpin to flight's msn success; promote to MSgt now!

**IV. RATER INFORMATION**

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| LISA M. BAILEY, MSgt, USAF<br>1st Combat Camera Squadron (AFPAA)<br>Charleston AFB SC | NCOIC, Video Training Element | | 10 Oct 2008 |
| | SSN | SIGNATURE<br>BAILEY.LISA.M | |

AF FORM 910, 20080618    PREVIOUS EDITIONS ARE OBSOLETE

PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

*Left margin:* Apr 20 — CHRISTMAN ZACHARY ... Technical Sergeant, AFPAA, ... "Certified True Copy," E-8, Christman, Zachary

## V. OVERALL PERFORMANCE ASSESSMENT
### Overall Performance During Reporting Period

RATEE NAME: **ZIER, JEREMY M.**

| ASSESSMENT | POOR (1) | NEEDS IMPROVEMENT (2) | AVERAGE (3) | ABOVE AVERAGE (4) | TRULY AMONG THE BEST (5) |
|---|---|---|---|---|---|
| RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |
| ADDITIONAL RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |

Last feedback was performed on: **27 Jun 2008**   If feedback was not accomplished in accordance with AFI 36-2406, state the reason.

## VI. ADDITIONAL RATER'S COMMENTS (Limit text to 3 lines)    ☒ CONCUR    ☐ NON-CONCUR

- Responsible for 50 videographers qual; training program benchmark during UCI; key to sq's "Excellent" rating
- Led 8-man ComCam ORI team; captured Amn in combat environment; coined by 621 CRW/CC for excellence
- Awarded Bronze Star for bravery while under fire in Iraq; dedicated ComCam warrior--promote to MSgt now!

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| M. TODD KELLY, Capt, USAF<br>1st Combat Camera Squadron (AFPAA)<br>Charleston AFB SC | Flight Commander, Combat Video Flight | 10 Oct 2008 |
| | SSN          SIGNATURE | |

## VII. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR
(Indicate applicable review by marking the appropnate box.)    ☐ FUNCTIONAL EXAMINER    ☐ AIR FORCE ADVISOR

| NAME, GRADE, BR OF SVC. ORGN, COMMAND AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| | SSN          SIGNATURE | |

## VIII. UNIT COMMANDER/CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER    ☒ CONCUR    ☐ NON-CONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| ROBYN A. CHUMLEY, Lt Col, USAF<br>1st Combat Camera Squadron (AFPAA)<br>Charleston AFB SC | Commander | 10 Oct 2008 |
| | SSN          SIGNATURE | |

## IX. RATEE'S ACKNOWLEDGEMENT

I understand my signature does not constitute agreement or disagreement. I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report.    ☒ Yes    ☐ No

| SIGNATURE | |
|---|---|
| ZIER.JEREMY.M.1022331023, | DATE **20 Oct 2008** |

## INSTRUCTIONS

Complete this report IAW AFI 36-2406. Reports written by Colonels or civilians (GS-15 or higher, or Supervisory Pay Band 3), do not require an additional rater; however, endorsement by the rater's rater is permitted unless the report is written by a senior rater or the Chief Master Sergeant of the Air Force. When the rater's rater is not at least a MSgt or civilian (GS-07 or higher, or Supervisory Pay Band 1), the additional rater is the next official in the rating chain meeting grade requirements  An overall rating of 2 or negative comments require the EPR to be referred IAW AFI 36-2406  Rationale for any additional evaluator nonconcurring with an overall rating must be included  Section VIII Reviewer nonconcurrence must be included on an AF Form 77. Letter of Evaluation  If ratee is deployed, provide copy and  feedback via e-mail/telecon.

## PRIVACY ACT STATEMENT

AUTHORITY: Title 10 United States Code, Section 8013 and Executive Order 9397, 22 November 1943.

PURPOSE: Information is needed for verification of the individual's name and Social Security Number (SSN) as captured on the form at the time of rating.

ROUTINE USES: May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3).

DISCLOSURE: Disclosure is mandatory. SSN is used for positive identification.

AF FORM 910, 20060918    PREVIOUS EDITIONS ARE OBSOLETE    PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

*Left margin (vertical text):* "Certified True Copy," E-8, Christman, Zachary W.1123485227, 1st Sergeant, AFPAA, __ Apr 20

*CHRISTMAN ZACH Digitally signed by CHRISTMAN.ZACHARY.W.1123485227B Date: 2020.04.16 ...*

US v. Zier Military Record of Trial and Appellate Extracts 000062 of 902

## ENLISTED PERFORMANCE REPORT (AB thru TSgt)

**I. RATEE IDENTIFICATION DATA** (Refer to AFI 36-2406 for instructions on completing this form)

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | TSgt | X3N052 |

| 5. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 6. PAS CODE | 7. SRID |
|---|---|---|
| 1st Combat Camera Squadron (AFPAA), Charleston AFB SC (AD) | CL12FVYZ | PAZ01 |

| 6. PERIOD OF REPORT | | 9. NO. DAYS SUPERVISION | 10. REASON FOR REPORT |
|---|---|---|---|
| From: 11 Oct 2008   Thru: 10 Oct 2009 | | 314 | Annual |

**II. JOB DESCRIPTION**

| 1. DUTY TITLE | 2. SIGNIFICANT ADDITIONAL DUTY(S) |
|---|---|
| Aerial Combat Videographer | Aerial Combat Videographer Instructor |

**3. KEY DUTIES, TASKS, AND RESPONSIBILITIES** (Limit text to 4 lines)
- Deploys w/6-hours notice; provides video acquisition, editing/AOR imagery mgt in spt of ops/ex's worldwide
- Operates digital video cameras, lighting, satellite transmission systems/related equipment in austere conditions
- Determines camera/microphone placement, conducts field interviews, reviews footage/edits master video clips
- Acquires/disseminates visual information products in support of the President, DoD, JCS and AF requirements

**III. PERFORMANCE ASSESSMENT**

**1. PRIMARY/ADDITIONAL DUTIES** (For SSgt/TSgt also consider Supervisory, Leadership and Technical Abilities)
Consider Adapting, Learning, Quality, Timeliness, Professional Growth and Communication Skills (Limit text to 4 lines)

| Does Not Meet | Meets | Above Average | Clearly Exceeds ☒ |
|---|---|---|---|

- Conducted 24 cmbt msns w/Navy SEALS during Iraq deployment--provided battlefield view for strategic ldrs
- Instituted Tng Business Area: developed electronic OJT records--improved training certification for 35 Airmen
- Ex COMBINED ENDEAVOR team lead--Denmark; showed NATO comm interoperability--built ties w/Allies
- Led 4-mbr team; doc'd Atlantic City air show; instructed 2 aerial photographers--mbrs gained flying experience

**2. STANDARDS, CONDUCT, CHARACTER & MILITARY BEARING** (For SSgt/TSgt also consider Enforcement of Standards and Customs & Courtesies)
Consider Dress & Appearance, Personal/Professional Conduct On/Off Duty (Limit text to 2 lines)

| Does Not Meet | Meets | Above Average | Clearly Exceeds ☒ |
|---|---|---|---|

- Represented Sq at tactical gear expo; cmbt expertise key to identify key purchases--enabled Sq to stay cmbt rdy
- AF spokesperson! Guest speaker at local middle school--educated 100+ students about AF and ComCam msn

**3. FITNESS** (Maintains Air Force Physical Fitness Standards) (For referrals, limit text to 1 line)

| Does Not Meet | Meets ☒ | Exempt |
|---|---|---|

**4. TRAINING REQUIREMENTS** (For SSgt/TSgt also consider PME, Off-duty Education, Technical Growth, Upgrade Training)
Consider Upgrade Ancillary, OJT and Readiness (Limit text to 2 lines)

| Does Not Meet | Meets | Above Average | Clearly Exceeds ☒ |
|---|---|---|---|

- Upgrade tng complete; 1 of 4 certified aerial instructors--maintained readiness of AF's largest video flying pgm
- Completed 2-wk basic announcing skills crs--gained broadcasting skills for producing cmbt news video stories

**5. TEAMWORK/FOLLOWERSHIP** (For SSgt/TSgt also consider Leadership, Team Accomplishments, Recognition/Reward Others)
Consider Team Building, Support of Team, Followership (Limit text to 2 lines)

| Does Not Meet | Meets | Above Average | Clearly Exceeds ☒ |
|---|---|---|---|

- Organized Sq's Sept 11th "Day of Caring" proj; enlisted 35 mbrs/280 man-hours--beautified local high school
- Sr enlisted for 9 jt mbr US group on Danish camp; maintained safety and accountability of pers--zero incidents

**6. OTHER COMMENTS**
Consider Promotion, Future Duty/Assignment/Education Recommendations and Safety, Security & Human Relations (Limit text to 2 lines)

- Volunteered for Habitat for Humanity; built low income homes--saved $7K in costs & improved local relations
- Committed NCO! Exudes service before self: sponsored two Amn to AF Ball/ALS graduation--promote now!

**IV. RATER INFORMATION**

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| TIMOTHY R. BAILEY, MSgt, USAF 1st Combat Camera Squadron (AFPAA) Charleston AFB SC | NCOIC, Combat Video Element | 3 Nov 2009 |
| | SSN       SIGNATURE | |

**AF FORM 910, 20080618**    PREVIOUS EDITIONS ARE OBSOLETE

**PRIVACY ACT INFORMATION:** The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

"Certified True Copy," E-8, Christman, Zachary, First Sergeant, AFPAA, Apr 20

CHRISTMAN ZACH Digitally signed by CHRISTMAN.ZACHARY.AN.1033462278 Date 2020.04.19 15:00:07 -04'00'

## V. OVERALL PERFORMANCE ASSESSMENT
Overall Performance During Reporting Period

RATEE NAME: ZIER, JEREMY M.

| ASSESSMENT | POOR (1) | NEEDS IMPROVEMENT (2) | AVERAGE (3) | ABOVE AVERAGE (4) | TRULY AMONG THE BEST (5) |
|---|---|---|---|---|---|
| RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |
| ADDITIONAL RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |

Last feedback was performed on: **10 Aug 2009**   If feedback was not accomplished in accordance with AFI 36-2406, state the reason

## VI. ADDITIONAL RATER'S COMMENTS (Limit text to 3 lines)   ☒ CONCUR   ☐ NON-CONCUR

- Excelled in MSgt role!  Led tng element/prepared 10 Amn for ComCam ops w/in 6 mos--boosted Flt resources
- Filmed crime scene investigation tng; produced DVD series--trained Iraqi teams on state-of-the-art techniques
- Remarkably talented and knowledgeable NCO!  Dedicated to shaping the future of AF Amn--promote to MSgt!

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| PHILLIP W. VENTURA, Capt. USAF 1st Combat Camera Squadron (AFPAA) Charleston AFB SC | Flight Commander, Combat Video Flight | | 4 Nov 2009 |
| | SSN | SIGNATURE | |

## VII. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR
(Indicate applicable review by marking the appropriate box.)   ☐ FUNCTIONAL EXAMINER   ☐ AIR FORCE ADVISOR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| | | | |
| | SSN | SIGNATURE | |

## VIII. UNIT COMMANDER/CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER   ☒ CONCUR   ☐ NON-CONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| AARON D. BURGSTEIN, Lt Col, USAF 1st Combat Camera Squadron (AFPAA) Charleston AFB SC | Commander | | 12 Nov 2009 |
| | SSN | SIGNATURE | |

## IX. RATEE'S ACKNOWLEDGEMENT

I understand my signature does not constitute agreement or disagreement   I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report   ☒ Yes   ☐ No

| SIGNATURE | DATE |
|---|---|
| ZIER.JEREMY.M.1022331023. | 17 Nov 2009 |

## INSTRUCTIONS

Complete this report IAW AFI 36-2406. Reports written by Colonels or civilians (GS-15 or higher, or Supervisory Pay Band 3), do not require an additional rater, however, endorsement by the rater's rater is permitted unless the report is written by a senior rater or the Chief Master Sergeant of the Air Force. When the rater's rater is not at least a MSgt or civilian (GS-07 or higher, or Supervisory Pay Band 1), the additional rater is the next official in the rating chain meeting grade requirements. An overall rating of 2 or negative comments require the EPR to be referred IAW AFI 36-2406. Rationale for any additional evaluator nonconcurring with an overall rating must be included  Section VIII Reviewer nonconcurrence must be included on an AF Form 77, Letter of Evaluation. If ratee is deployed, provide copy and feedback via e-mail/telecon

## PRIVACY ACT STATEMENT

AUTHORITY: Title 10 United States Code, Section 8013 and Executive Order 9397, 22 November 1943.

PURPOSE: Information is needed for verification of the individual's name and Social Security Number (SSN) as captured on the form at the time of rating.

ROUTINE USES: May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3).

DISCLOSURE: Disclosure is mandatory; SSN is used for positive identification.

AF FORM 910, 20080618   PREVIOUS EDITIONS ARE OBSOLETE   PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

"Certified True Copy," E-8, Christman, Zachary W.1033462278 First Sergeant, AFPAA,__ Apr 20

CHRISTMAN.ZACH ZACHARY W.1033462278 4229

# ENLISTED PERFORMANCE REPORT (AB thru TSgt)

## I. RATEE IDENTIFICATION DATA (Refer to AFI 36-2406 for instructions on completing this form)

| 1. NAME (Last, First, Middle Initial) | 2 SSN | 3 GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | TSgt | X3N052 |

| 5 ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 8. PAS CODE | 7. SRID |
|---|---|---|
| 1st Combat Camera Squadron (AFPAA), Charleston AFB SC (AD) | CL12FVYZ | PAZ01 |

| 8 PERIOD OF REPORT | | 9 NO. DAYS SUPERVISION | 10. REASON FOR REPORT |
|---|---|---|---|
| From: 11 Oct 2009 | Thru: 2 Jun 2010 | 235 | CRO |

## II. JOB DESCRIPTION

| 1 DUTY TITLE | 2. SIGNIFICANT ADDITIONAL DUTY(S) |
|---|---|
| Aerial Combat Videographer | N/A |

3. KEY DUTIES, TASKS, AND RESPONSIBILITIES  *(Limit text to 4 lines)*
- Deploys w/6-hrs notice; provides video acquisition, editing/AOR imagery mgt in spt of ops/exers worldwide
- Operates digital video cameras, lighting, satellite transmission systems/related equipment in austere conditions
- Determines camera/microphone placement, conducts field interviews, reviews footage/edits master video clips
- Acquires/disseminates visual information products in support of the President, DoD, JCS and AF requirements

## III. PERFORMANCE ASSESSMENT

1. PRIMARY/ADDITIONAL DUTIES  *(For SSgt/TSgt also consider Supervisory, Leadership and Technical Abilities)*
Consider Adapting, Learning, Quality, Timeliness, Professional Growth and Communication Skills  *(Limit text to 4 lines)*

☐ Does Not Meet   ☐ Meets   ☐ Above Average   ☒ Clearly Exceeds
- Led 4 mbr Exer COPE NORTH team; showcased US/Japan cmbt interoperability--video validated tng success
- Key sq planner for Exer EMERALD WARRIOR--coord'ed SOF exer doc guidelines/established requirements
- High-definition test subject; eval'd 5 camera units/software--key to bringing AF video up to industry standards
- Doc'd Doolittle Raider's 68th reunion; produced 4 news stories--preserved history/broadcast on media outlets

2. STANDARDS, CONDUCT, CHARACTER & MILITARY BEARING  *(For SSgt/TSgt also consider Enforcement of Standards and Customs & Courtesies)*
Consider Dress & Appearance, Personal/Professional Conduct On/Off Duty  *(Limit text to 2 lines)*

☐ Does Not Meet   ☐ Meets   ☐ Above Average   ☒ Clearly Exceeds
- Marched in Veteran's Day parade; represented ComCam/AF--awarded letter of appreciation from town mayor
- Patriotic Committee Chairman at NCO Academy; produced graduation video--honored spirit of military family

3. FITNESS  *(Maintains Air Force Physical Fitness Standards)*  *(For referrals, limit text to 1 line)*

☐ Does Not Meet   ☒ Meets   ☐ Exempt

4. TRAINING REQUIREMENTS  *(For SSgt/TSgt also consider PME, Off-duty Education, Technical Growth, Upgrade Training)*
Consider Upgrade, Ancillary, OJT and Readiness  *(Limit text to 2 lines)*

☐ Does Not Meet   ☐ Meets   ☐ Above Average   ☒ Clearly Exceeds
- Proficient on 11 airframes--increased ComCams aerial mission capability--provided invaluable documentation
- Finished 15 ancillary computer-based tng modules; met AF/sq mobility/readiness rqmts--trained/mission ready

5 TEAMWORK/FOLLOWERSHIP  *(For SSgt/TSgt also consider Leadership, Team Accomplishments, Recognition/Reward Others)*
Consider Team Building, Support of Team, Followership  *(Limit text to 2 lines)*

☐ Does Not Meet   ☐ Meets   ☐ Above Average   ☒ Clearly Exceeds
- Supported Panama City Iron Man competition; distributed water to over 2,400 athletes--kept members hydrated
- Contributed to Partners-In-Education pgm; scraped/painted lunch tables--provided svc to poorly funded school

## 6. OTHER COMMENTS
Consider Promotion, Future Duty/Assignment/Education Recommendations and Safety, Security & Human Relations  *(Limit text to 2 lines)*
- Created 2 Public Service Announcements for National Museum of the USAF--broadcast via worldwide web
- Outstanding ldr/manager/follower; organized 16 NCO Academy study groups; 100% grad rate--promote now!

## IV. RATER INFORMATION

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| TIMOTHY R. BAILEY, MSgt, USAF<br>1st Combat Camera Squadron (AFPAA)<br>Charleston AFB SC | NCOIC, Combat Video Element | 22 Oct 2010 |
| | SSN          SIGNATURE | |

AF FORM 910, 20080618      PREVIOUS EDITIONS ARE OBSOLETE      PRIVACY ACT INFORMATION:  The information in this form is FOR OFFICIAL USE ONLY.  Protect IAW the Privacy Act of 1974.

"Certified True Copy," E-8, Christman, Zachary,AW,W,10334622278  Digitally signed by CHRISTMAN.ZACHARY.W.10334622278 46626 Date: 2020.04.17 09:10:52 -05'00'   CHRISTMAN.ZACH   E-8, Christman, Zachary, W.1033462278 1151 Sergeant, AFPAA, __ Apr 20

US v. Zier Military Record of Trial and Appellate Extracts 000065 of 902

**V. OVERALL PERFORMANCE ASSESSMENT**
Overall Performance During Reporting Period

RATEE NAME: ZIER, JEREMY M.

| ASSESSMENT | POOR (1) | NEEDS IMPROVEMENT (2) | AVERAGE (3) | ABOVE AVERAGE (4) | TRULY AMONG THE BEST (5) |
|---|---|---|---|---|---|
| RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |
| ADDITIONAL RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |

Last feedback was performed on: 15 Feb 2010    If feedback was not accomplished in accordance with AFI 36-2406, state the reason

**VI. ADDITIONAL RATER'S COMMENTS** *(Limit text to 3 lines)*    ☒ CONCUR    ☐ NON-CONCUR

- NCOIC of 14 person team; doc'd Exer EMERALD WARRIOR--over 16K photos/1,500 video mins recorded
- Supported AF's largest video flying pgm; instructed 6 flyers on airborne duties--key to AF ComCam's core msn
- Superb NCO!  Respected by colleagues; sets the example for others to follow--promote to MSgt immediately!

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| CARMEN M. JUDGE, Capt, USAF<br>1st Combat Camera Squadron (AFPAA)<br>Charleston AFB SC | Flight Commander, Combat Video Flight | | 22 Oct 2010 |
| | SSN | SIGNATURE | |

**VII. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR**
*(Indicate applicable review by marking the appropriate box.)*    ☐ FUNCTIONAL EXAMINER    ☐ AIR FORCE ADVISOR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| | SSN | SIGNATURE | |

**VIII. UNIT COMMANDER/CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER**    ☒ CONCUR    ☐ NON-CONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| AARON D. BURGSTEIN, Lt Col, USAF<br>1st Combat Camera Squadron (AFPAA)<br>Charleston AFB SC | Commander | | 22 Oct 2010 |
| | SSN | SIGNATURE | |

**IX. RATEE'S ACKNOWLEDGEMENT**

I understand my signature does not constitute agreement or disagreement   I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report.    ☒ Yes    ☐ No

| SIGNATURE | DATE |
|---|---|
| ZIER.JEREMY.M.1022331023. | 1 Nov 2010 |

**INSTRUCTIONS**

*Complete this report IAW AFI 36-2406. Reports written by Colonels or civilians (GS-15 or higher, or Supervisory Pay Band 3), do not require an additional rater; however, endorsement by the rater's rater is permitted unless the report is written by a senior rater or the Chief Master Sergeant of the Air Force. When the rater's rater is not at least a MSgt or civilian (GS-07 or higher, or Supervisory Pay Band 1), the additional rater is the next official in the rating chain meeting grade requirements. An overall rating of 2 or negative comments require the EPR to be referred IAW AFI 36-2406. Rationale for any additional evaluator nonconcurring with an overall rating must be included. Section VIII Reviewer nonconcurrence must be included on an AF Form 77, Letter of Evaluation. If ratee is deployed, provide copy and feedback via e-mail/telecon*

**PRIVACY ACT STATEMENT**

AUTHORITY: Title 10 United States Code, Section 8013 and Executive Order 9397, 22 November 1943.

PURPOSE: Information is needed for verification of the individual's name and Social Security Number (SSN) as captured on the form at the time of rating.

ROUTINE USES: May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3)

DISCLOSURE: Disclosure is mandatory; SSN is used for positive identification.

AF FORM 910, 20080618    PREVIOUS EDITIONS ARE OBSOLETE    PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

*(Left margin, rotated text)* "Certified True Copy," E-8, Christman, Zachary wm First Sergeant, AFPAA, ___ Apr 20

CHRISTMAN.ZACH
ARY.W.4093462278

**ENLISTED PERFORMANCE REPORT (AB thru TSgt)**

**I. RATEE IDENTIFICATION DATA** (Refer to AFI 36-2406 for instructions on completing this form)

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | TSgt | 3N072 |

| 5. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 6 PAS CODE | 7. SRID |
|---|---|---|
| 3rd Combat Camera Sq (AFPAA), Lackland Air Force Base, Texas (AD) | LA12F1PM | PAZ01 |

| 8. PERIOD OF REPORT | | | 9. NO DAYS SUPERVISION | 10 REASON FOR REPORT |
|---|---|---|---|---|
| From: 3 Jun 2010 | Thru: 2 Jun 2011 | | 365 | Annual |

**II. JOB DESCRIPTION**

| 1. DUTY TITLE | 2. SIGNIFICANT ADDITIONAL DUTY(S) |
|---|---|
| Combat Videographer | NCOIC, Flying Operations |

3 KEY DUTIES, TASKS, AND RESPONSIBILITIES  (Limit text to 4 lines)
- Supervises 8-mbr Combat Camera (ComCam) aerial documentation team spt'ing DoD, USAF & AFPAA rqmts
- Operates digital video cameras, lighting, satellite transmission systems/related equipment in austere conditions
- Researches, defines VI project subject matter, assists w/ script preparations, conducts on-camera interviews
- Ensures over $4M of video production support equipment is utilized to meet in-garrison/deployed requirements

**III. PERFORMANCE ASSESSMENT**

1 PRIMARY/ADDITIONAL DUTIES  (For SSgt/TSgt also consider Supervisory, Leadership and Technical Abilities)
Consider Adapting, Learning, Quality, Timeliness, Professional Growth and Communication Skills  (Limit text to 4 lines)

[ ] Does Not Meet   [ ] Meets   [ ] Above Average   [X] Clearly Exceeds

- Led Freedom Flyer video; doc'd 10 former AF POWs; moving stories to debut in CSAF's Pioneers in Blue proj
- Stood up sq's aerial doc tng pgm; secured tng slots, enabled 8 mbrs ops readiness; linchpin to FOC rqmt's plan
- Led 21-mbr Nat'l Tng Ctr doc team; products assisted ldrs eval pre-deployment exercise; 6K Soldiers cmbt rdy
- Doc'd 1st Global Strike Challenge; coined by GSC/CC; broadcast new AF nuclear enterprise for int'l audience

2 STANDARDS, CONDUCT, CHARACTER & MILITARY BEARING  (For SSgt/TSgt also consider Enforcement of Standards and Customs & Courtesies)
Consider Dress & Appearance, Personal/Professional Conduct On/Off Duty  (Limit text to 2 lines)

[ ] Does Not Meet   [ ] Meets   [ ] Above Average   [X] Clearly Exceeds

- Entrusted by Hq AFPAA; served on EMERALD WARRIOR planning conf; initiated improvements for '12 exer
- Crafted tng seminar for 20-Amn; secured $0-cost professional development crs; improved operational imagery

3. FITNESS (Maintains Air Force Physical Fitness Standards)  (For referrals, limit text to 1 line)

[X] Does Not Meet   [ ] Exempt

4. TRAINING REQUIREMENTS  (For SSgt/TSgt also consider PME, Off-duty Education, Technical Growth, Upgrade Training)
Consider Upgrade, Ancillary, OJT and Readiness  (Limit text to 2 lines)

[ ] Does Not Meet   [ ] Meets   [ ] Above Average   [X] Clearly Exceeds

- Attended DoD ComCam Ldrs crs; 2-wk tng honed planning/leadership skills; ready to lead deployed cmbt ops
- Trained 10 ComCam Amn on night-vision doc & defensive driving techniques; adv'd readiness, FOC milestone

5. TEAMWORK/FOLLOWERSHIP  (For SSgt/TSgt also consider Leadership, Team Accomplishments, Recognition/Reward Others)
Consider Team Building, Support of Team, Followership  (Limit text to 2 lines)

[ ] Does Not Meet   [ ] Meets   [ ] Above Average   [X] Clearly Exceeds

- Key role in AFPAA transition; aided stand-up IG stds/eval div; enabled return of flying pgm to 4 ComCam sq's
- Exceptional mentor; motivational ldrship resulted in Amn winning Distinguished Grad, DINFOS Media Course

6 OTHER COMMENTS
Consider Promotion, Future Duty/Assignment/Education Recommendations and Safety, Security & Human Relations  (Limit text to 2 lines)

- Community ambassador! Volunteered 80 hrs; counseled 20 youths on drug-free lifestyle; lauded by AETC/CC
- Driven! Ready for Ops Chief responsibilities; successful w/toughest projects; MSgt promotion well deserved!

**IV. RATER INFORMATION**

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| PIPER A. FAULISI, MSgt, USAF<br>3rd Combat Camera Squadron (AFPAA)<br>Lackland AFB, TX | Superintendent, Documentation Flight | 11 Jul 2011 |
| | SSN          SIGNATURE | |

AF FORM 910, 20080618     PREVIOUS EDITIONS ARE OBSOLETE     PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

"Certified True Copy," E-8, Christman, Zachary — First Sergeant, AFPAA, ___ Apr 20

CHRISTMAN.ZACH Digitally signed by CHRISTMAN.ZACHARY.RYVW.1033482276
ARYVW.1033482276 Date: 2020.04.14 15:45:43 -05'00'

| V. OVERALL PERFORMANCE ASSESSMENT<br>Overall Performance During Reporting Period | RATEE NAME  ZIER, JEREMY M. | | | | |
| --- | --- | --- | --- | --- | --- |
| ASSESSMENT | POOR (1) | NEEDS IMPROVEMENT (2) | AVERAGE (3) | ABOVE AVERAGE (4) | TRULY AMONG THE BEST (5) |
| RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |
| ADDITIONAL RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |

Last feedback was performed on:    12 Nov 2010    If feedback was not accomplished in accordance with AFI 36-2406, state the reason

| VI. ADDITIONAL RATER'S COMMENTS  (Limit text to 3 lines) | ☒ CONCUR | ☐ NON-CONCUR |
| --- | --- | --- |

- Led 22-mbr tm at EMERALD WARRIOR; doc'd 2K+ int'l mbrs--highlighted Combined ops to SOCOM ldrship
- Produced key inputs to new aerial doc OI; set std for 100+ ComCam flyers--returned Amn to the fight AF-wide
- Proven ldr!  Selected by Hq AFPAA to direct ComCam Aerial Operations function--earned SNCO promotion!

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | DATE |
| --- | --- | --- |
| JOHN G. JONES, CMSgt, USAF<br>3rd Combat Camera Squadron (AFPAA)<br>Lackland AFB, TX | Superintendent | 11 Jul 2011 |
| | SSN      SIGNATURE | |

| VII. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR<br>(Indicate applicable review by marking the appropriate box.) | ☐ FUNCTIONAL EXAMINER | ☐ AIR FORCE ADVISOR |
| --- | --- | --- |
| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | DATE |
| | SSN      SIGNATURE | |

| VIII. UNIT COMMANDER/CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER | ☒ CONCUR | ☐ NON-CONCUR |
| --- | --- | --- |
| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | DATE |
| THOMAS A. KNOWLES, Major, USAF<br>3rd Combat Camera Squadron (AFPAA)<br>Lackland AFB, TX | Commander | 11 Jul 2011 |
| | SSN      SIGNATURE | |

**IX. RATEE'S ACKNOWLEDGEMENT**

I understand my signature does not constitute agreement or disagreement. I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report.    ☒ Yes    ☐ No

| SIGNATURE | DATE |
| --- | --- |
| ZIER.JEREMY.M.1022331023. | 12 Jul 2011 |

**INSTRUCTIONS**

Complete this report IAW AFI 36-2406.  Reports written by Colonels or civilians (GS-15 or higher, or Supervisory Pay Band 3), do not require an additional rater, however, endorsement by the rater's rater is permitted unless the report is written by a senior rater or the Chief Master Sergeant of the Air Force When the rater's rater is not at least a MSgt or civilian (GS-07 or higher, or Supervisory Pay Band 1), the additional rater is the next official in the rating chain meeting grade requirements.  An overall rating of 2 or negative comments require the EPR to be referred IAW AFI 36-2406.  Rebutals for any additional evaluator nonconcurring with an overall rating must be included.  Section VIII Reviewer nonconcurrence must be included on an AF Form 77.  Letter of Evaluation.  If ratee is deployed, provide copy and  feedback via e-mail/fafecon

**PRIVACY ACT STATEMENT**

AUTHORITY:  Title 10 United States Code, Section 8013 and Executive Order 9397, 22 November 1943.

PURPOSE:  Information is needed for verification of the individual's name and Social Security Number (SSN) as captured on the form at the time of rating.

ROUTINE USES:  May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3)

DISCLOSURE  Disclosure is mandatory, SSN is used for positive identification

| AF FORM 910, 20080618 | PREVIOUS EDITIONS ARE OBSOLETE | PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974. |
| --- | --- | --- |

CHRISTMAN ZACHARY.W.1033462278  Digitally signed by CHRISTMAN ZACHARY.W.1033462278  Date:...

"Certified True Copy," E-8, Christman, Zachary W., First Sergeant, AFPAA, ___ Apr 20

**ENLISTED PERFORMANCE REPORT (MSgt thru CMSgt)**

**I. RATEE IDENTIFICATION DATA** (Refer to AFI 36-2406 for instructions on completing this form)

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | MSgt | Q3N072 |

| 5. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 6. PAS CODE | 7. SRID |
|---|---|---|
| Air Force Public Affairs Agency (AFPAA) Joint Base San Antonio- Lackland, TX (AD) | LA12FDTW | PAZ02 |

| 8. PERIOD OF REPORT | 9. NO. DAYS SUPERVISION | 10. REASON FOR REPORT |
|---|---|---|
| From: 3 Jun 2011  Thru: 2 Jun 2012 | 366 | Annual |

**II. JOB DESCRIPTION**

| 1. DUTY TITLE | 2. SIGNIFICANT ADDITIONAL DUTY(S) |
|---|---|
| NCOIC, Policy and Programs Division | USAF PA Aerial Program Manager |

3. KEY DUTIES, TASKS, AND RESPONSIBILITIES (Limit text to 4 lines)
- Serves as Superintendent, Policy and Programs Division for SAF/PAs FOA; supervises two enlisted members
- Oversees global Aircrew Program Management, Video Production Management, and DVIAN Management
- Supports all policy research and planning requirements for the three 35-series AFIs under AFPAA OPR-ship
- Provides service lead PA, VI and COMCAM advice and counsel to all MAJCOMs, Wings, and unique units

**III. PERFORMANCE ASSESSMENT**

1. PRIMARY DUTIES
Consider Quality, Quantity, Timeliness, Technical Knowledge, Leading, Managing and Supervising (Limit text to 4 lines)
[ ] Does Not Meet [ ] Meets [ ] Above Average [X] Clearly Exceeds
- Authored PA jt exercise ops plan/established msn rqmts for 27 pers--enhanced int'l tng/relations for 2.9K mbrs
- Devoted 80 hrs reviewing DOD aerial instructions--ensured AF PA flight pgm accuracy/validated 88 flt slots
- Spearheaded 2d Bomb Wg/3rd COMCAM flt tng ops--secured 187 tng flts/showcased AFGSC/spt'd CSAF #2
- Oversaw PA $6.5M equip upgrade--provided seamless technology transition for COMCAM/home station CCs

2. STANDARDS: ENFORCEMENT AND PERSONAL ADHERENCE, CONDUCT, CHARACTER, MILITARY BEARING & CUSTOMS AND COURTESIES
Consider Dress & Appearance, Personal/Professional Conduct On/Off Duty (Limit text to 2 lines)
[ ] Does Not Meet [ ] Meets [ ] Above Average [X] Clearly Exceeds
- Organized HQ AFPAA Fiesta Especial '12 team--led 11 pers/vol'd 88 hrs for 5K visitors/helped raise $25.8K
- Led 6 hr Disaster Response media tng session--developed critical crisis comm skills of 43 civ/mil senior ldrs

3. FITNESS (Maintains Air Force Physical Fitness Standards) (For referrals, limit text to 1 line)
[X] Does Not Meet [ ] Meets [ ] Exempt

4. RESOURCE MANAGEMENT AND DECISION MAKING
Consider Efficiency, Judgment, Setting and Meeting Goals (Limit text to 2 lines)
[ ] Does Not Meet [ ] Meets [ ] Above Average [X] Clearly Exceeds
- Secured 26 aircrew SERE tng slots; coordinated w/AETC for zero cost to units--saved $130K in tng expenses
- Built 1st-ever COMCAM aerial OI; set roles/responsibilities/relationships--secured add'l $57K for msn rqmts

5. TRAINING, EDUCATION, OFF-DUTY EDUCATION, PME, PROFESSIONAL ENHANCEMENT AND COMMUNICATION
Consider Providing, Supporting and Personal Growth (Limit text to 2 lines)
[ ] Does Not Meet [ ] Meets [ ] Above Average [X] Clearly Exceeds
- Graduated global PA Mgt supt crs as TSgt; earned 6 hrs for BA in Comm/Journalism w/3.8GPA--honing skills
- Attended DOD COMCAM ldrs crs/Maine media workshop/SNCO prof dev sem--model for self-improvement

6. LEADERSHIP/TEAM BUILDING/FOLLOWERSHIP/MENTORSHIP
Consider Team Accomplishments, Leveraging Personal Experiences and Community Support, Recognition/Reward for Others (Limit text to 2 lines)
[ ] Does Not Meet [ ] Meets [ ] Above Average [X] Clearly Exceeds
- Selected as COMCAM evaluator for NORTHCOM exer--provided leadership w/real-world msn ops guidance
- Mentored 10 per at Comm Workshop--taught video doc/editing skills/boosted AF strategic messaging capacity

7. OTHER COMMENTS
Consider Promotion, Future Duty/Assignment/Education Recommendations, Safety, Security & Human Relations (Limit text to 2 lines)
- Served as SME for SAF/PAR LOGDET Conference--helped define global PA UTC deployable equipment stds
- Collaborated on AFI 35-109 rewrite; verified VI policy accuracy for 1.5 K global pers--ready for SMSgt now

**IV. RATER INFORMATION**

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| BRADLEY H. GILDEA, GS-13, DAF Air Force Public Affairs Agency (AFPAA) Joint Base San Antonio-Lackland, TX | Chief, Policy and Programs Division | 9 Jan 2013 |
| | SSN    SIGNATURE | |

AF FORM 911, 20080618     PREVIOUS EDITIONS ARE OBSOLETE     PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

*Left margin:* "Certified True Copy," E-8, Christman, Zachary/AW, W.1033462278 ... First Sergeant, AFPAA, __ Apr 20 ... CHRISTMAN.ZACH Digitally signed by CHRISTMAN.ZACHARY.W.1033462278

## V. OVERALL PERFORMANCE ASSESSMENT
Overall Performance During Reporting Period

RATEE NAME: **ZIER, JEREMY M.**

| ASSESSMENT | POOR (1) | NEEDS IMPROVEMENT (2) | AVERAGE (3) | ABOVE AVERAGE (4) | TRULY AMONG THE BEST (5) |
|---|---|---|---|---|---|
| RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |
| ADDITIONAL RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |

Last feedback was performed on: **30 Mar 2012**    If feedback was not accomplished in accordance with AFI 36-2406, state the reason.

## VI. ADDITIONAL RATER'S COMMENTS (Limit text to 3 lines)    ☒ CONCUR    ☐ NON-CONCUR

- Created 24 hour AFPAA COMCAM aircrew tng course--standardized flt operations rqmts for 88 aircrew mbrs
- Molded PA/IO exercise integration plan w/SOF POCs/set joint tng msn rqmts--ensured COMCAM in the fight
- Experienced ldr/mgr/career-field SME: ready to fill AFN Det Supt position--promote to SMSgt ahead of peers

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| RICHARD K. OSBURN, GS-14, DAF | Director, Field Operations | | 9 Jan 2013 |
| Air Force Public Affairs Agency (AFPAA) | SSN | SIGNATURE | |
| Joint Base San Antonio-Lackland, TX | | | |

## VII. REVIEWER'S COMMENTS (Limit text to 3 lines)    ☒ CONCUR    ☐ NON-CONCUR

- Secured 684 man-months/1750+ flt hrs for 57 aerial positions--doc'd US/int'l acft interoperabilities/airpower
- Revised COMCAM section of CDCs/helped deliver SAF/PA #1 priority--ensured 100% accurate training aid
- Earned 2011 AFPAA Headquarters NCO/Year award; exemplary whole person--promote to SMSgt first cycle

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| PAUL D. VILLAGRAN, Lt Col, USAF | Deputy Director | | 16 Jan 2013 |
| Air Force Public Affairs Agency (AFPAA) | SSN | SIGNATURE | |
| Joint Base San Antonio-Lackland, TX | | | |

## VIII. FINAL EVALUATORS POSITION

☐ SENIOR RATER
☒ SENIOR RATER'S DEPUTY
☐ INTERMEDIATE LEVEL
☐ LOWER LEVEL

## IX. TIME-IN-GRADE ELIGIBLE
N/A for CMSgt or CMSgt Selectee

☐ N/A
☐ YES
☒ NO

## X. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR
(Indicate applicable review by marking the appropriate box)

☐ FUNCTIONAL EXAMINER    ☐ AIR FORCE ADVISOR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| | SSN | SIGNATURE | |

## XI. UNIT COMMANDER/CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER    ☒ CONCUR    ☐ NON-CONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| LARRY D. CLAVETTE, GS-15, DAF | Director | | 25 Feb 2013 |
| Air Force Public Affairs Agency (AFPAA) | SSN | SIGNATURE | |
| Joint Base San Antonio-Lackland, TX | | | |

## XII. RATEE'S ACKNOWLEDGEMENT

I understand my signature does not constitute agreement or disagreement. I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report.    ☒ Yes    ☐ No

| SIGNATURE | DATE |
|---|---|
| ZIER.JEREMY.M.1022331023. | 27 Feb 2013 |

**PRIVACY ACT STATEMENT**
AUTHORITY  Title 10, United States Code, Section 8013 and Executive Order 9397, 22 November 1943.
PURPOSE  Information is needed for verification of the individual's name and Social Security Number (SSN) as captured on the form at the time of the rating
ROUTINE USES  May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3).
DISCLOSURE  Disclosure is mandatory; SSN is used for positive identification.

AF FORM 911, 20080618    PREVIOUS EDITIONS ARE OBSOLETE    PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

CHRISTMAN.ZACH... First Sergeant, AFPAA, __ Apr 20
"Certified True Copy", E-8, Christman, Zachary...

# ENLISTED PERFORMANCE REPORT (MSgt thru CMSgt)

## I. RATEE IDENTIFICATION DATA (Refer to AFI 36-2406 for instructions on completing this form)

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | MSgt | Q3N072 |

| 5. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 6. PAS CODE | 7. SRID |
|---|---|---|
| Air Force Public Affairs Agency (AFPAA) Joint Base San Antonio- Lackland, TX | LA12FDTW | PAZ02 |

| 8. PERIOD OF REPORT | | 9. NO DAYS SUPERVISION | 10. REASON FOR REPORT |
|---|---|---|---|
| From: 3 Jun 2012    Thru: 2 Jun 2013 | | 365 | Annual |

## II. JOB DESCRIPTION

| 1. DUTY TITLE | 2. SIGNIFICANT ADDITIONAL DUTY(S) |
|---|---|
| NCOIC, Plans and Policy Division | AF PA/Combat Camera (COMCAM) Aerial Pgm Mgr |

**3. KEY DUTIES, TASKS, AND RESPONSIBILITIES** *(Limit text to 4 lines)*
- Serves as enlisted leader of the Policy and Plans Division for SAF/PA's FOA; supervises 2 enlisted Airmen
- Manages AF Video Production pgm, and AF-level Defense Visual Info (VI) Activity Number (DVIAN) pgm
- Supports all policy research and planning requirements for three 35-series AFIs assigned to AFPAA as OPR
- Provides service lead PA, VI and COMCAM advice and counsel to all MAJCOMs, Wings, and unique units

## III. PERFORMANCE ASSESSMENT

**1. PRIMARY DUTIES**
Consider Quality, Quantity, Timeliness, Technical Knowledge, Leading, Managing and Supervising *(Limit text to 4 lines)*

☐ Does Not Meet  ☐ Meets  ☐ Above Average  ☒ Clearly Exceeds

- Secured 684 FY13 aircrew man-months w/ AF/A3 for Unit Type Code rqmnts--all COMCAM sqs war ready
- Briefed SES as aircrew SME to solve critical SecAF-to-DOD rqmt shortfall--brokered policy compromise fix
- Managed AF-lvl DVIAN re-validations for all MAJCOMs; 116 host units current--global units IG compliant
- Researched, input $5.1M equip upgrade plan--key to global video production, COMCAM, VI/PA msn success

**2. STANDARDS ENFORCEMENT AND PERSONAL ADHERENCE, CONDUCT, CHARACTER, MILITARY BEARING & CUSTOMS AND COURTESIES**
Consider Dress & Appearance, Personal/Professional Conduct On/Off Duty *(Limit text to 2 lines)*

☐ Does Not Meet  ☐ Meets  ☐ Above Average  ☒ Clearly Exceeds

- Initiative std bearer; prepped and facilitated SMSgt Retirement Ceremony--CCC lauded; "one of the best ever"
- Regularly selected to represent Agency & PA career field; SME at int'l video expo--exemplary tech integrater

**3. FITNESS** (Maintains Air Force Physical Fitness Standards) *(For referrals, limit text to 1 line)*

☐ Does Not Meet  ☒ Meets  ☐ Exempt

**4. RESOURCE MANAGEMENT AND DECISION MAKING**
Consider Efficiency, Judgment, Setting and Meeting Goals *(Limit text to 2 lines)*

☐ Does Not Meet  ☐ Meets  ☐ Above Average  ☒ Clearly Exceeds

- Mentored 10 MAJCOM/wing aerial photo pgm mgrs--ensured 59 PA aircrew professional training for air msn
- Secured, executed $81K funds/filled 45 adv photo/video tng slots--ensured 21 Amn rdy for COCOM ops rqmts

**5. TRAINING, EDUCATION, OFF-DUTY EDUCATION, PME, PROFESSIONAL ENHANCEMENT AND COMMUNICATION**
Consider Providing, Supporting and Personal Growth *(Limit text to 2 lines)*

☐ Does Not Meet  ☐ Meets  ☐ Above Average  ☒ Clearly Exceeds

- Graduated from Add'l Duty 1st Sgt Symposium, DOD VI Mgt, & DOD Ethics courses--self-improvement zealot
- Completed 12 credit hrs for BS in Mass Comm/3.8 GPA; attended Chiefs mentoring crs--gained ldrshp breadth

**6. LEADERSHIP/TEAM BUILDING/FOLLOWERSHIP/MENTORSHIP**
Consider Team Accomplishments, Leveraging Personal Experiences and Community Support, Recognition/Reward for Others *(Limit text to 2 lines)*

☐ Does Not Meet  ☐ Meets  ☐ Above Average  ☒ Clearly Exceeds

- Oversaw tech school "Night in Park"--ensured fun successful event for 249 Amn; raised $1.2K for JBSA Top 3
- Led Top 3 Wreaths Across America event/PBS telethon unit participation: emceed SNCO Induction--involved!

**7. OTHER COMMENTS**
Consider Promotion, Future Duty/Assignment/Education Recommendations, Safety, Security & Human Relations *(Limit text to 2 lines)*

- Trained on outside-the-wire video prods--rated industry AVA Gold Award from Assoc of Mktg Comm Pros
- Defined global AF COMCAM Flying pgm aircrew tng stds; leads vital war prep--make a SMSgt immediately!

## IV. RATER INFORMATION

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| BRADLEY H. GILDEA, GS-13, DAF Air Force Public Affairs Agency (AFPAA) Joint Base San Antonio-Lackland, TX | Chief, Policy and Programs Division | | 10 Sep 2013 |
| | SSN | SIGNATURE | |

AF FORM 911, 20080618    PREVIOUS EDITIONS ARE OBSOLETE

PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

"Certified True Copy," E-8, Christman, Zachary, AFPAA, _ Apr 20

CHRISTMAN.ZACH ARY.W.10334622 78 Digitally signed by CHRISTMAN.ZACHARY.W.1033462278

## V. OVERALL PERFORMANCE ASSESSMENT

Overall Performance During Reporting Period

**RATEE NAME:** ZIER, JEREMY M.

| ASSESSMENT | POOR (1) | NEEDS IMPROVEMENT (2) | AVERAGE (3) | ABOVE AVERAGE (4) | TRULY AMONG THE BEST (5) |
|---|---|---|---|---|---|
| RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |
| ADDITIONAL RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |

Last feedback was performed on: **14 Dec 2012**    If feedback was not accomplished in accordance with AFI 36-2406, state the reason.

### VI. ADDITIONAL RATER'S COMMENTS *(Limit text to 3 lines)*    ☒ CONCUR    ☐ NON-CONCUR

- Produced studio photography AFSC merger CBT video--ensured 5.5K PA Amn rec'd critical standardized tng
- Completed 17 Production ID numbers for DOD Imagery Mgt Ops Ctr database--secured cleared public distro
- Leader on/off duty; JBSA NCO/Yr judge: HS b-ball official: ready for AFN Det Supt--promote ahead of peers

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| RICHARD K. OSBURN, GS-14, DAF<br>Air Force Public Affairs Agency (AFPAA)<br>Joint Base San Antonio-Lackland, TX | Director, Field Operations | | 10 Sep 2013 |
| | SSN | SIGNATURE | |

### VII. REVIEWER'S COMMENTS *(Limit text to 3 lines)*    ☒ CONCUR    ☐ NON-CONCUR

- Revised COMCAM & Aircrew PA CDC sections--ensured 100% accurate tng delivery of SAF/PA #1 priority
- Led SOCOM EMERALD WARRIOR COMCAM planning; 17-day exer 24-amn team lead--CCDR praised job
- Served as 1st Sgt: immersed JBSA Top 3 ldr: highly seasoned whole-person SNCO--promote to SMSgt now!

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| LARRY D. CLAVETTE, GS-15, DAF<br>Air Force Public Affairs Agency (AFPAA)<br>Joint Base San Antonio-Lackland, TX | Director | | 17 Sep 2013 |
| | SSN | SIGNATURE | |

### VIII. FINAL EVALUATORS POSITION
☒ SENIOR RATER
☐ SENIOR RATER'S DEPUTY
☐ INTERMEDIATE LEVEL
☐ LOWER LEVEL

### IX. TIME-IN-GRADE ELIGIBLE
N/A for CMSgt or CMSgt Selectee
☐ N/A
☒ YES
☐ NO

### X. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR
*(Indicate applicable review by marking the appropriate box)*    ☐ FUNCTIONAL EXAMINER    ☐ AIR FORCE ADVISOR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| | | | |
| | SSN | SIGNATURE | |

### XI. UNIT COMMANDER/CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER    ☒ CONCUR    ☐ NON-CONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| LARRY D. CLAVETTE, GS-15, DAF<br>Air Force Public Affairs Agency (AFPAA)<br>Joint Base San Antonio-Lackland, TX | Director | | 17 Sep 2013 |
| | SSN | SIGNATURE | |

### XII. RATEE'S ACKNOWLEDGEMENT

I understand my signature does not constitute agreement or disagreement. I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report.    ☒ Yes    ☐ No

| SIGNATURE | DATE |
|---|---|
| ZIER.JEREMY.M.1022331023. | 18 Sep 2013 |

**PRIVACY ACT STATEMENT**
AUTHORITY: Title 10 United States Code, Section 8013 and Executive Order 9397, 22 November 1943
PURPOSE: Information is needed for verification of the individual's name and Social Security Number (SSN) as captured on the form at the time of the rating.
ROUTINE USES: May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3).
DISCLOSURE: Disclosure is mandatory. SSN is used for positive identification.

| AF FORM 911, 20080618 | PREVIOUS EDITIONS ARE OBSOLETE | PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974. |

"Certified True Copy," E-8, Christman, Zachary.AW.W.1033482278 CHRISTMAN.ZACHARY.W.1033482278 Digitally signed by CHRISTMAN.ZACHARY.W.1033482278 Date: 2007.04.14 14:26:08 First Sergeant, AFPAA, __ Apr 20

US v. Zier Military Record of Trial and Appellate Extracts 000072 of 902

## ENLISTED PERFORMANCE REPORT (MSgt thru CMSgt)

**I. RATEE IDENTIFICATION DATA** (Refer to AFI 36-2406 for instructions on completing this form)

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | MSgt | 3N072 |

| 5. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 6. PAS CODE | 7. SRID |
|---|---|---|
| American Forces Network Incirlik, Office of the Secretary of Defense (ZBL), Incirlik AB, Turkey | IN39FGJC | D9Z02 |

| 8. PERIOD OF REPORT | | | 9. NO. DAYS SUPERVISION | 10. REASON FOR REPORT |
|---|---|---|---|---|
| From: 3 Jun 2013 | Thru | 2 Jun 2014 | 315 | Annual |

**II. JOB DESCRIPTION**

| 1. DUTY TITLE | 2. SIGNIFICANT ADDITIONAL DUTY(S) |
|---|---|
| Detachment Superintendent | Demand Reduction Trusted Agent; WAPS Monitor; Duty Status Monitor; Hand Receipt Holder; Unit Training Mgr |

3 KEY DUTIES, TASKS, AND RESPONSIBILITIES  (Limit text to 4 lines)
- Leads 15-person staff--serves Incirlik's community of 4.5K+ military, DoD civilian, contractor and family members
- Oversees station ops; ensures DoD, AF & local command info (CI) and programming reaches base population 24/7
- Responsible for unit programs/support agreements; ensures proper use/maintenance of $2.5M+ broadcast equipment
- Coordinates strategic themes & messages with Wg leaders; determines CI priorities for Amn/family mbrs base-wide

**III. PERFORMANCE ASSESSMENT**

1 PRIMARY DUTIES
Consider Quality, Quantity, Timeliness, Technical Knowledge, Leading, Organizational Climate, Managing and Supervising  (Limit text to 4 lines)

| Does Not Meet | Meets | Above Average | ☒ Clearly Exceeds |
|---|---|---|---|

- Orchestrated 620 live radio shows/160 news stories/119 spots--timely command messages broadcasted worldwide
- Refocused commitment to social media; overhauled online strategy/calendar--650% interactivity boost in 10 months
- Directed live AF Assistance Fund telethon; 52 Amn raised $2.5K during 9 hr TV show--ranked #2 in AF per capita
- Created CI platform for Wing CC; introduced Virtual Town Hall, aired on web/TV/radio--base interaction up 500%

2 STANDARDS ENFORCEMENT AND PERSONAL ADHERENCE. CONDUCT. CHARACTER. MILITARY BEARING & CUSTOMS AND COURTESIES
Consider Dress & Appearance, Personal/Professional Conduct On/Off Duty  (Limit text to 2 lines)

| Does Not Meet | Meets | Above Average | ☒ Clearly Exceeds |
|---|---|---|---|

- Completed all directives ahead of schedule; staff learned sexual assault/resiliency programs--station fully compliant
- Interviewed 9 newcomers; established & communicated standards of conduct--primed station personnel for success

3 FITNESS (Maintains Air Force Physical Fitness Standards)  (For referrals, limit text to 1 line)

| ☒ Does Not Meet | Meets | Exempt |
|---|---|---|

4. RESOURCE MANAGEMENT AND DECISION MAKING
Consider Efficiency, Judgment, Setting and Meeting Goals  (Limit text to 2 lines)

| Does Not Meet | Meets | Above Average | ☒ Clearly Exceeds |
|---|---|---|---|

- Constructed 3 phase additional duty review; updated 35 critical readiness programs--station compliant in 5 months
- Executed digital sub-hand receipt system; tracking of $2.5M in equipment enhanced--100% accounted w/zero errors

5 TRAINING, EDUCATION, OFF-DUTY EDUCATION, PME, PROFESSIONAL ENHANCEMENT AND COMMUNICATION
Consider Providing, Supporting and Personal Growth  (Limit text to 2 lines)

| Does Not Meet | Meets | Above Average | ☒ Clearly Exceeds |
|---|---|---|---|

- Finished 21 credit hours w/3.8 GPA; 1 class from Journalism/Mass Comm B.A. degree--role model for unit Airmen
- Revitalized training program; fixed overdue 5/7 skill level upgrades--erased upgrade backlog on 4 Amn & 2 NCOs

6. LEADERSHIP/TEAM BUILDING/FOLLOWERSHIP/MENTORSHIP
Consider Team Accomplishments, Leveraging Personal Experiences and Community Support, Recognition/Reward for Others  (Limit text to 2 lines)

| Does Not Meet | Meets | Above Average | ☒ Clearly Exceeds |
|---|---|---|---|

- Developed Women/Black History campaigns; produced 45 radio/TV/web products--local participation raised 60%
- Led fitness improvement push for 15 Amn; fostered commitment to PT--peaked at 100% pass rate/90.9% avg score

7 OTHER COMMENTS
Consider Promotion, Future Duty/Assignment/Education Recommendations, Safety, Security & Human Relations  (Limit text to 2 lines)

- Executed surety comm plan; built 21 spots focused on nuclear education--lauded by 39ABW/CC for readiness focus
- Synced AFN and PA efforts; tackled Wg CC's priorities; teamwork/CI aligned across 39 ABW--promote to SMSgt!

**IV. RATER INFORMATION**

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| MICHELLE L. BALDANZA, MAJ, USA | Operations Manager | 2 Jun 2014 |
| American Forces Network North, OSD (ZBL) | SSN | SIGNATURE |
| Ramstein Air Base, Germany | | |

AF FORM 911, 20140101     PREVIOUS EDITIONS ARE OBSOLETE

PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

*Left margin (vertical text):* "Certified True Copy", E-8, Christman, Zachary A, W-1033462278 CHRISTMAN.ZACHARY Sergeant, AFPAA, __ Apr 20

**V. OVERALL PERFORMANCE ASSESSMENT**
Overall Performance During Reporting Period

RATEE NAME: ZIER, JEREMY M.

| ASSESSMENT | POOR (1) | NEEDS IMPROVEMENT (2) | AVERAGE (3) | ABOVE AVERAGE (4) | TRULY AMONG THE BEST (5) |
|---|---|---|---|---|---|
| RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |
| ADDITIONAL RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |

Last feedback was performed on: **18 Dec 2013**   If feedback was not accomplished in accordance with AFI 36-2406, state the reason.

**VI. ADDITIONAL RATER'S COMMENTS**  (Limit text to 3 lines)   ☒ CONCUR   ☐ NON-CONCUR

- Countered 2 real-world security threats; team aired political protest info on TV/radio/web--zero incidents occurred
- Choreographed surety inspection prep campaign; 1.5K Amn fixated on CSAF #1 priority--39ABW scored Excellent
- Organized Top 3 cleanup project at local school; enhanced US/Turkey relationship--promote to SMSgt immediately!

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| SHERRI K. REED, LTC, USA<br>American Forces Network Europe, OSD (ZBL)<br>Ramstein Air Base, Germany | Commander | | 9 Jun 2014 |
| | SSN | SIGNATURE | |

**VII. REVIEWER'S COMMENTS**  (Limit text to 3 lines)   ☒ CONCUR   ☐ NON-CONCUR

- ABW voice during Syrian crisis; delivered 6 town halls to 4.5K base residents--readied families for evacuation ops
- Led Incirlik launch of new streaming radio service; test bed for DoD program--local radio listeners increased 225%
- Built log plan for Preservation of Force and Family resiliency project; film selected #2 in DoD--promote to SMSgt!

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| RAY B. SHEPHERD, SES, DoD<br>Defense Media Activity (OSD)<br>Fort George G. Meade, Maryland | Director | | 26 Aug 2014 |
| | SSN | SIGNATURE | |

| VIII. FINAL EVALUATORS POSITION | IX. TIME-IN-GRADE ELIGIBLE<br>N/A for CMSgt or CMSgt Selectee |
|---|---|
| ☒ SENIOR RATER<br>☐ SENIOR RATER'S DEPUTY<br>☐ INTERMEDIATE LEVEL<br>☐ LOWER LEVEL | ☐ N/A<br>☒ YES<br>☐ NO |

**X. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR**
(Indicate applicable review by marking the appropriate box)    ☐ FUNCTIONAL EXAMINER  ☒ AIR FORCE ADVISOR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| PAMELA A.Q. COOK, Lt Col, USAF<br>Defense Media Activity (OSD)<br>Fort George G. Meade, Maryland | Dep Dir, DMA Plans, Policy and Assessments | | 11 Sep 2014 |
| | SSN | SIGNATURE | |

**XI. UNIT COMMANDER/CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER**   ☒ CONCUR   ☐ NON-CONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| DOUGLAS R. SMITH, GS-14, DoD<br>American Forces Network Europe, OSD (ZBL)<br>Sembach, Germany | Acting Director | | 2 Oct 2014 |
| | SSN<br>4404 | SIGNATURE<br>SMITH.DOUGLAS.REDFORD.1072276228 | |

**XII. RATEE'S ACKNOWLEDGEMENT**

I understand my signature does not constitute agreement or disagreement.  I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report.    ☒ Yes  ☐ No

| SIGNATURE | | DATE |
|---|---|---|
| ZIER.JEREMY.M.1022331023, | | 8 Oct 2014 |

**PRIVACY ACT STATEMENT**
AUTHORITY: Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force; AFI 36-2406, and Executive Order 9397 (SSN), as amended.
PURPOSE: Used to document effectiveness/duty performance history, promotion, school and assignment selection, reduction-in-force, control roster, reenlistment, separation, research and statistical analysis
ROUTINE USES: May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3).  DoD Blanket Routine Usese apply.
DISCLOSURE: Voluntary  Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.

| AF FORM 911, 20140101 | PREVIOUS EDITIONS ARE OBSOLETE | PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974. |

"Certified True Copy," E-8, Christman, Zachary, First Sergeant, AFPAA, __ Apr 20

CHRISTMAN.ZACH Digitally signed by
CHRISTMAN.ZACHARY.M.10
ARY.M.103346227874 3346227874
Date: 2016.04.05 14:55:56 -04'00'

US v. Zier Military Record of Trial and Appellate Extracts 000074 of 902

# ENLISTED PERFORMANCE REPORT (MSgt thru CMSgt)

## I. RATEE IDENTIFICATION DATA (Refer to AFI 36-2406 for instructions on completing this form)

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | MSgt | 3N072 |

| 5. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 6. PAS CODE | 7. SRID |
|---|---|---|
| American Forces Network Incirlik, Office of the Secretary of Defense, (ZBL) Incirlik AB, Turkey | IN39FGJC | D9Z02 |

| 8. PERIOD OF REPORT | | | 9. NO DAYS SUPERVISION | 10. REASON FOR REPORT |
|---|---|---|---|---|
| From: 3 Jun 2014 | Thru | 2 Jun 2015 | 248 | Annual |

## II. JOB DESCRIPTION

| 1. DUTY TITLE | 2. SIGNIFICANT ADDITIONAL DUTY(S) |
|---|---|
| Station Manager | First Sergeant, Demand Reduction Trusted Agent, Unit Deployment Manager, Unit Training Manager |

**3. KEY DUTIES, TASKS, AND RESPONSIBILITIES** *(Limit text to 4 lines)*
- Leads/mentors 14-person staff; serves Incirlik's community of 5K military/DoD civilian/contractor/family mbrs
- Oversees station ops; targets DoD, AF/local Command Info (CI) & programming delivery for base population
- Responsible for unit prgms & support agreements; ensures proper use/maintenance of $2.5M+ broadcast eqpmt
- Coord's American Forces Network-Europe (AFN-E) msgs w/Wg; decides CI priorities/best delivery methods

## III. PERFORMANCE ASSESSMENT

**1. PRIMARY DUTIES**

Consider Quality, Quantity, Timeliness, Technical Knowledge, Leading, Organizational Climate, Managing and Supervising *(Limit text to 4 lines)*

☐ Does Not Meet  ☐ Meets  ☐ Above Average  ☒ Clearly Exceeds

- Guided 710 live radio prgms/420 news stories/110 spots--aired Incirlik messages to 150K+ regional audience
- Managed dog bite prevention series; produced eight TV/web spots--tackled Wg priority/eradicated dog attacks
- Devised new CI method; developed overlay promos--provided local spots during TV programs, 1st in Europe
- Created unique safety initiative; crafted five spot 'Safety Sgt' series--delivered to 350K+ personnel worldwide

**2. STANDARDS ENFORCEMENT AND PERSONAL ADHERENCE, CONDUCT, CHARACTER, MILITARY BEARING & CUSTOMS AND COURTESIES**

Consider Dress & Appearance, Personal/Professional Conduct On/Off Duty *(Limit text to 2 lines)*

☐ Does Not Meet  ☐ Meets  ☐ Above Average  ☒ Clearly Exceeds

- Targeted top DoD concern; created month-long SAPR education radio series--victim reports increased by 60%
- Headed 6-mbr SNCO inspection team; investigated five bldgs--confirmed standards of living for 636 residents

**3. FITNESS** (Maintains Air Force Physical Fitness Standards) *(For referrals, limit text to 1 line)*

☒ Does Not Meet  ☐ Meets  ☐ Exempt

**4. RESOURCE MANAGEMENT AND DECISION MAKING**

Consider Efficiency, Judgment, Setting and Meeting Goals *(Limit text to 2 lines)*

☐ Does Not Meet  ☐ Meets  ☐ Above Average  ☒ Clearly Exceeds

- Formulated energy conservation comm plan; taught resource stewardship to 5K mbrs--base saved $1.4M CY14
- Invented emergency response tool; devised real-time TV FPCON banner--pushed cmd post msgs/1st of its kind

**5. TRAINING, EDUCATION, OFF-DUTY EDUCATION, PME, PROFESSIONAL ENHANCEMENT AND COMMUNICATION**

Consider Providing, Supporting and Personal Growth *(Limit text to 2 lines)*

☐ Does Not Meet  ☐ Meets  ☐ Above Average  ☒ Clearly Exceeds

- Completed six credit hrs w/3.8 GPA; finished B.A. in Journalism & Mass Comm--awarded Magna Cum Laude!
- Picked 1 of 12 by Chiefs Group to attend development seminar; 360 leadership course sharpened critical skills

**6. LEADERSHIP/TEAM BUILDING/FOLLOWERSHIP/MENTORSHIP**

Consider Team Accomplishments, Leveraging Personal Experiences and Community Support, Recognition/Reward for Others *(Limit text to 2 lines)*

☐ Does Not Meet  ☐ Meets  ☐ Above Average  ☒ Clearly Exceeds

- Pioneered CSAF reading list group; designed agenda for new prgm--shared insights w/12 Wg SNCOs & CGOs
- Revived wkly CC TV/radio show; created new graphics/layout--distributed rebooted show, lauded by Wg/CC

**7. OTHER COMMENTS**

Consider Promotion, Future Duty/Assignment/Education Recommendations, Safety, Security & Human Relations *(Limit text to 2 lines)*

- Critical voice during Syrian crisis; delivered six town halls to 5K base residents--Wg go-to org for threat info
- Trusted mentor; built ALS Levitow winner; AFN-E AF NCO of Year & Comm Excellence Amn--promote now!

## IV. RATER INFORMATION

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| CHRISTOPHER E. VADNAIS, GS-13, DoD American Forces Network Europe, OSD (ZBL) Sembach, Germany | Chief, Station Operations | | 22 Jul 2015 |
| | SSN | SIGNATURE | |

AF FORM 911, 20140101          PREVIOUS EDITIONS ARE OBSOLETE          PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

*Left margin:* "Certified True Copy," E-8, Christman, Zachary W. 103462278.6228 First Sergeant, AFPAA, __ Apr 20

*Signature block:* CHRISTMAN.ZACH ARY.W.103462278.6228 Digitally signed by CHRISTMAN.ZACHARY.W.103462278.6228

**V. OVERALL PERFORMANCE ASSESSMENT**
Overall Performance During Reporting Period

RATEE NAME: **ZIER, JEREMY M.**

| ASSESSMENT | POOR (1) | NEEDS IMPROVEMENT (2) | AVERAGE (3) | ABOVE AVERAGE (4) | TRULY AMONG THE BEST (5) |
|---|---|---|---|---|---|
| RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |
| ADDITIONAL RATER'S ASSESSMENT | ☐ | ☐ | ☐ | ☐ | ☒ |

Last feedback was performed on: **11 Feb 2015**    If feedback was not accomplished in accordance with AFI 36-2406, state the reason.

**VI. ADDITIONAL RATER'S COMMENTS** *(Limit text to 3 lines)*    ☒ CONCUR    ☐ NON-CONCUR

- Sharpened online strategies; boosted engagements by 650%--earned USAF's #2 Outstanding Digital Presence award
- Delivered 21 radio remotes; fostered nuclear readiness/inspection mindset--1.5K Amn fixated on CSAF #1 priority
- Won AFN-E's 2014 Senior Enlisted Service Mbr of Yr awd; exemplified leadership values--ready for SMSgt now!

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| DOUGLAS R. SMITH, GS-14, DoD<br>American Forces Network Europe, OSD (ZBL)<br>Sembach, Germany | Acting Director | | 23 Jul 2015 |
| | SSN | SIGNATURE | |

**VII. REVIEWER'S COMMENTS** *(Limit text to 3 lines)*    ☒ CONCUR    ☐ NON-CONCUR

- Propelled UEI prep; established 16 compliance checklists--AFN inspection ready, aided w/Wg's "Excellent" grade
- Directed 'Incirlik Pulse' TV/web program; CI message reached >2K in 48 hrs--selected #1 field production in DMA
- Brilliant leader; quarterbacked award winning 2014 AFN-E Station of Year tm--must promote to SMSgt this board!

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| RAY B. SHEPHERD, SES, DoD<br>Defense Media Activity (OSD)<br>Fort George G. Meade, Maryland | Director | | 4 Aug 2015 |
| | SSN | SIGNATURE | |

| **VIII. FINAL EVALUATORS POSITION** | **IX. TIME-IN-GRADE ELIGIBLE**<br>N/A for CMSgt or CMSgt Selectee |
|---|---|
| ☒ SENIOR RATER<br>☐ SENIOR RATER'S DEPUTY<br>☐ INTERMEDIATE LEVEL<br>☐ LOWER LEVEL | ☐ N/A<br>☒ YES<br>☐ NO |

**X. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR**
*(Indicate applicable review by marking the appropriate box)*    ☐ FUNCTIONAL EXAMINER    ☒ AIR FORCE ADVISOR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| JOHNNIE DENNIS JR., Maj, USAF<br>Defense Media Activity (OSD)<br>Fort George G. Meade, Maryland | Staff Plans Officer | | 1 Sep 2015 |
| | SSN | SIGNATURE | |

**XI. UNIT COMMANDER/CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER**    ☒ CONCUR    ☐ NON-CONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| DOUGLAS R. SMITH, GS-14, DoD<br>American Forces Network Europe, OSD (ZBL)<br>Sembach, Germany | Acting Director | | 10 Sep 2015 |
| | SSN | SIGNATURE | |

**XII. RATEE'S ACKNOWLEDGEMENT**

I understand my signature does not constitute agreement or disagreement. I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report.    ☒ Yes    ☐ No

| SIGNATURE    ZIER.JEREMY.M.1022331023, | DATE 21 Sep 2015 |
|---|---|

**PRIVACY ACT STATEMENT**
AUTHORITY: Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force; AFI 35-2406, and Executive Order 9397 (SSN), as amended.
PURPOSE: Used to document effectiveness/duty performance history; promotion, school and assignment selection, reduction-in-force; control roster; reenlistment; separation; research and statistical analysis
ROUTINE USES: May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3) DoD Blanket Routine Usage apply
DISCLOSURE: Voluntary. Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.

| AF FORM 911, 20140101 | PREVIOUS EDITIONS ARE OBSOLETE | PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974. |
|---|---|---|

*(left margin, vertical text)* CHRISTMAN.ZACH... Digitally signed by CHRISTMAN.ZACHARY.W.1003482278 ... Sergeant, APFAA, __ Apr 20

*(left margin, vertical text)* "Certified True Copy," E-8, Christman, Zachary W.1003482278,

# ENLISTED PERFORMANCE REPORT (MSgt thru SMSgt)

## PRIVACY ACT STATEMENT

AUTHORITY: Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force, AFI 36-2406, and Executive Order 9397 (SSN), as amended.
PURPOSE: Used to document effectiveness/duty performance history; promotion: school and assignment selection; reduction-in-force: control roster; reenlistment; separation; research and statistical analysis.
ROUTINE USES: May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3). DoD Blanket Routine Uses apply.
DISCLOSURE: Mandatory. Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.
SORN: F036 AF PC A, Effectiveness/Performance Reporting Records

### I. RATEE IDENTIFICATION DATA (Refer to AFI 36-2406 for instructions on completing this form)

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. RANK | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | MSgt | 3N072 |

| 5. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 6. PAS CODE | 7. SRID |
|---|---|---|
| American Forces Network, Incirlik, Office of the Secretary of Defense, (ZBL) Incirlik AB, Turkey | IN39FGJC | D9Z02 |

| 8. PERIOD OF REPORT (DD Mmm YYYY) | | 9. NO. DAYS NON-RATED | 10. NO. DAYS SUPERVISION | 11. REASON FOR REPORT |
|---|---|---|---|---|
| From: 03 Jun 2015 | Thru: 30 Sep 2015 | 4 | 51 | ANNUAL |

### II. JOB DESCRIPTION

**1. DUTY TITLE**
Superintendent, SAF/PAI

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES (Primary and Additional Duties)**
Superintendent of Command Information Division--responsible for policy compliance/all military personnel matters
Supervises 10 geographically separated PA Military Visual Journalism students attending the University of Syracuse
Provides advice/counsel concerning the well-being, performance, morale/standards for 23 military/civilian personnel
Leads/oversees AF-wide special interest items: COMCAM, Visual Information policy SME, AF PA flying programs

### III. PERFORMANCE IN LEADERSHIP/PRIMARY DUTIES/FOLLOWERSHIP/MENTORSHIP (Using AFI 36-2618, The Enlisted Force Structure, as the standard of performance expectations commensurate with the ratee's rank: assess to what degree the ratee complied with the following performance expectations.)

**Mission Accomplishment:** Consider the Airman's ability to lead and produce timely, high quality/quantity, mission-oriented results. Resource utilization (e.g. time) management, equipment, manpower and budget): Consider how effectively the Airman leads their team to utilize their resources to accomplish the mission. Team Buildings: Consider the amount of innovation, initiative, and motivation displayed by the airman and their subordinates (collaboration). Mentorship: Consider how well the Airman knows their subordinates, accepts personal responsibility for them, and is accountable for their professional development. Communication Skills: Describe how well the Airman communicates (includes listening, reading, speaking, and writing skills) in various mediums, translates superior's direction into specific tasks and responsibilities, fosters an environment for open dialogue, and enhances communication skills of subordinates. Comply with/Enforce Standards: Consider personal adherence and how the Airman fosters an environment where everyone enforces fitness standards, dress and personal appearance, customs and courtesies, and professional conduct. Duty Environments: Rate how well the Airman establishes and maintains caring, respectful, and dignified environments while valuing diversity; to include promoting a healthy organizational climate. Training: Describes how well the Airman and their team complies with upgrade, duty position, and certification requirements

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**COMMENTS (Minimum 1 line, but limited to 8 lines)**
- Oversaw 3-day AFA symposium support; 31 mbrs covered 72 events--delivered top-level strategic msgs worldwide
- Drove PA support of SECAF; synced 12 strategic msgs w/local TV/web/radio--readied 5K people for Sr leader visit
- Led SAF/AQ media training; director gained critical interview critique--prepped leader for 2M international audience
- Countered two real-world security incidents; aired anti-terrorism info in minutes--bolstered 39 ABW security posture
- Guided interview w/SACEUR; displayed NATO Patriot Missle msn to Turkey--helped stabilize US/Turkey relations
- Coached 24 PA leaders on VI equipment plans; reinforced neglected AFIs--eased execution of $6.7M annual budget
- Organized 2016 CSAF Reading List photo program; enhanced clarity of SOP--effort improved visibility of PA Amn
- Directed exclusive CSAF 9-11 ceremony video; event aired online/TV--reached 4.5M viewers through DoD SM sites

### IV. WHOLE AIRMAN CONCEPT (Not applicable if Airman receives referral evaluation based on comments or a "Met some but not all" rating in Section III.)

**1. Air Force Core Values:** Consider how well the Airman adopts, internalizes, demonstrates and insists on adherence of our Air Force Core Values of Integrity First, Service Before Self and Excellence in All We Do. Personal and Professional Development: Consider effort the Airman devoted to improve their subordinates, their work content/unit and themselves. Esprit de corps and Community Relations: Consider how well the Airman promotes camaraderie, enhances esprit de corps, and develops Air Force ambassadors.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**2. COMMENTS (If block IV is used minimum 1 line, but limited to 2 lines.)**
- Anchored Wg Top-III PDC; SNCOs taught 5-hr AF writing strategy seminar--34 NCOs gained vital leadership skills
- Key player for Wg's SMP; counseled 18 NCOs in 2-hrs--enhanced NCOs' leadership/career development curriculum

AF FORM 911, 20150731, V1     PREVIOUS EDITIONS ARE OBSOLETE     PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974

*Left margin (vertical text):* Apr 20    First Sergeant, AFPAA    "Certified True Copy," E-8, Christman, Zachary    CHRISTMANZACH Digitally signed by...

**V. OVERALL PERFORMANCE ASSESSMENT** *(Overall assessment of performance during rating period commensurate with sections III-IV)*

RATEE NAME:
ZIER, JEREMY M.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**VI. RATER INFORMATION** *(Signature signifies this is an unbiased assessment and all ACA sessions were completed, as required by AFI 36-2406)*

| NAME, RANK, BRANCH OF SERVICE, ORGN, COMMAND AND LOCATION | DUTY TITLE | | | DATE |
|---|---|---|---|---|
| CHRISTOPHER E. VADNAIS, GS-13, DoD | Chief, AFN Europe Station Operations | | | 05 Nov 2015 |
| American Forces Network Europe, OSD (ZBL) | SSN | SIGNATURE | VADNAIS.CHRISTOPHE R.E.1151061001 | |
| Sembach, Germany | | | | |

**VII. ADDITIONAL RATER'S COMMENTS**    ☒ Concur    ☐ Non-Concur
*(Comments are optional unless required for Referral, if not used state "This Section Not Used")*

- Revamped unit's IMA admin process; wrote and provided feedback on four NCO EPRs--eliminated 4-month backlog
- Supervised CSAF Order of the Sword invitation coverage; 500+ Facebook shares <24hrs--team thanked by CMSAF

| NAME, RANK, BRANCH OF SERVICE, ORGN, COMMAND AND LOCATION | DUTY TITLE | | | DATE |
|---|---|---|---|---|
| DOUGLAS R. SMITH, GS-14, DoD | Director of Operations, AFNE | | | 10 Nov 2015 |
| American Forces Network Europe, OSD (ZBL) | SSN | SIGNATURE | SMITH.DOUGLAS.REDF ORD.1072276228 | |
| Sembach, Germany | | | | |

**VIII. UNIT COMMANDER/MILITARY OR CIVILIAN DIRECTOR/ OTHER AUTHORIZED REVIEWER'S COMMENTS**    ☒ Concur    ☐ Non-Concur
*(Comments are optional unless required for Referral, if not used state "This Section Not Used")*

- Advanced COMPLAN for "MyVector" initiative; distributed SecAF's top priority—msg reached 497K mbrs AF-wide

**FUTURE ROLES** *(Recommend up to three roles/assignments that best serve the Air Force and continues the Airman's development)*

1. PA Superintendent    2.    3.

| EDUCATION *(as-of closeout date)* | PROMOTION ELIGIBILITY *(meets TIG/TIS as-of closeout date)* | THIS IS A REFERRAL REPORT | QUALITY FORCE REVIEW *(Ratee's personnel record has been reviewed for quality force indicators during the reporting period)* |
|---|---|---|---|
| CCAF conferred    PME complete | | | |
| YES    YES | YES | NO | YES |

| NAME, RANK, BRANCH OF SERVICE, ORGN, COMMAND AND LOCATION | DUTY TITLE | | | DATE |
|---|---|---|---|---|
| PAUL R. HAVERSTICK, JR., LTC, USA | Director, AFNE | | | 10 Nov 2015 |
| American Forces Network Europe, OSD (ZBL) | SSN | SIGNATURE | HAVERSTICK.PAUL.RIC HARD.JR.1111813945 | |
| Sembach, Germany | | | | |

**IX. FINAL EVALUATOR'S COMMENTS**    ☒ Concur    ☐ Non-Concur
*(Limit text to 1 optional line, if not used state "This Section Not Used")*

- Led team to win AFN Europe's SoQ award; client engagement plan grew SM audience 45%--promote to SMSgt now!

**PROMOTION RECOMMENDATION** *(Completed by authorized reviewer only when member is promotion eligible on closeout date)*

| A. FINAL EVALUATOR POSITION | B. SENIOR RATER STRATIFICATION *(This section restricted to Senior Rater only)* |
|---|---|
| DEPUTY EVALUATOR | |

| NAME, RANK, BRANCH OF SERVICE, ORGN, COMMAND AND LOCATION | DUTY TITLE | | | DATE |
|---|---|---|---|---|
| I. N. SKELTON, CAPT, USN | Director, AFRTS | | | 10 Nov 2015 |
| Defense Media Activity (OSD) | SSN | SIGNATURE | SKELTON.ISAAC.NEWT ON.V.1144934594 | |
| Fort George G. Meade, Maryland | | | | |

**X. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR** *(Indicate applicable review by marking the appropriate box)*    ☐ FUNCTIONAL EXAMINER    ☒ AIR FORCE ADVISOR

| NAME, RANK, BRANCH OF SERVICE, ORGN, COMMAND AND LOCATION | DUTY TITLE | | | DATE |
|---|---|---|---|---|
| JOHNNIE DENNIS, JR., Maj, USAF | Staff Plans Officer | | | 13 Nov 2015 |
| Defense Media Activity (OSD) | SSN | SIGNATURE | DENNIS.JOHNNIE.JR.103 0956938 | |
| Fort George G. Meade, Maryland | | | | |

**XI. REMARKS** *(Only use this section to spell out uncommon acronyms)*

PA - Public Affairs; COMCAM - Combat Camera; SME - Subject Matter Expert; AFA - Air Force Association; AQ - Acquisition; SM - Social Media; VI - Visual Information; SoQ -- Station of the Quarter; PDC - Professional Development Committee; SMP - Speed Mentor Program; COMPLAN - Communications Plan

**XII. RATEE'S ACKNOWLEDGEMENT**

I acknowledge all required ACA feedback was accomplished during the reporting period and feedback was provided upon receipt of this report (unless otherwise stated above)

| SIGNATURE | ZIER.JEREMY.M.1022331 023 | | DATE | 13 Nov 2015 |
|---|---|---|---|---|

AF FORM 911, 20150731, V1    PREVIOUS EDITIONS ARE OBSOLETE    PRIVACY ACT INFORMATION  The information on this form is FOR OFFICIAL USE ONLY  Protect IAW the Privacy Act of 1974

US v. Zier Military Record of Trial and Appellate Extracts 000078 of 902

Apr 20 · First Sergeant, AFPAA · Christman, Zachary/RAYMAN,ZACH · "Certified True Copy," E-8,

Left margin (vertical text): "Certified True Copy," E-8, Christman, Zachary CHRISTMAN.ZACHARY.Digitally signed by CHRISTMAN.ZACHARY — First Sergeant, AFPAA, __ Apr 20

## ENLISTED PERFORMANCE REPORT (MSgt thru SMSgt)

### PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force; AFI 36-2406, and Executive Order 9397 (SSN), as amended
**PURPOSE:** Used to document effectiveness/duty performance history; promotion; school and assignment selection; reduction-in-force; control roster; reenlistment; separation; research and statistical analysis.
**ROUTINE USES:** May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3). DoD Blanket Routine Uses apply.
**DISCLOSURE:** Mandatory  Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.
**SORN:** F036 AF PC A, Effectiveness/Performance Reporting Records

### I. RATEE IDENTIFICATION DATA (Refer to AFI 36-2406 for instructions on completing this form)

| 1. NAME (Last, First, Middle Initial) | 2. SSN | 3. RANK | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | SMSgt Select | 3N072 |

| 5. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 6. PAS CODE | 7. SRID |
|---|---|---|
| Secretary of the Air Force, Office of Public Affairs (HAF), Washington D.C. | HH12F1P8 | PAZ01 |

| 8. PERIOD OF REPORT (DD Mmm YYYY) | | 9. NO. DAYS NON-RATED | 10. NO. DAYS SUPERVISION | 11. REASON FOR REPORT |
|---|---|---|---|---|
| From 01 Oct 2015 | Thru 31 Jul 2016 | 00 | 305 | ANNUAL |

### B. JOB DESCRIPTION

**1. DUTY TITLE**

Superintendent, SAF/PAI

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES** (Primary and Additional Duties)
- Senior enlisted Amn for 44 mil/civ personnel Air Staff div; sets standards, provides advice/counsel on enlisted issues
- Supervises 10 geographically separated PA Military Visual Journalism students attending the University of Syracuse
- Leads/oversees AF-wide special focus programs, including COMCAM, Visual Information, Aerial Photojournalism
- Syncs command info activities with strategic communication planning in support of SecAF/CSAF/CMSAF/Air Staff

### III. PERFORMANCE IN LEADERSHIP/PRIMARY DUTIES/FOLLOWERSHIP/TRAINING (Using AFI 36-2618, The Enlisted Force Structure, as the standard of performance expectations commensurate with the ratee's rank; assess to what degree the ratee complied with the following performance expectations.)

**1. Mission Accomplishment:** Consider the Airman's ability to lead and produce timely, high quality/quantity, mission-oriented results. Resource utilization (e.g. time) management; equipment, manpower and budget): Consider how effectively the Airman leads their team to utilize their resources to accomplish the mission. Team Building: Consider the amount of innovation, initiative, and motivation displayed by the airman and their subordinates (collaboration). Mentorship: Consider how well the Airman knows their subordinates, accepts personal responsibility for them, and is accountable for their professional development. Communication Skills: Describe how well the Airman communicates (includes listening, reading, speaking, and writing skills) in various mediums, translates superior's direction into specific tasks and responsibilities, fosters an environment for open dialogue, and enhances communication skills of subordinates. Comply with/Enforce Standards: Consider personal adherence and how the Airman fosters an environment where everyone enforces fitness standards, dress and personal appearance, customs and courtesies, and professional conduct. Duty Environments: Rate how well the Airman establishes and maintains caring, respectful, and dignified environments while valuing diversity; to include promoting a healthy organizational climate. Training: Describes how well the Airman and their team complies with upgrade, duty position, and certification requirements.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**2. COMMENTS** (Minimum 1 line, but limited to 8 lines)
- Devised comm campaign to address info gap on AF Space pgrms; shaped msgs to Congress--guarded AF's reputation
- Created nuclear capability graphic; bridged knowledge gap w/4-star lvl think tank--enhanced AF modernization talk
- Drove CAP 75th Anniversary spt; coord'd visual products for SecAF comm objectives--amplified TAF contributions
- Managed 2016 CSAF Reading List photo portfolios; 6 packages selected by CSAF--projected AF's story world wide
- Selected for/attended coveted PA Qual Crs; studied PA planning/core competencies--ready to augment CGO tasking
- Executed 7-lvl tng pgrm for 8 div mbrs; reset resource mgmt/deployment basics--eliminated 2-year upgrade backlog
- Role player for exec-level media trng; aided three DoD spokespeople--speakers prepped for nat'l press engagements
- Supervised 10 NCOs at advanced academic pgm; aided transition to/from SU--helped mbrs achieve 3.4 GPA overall

### IV. WHOLE AIRMAN CONCEPT (Not applicable if Airman receives referral evaluation based on comments or a "Met some but not all" rating in Section III.)

**1. Air Force Core Values:** Consider how well the Airman adopts, internalizes, demonstrates and insists on adherence of our Air Force Core Values of Integrity First, Service Before Self and Excellence in All We Do. Personal and Professional Development: Consider effort the Airman devoted to improve their subordinates, their work center/unit and themselves. Esprit de corps and Community Relations: Consider how well the Airman promotes camaraderie, enhances esprit de corps, and develops Air Force ambassadors.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**2. COMMENTS** (If block IV is used minimum 1 line, but limited to 2 lines.)
- Attended Master Resilience pgm; counseled staff on suicide awareness/prevention strategies--expanded CAF mindset
- Completed add'l duty 1st Sgt symposium; networked with 14 AFDW helping agencies--ready to assist SAF/PA prsnl

AF FORM 911, 20150731, V1     PREVIOUS EDITIONS ARE OBSOLETE

PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY  Protect IAW the Privacy Act of 1974

"Certified True Copy," E-8, Christman, Zachary W/CHRISTMAN.ZACHARY.W.1033462278    Digitally signed by CHRISTMAN.ZACHARY.W.1033462278 ... First Sergeant, AFPAA, _ Apr 20

**V. OVERALL PERFORMANCE ASSESSMENT** (Overall assessment of performance during rating period commensurate with sections III-IV)

RATEE NAME: ZIER, JEREMY M.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| | | | | ☒ |

**VI. RATER INFORMATION** (Signature signifies this is an unbiased assessment and all ACA sessions were completed, as required by AFI 36-2406)

NAME, RANK, BRANCH OF SERVICE, ORGN, COMMAND AND LOCATION: LAWRENCE J. COX, GS-15, DAF
SAF/PA (HAF)
Pentagon, Washington DC

DUTY TITLE: Chief, Command Information
DATE: 19 Oct 2016
SSN: 19147    SIGNATURE: COX LAWRENCE J 10732...

**VII. ADDITIONAL RATER'S COMMENTS** (Comments are optional unless required for Referral, if not used state "This Section Not Used")
☒ Concur    ☐ Non-Concur

- Mentored 24 PA CGO/SNCO PA Mgmt Course students on VI trends/best practices--shaped direction of career field
- PA aerial pgm SME; coord'd with AF/A3 to re-acquire 56 flying billets--advanced restoration of SecAF's critical msn

NAME, RANK, BRANCH OF SERVICE, ORGN, COMMAND AND LOCATION: EDWARD W. THOMAS, Brig Gen, USAF
SAF/PA (HAF)
Pentagon, Washington DC

DUTY TITLE: Director
DATE: 17 Nov 2016
SSN: X.1192784651    SIGNATURE: THOMAS.EDWARD W.J...

**VIII. UNIT COMMANDER/MILITARY OR CIVILIAN DIRECTOR/ OTHER AUTHORIZED REVIEWER'S COMMENTS** (Comments are optional unless required for Referral, if not used state "This Section Not Used")
☒ Concur    ☐ Non-Concur

- Oversaw div during SAF/AA, PA merger; nav'd team increase from 21 to 44 prsnl --maintained spt to AF Top 6 Ldrs

FUTURE ROLES (Recommend up to three roles/assignments that best serve the Air Force and continues the Airman's development)
1. Large PA Team Superintendent    2. MAJCOM    3.

| 2. EDUCATION (as-of closeout date) | | 3. PROMOTION ELIGIBILITY (meets TIG/TIS as-of closeout date) | 4. THIS IS A REFERRAL REPORT | 5. QUALITY FORCE REVIEW (Ratee's personnel record has been reviewed for quality force indicators during the reporting period) |
|---|---|---|---|---|
| CCAF conferred | PME complete | NO | NO | YES |
| YES | YES | | | |

NAME, RANK, BRANCH OF SERVICE, ORGN, COMMAND AND LOCATION: ROBERT A. RICKER, Col, USAF
SAF/PA (HAF)
Pentagon, Washington DC

DUTY TITLE: Director of Staff, Air Force Public Affairs
DATE: 02 Dec 2016
SSN: 770651    SIGNATURE: RICKER.ROBERT.A.1135...

**IX. FINAL EVALUATOR'S COMMENTS** (Limit text to 1 optional line; if not used state "This Section Not Used")
☒ Concur    ☐ Non-Concur

- Authored 24 SOPs; eased leadership transition--delivered 2015 AFN-Europe Station of the Year honors for 2nd year!

1. PROMOTION RECOMMENDATION (Completed by authorized reviewer only when member is promotion eligible on closeout date)

A. FINAL EVALUATOR POSITION: INTERMEDIATE EVALUATOR
B. SENIOR RATER STRATIFICATION (This section restricted to Senior Rater only)

NAME, RANK, BRANCH OF SERVICE, ORGN, COMMAND AND LOCATION: ROBERT A. RICKER, Col, USAF
SAF/PA (HAF)
Pentagon, Washington DC

DUTY TITLE: Director of Staff, Air Force Public Affairs
DATE: 02 Dec 2016
SSN: 770651    SIGNATURE: RICKER.ROBERT.A.1135...

**X. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR** (Indicate applicable review by marking the appropriate box)    ☐ FUNCTIONAL EXAMINER    ☐ AIR FORCE ADVISOR

NAME, RANK, BRANCH OF SERVICE, ORGN, COMMAND AND LOCATION:
DUTY TITLE:
DATE:
SSN:    SIGNATURE:

**XI. REMARKS** (Only use this section to spell out uncommon acronyms)
AFN - American Forces Network, CAF - Comprehensive Airman Fitness, CAP - Civil Air Patrol, COMCAM - Combat Camera, PA - Public Affairs, PAO - Public Affairs Officer, SU - Syracuse University, TAF - Total Air Force, VI - Visual Information

**XII. RATEE'S ACKNOWLEDGEMENT**
I acknowledge all required ACA feedback was accomplished during the reporting period and feedback was provided upon receipt of this report (unless otherwise stated above)
SIGNATURE: ZIER.JEREMY.M.1022331 023
DATE: 09 Dec 2016

AF FORM 911, 20150731, V1    PREVIOUS EDITIONS ARE OBSOLETE
PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974

# ENLISTED PERFORMANCE REPORT *(MSgt thru SMSgt)*

## PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force; AFI 36-2406, and Executive Order 9397 (SSN), as amended.
**PURPOSE:** Used to document effectiveness/duty performance history; promotion; school and assignment selection; reduction-in-force; control roster; reenlistment; separation; research and statistical analysis.
**ROUTINE USES:** May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3). DoD Blanket Routine Uses apply.
**DISCLOSURE:** Mandatory. Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.
**SORN:** F036 AF PC A, Effectiveness/Performance Reporting Records

## I. RATEE IDENTIFICATION DATA *(Refer to AFI 36-2406 for instructions on completing this form)*

| 1. NAME *(Last, First, Middle Initial)* | 2. SSN | 3. RANK | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY M. | | SMSgt | 3N090 |

| 5. ORGANIZATION, COMMAND, AND LOCATION | 6. PAS CODE | 7. SRID |
|---|---|---|
| Secretary of the Air Force, Office of Public Affairs (HAF), Washington DC | HH13FBH7 | PAZ01 |

| 8. PERIOD OF REPORT *(DD Mmm YYYY)* | 9. NO. DAYS NON-RATED | 10. NO. DAYS SUPERVISION | 11. REASON FOR REPORT |
|---|---|---|---|
| From: 01 Aug 2016 Thru: 31 Jul 2017 | 0 | 365 | ANNUAL |

## II. JOB DESCRIPTION

**1. DUTY TITLE**
Superintendent, Command Information

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES** *(Primary and Additional Duties) (Minimum of 1 line, but limited to 4 lines)*
- Senior Enlisted Ldr for 44 mil/civ personnel Air Staff div; sets standards, provides advice/counsel on enlisted issues
- Syncs command info activities with strategic communication planning in support of SecAF/CSAF/CMSAF/Air Staff
- Supervises 10 geographically separated PA Military Visual Journalism students attending the University of Syracuse
- Leads/oversees AF-wide special focus programs, including COMCAM, Visual Information, Aerial Photojournalism

## III. PERFORMANCE IN LEADERSHIP/PRIMARY DUTIES/FOLLOWERSHIP/TRAINING *(Using AFI 36-2618, The Enlisted Force Structure, as the standard for performance expectations commensurate with the ratee's rank, assess to what degree the ratee complied with the following performance expectations.)*

**1. Mission Accomplishment:** Consider the Airman's ability to lead and produce timely, high quality/quantity, mission-oriented results. **Resource Utilization** *(e.g. time, management, equipment, manpower and budget):* Consider how effectively the Airman leads their team to utilize their resources to accomplish the mission. **Team Building:** Consider the amount of innovation, initiative, and motivation displayed by the Airman and their subordinates (collaboration). **Mentorship:** Consider how well the Airman knows their subordinates, accepts personal responsibility for them, and is accountable for their professional development. **Communication Skills:** Describe how well the Airman communicates *(includes listening, reading, speaking, and writing skills)* in various mediums, translates superior's direction into specific tasks and responsibilities, fosters an environment for open dialogue, and enhances communication skills of subordinates. **Comply with/Enforce Standards:** Consider personal adherence and how the Airman fosters an environment where everyone enforces fitness standards, dress and personal appearance, customs and courtesies, and professional conduct. **Duty Environments:** Rate how well the Airman establishes and maintains caring, respectful, and dignified environments while valuing diversity; to include promoting a healthy organizational climate. **Training:** Describes how well the Airman and their team complies with upgrade, duty position, and certification requirements.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**2. COMMENTS** *(Minimum 1 line, but limited to 8 lines)*
- Supervised 350+ multimedia projects; tackled SecAF/CSAF comm objectives--600K TAF prsnl focused on mission
- Finalized rewrite of AFI 35-109; 1st guidance to career-field in 9-years--ensured PA msn rqmts in-line w/ federal law
- Guided AF SM team; contributed to SecAF/CSAF/CMSAF ext comm strat; projected Sr Ldrs objectives world-wide
- Evaluated 2016 CSAF Reading List photo portfolios; showcased joint Airman in action--3 packages lauded by CSAF
- Completed Joint Contingency PA Crse; studied media ops, joint ops planning--postured for worldwide PA/IO tasking
- Bolstered sr ldr multimedia spt; secured $45K adv'd PA tng for 18 mil/civ--drove professional development mindset
- Guided initial media tng for 18th CMSAF; provided real-time all call/media scenarios--prepped for first engagements
- Oversaw product work-flow; streamlined SAF/HAF coord process--cut 365+ man hours yrly/provided timely release

## IV. WHOLE AIRMAN CONCEPT *(Not applicable if Airman receives referral evaluation based on comments on a "Met some but not all" rating in Section III.)*

**1. Air Force Core Values:** Consider how well the Airman adopts, internalizes, demonstrates and insists on adherence of our Air Force Core Values of Integrity First, Service Before Self and Excellence in All We Do. **Personal and Professional Development:** Consider effort the Airman devoted to improve their subordinates, their work center/unit and themselves. **Esprit de corps and Community Relations:** Consider how well the Airman promotes camaraderie, enhances esprit de corps, and develops Air Force ambassadors.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**2. COMMENTS** *(Minimum 1 line, but limited to 2 lines)*
- Completed 6 credit hrs toward M.A. National Security Studies; maintained 3.88 GPA--developed joint leader mindset
- Mentored 60 NCOs at 3 prof development pgms; taught ldrshp fundamentals--reinforced CSAF squadron focus area

AF FORM 911, 20150731, V1    PREVIOUS EDITIONS ARE OBSOLETE    PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY Protect IAW the Privacy Act of 1974

"Certified True Copy", E-8, Christman, Zachary    CHRISTMAN.ZACH... First Sergeant, AFPAA,_Apr 20

**V. OVERALL PERFORMANCE ASSESSMENT** *(Overall assessment of performance during rating period commensurate with Sections III-IV.)*

RATEE NAME: ZIER, JEREMY M.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**VI. RATER INFORMATION** *(Signature signifies this is an unbiased assessment and all ACA feedback sessions were completed as required per AFI 36-2406.)*

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| LAWRENCE J. COX, GS-15, DAF | Chief, Command Information | 14 Sep 2017 |
| SAF/PA (HAF) | SSN    SIGNATURE | |
| Pentagon, Washington DC | | |

**VII. ADDITIONAL RATER'S COMMENTS** *(Comments are optional unless required for Referral. if not used state "This Section Not Used")*    ☒ CONCUR    ☐ NON-CONCUR

1 COMMENTS *(Comments are optional unless required for Referral; if not used, state "This Section Not Used") (Minimum of 1 line, but maximum of 2 lines)*
- AF-wide aerial photography SME; wrote 3-vol 11-series AFI--developed first-ever evaluation criteria for PA aircrew
- Established innovative content mgmt tm; sent imagery real-time to media--aired MOAB story to 300M int'l audience

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| EDWARD W. THOMAS, JR., Brig Gen, USAF | Director, Air Force Public Affairs | 15 Sep 2017 |
| SAF/PA (HAF) | SSN    SIGNATURE | |
| Pentagon, Washington DC | | |

**VIII. UNIT COMMANDER/MILITARY CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER'S COMMENTS** *(Comments are optional with a maximum of 1 line, if not used, state "This Section Not Used".)*    ☒ CONCUR    ☐ NON-CONCUR

- Results driven! Guided 44 in SAF/PAs largest most diverse division--7 qtrly awd winners & HQ AF Amn of the Year

**1. FUTURE ROLES** *(Recommend up to three roles/assignments that best serve the Air Force and continues the Airman's development)*
1. MAJCOM Functional Mgr    2. Squadron Superintendent    3.

| 2. EDUCATION *(as of closeout date)* | 3. PROMOTION ELIGIBLE *(Promotion eligibility as-of closeout date)* | 4. THIS IS A REFERRAL REPORT | 5. QUALITY FORCE REVIEW *(Ratee's personnel record has been reviewed for quality force indicators during the reporting period)* |
|---|---|---|---|
| SCAF Conferred  PME Complete | | | |
| YES     YES | NO | NO | YES |

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| ROBERT A. RICKER, Col, USAF | Director of Staff, Air Force Public Affairs | 15 Sep 2017 |
| SAF/PA (HAF) | SSN    SIGNATURE | |
| Pentagon, Washington DC | | |

**IX. FINAL EVALUATOR'S COMMENTS** *(Limit text to 1 optional line, if not used state "This Section Not Used")*    ☒ CONCUR    ☐ NON-CONCUR

- Broke 6-year deadlock with HAF/A3; restored 56 flying billets to career field--enhanced PA focus on air superiority!

| A. FINAL EVALUATOR POSITION | B. SENIOR RATER STRATIFICATION. *(This section restricted to Senior Rater only)* |
|---|---|
| INTERMEDIATE EVALUATOR | |

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| ROBERT A. RICKER, Col, USAF | Director of Staff, Air Force Public Affairs | 25 Sep 2017 |
| SAF/PA (HAF) | SSN    SIGNATURE | |
| Pentagon, Washington DC | | |

**X. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR** *(Indicate applicable review by marking the appropriate box)*    ☐ FUNCTIONAL EXAMINER    ☐ AIR FORCE ADVISOR

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | DATE |
|---|---|---|
| | | |
| | SSN    SIGNATURE | |

**XI. REMARKS** *(Only use this section to spell out uncommon acronyms or to place required comments IAW AFI 36-2406.)*
Combat Camera (COMCAM); Information Operations (IO); Masters in Art (M.A.); Public Affairs (PA); Social Media (SM)

**XII. RATEE'S ACKNOWLEDGEMENT** *I acknowledge all required ACA feedback was accomplished during the reporting period and feedback was provided upon receipt of this report (unless otherwise stated above).*

| SIGNATURE   ZIER.JEREMY.M.1022331023 | DATE   04 Oct 2017 |
|---|---|

AF FORM 911, 20150731, V1          PREVIOUS EDITIONS ARE OBSOLETE          PRIVACY ACT INFORMATION  The information in this form is FOR OFFICIAL USE ONLY  Protect IAW the Privacy Act of 1974

*(left margin, rotated)* First Sergeant, AFPAA. __ Apr 20    "Certified True Copy." E-8. Christman, Zachary CHRISTMAN.ZACH...

## ENLISTED PERFORMANCE REPORT *(MSgt thru SMSgt)*

### PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force; AFI 36-2406, and Executive Order 9397 (SSN), as amended.
**PURPOSE:** Used to document effectiveness/duty performance history; promotion; school and assignment selection; reduction-in-force; control roster; reenlistment; separation; research and statistical analysis.
**ROUTINE USES:** May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3). DoD Blanket Routine Uses apply.
**DISCLOSURE:** Mandatory.  Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.
**SORN:** F036 AF PC A. Effectiveness/Performance Reporting Records

### I. RATEE IDENTIFICATION DATA *(Refer to AFI 36-2406 for instructions on completing this form)*

| 1. NAME (Last, First, Middle Initial) | | 2. SSN | 3. RANK | 4. DAFSC |
|---|---|---|---|---|
| ZIER, JEREMY M. | | | SMSgt | D3N090 |

| 5. ORGANIZATION, COMMAND, AND LOCATION | 6. PAS CODE | 7. SRID |
|---|---|---|
| HQ USAFE-AFAFRICA/PA, Ramstein Air Base, Germany | RF0DFC20 | 0DHPA |

| 8. PERIOD OF REPORT (DD Mmm YYYY) | 9. NO. DAYS NON-RATED | 10. NO. DAYS SUPERVISION | 11. REASON FOR REPORT |
|---|---|---|---|
| From: 01 Aug 2017 Thru: 31 Jul 2018 | 0 | 247 | ANNUAL |

### II. JOB DESCRIPTION

**1. DUTY TITLE**
Superintendent, Requirements & Development Division

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES** *(Primary and Additional Duties) (Minimum of 1 line, but limited to 4 lines)*
- Advises HQ PA dir/22-person HQ staff, mngs tactical/operational OCO rqmnts f/160+ Amn at 8 Wgs/USAFE Band
  Prgms $575K budget, audits line-item details, validates/executes spend plans/$2.1M in eqpt life-cycle replacements
- Leads deliberate, crisis action planning/strategic information operations exec f/3 COCOM across a 104-nation AOR
  Mngs 189 PA/Band UTCs, assigns PA forces to fill COCOM/AEF/exer rqmnts iso US/NATO partner building msns

### III. PERFORMANCE IN LEADERSHIP/PRIMARY DUTIES/FOLLOWERSHIP/TRAINING *(Using AFI 36-2618. The Enlisted Force Structure, as the standard performance expectations commensurate with the ratee's rank; assess to what degree the ratee complied with the following performance expectations.)*

**1. Mission Accomplishment:** Consider the Airman's ability to lead and produce timely, high quality/quantity, mission-oriented results. Resource Utilization (e.g. time, management, equipment, manpower and budget): Consider how effectively the Airman leads their team to utilize their resources to accomplish the mission. Team Building: Consider the amount of innovation, initiative, and motivation displayed by the Airman and their subordinates (collaboration). Mentorship: Consider how well the Airman knows their subordinates, accepts personal responsibility for them, and is accountable for their professional development. Communication Skills: Describe how well the Airman communicates (includes listening, reading, speaking, and writing skills) in various mediums, translates superior's direction into specific tasks and responsibilities, fosters an environment for open dialogue, and enhances communication skills of subordinates. Comply with/Enforce Standards: Consider personal adherence and how the Airman fosters an environment where everyone enforces fitness standards, dress and personal appearance, customs and courtesies, and professional conduct. Duty Environments: Rate how well the Airman establishes and maintains caring, respectful, and dignified environments while valuing diversity; to include promoting a healthy organizational climate. Training: Describes how well the Airman and their team complies with upgrade, duty position, and certification requirements.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**2. COMMENTS** *(Minimum 1 line, but limited to 8 lines)*
- Managed 70 dply'd Amn/35 msns; oversaw $151K TDYs in two AOR's--synchronized comms/IO across COCOM's
- Superb RA! ID'd crit eqpt shortfalls/purchased $89K...incr doc/NIPR/SIPR capes--HQ/Wgs rdy f/ COCOM/AEF spt
- Advised AF SM team; contributed to SecAF/CSAF/CMSAF ext comm strat; projected sr ldrs objectives world-wide
- Led cmd PA Comm Excellence awds; org'd 31 judges f/12 categories/46 noms--3x tm AF-lvl awds, 39 Amn recog'd
- Career field trng SME; conceptualized AFSC consolidation training plan w/CFM--stabilized future of PA operations
- Staffed 50+ video projects; oversaw AF sr ldr visual messaging--expanded msg to 2M+ AF stakeholders world-wide
- Streamlined sr ldr production process; facilitated principle advisor rough draft review--cut release approval time 50%
- Talented ldr; max'd exec of PA capes--dev'd streamlined prcs f/3 crit prgms--ensured operational PA spt to warfighter

### IV. WHOLE AIRMAN CONCEPT *(Not applicable if Airman receives referral evaluation based on comments or a "Met some but not all" rating in Section III.)*

**1. Air Force Core Values:** Consider how well the Airman adopts, internalizes, demonstrates and insists on adherence of our Air Force Core Values of Integrity First, Service Before Self and Excellence in All We Do. Personal and Professional Development: Consider effort the Airman devoted to improve their subordinates, their work center/unit and themselves. Esprit de corps and Community Relations: Consider how well the Airman promotes camaraderie, enhances esprit de corps, and promotes Air Force ambassadors.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**2. COMMENTS** *(Minimum 1 line, but limited to 2 lines)*
- Overhauled records prgm; crafted detailed reconstruction plan--ended 5-yr discrepancy trend/preserved msn archives
- Dir'd cmd's Media Awds prgm; prep'd 15 judges f/23 categories/121 noms--8 Amn honored at AF-lvl/2x at DOD-lvl

| AF FORM 911, 20150731, V1 | PREVIOUS EDITIONS ARE OBSOLETE | PRIVACY ACT INFORMATION  The information in this form is FOR OFFICIAL USE ONLY  Protect IAW the Privacy Act of 1974 |
|---|---|---|

"Certified True Copy." E-8, Christman, Zachary W. CHRISTMAN.ZACH... First Sergeant, AFPAA.__ Apr 20

**V. OVERALL PERFORMANCE ASSESSMENT** *(Overall assessment of performance during rating period commensurate with Sections III-IV.)*

RATEE NAME: **ZIER, JEREMY M.**

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**VI. RATER INFORMATION** *(Signature signifies this is an unbiased assessment and all ACA feedback sessions were completed as required per AFI 36-2406)*

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| RAHEEM J. MOORE, CMSgt, USAF<br>HQ USAFE-AFAFRICA/PA<br>Ramstein Air Base, Germany | Chief Enlisted Manager | | 27 Sep 2018 |
| | SSN | SIGNATURE | |

**VII. ADDITIONAL RATER'S COMMENTS** *(Comments are optional unless required for Referral. If not used state "This Section Not Used")*     ☒ CONCUR     ☐ NON-CONCUR

1. COMMENTS *(Comments are optional unless required for Referral; if not used, state "This Section Not Used") (Minimum of 1 line, but maximum of 2 lines)*
- Tackled SECDEF mandate; helped write policy to counter aggressive aerial encounters--ensured PA equities captured
- Devised historic AF 70 B'day media plan; captured 12 events--wrote 18 stories--imagery reached 2.4M/SecAF lauded

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| GABRIEL J. MYERS, GS-15, DAF<br>HQ USAFE-AFAFRICA/PA<br>Ramstein Air Base, Germany | Director, Public Affairs and Communication | | 01 Oct 2018 |
| | SSN | SIGNATURE | |

**VIII. UNIT COMMANDER/MILITARY OR CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER'S COMMENTS** *(Comments are optional with a maximum of 1 line, if not used, state "This Section Not Used".)*     ☒ CONCUR     ☐ NON-CONCUR

- Exec'd 129% TDY incr; fielded 55 Amn/$76K...spt f/2 COCOMs--U.S. partners assured despite Russian propaganda

FUTURE ROLES *(Recommend up to three roles/assignments that best serve the Air Force and continues the Airman's development)*
1. AFPAA OPS Superintendent     2. Large Wing Superintendent     3. Squadron Superintendent

| 2. EDUCATION *(as of closeout date)* | 3. PROMOTION ELIGIBLE *(Promotion eligibility as of closeout date)* | 4. THIS IS A REFERRAL REPORT | 5. QUALITY FORCE REVIEW *(Ratee's personnel record has been reviewed for quality indicators during the reporting period)* |
|---|---|---|---|
| BCAF Conferred     PME Complete<br>YES          YES | YES | NO | YES |

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| GABRIEL J. MYERS, GS-15, DAF<br>HQ USAFE-AFAFRICA/PA<br>Ramstein Air Base, Germany | Director, Public Affairs and Communication | | 01 Oct 2018 |
| | SSN | SIGNATURE | |

**IX. FINAL EVALUATOR'S COMMENTS** *(Limit text to 1 optional line, if not used state "This Section Not Used")*     ☒ CONCUR     ☐ NON-CONCUR

- Premier SNCO ldrshp! Dlvr'd PA's full range ops spt f/86 rqmnts--enabled new std f/strat effects in 2x COCOM AOR

| A FINAL EVALUATOR POSITION<br>DEPUTY EVALUATOR | B. SENIOR RATER STRATIFICATION: (This section restricted to Senior Rater only) |
|---|---|

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| DUSTIN M. HART, Lt Col, USAF<br>HQ USAFE-AFAFRICA/PA<br>Ramstein Air Base, Germany | Deputy Director, Public Affairs and Communi | | 04 Oct 2018 |
| | SSN | SIGNATURE | |

**X. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR** *(Indicate applicable review by marking the appropriate box)*     ☐ FUNCTIONAL EXAMINER     ☐ AIR FORCE ADVISOR

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| | | | |
| | SSN | SIGNATURE | |

**XI. REMARKS** *(Only use this section to spell out uncommon acronyms or to place required comments IAW AFI 36-2406.)*

AEF - Air Expeditionary Force, AOR - Area of Responsibility, CFM - Career Field Manager, COCOM - Combatant Command, IO - Information Operations, PA - Public Affairs, SM - Social Media

**XII. RATEE'S ACKNOWLEDGEMENT** *I acknowledge all required ACA feedback was accomplished during the reporting period and feedback was provided upon receipt of this report (unless otherwise stated above).*

| SIGNATURE<br>ZIER.JEREMY.M.1022331023   Digitally signed by ZIER JEREMY M 1022331023<br>Date: 2018.10.09 10:39 09-04'00' | DATE<br>09 Oct 2018 |
|---|---|

AF FORM 911, 20150731, V1          PREVIOUS EDITIONS ARE OBSOLETE          PRIVACY ACT INFORMATION  The information on this form is FOR OFFICIAL USE ONLY  Protect IAW the Privacy Act of 1974

*(left margin, vertical text)* Apr 20 · First Sergeant, AFPAA, · WHISTMAN ZACH · "Certified 'True Copy," E-8, Christman, Zachary ...

US v. Zier Military Record of Trial and Appellate Extracts 000084 of 902

## ENLISTED PERFORMANCE REPORT *(MSgt thru SMSgt)*

### PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force; AFI 36-2406, and Executive Order 9397 (SSN), as amended.
**PURPOSE:** Used to document effectiveness/duty performance history; promotion; school and assignment selection; reduction-in-force; control roster; reenlistment; separation; research and statistical analysis.
**ROUTINE USES:** May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3). DoD Blanket Routine Uses apply.
**DISCLOSURE:** Mandatory. Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.
**SORN:** F036 AF PC A, Effectiveness/Performance Reporting Records

### I. RATEE IDENTIFICATION DATA *(Refer to AFI 36-2406 for instructions on completing this form)*

| 1. NAME *(Last, First, Middle Initial)* ZIER, JEREMY M. | 2. SSN | 3. RANK SMSgt | 4. DAFSC Q3N090 |
|---|---|---|---|

| 5. ORGANIZATION, COMMAND, AND LOCATION Air Force Public Affairs Agency (AFPAA) Joint Base San Antonio-Randolph, TX w/ duty at 346th AEG, Camp Seweyo, Guyana | 6. PAS CODE RJ12FWGM | 7. SRID PAZ02 |
|---|---|---|

| 8. PERIOD OF REPORT *(DD Mmm YYYY)* From: 01 Aug 2018 Thru: 31 Jul 2019 | 9. NO. DAYS NON-RATED 0 | 10. NO. DAYS SUPERVISION 365 | 11. REASON FOR REPORT ANNUAL |
|---|---|---|---|

### II. JOB DESCRIPTION

**1. DUTY TITLE**
AFPAA Flying Program Manager

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES** *(Primary and Additional Duties) (Minimum of 1 line, but limited to 4 lines)*
- Leads global aerial photography program & AF-wide special focus programs including COMCAM, video production
- Manages SAF/PA Small Unmanned Aerial System (SUAS) program, provides input for DOD-lvl policy development
- Provides advice and counsel to all MAJCOMs, wings, and unique units on Operational Support man-month execution
- Supports all policy research and planning for Public Affairs related 35-series AFIs and AFMAN 11-2AP volumes 1-3

### III. PERFORMANCE IN LEADERSHIP/PRIMARY DUTIES/FOLLOWERSHIP/TRAINING *(Using AFI 36-2618, The Enlisted Force Structure, as the standard for performance expectations commensurate with the ratee's rank; assess to what degree the ratee complied with the following performance expectations.)*

**Mission Accomplishment:** Consider the Airman's ability to lead and produce timely, high quality/quantity, mission-oriented results. **Resource Utilization** (e.g. time, management, equipment, manpower and budget): Consider how effectively the Airman leads their team to utilize their resources to accomplish the mission. **Team Building:** Consider the amount of innovation, initiative, and motivation displayed by the Airman and their subordinates (collaboration). **Mentorship:** Consider how well the Airman knows their subordinates, accepts personal responsibility for them, and is accountable for their professional development. **Communication Skills:** Describe how well the Airman communicates (includes listening, reading, speaking, and writing skills) in various mediums, translates superior's direction into specific tasks and responsibilities, fosters an environment for open dialogue, and enhances communication skills of subordinates. **Comply with/Enforce Standards:** Consider personal adherence and how the Airman fosters an environment where everyone enforces fitness standards, dress and personal appearance, customs and courtesies, and professional conduct. **Duty Environments:** Rate how well the Airman establishes and maintains caring, respectful, and dignified environments while valuing diversity; to include promoting a healthy organizational climate. **Training:** Describes how well the Airman and their team complies with upgrade, duty position, and certification requirements.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**2. COMMENTS** *(Minimum 1 line, but limited to 8 lines)*
- Advanced USAFE/AMC formal flying prgms; secured 418 OSF man-mths for 55 prsnl--benchmarked by career field
- Upgraded to COMCAM Aircrew Examiner in 42 days--timely trng/check rides f/ 24 new prsnl brought prgm to IOC
- Honchoed innovation; cut lengthy coord process f/ cross-cmd attach--sv'd 4 hrs per flyer, aligned AFPAA w/ AF stds
- ID'd man-mth misappropriation; corrected HARM error, accounted f/ 107.5 months--sv'd HAF/A3 $16K FY18 funds
- Streamlined SERE allocat'n process w/ 19 AF; improved availability for COMCAM, secured 25 seats--met HOA task
- Initiated digital evaluation sys; crafted road map to erase paper trng records--modified AF-lvl contract, $0 cost to unit
- Authored 4 open/closed book tests; readied 32 aircrew f/ msn quals--brought into compliance w/ AF's flight trng regs
- Guided career-field SUAS implementation; aligned PA w/ DOD rqmts--delv'd roadmap for use of drones in PA msns

### IV. WHOLE AIRMAN CONCEPT

**1. Air Force Core Values:** Consider how well the Airman adopts, internalizes, demonstrates and insists on adherence of our Air Force Core Values of Integrity First, Service Before Self and Excellence in All We Do. **Personal and Professional Development:** Consider effort the Airman devoted to improve their subordinates, their work center/unit and themselves. **Esprit de corps and Community Relations:** Consider how well the Airman promotes camaraderie, enhances esprit de corps, and develops Air Force ambassadors.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**2. COMMENTS** *(Minimum 1 line, but limited to 2 lines)*
- Visible! Top III/Booster Club Sr mentor; facilitated 8 meetings/6 events/4 orgs--incrsd morale f/ 250 Amn & families
- Deployed TF ldr; org'd 4 events, raised $2.1K w/ camp Top III; complet'd SEJPME II & 3 hrs f/ MA in Nat'l Security

| AF FORM 911, 20150731, V2 | PREVIOUS EDITIONS ARE OBSOLETE | PRIVACY ACT INFORMATION The information in this form is FOR OFFICIAL USE ONLY Protect IAW the Privacy Act of 1974 |
|---|---|---|

"Certified True Copy," E-8, Christman, Zachary W--CHRISTMAN ZACH Digitally signed by CHRISTMAN ZACHARY First Sergeant, AFPAA, Apr 20

**V. OVERALL PERFORMANCE ASSESSMENT** *(Overall assessment of performance during rating period commensurate with Sections III-IV.)*

RATEE NAME: ZIER, JEREMY M.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**VI. RATER INFORMATION** *(Signature signifies this is an unbiased assessment and all ACA feedback sessions were completed as required per AFI 36-2406)*

NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION
BRADLEY H. GILDEA, GS-14, DAF
Air Force Public Affairs Agency (AFPAA)
Joint Base San Antonio-Randolph, TX

DUTY TITLE: Director of Staff    DATE: 05 Sep 2019
SSN    SIGNATURE

**VII. ADDITIONAL RATER'S COMMENTS** *(Comments are optional unless required for Referral, if not used state "This Section Not Used")*    ☒ CONCUR    ☐ NON-CONCUR

1. COMMENTS *(Comments are optional unless required for Referral; if not used, state "This Section Not Used")* (Minimum of 1 line, but maximum of 2 lines)
- Guided SOUTHCOM's $8.3M New Horizons PA plan f/ 500 deployers--USG actions/msgs countered Venezuelan IO
- Led cmd sync strat; org'd 18 media events. Guyanese president event; 13.3K pt visits/4 sites--incr'd US/HN sec coop

NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION
TODD M. B. VICIAN, Colonel, USAF
Air Force Public Affairs Agency (AFPAA)
Joint Base San Antonio-Randolph, TX

DUTY TITLE: Commander    DATE: 05 Sep 2019
SSN    SIGNATURE

**VIII. UNIT COMMANDER/MILITARY OR CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER'S COMMENTS** *(Comments are optional with a maximum of 1 line, if not used, state "This Section Not Used".)*    ☒ CONCUR    ☐ NON-CONCUR

No challenge too big! Restored AF PA global flying pgm off-line 8 yrs; IOC 30 days early--FOA HQ Sijan winner!

1. FUTURE ROLES *(Recommend up to three roles/assignments that best serve the Air Force and continues the Airman's development)*
1. Squadron Superintendent    2. Joint Assignment    3. MAJCOM Functional Manager

| 2. EDUCATION *(as of closeout date)* | 3. PROMOTION ELIGIBLE *(Promotion eligibility as-of closeout date)* | 4. THIS IS A REFERRAL REPORT | 5. QUALITY FORCE REVIEW *(Ratee's personnel record has been reviewed for quality force indicators during the reporting period)* |
|---|---|---|---|
| CCAF Conferred: YES  PME Complete: YES | YES | NO | YES |

NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION
TODD M. B. VICIAN, Colonel, USAF
Air Force Public Affairs Agency (AFPAA)
Joint Base San Antonio-Randolph, TX

DUTY TITLE: Commander    DATE: 05 Sep 2019
SSN    SIGNATURE

**IX. FINAL EVALUATOR'S COMMENTS** *(Limit text to 1 optional line, if not used state "This Section Not Used")*    ☒ CONCUR    ☐ NON-CONCUR

- My CEM f/ Hq Staff, 3 sqdns f/ 4 months! Rocked AEG Staff Supt/advised EFDP--FOA '18 SNCOY...PN to Chief!

| A FINAL EVALUATOR POSITION | B SENIOR RATER STRATIFICATION. (This section restricted to Senior Rater only) |
|---|---|
| SENIOR RATER    ☐ FORCED ENDORSEMENT | Top 20% of SMSgt |

NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION
TODD M. B. VICIAN, Colonel, USAF
Air Force Public Affairs Agency (AFPAA)
Joint Base San Antonio-Randolph, TX

DUTY TITLE: Commander    DATE: 15 Sep 2019
SSN    SIGNATURE

**X. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR** *(indicate applicable review by marking the appropriate box)*    ☐ FUNCTIONAL EXAMINER    ☐ AIR FORCE ADVISOR

NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION
DUTY TITLE    DATE
SSN    SIGNATURE

**XI. REMARKS** *(Only use this section to spell out uncommon acronyms or to place required comments IAW AFI 36-2406.)*
COMCAM - Combat Camera; EFDP - Enlisted Forced Distribution Panel; HN - Host Nation; IOC - Initial Operating Capability; PT - Patient; SUAS - Small Unmanned Aerial Systems; TF - Task Force

**XII. RATEE'S ACKNOWLEDGEMENT** *I acknowledge all required ACA feedback was accomplished during the reporting period and feedback was provided upon receipt of this report (unless otherwise stated above)*

SIGNATURE: ZIER.JEREMY.M.1022331023    Digitally signed by ZIER.JEREMY.M.1022331023 Date: 2019.09.16 13:20:46 -05'00'    DATE: 16 Sep 2019

AF FORM 911, 20150731, V2    PREVIOUS EDITIONS ARE OBSOLETE    PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974

*Left margin:* "Certified True Copy," E-8, Christman, Zachary W CHRISTMAN.ZACH... First Sergeant, AFPAA, ___ Apr 20

# DEFENSE EXHIBITS



Page 1 of 1

Def Exhibit _A_ for ID
Page Offered _28_
Page Admitted _28_



Page 1 of 1

Def Exhibit ___ for ID
Page Offered _28_
Page Admitted _28_



Page 1 of 1

Def Exhibit __C__ for ID
Page Offered __28__
Page Admitted __28__




# SMSGT JEREMY M. ZIER

## EXHIBITS IN EXTENUATION & MITIGATION
### (Exhibits are one page unless otherwise noted)

Exhibit    D    Index, 5 pages

## STATEMENT

Exhibit    E    SMSgt Zier's Personal Statement, 6 pages

## CHARACTER LETTERS

Exhibit    F    Character Letter from Ofc Shawn Weismiller, dtd 6 Jul 20, 1 page
Exhibit    G    Character Letter from David Clark, dtd 29 Jun 20, 2 pages
Exhibit    H    Character Letter from Douglas Lefforge, dtd 17 Jun 20, 2 pages
Exhibit    I    Character Letter from Jeremy Webster, dtd 6 Jul 20, 1 page
Exhibit    J    Character Letter from Renee Tyron, dtd 30 Jun 20, 2 pages
Exhibit    K    Character Letter from Stephen Faulisi, dtd 16 Jun 20, 2 pages
Exhibit    L    Character Letter from Timothy Bailey, dtd 29 Jun 20, 2 pages
Exhibit    M    Character Letter from Bradley Gildea, dtd 21 Jul 20, 1 page
Exhibit    N    Character Letter from Lawrence Cox, dtd 21 Jul 20, 2 pages
Exhibit    O    Character Letter from Christopher Moore, dtd 21 Jul 20, 1 page
Exhibit    P    Character Letter from David Steele, dtd 23 Jul 20, 1 page
Exhibit    Q    Character Letter from Auburn Braithwaite, dtd 1 Jul 20, 2 pages
Exhibit    R    Character Letter from James Lotz, dtd 22 Jul 20, 1 page
Exhibit    S    Character Letter from Lt Col Johnston, dtd 30 Jun 20, 1 page
Exhibit    T    Character Letter from Maj Anderson, dtd 24 Jul 20, 2 pages
Exhibit    U    Character Letter from Capt Morales, dtd 29 Jun 20, 2 pages
Exhibit    V    Character Letter from Capt Pardini, dtd 26 Jun 20, 1 page
Exhibit    W    Character Letter from CMSgt Victor, dtd 23 Jul 20, 1 page
Exhibit    X    Character Letter from CMSgt David, dtd 25 Jun 20, 1 page
Exhibit    Y    Character Letter from CMSgt Suddeth, dtd 29 Jun 20, 2 pages
Exhibit    Z    Character Letter from SMSgt Martin, dtd 22 Jun 20, 2 pages
Exhibit    AA   Character Letter from MSgt Kin, dtd 27 Jun 20, 2 pages
Exhibit    BB   Character Letter from MSgt D. Dickens, dtd 28 Jun 20, 2 pages
Exhibit    CC   Character Letter from MSgt Robertson, dtd 25 Jun 20, 2 pages
Exhibit    DD   Character Letter from MSgt M. Dickens, dtd 25 Jun 20, 1 page

## PHOTOGRAPHS

Exhibit    EE    Family and Military Photographs, undated, 7 pages

## CERTIFICATES, COINS & AWARDS

Exhibit    FF    Bronze Star Medal, dtd 3 Dec 07

Def Exhibit  D  for ID
Page Offered  146
Page Admitted  146

Page 1 of 5

| Exhibit | GG | Air Force Achievement Medal, dtd 1 Jun 00 |
|---|---|---|
| Exhibit | HH | Air Force Achievement Medal, dtd 31 Jan 01 |
| Exhibit | II | Air Force Achievement Medal, dtd 30 Mar 01 |
| Exhibit | JJ | Air Force Achievement Medal, dtd 27 Mar 02 |
| Exhibit | KK | Air Force Achievement Medal, dtd 14 Jul 20 |
| Exhibit | LL | Air Force Commendation Medal, dtd 20 Apr 02 |
| Exhibit | MM | Air Force Commendation Medal, dtd 2 Jul 10 |
| Exhibit | NN | Air Force Commendation Medal, dtd 14 Nov 11 |
| Exhibit | OO | Air Force Commendation Medal, dtd 13 Aug 19 |
| Exhibit | PP | Meritorious Service Medal, dtd 19 Jul 13 |
| Exhibit | QQ | Meritorious Service Medal, dtd 5 Oct 17 |
| Exhibit | RR | Meritorious Service Medal, dtd 26 May 18 |
| Exhibit | SS | Joint Service Achievement Medal, dtd 22 May 03 |
| Exhibit | TT | Joint Service Achievement Medal, dtd 1 Feb 05 |
| Exhibit | UU | Joint Service Commendation Medal, dtd 1 Jul 05 |
| Exhibit | VV | Defense Meritorious Service Medal, dtd 22 Jul 15 |
| Exhibit | WW | Letter of Appreciation from Col Ward, undated |
| Exhibit | XX | Letter of Appreciation from CMSgt Johnson, dtd 7 Aug 98 |
| Exhibit | YY | Letter of Appreciation from Brig Gen Soligan, dtd 1 Mar 99 |
| Exhibit | ZZ | Letter of Appreciation from Brig Gen Soligan, dtd 1 Mar 99 |
| Exhibit | AAA | Letter of Appreciation from Brig Gen Soligan, dtd 19 Mar 99 |
| Exhibit | BBB | Letter of Appreciation from Brig Gen Soligan, dtd 9 Jun 99 |
| Exhibit | CCC | Letter of Appreciation from Brig Gen Diehl, dtd 12 Jul 00 |
| Exhibit | DDD | Letter of Appreciation from Brig Gen Diehl, dtd 7 Sep 00 |
| Exhibit | EEE | Letter of Appreciation from Gen Robertson, dtd 16 Mar 01 |
| Exhibit | FFF | Letter of Appreciation from Maj Gen Williams, dtd 1 Apr 01 |
| Exhibit | GGG | Letter of Appreciation, dtd 18 Apr 01 |
| Exhibit | HHH | Letter of Appreciation from CMSgt Holbeck, dtd 14 May 01 |
| Exhibit | III | Letter of Appreciation from Gen Robertson, dtd 15 May 01 |
| Exhibit | JJJ | Letter of Appreciation from Brig Gen Diehl, dtd 18 Apr 01 |
| Exhibit | KKK | Letter from Col Lord, dtd 5 Jun 01 |
| Exhibit | LLL | Letter from Brig Gen Diehl, dtd 17 Jul 01 |
| Exhibit | MMM | Letter from Brig Gen Diehl, dtd 28 Jul 01 |
| Exhibit | NNN | Letter of Appreciation from Maj Gen (Sel) Hodges, dtd 11 Jul 02 |
| Exhibit | OOO | Letter of Appreciation from Sgt Maj Tilley, dtd 26 Feb 03 |
| Exhibit | PPP | Letter of Appreciation from Brig Gen Sealock, dtd 12 May 03 |
| Exhibit | QQQ | Letter of Appreciation, dtd 3 Jun 03 |
| Exhibit | RRR | Letters of Appreciation, dtd 16 Oct 03 and 23 Oct 04 |
| Exhibit | SSS | Letter of Appreciation from Col Woodward, dtd 16 May 05 |
| Exhibit | TTT | Letter of Appreciation from Maj Gen Wurster, dtd 18 May 05 |
| Exhibit | UUU | Letter of Appreciation from Brig Gen Flynn, dtd 2 Jun 05 |
| Exhibit | VVV | Letter of Appreciation from Maj Gen Parker, undated |
| Exhibit | WWW | Recognition for being on the Dean's List, undated |
| Exhibit | XXX | Letter of Appreciation from Gen Rice, dtd 20 Apr 11 |
| Exhibit | YYY | Letter of Appreciation from Lt English, dtd 11 Jun 98 |
| Exhibit | ZZZ | Letter of Appreciation from Col Conroy, dtd 9 Oct 98 |
| Exhibit | AAAA | Recommendation for Air Force Achievement Medal, undated |
| Exhibit | BBBB | Letter of Appreciation from Rhea Law, dtd 24 Feb 99, 2 pages |
| Exhibit | CCCC | Letter of Appreciation from Lt Col Cash, dtd 15 Mar 99 |

| | | |
|---|---|---|
| Exhibit | DDDD | Congratulations Letter from Col Diehl, undated |
| Exhibit | EEEE | Letter of Appreciation from SMSgt Stewart, dtd 17 Mar 00 |
| Exhibit | FFFF | Letter of Recommendation from Col Isaac, dtd 4 Nov 00 |
| Exhibit | GGGG | Letter of Appreciation from Col Ward, dtd 13 Oct 00 |
| Exhibit | HHHH | Letter of Appreciation from Lt Col Volavcheck, undated |
| Exhibit | IIII | Letter of Appreciation from Col McCoy, dtd 26 Mar 01 |
| Exhibit | JJJJ | Letter of Appreciation from Brig Gen Diehl, dtd 24 May 01 |
| Exhibit | KKKK | Letter of Appreciation from Laura Simpson, dtd 20 Jun 01 |
| Exhibit | LLLL | Letter of Appreciation from Col Worthing, dtd 4 Sep 02 |
| Exhibit | MMMM | Letter of Appreciation from Maj General (Sel) Hodges, dtd 25 Sep 02 |
| Exhibit | NNNN | Letter of Appreciation from Maj Skinner, dtd 18 Nov 02 |
| Exhibit | OOOO | Letter of Appreciation from Maj Gen (Sel) Hodges, dtd 18 Dec 02 |
| Exhibit | PPPP | Letter of Appreciation from Hap Lutz, dtd 3 Jun 03 |
| Exhibit | QQQQ | Letter of Appreciation from Cheryl Tyo, dtd 20 Nov 03 |
| Exhibit | RRRR | Letter of Appreciation from Leo Smith, dtd 28 Jun 04 |
| Exhibit | SSSS | Letter of Appreciation from Justin Gates, dtd 13 May 05 |
| Exhibit | TTTT | Letter of Appreciation from Gwen Parmley, dtd 24 Aug 06 |
| Exhibit | UUUU | Letter of Appreciation from Elena Furnari, dtd 11 Sep 06 |
| Exhibit | VVVV | Letter of Appreciation, dtd 15 Aug 06 |
| Exhibit | WWWW | Letter of Appreciation, dtd 7 Oct 06 |
| Exhibit | XXXX | Letter of Appreciation from Maj McKee, dtd Oct 06 |
| Exhibit | YYYY | Letter of Appreciation, dtd 17 Nov 06 |
| Exhibit | ZZZZ | Letter of Appreciation from TSgt Murphy, dtd 14 Jan 08 |
| Exhibit | AAAAA | Letter of Appreciation from Lt Col Karns, dtd 12 Sep 12 |
| Exhibit | BBBBB | 81 TRW Certificate for Outstanding Leadership and Dedication |
| Exhibit | CCCCC | Certificate for Support Flight Performer of the Month, Jul 99 |
| Exhibit | DDDDD | Certificate of Appreciation for Support at the Airfest, 1999 |
| Exhibit | EEEEE | Certificate of Appreciation for Support to Partnership in Education, 1998-1999 |
| Exhibit | FFFFF | Certificate of Commendation in Support to AF Sergeants Association, 2000 |
| Exhibit | GGGGG | Certificate of Appreciation, dtd 20 July 00 |
| Exhibit | HHHHH | Certificate of Achievement as Performer of the Month, dtd Oct 00 |
| Exhibit | IIIII | Certificate of Appreciation for Support to the Hops Marathon, dtd 10 Dec 00 |
| Exhibit | JJJJJ | Certificate of Appreciation for Support the Special Olympics, dtd Jan 01 |
| Exhibit | KKKKK | Certificate of Appreciation for Support to Super Bowl XXXV, dtd 24 Jan 01 |
| Exhibit | LLLLL | Certificate of Appreciation from Brig Gen Diehl, dtd 15 Feb 01 |
| Exhibit | MMMMM | Certificate of Appreciation from SSgt Woodruff, undated |
| Exhibit | NNNNN | Certificate of Appreciation from Maj Hartford, dtd 15 May 02 |
| Exhibit | OOOOO | Award of Excellence from Lamar Hammer, dtd 6 Sep 02 |
| Exhibit | PPPPP | Certificate of Appreciation from Gen Holland, dtd 9 Jun 03 |
| Exhibit | QQQQQ | Certificate of Appreciation from Gen Brown, dtd 1 Jun 04 |
| Exhibit | RRRRR | Meritorious Service Certificate in Support of Combat Operations, 2007 |
| Exhibit | SSSSS | Certificate of Recognition from Gen Lichte, dtd 10 Aug 08 |
| Exhibit | TTTTT | Certificate of Appreciation from Lt Col Dollesin, Sep 09 |
| Exhibit | UUUUU | Air Force Combat Action Medal, dtd 23 Oct 09 |
| Exhibit | VVVVV | Certificate of Recognition from CMSgt McVicar, dtd 15 Dec 09 |
| Exhibit | WWWWW | Certificate of Appreciation for Emerald Warrior, 2011 |
| Exhibit | XXXXX | Certificate for AVA Awards Gold Winner, 2011 |
| Exhibit | YYYYY | Certificate for Promotion to Chief Master Sergeant, undated |
| Exhibit | ZZZZZ | Certificate of Training for AFJROTC 2 Year Program, dtd 5 Aug 97 |

US v. Zier Military Record of Trial and Appellate Extracts 000093 of 902

| | | |
|---|---|---|
| Exhibit | AAAAAA | Video Production/Documentation Course Diploma, dtd 25 Jun 98 |
| Exhibit | BBBBBB | Certificate of Completion for Intro to Media Composer Editing, dtd 29 Sep 99 |
| Exhibit | CCCCCC | Certificate of Completion for Intro to Media Composer Effects, dtd 9 Jun 00 |
| Exhibit | DDDDDD | Certificate of Completion for Advanced Techniques for Media Composer, dtd 13 Jun 00 |
| Exhibit | EEEEEE | MacDill AFB Honor Guard Certificate of Training, undated |
| Exhibit | FFFFFF | Certificate of Training for Block III Equipment Custodian Training, dtd 5 Jan 01 |
| Exhibit | GGGGGG | Electronic Imaging Course Diploma, dtd 12 Jun 01 |
| Exhibit | HHHHHH | Certificate of Training for Visual Information Craftsmen Course, dtd 14 Nov 02 |
| Exhibit | IIIIII | Certificate of Completion for Advanced Media Composer Effects, dtd 10 Nov 04 |
| Exhibit | JJJJJJ | Syracuse University Certificate of Completion for Military Motion Media, dtd 8 Aug 05 – 11 May 06 |
| Exhibit | KKKKKK | Certificate of Achievement for Patrol Rifle Instructor Training, dtd 2 – 4 Oct 06 |
| Exhibit | LLLLLL | Certificate of Training for Combat Lifesaver Course, dtd 18-21 Mar 07 |
| Exhibit | MMMMMM | Certificate of Training for M114 Up-Armored HMMWV, dtd 1 Mar 07 |
| Exhibit | NNNNNN | Certificate of Training for Emergency Parachute Training, dtd 22 Jan 08 |
| Exhibit | OOOOOO | Certificate of Training for Combat Skills Training, dtd 22 Feb-22 Mar 07 |
| Exhibit | PPPPPP | Certificate of Training for Combat Survival Training Course, dtd 8 Feb 08 |
| Exhibit | QQQQQQ | Certificate of Training for Water Survival Training Course, dtd 14 Feb 08 |
| Exhibit | RRRRRR | Certificate of Training for USAF Public Affairs/Multimedia Leadership Course, dtd 21 Mar 08 |
| Exhibit | SSSSSS | Certificate of Training for Combat Lifesaver Course, dtd 28 Sep – 1 Oct 08 |
| Exhibit | TTTTTT | Certificate of Training for Combat Skills Training, dtd 20 Sep – 17 Oct 08 |
| Exhibit | UUUUUU | Certificate of Training for Remote Weapon Systems, dtd 14 – 15 Dec 08 |
| Exhibit | VVVVVV | Certificate of Completion for NCOA, dtd 17 Dec 09 |
| Exhibit | WWWWWW | Certificate of Training for Combat Camera Leadership Course, dtd 14 Jan 11 |
| Exhibit | XXXXXX | Certificate of Completion for Location Lighting Workshop, dtd 3 – 9 Jul 11 |
| Exhibit | YYYYYY | Certificate of Completion for Air Force Public Affairs Management Workshop, dtd 12 – 16 Sep 11 |
| Exhibit | ZZZZZZ | Certificate of Completion for Military Newsvideo Workshop, undated |
| Exhibit | AAAAAAA | Certificate of Completion for USAF Senior Noncommissioned Officer Distance Learning Course, dtd 17 Jan 12 |
| Exhibit | BBBBBBB | Certificate of Completion for Senior Enlisted Professional Military Education Course, dtd 8 Mar 12 |
| Exhibit | CCCCCCC | Certificate of Training for Visual Information Management, dtd 15 Aug 12 |
| Exhibit | DDDDDDD | Certificate of Training for Joint Contingency Public Affairs Course, dtd 21 Jul 17 |
| Exhibit | EEEEEEE | CCAF Diploma for Accocaite in Applied Science, Audiovisual Production Services, dtd 20 Aug 03 |
| Exhibit | FFFFFFF | Hillsborough Community College Associate in Arts Diploma, dtd 10 May 04 |
| Exhibit | GGGGGGG | Ashford University Diploma, Bachelor of Arts, Journalism and Mass Communication, dtd 28 Jul 14 |
| Exhibit | HHHHHHH | Newspaper photo of SMSgt Zier as the youngest member of the mess, undated |

Page 4 of 5

| | | |
|---|---|---|
| Exhibit | IIIIIII | Newspaper photo of SMSgt Zier volunteering and newspaper clipping Recognizing SMSgt Zier for Military Citizen of the Year Awards Banquet, undated |
| Exhibit | JJJJJJJ | Newspaper clipping of SMSgt Zier being recognized as Diamond Sharp, undated |
| Exhibit | KKKKKKK | 6 CS Commander's Award, dtd Dec 99 |
| Exhibit | LLLLLLL | 6 CS Airman of the Year Award, 1999 |
| Exhibit | MMMMMMM | 6 CS Airman of the Year Award, 2000 |
| Exhibit | NNNNNNN | 6 ARW Airman of the Year Award, 2000 |
| Exhibit | OOOOOOO | Airman Leadership School John L. Levitow Award |
| Exhibit | PPPPPPP | MacDill AFB Honor Guard Appreciation Award, dtd Feb 00 – May 02 |
| Exhibit | QQQQQQQ | AFSA Certificate of Commendation, dtd 19 May 01 |
| Exhibit | RRRRRRR | Headquarters AFPAA NCO of the Year Award, 2011 |
| Exhibit | SSSSSSS | Incirlik First Sergeants Counsel Appreciation Plaque, dtd Dec 14 – May 15 |
| Exhibit | TTTTTTT | AFN Europe Senior NCO of the Year Certificate, 2014 |
| Exhibit | UUUUUUU | SAF/PA Appreciation Plaque, dtd 24 Jul 15 – 15 Sep 17 |
| Exhibit | VVVVVVV | HQ SNCO of the Year Award, 2018 |
| Exhibit | WWWWWWW | SNCO of the Year Award, 2018 |
| Exhibit | XXXXXXX | SNCO Captain Lance P. Sijan Leadership Award, 2019 |
| Exhibit | YYYYYYY | Coins, undated, 11 pages |

Page 5 of 5

## Personal Statement of SMSgt Jeremy M. Zier

Members, first and foremost I would like to apologize. I'm sorry for my terrible choices that have put me in this position. I'm sorry that my poor judgement has brought everyone here away from their families and their busy lives. I regret that my actions have forced my shop and my squadron to lose an asset that they have drastically invested in. That my irresponsibility has slightly hindered the ability to generate mission capable jets. Finally, for what it is worth, I wish to apologize to my future self for adding speed bumps on the road to my desired future that can't be avoided.

I know these simple words alone cannot atone for my wrong doings, but given the opportunity, I would like to try and paint a picture. A picture that sheds some light on who I am, where I've been, why I'm here, and most importantly how I can learn from this experience to become a better person for the people who care and support me.

I am Jeremy Michael Zier and on the occasion of my 23rd year of service to this great nation I wanted to take this opportunity to talk about where I am from and some of my experiences along the way.

I was born in Buffalo, NY to Judith Zier and Neil Harris. I'm a product of a biracial relationship. This fact doesn't define me, but it has offered me a unique perspective to view the world from. My biological father departed before we ever had a real relationship. I initially had a relationship with his parents, but I was told by my mother that it eventually fell apart as well. Despite the early challenges in my mother's life she ended up meeting my now stepfather, Darrell Crawford. He has been a part of my life since the age of 3. He is all I know as a father and I couldn't have been luckier to have a man that took me and my older brother in as his own. Over the first 17 years of my life my parents ended up having 4 more children, with me being the second oldest. Both of my parents were hard-working, blue-collar people. My mom served as a nurse and my dad worked as a regional truck driver. He was gone all the time, so my brother and I shouldered a lot of the burden to take care of our younger siblings as my mom worked long shifts at various hospitals. Overall, my childhood was crowded, and we didn't always have the money we needed. Despite the fiscal limitations my parents always made up for it in involvement in our lives and love. My childhood was much like any other kids. I played a lot of sports and a lot of video games. My family loved football and I was raised a fan of the Buffalo Bills.

Both my grandfathers served in the military; but due to their advanced ages I never had a chance to really understand their sacrifices and hear their stories, so my understanding of the military was limited. That was until I entered high school. The first week of school I was faced with the decision to either take a foreign language or join JROTC. Knowing how much I loathed learning a language I immediately choose JROTC. Looking back, this was one of the best decisions I made as a young adult. I immediately took to the structure of the program and enjoyed learning about marching. Prior to my sophomore year I was hand selected for a brand-new Aerospace Science program that my school was only 1 of 20 in the country to participate in. This program would take me daily to a hangar at the Buffalo Airport where I would attend class. Half of the day would be dedicated to aerospace science, engineering, math, and JROTC

1

Defense Exhibit ___E___ for ID
Page Offered _146_
Page Admitted _146_

curriculum. This program provided me with my very first opportunity to fly. I'll never forget that Cessna 150 flight. In summer of 1995, due to crime in our neighborhood my parents made the decision to move out of the dangerous city to the country. We moved to Eagle, New York, which is where I spent my last two years of high school, without JROTC. As the end of my senior year approached, I faced the realization that I had no real plan. That is when my tie in JROTC filled my head. At the same time SSgt Matt Syverson was walking the hallways of my school. Given the rarity of recruiters visiting our rural school it was a sign that I was meant to meet him. From there I never looked back. In March 1997 I was signed up for the delayed enlistment program and on 6 August 1997, I entered the gates at Joint Base San Antonio - Lackland Air Force Base.

Much like JROTC, the military just felt right for me. I really enjoyed the structure and I feel like I'm at my best when part of a team. That was especially true when I attended tech school at Ft. Meade, MD for the AFSC video production documentation. My MTLs thought I was a good Airmen and they selected me to wear the green and then yellow rope and represent the Air Force as a student leader. I eventually graduated tech school in July 1998 and went to MacDill AFB for my first assignment. This assignment was critical to my career. I had strong leaders at every level that nurtured me and provided me with glowing examples of what a leader looks like. Those same leaders offered to buy me a ticket to the Dining Inn so that I could attend. The event was an important part of my early career where I was able to see and appreciate the history and pageantry that represented many time-honored traditions. This moment is why I always look forward to sponsoring Airmen to formal events so that they can get the same experience and hopefully be motivated like me. My first few years of service offered so many lessons about Airmanship. Along the way I was the Wing's Airman of the Year and the MAJCOM level winner for the Communications Excellence Award. These early successes showed me how critical it is to stay involved in your Airman's career and to make sure you're invested in their success and failures to help everyone grow. Prior to joining, I thought I would be a one-term Airman and done. That changed after my first deployment to Italy in 1999 in support of Operation Allied Force. This was the first time I supported the execution of Air Power. Seeing how the Air Force operated in a deployed environment refocused my energy to now wanting to stay in.

My first assignment also offered me the opportunity to serve on the Base Honor Guard. I was involved with the honor guard for nearly 2 years and this was a highlight of my career. At first seeing families grieve is hard to process. But having the honor of presenting the flag to a spouse or family member started to take on a whole other meaning. I was now able to represent the last memory that this family will think about whenever they look at the flag at home. Our membership in the profession of arms demands that we honor those that served. They earned it and the least we can do is ensure they receive proper recognition and the family gets closure. What started out as an additional duty turned into a full-time job that gave me more pleasure than the job my AFSC said I was paid to do.

The next stage of my career started with my selection to Staff Sergeant on my first try. This achievement was such an awesome feeling. I ended up attending ALS where I was selected as the class Levitow winner. I put Staff on and took my next assignment to U.S. Special Operations Command where I started editing Weapon System videos of classified missions and eventually transitioned to working for the Commander's Action Group where I helped produce

2

visual products that communicated critical Combatant Command priorities to external audiences. Getting a chance to see what a 4 Star general thought was important really shaped how I was able to support commanders the rest of my career. After working hard on the SOCOM staff I was hand selected by career field leadership to attend the highly selective Military Motion Media Program at Syracuse University. In 2006, after a year in residence at the University I was off to Charleston, SC to start the most impactful job of my career.

My assignment to Combat Camera (COMCAM) in June 2006 was a huge turning point in my career. I went from doing staff work and working at a wing to leading expeditionary Airmen and having to learn how to be a combat Airmen. I was an expert with the camera. Now I was expected to be highly proficient with a weapon, and how to shoot, move, and communicate like the joint service partners I would soon be supporting. I also started Aircrew training so that I could also be qualified to document the mission in the air. All of this training really made me understand that this assignment would be different. After training for the first 7 months, I was finally slated to deploy in March 2007.

I was tasked to support a Special Operations Take Force at Airbase overseas. The team's mission was focused on creating informational products and other strategic non-kinetic effects. In this capacity I got to work alongside Special Operations Forces that were stationed around this country. The day that forever changed my outlook on life was my first "mission" during this deployment. I was attached to a unit from an Airborne Division and the mission for the next 48 hours was to visit an enemy controlled neighborhood and be sure to kick the proverbial hornets' nest. This action would encourage local fighters and supporters to use commercial communication systems so that U.S. Special Operations Forces could intercept these communications to in turn get a sight picture of terrorist activity and relationships.

Since this was my first mission, I was really unsure what to expect. I went out to the flight line to meet the vehicle that was going to pick me and my partner up. When the two helicopters finally landed, I realized that the helo was jammed packed with soldiers. There were over 40 soldiers sitting on the helicopter floor, which stretched three rows wide. Each row was roughly 12-15 soldiers in length sitting in between each other's legs with enough gear and supplies to last 72 hours. I immediately sat down between the legs of another man and braced myself for take-off. After a 20-minute pitch black flight at 0300, I heard the muffled sound of the platoon leader yelling 3 minutes out. The rest of the platoon echoed the 3 minutes out call and instantly I heard over 40 M4 carbine rifles simultaneously rack a round into the chamber. That moment was surreal because no matter how many rooms I cleared in training I was mentally unprepared to land on foreign soil to help prosecute America's national defense objectives. The helo loitered over a farmer's field and I exited. From there I would proceed to visit dozens of houses and investigate lots of leads. My role was to document the mission and provide commanders with battlefield intel or visual information products to help shape their information environment. It's 0700 now and we no longer have the cover of night. Our platoon of 40 soldiers was moving in a farmer's field and it was filed with tall weeds or off trees. We noticed that up ahead our position was compromised. We hunkered down and tried to find cover hoping they didn't actually see us. Just like that I heard a zip and another zip go over my head. I sat there and thought "did I just get shot at?" Before I could really process what happened the Platoon

3

Sergeant yells at us to get down lower to the ground. The rest of that mission was really uneventful but to be shot at on my first op was memorable.

The rest of the deployment was so intense that this document won't do it justice. I participated in combat operations that I will never forget. I was shot at numerous times. I discharged my weapon at enemy combatants. My work contributed in yielding critical intel that led to mission success. Ultimately, I received the Bronze Star for my direct support to combat operations.

Upon returning back to the squadron I finalized the rest of my Aircrew training and attended SERE and water survival. As a fully qualified flyer, I documented flying missions all over the world to include, Guam, Denmark, Germany, and the Middle East. Due to my extensive experience and knack for being a strong communicator and leader, I was selected by the commander to be an instructor where I oversaw training for new COMCAM flyers. Having been successful trainer, I was selected as a TSgt to run the training flight. This position had been previously only been filled with MSgts. During all this training, I was tagged again to deploy and this time I was going back to Iraq to support the Navy SEALS. My mission this time was to help train Iraqi Police in advanced tactics so they could eventually execute highly skilled missions without U.S. Support. This deployment was another extreme experience. One of my highlights from the trip was to create a video that would "show" a US military member getting killed. This was a condition that one of our counter intel sources needed so that he could officially join ISIS. Using all the training and experiences that I collected over the years I was able to produce a sniper kill video and a roadside bomb explosion with the assistance of 2 motivated Navy EOD techs. These videos ended up allowing our source to infiltrate the terrorist group, which gave U.S. Forces important insider info. This deployment had many outside the wire missions, but it was my focus on developing a theatre-wide Information Operation campaign that gave me the most satisfaction.

I returned from the deployment and spent the rest of my time in Charleston focusing on the flying mission and the rules and regulations that Air Force Aircrew must adhere to. My flying experience took me back to Joint Base San Antonio - Lackland AFB where I was hand selected by Air Force Public Affairs Agency (AFPAA) director to help establish the newly created 3rd Combat Camera Squadron. As a critical asset, not just to my squadron, but to the entire Agency, I was moved to the HQ at the Port of San Antonio so that leadership across the three COMCAM squadrons could benefit from my leadership and extensive knowledge of DOD and AF doctrine.

While in San Antonio I met my wife Alejandra. We first met at a CO-ED recreational kickball league in early 2011. There we spent a few weeks getting to know each other in a group setting. We eventually went on our first date and I asked if she likes cooked. She said to me that "her favorite thing to make is a reservation." I loved that answer, but I realized that it was going to be interesting life since we both weren't cooks. This discussion established our mutual appreciation of restaurants and exotic dining adventures. Besides our love of food, it turned out that not only was she an Army Reservist, but she graduated the Graphics course that is at the same joint schoolhouse that I attended. Turns out that we were also deployed to the same location at the same time, but we weren't meant to meet then. These might have been simple

4

coincidences, but it seemed like it was much more, and we were fated to be together. This relationship has given me more joy then I have ever known. We got married on November 11, 2012 and after only a few months we received orders to move to Turkey in July 2013. We were extremely excited for this move and embraced it. We used the entire tour to travel and grow as a couple. We eventually had our first child, Zoey there. The mission in Turkey was also great. AFN is normally considered a joke to many but due to the access I was given to work with the Wing CC I had a first class ticket to see what it's like to lead at a remote assignment and also help to understand what type of information products we could provide that would better support their objectives. Since it was a short tour, I had over a dozen 1st term Airmen that cycled through the office. Mentoring and providing my unique experiences to these Airmen seemed like it was something I was supposed to do. My wife and I were focused on establishing a family like environment that helped to develop resilient Airmen before resilience was a catch phrase. During the tour I learned a lot about leadership and my team was rewarded for their hard work with many Quarterly, Annual, and MAJCOM level Communication Excellence Awards. The crown jewel was that we were chosen as Station of the Year for all of Europe in 2014 and 2015. This was the first station of the year award for AFN-Incirlik in over 8 years. Seeing their success made me a proud father.

My flying experience was once again called upon. There were some significant policy changes that were happing at the Pentagon. My career field manager called me in Turkey and asked if I would be interested in taking a special job at the Pentagon. Honored by the offer, we packed up from Turkey and headed to DC in July 2015. There I was the superintendent of the Secretary of the Air Force Public Affairs Command Information Division. From there I would lead the visual product development for the entire Air Staff and also help the Public Affairs CFM author policy that would bring COMCAM back to Aircrew status. Some of the highlights from that assignment were providing CMSAF Kaleth Wright's initial media training that helped set him up for success as he went on his first town hall visits. We helped work multiple Medal of Honor Ceremonies and countless other SECAF and CSAF priorities.

After two years I was vectored for a MAJCOM level functional manager job at USAFE with a move date of Sept 2017. Before departing it was discovered that my wife was pregnant with our second child. We knew that he would also be born overseas so we were extra excited for this new chapter in our life. That excitement soon dissipated as we went to or first ultrasound in Germany where our son was diagnosed with congenital diaphragmatic hernia. This rare diagnosis called for a late term abortion since they estimated only a 10 percent chance of survival. We knew that was not an option. He was going to get a chance to live and if he didn't then maybe his little organs could save some other babies life. This decision caused us to get medically evacuated back to the DC area to meet physicians at Walter Reed and specialists at John Hopkins. Hopkins approved us for an experimental procedure, so we waited patiently to see how he responded to the procedure. From the surgery in December 2017 to his due date in late February we were going to sit idly by to see when Noah would join us. He decided to make his grand entrance on 13 January, six weeks early. That started the fight for his life. Over the next 4 months he was hospitalized and received 3 surgeries with the first coming at only 5 days old. He had an uphill battle to fight and compensate for the fact he was born with miniature lungs. Life for the family was extremely difficult too, Due to his fragile medical situation, while on life support, we were unable to hold him for the first six weeks. This added to the pain since there

5

was nothing that we could do to comfort our son and even though he didn't pass away like many specialists anticipated, we were always on pins and needles because his health could decline at any moment. Since we were medically evacuated from overseas, we had to manage without many of the normal comforts that make life easier such as a vehicle, washing machines, and a fully stocked kitchen to name a few. All we had was items that we could fit in our luggage. Additionally, we ended up staying in a hotel for the entire time which meant that space was tight, and stress was through the roof. We had our three-year-old daughter there as well, so we had to do our best to not neglect her and ensure she was insulated, as much as possible, from the stress and uncertainty. The tension between Alejandra and I was always present. Many families in similar situations wouldn't be able to handle it. Given our maturity and respect for each other we took the opportunity to focus on communicating better and sharing the burden. This was a terrible time, but we didn't have to do it alone. Even after Noah was discharged from the hospital, Noah still required an at home nurse to help with his feeding tube and the myriad of therapies and medical interventions that he required. His fight and tenacity throughout this entire ordeal inspire me to this day to be a better father and human. Once he was ready to go home, we received orders back to San Antonio Texas in May 2018. That four months were the hardest thing in my life. That fear was way more intense than anything I encountered in combat. After all the stress and uncertainty, we are now a beautiful family of four that is significantly stronger and more resilient than any curveballs life can and will throw at us. I am lucky to know that whenever my service ends that I have a family that will stick by me through it all. I am blessed beyond measure for that.

Members, this is a glimpse into my life. Where I've been, what I've seen, and how I've contributed. I've spent more time of my life in the military then out. I've dedicated my heart and soul to this nation and I always taken my oath seriously. The miles I've traveled and the invisible scars that I bear will be with me until the end. I'm sincerely sorry that I've already taken up so much of your valuable time and the time of those involved, time that we can't get back. I do hope that this portrait I have attempted to make with these words gave you a more defined image of me. Thank you, Members.

6

July 6, 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: Officer Shawn Weismiller

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. My name is Shawn Weismiller, I am a police officer for the Seattle Police Department. For more than two years, I have been serving and protecting the people of Seattle. This includes law enforcement, criminal investigations, crisis intervention, and medical aid response. I am a veteran of the United States Air Force and held the rank of Staff Sergeant. My assignments included the Air Warfare Center, Nellis AFB and the 1st Combat Camera Squadron, Charleston AFB. I served in both Afghanistan and Iraq with numerous units, to include 3-1 Cavalry Regiment, 1-15th Infantry, and the 129th Expeditionary Rescue Squadron. I was honored to receive the Joint Service Commendation Medal and the Army Commendation Medal. During both my military and professional careers, I have served in a variety of supervisory roles.

2. In 2005, while I was in the Air Force, I was selected to attend the Advanced Military Photojournalism Program at Newhouse School of Communications, Syracuse University. SMSgt Zier was my roommate and we became close friends. We studied, worked and socialized together. After graduating Syracuse, SMSgt Zier and I were both assigned to the 1st Combat Camera Squadron in Charleston SC. We remained friends and continued to socialize daily for many years. As years past, SMSgt and I took different career paths. SMSgt Zier and I have remained friends and speak often. SMSgt Zier and I have spent hours discussing work, life and philosophy.

3. Before reporting for our new assignment at Syracuse University, the then SSgt Zier contacted me to discuss logistics. I had not been in the military long and SSgt Zier took the initiative to coordinate housing and transport. From then on, I recognized SMSgt as a leader amongst his peers. I have watched him successfully graduate Syracuse University, coordinate military operations, guide subordinates, and strive for personal/professional growth. SMSgt's Zier's persuasive, charismatic and professional nature set him above the rest. Throughout his military and professional career, SMSgt Zier has had the ability to motivate people to be better. To be better Airman, but more importantly better human beings. It is why I am honored to call SMSgt Zier my friend.

4. "Thank you for your time and consideration. If you would like to discuss this matter further, please do not hesitate to contact me at

Respectfully,

**Officer Shawn Weismiller**

Def Exhibit F for ID
Page Offered 146
Page Admitted 146

Page 1 of 1

29 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: DAVID L. CLARK

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. My name is David Clark and I am GS-13 Department of Navy (DON) civilian. I am the Public Affairs (PA) Policy and Doctrine Program Manager at the Navy Office of Information at the Pentagon. In this position I am responsible for the development, review, and revision of DON PA policy and doctrine, ensuring compliance with these policies and regulations.

Prior to this I served as the American Forces Network-Europe Regional Media Operations Chief at Sembach Kaserne, Germany for just shy of three years. In that position I supervised a team of 30 active duty Soldiers, Sailors, and Airmen who supported the command information and PA priorities for U.S. European Command, U.S. Africa Command, and all subordinate service commands.

Before I began my tenure in the civil service, I was an active duty Airman for twelve years, separating as a Technical Sergeant. During my service, I had assignments to Yokota Air Base, Japan, Syracuse, New York, and Joint Base San Antonio—Lackland, Texas. In my final assignment at the 3d Combat Camera Squadron in San Antonio, I supervised a dozen Airmen and led several squadron-level programs including Unit Deployment Management and Aerial Photography Program.

2. I have known SMSgt Zier since 2010 when he PCSd to the 3d Combat Camera Squadron. Jeremy and I shared the same office in the squadron. Initially, we were just coworkers, but we soon became friends.

Professionally, SMSgt Zier was a coworker and mentor. As I recall, one of his primary duties was to establish the aerial photography program at the squadron. As a member of the flying program, I worked closely with him to learn how to become an aerial photographer. After SMSgt Zier's PCA to the Air Force Public Affairs Agency headquarters, I took over his duties as the flying program manager, and I continued to work with him to continue building and improving the program. SMSgt Zier is one of the best Airmen and Senior NCOs I have ever worked with. He would go out of his way to help and mentor a fellow Airman.

Socially, I would describe Jeremy's and my friendship as close. While he was still in San Antonio the first time around, we would go to sports bars and watch football on Sundays. I helped him move into his now wife's home. He became friends with my now ex-wife, and I with his. I even served as a groomsman at his wedding. Most recently, I spent quite a lot of time with Jeremy and his family when he was briefly stationed at Ramstein Air Base, Germany. I took weekend trips with both his entire family, and him and I alone.

Defense Exhibit  G   for ID
Page Offered  146
Page Admitted  146

Page 1 of 2

3.  SMSgt Zier is the quintessential Airman. He lives and breathes the Core Values, both on and off duty. Jeremy is an amazing father and husband. I am in awe of his relationship with Alejandra and how much he is in love with her. He is incredibly dedicated to his family and puts them first in everything he does. Jeremy is absolutely the last person I would think would be accused of what he is accused of.

4.  Thank you for your time and consideration.  If you would like to discuss this matter further, please do not hesitate to contact me at                           .

Respectfully,

DAVID L. CLARK, GS-13, DONC

US v. Zier Military Record of Trial and Appellate Extracts 000104 of 902

17 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: DOUGLAS W. LEFFORGE

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. I am Douglas W. Lefforge. I am currently the director of operations at the Air Force Public Affairs Agency headquarters located on Joint Base San Antonio-Randolph, Texas. I am a senior GS-1035-14 supervisory public affairs specialist. AFPAA is a Field Operating Agency reporting to the Secretary of the Air Force for Public Affairs, the Pentagon, Washington DC. In my capacity, I oversee the program management of several Air Force (and now Space Force)-level programs to include: A) Plans and operations for the Air Force's only active duty Combat Camera unit supporting the Joint Chiefs of Staff, Headquarters Air Force and Combatant Command visual information documentation requirements; B) execution of all Visual Information (VI) related requirements for the Air Force; C) Air and Space Force Intellectual Property Management which is the protection of Department of the Air Force trademarks and the licensing of such marks in commerce; D) Air and Space Force Public Web and its management of more than 330 public-facing websites across the Services. I currently hold an advisory role for the Combat Camera Aircrew Flying Operations program of which Senior Master Sergeant Jeremy Zier is chief of the Standardization and Evaluation division in AFPAA which validates mission readiness and the effectiveness of a unit's flying program. I served on active duty for nearly 27 years, honorably retiring at the rank of lieutenant colonel. My greatest decorated achievement was the Bronze Star Medal earned for actions performed in Afghanistan. While in the service, I supervised hundreds of uniformed Airmen, Soldiers and Sailors, both directly and indirectly, as an aviator and Public Affairs professional and commander. In my current capacity as a government service civilian, I have supervised approximately 100 civilian and uniformed Airmen in my nearly 13 years as a supervisory public affairs specialist. In addition to assignments in the U.S., I have been assigned and deployed across the world in various capacities and in various leadership roles in my nearly 40 years of federal service to the nation.

2. I have known Jeremy Zier for 10 years. He and I joined the AFPAA about the same time. I arrived in July, 2010 when the AFPAA was located at JBSA-Lackland, and Jeremy moved to the 3rd Combat Camera Squadron, a subordinate unit of the AFPAA, in July, 2010, also on Lackland. I came in as a GS-14 directorate director for internal (command) information. About six months in the job at 3d CTCS, Jeremy was reassigned to the field operations directorate at the headquarters in January 2011 as the superintendent to the policy and programs division. As I recall, his role, in addition to leading and supervising enlisted personnel in the division, was to help rebuild the combat camera and public affairs flying program which had been deactivated a few years previous. The flying program is important to the DOD mission because it establishes the policy whereas public affairs specialists can safely perform their photo and video documentation mission in flight as an aircrew member assisting in safety of flight matters and other aircrew duties while documenting. Jeremy's and my interaction at the time was regular, daily, weekly, but not in a directive capacity. He was assigned under a different

Defense Exhibit __H__ for ID
Page Offered __146__
Page Admitted __146__

Page 1 of 2

directorate and had a separate chain of command. We would talk with one another about flying, football calls made by referees, and other watercooler topics, and we attended similar staff meetings. We also attended the same office social events, but I did not socialize with him outside of work. I, as a leader or supervisor, did not benefit from his work in the flying program at the time, but as my position changed to director of field operations in late 2014, I began to gain an understanding of, and been able to cultivate, the work Jeremy started on the flying program, earlier. I don't have Jeremy's dates of assignments after leaving AFPAA, but know that he was selected as broadcasting station manager of the American Forces Network station in Incirlik, Turkey, where he led his station personnel to Station of the Year prior to returning to the Public Affairs Airstaff directorate at the Pentagon where he picked up the policy role for the flying program, again. He made great strides in developing this much needed program. We talked about the program a few times while he was at Airstaff. Then, with the needs of senior noncommissioned officers who were and are still in short supply and high demand, Jeremy took an assignment to the combat-oriented major command public affairs office at United States Air Forces in Europe, Germany. I didn't have any interaction with Jeremy while he was there but know it was a shortened tour. Jeremy's son had complications which could not be solved overseas, so the AFPAA director at the time worked to bring Jeremy back to the AFPAA into one of my vacant manpower positions to manage the flying program again, but from the headquarters, this time. I've worked with Jeremy almost daily since his return in May of 2018 (minus a deployment he took to Central America), and have enjoyed his professional contributions and his personality ever since. I see his wife Alejandra and two children at events and around the office from time to time. The last office social event we attended at the same time was a Holiday dinner at the San Antonio Zoo in December, 2019.

3.  Jeremy is well liked and respected here at the headquarters where we both work. He's very personable and easy to talk with. He's always positive and willing to help on professional matters across the divisions. He is the commander's go-to expert on combat camera aircrew flying topics. He is *the* top expert in combat camera aircrew flying operations in the Air Force. I, personally, like him very much. We speak of our children and grandchildren in admiration. He is very protective of and attentive to his son. It's apparent to me that his wife adores him. Even though I learned that Jeremy was accused of misconducts, my opinion of him has not changed. I find his character beyond reproach. During all instances where I have been in his presence, he has always been the consummate professional, caring and respectful. I consider him a professional friend.

4.  To whomever shall read this testament, thank you for reading it to its conclusion. An Airman's future, not to speak of his reputation, honor and respect by others is at stake. If you require additional information or discussion on this matter, please don't hesitate to contact me by telephone or email at ⎯ ⎯ ⎯ ⎯ ⎯ ⎯ ⎯ ⎯

Respectfully,

DOUGLAS W. LEFFORGE, GS-14, DAFC

US v. Zier Military Record of Trial and Appellate Extracts 000106 of 902

7/6/2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: JEREMY L. WEBSTER

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. I am the Secretary of the Air Force Public Affairs Command Information Operations Branch Chief, with more than 12 years of federal service. In my current position, I provide communication advice and counsel to the Department of the Air Force senior leaders, while also overseeing the daily operations of the United States Air Force and Space Force digital media platforms. I started my career as a Palace Acquire intern (PAQ) in 2008 and had the privilege to attend Squadron Officer School, in-residence as a civilian in 2013.

2. I have known SMSgt Jeremy Zier since my time as a PAQ at Hurlburt Field in March 2009 and out paths crossed again when I arrived at SAF/PA in 2015. When I arrived at SAF/PA, he was serving as the SAF/PAI superintendent, this is where our friendship and mentorship truly began. During this time, our families bonded over numerous birthday parties and family gatherings. I am also proud to say that I am the supervisor I am today because of Jeremy. SMSgt Zeir has taught me how to have the tough conversations with the Airmen, and that the Air Force standards are not an option. Those standards were a requirement, and he held everyone he supervised to those standards.

3. Today, I write this letter in support of SMSgt Zier. Since I've known him, he has been a model senior non-commissioned officer who has always carried himself with the utmost professionalism. Even during the times, where his son was undergoing intense medical care, Jeremy was always putting service before self and making sure that his Airmen were taken care of no matter what he was going through. Jeremy is a friend who is always working hard to ensure his Airmen and his kids are prepared to face any uncertainties they may encounter in the future. Ever since I've known Jeremy he has been nothing but professional. Whatever situation he is in, I truly he will he will learn from it and use it as a teaching moment to mentor others on how to be a better person. Jeremy has been a great mentor to numerous Airmen during his time of service.

4. Thank you for the opportunity to write this character reference. If you need anything else, please do not hesitate to contact me at

Respectfully,


Jeremy L. Webster, GS-14, DAF

Defense Exhibit __I__ for ID
Page Offered _146_
Page Admitted _146_

Page 1 of 1

30 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: Renée Tyron, GS-13 (CMSgt, USAF Ret.)

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. My name is Katherine Renée Tyron (go-by Renée). I am currently the Director of Operations at the 1st Combat Camera Squadron overseeing more than 100 officers, enlisted Airmen and civilians at Joint Base Charleston, SC. I am an Air Force Civil Service employee (GS-13) with ten years tenure and nearly seven years in a supervisory role. I assumed my current position in December 2013 and was assigned previously at the Pentagon in the Secretary of the Air Force Office of Public Affairs for three and a half years.

   a. My duties at 1 CTCS include leading and directing the planning, programming, coordination, and operations of multimedia documentation, audiovisual productions and combat camera mobility of the squadron. Additionally, I am responsible for maintaining Combat Camera forces in order to provide critical operational imagery products and life cycle-management in support of Secretary of Defense, Joint Chiefs of Staff, Department of Defense, Unified Commands and Air Force mission requirements.

   b. I am a 30-year veteran of the U.S. Air Force and retired in October 2009 with the rank of Chief Master Sergeant (E-9). Throughout my career, I served as a photographer, videographer and public affairs professional at various locations around the world (including Nellis AFB, UK, Air Force Academy and Wright-Patterson AFB; a Combat Camera aerial videographer at Charleston AFB, communications squadron flight superintendent at Osan AB, ROK and Hickam AFB; and the Public Affairs Chief Enlisted Manager for U.S. Air Forces Central Command overseeing 500+ Airmen supporting annual requirements in Southwest Asia. I was a supervisor for over 26 years.

   c. My awards and decorations include the Air Force Meritorious Civilian Service Award, the Meritorious Service Medal with 6 oak leaf clusters, the Joint Service Commendation Medal, the Air Force Commendation Medal with 2 oak leaf clusters, the Joint Service Achievement Medal, the Air Force Achievement Medal with one oak leaf cluster, the Combat Readiness Medal with 2 oak leaf clusters, the Armed Forces Expeditionary Medal, the Global War on Terrorism Expeditionary Medal, the Korean Defense Medal, the Humanitarian Service Medal and the NATO Medal with bronze star.

2. I first met SMSgt Zier while I was assigned to U.S. Air Forces Central Command in 2007 in Charleston, SC while we were both participating in a Public Affairs working group related to the PA – multimedia merger; specifically deployment operations and unit type code development. At this time, this contact was wholly duty related. A SSgt at the time, SMSgt Zier struck me as very articulate and professional and definitely passionate about the Combat Camera mission. While assigned to AFCENT, I had occasion to interact with SMSgt Zier while he was deployed and upon his return from operations in Southwest Asia. Following my retirement from the Air Force and my subsequent position at the Secretary of the Air Force Office of Public Affairs, I occasionally travelled to San Antonio for temporary duty. At the time, I had numerous friends either stationed in

Defense Exhibit ___J___ for ID
Page Offered _146_
Page Admitted _146_

Page 1 of 2

or retired in the area and would often meet with them for dinner or drinks either at restaurants or at homes. SMSgt Zier was part of a group of mutual friends and we socialized from time to time. Any personal conversations between the two of us during these social settings were almost always about combat camera or training. Other conversations centered around mutual combat camera or PA contacts we shared.

a. Following my appointment to my current position, I believe that SMSgt Zier was still in San Antonio and I may have run into him again occasionally on a couple of visits to AFPAA but they were unremarkable. At some point, we became FaceBook friends and I followed his posts while he was at the Pentagon (lots of PT photos) and then later when he moved to Germany. I especially remember his posts about his daughter's illness and all the anxiety that went with it. In late 2016, SMSgt Zier came down to Charleston from the DC area to participate in the USAF Combat Camera Reunion where I socialized with him and many others attending the reunion (I was the event coordinator).

b. SMSgt Zier returned to the AFPAA family in 2018 as the Aerial Program Coordinator. In this capacity, he has travelled to JB Charleston on multiple occasions to conduct commander/squadron leader briefings as well as non-rated enlisted aircrew training with our squadron members. These visits were all primarily duty related and I do not recall any interactions beyond professional discussions and working group type meetings. Any social interactions were usually related to squadron events that SMSgt Zier attended while TDY here for aerial program related duties. During all of these interactions, I have always found SMSgt Zier to be professional, forthcoming and extremely knowledgeable in the areas of Combat Camera capabilities, our aerial program as well as public affairs processes throughout the career field.

3. As mentioned previously, I have known SMSgt Zier on a mostly professional basis since 2007; however, I do consider him a friend as well. Even as a Staff Sergeant, I found Jeremy to be sincere and respectful of others and I have never witnessed any inappropriate behavior towards women or others. In addition, while alcohol was consumed by all in many social settings, I personally have never seen him incapacitated, inappropriate or belligerent due to alcohol or any other reason. Jeremy has always treated me with the utmost of respect. As a retired CMSgt, I cheered his many successes and leadership in the career field and was excited when he was selected for Chief last year. It was well deserved and wholly earned by his professionalism, service before self and leadership. I believe that Jeremy is a valuable and productive member of the Air Force enlisted corps and of our overall Public Affairs career field and I look forward to watching him grow further as he leads the Airmen of the 3d Audiovisual Squadron.

4. Thank you for your time and consideration. If you would like to discuss this matter further, please do not hesitate to contact me on my cell phone:                     or my duty phone once we return to normal operations:

                              Respectfully,


                              K. RENÉE TYRON, GS-13, DAF


                              Page 2 of 2

16 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: Stephen Faulisi

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1.  My name is Stephen Faulisi and I am a Visual Information Planner at Defense Media Activity (DMA), Ft. Meade, Maryland. I coordinate with various Combatant Command Public Affairs planners to assist in the acquisition, distribution and preservation of visual information created during military operations.  I am also a U.S. Air Force veteran. I retired in 2008 in the grade of Master Sergeant after serving 26 years as a Combat Photojournalist.  I have supervised several Airman and Junior Non-Commissioned Officers (NCO) throughout my career. Some of my awards and decorations include the Defense Meritorious Service Medal, Meritorious Service Medal, Air Force Commendation Medal (3 OLC) Joint Service Achievement Medal, Air Force Achievement Medal (2 OLC) and Air Force Combat Action Medal.

2.  I have both a professional and personal relationship with SMSgt Jeremy Zier. I have known Jeremy for about 14 years. I met Jeremy when he arrived at the 1st Combat Camera Squadron, Charleston AFB, South Carolina in 2006.  When he arrived, he was a young Junior NCO and he was ready to take on the demanding role as a Combat Videographer. Jeremy was not in my chain of command and I never directly worked with him, but observing him in his work environment I was always in awe of his ability to project a commanding presence with confidence. The same was felt when he was off duty. He was always above reproach and was simply acting the way Airman were expected to act both on and off duty. I knew he would climb the ladder of success to become the Senior NCO he is today. His recent promotion to Chief Master Sergeant attests to that. Over the years, I developed a personal relationship with Jeremy. We have Western New York ties and we support the same Buffalo sports teams. I always enjoyed our conversation as we watched several football and hockey games together.  I continued to have both a professional and personal relationship with him after my retirement. We crossed paths again when I lived in San Antonio, Texas. Jeremy was now assigned to the Air Force Public Affairs Agency and later the 3rd Combat Camera Squadron located on Lackland AFB. I was humbled when he coordinated with his Squadron commander to have me become a photography mentor for some of his young Airman. We also continued our personal relationship throughout my time in Texas. I was there for his wedding and we continued that relationship after he left for a new assignment to Maryland. A few short years later, I was overjoyed when I knew our paths would cross again when I took my current job at DMA. We reconnected and was elated to see the new additions to his family. Jeremy also assisted me professionally when he was in charge of a Public Affairs team in Guyana and ensured that content made there would be expeditiously forwarded to me so I could amplify to my clients. Unfortunately for me, Jeremy was picked up for another assignment and I haven't seen him in a couple years, but we continue to stay connected and have a close friendship.

Page 1 of 2

3.   During our professional and personal relationship, Jeremy has proven to me to be of fine and moral character. He is the epitome of the Senior NCO and is a dedicated husband and father. As an unfaltering and responsible member of the U.S. Air Force, SMSgt Zier's offences were quite shocking and unexpected. These offences are not consistent with SMSgt Zier's nature. I believe in his innocence and I hope that you will take this into consideration when considering his case.

4.   All I can say that in all the time I have known Jeremy, he has been a hardworking, decent and honorable person. I hope this statement will give an idea of that character. Thank you for your time and consideration.  If you would like to discuss this matter further, please do not hesitate to contact me at

Respectfully,

Stephen M. Faulisi

Page 2 of 2

29 Jun 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: Chief Master Sergeant (Ret.) Timothy R. Bailey

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. My name is Chief Master Sergeant (Ret.) Timothy R. Bailey and I honorably served over 26 years in the U.S. Air Force. Throughout my career, I worked in three different career fields, held a variety of leadership positions and participated in numerous operations and exercises. I deployed in direct support of Operations PROVIDE COMFORT, JOINT GUARD, PROVIDE PROMISE, NOBLE EAGLE, UNIFIED RESPONSE, ENDURING FREEDOM and IRAQI FREEDOM. The latter two I earned Bronze Star medals during two of those deployments. Most of my career was at the 1st Combat Camera Squadron, Charleston, SC where I did three tours. I served there in ranks from SrA to SMSgt and was an aerial videographer for most of my time and I was one of the few to earn the Senior Aircrew badge. As a CMSgt, I served as the Senior Enlisted Leader for the Air Force Public Affairs Agency (AFPAA), Joint Base San Antonio-Randolph, Texas which is the headquarters for the 1st Combat Camera Squadron. In this position, I advised the director and staff on all enlisted matters to include morale, career progression, recognition, welfare, and mission effectiveness of more than 280 personnel within the AFPAA headquarters, two diverse squadrons and six operating locations. I retired from active duty on 31 Aug 2017 and started working as an Air Force GS civilian employee at the 1st Combat Camera Squadron in Feb 2018 as their Chief of Video Standardization/Evaluation and Training. In this role I oversee the training and proficiency of 77 Airmen responsible for Combat Camera documentation for the U.S. Air Force and Department of Defense.

2. I have known SMSgt Jeremy Zier since Oct 2006. I first met him after being assigned to the 1st Combat Camera Squadron for my third time. During our approximately 4 years together, I served as co-worker, aerial instructor/examiner, supervisor and flight chief to the now SMSgt Zier. We conducted multiple aerial missions together where I trained him on the responsibilities of being an aerial videographer/photographer. This eventually led to him overseeing the aircrew program for AFPAA and the Public Affairs career field. We worked closely together in creating training plans and training the Airmen for the Combat Camera mission. Our work relationship grew into a true friendship, which involved spending time outside of work. A lot of this time was spent enjoying boating on the weekends because SMSgt Zier had a jet ski and I had a boat. As with any military assignment, we both eventually moved away from Charleston, but always stayed in touch. While I was station manager at American Forces Network (AFN) Spangdahlem in Germany in 2013/2014, he was stationed in Turkey working at the AFN station. Even though we were not physically together, I provided mentorship from afar. This continued when he was stationed at the Pentagon working for the Secretary of the Air Force/Public Affairs office and I was the Chief at AFPAA. At this time, SMSgt Zier worked closely with me on correcting a major career field issue that took away aircrew status from Public Affairs' Combat Camera Airmen and relegated them to operational support flyers, resulting in our flyers receiving no training. Thanks to SMSgt Zier, this issue was corrected and Combat Camera Airmen are once again trained aircrew. Part of this

Defense Exhibit L for ID
Page Offered 146
Page Admitted 146

transition back to aircrew status required SMSgt Zier, now stationed at AFPAA as the flying program manager, to come temporary duty to Charleston and do a lot of flying with the Airmen. I saw SMSgt Zier during each visit, mostly at work, but on a couple occasions outside of work.

3.  I am absolutely shocked to hear of the charges against SMSgt Zier. It is completely out of character for him, and honestly, extremely hard for me to believe these charges are truly legitimate. SMSgt Zier is one of the best Airmen I have served with in my 26 years of service! He is an honest, trustworthy and compassionate person who always puts others before himself. Beyond an Airmen, he is a devoted husband, father and friend. In my 14 years of knowing SMSgt Zier, I have never witnessed anything that would make me question his character or integrity. He is the epitome of professionalism and is a true asset to the Air Force and the Airmen.

4.  Thank you for your time and consideration. If you would like to discuss SMSgt Zier's character further, please do not hesitate to contact me at                    .

                              Respectfully,


                              TIMOTHY R. BAILEY, CMSgt (Ret.), USAF

US v. Zier Military Record of Trial and Appellate Extracts 000113 of 902

21 July 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: Mr. Bradley H. Gildea

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. My name is Brad Gildea and I serve as the Air Force Public Affairs Agency (AFPAA) Director of Staff. In this role I manage all the care and feeding of the Air Staff Field Operating Agency, including manpower, personnel, finance, logistics, information technology, and executive administration. I am a retired Air Force Chief Master Sergeant, and have been a federal civilian since January 2009. I have been a part of AFPAA since June 2010, shortly after it was founded. I have been the DS since September 2015, and previously served as the Chief of the Plans and Programs division.

2. I have known Jeremy Zier since October of 2011, when he was first assigned to my division at AFPAA. I worked closely with him on several plans, policy and program management missions. He was the subject matter expert to the entire career field on aerial program management and was hand-picked to lead the career field efforts to reinstate the flying program. I consistently relied upon Jeremy to solve the most complex problems as he has a knack for root cause analysis and creating solutions to fix them. He left in August 2013 and was assigned to Incirlik, Turkey, followed by the Pentagon (2015), and then Ramstein (2017), before returning to AFPAA in May of 2018. While away from AFPAA between Aug 2013, and 2018, I didn't communicate very often with him. Upon his return in 2018, we have worked 15 feet away from each other, and communicate periodically. I have not been in his chain for operational missions, although I was the signer of his most recent EPR.

3. Jeremy Zier has always exhibited the highest character and integrity in my presence and when representing the Agency at meetings, while deployed or TDY, etc. I believe his character is not in sync with the apparent allegations, and accusations of this type would be for me very hard to believe. In my opinion, he is an exemplary Airman with a sustained record of excellence.

4. Thank you for your time in accepting my statement. Please contact me at any time at my personal cell                    , if you have any questions. Thank you again.

Respectfully,

GILDEA.BRADLE Digitally signed by
GILDEA.BRADLEY.H.1083777431
Y.H.1083777431 Date: 2020.07.21 13:20:27 -05'00'
BRADLEY H. GILDEA, GS-14, DAF
Director of Staff

Defense Exhibit  M   for ID
Page Offered  146
Page Admitted  146

Page 1 of 1

21 July 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: *LAWRENCE J. COX, GS-15, DAFC, CHIEF, CMD INFO DIV, SAF/PA*

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1.  I, Lawrence J. Cox, am the GS-15 division chief for the Command Information Division within Secretary of the Air Force Directorate at Headquarters, U.S. Air Force.  As such I oversee and supervise two branches, five teams, and more than 45 officer, enlisted, and civilian members within the division.  The division provides direct support to the Air Force's most senior leaders, digital media distribution and content support to public affairs functions across the Air Force enterprise, and digital and visual content to all of the Air Force's public audiences.  I've served in this role for the past 10 years, and in similar GS roles in the 5 years before that.  Before entering civil service I worked in senior corporate communications roles for three companies in the defense industry, and prior to that I retired as a lieutenant colonel following 23 years of active duty commissioned and enlisted service.  In each of my military and civilian roles and positions since my enlisted assignment in 1982, I have been charged with leadership and supervisory responsibilities, and in every case was recognized for exceptional and successful performance of those duties and responsibilities.  The bottom line…my experience in and knowledge of leadership and supervision in a government and/or military context is vast.

2.  In 2015 the Secretary of the Air Force Public Affairs Director and the Secretary of the Air Force Administrative Assistant assigned me the responsibility to build the Command Information Division (it did not exist previously) by combining 3-4 sub-organizations into the new team.  At the outset, I was provided a senior non-commissioned officer to serve as the division's superintendent and to help me build the division—this was (at the time) MSgt Jeremy Zier, whom I supervised directly.  In the ensuing two-plus years SMSgt Zier led many of these organization-building efforts, including: 1) assignment of numerous new enlisted and civilian personnel to the division, 2) building numerous operational processes and training assigned personnel in conducting these, and 3) procuring and maintaining several million dollars in equipment and supplies required to perform the mission.  While he successfully and expertly delivered all of this support he also served as first-line or second-line supervisor to all assigned enlisted personnel (15+ personnel at any given time).  In every instance, SMSgt Zier performed flawlessly.  He served as and proved to be an exceptional mentor for all team members, military and civilian.  And as he represented this new division in its interaction with other divisions in Public Affairs and across the Air Staff, he was widely regarded as a "must have" counselor and subject matter expert.  (In the second paragraph, describe your relationship with SMSgt Zier.  In all, these activities required SMSgt Zier and me to work closely together with hourly (if not minute by minute) interaction each duty day.  While my exposure to SMSgt Zier socially was extremely rare, our close interaction in duty performance introduced me to his spouse and other family members, with whom he quite obviously shared an extremely close bond.

Page 1 of 2

Defense Exhibit  N   for ID
Page Offered  146
Page Admitted  146

3. In approx. 40 years of federal service, I've been supported directly (as superintendent or NCO in Charge) by more than 10 senior NCOs. SMSgt Zier was, without question, the most effective, most reliable, highest-character, most supportive of them all. I can't think of one aspect of his character or performance that I recall needed improvement or repair. The Air Force as an institution, in review of the body of his professional experience, must have come to the same conclusion as it selected him for promotion to the rank of Chief Master Sergeant—the highest enlisted rank/grade. My personal exposure to him and experience with him validates the judgment of the Chief Master Sergeant promotion selection board. He is, has been, and continues to be, the best of the best when it comes to Air Force senior NCOs.

4. Thank you for your time and consideration. If you would like to discuss this matter further, please do not hesitate to contact me at                    (duty phone).

Respectfully,

LAWRENCE J. COX, GS-15, DAFC
Chief, Command Info Division
Secretary of the Air Force, Public Affairs

Page 2 of 2

21 July 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: CHRISTOPHER M. MOORE, LT COL (RET), USAF

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. I'm retired Air Force Lieutenant Colonel Chris Moore. I recently retired from the service in 2019 as a public affairs officer with more than 22 years of service. I entered the Air Force in 1996 at 17 as an enlisted print journalist, worked my way through college at night, and eventually commissioned in 2001 as a communications officer. I cross trained in 2005 into public affairs where I spent the bulk of my career. I worked at the squadron, wing, major command and headquarters Air Force levels. I commanded the 3rd Combat Camera Squadron and served as the personal communication advisor for General Mark Welsh, the Air Force Chief of Staff. I had 12 assignments over those years, with most in a supervisory capacity. I now work as an Air Force public affairs civilian at Air Combat Command headquarters at Langley AFB, Va.

2. I've known Jeremy since 2013, when I took command in San Antonio and he worked at my headquarters. I really got close to him in 2016, when I became the deputy branch chief of Air Force Command Information, where we has our superintendent. I supervised him there, and as a team, we led the Airmen. We ate lunch together almost daily, PT'd together, attended office social events and went TDY together. Our team was not just a team, but a family. He chose me to promote him to senior master sergeant. I left after a year, but we still maintain contact weekly or so through calls, texts, and social media.

3. I love Jeremy Zier and his beautiful family. I remain shocked at the allegations against him. The JZ I know is one of the most professional, hardworking, and compassionate Airmen I've ever met. His character is above reproach and I've never seen or heard of anything to the contrary. He is well respected among the officer and enlisted PA community, and his selection to Chief was no surprise to anyone. He loves his Airmen, and his Airmen love him. He deserves as much compassion and leniency as the court allows.

4. Thank you so much for taking the time to read this, and I hope you will see Jeremy the way I do. Please feel free to contact me at any time at

Respectfully,

CHRISTOPHER M. MOORE, LT COL (Ret.),
USAF

Defense Exhibit  O   for ID
Page Offered  146
Page Admitted  146

Page 1 of 1

23 July 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: DAVID M. STEELE

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1.      I am a retired Chief Master Sergeant with over 28 years of active military service
having served in the Security Police field for over 15 of those years and finished my career as
the senior enlisted manager at the Air Force Public Affairs Agency (AFPAA). After my
retirement, I was employed for six years as a contractor working for the Navy at the National
Maritime Intelligence-Integration Office. I have been at my current position, Visual
Information and Combat Camera Policy Manager at the Secretary of the Air Force Public
Affairs Command Information division (SAF/PAI), since April 2016.

2.      I have known SMSgt Jeremy Zier since being assigned to SAF/PAI in April 2016 and
he was the SAF/PAI superintendent. On occasion, Jeremy would ask for advice with running
an office with such a diverse group of people, military and civilian. I have kept in contact with
Jeremy when he made a PCS move to Ramstein AB, Germany, and then to his current
assignment at AFPAA. I have worked closely with Jeremy on writing the 3-volume AFI for the
public affairs flying program. I have also met with Jeremy outside of work while either he or I
have been TDY.

3.      I am at a complete loss at the charges levied against SMSgt Zier. This is not the friend
and coworker that I know and is totally against his character. Jeremy has always carried
himself with the upmost professionalism in all my interactions with him. He has always done
what it takes to ensure the mission at hand is complete. Regardless of his situation, he has kept
his military bearing and cared for those that work for and with him. Jeremy is a committed
family man. I know he has been under immense pressure from the time he learned of his son's
medical situation. Jeremy has juggled work and family, and from what I have seen and heard,
he has done an admirable job. In the time that I have known Jeremy he has been nothing but
professional, at work and in social gatherings. From holiday parties to meetings with friends,
nothing but above approach behavior is what I have witnessed. Jeremy has been committed to
learning and I'm sure this situation will be no different. He will learn and grow from this. I
hope you take Jeremy's honorable service to our country in consideration.

4.      I would like to thank you for your time. Please do not hesitate to contact me if you wish
to discuss this matter with me. I may be contacted at

Respectfully,

David M. Steele

Defense Exhibit  P  for ID
Page Offered 146
Page Admitted 146

Page 1 of 1

1 July 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: Auburn Braithwaite, GS-13, DAF

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1.    My name is Auburn N. Braithwaite and I am the Chief of the Public Affairs Career Field Team, located at the Air Force Personnel Center on Joint Base San Antonio-Randolph, Texas. In this position I oversee the public affairs civilian force. Job duties include planning and supporting the officer and civilian annual development team meetings, in which our PA senior leaders decide on officer and civilian assignments, developmental education and training opportunities. My duties also include managing the Air Force central salary account for all of AF public affairs, civilian tuition assistance, civilian leadership training funds, the PA PALACE Acquire and career broadener programs, and much more to support the growth and development of our career field and more than 960 global civilian employees. I have been working for the Air Force for ten years and have been assigned to 5 bases. I came in to the field as a PALACE Acquire; after completing that program I followed on in my career in roles such as a deputy division MAJCOM chief, the chief of PA at a wing, a two-time OCONUS MAJCOM PA division chief and a two-time Air Force career broadener. Awards and honors include: 2018 Air Force-level winner of the United States Air Force Outstanding Communication Civilian Category II of the Year award; 2018 and 2017 U.S. Air Forces in Europe & Air Forces Africa Outstanding Communication Civilian Category II of the Year; 2017 and 2016 USAFE-AFAFRICA Public Affairs Category II Civilian of the Year; 2016, 2015, 2014 and 2013 Air Force Space Command Outstanding Communication Civilian Category II of the Year; 2015 Team-Buckley Air Force Base Civilian Supervisory Category II of the Year; 2015 Air Force-level winner of the Major Henry "Hap" Arnold Team Award for Public Affairs Communication Effectiveness; 2015 460th Space Wing Civilian Supervisory Category II of the Year; 2015 460th Space Wing Air Force Association Outstanding Civilian Program Manager of the Year; 2015 Air Force Meritorious Civilian Service Medal; 2013 Headquarters Air Force Space Command Civilian Category II of the Year; 2013 Public Relations Society of America Gold Pick for Best Social Media Program of the Year; 2013 Headquarters Air Force Space Command Civilian Category II of the Quarter and the 2013 Society of American Military Engineers (SAME) Sustainability Team Award.

2.    SMSgt Jeremy Zier and I first met in 2011-2012, when we both attended a Visual Information course at the Defense Information School, Fort Meade, Maryland. During this two-week course, Jeremy and I worked on numerous projects together and went to several social outings with our course-mates. Jeremy and I linked back up and got to know each other more in 2018, when we were both stationed at headquarters USAFE-AFAFRICA, Ramstein AB, Germany. During our time stationed there, we worked on several missions and projects, to include the deployment of approximately 30 individuals to more than 10 countries for various missions and exercises in support of NATO and US operations. Aside from our professional relationship, Jeremy was an enlisted mentor for me, as well as a dear friend. He was my go-to for questions regarding my Airmen, questions about processes, combat camera, and much

Defense Exhibit  Q  for ID
Page Offered  146
Page Admitted  146

Page 1 of 2

more. Outside of work we attended many social outings with co-workers and with other outside-of-work friends in a non-work setting, such as Christmas parties, dinners, game nights and more. We also supported each other as friends through his wife's hard pregnancy with his second child, Noah and through the one-year PCS location separation of my husband to England, while I was still in Germany. All in all, Jeremy and I have known each other for nearly 10 years, worked closely together as co-workers for a year, and we have been good friends for about three years.

3.   I whole-heartedly feel SMSgt Jeremy Zier is a kind, caring, dependable, driven and loyal person. There has not been a time since I have known him that he hasn't offered to lend a hand to help, or an ear to listen.  Even through any of his own personal struggles, such as the time away from his family, or the difficult life-threatening birth of his child, he was there for me to help with my battles, both personal and professional.  In a work-setting and in a social, he is someone I would trust and would go to first for advice or assistance. There is not a doubt in my mind that Jeremy is a stand-up individual with the capacity to do great and be great.

4.   Thank you for your time and consideration.  If you would like to discuss this matter further, please do not hesitate to contact me at

Respectfully,


AUBURN N. BRAITHWAITE, GS-13, DAF
Chief, Public Affairs Career Field Team

US v. Zier Military Record of Trial and Appellate Extracts 000120 of 902

22 July 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: James E. Lotz, GS-13, USAF

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. I am writing on behalf of SMSgt Jeremy Zier. I am a retired U.S. Air Force Aerial Combat Camera Photojournalist. I served 24 years active duty and retired from 1st ComCam Squadron in 2006. I later became the Director of Operations (DO) for the 1st Combat Camera Squadron, Charleston Air Force Base, SC in Aug 2009. MSgt Jeremy Zier worked with me and for me at the 1st ComCam Squadron for at least 3-4 years. I was in charge of approximately 134 Airmen and MSgt Zier worked as Aerial Combat Camera Videographer. As the DO, I was in charge of selecting cream of the crop team leaders as well as division chiefs, managers, superintendents. MSgt was often selected for all positions of leadership due his high qualifications as a leader. I am currently working as the Deputy Director of Public Affairs for Air Force District of Washington (AFDW), at Joint Base Andrews, Maryland.

2. I have known SMSgt Zier on and off for the past 15 years. We have worked together as Combat cameramen. As the 1st ComCam DO, he has worked directly for me at lease 3-4 years. We have also worked together while he was assigned to the Pentagon. While working for me at 1st ComCam squadron, I highly recommended him to be the Aerial ComCam Flying Manager. This is because of his high standards to discipline, integrity, and regards for upholding regulations. As a combat videographer, he was always exceeding the standards and completing his task above his peers. We have many friends outside of a working relationship, where we have met socially for dinners, retirements, and promotion events where he has maintained the utmost professionalism and respect for others.

3. SMSgt Zier's character is above reproach. I have seen few Senior Non-Commissioned Officers (NCO) with such high integrity and professionalism on and off duty. He is direct with what daily requirements are to be completed as well as being empathetic towards Airmen's fundamentals and training. As I kept in contact with SMSgt Zier's career. I have seen him grow to become one of our Public Affairs highest leaders who continues to ask for advice and counsel. He sets the example of excellence, integrity, honor and Esprit-de-corps. He has always devoted nothing but cohesiveness, camaraderie and team spirit to accomplish the mission at hand. SMSgt Zier is the epitome of what the Air Force seeks for a career NCO and should demand his qualities continue to serve as a U.S. Air Force Chief Master Sergeant.

4. Thank you for your time and consideration. If you would like to discuss this matter further, please do not hesitate to contact me at                or email me at

Respectfully.

JAMES E. LOTZ, GS-13, USAF
AFDW/PA, Deputy Director

Defense Exhibit __R__ for ID
Page Offered _146_
Page Admitted _146_

Page 1 of 1

30 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: LT COL SHEILA N JOHNSTON

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. I am Lieutenant Colonel Sheila Johnston, a Public Affairs officer currently serving on active duty and assigned to U.S. Indo-Pacific Command.

2. I met SMSgt Zier when he was TSgt and MSgt Zier and we were both stationed in Charleston, S.C. assigned to the 1st Combat Camera Squadron. I was in the squadron from summer 2009 to summer 2012 and served as a flight commander and then assistant director of operations for the squadron. I was frequently in charge of teams sent to exercises and humanitarian or contingency operations, and TSgt/MSgt Zier worked for me as he mentored incoming Airmen and managed the squadron's flying training program for aerial-qualified photographers and videographers. There were regular opportunities for squadron interaction during home-stations and travel duties, during official and community fitness events, and during fellowship at squadron functions and meals while traveling.

3. I have known SMSgt Zier for more than a decade now, and I worked with him for three years directly as part of the Combat Camera community. During that time, he showed compassion for the Airmen under his charge and held great rapport with peers, leaders, and those he taught. I cannot speak to the situation at hand, but I can say it seems out of character based on my personal experience at home and while traveling TDY with then TSgt and MSgt Zier. I have only known Jeremy to be a compassionate individual who fights hard for his team and his Airmen to have the best equipment and training they need to succeed. I have also only known him to be someone who would take care of Airmen in need, not take advantage of them in any way. I have no doubt he will continue to be a thoughtful leader in his organization and in the community.

4. Many thanks for your time. I am happy to discuss further and am available at from 0800-1700 HST.

Respectfully,

SHEILA N JOHNSTON, LT COL, USAF

Page 1 of 1

Defense Exhibit  S  for ID
Page Offered  146
Page Admitted  146

24 JUL 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: Maj. Zachary L. Anderson

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. I am Major Zach Anderson. I currently serving as the Director of Operations for the 4th Combat Camera Squadron at Joint Base Charleston, South Carolina. My squadron is co-located in a Total Force construct with the active duty 1st Combat Camera Squadron. I am an Air Reserve Technician, which is a civil servant serving in a full-time military position within a reserve unit. I have 14 years of service in the Air Force Reserve, eight of which were in full-time status. In my current position, I oversee the training, equipping, and operational capability of 44 reserve Airmen in the Air Force Reserve's only Combat Camera capability. In my career, I have served in a supervisory role in two prior assignments. Prior to this assignment, I served as the Individual Mobilization Augmentee to the Director of Operations at the 1st Combat Camera Squadron. I have also served as the Chief of Public Affairs for the 931st Air Refueling Group at McConnell Air Force Base, Kansas, a staff public affairs officer at March Air Reserve Base, California, an enlisted public affairs specialist at Tinker Air Force Base, Oklahoma, and, in a civilian capacity, as an action officer at the Secretary of the Air Force Public Affairs at the Pentagon.

2. I have known Senior Master Sgt. Jeremy Zier for approximately two years. My relationship with him has been primarily professional in nature. He served as the primary instructor and evaluator in assisting me in standing up aerial photography and video operations for my squadron. His duties were to instruct my aerial personnel, evaluate their performance in flight duties, and to sign off on their capacity to perform their duties effectively thus qualifying them for flight status. I worked with him rather closely in this endeavor as he taught me how the aerial Combat Camera program worked, and I observed his performance on an almost daily basis over the course of several months as he instructed both reserve and active duty combat camera Airmen. Additionally, we've had several phone calls when I have had questions about the flying program and he has assisted and provided guidance on regulations, procedures, processes, etc. While we've never particularly socialized together, we have been to squadron dinners and holiday party events together.

3. During my interactions with Senior Master Sgt. Zier, I can say without any hesitation that I have known him to be a consummate professional at all times. He went above and beyond in assisting my reservist in gaining flight status, and did so in a highly professional manner. I have seen absolutely nothing in his behavior, mannerisms, or speech that was unprofessional or inappropriate. I have known him to be nothing more than a top-tier senior NCO, a hard worker, and an individual who has always been willing to help me, or my Airmen, when needed. While I have limited interactions with Senior Master Sgt. Zier outside of a work setting, during those few social engagements I've never witnessed anything inappropriate or unprofessional. Additionally, I know he is a man who cares deeply about his family and speaks of them often.

Page 1 of 2

Defense Exhibit __T__ for ID
Page Offered _146_
Page Admitted _146_

As a husband and father myself, I completely identify with that, and I respect the love and care he has for them.

4. I sincerely appreciate your time and consideration in reading this statement. I am happy to discuss this matter further if needed, and may be contacted at                               or

Respectfully,


ZACHARY L. ANDERSON, Maj, USAF

Page 2 of 2

29 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: Captain Mayrem Morales

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1.  I am Captain Mayrem Morales, I am a Public Affairs Officer, currently working as a Public Affairs planner for Headquarters U.S. Air Force in Europe and Air Forces Africa. I have been in the U.S. Air Force for over 9 years.

2.  I have known SMSgt Zier since 2017. He was also assigned to HQ USAFE-AFAFRICA Public Affairs as the Requirements and Development Superintendent. Unfortunately due to a family medical emergency, SMSgt Zier had to PCS to the United States the following year. The USAFE Public Affairs office is very close knit and most of the staff become Facebook friends right away. That was the case with SMSgt Zier and me. Shortly after his unborn son was diagnosed with Congenital Diaphragmatic Hernia (CDH), I began to follow a private Facebook group his wife and him created to keep us posted on his son's medical condition. During this time I did not communicate with him directly until I was tasked to deploy to Guyana for four months during the summer of 2019. SMSgt Zier was also deploying to Guyana and would serve as my Public Affairs Superintendent. In preparation for the deployment, we began to regularly communicate via government e-mail. Once in Guyana, we were joined by a Public Affairs videographer, Staff Sergeant Matthew Hester and photographer Senior Airman Derek Seifert. Our Public Affairs team would spend every day together. We worked 6 days a week and worked at least 10 hours a day next to each other. Our PA team was responsible for photographing and filming four construction projects and numerous medical outreach events throughout the country. Since the locations were spread throughout the country we also spent a lot of time transiting from location to location. Sometimes up to 3 hours one way. During these car rides, our team got to know each other and the conversations we shared always remained professional and in good taste. It is worth mentioning, our deployment to Guyana was very unique, in the way that we worked where we lived. Our work spaces were located within the camp where we lived called Camp Seweyo. Which means, even when we were done for the day, we still ran into each other. We even had dinner together most of the times.

3.  Due to the close proximity and amount of time we spent together, I got to know SMSgt Zier pretty well. Working and living at Camp Seweyo, Guyana would reveal our personalities and there is no doubt in my mind SMSgt Zier's character during that time was reputable and inspiring. Having served in Combat Camera for over 5 years, he was a technical expert, role model, and mentor to SSgt Hester and SrA Seifert. He was also my mentor. When I first found out I was deploying I was very nervous because I had never deployed and I was new to the Public Affairs career field, however upon finding out SMSgt Zier was my superintendent I knew I was in good hands. Additionally, everyone at USAFE PA who had worked with him, reassured me of it. Once in Guyana, I quickly latched on to his knowledge, expertise, and enthusiasm. I remember my flight to Guyana got delayed by a couple of days and I was very concerned Public Affairs operations would have a late start. However, SMSgt Zier was not

Page 1 of 2

Defense Exhibit U     for ID
Page Offered  146
Page Admitted  146

delayed and he hit the ground running. Within his first day he had already done a radio interview and synced with the U.S. Marine Civil Affairs team, which we worked closely with. Throughout the deployment he was a team player and mentor for all, often interested in the well-being of every Airman on camp not just our team. As mentioned before I was new to deploying and the career field, if it wasn't for SMSgt Zier advocating to leadership I deserved a decoration I would not have received one. Towards the end of our deployment, SrA Seifert and SMSgt Zier returned home about a week earlier. After their departure, I had a work situation with our Group Commander (the deployment commander), and I needed someone to discuss it with. I did not hesitate to Facebook message SMSgt Zier and ask if we could talk. He immediately made time for me and after listening to what happened, offered advice. I was so grateful for his guidance and availability even when he was supposed to be in Rest and Recreation (R&R). For these and many other instances similar to this, I consider SMSgt Zier one of the best SNCOs within the Public Affairs career field.

4.  Thank you for your time and consideration. If you would like to discuss this matter further, please do not hesitate to contact me via cell phone                    or e-mail

Respectfully,

MORALES.MAYR EM.1387283630 Digitally signed by MORALES.MAYREM.1387283630 Date: 2020.06.29 09:03:55 +02'00'

Mayrem Morales, Capt, USAF
Public Affairs Officer, USAFE-AFAFRICA

US v. Zier Military Record of Trial and Appellate Extracts 000126 of 902

26 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: CAPT MATTHEW K. PARDINI

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1.  My name is Matthew Pardini and I am writing on behalf of SMSgt Jeremy Zier. I have 20 years of Air Force active duty service across many echelons of leadership and career fields. My last 8 years as an Aircraft Maintenance Officer has allowed me the opportunity to lead Aircraft Maintenance Units of 200+ Airmen during daily flying operations, two deployments, and many temporary duty (TDY) exercises around the world. The skill I find most important in leading these units to record-breaking and enemy-crushing accomplishments is my ability to read people and identify positive and negative character traits affecting our mission success. It is through this lens that I view and give my opinion of SMSgt Zier's character.

2.  I first met Sgt Zier on or around 15 October 2007 when the Air Force assigned me to the 1st Combat Camera Squadron at Charleston Air Force Base, Charleston, South Carolina. Sgt Zier quickly became my unofficial sponsor who spent his professional time teaching me my new job and helped me to understand the organizational structure within joint environments. He advocated for me to go on, and prepared me for, my first Army embedded deployment to Iraq. After work, we spent time together going out to dinners with coworkers, going out downtown, a TDY and vacation to Las Vegas, and a cruise with a group of friends. We also spent time on our personal water vehicles on the waters in and around Charleston, South Carolina. Jeremy is a great peer who I learned a lot from and he ultimately became and is a lifelong friend.

3.  I am often asked to write character reference letters for Airmen who may be in trouble. I am very selective on who I choose to back because I do not want to jeopardize my word. Grounded in the first impression and lasting ability and professionalism SMSgt Zier displays, I have no reservation in vouching for his character. Jeremy has always been a stellar Airman and a great example of how leaders should support Airmen. He genuinely cares about the wellbeing and success of others; I have personally seen him sit down with a countless numbers of people to discuss the issues they were going through. His heart to listen and help others is truly remarkable and there are few others who I know who are as selfless as Jeremy. No matter the situation, he always acts above board and remains professional by treating others with graciousness and respect. I do not know the details of why I am being asked to write this letter, but I know Jeremy is a professional SNCO who lives the creed in all aspects of his life.

4.  Thank you for your time and consideration. If you have any questions or concerns, or if I can be of further assistance, I can be reached at                    during the day,                in the evenings, or by email at                    .

Respectfully,

PARDINI.MATTHEW .KEITH.1165375137  Digitally signed by PARDINI.MATTHEW.KEITH.11653 75137 Date: 2020.06.26 13:28:04 -07'00'

MATTHEW K. PARDINI, Capt, USAF
Academics Ops Officer/Instructor

Defense Exhibit  V   for ID
Page Offered 146
Page Admitted 146

23 July 20

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: JILL N. VICTOR, CMSGT

SUBJECT: Character Statement for SMSgt Jeremy Zier

1. My name is CMSgt Jill N. Victor and I have been a proud member of the Air Force for over 27 years. I am the Command First Sergeant for the Air and Education Training Command (AETC). I have been in my current position for 16 months. My total time serving as a first sergeant seven and a half years. Prior to becoming the Command First Sergeant for AETC, I was the Senior Enlisted Leader for the Air Force Public Affairs Agency (AFPAA), which provides operational control over one combat camera squadron and two audiovisual squadrons.

2. I met SMSgt Jeremy Zier in May 2018 when he received an Exceptional Family Member (EFMP) assignment to AFPAA. SMSgt Zier was a God send to our organization as his experience and expertise were vital in a priority mission in Public Affairs, Combat Camera Flying Program. He built the program from cradle to grave. As SMSgt Zier's supervisor, I would consider him a top notch SNCO. I can only attest to his behavior as being highly professional, super motivated, driven, detail oriented, level headed, and well organized. He is extremely respected in the Public Affairs community and is sought after for mentorship by Airmen of all ranks. Ironically, SMSgt Zier lived directly across the street from me. He purchased his home prior to meeting me or knowing of me. For the eight months I lived across the street from SMSgt Zier, it was apparent to me that he poured himself into his family, just as he did his work. I would describe SMSgt Zier as a family man to the core. From what I have witnessed of SMSgt Zier, I would categorize him as a person of high caliber. Considerate in nature to those around him and the embodiment of our core values.

3. If you have questions or concerns, please feel free to contact me at

JILL N. VICTOR, CMSgt, USAF
Command First Sergeant, HQ AETC

Defense Exhibit _W_ for ID
Page Offered _146_
Page Admitted _146_

Page 1 of 1

6/25/2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: CMSgt Jason A. David

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1.  Howdy, my name is Jason David, I currently serve as the Senior Enlisted Advisor for the American Forces Network and as the MAJCOM functional manager for the Defense Media Activity. Currently, I oversee roughly 650 joint servicemembers at 35 locations worldwide. I've served at unit, squadron, group and wing levels in the past. My decorations include the Purple Heart, 2 Defense Meritorious Service Medals, 2 Meritorious Service medals and 9 additional Joint, Air Force and Army Commendation and achievement medals.

2.  I have known SMSgt Zier since we were young NCOs. Over the past 10 years, I have been stationed with him in a joint capacity, played golf, went to dinner and attended professional development and official Public Affairs functions together. Jeremy has always been a kind, courteous and family oriented father, husband, wingman and friend.

3.  I cannot speak to the allegations that SMSgt Zier is facing or their validity, but I am comfortable saying that Jeremy is hard on himself at all times to maintain professionalism, Air Force competence and reputation management. He is a Senior leader that droves of Airmen in Air Force Public Affairs look up to and has the confidence of many in our PA Chief's group including myself. He is a responsible parent, a doting husband and a great wingman.

4.  I appreciate the opportunity to speak from my heart on SMSgt Jeremy Zier's character. If you would like to discuss further, please contact me at

Respectfully,

DAVID.JASON. Digitally signed by
DAVID.JASON.ALEXAND
ALEXANDER.1 ER.1068379705
Date: 2020.06.25
068379705 17:31:24 -04'00'

JASON A. DAVID, CMSgt, USAF
SEA, Defense Media Activity-Air Force

Defense Exhibit  X   for ID
Page Offered  146
Page Admitted  146

Page 1 of 1



**DEPARTMENT OF THE AIR FORCE**
UNITED STATES AIR FORCES CENTRAL COMMAND (USAFCENT)
SHAW AIR FORCE BASE SOUTH CAROLINA 29152-5029

29 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: CMSGT JUSTIN S. SUDDETH

SUBJECT: Character Statement for SMSgt Jeremy M. Zier

1. I am Chief Master Sergeant Justin Suddeth, and I have been in the United States Air Force over twenty-two years as a Combat Camera and Public Affairs SNCO. I have deployed around the globe supporting Air Force and Joint operations. Further, I have served in war zones supporting Operation Enduring Freedom, Iraqi Freedom, and New Dawn as the team lead. Moreover, I have served as a Squadron Superintendent in two squadrons, advising Commanders on enlisted personnel issues; ensured the forces were optimally organized, trained, and equipped to perform their mission while maintaining good order and discipline. Additionally, I was handpicked to assist with reestablishing the Public Affairs Flying Program where I was selected as an initial Flight Evaluator for the Air Force Public Affairs Agency and Combat Camera. Currently, I serve as the United States Air Force Central Command's Chief Enlisted Manager for Public Affairs where I conduct long-range planning, develop strategic communication strategies for operations, serve as the Public Affairs functional area manager, and directly provide Public Affairs guidance to the Commander of Air Force Forces and his staff.

2. I have known SMSgt Jeremy Zier for Over 20 years in a personal and professional capacity. I first met SMSgt Zier as a student at the Defense Information School. During our time at school, we would associate socially and at unit functions. Throughout my career, our paths crossed many times due to a small AFSC population. We would go TDY to the same places and serve at the same duty locations.

   a. In 2009 we were both stationed at the 1st Combat Camera Squadron, Joint Base Charleston, South Carolina, where SMSgt Zier was an Aerial Combat Videographer and a training Noncommissioned Officer. SMSgt Zier was responsible for training newly assigned personnel and organizing continuation training for approximately 50 Video Flight Airmen, in addition to instructing nearly 40 Aerial Photographers on inflight safety, emergency egress, and visual documentation techniques.

   c. For the last five years, we've worked side-by-side building the Air Force Public Affairs Flying Program. This included developing career field flying standards, authoring regulations, and evaluating approximately 55 total force aerial photographers. During this time, we would regularly go to movies, sporting events, and eat dinner at off-base establishments. During our time in the Air Force we have been able to see each other's professional advancement and serving with other Airmen who worked with or worked for SMSgt Zier. Throughout our careers, we have maintained a personal and professional friendship.

   d. While building the Air Force's Public Affairs flying program, I witnessed SMSgt Zier's people-oriented leadership approach build professional relationships that benefited the mission and Airmen under his charge. The creation of the Public Affairs flying program was, at times, contentious between directorates and functional area senior leaders. SMSgt Zier maintained a levelheaded, task-oriented approach that kept the program on task without breaching suspense dates.

Page 1 of 2

Defense Exhibit _Y__ for ID
Page Offered _146_
Page Admitted _146_

e. I have never witnessed SMSgt Zier make or say anything that caused me concern or would have brought a negative image to the Air Force or himself, recognizing I cannot account for every hour of the workday and weekend, but it's hard to believe he could suppress his conduct for as long as I have known him.

3. Although I have known SMSgt Zier for over 20 years and have witnessed his work ethic and dedication to furthering the Air Force visual documentation mission, I recognize his conduct and court-martial conviction does not adhere to the most common fundamental Air Force codes of conduct, which I do not, nor have I ever condoned. However, I am a firm believer that those whose conduct falls below the acceptable should be given opportunities to turn their lives around and become successful. To this end, SMSgt Zier's knowledge and abilities should not be forgotten, nor short shifted..

4. Unfortunately, the world and the Air Force are experiencing a chaotic and tumultuous time, having the public scrutinizing and questioning the fairness of our military justice system. Even though the Air Force is not perfect, the Air Force has always tried to correct its offences and shortcomings. This is an opportunity for the Air Force to demonstrate that our system is fair and strives to ensure outcomes are holistically centered. As such, allowing SMSgt Zier the opportunity to rehabilitate himself would demonstrate the Air Force's commitment to justice, cultural change, and strengthening resiliency within our ranks. I believe the Air Force would suffer without SMSgt Zier's knowledge, management acumen, and work ethic. By giving him an opportunity to rehabilitate himself, he will overcome these misdeeds and become a valuable Senior Noncommissioned Officer. His knowledge and experience are not easily replaced, and with time and hard work, SMSgt Zier can rebuild his Airmen and leaderships' trust.

5. Thank you for your time and consideration. Please contact me if you would like to discuss this matter further. My contact information is

SUDDETH.JUST Digitally signed by SUDDETH.JUSTIN.S 117472398 9
IN.S.1174723989 9 Date: 2020.07.02 14.25 15 -04'00'

JUSTIN S. SUDDETH, CMSgt, USAF
Chief Enlisted Manager, Public Affairs

US v. Zier Military Record of Trial and Appellate Extracts 000131 of 902

22 JUN 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: SMSgt James Russell Martin

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1.  My name is SMSgt James Russell (Russ) Martin. I am the Chief Enlisted Manager for Air Force District of Washington Public Affairs and oversee training and equipping 120 Public Affairs enlisted and officer Airmen serving in 104 countries around the world. I am currently a Chief Master Sergeant Select with more than 22 years of total active military service. I have been stationed at eight locations to include assignments as part of Air Force Recruiting and the United States Air Force Air Demonstration Squadron, Thunderbirds. I have been a superintendent for 10 years and have overseen offices from as little as five Airmen, to as many as 24 personnel. I have enjoyed success in my career that have seen me named John L. Levitow Award winner in Airman Leadership School in 2002, Distinguished Graduate and Commandant's Award winner in Noncommissioned Officer Academy in 2010; twice being named the MAJCOM Public Affairs Senior Noncommissioned Officer of the Year and most recently the MAJCOM Senior Noncommissioned Officer of the Year 2018.

2.  I first met Jeremy in 1998 when we both were students at the Defense Information School at Ft George G. Meade, MD. We did not know each other well back then, however in 2014 we were stationed together again at Incirlik Air Base, Turkey. He was the American Forces Network station manager and I was the superintendent of the 39th Air Base Wing Public Affairs Office and managed the Wing Commander's internal communication programs. Our commander routinely would have a weekly guest spot on the radio with SMSgt Zier's team. This led to many collaborations with SMSgt Zier.  After about a month, SMSgt Zier invited me out to golf with him and a fellow SNCO. That led to weekly golf outings. Jeremy and I would sometimes golf alone or with a handful of other players. Depending on the weekend, we would golf 18, 36, 54, or even 72 holes (1, 2, 3, 4 rounds of golf).  We had many conversations about our personal lives as well as professional success and challenges. Occasionally he would invite me over to have dinner with his family as well. This relationship continued for the better part of a 10-12 months until the Zier family permanently changed stations and moved on to Washington D.C. in the Spring of 2015.

3.  Jeremy's ability to create an inclusive environment both on and off duty is commendable. He's quick to make newcomers feel welcome and always is invested in the future of his coworkers and subordinates. It has been a few years since I've been able to talk to Jeremy on a daily basis. I was there when his first born daughter, Zoey, was brought home from Germany. I got to witness firsthand the love he felt for his family. I got to see how he put his family's needs first while also sharing success and challenges while leading his team at AFN. We have stayed in touch and check-in on each other, how our careers are going, families are doing etc. We both found out we were promoted to Chief Master Sergeant together. Personally, there is not a doubt in my mind that with the driving force of family behind him, and his dedication to his craft, Jeremy is the ideal candidate for rehabilitation if required.

Defense Exhibit _Z__ for ID
Page Offered _146_
Page Admitted _146_

Page 1 of 2

4.  Thank you for your time and consideration.  If you would like to discuss this matter further, please do not hesitate to contact me at                                    or email me at

Respectfully,

MARTIN.JAMES.RU   Digitally signed by
SSELL.1157451266   MARTIN.JAMES.RUSSELL.115745
1266
Date: 2020.07.21 14:35:36 -04'00'

JAMES RUSSELL MARTIN, SMSgt, USAF

Page 2 of 2

27 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: Master Sgt. Andy M. Kin

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1. My name is Andy M. Kin, I have been serving in the United States Air Force for over 17 years, currently hold the rank of Master Sgt., and I'm the Regional Media Operations Superintendent, Defense Media Activity -- Atlantic. I oversee the day to day operations of 32 joint service members who are engaged in operations throughout the European and African theater. I have been filling a superintendent role for over four years from Wing support to running a public affairs office down range. My assignments include: Hurlburt Field, Fl., Charleston AFB, SC., Ft. Meade, Md., Whiteman AFB, Mo., and DMA-Atlantic, Germany.

2. I first met SMSgt Zier back in 2008 while assigned to the 1st Combat Camera Sq., in Charleston, SC. I was in the photography flight and he was in the video flight. From the first week there I heard about his reputation as one of the go to NCO's and producers. Our first interactions were casual but the environment at combat camera was family oriented and very inviting. It wasn't until I got on flying status where I got to work alongside him as aerial evaluators/trainers. There was a small group of aerial trainers and 50+ flyers who needed upgrade training and spot inspections on a regular basis. You could say we worked hand in hand a lot for over two years. We built training plans and he could probably spit out every AFI or OI that governs our job when it comes to aerial support or taskers. SMSgt Zier has always been on top of his game and he was always there for mine and others professional and personal development. It didn't matter if it was during local missions or TDY's he would always be running point, directing aerial operations and mentoring our young public affairs officers. He's the consummate professional and always leads from the front.

3. I've had the honor to serve alongside SMSgt Zier for over 12 years where I became very familiar with his Airmanship, character, work ethic and determination to ensure mission success. My biggest praise for him isn't about what he does in the uniform but when it's off. The husband, father, community ambassador, and friend. SMSgt Zier, is one of the most humble and honest people I've ever met. The kind of guy that would give you the shirt off his back or invite a total stranger over to Thanksgiving dinner (true story). He's a football linesman all over San Antonio from junior high to college. He gives countless hours back to every community he's lived in. I got to see firsthand the toll it took on him and his family when his son Noah was born with a laundry list of health issues. His faith never wavered and he continued to thrive in a new role at work while being that rock for his wife at home. I can go on and on about Jeremy Zier as a person but on a professional note, as we continue to look for new and innovative ways to develop the next generation of Airmen, I strongly believe that SMSgt Zier can influence, mentor, train and develop Airmen both personally and professionally. Simply put, SMSgt Zier is the best I have seen.

Defense Exhibit AA for ID
Page Offered 146
Page Admitted 146

Page 1 of 2

4. I want to personally thank you for your time and consideration. If you have any questions or need any additional information, please feel free to contact me at                    or email

Respectfully,

ANDY M. KIN, MSgt, USAF
Superintendent, RMC

US v. Zier Military Record of Trial and Appellate Extracts 000135 of 902

28 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM:  MSgt Dominique A. Dickens

SUBJECT:  Statement Regarding SMSgt Jeremy M. Zier

1.  My name is Master Sergeant Dominique A. Dickens and I am a resource advisor for the Programs and Resources division of Headquarters Air Education and Training Command Public Affairs, Joint Base San Antonio – Randolph.  In my current position, I am responsible for overseeing and executing the budgets for 13 wing and tenant units. Additionally, I serve as the assistant MAJCOM PA functional. I have served in the Air Force for more than twenty years and my assignments include 1st Combat Camera Squadron, American Forces Network Incirlik, 1st Special Operations Wing Public Affairs and American Forces Network Kunsan where I functioned as the Operations Superintendent, Operations Manager, NCOIC of Video Production and Station Manager, respectively. I have won several awards at the Field Operating Agency, Squadron, Wing and MAJCOM levels. I also assist as a mentor and subject matter expert for career field related events and workshops.

2.  I've known SMSgt Zier professionally since 2011 when stationed at Hurlburt Field, but personally since 2013 while assigned to American Forces Network, Incirlik Air Base, Turkey. He was the Station Manager and I was the Operations Manager. As the detachment's two senior NCOs, we served as the leadership core and were responsible for leading ten Airmen in support of providing command information via the installation television and radio station. I worked extremely close with Senior Zier as I was essentially the unit's "deputy" and we operated shoulder to shoulder concerning all personnel, training, and mission matters. I was unaccompanied during this assignment, so I spent much of my time with SMSgt Zier and his family. I would often eat dinner at his home and spend holidays with them. The Ziers also played host to my wife and I when she came to visit. Our relationship continued when we returned to the United States. His family traveled from Washington D.C. to celebrate my son's first birthday. He currently manages the Air Force public affairs flying program and because I am the MAJCOM equivalent, I frequently communicate with him regarding policy, etc. Since relocating to San Antonio, our families have remained close outside of work as well. We have children who are roughly the same age so we occasionally celebrate events together.

3.  There hasn't been a time where I have seen SMSgt Zier behave inappropriately in any setting. He has always been a consummate professional, was courteous and respectful around me and to everyone we have come in contact with. He has been a true friend to me and my family and served as a supportive and invaluable resource in all work-related dealings. I sincerely believe that he holds the institution of the Air Force in high regard, values his duty and responsibility as a SNCO immensely and would not act in a manner that would tarnish either. I ask for leniency in his punishment if he has committed any misconduct. I strongly believe that if given the opportunity he would undoubtedly continue to mentor and motivate Airmen. His leadership and knowledge are vital to public affairs and the Air Force.

Defense Exhibit  BB  for ID
Page Offered  146
Page Admitted  146

Page 1 of 2

4.  Thank you for your time and attention. If you would like to discuss this matter further, please do not hesitate to contact me at work phone                    , my cell phone                    or via email                    .

Respectfully,

DICKENS.DOMINIQ  Digitally signed by
UE.A.1071498987   DICKENS.DOMINIQUE.A.1071498
                  987
                  Date: 2020.08.30 15:24:03 -05'00'

DOMINIQUE A. DICKENS, MSGT, USAF

**Page 2 of 2**

25 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: MSgt Jason Robertson

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

My name is MSgt Jason Robertson and I am currently serving as the Superintendent of Operating Location Alpha, 1st Combat Camera Squadron, (OL-A, 1 CTCS) located at Hurlburt Field, FL. In this capacity, I provide leadership advice, technical expertise and management support to the Commander of the 24th Special Operations Wing and the Commander of the 1st Combat Camera Squadron in conducting combat camera visual information missions. I also oversee daily operations and training for Airmen assigned to Operating Location Alpha, who execute combat camera operations supporting the Special Tactics enterprises role in worldwide combat and contingency operations, humanitarian assistance and disaster relief missions, and joint exercises. I enlisted in the Air Force in 2003 and over the course of my 17 years of service have deployed a total of 7 times to locations such as Iraq, Afghanistan and Syria. In 2011, I graduated from the 10-month Military Photojournalism Program at Syracuse University. I have spent the majority of my career in the 1st Combat Camera Squadron and held positions such as, Combat Photography NCOIC and Aerial Photography Program Manager. My awards and decorations include the Air Force Meritorious Service Medal, Joint Service Commendation Medal, Air Force Commendation Medal with oak leaf cluster, Army Commendation Medal, Air Force Achievement Medal, Air Force Combat Action Medal, Afghanistan Campaign Medal, Iraq Campaign Medal, Inherent Resolve Campaign Medal, and Humanitarian Service medal with device.

The first time I met SMSgt Zier was in 2003 during my first Air Force assignment at MacDill AFB, FL. During this time SMSgt Zier was a SSgt working for the SOCOM headquarters' Public Affairs Office and I was a young motivated photographer (A1C) working for the 6th AMW Visual Information Office. I learned that SMSgt previously was assigned to my office before he PCA'd over to the SOCOM office on base and because of this a lot of my co-workers knew SMSgt Zier and had worked alongside him. During this time, I had a professional relationship with SMSgt Zier, but probably hung out with him outside of work with mutual friends on a few occasions. As a photographer assigned to the host wing, I would frequently support tasking from the tenant units assigned to MacDill AFB, to include SOCOM. I believe in 2006 SMSgt Zier arrived to the 1st Combat Camera Squadron at Charleston, AFB. I followed shortly after and was assigned there in 2007. I believe between January 2007 and June 2010 we served together at 1 CTCS; he was a TSgt and I was a SSgt. During this time, I only remember working for him directly for a period of about four days supporting an air show in Atlantic City, NJ. I should point out that while assigned to 1 CTCS during this timeframe both of us were probably continually TDY or deployed approximately 180 days a year. SMSgt Zier and I were always friendly with one another on the rare occasion we were both home at the same time and on some occasions, we would hang out together outside of work with mutual friends. Between 2010 and today SMSgt Zier and myself have bounced around to assignments

Defense Exhibit CC for ID
Page Offered 146
Page Admitted 146

Page 1 of 2

within the Public Affairs career field. I have occasionally run into him while TDY and in doing so we have gotten meals together and caught up on our professional and personal lives.

From the first time I met SMSgt Zier, he has had the best interest of Airmen in his heart. Back in 2006, he would go out of his way to mentor myself and the other junior Airmen and even go as far as setup opportunities for us to socialize with and photograph the SOCOM parachute team. As a young Airmen it was opportunities like this that showed me the more enjoyable side of Public Affairs and made me want to pursue a career in Combat Camera. As I became an NCO and then a SNCO, I found myself continually going to SMSgt Zier for guidance and support, as SMSgt Zier has always been someone to look up to within the career field. SMSgt Zier has always been generous with his time and advice and is someone that I have modeled my career and leadership style after. In my experience, he has always had a professional and friendly attitude in the workplace and outside of it. In Atlantic City led our team with professionalism and respect. To this day, every time I see SMSgt Zier, one of the first things he will ask me is how my family is doing and he will do so sincerely and with genuine care. If for some reason SMSgt Zier is found guilty, there is no doubt in my mind that he would rehabilitate without fail and go back to being a contributing and abiding member of society.

Thank you for your time and consideration. If you would like to discuss this matter further, please do not hesitate to contact me at

Respectfully,

JASON ROBERTSON, MSGT, USAF

Page 2 of 2

25 June 2020

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: MSgt Mareshah D. Dickens

SUBJECT: Statement Regarding SMSgt Jeremy M. Zier

1.  My name is MSgt Mareshah Dickens and I am a flight chief for the 3rd Audiovisual Squadron, Joint Base San Antonio, Texas. I oversee a flight of 18 Airmen who create video productions to support communication objectives for Secretary of the Air Force and MAJCOM-level campaigns. I have served in the Air Force for more than 19 years and my assignments include positions at the Air Force News Agency, Headquarters Defense Media Activity, 1st Combat Camera Squadron and Joint Base Charleston Public Affairs. During this time I've earned several awards at the squadron and Field Operating Agency levels. I was also awarded two civilian awards for my photojournalism work and was invited to a Department of Defense-wide workshop to mentor military photojournalists.

2.  Prior to this assignment in San Antonio, my relationship with SMSgt Zier was primarily personal but now we do have more professional interactions as he is the lead for the Air Force Public Affairs Agency flying program and is a senior leader at my parent FOA. I met SMSgt Zier in 2014 at Incirlik Air Base, Turkey, when I visited my husband while they were both on a remote assignment. As the two senior NCOs at their detachment, SMSgt Zier and my husband formed a friendship and our two families became close. During the two weeks I was there, we socialized several times at the Ziers' home and off base. Our families remained close when we all returned to the United States. The Ziers travelled from Virginia to South Carolina to celebrate our son's first birthday with us. All of our children are close in age and we get together from time to time to celebrate family events together.

3.  I have never seen SMSgt Zier behave inappropriately in any setting that we have been in together. In my presence, he has always been professional and respectful to everyone we have come in contact with. He has always been kind to me and my family in social settings and helpful and fair in our work interactions. I know he has sacrificed a lot to make it to this point in his career. I believe he values the Air Force, his integrity and his charge as a SNCO enough to conduct himself in a way that would make his superiors, peers, subordinates, friends and family members proud. If he has committed any wrongdoing, I would ask for leniency in his punishment. I believe his experience, knowledge and leadership are an asset to our career field and the Air Force that he could continue to use to positively affect Airmen.

4.  Thank you for your time and consideration. If you would like to discuss this matter further, please do not hesitate to contact me at work phone

Respectfully,

DICKENS.MARESHAH.D.1246 Digitally signed by
102461                   DICKENS.MARESHAH.D.1246102461
                         Date: 2020.08.03 15:17:58 -05'00'

MARESHAH D. DICKENS, MSgt, USAF

Defense Exhibit DD   for ID
Page Offered  146
Page Admitted  146

Page 1 of 1



SMSgt Zier with his family as a child during the Christmas holiday in 1985.



SMSgt Zier with his mother and father during his high school graduation in Yorkshire, NY, June 1997.



SMSgt Zier on vacation in Florida with his siblings, grandparents and all the grandchildren in July 2017.

Defense Exhibit  EE   for ID
Page Offered  146
Page Admitted  146

Page 1 of 7



SMSgt Zier with his wife and two children, Fall 2019.

SMSgt Zier as an Airman selected as a student leader green rope at the 336 Training Squadron Det. at Fort Meade, MD in March 1998.





SMSgt Zier was selected for Airman Below the Zone at MacDill AFB, FL in 2000.

Page 2 of 7



SMSgt Zier was coined by the SGM of the Army for exceptional support for his visit to the US Special Operations Command in 2004.




SMSgt Zier being presented with the Bronze Star Medal for direct support to combat operations during OIF on 13 May 2008.



SMSgt Zier during a ground patrol with the 82d Airborne in Diyalya Province, Iraq, July 2007.

Page 3 of 7



SMSgt Zier during a ground patrol with the Navy Seals in Anbar Province, Iraq, 2009.





SMSgt Zier with the SAF/PA Command Information Team outside of the Pentagon in September 2016.



SMSgt Zier attending an ALS graduation ceremony as the SAF/PA SEL at JB Andrews on behalf of the Career Field Manager in February 2017.



SMSgt Zier during his wedding in San Antoni, TX on 11 November 2012.

SMSgt Zier and his wife, Alejandra, with their miracle baby, Noah, at the Johns Hopkins Pediatric ICU on 8 February 2018.





SMSgt Zier and his daughter, Zoey, in October 2014.

Page 5 of 7



SMSgt Zier and his daughter, Zoey, at the AFN office on Incirlik AB, Turkey in December 2014.



SMSgt Zier with his two children, Zoey and Noah, at the Zoo on the night of the AFPAA Holiday Party on 13 December 2019.



SMSgt Zier with his wife and daughter running in the Patriot Run 5K at Mount Vernon, VA in September 2016.

Page 6 of 7



SMSgt Zier has a passion for sports and is a high school football official, he is pictured here in 2009.



SMSgt Zier and his wife, Alejandra, at his reenlisment in June 2015.

Page 7 of 7

CBS



# THE UNITED STATES OF AMERICA

TO ALL WHO SHALL SEE THESE PRESENTS, GREETING: THIS IS TO CERTIFY THAT THE PRESIDENT OF THE UNITED STATES OF AMERICA AUTHORIZED BY EXECUTIVE ORDER, 24 AUGUST 1962 HAS AWARDED

## THE BRONZE STAR MEDAL.

TO

STAFF SERGEANT JEREMY M. ZIER

JOINT TASK FORCE

FOR EXCEPTIONALLY MERITORIOUS ACHIEVEMENT AS A COMBAT CAMERA VIDEOGRAPHER FOR A JOINT TASK FORCE IN SUPPORT OF OPERATION IRAQI FREEDOM. DURING THIS PERIOD, SERGEANT ZIER'S LEADERSHIP, TECHNICAL EXPERTISE, AND ORGANIZATIONAL SKILLS ALLOWED HIM TO SUPPORT THE JOINT TASK FORCE DOCUMENTING OBJECTIVES DURING SUSTAINED COMBAT OPERATIONS. THIS DOCUMENTATION CONTRIBUTED SIGNIFICANTLY TO THE EFFECTIVE SYNCHRONIZATION OF INFORMATION PROVIDED TO GLOBAL AUDIENCES AND THE PRESERVATION OF ABSOLUTE CREDIBILITY OF THE TASK FORCE DURING GROUND COMBAT OPERATIONS OF NATIONAL SIGNIFICANCE. THROUGH HIS DISTINCTIVE ACCOMPLISHMENTS, STAFF SERGEANT ZIER REFLECTED GREAT CREDIT UPON HIMSELF, THIS COMMAND, THE UNITED STATES AIR FORCE, AND THE UNITED STATES ARMY.

PERIOD: 15 APRIL 2007 TO 5 OCTOBER 2007

GIVEN UNDER MY HAND IN THE CITY OF WASHINGTON
THIS 3RD DAY OF DECEMBER 2007

Stanley A. McChrystal
Lieutenant General, USA
Commanding General
PO 337-009, 3 December 2007

SECRETARY OF THE ARMY



DA FORM 4980-5 (WT), JAN 2000

Page 1 of 1

Defense Exhibit FF for ID
Page Offered 146
Page Admitted 146



# DEPARTMENT OF THE AIR FORCE

### THIS IS TO CERTIFY THAT

## THE AIR FORCE ACHIEVEMENT MEDAL

### HAS BEEN AWARDED TO

AIRMAN FIRST CLASS JEREMY M. ZIER

### FOR

OUTSTANDING ACHIEVEMENT
14 SEPTEMBER 1998 TO 18 SEPTEMBER 1998

### ACCOMPLISHMENTS

Airman First Class Jeremy M. Zier distinguished himself by outstanding achievement while assigned to the 6th Services Squadron Search and Recovery Team, 6th Air Refueling Wing, MacDill Air Force Base, Florida. While responding to the fatal crash of an F-16 at Avon Park Bombing Range, Airman Zier spent five days in extreme heat and dangerous swamp conditions photographing the recovery of the pilot. Airman Zier's ceaseless efforts were critical to the return of the pilot's remains to his family for proper funeral services. These actions assisted in providing the pilot's family closure to this event and recognized his honorable service to our country. The performance of Airman Zier reflects credit upon himself, his unit, and the 6th Support Group.

GIVEN UNDER MY HAND
1 JUNE 2000

BRADFORD E. WARD, Colonel, USAF
Commander, 6th Support Group

AF FORM 2274, 20000101

Page 1 of 1

Defense Exhibit  GG  for ID
Page Offered _146_
Page Admitted _146_



# DEPARTMENT OF THE AIR FORCE

THIS IS TO CERTIFY THAT

## THE AIR FORCE ACHIEVEMENT MEDAL
(SECOND OAK LEAF CLUSTER)
HAS BEEN AWARDED TO

SENIOR AIRMAN JEREMY M. ZIER

FOR

OUTSTANDING ACHIEVEMENT
16 NOVEMBER 2000 TO 28 NOVEMBER 2000

### ACCOMPLISHMENTS
Senior Airman Jeremy M. Zier distinguished himself by outstanding achievement as Alert Videographer in support of the crash investigation and recovery of an F-16 aircraft near Sarasota, Florida. During this period, Airman Zier's expert videographic skills were critical to the initial response to the crash site. The first Air Force videographer at the tragic scene, his thorough record of crash site the first night provided vital information for the subsequent review by follow-on safety investigators. His professionalism was clearly evident in the documentation of the fatal civilian aircraft crash site. Working under extreme lighting conditions, he ensured all aircraft wreckage was accurately captured on videotape. Faced with the grim task of documenting the civilian victim, Airman Zier performed the tough task with dignity and honor. The distinctive achievements of Airman Zier reflect credit upon himself and the United States Air Force.

GIVEN UNDER MY HAND
31 JANUARY 2001

ARTHUR F. DIEHL III
Brigadier General, USAF
Commander, 6th Air Mobility Wing

AF FORM 2274, 20000101

Page 1 of 1

Defense Exhibit  HH  for ID
Page Offered 146
Page Admitted 146



# DEPARTMENT OF THE AIR FORCE

### THIS IS TO CERTIFY THAT

## THE AIR FORCE ACHIEVEMENT MEDAL
#### (FIRST OAK LEAF CLUSTER)
### HAS BEEN AWARDED TO

### SENIOR AIRMAN JEREMY M. ZIER

### FOR

#### OUTSTANDING ACHIEVEMENT
#### 19 DECEMBER 1999 TO 19 MARCH 2000

### ACCOMPLISHMENTS

Senior Airman Jeremy M. Zier distinguished himself by outstanding achievement as Videographer, 31st Communications Squadron, 31st Expeditionary Wing, Aviano Air Base, Italy. During this period, Airman Zier's outstanding performance contributed to the success of the North Atlantic Treaty Organization support of Operation JOINT FORGE. He provided intelligence operations with over 120 hours of critical air damage reconnaissance imagery to the multinational forces. He produced a superb video highlighting fuels operations for the visiting "Best in United States Air Forces Europe" Team. This video proved instrumental as the base garnered a first-place finish. His timeliness and strict attention to detail on alert assignments such as in-flight emergencies and ground mishaps were vital to sustaining the wing's warfighting capabilities. The distinctive accomplishments of Airman Zier reflect credit upon himself, his unit, and the 6th Support Group.

#### GIVEN UNDER MY HAND
#### 30 MARCH 2001

BRADFORD E. WARD, Colonel, USAF
Commander, 6th Support Group



AF FORM 2274, 20000101

Page 1 of 1

Defense Exhibit II for ID
Page Offered 146
Page Admitted 146



# DEPARTMENT OF THE AIR FORCE

### THIS IS TO CERTIFY THAT

## THE AIR FORCE ACHIEVEMENT MEDAL
### (THIRD OAK LEAF CLUSTER)
### HAS BEEN AWARDED TO

### STAFF SERGEANT JEREMY M. ZIER

### FOR

### OUTSTANDING ACHIEVEMENT
### 1 JANUARY 2001 TO 15 MARCH 2002

### ACCOMPLISHMENTS

Staff Sergeant Jeremy M. Zier distinguished himself by outstanding achievement as a member of the Honors and Ceremonies Team, 6th Air Mobility Wing, MacDill Air Force Base, Florida. During this period, Sergeant Zier's motivation to deliver honors with dignity was consistently displayed as he performed over 53 funerals and 13 colors presentations, dedicating more than 462 hours. His outstanding efforts earned him numerous letters of appreciation from family members and the Commander, 6th Air Mobility Wing. Sergeant Zier's high level of performance as a ceremonial guardsman contributed immensely to the honor guard's ability to provide exceptional service to the MacDill Air Force Base community and the United States Air Force. The distinctive achievements of Sergeant Zier reflect credit upon himself and the United States Air Force.

### GIVEN UNDER MY HAND

### 27 MARCH 2002

BARBARA JACOBI, Colonel, USAF
Commander, 6th Support Group

Page 1 of 1

AF FORM 2274, 20000101

Defense Exhibit JJ for ID
Page Offered 146
Page Admitted 146



# DEPARTMENT OF THE AIR FORCE

## THIS IS TO CERTIFY THAT

## THE AIR FORCE ACHIEVEMENT MEDAL
### (FOURTH OAK LEAF CLUSTER)

### HAS BEEN AWARDED TO

### SENIOR MASTER SERGEANT JEREMY M. ZIER

### FOR

### OUTSTANDING ACHIEVEMENT
### 11 JULY 2018 TO 11 MAY 2020

## ACCOMPLISHMENTS

Senior Master Sergeant Jeremy M. Zier distinguished himself by outstanding achievement as Flying Program Manager, Headquarters Air Force Public Affairs Agency. During this period, Sergeant Zier led the team responsible for bringing the Air Force's dormant Combat Camera Aerial Photographer program to full operational capability. He coordinated with major commands to effectively establish records management and training and evaluation programs in line with operational instructions. Sergeant Zier also rebuilt initial, continuation, and hands-on aircrew training curriculums ensuring the effective development of 56 aerial positions. Furthermore, Sergeant Zier created a rigorous three-day academic course and in-flight lesson plan delivering standardized learning for all trainees, and developed inspection criteria to ensure the program's long-term success. He oversaw creation of a fighter-familiarization program and unit type code compliance for the first time in eight years. Finally, through Sergeant Zier's leadership, the Air Force Public Affairs Agency greatly increased its ability to employ combat camera forces enhancing strategic, operational and tactical information products supporting Department of Defense, Combatant Command and Air Force mission requirements. The distinctive accomplishments of Sergeant Zier reflect credit upon himself and the United States Air Force.

### GIVEN UNDER MY HAND
### 14 July 2020

Todd M. B. Vician, Colonel, USAF
Commander, Air Force Public Affairs Agency

VICIAN.TODD.M B.1138364840      Special Order: G-084437    Condition: 4    PAS: RJ12FWGM    RDP: 13 May 2020

Page 1 of 1

Defense Exhibit __KK__ for ID
Page Offered __146__
Page Admitted __146__



# DEPARTMENT OF THE AIR FORCE

### THIS IS TO CERTIFY THAT

## THE AIR FORCE COMMENDATION MEDAL

### HAS BEEN AWARDED TO

STAFF SERGEANT JEREMY M. ZIER

### FOR

MERITORIOUS SERVICE
2 JULY 1998 TO 10 MAY 2002

### ACCOMPLISHMENTS

Staff Sergeant Jeremy M. Zier distinguished himself by meritorious service as Visual Information Production Journeyman, 6th Communications Squadron, 6th Air Mobility Wing, MacDill Air Force Base, Florida. During this period, Sergeant Zier's outstanding skills and professionalism made him MacDill's most sought-after videographer. He brilliantly captured the Secretary of Defense's visit to MacDill and was coined by Secretary Cohen for his flawless performance. He was instrumental in the success of CORONA South 2001, the Air Force's premier four-star conference. He expertly set up 137,000 dollars of specialized video equipment and garnered "best conference ever" remarks from the Air Force Chief of Staff. Sergeant Zier's outstanding contributions led to his selection as Air Mobility Command's Communications and Information Professional of the Year, 6th Air Mobility Wing's Airman of the Year, and the Greater Tampa Chamber of Commerce Military Citizen of the Year. Additionally, he earned the John L. Levitow Award from Airman Leadership School. The distinctive accomplishments of Sergeant Zier reflect credit upon himself and the United States Air Force.

### GIVEN UNDER MY HAND

### 20 APRIL 2002

WILLIAM W. HODGES
Brigadier General, USAF
Commander, 6th Air Mobility Wing

AF FORM 2224, JUL 90



Defense Exhibit __LL__ for ID
Page Offered __146__
Page Admitted __146__

Page 1 of 1



*C C F*

# DEPARTMENT OF THE AIR FORCE

### THIS IS TO CERTIFY THAT

## THE AIR FORCE COMMENDATION MEDAL
### (FIRST OAK LEAF CLUSTER)

### HAS BEEN AWARDED TO

### TECHNICAL SERGEANT JEREMY M. ZIER

### FOR

### MERITORIOUS SERVICE
### 13 JUNE 2006 TO 1 JULY 2010

## ACCOMPLISHMENTS

Technical Sergeant Jeremy M. Zier distinguished himself by meritorious service as Aerial Combat Videographer, 1st Combat Camera Squadron, Air Force Public Affairs Agency, Charleston Air Force Base, South Carolina. During this period, Sergeant Zier was deployed for over 600 days documenting over one dozen events to include real-world operations and exercises. While deployed in support of Exercise COMBINED ENDEAVOR in Denmark, he led a 9-member joint United States team showcasing the North Atlantic Treaty Organization's communications fostering strong ties between allies. Additionally, Sergeant Zier excelled in a Master Sergeant role when he led the video flight training element for eight months and was responsible for training and qualification of 50 videographers. His leadership was evident when the training program set a benchmark during a Unit Compliance Inspection and was key to the squadron's Excellent rating. Furthermore, Sergeant Zier organized the unit's Day of Caring event where he enlisted 35 personnel to help beautify a local high school. The distinctive accomplishments of Sergeant Zier reflect credit upon himself and the United States Air Force.

### GIVEN UNDER MY HAND

### 2 JULY 2010

**LARRY D. CLAVETTE, YC-03, DAF**
**AFPAA**
The Pentagon Washington DC

AF FORM 2224, JUL 80     Special Order: GA-1030



Condition: 6    PAS: CL12FVYZ    RDP: 3 Apr 10

Defense Exhibit __MM__ for ID
Page Offered _146_
Page Admitted _146_

Page 1 of 1



*CCF*

# DEPARTMENT OF THE AIR FORCE

### THIS IS TO CERTIFY THAT

## THE AIR FORCE COMMENDATION MEDAL

### SECOND OAK LEAF CLUSTER

### HAS BEEN AWARDED TO

### TECHNICAL SERGEANT JEREMY M. ZIER

### FOR

### MERITORIOUS SERVICE
### 03 JUNE 2010 TO 13 OCTOBER 2011

### ACCOMPLISHMENTS

Technical Sergeant Jeremy M. Zier distinguished himself by meritorious service as a Combat Videographer, 3rd Combat Camera Squadron, Air Force Public Affairs Agency, Joint Base San Antonio, Texas. During this period, Sergeant Zier's leadership, expertise and teamwork across the full spectrum of activity proved invaluable in activating and establishing an all-new Air Force combat camera squadron. He expertly built the foundation for and directed squadron flight operations. He developed an aerial training program, secured flight equipment and led eight airmen to achieve training required for flight certification. Sergeant Zier was also vital to the creation of a new Air Force-level aerial documentation operating instruction. His inputs established new standards for more than 100 Combat Camera flyers, and returned a vital intelligence and operational capability to the Air Force. In support of Air Force-level priorities, he expertly directed a 22-person documentation team at EMERALD WARRIOR 2011. Sergeant Zier encapsulated combined operations lessons learned involving 2,200-plus American and international forces, earning the praise of the United States Special Operations Command leadership. He also documented the first-ever Global Strike Challenge bomber, missile and security forces competition. His efforts highlighted Air Force Global Strike Command's mission, vision and values, and helped inform a national audience on Air Force progress in strengthening the nuclear enterprise. The distinctive accomplishments of Technical Sergeant Zier reflect credit upon himself and the United States Air Force.

### GIVEN UNDER MY HAND

### 14 NOVEMBER 2011

**LARRY D. CLAVETTE, GS-15, DAF**
Director, Air Force Public Affairs Agency
Lackland AFB TX

AF FORM 2224, JUL 69    Special Order GP-1205    Condition: 7    PAS: LA12F1PM    RDP: 12 OCT 11



Defense Exhibit __NN__ for ID
Page Offered __146__
Page Admitted __146__

Page 1 of 1



# DEPARTMENT OF THE AIR FORCE

THIS IS TO CERTIFY THAT

## THE AIR FORCE COMMENDATION MEDAL

(THIRD OAK LEAF CLUSTER)

HAS BEEN AWARDED TO

**SENIOR MASTER SERGEANT JEREMY M. ZIER**

FOR

**OUTSTANDING ACHIEVEMENT**
**1 MAY 2019 TO 23 AUGUST 2019**

### ACCOMPLISHMENTS

Senior Master Sergeant Jeremy M. Zier distinguished himself by outstanding achievement as Public Affairs Superintendent, 346th Air Expeditionary Group, Task Force NEW HORIZONS, Air Forces Southern, Camp Seweyo, Guyana. During this period, Sergeant Zier led public affairs operations, synchronizing messaging for 607 joint personnel in support of Twelfth Air Force's largest-ever exercise, valued at 8.3 million dollars. Encouraging community engagement, he helped devise advertising campaigns for the medical and veterinary readiness training exercises and construction completion ceremonies by infusing local style into informational radio, television, and social media updates. His messaging campaigns contributed to public support of 900,000 dollars in community construction and ensured trusted care for 9,575 Guyanese patients which exceeded the Defense Health Agency projected engagement goal by an outstanding forty percent. Finally, Sergeant Zier spearheaded closing ceremony planning by liaising with the Guyanese government and the Guyana Defence Force where he was pivotal in securing invitations for senior officials to attend the ceremony, including the President of Guyana, the military Chief of Staff, and the Deputy United States Ambassador. His accomplishments ultimately increased the visibility of the mission within the United States Southern Command's area of responsibility and bolstered the strong and enduring partnership between the Unites States and Guyana. The distinctive accomplishments of Sergeant Zier reflect credit upon himself and the United States Air Force.

GIVEN UNDER MY HAND
**13 August 2019**

KENNETH B. BRATLAND, Colonel, USAF
Commander, 346th Air Expeditionary Group

BRATLAND.KENNETH.B.1183884944        Special Order: G-092644    Condition: 4    PAS: DF: CFBDL    RDP: 16 July 2019

Page 1 of 1

Defense Exhibit _OO_ for ID
Page Offered _146_
Page Admitted _146_



# THE UNITED STATES OF AMERICA

### TO ALL WHO SHALL SEE THESE PRESENTS, GREETING:
THIS IS TO CERTIFY THAT THE PRESIDENT OF THE UNITED STATES OF AMERICA AUTHORIZED BY EXECUTIVE ORDER, 16 JANUARY 1969 HAS AWARDED

## THE MERITORIOUS SERVICE MEDAL

### TO

#### MASTER SERGEANT JEREMY M. ZIER

### FOR

#### MERITORIOUS SERVICE
11 OCTOBER 2011 TO 19 JULY 2013

#### ACCOMPLISHMENTS

Master Sergeant Jeremy M. Zier distinguished himself in the performance of outstanding service to the United States as the Noncommissioned Officer In Charge, Plans and Policy Division, Field Operations Directorate, Air Force Public Affairs Agency, Joint Base San Antonio-Lackland, Texas. During this period, Sergeant Zier standardized global aircrew training while serving as the Air Force Combat Camera Aerial Program Manager. He was the subject matter expert for global broadcaster mission equipment, and was vital to procuring more than $11 million worth of upgrades for Air Force units. He served as lead Combat Camera support planner to nine joint exercises, and deployed as the 24-person operational team lead for U.S. Special Operations Command's EMERALD WARRIOR 2013. Sergeant Zier graduated from the Defense Information School's Visual Information Management course and the Department of Defense Joint Senior Enlisted Professional Military Education course. His professional duty record and base and community leadership resulted in him receiving the 2011 AFPAA Headquarters Staff NCO of the Year award. The singularly distinctive accomplishments of Master Sergeant Zier reflect great credit upon himself and the United States Air Force.

#### GIVEN UNDER MY HAND

#### 19 JULY 2013

LARRY D. CLAVETTE, GS-15, DAF
Director, Air Force Public Affairs Agency
Joint Base San Antonio-Lackland, TX

Special Order OP-1353    Condition: 6

PAS: LAI2FDTW    RDP: 23 APR 13

AF FORM 2223, AUG 98

Page 1 of 1

Defense Exhibit PP for ID
Page Offered 146
Page Admitted 146



# THE UNITED STATES OF AMERICA

TO ALL WHO SHALL SEE THESE PRESENTS, GREETING:

THIS IS TO CERTIFY THAT THE PRESIDENT OF THE UNITED STATES OF
AMERICA AUTHORIZED BY THE EXECUTIVE ORDER, 16 JANUARY 1969 HAS
AWARDED

## THE MERITORIOUS SERVICE MEDAL

**(FIRST OAK LEAF CLUSTER)**

TO

**SENIOR MASTER SERGEANT JEREMY M. ZIER**

FOR

**MERITORIOUS SERVICE**
**27 JULY 2015 TO 14 SEPTEMBER 2017**

### ACCOMPLISHMENTS

Senior Master Sergeant Jeremy M. Zier distinguished himself in the performance of outstanding service to the United States as Superintendent, Command Information Division, Secretary of the Air Force, Office of Public Affairs, the Pentagon, Washington, District of Columbia from 27 July 2015 to 14 September 2017. During this period, Sergeant Zier led the design and integration of organizational and process structures leading to the successful creation and initial operations of the new Command Information Division, consolidating and synchronizing digital content creation and distribution capabilities in support of Secretary of the Air Force, Chief of Staff of the Air Force and Chief Master Sergeant of the Air Force communication objectives. He ensured more than 350 dynamic visual information products were aligned with senior leader priorities and amplified via the Web and social media to Air Force audiences. As the public affairs career field's aerial photography expert, he led development of policy and directives establishing the first-ever qualification criteria for combat camera aerial photographers. Additionally, he anchored the Directorate's efforts to restore 56 flying billets within the public affairs enterprise, reestablishing this specialized capability to support combatant commander operations. Finally, as the division's senior enlisted leader, he fostered a culture of family, mentorship, readiness, productivity, and morale for the team's civilian and uniformed Airmen. The singularly distinctive accomplishments of Sergeant Zier reflect great credit upon himself and the United States Air Force.

GIVEN UNDER MY HAND
**5 October 2017**

EDWARD W. THOMAS, JR.
Brigadier General, USAF
Director, Air Force Public Affairs



THOMAS.EDWARD.W.JR.1132784651

Special Order: G-001857 Condition:6
PAS: HH13FBH7 RDP 5 June 2017

Defense Exhibit QQ for ID
Page Offered 146
Page Admitted 146

Page 1 of 1

BEST AVAILABLE DOCUMENT



Cmm

# THE UNITED STATES OF AMERICA

TO ALL WHO SHALL SEE THESE PRESENTS, GREETING:

THIS IS TO CERTIFY THAT THE PRESIDENT OF THE UNITED STATES OF AMERICA AUTHORIZED BY EXECUTIVE ORDER, 16 JANUARY 1969 HAS AWARDED

## THE MERITORIOUS SERVICE MEDAL

### (SECOND OAK LEAF CLUSTER)

TO

### SENIOR MASTER SERGEANT JEREMY M. ZIER

FOR

**MERITORIOUS SERVICE**
**20 SEPTEMBER 2017 TO 25 MAY 2018**

### ACCOMPLISHMENTS

Senior Master Sergeant Jeremy M. Zier distinguished himself in the performance of outstanding service to the United States as Superintendent, Requirements and Development, Public Affairs Directorate, Headquarters United States Air Forces in Europe and United States Air Forces Africa, Ramstein Air Base, Germany. During this period, Sergeant Zier's exceptional leadership and managerial skills were evident as he administered operational resources and deployment actions for 60 Airmen on 25 missions, promoting United States airpower and reassuring allied nations across two combatant commands. Furthermore, he oversaw the development of the command's first-ever flying program for Public Affairs Airmen. He developed and updated new flying procedure controls, which resulted in the command securing 70 man-months and $200,000 dollars toward the program. Additionally, Sergeant Zier supervised the implementation of the European Deterrence Initiative into United States Air Forces in Europe Public Affairs operations, resulting in more than 700 additional man-days to the command. Finally, as resource advisor he adeptly managed a $525,000 dollar budget and steered eight wing offices, ensuring the successful accomplishment of the Public Affairs mission. The singularly distinctive accomplishments of Sergeant Zier reflect great credit upon himself and the United States Air Force.

GIVEN UNDER MY HAND

**26 MAY 2018**

GABRIEL J. MYERS, GS-15, DAF
Director, Public Affairs and Communication

Special Order G-034          Condition 6          PAS RF0DFC20          RDP: 28 May 2016
AF FORM 2020 AUG 96

Page 1 of 1

Defense Exhibit RR for ID
Page Offered 146
Page Admitted 146

## CITATION

## TO ACCOMPANY THE AWARD OF

## THE JOINT SERVICE ACHIEVEMENT MEDAL

## TO

## STAFF SERGEANT JEREMY M. ZIER
## UNITED STATES AIR FORCE

Staff Sergeant Jeremy M. Zier, United States Air Force, distinguished himself by exceptionally meritorious achievement while performing duties for Special Operations Forces (SOF) Week, United States Special Operations Command, MacDill Air Force Base, Florida, from 1 April 2003 to 22 May 2003. During this period, Sergeant Zier engineered the production of the video utilized to highlight the life and career of retired Brigadier General Harry C. Aderholt, the 2003 Bull Simons Award recipient. The video was viewed by hundreds of senior military, Department of Defense civilians, and industry leaders during the SOF Week Awards Dinner. Sergeant Zier's exceptional performance, dedication, and tireless devotion to duty ensured a quality product which significantly added to the success of SOF Week 2003. The distinctive accomplishments of Staff Sergeant Zier reflect credit upon him, the United States Special Operations Command, the United States Air Force, and the Department of Defense.



Defense Exhibit SS__ for ID
Page Offered 146__
Page Admitted 146__

Page 1 of 1

# CITATION

## TO ACCOMPANY THE AWARD OF

## THE JOINT SERVICE ACHIEVEMENT MEDAL
### FIRST OAK LEAF CLUSTER

## TO

## STAFF SERGEANT JEREMY M. ZIER
### UNITED STATES AIR FORCE

Staff Sergeant Jeremy M. Zier, United States Air Force, distinguished himself by exceptionally meritorious achievement on the United States Special Operations Command (USSOCOM), Joint Service Color Guard (JSCG), MacDill Air Force Base, Florida, from 1 February 2003 to 1 February 2005. During this period, Sergeant Zier displayed honor and utmost bearing while leading the eight-man team in flawless execution in over 25 events in an 18-month period. His leadership and "Aim High" attitude exemplifies the JSCG member and representation of all the Armed Services and USSOCOM. This dynamic noncommissioned officer displayed his talents as the lead Air Force Flag Bearer and primary trainer for all new Air Force JSCG members. His versatility was immediately felt by undertaking and qualifying in the JSCG positions of National Ensign Bearer, USSOCOM Flag Bearer, and Front and Rear Guard. Sergeant Zier participated in the Disabled Veteran's Association meeting, 50th Anniversary of the Korean War, Flags Along Bayshore Commemorating the First Anniversary of the September 11th terrorist attacks, and USSOCOM Special Operation Forces Week Medal of Honor ceremony. Sergeant Zier's skill, professionalism, versatility, devotion, and attention to detail contributed significantly to the success and positive reputation of the USSOCOM JSCG throughout the United States and Tampa Bay area. The distinctive accomplishments of Staff Sergeant Zier reflect credit upon him, the United States Air Force, the United States Special Operations Command, and the Department of Defense.

Def Exhibit TT for ID
Page Offered 146
Page Admitted 146

Page 1 of 1

CITATION

TO ACCOMPANY THE AWARD OF

THE JOINT SERVICE COMMENDATION MEDAL

TO

STAFF SERGEANT JEREMY M. ZIER
UNITED STATES AIR FORCE

Staff Sergeant Jeremy M. Zier, United States Air Force, distinguished himself by exceptionally meritorious service as Visual Information Production Journeyman, Command Visual Information Services Branch, Command Information Services Division, Center for Command Support, United States Special Operations Command (USSOCOM), MacDill Air Force Base, Florida, from 15 June 2002 to 1 July 2005.  During this period, Sergeant Zier's overwhelming commitment to excellence and technical expertise ensured the successful acquisition of over $100,000 in state of the art video assets that helped shape USSOCOM's Audio Visual Production Element.  While augmenting the 6th Air Mobility Wing, Sergeant Zier directed and produced a complicated "live production" which featured four cameras and simultaneously aired to over 1,000 people in attendance of the Air Force's 56th birthday celebration.  Further, he outlined and documented audio visual requirements for highly visible 2003, 2004, and 2005 Special Operations Forces Week activities. Sergeant Zier had a hand in all of USSOCOM's important video events. The distinctive accomplishments of Staff Sergeant Zier reflect great credit upon him, the United States Special Operations Command, the United States Air Force, and the Department of Defense.



Defense Exhibit UU for ID
Page Offered 146
Page Admitted 146

Page 1 of 1

CDMS



## Citation

### TO ACCOMPANY THE AWARD OF THE

# DEFENSE MERITORIOUS SERVICE MEDAL

TO

## MASTER SERGEANT JEREMY M. ZIER

Master Sergeant Jeremy M. Zier, United States Air Force, distinguished himself by exceptionally meritorious service as station manager, while assigned to American Forces Network-Incirlik, American Forces Network-Europe, Defense Media Activity, Incirlik Air Base, Turkey, from 22 July 2013 to 22 July 2015. During this period, Sergeant Zier guided his team in the creation of a comprehensive nuclear inspection preparation campaign. The team devised 65 radio, television, and web products that focused wing personnel on nuclear education and readiness. His efforts ensured the base population was postured for their Air Force level inspection, which ultimately contributed to Team Incirlik receiving the highest Air Force Inspector General rating in 16 years. Furthermore, he led 42 personnel during a rigorous 9-hour live television and radio telethon. The program bolstered Incirlik Air Base's support of the Air Force Assistance Fund which allowed the base to exceed its goal by 180 percent, and be recognized as the installation with the second highest fundraiser, per capita, throughout the Air Force. Additionally, Sergeant Zier enhanced his team's social media engagement strategy by renewing their focus on audience interaction. Through the units efforts, the station boosted its interactivity by 650 percent in just 9 months and increased its Facebook followership by 34 percent. Finally, he propelled the wing's Unit Effectiveness Inspection preparation by establishing 16 unit Management Internal Control Toolset checklists, ensuring that American Forces Network-Incirlik was inspection compliant helping the wing to receive an "Excellent" rating. Sergeant Zier's contributions led to his selection as American Forces Network-Europe's 2014 Senior Enlisted Service member of the Year. Additionally, he led his station as they received American Forces Network-Europe's 2014 Station of the Year honors. The distinctive accomplishments of Master Sergeant Zier reflect credit upon himself, the United States Air Force, and the Department of Defense.

Page 1 of 1

Defense Exhibit  VV  for ID
Page Offered  146
Page Admitted  146



# 6th AIR REFUELING WING (AMC)
# SUPPORT GROUP COMMANDER

**A1C Jeremy Zier**

I want to thank you for the great briefing on your job and the functions of your workcenter during my visit in September. After spending time with you I came away with the knowledge of how diversified the squadron is and what sharp, knowledgeable, and professional troops we have. Please keep up the good work and once again thank you.

*Superb!*
*Thanks for so*
*taking the time to see!*
*professions is at Work*

Col Bradford E. Ward

## AMC -- GLOBAL REACH FOR AMERICA

Defense Exhibit __WW__ for ID
Page Offered _146_
Page Admitted _146_

Page 1 of 1



**OFFICE OF THE SENIOR ENLISTED ADVISOR**
**6TH AIR REFUELING WING (AMC)**
**3208 HANGAR LOOP DRIVE, SUITE 1**
**MACDILL AFB FL 33621**

7 AUGUST 1998

A1C Jeremy M. Zier
6th Communications Squadron
MacDill AFB FL 33621

Dear Airman Zier *Jeremy*

On behalf of General Soligan and myself, I want to thank you for the great job you did video taping the the Dining-In. Because of your hard work, the 6 ARWs first inaugural Dining-In was a great success! Everyone that I talked to said they had a super time and it couldn't have been done without your support and dedication.

Again, thanks for stepping up to the challenge and helping to make such a memorable evening.

Sincerely

*Hope you enjoyed the evening & prays you received !!*

DAN C. JOHNSON, CMSgt, USAF
Senior Enlisted Advisor

Defense Exhibit _XX_ for ID
Page Offered _146_
Page Admitted _146_

Page 1 of 1



**COMMANDER**
**6TH AIR REFUELING WING (AMC)**
**MACDILL AIR FORCE BASE, FLORIDA 33621-5502**

1 March 1999

Dear Airman First Class Zier

      Thank you for the outstanding support you provided during the Gulf Coast Drill Meet at Bloomingdale High School. Your commitment and professionalism are evidenced by your spending weekend time to make this event a success. You provided an exceptional model for these youths.

      You should be proud of your work. I am honored to have you representing MacDill Air Force Base and the United States Air Force.

      Once again, thank you for a job well done.

                               Sincerely

                               JAMES N. SOLIGAN
                               Brigadier General, USAF
                               Commander

Attachment:
Letter of Appreciation

Page 1 of 1

Defense Exhibit _YY_ for ID
Page Offered _146_
Page Admitted _146_



**COMMANDER**
**6TH AIR REFUELING WING (AMC)**
**MACDILL AIR FORCE BASE, FLORIDA 33621-5502**

1 March 1999

Dear Airman Zier

Thank you for the great support you provided Ms. Law during her recent visit to the base for an F-16 orientation ride. She was clearly impressed with your enthusiastic attitude and professional performance.

Your courtesy enhanced the relationship we enjoy with the surrounding community. I am proud to have you represent the 6th Air Refueling Wing and recognize your efforts in maintaining our first class reputation for superior service.

Once again, thank you for a job well done.

Sincerely

*Thanks — I appreciate it !*

JAMES N. SODGAN
Brigadier General, USAF
Commander

Attachment:
Letter of Appreciation

Page 1 of 1

Defense Exhibit ZZ for ID
Page Offered 146
Page Admitted 146



**COMMANDER**
**6TH AIR REFUELING WING (AMC)**
**MACDILL AIR FORCE BASE, FLORIDA 33621-5502**

19 March 1999

Dear Airman First Class Zier

Thank you for the great support you provided during CORONA SOUTH '99. Your professional courtesy and image, combined with superior service, was noticed by all the conferees. I appreciate all of the organization and coordination you did for us during the weeks prior to the conference.

Team MacDill hit a home run during the event, but above all else, the Air Force leadership was impressed by our people. I sincerely appreciate your top-notch effort to provide the world class support for which the wing has become renown.

I am proud to have you represent the 6th Air Refueling Wing and the United States Air Force.

Once again, thank you for a job well done.

Sincerely

JAMES N. SOLIGAN
Brigadier General, USAF
Commander

Page 1 of 1

Defense Exhibit AAA for ID
Page Offered 146
Page Admitted 146



**COMMANDER**
**6TH AIR REFUELING WING (AMC)**
**MACDILL AIR FORCE BASE, FLORIDA 33621-5502**

9 June 1999

Dear Airman First Class Zier,

Your patriotism and dedication to duty make a difference, proven by your outstanding performance during the "reading of the names" at the Vietnam Memorial Moving Wall on 24 April 1999.

I personally thank you for your participation in this important event. You should be proud of your performance and contribution in remembering those who have made the ultimate sacrifice for our nation. I am honored to have you representing MacDill Air Force Base and the United States Air Force.

Thank you and keep up the superior work.

Sincerely

JAMES N. SOLIGAN
Brigadier General, USAF
Commander

Attachment:
Letter of Congratulations

Defense Exhibit BBB for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



**COMMANDER**
**6TH AIR REFUELING WING (AMC)**
**MACDILL AIR FORCE BASE, FLORIDA 33621-5502**

12 July 2000

Dear Senior Airman Zier

I want to commend and thank you for the outstanding administrative support you provided during the 21st Air Force Commanders' Conference. I know you worked many long hours setting up the "Operations Center" with computers and phones, the audio/visual requirements in the conference room, directing slide shows and presentations, and the graphics design for the folder covers and posters. Due to your efforts, our conference was a smashing success. I truly appreciate your commitment and dedication. Your professionalism and superb support leaves a favorable and lasting impression of you and the 6th Air Refueling Wing.

Again, many thanks for going the extra mile and keep up the great work!

VERY SINCERELY,

*This was a great Commanders' Conference. Thanks so much for all your support.*

ARTHUR F. DIEHL III
Brigadier General, USAF
Commander

Page 1 of 1

Defense Exhibit CCC for ID
Page Offered 146
Page Admitted 146



**COMMANDER**
**6th AIR REFUELING WING (AMC)**
**MACDILL AFB FL 33621-5502**

7 September 2000

Dear Senior Airman Zier

I wish to extend my personal appreciation for the outstanding job you did for the young people enrolled in our Drug Education for Youth (DEFY) Camp. Thanks to the unselfish giving of your valuable time and the sharing of your wealth of experience, the DEFY youth were immeasurably touched. In particular, your expertise at communicating an understanding of what it takes to be successful in the military, and your personal portrayal of commitment, encouraged all present to follow your example.

By personally contributing to the success of the DEFY program, you have made a significant gift to the well-being of our nation in the years to come. In addition to an introduction to the complex and challenging careers of the military, these young future leaders received from you an education in positive attitudes, self-esteem, community responsibility, and goal setting.

I welcome your continued support in the years to come as we improve and build upon our DEFY program.

*Very Sincerely*

*Thanks once more for all your outstanding support & giving so much of your time! The real winners here are the kids*

**ARTHUR F. DIEHL III**
Brigadier General, USAF
Commander

Page 1 of 1

Defense Exhibit DDD for ID
Page Offered 146
Page Admitted 14



COMMANDER
AIR MOBILITY COMMAND
SCOTT AIR FORCE BASE, ILLINOIS 62225-5310

**16 March 2001**

Major General George N. Williams, USAF
Commander
21st Air Force
1907 East Arnold Avenue
McGuire AFB, New Jersey 08641-5613

Dear General Williams — *Nick —*

   Congratulations on the selection of 12 of your finest within the 21st Air Force for the 2000 AMC Communications and Information Awards. They have earned this honor through outstanding contributions to the Air Force communications and information community and AMC's global reach mission. Vision and perseverance at all levels have kept AMC at the forefront of communications and information technology.

   I wish the men and women of the 21st great success as they compete at the Air Force level.

Sincerely

CHARLES T. ROBERTSON, JR.
General, USAF

Attachment:
21 AF Winners

Defense Exhibit EEE for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



**OFFICE OF THE COMMANDER**
**Headquarters Twenty-First Air Force (AMC)**
**McGuire Air Force Base, New Jersey 08641-5613**
1 April 2001

Brigadier General Arthur F. Diehl III
Commander
6th Air Mobility Wing
8208 Hangar Loop Drive Suite 1
MacDill AFB FL 33621-5502

Dear General Diehl

      Please pass my sincere congratulations to Senior Airman Jeremy M. Zier of the 6th Communications Squadron for his selection as an Air Mobility Command nominee for the 2000 Communications and Information Professional Award. The hard work, professionalism and dedication to duty displayed by Airman Zier led to his selection for this prestigious award.

      I am extremely proud of Airman Zier and wish him good luck at the Air Force competition as he represents Twenty-Force Air Force. Keep up the great work!

                        Sincerely

                        **GEORGE N. WILLIAMS**
                        **Major General, USAF**
                        **Commander**

Attachment:
AMC/CC Ltr, 16 Mar 01

Defense Exhibit FFF for ID
Page Offered 146
Page Admitted 146

Page 1 of 1

**DEFENSE COUNSEL**

SUMMARIZED

# RECORD OF TRIAL

(and accompanying papers)

**of**

ZIER, JEREMY, M.
_(Name: Last, First, Middle Initial)_

_(Social Security Number)_

Senior Master Sergeant (E-8)
_(Rank)_

Air Force Public Affairs Agency (AETC)
_(Unit/Command Name)_

United States Air Force
_(Branch of Service)_

JBSA-Randolph, TX
_(Station or Ship)_

**By**

**SPECIAL** **COURT-MARTIAL**

Convened by    **COMMANDER**
_(Title of Convening Authority)_

AIR FORCE PUBLIC AFFAIRS AGENCY (AETC)

**Tried at**

JBSA-Randolph, TX
_(Place or Places of Trial)_

**on**

10 August 2020 – 14 August 2020
_(Date or Dates of Trial)_

Volume 2 of 4 Volumes

**DEFENSE EXHIBTIS**
**APPELLATE EXHIBITS**
**ATTACHMENTS AND ALLIED PAPERS**
**POST-SENTENCING**
**PRETRIAL**

**Personal Data – Privacy Act of 1974 (5 U.S.C. 552a)**

**DD FORM 490, MAY 2000**    PREVIOUS EDITION IS OBSOLETE    **Front Cover**



Greater TAMPA
**Chamber of Commerce**

18 April 2001

Dear Jeremy,

This Award is so very well deserved.
You are a credit to your family and the
uniform you wear.

There were 46 candidates for this award,
but you were the unanimous choice of the
7 person selection committee to win the
award, as far as I can remember and
have been informed (some 20 years) this has
never happened before.

It was a pleasure meeting your lady friend
Tara Shepard, only proves you have good taste
in everything.

If I can ever be of assistance to you, please
get in touch with me. Congratulations,

Sincerely

Page 1 of 1

Defense Exhibit GGG for ID
Page Offered 146
Page Admitted 146



**HEADQUARTERS AIR MOBILITY COMMAND**
**OFFICE OF THE COMMAND CHIEF MASTER SERGEANT**
**402 Scott Drive, Unit 3EC, Scott Air Force Base, Illinois 62225-5310**

14 May 2001

Dear Airman Zier  *Jeremy*

    Congratulations on your selection to attend Air Mobility Command's
PHOENIX STRIPE Program! PHOENIX STRIPE was designed to give future
enlisted leaders a broad perspective of our mobility mission through command
presentations, discussions with key leaders, and interaction between those
handpicked to participate. Your selection to attend this seminar identifies you as
one of the "best of the best" in AMC—the future of our enlisted force. I
encourage you to take full advantage of this rare opportunity and, upon returning
to your unit, request you share your PHOENIX STRIPE experience with your
fellow enlisted members.

    If there's anything we can do to make your visit more productive or enjoyable,
please let me know. Again, congratulations and welcome!

               Sincerely

               KENNETH F. VAN HOLBECK, CMSgt, USAF
               Command Chief Master Sergeant

Page 1 of 1

Defense Exhibit HHH for ID
Page Offered  146
Page Admitted  146



COMMANDER
AIR MOBILITY COMMAND
SCOTT AIR FORCE BASE, ILLINOIS 62225-5310

**15 May 2001**

Dear Airman Zier      Jeremy -

The next four days are dedicated to you...to your views and your perspectives on Air Mobility Command and AMC enlisted issues. As we continue the Year of Retention and Recruiting in AMC, this is your opportunity to discuss issues impacting your organizations as well as those impacting the command. We look forward to hearing all of your comments.

We have planned a comprehensive agenda. Collectively, the AMC staff stands ready to answer your questions and address your concerns. If we can do anything to make this conference more pleasant or productive, please don't hesitate to let us know.

Welcome to PHOENIX STRIPE!

Sincerely

**CHARLES T. ROBERTSON, JR.**
**General, USAF**

Page 1 of 1

Defense Exhibit III_ for ID
Page Offered 146_
Page Admitted 146_



COMMANDER
6TH AIR MOBILITY WING (AMC)
MACDILL AIR FORCE BASE, FLORIDA 33621-5502
18 April 2001

Dear Senior Airman Jeremy Zier

Thank you for the outstanding professionalism and dedication you exhibited during the 6th Annual Gulf Coast Invitational Drill Meet held at Bloomingdale High School.

Your exceptional judging skills impressed the AFJROTC cadet corps and their Aerospace Science Instructors. In this, the Year of Recruiting and Retention, your efforts have gone a long way in promoting the Air Force way of life. Your participation directly contributed to the superior reputation the 6th Air Mobility Wing has for our local community.

Once again, thank you for representing our Air Force!

*THANKS!*

ARTHUR F. DIEHL III
Brigadier General, USAF
Commander

Attachments:
Bloomingdale Letter

Defense Exhibit JJJ for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



**DIRECTOR OF COMMUNICATIONS AND INFORMATION**
**HQ AIR MOBILITY COMMAND**
**203 W. LOSEY STREET, ROOM 3600**
**SCOTT AIR FORCE BASE, ILLINOIS 62225-5223**
5 June 2001

Brigadier General Arthur F. Diehl III, USAF
Commander, 6th Air Mobility Wing
8208 Hangar Loop Dr., Suite 1
MacDill AFB, Florida 33621-5502

Dear General Diehl

It's with great pleasure that I forward this award for Senior Airman Jeremy M. Zier who was selected as a 2000 AMC Communications and Information Award winner in the Airman 3VXXX category. He earned this honor through outstanding contributions to the Air Force communications and information community and AMC's global reach mission.

I wish him great success as he competes at the Air Force level.

Very respectfully

WILLIAM T. LORD
Colonel, USAF

Defense Exhibit KKK for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



**COMMANDER**
**6TH AIR MOBILITY WING (AMC)**
MACDILL AIR FORCE BASE, FLORIDA 33621-5502
**17 July 2001**

Senior Airman Jeremy Zier

     I want to echo General Robertson, General Williams, and Colonel Lord by saying congratulations on your selection as the 2000 AMC Communications and Information Award winner in the Airman category. Your outstanding work and professionalism continue to impress the men and women of MacDill and the Command.

     Please keep up the great efforts and good luck at the Air Force Level!

*Congrats Jeremy*
*You're The Best*
*God Bless,*
*& We'll miss you.*

       **CHIP DIEHL**
       Brigadier General, USAF
       Commander

Attachments:
Letters of Appreciation
Award

Page 1 of 1

Defense Exhibit LLL for ID
Page Offered 146
Page Admitted 146

28 Jul 01

DEAR SRA ZIER ~

JEREMY, WE WILL ALWAYS REMEMBER YOU, YOUR DEDICATION & SMILE! YOU HAVE ALWAYS BEEN THERE FOR US AND THIS WING ~ I WANT YOU TO KNOW I SINCERELY APPRECIATE ALL YOUR HARD, HARD WORK. YOUR EFFORTS HAVE PRESERVED SO MANY GREAT EVENTS AND MILESTONES WHILE ALSO BRINGING SO MANY SMILES ON THE FACES OF OUR FAMILIES & FRIENDS.

THANK YOU JEREMY FROM THE BOTTOM OF OUR HEARTS. I SALUTE YOU & WISH YOU ALL GOD'S BLESSINGS FOR CONTINUED SUCCESS & HAPPINESS. WITH GREAT ADMIRATION,

Page 1 of 1

Defense Exhibit MMM for ID
Page Offered 146
Page Admitted 146



**COMMANDER**
**6TH AIR MOBILITY WING (AMC)**
**MACDILL AIR FORCE BASE, FLORIDA 33621-5502**
11 Jul 02

Lt Col Marie Y. Rigotti
6 CS/CC
8011 Red Hibiscus Place
MacDill AFB FL 33621-1454

Dear Lt Col Rigotti

    Please convey my sincere thanks and appreciation to SSgt Jeremy Zier for the fantastic job he did in putting together the video presentation for Col Coman's farewell party, 24 June 2002. It was a perfect blend of humor and accurately portrayed Col Coman's depth of caring for the wing. Additionally, he quickly handled numerous impromptu changes and rolled with all the punches!

    For his outstanding performance, I have presented him with my wing coin—authorizing him a one-day pass. Again, please pass along my thanks for a job well done!

              Sincerely

              WILLIAM W. HODGES
              Major General (Sel), USAF
              Commander

CC: 6 SPTG/CC

Page 1 of 1

Defense Exhibit NNN for ID
Page Offered 146
Page Admitted 146



**UNITED STATES ARMY
THE SERGEANT MAJOR**

February 26, 2003

SSgt Jeremy Zier
U. S. Special Operations Command
7701 Tampa Point Blvd
MacDill AFB, FL 33621

Dear Sergeant Zier:

I want to pass along my personal appreciation for the support and professionalism you displayed during my visit to the U.S. Special Operations Command. Your participation helped make this event a great success.

As a token of my appreciation I have enclosed my coin. This is a special coin and as long as you continue to support our Nation it will never tarnish. Once again, thank you for your support. Hooah!

Sincerely,

Jack L. Tilley
12th Sergeant Major of the Army

Page 1 of 1

Defense Exhibit OOO for ID
Page Offered 146
Page Admitted 146



Deputy Commanding General
United States Army Cadet Command
55 Patch Road
Fort Monroe, Virginia  23651-5000

May 12, 2003

SSgt Jeremy Zier
4323 Bayside Village Drive, #207
Tampa, Florida  33615

Dear Sergeant Zier:

I want to thank you for sacrificing valuable time and effort to attend the High School National Drill Championships in Daytona Beach, Florida.  Your professionalism means so much to these cadets, their retired Cadre, parents, and community leaders.  I heard nothing but praise for your display of military bearing and your sharp appearance.  You have represented our Army well, and your presence will be thought of as a model of our current leadership.

Thanks again for dedicating your weekend to our nation's youth.  They will easily remember your instructions, your efforts at fair grading and evaluation, as well as your expert representation of our Army for years to come.

Train to Lead!

*HOOAH! Thanks for the great job!*

Sincerely,

Gratton O. Sealock II
Brigadier General, U.S. Army

Defense Exhibit PPP  for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



4/3/03

**UNITED STATES SPECIAL OPERATIONS COMMAND**
**OFFICE OF THE CHIEF OF STAFF**
**7701 TAMPA POINT BOULEVARD**
**MACDILL AIR FORCE BASE, FLORIDA 33621-5323**

SSgt Zier

Recently I received two letters of appreciation on your presentation as a judge for a recent High School Drill Team Championship in Daytona Beach. Thank you for volunteering your free time and dedicating it to the young people of our country – you have made a tremendous impact on how they view the US Military. It is people like you who make our country so great. Thanks Warrior!

BGen Osmne

Defense Exhibit QQQ for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



16 OCT 03

SSGT ZIER,

YOU HAVE PASSED AN IMPORTANT
MILESTONE WITH THE AWARD
OF YOUR CCAF DEGREE. WELL
DONE. KEEP UP THE GOOD
WORK AND CONGRATULATIONS!

---



23 OCT 04

SSGT ZIER —

THANKS SO MUCH FOR
YOUR TIME TO PRESENT MY
COLORS UPON PROMOTION. YOU
MADE THE EVENT MEMORABLE.
THANKS!

---

Page 1 of 1

Defense Exhibit RRR for ID
Page Offered 146
Page Admitted 146



**COMMANDER**
**6TH AIR MOBILITY WING (AMC)**
**MACDILL AIR FORCE BASE, FLORIDA 33621-5502**

16 May 05

Dear General Flynn

    Please pass along my sincere thanks and appreciation to SSgt Jeremy Zier for the exceptional support he provided during the Bloomingdale High School AFJROTC Drill Competition. The time and effort he gave to help judge and mentor these future leaders was phenomenal. His participation helped make the event a huge success!

    Again, please pass along my appreciation to SSgt Zier for his exceptional support!

                    Sincerely

                    MARGARET H. WOODWARD
                    Colonel, USAF

Brigadier General George J. Flynn
USSOCOM/SOCS
7701 Tampa Point Blvd
MacDill AFB, FL 33621

Page 1 of 1

Defense Exhibit _SSS_ for ID
Page Offered _146_
Page Admitted _146_



United States Special Operations Command
7701 Tampa Point Boulevard
MacDill Air Force Base, Florida 33621-5323

May 18, 2005

Dear SSgt Zier,

    You continue to set the standard by volunteering at the 23rd National
High School Drill Team Championships in Daytona Beach, Florida.  Your
dedication and selfless act serves as a testament to your demonstrated
performance and your personal enrichment as a role model.  We are all
proud of your great effort.

    Well done!    *THANKS*

                            Sincerely,


                            Donald C. Wurster
                            Major General, U.S. Air Force
                            Deputy Director, Center for Special Operations

SSgt Jeremy M. Zier
United States Special Operations Command
Office of the Chief of Staff, Secretary of Joint Staff Services
7701 Tampa Point Boulevard
MacDill AFB, FL 33621-5323

Page 1 of 1

Defense Exhibit TTT for ID
Page Offered 146
Page Admitted 146



UNITED STATES SPECIAL OPERATIONS COMMAND
OFFICE OF THE CHIEF OF STAFF
7701 TAMPA POINT BOULEVARD
MACDILL AIR FORCE BASE, FLORIDA 33621-5323

June 2, 2005

Dear Staff Sergeant Zier,

It is with pleasure I forward the enclosed Letter of Appreciation from the Commander, 6th Air Mobility Wing (AMC) for your support during Bloomingdale High School AFJROTC Drill Competition.

Your efforts and enthusiasm displayed to the youth at the school speak very highly of your character. I am proud to say that you are a member of United States Special Operations Command.

Sincerely,

George J. Flynn
Brigadier General, U.S. Marine Corps
Chief of Staff

Staff Sergeant Jeremy M. Zier
United States Special Operations Command
Chief of Staff and Command Support Center, (SOCS-SJS-VIC)
7701 Tampa Point Boulevard
MacDill Air Force base, Tampa, Florida 33621-5323

Page 1 of 1

Defense Exhibit UUU for ID
Page Offered 165
Page Admitted 165



Dear Sergeant Zier,

I would like to personally thank you for your outstanding contributions to the 228th Army Birthday Celebration. The time, dedication and assistance you provided made the tactical audio-video display a huge success. Your support helped ensure this year's event was a memorable occasion for all soldiers and family assigned to MacDill AFB.

You truly represent the "Quiet Professionals" of the special operations forces community. My sincere appreciation and thanks for a job well done.

Sincerely,



JAMES W. PARKER
Major General, U.S. Army
Commander, U.S. Army Element

Staff Sergeant Jeremy Zier
Center for Command Support, SOCS
7701 Tampa Point Boulevard
MacDill Air Force Base, Florida 33621

Defense Exhibit VV for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



**Newhouse School**

In recognition of superior scholarship the name of

**Jeremy M. Zier**

has been entered on the Dean's List for the Spring Semester 2006

Dean

**S.I. Newhouse School of Public Communications at Syracuse University**

Page 1 of 1

Defense Exhibit WWW for ID
Page Offered 146
Page Admitted 146



**AIR EDUCATION AND TRAINING COMMAND**
**UNITED STATES AIR FORCE**
Office of the Commander
1 F Street Ste 01
**RANDOLPH AIR FORCE BASE TEXAS 78150-4234**

20 April 2011

Technical Sergeant Jeremy Zier
3rd Combat Camera Squadron
1359 Tinker St.
Lackland AFB TX 7 8236

Dear Sergeant Zier

Thank you for your assistance during the 2011 Fiesta in Blue concert featuring the U.S. Air Force Band of the West.

Your willingness to volunteer and spend your evening supporting this important community outreach program speaks volumes about your attitude and dedication. Because of your efforts, about 1,500 members of our community enjoyed a first-class Air Force musical showcase. Fiesta in Blue is an important part of the long-lasting relationship between the Air Force and the City of San Antonio. Your sharp appearance and positive attitude directly contributed to making a highly favorable impression.

Sincerely

EDWARD A. RICE, JR
General, USAF
Commander

Defense Exhibit XXX for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



**DEPARTMENT OF THE AIR FORCE**
AIR EDUCATION AND TRAINING COMMAND

11 June 98

MEMORANDUM FOR AMN JEREMY M. ZIER

FROM: DET 4, 335 TRS/CC

SUBJECT: Letter of Appreciation

This letter is to recognize Amn Jeremy M. Zier for outstanding work rendered as an Airman Leader (Yellow Rope) while assigned to Detachment 4, 335th Training Squadron at Fort George G. Meade, Maryland. His willingness to accept additional responsibilities and extend his duty hours are indicative of Amn Zier's professionalism and pride. His enthusiastic approach to his duties went a long way in assisting Detachment staff. He will without a doubt be a key player on any Air Force team, and should be challenged to continue to develop his leadership abilities.

DONALD E. ENGLISH Jr., 1Lt, USAF
Commander

Page 1 of 1

Defense Exhibit <u>YYY</u> for ID
Page Offered <u>146</u>
Page Admitted <u>146</u>



**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS AIR COMBAT COMMAND
LANGLEY AIR FORCE BASE, VIRGINIA

9 Oct 98

Colonel Wayne F. Conroy
419 OG/CC
5713 Lahm Ln
Hill AFB, UT 84056-5410

Brigadier General James N. Soligan
6 ARW/CC
5208 Hanger Loop Dr
MacDill AFB, FL 33621

Dear General Soligan

    SSgt Hillsgrove, SrA Clark, SrA Amayo, SrA Lopez, and A1C Zier, the photographers of the 12 Sep 98 F-16D aircraft mishap, demonstrated the ultimate in professional behavior, thoroughness and tenacity in accomplishing the mission. They managed to produce quality photographs in deplorable working conditions. They had to perform in an insect and snake infested swamp in over 90-degree temperatures, in water up to three feet deep.

    Not only were the field conditions harsh, but the limited billeting accommodations required some people to double up. Through all the discomfort, they maintained high spirits and kept in mind the importance of what they were doing.

    Please pass on my heartfelt thanks and deep admiration of their character and resourcefulness. I strongly recommend each one of them be awarded the Air Force Achievement Medal for Outstanding Achievement.

                                Sincerely


                                WAYNE F. CONROY, Col, USAFR
                                Safety Investigation Board President


*Global Power For America*

Page 1 of 1

Defense Exhibit <u>ZZZ</u> for ID
Page Offered <u>146</u>
Page Admitted <u>146</u>



# DEPARTMENT OF THE AIR FORCE
## 31ST FIGHTER WING (USAFE

TO: MEMORANDUM FOR: 6ᵗʰ CS/CC

FROM: 31CS/SCSVV

SUBJECT: Recommendation for the Air Force Achievement Medal

1. I am recommending Senior Airman Jeremy M. Zier for the Air Force Achievement Medal for his outstanding duty performance while temporarily assigned to the 31ˢᵗ Communications Squadron during NATO Operation DELIBERATE FORGE at Aviano Air Base, Italy. During the period of 21 December 1999 through 19 March 2000, SrA Zier performed his duties as Production Documentation Journeyman in an outstanding manner contributing directly to the overall mission of the command.

2. SrA Zier provided exceptional support to the 31ˢᵗ FW Intel Squadron as part of his daily duties. He quickly learned an advanced non-linear editing system configuration in one day's time to assist in analyzing and archiving critical targets. SrA Ziers support to the Intel Squadron Squadron allowed the permanently assigned personnel to succeed in meeting their timeline in analyzing targets. SrA Zier documented and edited a stand out video for the Fuels Management Unit; culminated in 1999 USAF Golden Drum Award for Fuels, also presented at Air Force level and received 1999 "Best In Air Force." First on scene to a life-taking automobile accident; video documentation key to 31ˢᵗ Security Forces and Base Safety in investigating cause of accident. Organized and captioned video imagery for the shop, provided easy access and location of imagery; saving hours of research time for future utilization. Selflessly volunteered after duty hours to document local Italian national and Americans participating in the base's Special Olympics Program. Contribution directly enhanced foreign community relations.

3. Due to TDY commitments and personnel changes of the video section a Letter of Evaluation was not accomplished at the time of SrA Ziers departure from Aviano AB. If one had been accomplished it would have reflected the outstanding accomplishments and contributions SrA Zier provided during his time serving with as at the 31ˢᵗ Communications Squadron.

4. If you have any questions please contact TSgt Maria S. Gunther at DSN 276-4620.


MARIA S. GUNTHER, TSgt, USAF
NCOIC Video Documentation


Defense Exhibit AAAA for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



FOWLER, WHITE, GILLEN, BOGGS, VILLAREAL AND BANKER, P. A.

ATTORNEYS AT LAW

TAMPA — ST. PETERSBURG — CLEARWATER

FT. MYERS — TALLAHASSEE

CABLE · FOWHITE
TELEX 52776

501 EAST KENNEDY BLVD.
POST OFFICE BOX 1438
TAMPA, FLORIDA 33601

TELECOPIER
(813) 229-0313

(813) 228-7411

February 24, 1999

Brigadier General James Soligan
Commander
6th Air Refueling Wing
8202 Hangar Loop Drive
Suite 1
MacDill AFB, Florida 33621-5407

Dear General Soligan:

Mere words of thanks are not sufficient to express my gratitude for the F-16 initiation last week. The power and precision of that aircraft were remarkable. I was particularly taken with the responsiveness of the craft to the controls -- not to mention the power. The full power takeoff and landing, 5 g loops, rolls, an Immelman, breaking the sound barrier and reconnaissance of Avon Park was a mission to be remembered.

The experience was enhanced by the professionalism and commitment of your staff. Specifically, the day started at the hospital complex which was neat, orderly and well run. Although I did not have the pleasure of meeting Col. Greg Baggerly, the hospital operation speaks well of his administration. I did meet with the Flight Surgeon, Captain Eric Zerla who exhibited genuine concern for my welfare. I certainly appreciate his thoroughness as well as his caution. I am extremely pleased to say that his admonition regarding airsickness, although important, turned out to be unnecessary.

We were joined immediately by the Wing Photographer Senior Airman Kenny Ballard and the Wing Videographer Airman Jeremy Zier. Although I've not yet seen the photos, I am so pleased that they were there to record the experience. These young men exhibited an enthusiasm for the Air Force and their jobs which speaks well of their Support Group Commander, Col. Brad Ward. I enjoyed their company and will treasure the photographic mementoes.

Bob Benson's extreme kindness to my father, John Fogarty and husband, Wayne Williams, was specially appreciated. My father had a fantastic time in the simulator.

Diane Green was wonderful in making this an experience of a lifetime. She spent untold hours in coordinating the day and everything went off perfectly. I have always enjoyed working with Diane; she is a real asset to MacDill AFB.

Page 1 of 2

Defense Exhibit <u>BBBB</u> for ID
Page Offered <u>146</u>
Page Admitted <u>146</u>

Brigadier General James Soligan
February 24, 1999
Page 2

Finally, and most importantly, I sincerely appreciate your taking time from your very busy schedule to see me off and welcome me back to earth. This was truly a ride of a lifetime. Thank you for everything.

Sincerely yours

Rhea F. Law

US v. Zier Military Record of Trial and Appellate Extracts 000198 of 902



**DEPARTMENT OF THE AIR FORCE**
**6TH AIR REFUELING WING (AMC)**
**MACDILL AIR FORCE BASE, FLORIDA**

15 Mar 99

MEMORANDUM FOR A1C Jeremy Zier
SCSVV

FROM: 6 CS/CC

SUBJECT: Letter of Appreciation

It always brings me pleasure to pass along notes of appreciation for individuals who support the community. Your participation as a judge for the Gulf Coast Drill Meet is an excellent way to instill pride and professionalism in the cadets and cast a positive light on the 6th Communication Squadron and the Air Force. Your outstanding contribution will not be forgotten. Thank you for volunteering your time.

STEVEN E. CASH, Lt Col, USAF
Commander

**AMC – GLOBAL REACH FOR AMERICA**

Page 1 of 1

Defense Exhibit CCCC for ID
Page Offered 146
Page Admitted 146



**DEPARTMENT OF THE AIR FORCE**
**6TH AIR REFUELING WING (AMC)**
**MACDILL AIR FORCE BASE, FLORIDA**

6 ARW/CC
8208 Hangar Loop Dr., Suite 1
MacDill Air Force Base, Florida 33621-5502

Airman First Class Jeremy M. Zier
6th Communications Squadron
8011 Red Hibiscus Place
MacDill Air Force Base, Florida 33621

Dear Airman Zier,

Congratulations on your selection for promotion to Senior Airman Below-The-Zone effective 6 Feb 00. This achievement is a direct result of your outstanding performance and is indicative of the confidence and trust placed in you by the United States Air Force.

Well deserved, I salute your dedication, integrity, selflessness and steadfast commitment, which earned you this promotion. Now, take a moment to enjoy this milestone with those in your unit, your friends, and your family. You should be as proud as they are.

I wish you all the best and continued success as you continue to serve our Air Force and nation.

Once again, my heartiest congratulations.

*CONGRATULATIONS !*

ARTHUR F. DIEHL III
Colonel, USAF
Commander

**AMC – GLOBAL REACH FOR AMERICA**
Page 1 of 1

Defense Exhibit DDDD for ID
Page Offered 146
Page Admitted 146



**DEPARTMENT OF THE AIR FORCE**
**31ST FIGHTER WING (USAFE)**

17 Mar 00

MEMORANDUM FOR SENIOR AIRMEN JEREMY ZEIR

FROM:  31 SUPS/LGSD

SUBJECT:   Letter of Appreciation for 31 FW Annual Awards Banquet Support

I'd like to extend my personal thanks to you for the support you provided helping us make the 31 FW 1999 Annual Awards Banquet a huge success.  Setting up and running an event of this nature is difficult, but it was a task made easy because there are dependable folks such as you.

Feedback I received on the work you did with the Audio Visual presentations was positive.  In fact, one person told me that in the 3 years they have been here, this AV presentation was the best they had seen.  You can be proud knowing you helped create a class environment that allowed the premier wing in the Air Force to recognize its best and brightest.

ROBERT A. STEWART, SMSgt, USAF
Chairman, Annual Awards Committee

Defense Exhibit <u>EEEE</u> for ID
Page Offered <u>146</u>
Page Admitted <u>146</u>

# DEPARTMENT OF THE AIR FORCE
## 6th AIR REFUELING WING (AMC)
## MacDILL AIR FORCE BASE, FLORIDA

MEMORANDUM FOR TO WHOM IT MAY CONCERN      04/11/00
FROM: 6 ARW/ Col Mac Isaac
SUBJECT: Letter of Recommendation

1. I had the distinct honor and pleasure of serving with Senior Airman Jeremy Zier, 6th Communications Squadron, for the past three years. His performance has been absolutely outstanding. Jeremy is a young, rising super star in our enlisted force, and has the tickets to back it up; BTZ in '99, Communications Squadron Airman of the Year '99, Support Group Airman of the Quarter Dec. '99. His spirit and imagination were of great assistance to me when we hosted the famous 555th Fighter Squadron – The Triple Nickel – during the immediate post Operation Allied Force months. The Nickel came to MacDill to train while their home field, Aviano, IT, was undergoing runway repair. On his own initiative, Jeremy flew out on one of our KC-135Rs and filmed the mid-Atlantic refueling of the Nickel. He proceeded to make a documentary film of the Nickel's arrival home to MacDill (Squadron was "born" here at MacDill in 1943, reactivated again in 1964 prior to duty in Southeast Asia). That film, and another one made while the Squadron was here training were cornerstones to a very special Dining In reunion here at MacDill of old Nickels and the new young Nickels in the fall of 1999 – both outstanding products! He has been our go-to-guy for film coverage of our annual Air Fest airshow – known well by the THUNDERBIRDS – his footage was shown on national news. Jeremy led his section on producing a training film on Hurricane preparation procedures – the film was so good, local civil defense/disaster prep folks use it. I could go on and on about his great technical skills.

2. Many have "good" skills, what sets Jeremy apart from others is his gift of a positive attitude and unwavering work ethic. This young Airman loves the United States Air Force. He is and will continue to be a great ambassador for the Air Force. When I go out into the public to make a presentation, I take him with me – always introducing him to the public as an example of the quality young people we have in the Air Force. I am in my 31st year of service in the United States Air Force, nearly 30 as a commissioned Officer. I have never had under my command anyone who possessed the rare combination of talents and attitude as Jeremy has. It is with great reservation that I write this letter of recommendation, for I fear the United States Air Force might loose Jeremy and that would be a great loss to the Service I love and honor so much. The THUNDERBIRDS will be a better organization if the make Jeremy Zier one of their own. Treat him well, and get ready for the best video coverage the THUNDERBIRDS will ever have. Please feel free to call me if you have any questions; DSN 968-9205.

RICHARD S. Mac ISAAC
COLONEL, USAF
6th Air Refueling Wing

Page 1 of 1

Defense Exhibit FFFF for ID
Page Offered 146
Page Admitted 146



**DEPARTMENT OF THE AIR FORCE**
6TH AIR REFUELING WING (AMC)
MACDILL AIR FORCE BASE, FLORIDA

13 October 2000

Colonel Bradford E. Ward
Commander, 6th Support Group
MacDill AFB FL  33621

Senior Airman Jeremy Zier
6th Communications Squadron
MacDill AFB FL  33621

Dear Airman Zier

Thank you for making MacDill a great place to be assigned.  Your hard work installing and maintaining the computer equipment for the Base Appearance Competition 2000 was extraordinary.  The time you spent preparing for this evaluation ensured the success of this occasion. Your time and effort did not go unnoticed by the evaluators.  Their positive impression of MacDill was the result of your dedicated efforts.

Again, thank you for your dedication and commitment to the MacDill family and for a job well done!

Sincerely

*SrA Zier,*
*Very well done!*
*Thank you!*

*Comm Rules*

BRADFORD E. WARD, Colonel, USAF
Commander, 6th Support Group

**AMC--GLOBAL REACH FOR AMERICA**

Page 1 of 1

Defense Exhibit GGGG for ID
Page Offered 146
Page Admitted 146

MEMORANDUM FOR 6th Communications Squadron/CC

FROM: 6th SVS/CCI

SUBJECT: Letter of Appreciation for Senior Airman Jeremy Zier

1.  On Wednesday, 24 Jan, 2001, the NFL Players Golf Club held their annual NFL Players Super Shootout golf tournament on Bay Palms Golf Club at MacDill AFB, Florida. Airman Zier, 6th Communications Squadron, contributed his time and talents to support this event. The tournament was nationally televised and had both the Chief of Staff of the Air Force, Gen Ryan, and Commander of Air Mobility Command, General Robertson, in attendance. These activities were important for the MacDill community and the Air Force as it carried with it a recruiting message. Our Air Force was on display throughout the week's nationally televised events. The volunteer effort was comprised almost exclusively from 6th Air Mobility Wing personnel and those volunteers executed their game plans to perfection.

2.  Please pass my sincere appreciation to Jeremy for supporting this important community event on MacDill AFB.

Sincerely

ROBERT I. VOLAVCHEK, Lt Col, USAF
Mobilization Augmentee to the Commander
Volunteer Coordinator- NFL Players Kids
Golf Jam & Super Shootout golf tournament

Page 1 of 1

Defense Exhibit HHHH for ID
Page Offered 146
Page Admitted 146



Office of Public Affairs
Headquarters Air Combat Command
115 Thompson Street, Suite 211
Langley AFB VA 23665-1987

**26 March 2001**

Lieutenant Colonel Marie Y. Rigotti
Commander
6th Communication Squadron
8011 Red Hibiscus Place
MacDill AFB FL 33621-5502

Dear Colonel Rigotti

Thank you for allowing several members of your squadron to assist ACC/PA with the Accident Investigation Board press conference on 6 March 2001 at the Crowne Plaza Hotel in Tampa.

SSgt Kevin Hughes, SrA Stanley K. Wood, SrA Jeremy Zier, SrA Jack Patterson and SrA Nicole Alessi were outstanding! They took care of all setup, ran the equipment, fixed problems and adapted easily to on-the-spot requests. Most important, they worked late hours to get us several audio and video copies before our flight left early the next morning.

Please extend my sincere thanks to them for their professionalism, dedication and enthusiasm.

Sincerely

DOUGLAS D. MCCOY, JR., Colonel, USAF
Director of Public Affairs

Defense Exhibit IIII for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



**DEPARTMENT OF THE AIR FORCE**
**6TH AIR REFUELING WING (AMC)**
**MACDILL AIR FORCE BASE, FLORIDA**

24 May 2001

Brigadier General Arthur F. Diehl III
Commander
8208 Hangar Loop Dr, Ste 1
MacDill AFB FL 33621-5502

Senior Airman Jeremy Zier
6th Communications Squadron
MacDill AFB FL 33621

Dear Airman Zier

I would like to take this moment and thank you for all the great communications support you furnished for the Volunteer Appreciation Committee. Your hard work preparing the banquet was superb. It was a resounding success for the many volunteers whom you helped to honor. It is people like you who go the extra mile to help recognize our behind-the-scenes volunteers and make MacDill a great place to live and work.

Your continued support of this and other events is a tribute to you and your knowledge of the importance of our many volunteers to MacDill's success. Again, great work!

*THANKS ONCE AGAIN!*
*JEREMY!*

Sincerely

ARTHUR F. DIEHL III
Brigadier General, USAF
Commander

**AMC--GLOBAL REACH FOR AMERICA**

Defense Exhibit JJJJ___ for ID
Page Offered 146
Page Admitted 146



# THE GREATER BRANDON CHAMBER OF COMMERCE

808 Oakfield Dr. Brandon, FL 33511-4952  ▲  (813) 689-1221  ▲  Fax 689-9440  ▲  brandonchamber.com  ▲  brandondirectory.com

June 20, 2001

MSgt Linda Valinho
2013 Bridgehampton Pl.
Brandon, FL 33511

Dear SrA Jeremy Zier:

We would like to take this opportunity to say "thank you" for the part that you played in the TECO Energy Brandon Balloon Classic. Without the support of our volunteers, the event would not have run so smoothly or efficiently.

Successful does not begin to describe the 2001 Classic. Since the move to Vandenberg Airport, the event has been able to take on a different look and appeal. Carnival rides and amusements were again present this year. There were approximately 20,000 people present over the course of the weekend. Along with almost 60 balloons, there were static displays, live entertainment and many other forms of family fun. All of these things would not of taken place without our devoted volunteers.

Again, thank you for your support and we look forward to working with you in the future, as we begin plans for 2002.

Sincerely,


Laura Simpson
Vice President
Business & Community Development

KIM BOYLE - Chairman  ▲  MAJOR STEVE SAUNDERS - Chairman-Elect  ▲  FRANCES REGISTER - Secretary/Treasurer  ▲  EARL HAUGABOOK - Immediate Past Chair  ▲  TAMMY C. BRACEWELL - President

DR. IGNACIO ARMAS  ▲  DR. ROBERT CHUNN  ▲  JULIAN CRAFT  ▲  MICHAEL M. FENCEL  ▲  EDWIN HUNZEKER  ▲  SENATOR TOM LEE  ▲  GEORGE T. MAY IV  ▲  STATE REPRESENTATIVE SANDY MURMAN
JENNIFER L. MURPHY  ▲  JOHN M. PATON  ▲  DANIEL F. PILKA  ▲  MARSHALL RAINEY, Consulting Attorney  ▲  PAUL SEKORY  ▲  DR. CARLOS M. SOTO
SCOTT SPICER  ▲  CHARLOTTE M. STERTZER  ▲  JOHN SULLIVAN  ▲  ARLENE WALDRON

Page 1 of 1

Defense Exhibit KKKK for ID
Page Offered 146
Page Admitted 146



**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS AIR MOBILITY COMMAND (AMC)**

4 September 2002

MEMORANDUM FOR 6 AMW/CC

FROM: HQ AMC/IGC
510 POW-MIA Drive
Scott AFB, Illinois 62225-5020

SUBJECT: Letter of Appreciation

1. On behalf of Colonel Thomas E. Stickford and the entire Headquarters Air Mobility Command Inspector General (HQ AMC/IG) team, we would like to formally recognize the following individuals of your organization for their exceptional support to the HQ AMC/IG team during your Single Integrated Operational Plan (SIOP) and Unit Compliance Inspection (UCI), theater outbrief conducted 22 July 2002:

| | |
|---|---|
| SMSgt Jeffrey T. Fewell | 6th Communications Squadron |
| TSgt Mark Taylor | 6th Communications Squadron |
| SSgt Jeremy Zier | 6th Communications Squadron |
| SSgt Denedra Threatt | 6th Communications Squadron |
| SSgt Bryan Forsythe | 6th Communications Squadron |
| SSgt Frankie Woodard | 6th Communications Squadron |
| SSgt Stan Wood | 6th Communications Squadron |

2. These individuals provided critical support and technical expertise to the IG Team during setup, rehearsal, and presentation of your wing's theater outbrief. The Visual Information team's conscientious effort and attention to detail ensured flawless operation of equipment and a technically error-free presentation from start to finish. Their efforts set the stage for a stellar theater outbrief and a lasting impression of a successful inspection.

3. Please extend our thanks to these outstanding professionals for a job extremely well done.

JEFFERY A. WORTHING
Colonel, USAF
Team Chief

**AMC-GLOBAL REACH FOR AMERICA**

Page 1 of 1

Defense Exhibit LLLL for ID
Page Offered 146
Page Admitted 146



**COMMANDER**
**6TH AIR MOBILITY WING (AMC)**
**MACDILL AIR FORCE BASE, FLORIDA 33621**
**25 September 2002**

Dear Lt Col O'Rear

Please extend my sincere thanks and appreciation to CMSgt Kevin Thompson and the men and women of the visual support, photography, graphics, and videography elements in helping to make the wing's YOWS and USAF birthday dining out a huge success.

Their attention to detail and dedication to perfection ensured a grand night and made this the best dining out the wing has ever seen.

Every picture, video, and camera shot was cued to perfection and added to the professionalism of the entire evening.

Chief Thompson and his flight have always been a staple of success within the communications squadron, but this time they really out-did themselves.

I salute them all for a truly professional job!

Sincerely

WILLIAM W. HODGES
Major General (Sel), USAF
Commander

Defense Exhibit MMMM for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



# DEPARTMENT OF THE AIR FORCE
## 6TH AIR MOBILITY WING (AMC)
## MACDILL AIR FORCE BASE, FLORIDA

18 November 2002

MEMORANDUM FOR CS/CC

FROM:    6 SFS/CC

SUBJECT:    Letter of Appreciation

1. Please pass on my thanks to the following personnel for volunteering to help the 6th Security Forces Squadron during Operation Pumpkin Patrol, 31 October 2002. Their participation helped ensure a safe and incident free night of Trick-or-Treating for our MacDill AFB families.

     SSgt Jeremy Zier

2. During these times of heightened awareness, increased force protection measures, and extended duty hours, this program was more important than ever before. As a volunteer, they gave the greatest gift of all...their time. Again, please pass on my thanks for their superb efforts.


                LYNDEN P. SKINNER, Major, USAF
                Commander, 6th Security Forces Squadron

Page 1 of 1

Defense Exhibit NNNN for ID
Page Offered 146
Page Admitted 146



COMMANDER
6TH AIR MOBILITY WING (AMC)
MACDILL AIR FORCE BASE, FLORIDA 33621-5502
18 Dec 02

Dear Lt Col O'Rear

Please extend my sincere thanks for your support during the Headquarters Air Mobility Command Inspector General team visit. The men and women of the 6th Communications Squadron stepped up to provide top-notch assistance during the outbrief of our Single Integrated Operational Plan and Unit Compliance Inspection. In particular, I would like to recognize SMSgt Jeffrey Fewell, TSgt Mark Taylor, SSgt Jeremy Zier, SSgt Denedra Threatt, SSgt Bryan Forsythe, SSgt Frankie Woodard, and SSgt Stan Wood.

Thanks again for all the help in making this event such a success. The results speak volumes of the caliber of individual it takes to carry it out—Thanks for all you do!

Sincerely

WILLIAM W. HODGES
Major General (Sel), USAF
Commander

Lt Col Stephen E. O'Rear
6 CS/CC
8011 Red Hibiscus Place
MacDill AFB FL 33621-1454

Page 1 of 1

Defense Exhibit OOOO for ID
Page Offered 146
Page Admitted 146

 FROM THE DESK OF HAP LUTZ 

Yo Sergeant Zier,                    5 June 2003

Thank you so much for sending the video. Your work is very professional and detailed. You apprised me earlier about the editing constraints and I was prepared for you doing what was necessary to keep within the parmeters of your guidelines.

Your film was shown at a recent cocktail party honoring General Aderholt's receipt of the "Bull" Simons award that my wife and I attended. It received high acclaim to all who viewed it.

Again, thank you and hope to see you again someday.

Very sincerely,


Hap/Lutz

Defense Exhibit PPPP for ID
Page Offered 146
Page Admitted 146

US v. Zier Military Record of Trial and Appellate Extracts 000212 of 902



**Hillsborough County School Board**

Carol W. Kurdell, Chairman
Glenn Barrington, Vice Chairman
Carolyn Bricklemyer
Jennifer Faliero
Jack R. Lamb, Ed. D.
Candy Olson
Doris Ross Reddick

Superintendent of Schools
**Earl J. Lennard, Ph.D.**

Deputy Superintendent
**Randolph Poindexter**

Principal
**Cheryl A. Tyo**

# HILLSBOROUGH COUNTY PUBLIC SCHOOLS
## General Tinker Elementary School

November 20, 2003

Dear Mr. Zier,

The Great American Teach-In at Tinker Elementary was a resounding success and a wonderful experience for all persons involved. On behalf of the Tinker Elementary staff, please accept our sincerest thanks for giving of your time and talent to this outstanding celebration of education.

Community participation was the key to the success of this year's celebration. Your investment of time encouraged and challenged our students to prepare themselves for future work and life. You were an integral part of this year's Great American Teach-In.

Again, please accept our thanks for contributing to the success of the 2003 Great American Teach-In.

Sincerely,

Cheryl A. Tyo
Principal

Jean Fernandez
Guidance Counselor

Defense Exhibit QQQQ for ID
Page Offered 146
Page Admitted 146



**UNITED STATES SPECIAL OPERATIONS COMMAND**
7701 TAMPA POINT BOULEVARD
MACDILL AIR FORCE BASE, FLORIDA 33621-5323

SOCS-SJS-S                                          28 June 2004

MEMORANDUM FOR:  STAFF SERGEANT JEREMY M. ZIER, UNITED STATES
SPECIAL OPERATIONS COMMAND, ATTN: SOCS-SJS-SR, 7701 TAMPA POINT
BLVD, MACDILL AFB, FL 33621-5323

SUBJECT:  Letter of Appreciation

1.  Now that Mr. Bryan Lee has successfully retired from Civil Service, I wish to express
my appreciation to you for your hard work in contributing to a wonderful farewell
celebration for him.

2.  An event of that magnitude takes a team effort and your participation in filming the
ceremony and presentations at the luncheon was key to ensuring Mr. Lee and his family
have a remembrance of this special day.  You also cheerfully volunteered your time and
expertise in assembling and attending to the music throughout the festivities.  Your
enthusiasm and cooperative attitude directly contributed to the day's success.  Please
accept my sincere appreciation for the excellent support.

LEO M. SMITH, JR.
Chief, Command Information Services
Division

Page 1 of 1

Defense Exhibit RRRR for ID
Page Offered 146
Page Admitted 146



# SPORTS NETWORK INTERNATIONAL, INC.

**Samantha Ste.Claire**
Chief Executive Officer

**Justin Gates**
Competition Director

**Sharron Ritch**
Event Director

**John Ladd**
Event Director

**Jennifer Troiano**
Office Manager

**Sabrina Mincey**
Administrative Assistant

Major General Donald Wurster
SCSOD
7701 Tampa Point Blvd.
Tampa, FL 33621

Friday, May 13, 2005

RE: Commendation Letter for SSgt. Jeremy Zier at the
2005 National High School Drill Team Championships

Dear Major General Donald Wurster:

Enclosed you will find a commendation letter for an exceptional individual under your command, SSgt. Jeremy Zier. Recently, he was a part of the National High School Drill Team Championships in Daytona Beach, Florida. Serving in the capacity of a judge at this world-famous event, SSgt. Zier displayed exceptional dedication to the task at hand and represented the U.S. Air Force with true professionalism.

I would greatly appreciate the inclusion of this letter into the permanent file of SSgt. Zier. I feel it is the least that we can do for a selfless weekend of dedication this judge put forth.

The words of praise and event descriptions contained within this commendation letter are heart-felt and well-deserved. **Without the work of each of this fine individual, there could be no drill competition for the hard working youngsters!** The sacrifice of each judge on behalf of the young JROTC cadets and future leaders of our nation is noteworthy. Their dedication to these quality leaders deserves our praise and accolades. I am proud to extend the following letter to you and more importantly, I am proud to know that SSgt. Zier represents the U.S. Air Force.

Many Thanks,

Justin Gates
NHSDTC Judging Director
Sports Network International

**775 Fentress Boulevard ◆ Daytona Beach, Florida 32114-1213 ◆ 386/274-1919 ◆ 800/327-9311**
**website: www.thenationals.net ◆ e-mail: sni@thenationals.net**

Page 1 of 1

Defense Exhibit SSSS for ID
Page Offered 146
Page Admitted 146



Mrs. Gwen Parmley
St Marks African Methodist Episcopal Zion Church
511 Water Street
Bayboro, North Carolina

August 24, 2006

SSgt Jeremy Zier
Charleston Air Force Base
Charleston, South Carolina

Dear Jeremy,

On behalf of the Avery Family members, we would like to take this opportunity to express our sincerest gratitude for the generosity and compassion shown to the Avery family as a result of the family loosing every material possession in a house fire last month. Your financial and material gifts will assist this family in the setup of another home. Every piece and every item was greatly appreciated.

For you to reach out and assist this unknown family, hundreds of miles away from your location, lets us know that there are still those in this world that can feel their brother and sister's care in the time of need. Upon receiving the items, the family members reminded me of the joy on a child's face on Christmas morning!

May God richly BLESS each of you and your families as we pray His BLESSINGS on the men and women who so bravely serve our country.

Continue to be BLESSED!

Sincerely,

Mrs. Gwendolyn G. Parmley

Defense Exhibit TTTT for ID
Page Offered 146
Page Admitted 146

Page 1 of 1

### R.H. Rollings Middle School of the Arts

815 South Main Street • Summerville, South Carolina 29483 • Phone (843) 873-3610 • Fax (843) 821-3985
**Dr. Kathy Sobolewski** • *School Principal* • **Elena Furnari** • *Assistant Principal*



*Where Learning is an "ART"*

September 11, 2006

Jeremy Zier and the 1st Combat-Camera Squadron,

Thank you so much for all the help you provided us today during the day of caring that was sponsored by the Trident United Way. It would have taken weeks for our school family to get the work done that you did in one day. You saved us time and money.

Not only was the work you did very helpful to us, the example of volunteerism you provided to our students is priceless. We pride ourselves in providing quality instruction to our students on a daily basis, and today they all received an additional life long lesson-the value of sharing time and talents with others.

As we go through the school year, we can be reminded of the special gift you shared today, just by walking down the hallways.

Sincerely,

Elena Furnari
Assistant Principal
Rollings Middle School of the Arts

Rollings Middle School of the Arts is a school for the fine and performing arts with an emphasis on interdisciplinary learning in all the content areas. The content areas are defined as the arts, language arts, math, science, social studies, technology, and wellness/health.

Page 1 of 1

Defense Exhibit UUUU for ID
Page Offered 146.
Page Admitted 146

 

15 Aug 06

SSgt Zier

I personally appreciate your volunteer efforts as the opposing force during our Expeditionary Combat Skills Training Course.

Our wing members are more highly trained and ready for combat operations due to your dedication. Thanks for the hard work!

V/r,

Page I of I

Defense Exhibit VVVV for ID
Page Offered 146
Page Admitted 146



7 OCT 06



SSgt Zier

Once again I must personally thank you for your dedication and willingness to continue training our wing members.

Your awesome performance as the Opposing Force during our Expeditionary Combat Skills Training Course has prepared our wing to continue the battle against the Global War on Terrorism.

Your welcome to continue your participation anytime!

V/r,

Page 1 of 1

Defense Exhibit WWWW for ID
Page Offered 146
Page Admitted 146



**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 437TH AIRLIFT WING (AMC)**

OC ⸱ ⸱ ⸱006

MEMORANDUM FOR 1 CTCS/CC
           ATTN: SSGT JEREMY M. ZIER

FROM: 437 SFS/CC

SUBJECT: Letter of Appreciation

Please pass on my appreciation to SSgt Zier for his outstanding performance as Expeditionary Combat Skills Training OFOR. His willingness to assist with this wing program truly demonstrated the Air Force Core Values of Integrity, service before self, and Excellence. Performing as OPFOR gave Charleston Airmen a realistic atmosphere for training before deploying to Iraq or Afghanistan. Again, thanks for all of his hard work and dedication.

                        SETH J. MCKEE III, Maj, USAF
                        Commander

Defense Exhibit XXXX for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



17 NOV 06



SSgt Zier

Now a 3rd time to volunteer as the opposing force during Expeditionary Combat Skills training.

You are an awesome asset to your unit and continuing to train our wing airman for combat will definitely save lives.

Keeping the great work!

V/r,

Defense Exhibit YYYY for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



*Team Charleston First Six Association*
*Charleston Air Force Base, South Carolina 29404*
*14 January 2008*


*Staff Sergeant Jeremy Zier*
*437th 1st Combat Camera Squadron*
*Charleston Air Force Base, South Carolina 29404*


*Dear Sergeant Zier,*

*The First Six Association would like to extend our sincere appreciation for volunteering your time for Holiday Cheer, December 2007. Each year the First Sergeants coordinate this important event to provide several Team Charleston families an extra bit of assistance during the holidays. Your selfless efforts to help the First Six raise $280 have made a significant contribution to the success of the Holiday Cheer program and the mission of the First Six.*

*The First Six's mission is to represent the voices of Team Charleston's junior enlisted members on issues affecting prestige, morale, welfare, and esprit de corps. The association challenges enlisted members from the ranks of E-1 through E-6 to make a positive impact on the base and local community through various activities and other events. Your pride, professionalism and positive attitude will ensure the future success of the First Six Association and reflect favorably on the members of Team Charleston.*


*Sincerely,*



*NINA M MURPHY, TSgt, USAF*
*President, Charleston First Six Association*


Page 1 of 1

Defense Exhibit ZZZZ for ID
Page Offered 146
Page Admitted 146



**DEPARTMENT OF THE AIR FORCE**
3RD **COMBAT CAMERA SQUADRON(AFPAA)**

12 September 2012

3 CTCS/CC
1359 Tinker Street Bldg 7362
Lackland AFB, TX 78236

Master Sergeant Jeremy Zier
AFPAA/HQ, Ste 7000
3515 S. General McMullen
San Antonio, TX 78226-9853

Dear Sergeant Zier,

Congratulations on being awarded the AVA Awards Gold Award for your involvement with the Air Force Sergeants Association video production in 2011. Your video work and expertise during the staging and shooting of this production was critical to showcasing senior leader perspectives and the importance of innovation in today's Air Force.

The AVA Awards is an international compitition that recognizes products for outstanding work and judged by professionals in the field of video and communication. The Gold Award is one of the highest award given, scoring products based on quality of video, communication and overall excellence.

High-caliber performance is exactly what we need every day to ensure mission success. Thank you for representing the Air Force Public Affairs Agency so very well. Congrats again!

Sincerely,

CHRISTOPHER P. KARNS, Lt Col, USAF
Commander

Defense Exhibit AAAAA for ID
Page Offered 146
Page Admitted 146

*Focused on the Fight*

Page 1 of 1

# 81st TRAINING WING



*Awards this*

# CERTIFICATE

*to*

## Amn Jeremy M. Zier

*for*

*OUTSTANDING LEADERSHIP AND DEDICATION TO DET 4, 335 TRS*

DONALD E ENGLISH Jr, 1Lt, USAF
Commander, Det 4, 335 TRS

MICHELLE L. GAINES SSgt, USAF
MTL, Det 4, 335 TRS

KEESLER AFB FORM 14, JUL 94    PREVIOUS EDITION(S) ARE OBSOLETE

Page 1 of 1

Defense Exhibit <sup>BBBBB</sup> for ID
Page Offered 146
Page Admitted 146



# CONGRATULATIONS

to

## A1C Jeremy Zier

of the

## 6th COMMUNICATIONS SQUADRON

IT IS WITH GREAT PLEASURE THAT I PRESENT YOU
WITH THIS CERTIFICATE ALONG WITH MY PERSONAL
CONGRATULATIONS FOR YOUR SELECTION AS
SUPPORT FLIGHT PERFORMER OF THE MONTH,
July 1999



ERNEST K. THOMPSON, JR., CMSgt, USAF
Chief, Support Flight

Page 1 of 1

Defense Exhibit CCCCCfor ID
Page Offered 146
Page Admitted 146



# Certificate of Appreciation

Presented To

## JEREMY M. ZIER

In Recognition For Your Outstanding Support At The Airfest '99 In Helping The MacDill Education Council Raise Over $10,000 Toward MacDill Education Programs. Thanks For Making Our Program "Real" To Our People



Commander, 6 ARW



Page 1 of 1

Defense Exhibit DDDDD for ID
Page Offered 146
Page Admitted 146



Certificate of Appreciation

For Outstanding Support to
Partnership in Education
MacDill AFB
1998-1999

To

A1C Jeremy Zier

JAMES N. SOLIGAN, Brig Gen, USAF
Commander, 6th Air Refueling Wing

BRADFORD E. WARD, Col, USAF
Commander, 6th Support Group

Page 1 of 1

Defense Exhibit EEEEE for ID
Page Offered __146__
Page Admitted __146__



# CERTIFICATE OF COMMENDATION

## Is Hereby Awarded To

### SrA Jeremy Zier

## In Recognition Of Outstanding Support
## To The

# UNITED STATES AIR FORCE
# AND
# AIR FORCE SERGEANTS ASSOCIATION

Participating in the reading of the over 2,500 Floridian names off the Vietnam memorial Traveling Wall.  Your patriotism and concern for our veterans, and their family and friends, is forever appreciated.

GIVEN AT MacDill AFB           THIS 30    DAY OF April , 20 00



MARC J. ZUCCOLA
President
Chapter 552

Page 1 of 1

Defense Exhibit FFFFF for ID
Page Offered 146
Page Admitted 146

# UNITED STATES CENTRAL COMMAND



## CERTIFICATE OF APPRECIATION

TO:     SENIOR AIRMAN JEREMY ZIER

FOR: outstanding, exceptional support to Headquarters, United States Central Command during the preparation for and execution of the Commander-in-Chief's Change of Command Ceremony 6 July 2000. Your superb planning, patience, agility, and faultless execution during the event helped ensure its success. Your individual effort was key to the accomplishment of this difficult and many faceted event. The Commander-in-Chief and the men and women of U.S. Central Command appreciate your unwavering support, dedication to duty, and hard work.

GIVEN UNDER MY HAND THIS 20TH DAY OF JULY 2000

_____
Lieutenant General, U.S. Army
Deputy Commander in Chief

United States Central Command
MacDill AFB, Florida

Page 1 of 1

Defense Exhibit <u>GGGGG</u> for ID Page
Offered <u>146</u>
Page Admitted <u>146</u>

# CERTIFICATE OF ACHIEVEMENT

Having demonstrated superior performance

## SrA Jeremy Zier

is the Support Flight's
Performer of the Month
October 2000
MacDill AFB, FL

It is with great pleasure that I present you
with this certificate along with my personal
congratulations for your selection as
Support Flight Performer of the Month

ERNEST K. THOMPSON, JR, CMSgt, USAF
Chief, Support Flight

Support Flight

Performer of the Month

6th COMMUNICATIONS SQUADRON

Page 1 of 1

Defense Exhibit HHHH for ID
Page Offered 146
Page Admitted 146



**Page 1 of 1**

Defense Exhibit IIIII  for ID
Page Offered 146
Page Admitted 146



**Special Olympics**
*Florida*

This certificate is presented to

**SrA Jeremy Zier**

The Special Olympics Florida 2001 Southwest Sectional Basketball Tournament Committee greatly appreciates your enthusiastic volunteerism during this successful event held on MacDill Air Force Base in January 2001.

*Created by the Joseph P. Kennedy, Jr. Foundation*

*Authorized and Accredited by Special Olympics, Inc. for the Benefit of Persons with Mental Retardation*

Page 1 of 1

Defense Exhibit JJJJJ for ID
Page Offered 146
Page Admitted 146



# Certificate of Appreciation

presented to:

*SrA Jeremy Zier*

*For outstanding dedication and service*
*as a volunteer in helping make*
*MacDill AFB a successful part of Super Bowl XXXV.*

24 January 2001
DATE

LEE O. WYATT, Lt. Col, USAF
Commander, 6th Services Squadron

Page 1 of 1

Defense Exhibit<sup>KKKKK</sup> for
ID Page Offered  146
Page Admitted  146





Chip Diehl, Brig Gen, USAF
Commander, 6th Air Mobility Wing
Page 1 of 1

15 FEB 01
Defense Exhibit LLLLL for ID
Page Offered 146
Page Admitted 146



# Certificate

## OF

# Appreciation

Special thanks to SrA Jeremy Zier,
for volunteering time in support of the Muscular
Dystrophy Association "Jail & Bail" fundraiser at the
Double Tree Hotel on 27 March 2001.
The volunteer's efforts helped to raise $74,000.
This money will help send kids to summer camp,
provide wheelchairs to patients and fund MDA clinics
and support groups.



MacDill Family Support Center

$ Sg

MDA Vol unteer Coo rdinat or

Page 1 of 1

Defense Exhibit MMMMM ____ for ID Page
Offered 146
Page Admitted 146



**39th CES Escort Team Deployed**

Gratefully acknowledges

*SSgt Jeremy M. Zier*

for his outstanding contribution to

**39th Wing, Operation Northern Watch, and Operation Enduring Freedom**

*Incirlik Air Base, Turkey*

*SCOTT A. HARTFORD, Maj, USAF*
Commander

Signed this day,
15 May 2002

Page 1 of 1

Defense Exhibit NNNNN for ID
Page Offered 146
Page Admitted 146



# MORT ELEMENTARY

## AWARD OF EXCELLENCE

### PRESENTED TO

SSgt Jeremy Zier

OUR HERO WITH THE ARMED FORCES FROM
MACDILL AIR FORCE BASE
PRESENTED THIS 6TH DAY OF SEPTEMBER, 2002

Lamar Hammer, Principal

Page 1 of 1

Defense Exhibit OOOOO for ID
Page Offered 146  Page
Admitted 146



# UNITED STATES SPECIAL OPERATIONS COMMAND

*SSgt Jeremy Zier*

IS AWARDED THIS

## CERTIFICATE OF APPRECIATION

Recognizing your superb efforts in support of Headquarters, United States Special Operations Command *Special Operations Forces Week*, 19-22 May, 2003. Your efforts resulted in an outstanding conference for the Command as well as the participants. GREAT JOB!

Charles R. Holland, General, USAF
Commander,
United States Special Operations Command

GIVEN ON THIS *ninth* DAY OF *June 2003*

Page 1 of 1

Defense Exhibit[PPPPP] for ID
Page Offered 146
Page Admitted 146



UNITED STATES SPECIAL OPERATIONS COMMAND

# Certificate of Appreciation

AWARDED TO

## Staff Sergeant
## Jeremy Zier

For the outstanding dedication in support of the United States Special Operations Command's Special Operations Forces Week, 10 - 13 May 2004. Your tireless efforts resulted in a superb conference for the Command as well as the participants. JOB WELL DONE!

GIVEN ON THIS 1ST DAY OF JUNE 2004

BRYAN D. BROWN
General, U.S. Army
Commander

Page 1 of 1

Defense Exhibit QQQQQ for ID
Page Offered 146
Page Admitted 146



## SSgt Jeremy "I Got An Idea" Zier

### For meritorious service to our Nation in support of Combat Operations in Iraq from 25 April 2007 through 1 October 2007

Throughout his tenure as a Joint Task Force - Iraq Effect Cell Combat Videographer, SSgt Jeremy "I Got An Idea" Zier consistently demonstrated his professionalism and unwavering dedication in support of Operation Iraqi Freedom. In-between Capturing Mission Videos, Managing Non-Combatants and Calling Out IEDs, Jeremy always had a Great Idea. These inevitably led to making his life a little easier. Despite these departures, his Combat Camera Skills and Video Stylings directly contributed to the ongoing destruction of the Iraqi insurgency. SSgt Jeremy Zier's outstanding service, loyalty and devotion to duty reflect great credit upon himself, this Command, and the United States of America.

"God must have loved the common man, He made so many of them, but it is uncommon men and women, uncommon men and women who, when nations get in danger, as they invariably do, must come fore and lead."
    - Abraham Lincoln

JTF-I 714 Effects Cell Chief

*Legacy, not Glory*

Page 1 of 1

Defense Exhibit RRRRR for ID
Page Offered  146
Page Admitted  146



# AIR MOBILITY COMMAND

## OFFICE OF THE INSPECTOR GENERAL

### CERTIFICATE OF RECOGNITION

Awarded To

**Technical Sergeant Jeremy M. Zier**
**1st Combat Camera Squadron**
**Charleston Air Force Base, South Carolina**

For Outstanding Performance During The
AMC Operational Readiness Inspection

Conferred This   10th   Day of   August   In the Year of 2008

DONALD LUSTYG
Brigadier General, USAF
Inspector General

ARTHUR J. LICHTE
General, USAF
Commander

Page 1 of 1

Defense Exhibit SSSSS for ID
Page Offered  146
Page Admitted  146



# CERTIFICATE OF APPRECIATION

*Presented to*

**TSgt Jeremy Zier**

*In recognition of your outstanding support to*

## COMBINED ENDEAVOR

*4 – 17 September 2009*

DAVID A. COTTON
Brigadier General, USAF
Director, Command, Control, Communications and Warfighting Integration
USEUCOM J6

RICHARD A. DOLLESIN
Lieutenant Colonel, USAF
Exercise Director, COMBINED ENDEAVOR 2009

Page 1 of 1

Defense Exhibit TTTTT for ID
Page Offered 146
Page Admitted 146



# DEPARTMENT OF THE AIR FORCE

### ON BEHALF OF THE SECRETARY OF THE AIR FORCE THE

# AIR FORCE COMBAT ACTION MEDAL

**IS PRESENTED
TO
TECHNICAL SERGEANT JEREMY M. ZIER**

**THE UNITED STATES AIR FORCE
FOR**

ACTIVE PARTICIPATION IN COMBAT, HAVING BEEN UNDER DIRECT AND HOSTILE FIRE OR

PHYSICALLY ENGAGING HOSTILE FORCES WITH DIRECT AND LETHAL FIRE, IN

CONNECTION WITH MILITARY OPERATIONS ON
**21 JULY 2009**

**WHILE SERVING WITH
OPERATION IRAQI FREEDOM**

GIVEN UNDER MY HAND ON THIS
**23RD DAY OF OCTOBER 2009**



**GILMARY M. HOSTAGE III**
Lieutenant General, USAF
Commander, USAFCENT

Page 1 of 1

Defense Exhibit UUUUU for ID
Page Offered [146]
Page Admitted [146]



# AIREY NCO ACADEMY

## Certificate of Recognition

Presented to

*TSgt Jeremy Zier*

*"MARATHON CLUB"*
*Total miles ran: 29.3*



You are hereby saluted and recognized for your leadership by example. We appreciate your leadership of the Air Force Fit-To-Fight initiative by exceeding the fitness standards established by this institution during Class 10-1. Your discipline, motivation, and pursuit of success demonstrated your commitment to our warrior ethos, and is an example for all Airmen to follow. Thank you for your tremendous display of the Air Force Core Values; Integrity First, Service Before Self and Excellence in All We Do!

15 December 2009

MALCOLM  W. MCVICAR JR., CMSgt, USAF
Commandant

Page 1 of 1

Defense Exhibit<sup>VVVVV</sup> for ID
Page Offered 146
Page Admitted 146



# CERTIFICATE OF APPRECIATION
## EMERALD WARRIOR 2011

To

### TSgt Jeremy Zier

For outstanding support to USSOCOM's premier Irregular Warfare exercise.
Your dedication and expertise greatly contributed to the success of Emerald
Warrior 2011

Colonel Bruce Taylor
EW Exercise Director

Page 1 of 1

Defense Exhibit _WWWWW_ for ID
Page Offered _146_
Page Admitted _146_





# AVA AWARDS

## 2011
## Gold Winner

3rd Combat Camera Squadron
Lackland AFB, Texas
Web Video: Government
AF Sergeants Association Conference



**HONORING EXCELLENCE IN DIGITAL EVOLUTION**

DIGITAL MEDIA VIDEOS SOCIAL MEDIA WEBSITES



Page 1 of 1

Defense Exhibit XXXXX for ID
Page Offered ___146___
Page Admitted ___146___



**AIR FORCE PUBLIC AFFAIRS AGENCY**

*This certificate is presented to*

*Jeremy Zier*

*for promotion to*
*Chief Master Sergeant*

TODD M. B. VICIAN, Col, USAF
Commander

QUINTON T. BURRIS, CMSgt, USAF
Senior Enlisted Leader

Page 1 of 1

Defense Exhibit<sup>YYYYY</sup> for ID
Page Offered __146__
Page Admitted __146__





The
United
States
Air Force

CERTIFIES THAT

*Jeremy Zier*

HAS SUCCESSFULLY COMPLETED THE

AFJROTC 2 Year Program

AND IS HEREWITH AWARDED THIS

Certificate of Training



5 August 1997
DATE

*Frederick R. Moore, Major, USAF (Retired)*
*Aerospace Science Instructor*

AF FORM 1256, NOV 86  Previous editions will be used.

Page 1 of 1

Defense Exhibit ZZZZZ for ID
Page Offered 146
Page Admitted 146

*The*

# Defense Information School

*Awards*

*This*

*Diploma*

*to*

## A1C Jeremy M. Zier

Upon successful completion of the

## Video Production/Documentation Course

at

Fort George G. Meade, Maryland

on this

25th day of June 1998



ATTEST:

REGISTRAR

COURSE:   AFIS-VPD
720 HOURS OF INSTRUCTTION

COMMANDANT

DINFOS is accredited by the Accrediting Commission of the Council on Occupational Education

Defense Exhibit AAAAAA for ID
Page Offered  146
Page Admitted  146

Page 1 of 1



**Avid** | Authorized Education Center

**Jeremy M. Zier**

*has successfully completed*

**Introduction to Media Composer Editing**

Avid Authorized Instructor

9/29/99

Completion Date

Page 1 of 1

Defense Exhibit BBBBBB for ID
Page Offered 146
Page Admitted 146



**Avid** | **Authorized Education Center**

## Jeremy M. Zier

*has successfully completed*

**Introduction to Media Composer Effects**

*Avid Authorized Instructor*

**June 9, 2000**

*Completion Date*

Page 1 of 1

Defense Exhibit CCCCCC for ID
Page Offered 146
Page Admitted 146



**Avid** | **Authorized Education Center**

## Jeremy M. Zier

*has successfully completed*

## Advanced Techniques for Media Composer

June 13, 2000

*Completion Date*

*Avid Authorized Instructor*

Page 1 of 1

DDDDDD
Defense Exhibit _____ for ID
Page Offered 146
Page Admitted 146



MacDill Air Force
Base Honor Guard
Certificate of Training

Awarded to

SrA Jeremy Zier

For Successfully Completing The MacDill AFB
Honor Guard Training Course

Duty, Honor, and Country Above One's Self

GREGORY M. KUZMA, 1Lt, USAF
OIC, 6th AMW Honors & Ceremonies

BARBARA JACOBI, Colonel, USAF
Commander, 6th Support Group

Page 1 of 1

Defense Exhibit EEEEEE for ID
Page Offered 146
Page Admitted 146





# The United States Air Force

## CERTIFIES THAT

### SrA Jeremy Zier

HAS SUCCESSFULLY COMPLETED THE
BLOCK III EQUIPMENT CUSTODIAN TRAINING (2 HOURS)
6TH SUPPLY SQUADRON, MACDILL AIR FORCE BASE, FLORIDA

AND IS HEREWITH AWARDED THIS



*Certificate of Training*

5 Jan 01
DATE

JO ANN BOKENKAMP, GS-7
6TH Supply Training Manager

AF FORM 1256, NOV 86  Previous edition will be used.

Defense Exhibit FFFFFF for ID
Page Offered 146
Page Admitted 146

Page 1 of 1

# The
# Defense Information School
## Awards
## This
## Diploma
## to

### SrA Jeremy M. Zier

Upon successful completion of the

**Electronic Imaging Course**
at
Fort George G. Meade, Maryland
on this

12th day of June 2001



ATTEST:
REGISTRAR

COURSE: AFIS—EIC

COMMANDANT

 DINFOS is accredited by the Accrediting Commission of the Council on Occupational Education

Page 1 of 1

Defense Exhibit _____ GGGGG for ID
Page Offered 146
Page Admitted 146







The
United
States
Air Force

CERTIFIES THAT

SSgt Jeremy M. Zier

HAS SUCCESSFULLY COMPLETED THE
E3ACP3V071, VISUAL INFORMATION CRAFTMEN COURSE – PDS CODE 5E3
Conducted by the 81st Training Group, Keesler AFB, Mississippi
CCAF Credit: 3 Hours

AND IS HEREWITH AWARDED THIS

*Certificate of Training*

14 November 2002
DATE

THOMAS L. FOSSEN, Colonel, USAF
Commander
81st Training Group

AF FORM 1256, NOV 86   Previous edition will be used.

Page 1 of 1

Defense Exhibit ____HHHHHH____ for ID
Page Offered __146__
Page Admitted __146__



Page 1 of 1

Defense Exhibit IIIIII for ID
Page Offered 146
Page Admitted 146



The S.I. Newhouse School of Public Communications

**SYRACUSE UNIVERSITY**

*presents to*

*Jeremy M. Zier*

this certificate for successful completion of the
Military Motion Media Program
August 8, 2005 - May 11, 2006

Commandant, Defense Information School

Dean, S.I. Newhouse School

Page 1 of 1

Defense Exhibit JJJJJJ for ID
Page Offered ___146___
Page Admitted ___146___



**Certificate of Achievement**

Be it known that

Jeremy Zier

has successfully completed 30 hours
of training in the
PATROL RIFLE INSTRUCTOR
course of instruction at

InSights Training Center, Inc.

PRESIDENT

02-04 October, 2006

Page 1 of 1

Defense Exhibit KKKKK for ID
Page Offered 146
Page Admitted 146

# DEPARTMENT OF THE ARMY

# CERTIFICATE OF TRAINING



This is to certify that

## SSGT Jeremy M. Zier

### JSTO

has successfully completed

# Combat Lifesaver Course

## 18-21 March 2007

### 40 HOUR BLOCK OF INSTRUCTION
TCCC BASED

Given at _____ Ft Hood Killeen, TX

Monique Y. Washington
MAJ, QM
Commanding

DA FORM 87, 1 OCT 78

Page 1 of 1

Defense Exhibit LLLLLL for ID
Page Offered 146
Page Admitted 146



**2nd Brigade, 75th Division (Training Support)**

*Certificate of Training*

is presented to

**SSGT ZIER, JEREMY M.**

has successfully completed

40 hours of training on the

M1114 Up-Armored HMMWV

This 1st Day of March 2007
FORT HOOD, TX

**DARIN C. BLANCETT**
LTC, IN
COMMANDING

Page 1 of 1

Defense Exhibit ____ for ID (MMMMMM)
Page Offered 146
Page Admitted 146





# The United States Air Force

CERTIFIES THAT

## STAFF SERGEANT JEREMY M ZIER

HAS SUCCESSFULLY COMPLETED THE
S-V80-B EMERGENCY PARACHUTE TRAINING (R16)
COURSE LENGTH: 1 DAY
22ND TRAINING SQUADRON, FAIRCHILD AIR FORCE BASE, WASHINGTON
AND IS HEREWITH AWARDED THIS

## Certificate of Training

22 January 2008
DATE

ROBERT W. JONES, Lt Col, USAF
Commander

Page 1 of 1

Defense Exhibit _NNNNNN_ for ID
Page Offered _146_
Page Admitted _146_



# On Behalf of a Grateful Nation
### and in support of the
### Global War On Terrorism

# This Certifies

that

## JEREMY ZIER

completed

# Combat Skills Training

at

## Fort Hood, Texas

from

## 22 Feb 07 to 22 Mar 07

MARK B. McLELLAND, Col, USAFR
Commander, Second Expeditionary Mission Support Group

THERON A. FLORENCE CMSgt, USAF
Superintendent, Second Expeditionary Mission Support Group

Defense Exhibit OOOOOO for ID
Page Offered 146
Page Admitted 146

Page 1 of 1



# The United States Air Force

## CERTIFIES THAT

### TECHNICAL SERGEANT JEREMY M ZIER

### HAS SUCCESSFULLY COMPLETED THE

S-V80-A COMBAT SURVIVAL TRAINING COURSE (ERR)
COURSE LENGTH-17 DAYS
22ND TRAINING SQUADRON, FAIRCHILD AIR FORCE BASE, WASHINGTON

### AND IS HEREWITH AWARDED THIS



## Certificate of Training

February 8, 2008
DATE

Robert W. Jones, Lt. Col, USAF
Commander

Page 1 of 1

Defense Exhibit<sup>PPPPPP</sup> for ID — Defense Exhibit[PPPPPP] for ID
Page Offered __146__
Page Admitted __146__







# The United States Air Force

CERTIFIES THAT

## TSGT JEREMY M. ZIER

HAS SUCCESSFULLY COMPLETED THE

WATER SURVIVAL TRAINING COURSE S-V86-A, CLASS 08-17, PDS CODE —V-8D, COURSE LENGTH THREE DAYS, 12-14 FEB 08, DET 2, 66TH TRAINING SQUADRON, NAVAL AIR STATION, PENSACOLA, FLORIDA

AND IS HEREWITH AWARDED THIS

*Certificate of Training*

14 February 2008
DATE

SCOTT B. SHEPARD, Maj, USAF
Commander

AF FORM 1256, NOV 86 Previous edition will be used.



Defense Exhibit QQQQQQ for ID
Page Offered 146
Page Admitted 146

Page 1 of `



Intellectual and Leadership Center of the Air Force - Producing Air, Space & Cyberspace Power leaders one student at a time.

AIR UNIVERSITY

*Communicating at the Speed of Trust*



# DEPARTMENT OF THE AIR FORCE
## Air University

THIS IS TO CERTIFY THAT

*TSgt Jeremy Zier*

has successfully completed the

MPACE101

USAF Public Affairs/Multimedia

Leadership Course

21 March 2008

**ROBERT A. POTTER, YA-03, DAF**
**Director, USAF Public Affairs Center of Excellence**

Page 1 of 1

Defense Exhibit RRRRRR for ID
Page Offered 146
Page Admitted 146



# DEPARTMENT OF THE ARMY

Mobilization Assistance Team, 479th F.A. Brigade, Division West (TS)

## Certificate of Training

*This is to certify that:*

*TSgt Jeremy Zier*

*Completed 40 hours of instructions and met all requirements for the certification for the (New Edition B) Combat Lifesaver Course. Course was held from: 28 Sep – 1 Oct 2008*

ERIC J. PATER
LTC, FA
Commanding

HENRY L. WILLIAMS
SFC, USA, 68W40
Senior Instructor

Awarded at 479th F.A. Brigade, Division West (TS) Fort Sill, OK

Page 1 of 1

Defense Exhibit ᔆᔆᔆᔆᔆᔆ for ID
Page Offered ___146___
Page Admitted ___146___



On Behalf of a Grateful Nation

and in support of the
Global War On Terrorism

This Certifies

that
TSGT JEREMY ZIER

completed

Combat Skills Training

at
Fort Sill, OK

from
20 Sep 08 - 17 Oct 08

LAWRENCE F. RHOADES, CMSgt, USAF
Superintendent, 802 Training Group (Provisional)

KEVIN P. McGLAUGHLIN, Col, USAF
Commander, 802 Training Group (Provisional)

Page 1 of 1

Defense Exhibit ¯¯¯¯¯¯¯¯ for ID
Page Offered 146
Page Admitted 146



**SOCOM**

*Remote Weapon System (RWS) Training*

is hereby granted to

**Zier, Jeremy M.**

to certify that he/she has completed to satisfaction

**RWS  Operator New Equipment Training
Course (40 HRS) on
14-15 DEC 2008**

CHIEF, ARMT/BIO/CHEM NET
DIVISION

**TANK AUTOMOTIVE
AND ARMAMENTS COMMAND
ROCK ISLAND, IL 61299-7630**

Page 1 of 1

Defense Exhibit UUUUUU for ID
Page Offered 146
Page Admitted 146

# Air University

## Airey Noncommissioned Officer Academy

To all who shall see these presents, greetings

Be it known that

## Technical Sergeant Jeremy M. Zier

successfully completed the

### Noncommissioned Officer Academy

Class: 10-1

05 November 2009 - 17 December 2009
and is hereby awarded this diploma on
this 17th day of December 2009



LIEUTENANT GENERAL, UNITED STATES AIR FORCE
COMMANDER, AIR UNIVERSITY

CHIEF MASTER SERGEANT, UNITED STATES AIR FORCE
COMMANDANT, AIREY NCO ACADEMY

PREVIOUS EDITION WILL BE USED

AU FORM 34, 19930301

Page 1 of 1

Defense Exhibit _____ VVVVV for ID
Page Offered _146_
Page Admitted _146_



The

# Defense Information School

awards this

## Certificate of Training

to

*TSgt Jeremy M. Zier*

upon successful completion of the

## Combat Camera Leadership Course

given at Fort George G. Meade, Maryland on this
14th day of January 2011

Commandant

Registrar

Course: DINFOS-CCLC; DINFOS is accredited by the accrediting Commission of the Council on Occupational Education

Page 1 of `

Defense Exhibit _____ for ID
Page Offered 146
Page Admitted 146

# CERTIFICATE OF COMPLETION

## JEREMY ZIER

has successfully completed the one-week
## LOCATION LIGHTING WORKSHOP
July 03, 2011 through July 09, 2011
with
### MICHAEL HOFSTEIN



Instructor                    Charles Altschul, Executive Director

# MAINE MEDIA
# WORKSHOPS

Defense Exhibit _____ for ID XXXXXX
Page Offered 146
Page Admitted 146

Page 1 of `

# Air Force Public Affairs Management Workshop

## Certificate of Completion

is awarded to

### TSgt Jeremy Zier

**Air Force Public Affairs Agency**

Air Force Public Affairs Management Workshop
September 12-16, 2011

*Secretary of the Air Force Office of Public Affairs*
*1690 AF Pentagon, Washington DC 20330-1690*

Page 1 of 1

Defense Exhibit _YYYYYY_ for ID
Page Offered _146_
Page Admitted _146_



National Press Photographers Association

# MILITARY NEWSVIDEO WORKSHOP

(50 class hours)

*recognition of completion*

## TSgt Jeremy Zier

*"Tell me and I will hear, show me and I will see, involve me and I will understand."*

Stephen Hooker

Sharon Levy

Douglas Legore

Page 1 of 1

Defense Exhibit _ZZZZZZ_ for ID
Page Offered _146_
Page Admitted _146_

# Air University

*upon recommendation of the faculty awards this diploma to*

## TSgt Jeremy M. Zier

*for successfully completing the*

## USAF Senior Noncommissioned Officer Distance Learning Course

17 January 2012

LIEUTENANT GENERAL, UNITED STATES AIR FORCE
COMMANDER AND PRESIDENT, AIR UNIVERSITY



COLONEL, UNITED STATES AIR FORCE
COMMANDANT, BARNES CENTER FOR ENLISTED EDUCATION

Page 1 of 1

Defense Exhibit _____ for ID AAAAAAA
Page Offered _146_
Page Admitted _146_

# National Defense University

## Joint Forces Staff College
### Norfolk, Virginia

*This is to certify that*

### TSgt Jeremy Zier, USAF

*has successfully completed the requirements of the*
*Senior Enlisted Joint Professional Military Education Course*

8 March 2012

Class SEJPME-1203-C

(40 Course Hours)

R. E. Rondeau
Vice Admiral, U.S. Navy
President
National Defense University

Joseph S. Ward, Jr.
Brigadier General, U.S. Air Force
Commandant
Joint Forces Staff College

Page 1 of 1

Defense Exhibit ____BBBBBBB____ for ID
Page Offered __146__
Page Admitted __146__



The

# Defense Information School

awards this

## Certificate of Training

to

*MSgt Jeremy M. Zier*

upon successful completion of the

## Visual Information Management

given at Fort George G. Meade, Maryland on this

15th day of August 2012

_____ Commandant

_____ Registrar

Course: DINFOS-VIM; DINFOS is accredited by the accrediting Commission of the Council on Occupational Education

Page 1 of 1

Defense Exhibit _____ CCCCCC for ID
Page Offered 146
Page Admitted 146



The

# Defense Information School

awards this

## Certificate of Training

to

*SMSgt Jeremy M. Zier*

upon successful completion of the

Joint Contingency Public Affairs Course

given at Fort George G. Meade, Maryland on this 21st day of July 2017

_____ Commandant

_____ Registrar

Course: DINFOS-JCPAC: DINFOS is accredited by the accrediting Commission of the Council on Occupational Education

Page 1 of 1

Defense Exhibit _DDDDDD_ for ID
Page Offered  146
Page Admitted  146



Page 1 of 1

Defense Exhibit _____ for ID
Page Offered _146_
Page Admitted _146_



Page 1 of 1

Defense Exhibit<sup>FFFFFFF</sup> _____ for ID
Page Offered 146
Page Admitted _146_



Page 1 of 1

Defense Exhibit _____ for ID  GGGGGGG
Page Offered 146
Page Admitted 146



With 6th ARW Commander Brig. Gen. James Soligan looking on, Chief Master Sgt. Dan Johnson, 6th ARW senior enlisted adviser, presents Airman 1st Class Jeremy Zier, 6th Communication Squadron with some gifts for being the youngest member of the mess.

Page 1 of 1

Defense Exhibit _HHHHHHHH_ for ID
Page Offered __146__
Page Admitted __146__



**Airman 1st Class Jeremy Zier, 6th Communications Squadron, reads names as Master Sgt. Lori Pullen, 6th Medical Group, helps him keep his place. Volunteers read the names of Florida residents on the Wall.**

4 FLORIDA/METRO   SUNDAY, APRIL 15, 2001 ◆

# Chamber recognizes local service members

The Greater Tampa Chamber of Commerce sponsored a Military Citizen of the Year Awards Banquet on April 5 to honor local members of the military and civilians associated with the military.

Those honored were Ramon Perez; Army Staff Sgt. Armin Ogden; Army Reserve Lt. Col. Edward Dillenschneider; Army Staff Sgt. Tina Trotman-Shaw; Marine Cpl. Sidney Richardson IV; Marine Reserve Cpl. Khadijah Nashagh (Nash); Marine Staff Sgt. Matthew Ortensie; Henry Martin; Navy Reserve Lt. Robert Jackson Jr.; Navy Petty Officer Luis Moreno Jr.; Coast Guard Petty Officer Ramon Moore; Coast Guard Reserve Port Security-man John Twining II; Coast Guard Petty Officer Daryl Barnes; Air Force Senior Airman Jeremy Zier; Air Force Reserve Maj. Richard Hartman; Air Force Senior Airman Alisa Willet; Cadet Lt. Col. Justin Ward; Cadet Sgt. Phillip Cain; Cadet Lt. Col. Robert Magee; and Cadet Airman Melissa Cotton.

Page 1 of 1

Defense Exhibit IIIIIII for ID
Page Offered 146
Page Admitted 146



Defense Exhibit JJJJJJJ for ID
Page Offered 146
Page Admitted 146



Page 1 of 1

Defense Exhibit _KKKKKKK_ for ID
Page Offered _146_
Page Admitted _146_



Page 1 of 1

Defense Exhibit _LLLLLL_ for ID
Page Offered _146_
Page Admitted _146_



Page 1 of 1

Defense Exhibit _____ for ID
Page Offered __146__
Page Admitted __146__



Page 1 of 1

Defense Exhibit _____ for ID
Page Offered  146
Page Admitted  146



Page 1 of 1

Defense Exhibit _____ for ID
Page Offered __146__
Page Admitted __146__



Page 1 of 1

Defense Exhibit _____ for ID <sup>PPPPPPP</sup>
Page Offered _146_
Page Admitted _146_



AIR FORCE SERGEANTS ASSOCIATION
CERTIFICATE OF COMMENDATION

Is Hereby Awarded To

*SrA Jeremy Zier*

**FOR**

*First Term Airman of the Year*
*Nominee*
*Chapter 552*
*MacDill AFB, Florida*

GIVEN AT *Cocoa Beach, Florida* THIS _19th_ DAY OF _May_ , 20 _01_

*Harry J. Wagner*
*Division Five  President*

Page 1 of 1

Defense Exhibit _____ for ID
Page Offered __146__
Page Admitted __146__



Page 1 of 1

Defense Exhibit _____ for ID RRRRRRR
Page Offered 146
Page Admitted 146



Page 1 of 1

Defense Exhibit<sup>SSSSSSS</sup> for ID
Page Offered 146
Page Admitted 146



Defense Exhibit _____ for ID
Page Offered 146
Page Admitted 146



Page 1 of 1

Defense Exhibit _____ for ID
Page Offered _146_
Page Admitted _146_



Page 1 of 1

Defense Exhibit _____ for ID
Page Offered  146
Page Admitted  146



Page 1 of 1

Defense Exhibit WWWWWWW for ID
Page Offered 146
Page Admitted 146



AIR FORCE PUBLIC AFFAIRS AGENCY HEADQUARTERS

2019 Senior Non Commissioned Officer
Captain Lance P. Sijan leadership Award

Has been presented
to

*SMSgt Jeremy M. Zier*

In recognition of your outstanding leadership and
professionalism both in and out of uniform.

Congratulations on your tremendous achievement

GORDON T. MEISNER, SMSgt, USAF
Senior Enlisted Leader

TODD M. B. VICIAN, Colonel, USAF
Commander

Page 1 of 1

Defense Exhibit _____ for 1D  XXXXXXX
Page Offered 146
Page Admitted 146




Present by CMSAF Cody for outstanding support during his tenure at the Pentagon.




Presented by Gen Schoomaker USSOCOM/CC for outstanding support to him and his staff.




Presented by SGM of the Army Tilley for outstanding support to him during a trip to USSOCOM.




Presented by CMSAF Finch for my nomination as AFSA Regional Amn of the Year representing Air Force bases in the Southeast US.

Page 1 of 11

Defense Exhibit _____ YYYYYYY for ID
Page Offered _146_
Page Admitted _146_

 

Presented by SECDEF Cohen for outstanding support to his visit to MacDill AFB in 1998.

 

Presented by Gen Brown USSOCOM/CC for support to the very first SOCOM International SOF Week.

 

Presented by Lt Gen Klotz AFGSC/CC for support to the very first Global Strike Challenge.

 

Presented by Maj Gen Hopper 21AF/CC for support to him during a visit to MacDill AFB.

**Page 2 of 11**



Presented by 621 CRW/CCC for support to him during a visit to Charleston AFB.



Presented by USSOCOM Parachute team CC for video produced to aid recruitment message at Airshow circuit.



Presented by Brig Gen Trebon JSOC/CD for special support during a conference.



Presented by Gen Holland USSOCOM/CC for producing a touching video in honor of AFSOC Legend Brig Gen Heinie Aderholt.

Page 3 of 11

 

Presented by Col William Anderson AFSOTC/CC for support to Exercise Emerald Warrior 2011.

 

Presented by Brig Gen Thomas SAF/PA Director for exceptional support to him and the entire Air Staff.

 

Presented by Lt Gen USSOCOM/CD for exceptional support to the USSOCOM Command Mission.

 

presented by Lt Gen Dailey, 1st USSOCOM CSO/CC for exceptional support to the establishment of the specialized war-fighting organization.

**Page 4 of 11**

 

Presented by Lt Gen Bailey 21 AF/CC for volunteering to support a briefing at a local school.

 

Presented by Army ROTC Commanding General for volunteer support to the National JROTC Drill team championships in Daytona Beach, FL.

 

Presented by American Forces Europe (AFN) CC for Senior Enlisted Service Member for the Year 2014 (Joint Award).

 

Presented by Maj Gen Parker, Center for Special Ops/CC for continued support to command Info Ops Mission.

Page 5 of 11




Presented by CMSgt Martens USSOCOM/CCC in support of resiliency programs that benefit wounded warriors.




Presented by Brig Gen Soligan 6ARW/CCC for dedicated support to the Wing mission.




Presented by AMC/A6 Director for winning AMC Level Comm Excellence Award.




Presented by Brig Gen Cook SAF/PA Director for dedicated support to SECAF/CSAF transition.

Page 6 of 11



Presented by Vice Admiral Olson USSOCOM/CD for support to Int'l Special Operations Week.



Presented by American Forces Network Europe/CC for my team winning Station of the Year for all of Europe.



Presented by Air Aramant Center/CCC for dedicated support to the unit's mission.



Presented by Commander Chaby Seal Team 10 commander for direct support to combat operations in Anbar Province, Iraq.

Page 7 of 11



Presented by Brig Gen Diehl, 6AMW/CC, for Tampa Chamber of Commerce Military Citizen of the Year.



Presented by AMC IG Director as for being selected as Superior Performer during ORI.



Presented by 621 CRW/CC for support to command during an exercise.



Presented by CMSgt Cormier, PA Career Field Manager, for critical support to a week long workshop.

Page 8 of 11

 

Presented by a CMSgt for MAJCOM Comptroller team for providing specialized PA Support.

 

Presented by Lt Col Aaron Bergstein, 1 CTCS/CC, for Team leadership during exercise.

 

Presented by 628AMW/CC for support to wing leading up to Wing ORI.

Page 9 of 11

 

Presented by 6ARW/CC for being youngest in the Mess at a Wing dining out.

 

Presented by 3CTCS/CC for leadership in getting newly established unit to Fully Operational Capable.

 

Presented by 86AW/SE for support to Wing Safety Inspection Program.

Page 10 of 11



Jeremy,                                    June 19, 2020

Thank you for your superb leadership
in AFPAA, your critical role with our
Flying program, and your advice and
counsel to me. The Flying Program shadow
box has flown right to the top of my
"prized posessions" list — it's awesome!
Thanks; I appreciate you.

Presented by AFPAA/CC for program leadership and getting the
flying program to Fully Operational Capable.

Page 11 of 11

# APPELLATE EXHIBITS

DEPARTMENT OF THE AIR FORCE
UNITED STATES AIR FORCE TRIAL JUDICIARY

| | |
|---|---|
| United States | ) |
| | ) |
| | ) MOTION FOR APPROPRIATE RELIEF: |
| | ) COMPEL CONFIDENTIAL EXPERT |
| | ) CONSULTANT (FORENSIC |
| v. | ) PSYCHOLOGIST) |
| | ) |
| SMSgt Jeremy M. Zier | ) |
| Air Force Public Affairs Agency (AETC) | ) |
| Joint Base San Antonio – Randolph, TX 78150 | ) 18 May 2020 |

Now comes the Accused, SMSgt Jeremy M. Zier, by and through defense counsel, pursuant to Article 46 of the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial (RCM) 703(d), 905(b)(4), and 906(b)(7), and respectfully requests that this Honorable Court compel the government to appoint a confidential forensic psychologist for the defense.

## Summary

SMSgt Zier is charged with one charge and one specification of dereliction of duty, in violation of Article 92, Uniform Code of Military Justice (UCMJ) and one charge and three specifications of abusive sexual contact in violation of Article 120, UCMJ. All four specifications relate to three separate incidents of alleged indecent conduct between SMSgt Zier and three complainants, EP, CF, and TW. A forensic psychologist is both relevant and necessary in this case in evaluating the effects alcohol has on the memory as it relates to the allegations made by the complainants, described by witnesses, and/or defended by SMSgt Zier. Additionally, a forensic psychologist is relevant and necessary in determining a defense for these allegations as well as putting forward mitigation and rehabilitation evidence if SMSgt Zier is convicted of any specification. The Defense requests this confidential expert consultant (forensic psychologist) be compelled and approved for twelve hours of pretrial consultation, one day of in person trial preparation, presence during the entirety of trial, and two travel days.

## Facts

1. On 24 March 2020, one charge and one specification of dereliction of duty in violation of Article 92, UCMJ and one charge and three specifications of abusive sexual contact in violation of Article 120, UCMJ were preferred on SMSgt Zier.

2. The charged misconduct covers alleged sexual acts that occurred at three separate locations over the span of 4.5 years. The sexual acts were alleged to have occurred between SMSgt Zier and three victims, EP, CF, and TW. In these allegations, SMSgt Zier is accused of touching the buttocks and genitalia of these women during social gatherings and holiday parties.

3. Alcohol was available and consumed during all three alleged acts. Victims EP and CF state that they consumed alcohol during their encounters with SMSgt Zier. Additionally, victim TW states that she consumed alcohol on the night of her alleged encounter with SMSgt Zier; however she claims that she was not intoxicated when the alleged contact occurred. Attachment 1 at 4-6.

4. SMSgt Zier is alleged to have inappropriately touched EP's buttocks during a holiday party. When interviewed by AFOSI agents, however, witnesses state that on the night of the incident, EP was so intoxicated that she was "stumb[ling] while she walked." *Id.* at 4. EP would later state to AFOSI agents that she was embarrassed by the incident and could "not recall the events that occurred throughout the night, due to her level of intoxication." *Id.* AFOSI agents would later note in their report that EP "did not feel comfortable revealing the total amount of alcohol consumed throughout the night." Id. at 6.

5. SMSgt Zier is alleged to have inappropriately touched the genitalia of CF during a social gathering in a hot-tub. CF was interviewed by AFOSI agents and said that on the day of the incident, both she and SMSgt Zier had consumed alcohol. CF further stated that she could not recall how many alcoholic drinks she had consumed. *Id.* at 6. Witnesses at trial are expected to testify that CF was heavily intoxicated during the hot-tub party.

6. In addition to EP and CF, SMSgt Zier is alleged to have been intoxicated at various times throughout the charged misconduct.

7. Accordingly, the Defense believes that alcohol use may have played a major role in his alleged misconduct.

8. Both EP and CF delayed reporting the alleged incidents to law enforcement.

9. On 25 March 2020, both charges were referred to trial.

10. On 24 April 2020, the Defense submitted a request for an expert consultant in forensic psychology to the Government. Attachment 2.

11. On 1 May 2020, Col Jeffrey F. Carter denied the Defense's request. Attachment 3. In the denial, Col Carter stated that he "[found] the request does not adequately demonstrate a reasonable probability that the expert will be of assistance to the defense." *Id.*

12. On 5 May 2020, the Government sent the denial of the forensic psychologist request to the Defense.

## Burden

13. The burden of persuasion in this matter rests with the defense as the moving party. RCM 905(c)(2)(A). The burden of proof is by a preponderance of the evidence. RCM 905(c)(1).

## Law

US v. Zier Military Record of Trial and Appellate Extracts 000312 of 902

14. RCM 703(d) provides for the employment of an expert witness in military courts-martial. Although RCM 703(d) does not specifically address expert consultants, military courts have recognized that RCM 703(d) is generally applicable to expert consultants in the same way it is applicable to expert witnesses. *See United States v. Warner*, 59 M.J. 573, 578 (A.F. Ct. Crim. App. 2003).

15. When the accused applies for the employment of an expert, he must demonstrate the necessity for the services. *United States v. Garries*, 22 M.J. 288 (C.M.A. 1986). In showing this necessity, "the defense [must be] specific enough in defining the issues they [hope] to develop with expert assistance [and must] demonstrate that they [have] sufficiently educated themselves as to such potential issues that might be developed with expert assistance." *United States v. Tornowski*, 29 M.J. 578 (A.F.C.M.R. 1989). Furthermore, "a trial defense counsel who seeks the services of an expert consultant cannot play coy. He must show whatever cards he either thinks he holds or may acquire with such expert assistance." *Id.* In general, the accused has the burden of demonstrating that the testimony or assistance is relevant and necessary. *United States v. Van Horn*, 26 M.J. 434 (1988). Once this showing has been made, the Government must either provide the expert or an adequate substitute.

16. Article 46, UCMJ, provides that Trial Counsel and Defense Counsel shall have equal opportunity to obtain witnesses and other evidence in accordance with appropriate regulations. In *Garries*, the Court of Military Appeals stated, "[a]s a matter of military due process, service members are entitled to . . . expert assistance when necessary for an adequate defense." *Id.* at 290.

17. Courts have applied a three-part analysis to determine whether an accused has established the need for expert assistance, namely: (1) why the expert is needed, (2) what the expert would accomplish for the defense, and (3) why the defense is unable to gather and present the evidence that the expert assistant would be able to develop. *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994); *United States v. Danyi*, 45 M.J. 315 (C.A.A.F. 1996).

## Argument

*A forensic psychologist is relevant and necessary for the Defense's preparation in understanding the effect alcohol had on the memory of the witnesses, their subsequent reporting of their allegations against SMSgt Zier, and the differences that it plays between men and women*

18. SMSgt Zier's charges span over the course of 4.5 years. The evidence provided to defense suggests the government's case will be contingent on the testimony of several victims and witnesses. The victims in several specifications either consumed alcohol or were intoxicated at the time of the alleged incidents. As such, alcohol and its impact on the memory of the complainants and the witnesses will be an issue that is expected to come up at trial.

19. Victim EP stated to OSI that she could not remember details of the incident due to her level of intoxication. The Defense is not adequately trained on the role of alcohol in sexual assault cases. A forensic psychologist will be necessary in assisting the Defense in understanding how alcohol, as a central nervous system depressant, can cause confusion, memory loss, impaired

judgment, behavioral changes, cognitive impairment, and reduced inhibitions on the alleged victims.

20. In regards to memory recall, a forensic psychologist is relevant and necessary in assisting the Defense in understanding how recollection of events is a reconstructive process, how alcohol can cause a person to perceive information inaccurately (also known as alcohol myopia) and, at times, deteriorate their memory of specific events. In regards to reporting, a forensic psychologist can assist the Defense in understanding how alcohol affects women's reports more than men's, as it affects attention and memory consolidation at a lower dose for women than for men. Here, SMSgt Zier is alleged to have been intoxicated at certain times during the charged misconduct.

21. A forensic psychologist will be relevant and necessary for the Defense because they will be able to identify how details for a crime can occur during subsequent interviews following intoxication. Here, all three reports were not made at the time of the alleged misconduct. It is very likely that the complainants' allegations occurred following the consumption of alcoholic beverages and were either made to OSI investigators, witnesses, or trial counsel. A forensic psychologist can assist the Defense in understanding how subsequent interviews of individuals who were intoxicated at the time of an alleged offense can yield new details.

22. A forensic psychologist will be relevant and necessary for the Defense because they will be able to assist the Defense in understanding how and why people regularly underestimate their own alcohol consumption when engaging in heavy drinking. Studies suggest that this underestimation is especially common for women and young adults. Here, according to OSI agents' notes, complainant EP was not comfortable revealing the total number of alcoholic beverages she consumed during the night of the alleged offense. It is important that a forensic psychologist assists the Defense in understanding how the accuracy of alcohol consumption affects details in subsequent allegations and the credibility of the witness.

23. In addition to the above, an expert consultant will be relevant and necessary for the Defense in analyzing the statements given by government witnesses, looking for psychological clues as to the possible motivation behind these statements, and assist the Defense in developing further discovery, trial strategy and witness cross-examination from this. Lastly, expert consultation can assess the named victims; background and history, and what impact this could have on witness credibility or the believability of the charged offenses. This includes inconsistencies, motives to fabricate, perception of events, memory of events, reconstruction of events, and reporting of events. Should SMSgt Zier be convicted of any specification, a forensic psychologist is relevant and necessary to analyze his recidivism and general rehabilitation potential. A forensic psychologist will be able to conduct a psychological evaluation on SMSgt Zier that will address psychological problems that could have led to the alleged misconduct or if any personality disorders are present. These sort of evaluations of SMSgt Zier are necessary for the Defense to present a zealous sentencing case that provides all perspectives to the members.

*The Defense Counsel is unable to gather and present the evidence that a forensic psychologist would be able to develop.*

24.  No member of the defense has the academic background or practical experience, despite experience with these types of cases, to perform the necessary forensic analysis discussed above. The psychological testing instruments required to carry out these duties require many years of education, training, and practical application to ensure accuracy in testing.  Furthermore, these evaluations involve illuminating some of the complex and unique dynamics involved with alcohol based offenses and must be conducted by a practitioner with specialized training and experience in the field.  No member of the defense holds a doctoral degree or certification in forensic psychology or has any experience in psychology sufficient to perform even a clinical interview. Finally, no member of the defense is qualified to educate the factfinder on these matter should testimony be required on this subject.

## **Relief Requested**

25.  Wherefore, SMSgt Zier, by and through counsel, moves this Honorable Court to compel the government to appoint a confidential forensic psychologist for the defense and approve twelve hours of pretrial consultation, one day of in person trial preparation, presence during the entirety of trial, and two travel days.

26.  The Defense does not request an Article 39(a) hearing to present additional evidence and argument on this motion in hopes of maintaining the current trial date.  However, the Defense does request a right to respond to the Government's motion, given that no basis for the denial, absent the brief sentence from the CA's MFR, has been provided at this time.

Respectfully submitted, this the 18th day of May 2020.

*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Defense Counsel

3 Attachments:
1.  AFOSI ROI excerpt, dtd 1 March 2020 (6 pages)
2.  Defense Expert Request for Forensic Psychologist, dtd 24 April 2020 (4 pgs)
3.  Denial of Defense request for Forensic Psychologist, dtd 1 May 2020 (1 pg)

CERTIFICATE OF SERVICE

I hereby certify that I caused the above *Motion for Appropriate Relief: Compel Confidential Expert Consultant (Forensic Psychologist)* to be served on the Military Judge and Trial Counsel via e-mail on 18 May 2020.

*J. Dillon Emmanuel*

JAMESIAN D. EMMANUEL, Capt, USAF
Defense Counsel

# ATTACHMENT 1

US v. Zier Military Record of Trial and Appellate Extracts 000317 of 902



**DEPARTMENT OF THE AIR FORCE**
OFFICE OF SPECIAL INVESTIGATIONS

# Report of Investigation

**REPORT BY:** SA LUKASZ K. MISINIEC    **FILE NO:** 310-C-120AA4-35221193511545

**PERIOD OF REPORT:** 10 Dec 19 – 28 Feb 20    **DATE OF REPORT:** 1 Mar 20

**SUBJECT:** JEREMY M ZIER; Male Born ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Force Public Affair Agency (AETC), Joint Base San Antonio-Randolph, TX

**VICTIMS:** ▮▮▮▮▮▮▮▮ P▮▮▮, Female Born: ▮▮▮▮▮; E-3; SSN: ▮▮▮▮
▮: 1st Combat Camera Squadron (ACC), Joint Base Charleston, SC

C▮▮▮▮▮▮ F▮▮▮▮▮; Female Born: ▮▮▮▮▮; E-5; SSN:
4th Fighter Wing, Seymour Johnson AFB (ACC), NC

T▮▮▮ W▮▮▮▮; Female Born: ▮▮▮▮▮; Civ; SSN: ▮▮▮▮
▮;

| MATTERS INVESTIGATED | | | |
|---|---|---|---|
| INCIDENT | OFFENSE DESCRIPTION | SUBJECT | VICTIM |
| 2M206J3S | ABUSIVE SEXUAL CONTACT ON OR AFTER JUNE 28, 2012 | JEREMY M. ZIER | C▮▮▮ ▮ |
| 2M206JNJ | ABUSIVE SEXUAL CONTACT ON OR AFTER JUNE 28, 2012 | JEREMY M. ZIER | T▮▮ W▮▮▮ |
| 2M206JMJ | ABUSIVE SEXUAL CONTACT ON OR AFTER JUNE 28, 2012 | JEREMY M. ZIER | E▮▮ P▮▮ |

**STATUS:** Referred for Action. Action Authority or designee must report to OSI all dispositions on investigated offenses and specifications. (AFI 71-101, Volume 1).

HIGHT.DARREN.R.11
64601052
Digitally signed by
HIGHT.DARREN.R.1164601052
Date: 2020.09.01 12:35:42 -06'00'

DARREN R. HIGHT, SA, DAFC
Special Agent-in-Charge, OSI Det 404

**DISTRIBUTION:**

AFPAA/CC (Action)(w/ Exhibits)...................................................................... 1
502 SFG/JA (Info)(w/ Exhibits) ....................................................................... 1
File (w/ Exhibits) ........................................................................................... 1

**SPECIAL HANDLING REQUIRED: This document is subject to a claim of privilege under military law. Handle in accordance with AFI 71-101, Volume 1.**



US v. Zier Military Record of Trial and Appellate Extracts 000318 of 902



File No: 310-C-120AA4-35221193511545

## TABLE OF CONTENTS

SUMMARY OF INVESTIGATION
ELEMENTS OF PROOF
INVESTIGATIVE ACTIVITIES                              1-1
EXHIBITS                                             2-1
EVIDENCE                                             3-1
                                                    4-1

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE



ROI Page 2

US v. Zier Military Record of Trial and Appellate Extracts 000319 of 902



File No: 310-C-120AA4-35221193511545



FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE



ROI Page 3



**File No: 310-C-120AA4-35221193511545**

## 1-1. ELEMENTS OF PROOF

| Elements of Proof (Abusive Sexual Contact On Or After June 28, 2012) | Ref Para #: |
|---|---|
| Any person subject to this chapter who commits or causes sexual contact upon or by another person, if to do so would violate subsection (b) (sexual assault) had the sexual contact been a sexual act, is guilty of abusive sexual contact and shall be punished as a court-martial may direct. | 2-1, 2-3, 2-7, 2-22, 2-27, 2-28, 2-37, 2-40, 2-43 |

## 2-1. INVESTIGATIVE ACTIVITIES

2-1. On 10 Dec 19, SA KYLE CARTER and SA JIHAD KANDIL, OSI Det 310, Joint Base Charleston (JB CHS), SC interviewed SSgt IZABELLA WORKMAN, 1st Combat Camera Squadron (CTCS), JB CHS, SC at OSI Det 310, JB CHS. SC, who verbally provided the following:  On 07 Dec 19, WORKMAN went to a holiday party at North Charleston Marriott Hotel, 4770 Goer Dr, North Charleston, SC, organized by 1 CTCS, JB CHS, SC. Prior to attending the squadron holiday party, WORKMAN dropped off a few items with SrA HALEY PHILLIPS, 1 CTCS, JB CHS, SC, who hosted a small gathering at her residence,                    , with her friends, SSgt ▓ ▓▓▓▓▓, (VICTIM ▓▓▓▓▓), 1 CTCS, JB CHS, SC; SrA SEAN CAMPBELL, 1 CTCS, JB CHS, SC; SSgt CLAYTON CUPIT, 1 CTCS, JB CHS, SC; SSgt TAYLOR HARRISON, 1 CTCS, JB CHS, SC; SSgt CHRIS DRZAZGOWSKI, 1 CTCS, JB CHS, SC; TSgt GUSTAVO CASTILLO, 1 CTCS, JB CHS, SC; Civ IAN LEPLA, WORKMAN's boyfriend,                    ; and Civ RYAN BAUMGART,                         VICTIM ▓▓▓▓▓ consumed alcohol while at PHILLIPS' residence; however, WORKMAN did not know how many drinks VICTIM P consumed.  WORKMAN and LEPLA took an Uber the North Charleston Marriott Hotel and sat at VICTIM P▓▓▓▓'s table.  VICTIM ▓▓▓▓▓ consumed more alcohol at the holiday party and became visibly intoxicated to the point that she stumbled while she walked.

SUBJECT followed VICTIM P▓▓▓▓ around throughout the event. At one point, SUBJECT sat next to VICTIM P▓▓▓▓ and WORKMAN overheard a conversation between SUBJECT and VICTIM P▓ about her sexual practices with TSgt DOMINIC P▓        (VICTIM P▓        husband). 628 Logistic Readiness Squadron (LRS), 1 CTCS, JB CHS. SC who was deployed. Later that night, WORKMAN observed SUBJECT's hand on VICTIM P▓▓▓▓ buttocks.  WORKMAN told LEPLA to go and separate VICTIM F        and SUBJECT due to SUBJECT placing his hand on VICTIM F        s buttocks.  LEPLA walked over to VICTIM F        and asked if she would like to "step outside for a smoke", which she did.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ VICTIM P▓

appeared embarrassed by the situation since she did not recall the events that occurred throughout the night, due to her level of intoxication. WORKMAN told VICTIM P▓▓▓▓ she would speak with MSgt KEVIN CARTINO, First Sergeant, 1 CTCS, JB CHS. SC to report SUBJECT's behavior.  VICTIM P▓        expressed she was nervous about WORKMAN speaking to CARTINO since she would be leaving for Officer Training School in January 2020.

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

**ROI Page 4**



**File No: 310-C-120AA4-35221193511545**

WORKMAN also believed SUBJECT may have inappropriately touched SSgt C         FI         l,
(VICTIM F         ), 4th Fighter Wing, Seymour Johnson AFB (SJAFB), NC.



**2-3. VICTIM FERGUSON Interview:** On 11 Dec 19, SA VOTTERO and SA CARTER, OSI Det 310, JB CHS, SC, conducted an interview of VICTIM F         , at OSI Det 310, JB CHS, SC. SA VOTTERO briefed VICTIM F         on the services available to her via the DD Form 2701, along with her right to a Special Victims' Counsel. VICTIM F         verbally provided the following details: She was stationed at Incirlik Air Base (AB), Turkey from May 2014 to August 2015. SUBJECT was her station manager at the Armed Forces Network (AFN). She related an incident which occurred while on a trip to Colossae Thermal Hotel, Pamukkale/Denizli, Turkey, in April 2015; which involved, SUBJECT, MSgt TSUYOSHI SHINZATO, Air Mobility Command Public Affairs, Scott AFB, IL, Civ SCOTT TAYLOR,                                          SSgt KATELYNN MOELLER, AFN Sembach, Germany (DEU) and SSgt AARON WOLFF, 23rd Combat Communications Squadron (CBCS), Travis (TAFB), CA. On the second night of the trip, SUBJECT socialized with VICTIM F         and TAYLOR who was staying in a room with VICTIM F         . SUBJECT began a conversation with VICTIM F         regarding volunteer work bullets associated with the Lesbian Gay Bisexual Transsexual (LGBT) alliance on the installation. From those conversations, he asked VICTIM F         about her sex life with other women, and what it was like to be with them. SUBJECT told her "you just haven't had the right dick yet." VICTIM F         became uncomfortable with the conversation. After a while, VICTIM F         , TAYLOR, and SUBJECT left to meet with MOLLER, WOLFF and SHINZATO who were socializing in the hot tub in the rear of the hotel. In the hot tub, TAYLOR sat to the right of VICTIM F         and SUBJECT sat to the left of her. SHINZATO sat to the left of SUBJECT, MOELLER sat to the left of SHINZATO and WOLLF sat to the left of MOELLER. VICTIM F         provided a sketch of the seating arrangement in the hot tub (Exhibit 1). VICTIM F         and SUBJECT consumed alcohol while in VICTIM FI         room and in the hot tub. VICTIM F         did not recall the amount of alcohol consumed. She recalled that she was cognizant and aware of her surroundings but not account for how intoxicated others may have been.

While in the hot tub, SUBJECT consumed alcohol and sat next to VICTIM F         .





File No: 310-C-120AA4-35221193511545



2-4. VICTIM P[redacted] Interview: On 12 Dec 19, SA VOTTERO and SA KANDIL, OSI Det 310, JB CHS, SC, interviewed VICTIM P[redacted], at OSI Det 310, JB CHS, SC, who verbally provided the following: On 7 Dec 19, she took an Uber to PHILLIPS' residence. While at PHILLIPS' residence, a bottle of Prosecco was served and VICTIM P[redacted] drank one flute-sized glass. (Agent note: VICTIM P[redacted] did not feel comfortable revealing the total amount of alcohol consumed throughout the night.) VICTIM P[redacted] left PHILLIPS' residence and took an Uber to the squadron holiday party where she remembered SUBJECT asked about D. P[redacted]. She added the question was sexual in nature, but did not recall specifics about the conversation. In addition, she did not remember if SUBJECT touched or grabbed her buttocks. VICTIM P[redacted] heard a rumor in her office that SUBJECT also made Lt NATASHA MOSQUERA, I CTCS, JB CHS, SC feel uncomfortable at the party and showed up at MOSQUERA's apartment complex where he messaged her and asked her to come downstairs to see him. (Agent Note: VICTIM P[redacted] did not provide any additional details about the allegation and subsequently elected not to participate in the investigation).

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE



ROI Page 6

US v. Zier Military Record of Trial and Appellate Extracts 000323 of 902

# ATTACHMENT 2

US v. Zier Military Record of Trial and Appellate Extracts 000324 of 902



**DEPARTMENT OF THE AIR FORCE**
AREA DEFENSE COUNSEL (AFLOA)
WHITEMAN AIR FORCE BASE, MISSOURI

24 April 2020

MEMORANDUM FOR  ALL REVIEWING AUTHORITIES

FROM:  AFLOA/ADC (Capt Jamesian D. Emmanuel)

SUBJECT:  Defense Request for Expert Consultant in Forensic Psychology –
         *United States v. SMSgt Jeremy M. Zier*

1. Pursuant to Article 46, Uniform Code of Military Justice (UCMJ), and Rules for Courts-Martial (RCM) 703(d), the defense respectfully requests you appoint an expert consultant in the field of forensic psychology to assist the defense in its preparation for *United States v. SMSgt Jeremy M. Zier*.  The defense requests the consultant be appointed as a representative of the defense so that any communications between the expert, SMSgt Zier, and/or the Defense Counsel will be privileged with the attorney-client privileged outlined in Military Rule of Evidence (MRE) 502.  This is not a request for an expert testifying witness, although information discovered by the expert consultant may result in the defense later requesting that the expert consultant become a testifying witness at trial.

2. *Request for forensic psychologist.*  The Defense requests the appointment of a forensic psychologist as its confidential expert consultant in forensic psychology.  Specifically, the Defense requests a forensic psychologist with significant experience and expertise in criminal cases such as this one, including experience both in forensic psychology and clinical psychology, specialized experience in working with Veterans, and one who has been contracted by the USAF on several occasions to serve as a forensic expert for either the Government and/or Defense.

3. *Law.*  RCM 703(d) provides for the employment of an expert witness I military courts-martial.  Although RCM 703(d) does not specifically address expert consultants, military courts have recognized that RCM 703(d) is generally applicable to expert consultants in the same way it is applicable to expert witnesses.  *See United States v. Warner,* 59 MJ 573, 578 (A.F. Ct. Crim. App. 2003)

   a. When the accused applies for the employment of an expert, he must demonstrate the necessity for the services.  *United States v. Garries,* 22 MJ 288 (CMA 1986).  In showing this necessity, "the defense [must be] specific enough in defining the issues they [hope] to develop with expert assistance [and must] demonstrate that they [have] sufficiently educated themselves as to such potential issues that might be developed with expert assistance."  *United States v. Tornowski,* 29 MJ 578 (A.F.C.M.R. 1989).  Furthermore, "a trial defense counsel who seeks the services of an expert consultant cannot play coy.  He must show whatever cards he either thinks he holds or may acquire with such expert assistance."  *Id.*  In general, the accused has the burden of demonstrating that the testimony or assistance is relevant and necessary.  *United States v. Van Horn,* 26 MJ 434 (1988).  Once this showing has been made, the Government must either provide the expert or an adequate substitute.

Page 1 of 4

b. Article 46, UCMJ, provides that trial counsel and defense counsel shall have equal opportunity to obtain witnesses and other evidence in accordance with appropriate regulations. In *Garries*, the Court of Military Appeals stated, "[a]s a matter of military due process, service members are entitled to . . . expert assistance when necessary for an adequate defense." *Id.* at 290.

c. Courts have applied a three-part analysis to determine whether an accused has established the need for expert assistance, namely: (1) why the expert is needed, (2) what the expert would accomplish for the defense, and (3) why the defense is unable to gather and present the evidence that the expert assistant would be able to develop. *United States v. Gonzalez*, 39 M.J. 459, 461 (CMA 1994); *United States v. Danyi*, 45 MJ 315 (CAAF 1996).

4. *Justification for expert consultant in forensic psychology.* SMSgt Zier is charged with multiple offenses including one charge and one specification of dereliction of duty, in violation of Article 92, Uniform Code of Military Justice (UCMJ) and one charge and three specifications of abusive sexual contact in violation of Article 120, UCMJ. All four specifications relate to three separate incidents of alleged indecent conduct between SMSgt Zier and three complainants, EP, CF, and TW. These separate incidents occurred over the course of five (5) years with the earliest conduct occurring in April 2015. Additionally, alcohol consumption was a prevalent factor in all three incidents and in multiple incidents, evidence suggests that SMSgt Zier, witnesses, and/or the complainants were intoxicated at the time of the alleged offenses. The evidence used to support these allegations in the Report of Investigation, include statements made between various witnesses and SMSgt Zier and complainants' statements. Currently, there does not appear to be any physical evidence that directly substantiates the complainants' allegations.

A forensic psychologist is both relevant and necessary in determining a defense for these allegations as well as putting forward mitigation and rehabilitation evidence if SMSgt Zier is convicted of any specification. The defense needs expert assistance related to the following issues: (1) the mental state of SMSgt Zier during and after the alleged offenses to determine whether any defense exists for lack of mental responsibility to commit any of these crimes and/or his competency to stand trial; (2) evaluate the effects of alcohol on the memory as it relates to the allegations made by the complainants, described by witnesses, or defended by SMSgt Zier; and (3) assist in identifying extenuation and mitigation for purposes of a potential sentencing case. A more thorough justification for an expert consultant in forensic psychology is included below.

As SMSgt Zier's alleged conduct occurred over the past five years, the government's case will be contingent on the testimony of several complainants who had either consumed alcohol or were intoxicated at the time of the alleged incidents. As such, alcohol and its impact on the memory of the complainants and the witnesses will be an issue that is expected to come up at trial. As the Defense is not adequately trained on the role of alcohol in sexual assault cases, a forensic psychologist will be vital to describe how alcohol, as a central nervous system depressant, can cause confusion, memory loss, impaired judgment, behavioral changes, cognitive impairment, and reduced inhibitions. In regards to memory recall, a forensic psychologist can assist the Defense in understanding how recollection of events is a reconstructive process, how

US v. Zier Military Record of Trial and Appellate Extracts 000326 of 902

alcohol can cause a person to perceive information inaccurately (also known as alcohol myopia) and, at times, deteriorate their memory of specific events. In regards to reporting, a forensic psychologist can assist the Defense in understanding how alcohol affects women's reports more than men's, as it affects attention and memory consolidation at a lower dose for women than for men. This will be especially important for the Defense as SMSgt Zier is alleged to have been intoxicated at certain times during the charged misconduct.

Additionally, as the crimes were not immediately reported, a forensic psychologist will be useful for the Defense because they will be able to identify how details for a crime can occur during subsequent interviews following intoxication. Here, all three reports were not made at the time of the alleged misconduct. Although one complainant states that she reported an incident to the Sexual Assault Response Coordinator's office at Incirlik, Turkey, no such report has been found. As such, it is very likely that the complainants' allegations occurred following the consumption of alcoholic beverages and were either made to OSI investigators, witnesses, or trial counsel. A forensic psychologist can assist the Defense in understanding how subsequent interviews of individuals who were intoxicated at the time of an alleged offense can yield new details.

A forensic psychologist can also assist the Defense in understanding how and why people regularly underestimate their own alcohol consumption when engaging in heavy drinking. Studies suggest that this underestimation is especially common for women and young adults. Here, according to OSI agents' notes, complainant EP was not comfortable revealing the total number of alcoholic beverages she consumed during the night of the alleged offense. It is important that a forensic psychologist assists the Defense in understanding how the accuracy of alcohol consumption affects details in subsequent allegations and the credibility of the witness.

In addition to the above, an expert consultant can assist the Defense in analyzing the statements given by government witnesses, looking for psychological clues as to the possible motivation behind these statements, and assist defense counsel in developing further discovery, trial strategy and witness cross-examination from this. Lastly, expert consultation can assess the named victims; background and history, and what impact this could have on witness credibility or the believability of the charged offenses. This includes inconsistencies, motives to fabricate, perception of events, memory of events, reconstruction of events, and reporting of events. Should SMSgt Zier be convicted of any specification, a forensic psychologist is relevant and necessary to analyze his recidivism and general rehabilitation potential. A forensic psychologist will be able to conduct a psychological evaluation on SMSgt Zier that will address psychological problems that could have led to the alleged misconduct or if any personality disorders are present. These sort of evaluations of SMSgt Zier are necessary for the Defense to present a zealous sentencing case that provides all perspectives to the members.

5. *Anticipated duties of expert consultant.* The defense anticipates a forensic psychologist will perform several roles, including, but not limited to: reviewing investigative reports, video recorded interviews, statements, and other case discovery to identify and assist with memory recollection and alcohol related impairment aspects of witnesses and complainants for of the defense; conducting a series of in-depth clinical interviews of SMSgt Zier and available

witnesses and complainants; and evaluate how alcohol related consumption on the complainants impacted their actions during the alleged offenses and recollection during subsequent reporting.

6. *Why Defense Counsel cannot perform the duties requested of a forensic psychologist.* No member of the defense has the academic background or practical experience, despite experience with these types of cases, to perform the necessary forensic analysis discussed above. The psychological testing instruments required to carry out these duties require many years of education, training, and practical application to ensure accuracy in testing. Furthermore, these evaluations involve illuminating some of the complex and unique dynamics involved with alcohol based offenses and must be conducted by a practitioner with specialized training and experience in the field. No member of the defense holds a doctoral degree or certification in forensic psychology or has any experience in psychology sufficient to perform even a clinical interview. Finally, no member of the defense is qualified to educate the factfinder on these matter should testimony be required on this subject.

7. For the abovementioned reasons, the Defense request a forensic psychologist be appointed as the Defense's confidential expert consultant in forensic psychology. We specifically request that this expert be appointed as a representative of the defense so that any communications between him, and/or the Defense Counsel will be privileged within the attorney-client privilege outlined in MRE 502. At this time, we are not requesting that this expert be appointed as an expert witness. However, in the event that the defense needs the expert to serve an as expert witness, we will submit a follow-on request to the government as soon as practicable.

8. Based on the anticipated duties, the defense is requesting a forensic psychologist be approved for **twelve hours of pre-trial consultation with defense; one day in person consultation with the defense prior to the first day of trial; presence for the duration of the anticipated trial; and two days of travel to and from Randolph AFB.**

9. If you have any questions, please contact my office at DSN           during duty hours, or
           . Thank you for your time and consideration.


*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel

US v. Zier Military Record of Trial and Appellate Extracts 000328 of 902

# ATTACHMENT 3

US v. Zier Military Record of Trial and Appellate Extracts 000329 of 902




**DEPARTMENT OF THE AIR FORCE**
**502D AIR BASE WING**
**JOINT BASE SAN ANTONIO**

1 May 2020

MEMORANDUM FOR  502 SFG/JA

FROM:  502 SFG/CC

SUBJECT:  Request for Defense Expert Consultant in Forensic Psychology –
*U.S. v. SMSgt Jeremy M. Zier*

I hereby deny the defense request for the appointment of a confidential expert consultant in the field of forensic psychology in the abovementioned case.  I find the request does not adequately demonstrate a reasonable probability that the expert will be of assistance to the defense.  The defense may submit additional matters for my consideration.

JEFFREY F. CARTER, Colonel, USAF
Commander

US v. Zier Military Record of Trial and Appellate Extracts 000330 of 902

## DEPARTMENT OF THE AIR FORCE
## UNITED STATES AIR FORCE TRIAL JUDICIARY

| | |
|---|---|
| **UNITED STATES** | **GOVERNMENT RESPONSE TO DEFENSE MOTION FOR APPROPRIATE RELIEF: COMPEL CONFIDENTIAL EXPERT CONSULTANT (FORENSIC PSYCHOLOGY)** |
| **v.** | |
| **SMSGT JEREMY M. ZIER AIR FORCE PUBLIC AFFAIRS AGENCY (AETC) JBSA-Randolph, Texas** | **22 May 2020** |

### MOTION

The United States, by and through counsel, respectfully requests the Military Judge deny the Defense motion to compel the appointment of a confidential expert consultant in the field of forensic psychology.

### SUMMARY

On 25 March 2020, *U.S. v. SMSgt Jeremy M. Zier* was referred to a Special Court-Martial. The referred charges and specifications consist of: one charge with one specification for violation of Article 92, Uniform Code of Military Justice (UCMJ) and one charge and three specifications for violation of Article 120, UCMJ. Specifically, the Article 92 Charge and one Specification of the Article 120 Charge relate to an incident in April of 2015 where the Accused failed to maintain professional relationships with subordinate Airmen and touched the inner-thigh and genitals of a female Airman. Specifications 2 and 3 of the Article 120 Charge arise out of 2 distinct incidents in December of 2019 in which Accused touched the buttocks of a female Airman and a female civilian. The Government opposes the request because the Defense has failed to demonstrate the specific manner in which the requested expert would assist the Defense or why the denial of such a request would result in a fundamentally unfair trial. Furthermore, the Defense has failed to show why denial of these requests would result in a fundamentally unfair trial.

### FACTS

1. The Government generally agrees with the recitation of facts in the Defense Motion, but offers the following additional facts. The Accused faces charges arising from three distinct incidents that occurred between April of 2015 and December of 2019.

   a. *The April 2015 incident in Pammukale, Republic of Turkey.* In April of 2015, while he was the American Forces Network Station Chief at Incirlik Air Base, the Accused organized a trip to Pamukkale, Republic of Turkey for the members of his Flight. After a day of sightseeing, the Accused joined members of the flight at the hotel's hot tub and repeatedly placed his hand on the upper-thigh of a female Airman, C.F., eventually sliding his hand under her bikini bottoms and grazing her genitals. During the same evening in which the incident involving C.F. took

Appellate Exhibit ____
Marked Page    8

place, the Accused removed his bathing suit and, at one point, exited the hot tub while completely nude. The Accused, C.F., and the Airmen in the hot tub were all consuming alcohol at the time these incidents took place.

b. *The December 2019 incident at the Joint Base Charleston Christmas party.* While attending a unit Christmas party at Joint Base Charleston in December of 2019 the Accused was observed interacting with a female Staff Sergeant, E.P., who multiple witnesses describe as being visibly intoxicated. At the conclusion of the party two witnesses saw the Accused wrap his arm around E.P. and place his hand on her buttocks. SSgt E.P. has no recollection of the touching, but advises that she would not have consented to such contact by the Accused.

c. *The December 2019 incident at the Joint Base San Antonio Christmas party.* While attending a unit Christmas party at Joint Base San Antonio in December of 2019 the Accused touched the buttocks of civilian T.W. while the two were standing in line at the bar. Shortly after arriving at the party T.W. stood in line at the bar and noted that the individual standing behind her brushed her buttocks with his hand. T.W. assumed the contact was inadvertent and stepped forward to create space between her and the individual; following which he stepped forward and again touched her buttocks with his hand.

d. *The investigation.* Following the Joint Base Charleston Christmas party the Air Force Office of Special Investigations (AFOSI) was notified of an alleged instance of Abusive Sexual Contact against SSgt E.P. which resulted in the initiation of a formal investigation. During the course of investigating the allegations involving SSgt E.P., AFOSI investigators were advised to speak with SSgt C.F. who, in turn, disclosed the allegations involving the Accused from the 2015 trip to Pamukkale, Republic of Turkey. As the investigation was ongoing AFOSI became aware of additional allegations arising from the December 2019 Christmas party at Joint Base San Antonio, and obtained statements from civilian T.W. and her sister TSgt C.G.

e. *The evidence.* The evidence against the Accused is comprised entirely of eyewitness testimony regarding the allegations. In the case of the 2015 incident in Pamukkale, Republic of Turkey, all of the individuals who were present in the hot tub describe varying levels of intoxication among all of the parties who were present. In the case of the incident at the Joint Base Charleston Christmas party, while E.P. is described as highly intoxicated and does not recall the contact, the other witnesses' perception of events does not appear to have been impaired by alcohol consumption. Finally, in the case of the conduct occurring at the Joint Base San Antonio Christmas party, T.W. was not impaired by alcohol at the time the acts transpired.

2. The Government offers the following additional facts for the Court's consideration:

a. SSgt C.F.'s recollection of events is supported by contemporaneous reports to outcry witnesses which do not show any material indicia of unreliability or incomplete recollection.

b. While SSgt E.P. is described as highly intoxicated at the time of the charged misconduct, the relevant acts were witnessed by two separate witnesses, neither of whom report appreciable levels of impairment from alcohol at the time they observed the misconduct.

Appellate Exhibit _____
Marked Page _____

c. The Defense has not filed notice of a lack of mental responsibility defense in accordance with the 15 May 2020 deadline contained in the Court's Scheduling Order dated 6 April 2020.

d. The Government has not sought assistance from a forensic psychologist.

## BURDEN

3. The burden of proof and persuasion rests on the Defense for this motion. The standard as to any factual issue necessary to resolve this motion is to a preponderance of the evidence. R.C.M. 905(c)(1).

## LAW

4. "'The accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial.'" *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (quoting *United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008))(internal citations omitted). "A trial is fundamentally unfair where the government's conduct is 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Anderson*, 68 M.J. 378, 383, (C.A.A.F. 2010)(citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973)). To show that an expert would be of assistance "[t]he defense must show (1) why the expert is necessary; (2) what the expert would accomplish for the accused; and (3) why defense counsel is unable to gather and present the evidence that the expert would be able to develop.'" *Lloyd*, 69 M.J. at 99 (citing *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994)).

5. It is not enough for defense to articulate how an expert could assist defense counsel, the defense must also demonstrate *why* defense counsel is unable to educate themselves to attain competence in defending an issue presented in a particular case, using primary and secondary materials that are readily available. *United States v. Short*, 50 M.J. 370, 373 (C.A.A.F. 1999)(citing *United States v. Kelly*, 39 M.J. 235, 238 (C.M.A. 1994). For example, in *United States v. Bresnahan*, 62 M.J. 137, the accused confessed to shaking his three-month-old baby in a manner that eventually caused death after being told that, in order to save the baby's life, the doctors need to know exactly what he had done. 62 M.J. at 140 (C.A.A.F. 2005). At trial, he asked for expert assistance to determine if his confession was unreliable because of the techniques employed by the interviewing detective. *Id.* at 139. C.A.A.F. held that the military judge did not abuse his discretion in denying the defense request for expert assistance because defense counsel never established why they themselves were unable to gather and present the evidence the expert would have developed. *Id.* at 143-44.

6. Similarly, in *Freeman*, the police interrogated the accused for ten hours and he eventually admitted to some wrongdoing. 65 M.J. 451 at 456. Before trial, defense requested a confidential consultant in sociology with a specialty in police interrogation techniques. *Id.* at 457. The request was denied but defense renewed the request at trial, arguing the expert would help reconstruct interrogations and this was necessary for the defense team to determine the likelihood that the accused confessed to a crime he did not commit. Defense argued that defense

Appellate Exhibit _____
Marked Page _____

counsel were unable to gather and present the evidence that the expert assistance would be able to develop, saying:

> [T]he defense team does not possess the academic or practical experience to perform the necessary analysis the expert consultant would be able to perform. Reading the literature on the subject and interviewing the interrogators is not sufficient to ensure that SrA Freeman is able to present a defense in this area. . . . It is absolutely vital that an expert in the field be appointed to assist the defense in knowing which questions to ask and which areas to address during their interviews and cross examination. *Id.* at 458-459.

C.A.A.F. rejected this argument, holding that the appellant failed to establish necessity for assistance. *Id.* at 459. C.A.A.F. concluded that defense counsel was asking for information they could have obtained themselves. C.A.A.F. also held that the defense failed to establish why they were unable to gather the relevant information and cross-examine the investigators on their interrogation techniques and their use of those techniques in eliciting a confession. *Id.*

7. In the specific context of demonstrating the necessity of a consultant in forensic psychology, courts have maintained that defense counsel must demonstrate with specificity how the requested consultant and the various psychological topics raised would create a reasonable probability of assistance to the defense. *United States v. Salas*, 2013 C.C.A. LEXIS 676 (A.F.C.C.A. 2013). In the narrower context of expert consultants regarding the impact of alcohol on memory and cognition, the Army Court of Criminal Appeals has held that defense counsel must put forth evidence demonstrating their efforts to understand, gather, develop, or present evidence in order to support their motion to compel appointment of an expert consultant. *United States v. Leyba*, 2018 CCA LEXIS 394 (A.C.C.A. 2018)(rev denied, *See United States v. Leyba*, 2019 C.A.A.F. LEXIS 4 (2019). (Attachment 1)

8. A trial is fundamentally unfair when the government's conduct is "so outrageous" that due process principals are violated. *United States v. Anderson*, 68 M.J. 378, 382 (C.A.A.F. 2010). Denial of a defense expert that was requested to assist in developing and presenting mitigation evidence at sentencing does not result in a fundamentally unfair trial. *See, United States v. Varniychuck*, 2010 CCA LEXIS 150, page 4 (A.F. Ct. Crim. App. 2010)(Denial of a defense request for a forensic psychologist to assist in preparing mitigation evidence was not an abuse of discretion); *See also*, *U.S. v. Cook*, 61 M.J. 757, 760 (A.F. Ct. Crim. App. 2005)(Defense request for forensic psychologist to assist with extenuation and mitigation evidence and to educate the defense on the issues of recidivism and rehabilitation potential was found to not qualify as necessary and so denial was appropriate).

## ARGUMENT

9. The defense has the burden of proof. In this case, the defense has failed to meet its burden with respect to both the necessity of the requested expert and by failing to demonstrate how the denial of the requested expert would result in a *fundamentally* unfair trial.

### A Forensic Psychologist Is Not Necessary

Appellate Exhibit _____
Marked Page _____

10. **Necessity of the expert.** The defense's request articulates several bases for their position that expert assistance is necessary to assist counsel: 1) in evaluating the impact of alcohol consumption on the memory of witnesses and victims at trial; 2) in the context of SSgt E.P., to assess the impact of alcohol consumption on her memory, judgement, behavior, and inhibition; 3) in understanding alcohol's impact on memory and recollection broadly and how those impacts differ based on gender; 4) in evaluating how alcohol consumption may impact reporting and subsequent recollection of details during interviews; 5) understanding how and why individuals underestimate their own alcohol consumption and its impact on witness credibility; 6) understanding "psychological clues" and potential motivations for witness testimony in order to develop trial strategy; and 7) identifying potential matters in mitigation and extenuation at sentencing. These basis must be evaluated under the relevant factors outlined in *Gonzalez*, specifically: 1) why the expert is necessary; 2) what the expert would accomplish for the accused; and 3) why defense counsel is unable to gather and present the evidence that the expert would be able to develop.

11. **Why the expert is necessary.** The Defense Motion proposes a number of discrete topics which an expert in forensic psychology may provide additional understanding of or render professional opinions regarding; however, it fails to demonstrate the *necessity* of an expert in the current case. For example, the Defense Motion discusses several different bases for exploring what is, broadly speaking, a series of variations on the impact of alcohol on memory. However, the defense has failed to articulate more than a broad statement that alcohol consumption took place at the time of the incidents without elaborating on the basis for any conclusion that this has resulted in a measurable impact on the witnesses' ability to perceive or recall events. Moreover, the Motion fails to describe why defense counsel are unable to identify develop testimony relevant to these issues without the assistance of an expert consultant. For example, in the case of SSgt E.P., who concedes she was intoxicated and does not recall the charged acts, defense counsel are readily able to draw out testimony to that effect and effectively cross-examine SSgt E.P. as to any failings in her memory of the night of the charged acts, including the possibility that she consented to the conduct and does not remember. Absent a showing that there are finite concerns with regard to the ability of witnesses to perceive and accurately recall events which defense counsel cannot effectively cross-examine them on, the broad-brush assertion that merely because alcohol consumption occurred is insufficient to demonstrate the necessity of the expert.

12. **What the expert assistance would accomplish.** Turning to the second *Gonzalez* factor, the defense has failed to demonstrate with any degree of specificity precisely what an expert would accomplish for the defense. Instead, they have offered general areas or topics of interest that the forensic psychologist may explore, but have done so with no promise that the exercise will yield any viable defense strategy or specific result. The Defense Motion highlights issues with memory, perception, "alcohol myopia", and related topics, but has not articulated its specific theory of how these topics are specifically relevant to achieving a particular outcome or objective requiring the requested expert.

13. The mere possibility that an expert may identify something of value from among a broad array of possible topics falls short of demonstrating what discrete value an expert would provide to the Accused's defense. As detailed in *Lloyd*, the defense must demonstrate a *reasonable probability* that the requested expert would be of assistance to the defense. Additionally, in the

Appellate Exhibit _____

Marked Page _____

context of forensic psychology, appeals courts have held that one must have a reasonably articulable basis for the manner in which the requested consultant would assist the defense.

14.  **Why the Defense is unable to gather and present the evidence the expert assistance would be able to develop.**  Regarding the final *Gonzalez* factor, the defense has failed to demonstrate why they are unable to gather and present the evidence the expert consultant is needed to develop.  The Defense Motion asserts that counsel lack academic or practical experience to undertake the "necessary forensic analysis" which require extensive education and training to apply; however, as cited above, there is no specific request for a particularized battery of psychological testing or interpretation of previously administered testing.  The Defense Motion merely asserts that an expert consultant would be available to discuss topics including alcohols impact on memory generally, with the hope of developing a more particularized application of this knowledge at trial.  Barring a more specific assertion of a definite, measurable work product to be provided by the requested expert, at this time the defense's assertion that it cannot gather and present the evidence it hopes to develop is unsubstantiated.

*Denial of a Forensic Psychologist Would Not Result in a Fundamentally Unfair Trial*

15.  While not addressed in the Defense Motion, the Defense must also demonstrate that the denial of the requested expert would result in a fundamentally unfair trial.  Fundamental unfairness is predicated on conduct "so outrageous" that the fundamental elements of due process are violated.  *See Anderson* at 382 (C.A.A.F. 2010).  While the use of an expert consultant in forensic psychology has undoubted utility, the denial of such services in the present context does not result in a fundamentally unfair trial.  The Defense has raised several arguments relating to the possibility that alcohol's impact on memory, reporting of the misconduct, and how its impact is manifested in different genders; however, they have failed to show how any of these specific considerations relate to fundamental principles of due process.  The Government, which bears the burden of proof at trial, has not availed itself of any comparable expert services and must take their witnesses as they find them.  The Defense has not demonstrated an inability to effectively utilize means at their disposal, such as academic journals, and traditional forms of cross-examination to address witnesses' use of alcohol as a means of impeachment.  Moreover, the Defense has not presented any affirmative defenses that rely upon the use of a forensic psychologist to present such a defense to the fact finder.

16. The Defense Motion fails to assert that denial of the requested expert would result in a fundamentally unfair trial and, even if such an assertion were made, the facts and circumstances of the specific case are such that the impact of denial of the expert request is *de minimis*.  The present case does not rely upon interpretation of scientific data relating to levels of impairment at a given blood-alcohol content, such as the ability to operate an automobile, or specific phenomena, such as brown-outs or black-outs resulting from alcohol consumption.  The examination of the impact of alcohol on Government witnesses is no different in this context than are factors regularly addressed by counsel at trial, such as the impact of the passage of time, age, distance from the perceived events, and physical impairments such as vision or hearing problems – all of which are routinely addressed on cross-examination without the assistance of experts.

Appellate Exhibit _____
Marked Page _____

*The Defense Burden*

17. The Defense has failed to meet its burden under both the necessity and fundamental unfairness standards outlined in *Gunkle* and its progeny. As detailed above, in each instance the Defense Motion fails to articulate the necessity of the requested expert consultant in terms of specific, articulable evidence to be gathered and presented in the case at bar. More importantly, the Defense Motion has failed to put forth *any* argument regarding the second-prong of the analysis, requiring that the defense demonstrate that the denial of the expert consultant request would result in "fundamental unfairness." As *Gunkle* and its progeny make clear, it is the defense's burden to demonstrate both prongs of this analysis and the Defense has failed to do so in the present instance.

## MOTION HEARING

18. The Government does *not* require an Article 39(a) hearing and argument on this matter.

## RELIEF REQUESTED

19. WHEREFORE, the Government respectfully requests that this Honorable Court deny defense's motion to compel production of a forensic psychologist.

Respectfully Submitted,

COLEMAN.EDW    Digitally signed by
COLEMAN.EDWARD.SEAN.1
ARD.SEAN.1504    504605899
Date: 2020.05.22 11:08:50
605899    -05'00'

EDWARD S. COLEMAN, Capt, USAF
Assistant Trial Counsel

Attachment:
1. *United States v. Leyba*, 2018 CCA LEXIS 394 (A.C.C.A. 2018)

Appellate Exhibit _____
Marked Page _____

<u>**Certificate of Service**</u>

I hereby certify that I caused to be served a copy of this Government Response to Defense's Motion for Appropriate Relief: Compel Confidential Expert Consultant (Forensic Psychology) on the Military Judge (Colonel Sterling Pendleton) and the Defense Counsel (Mr. Lance Wood and Capt J. Dillon Emmanuel), via e-mail on 22 May 2020.

COLEMAN.EDWA
RD.SEAN.150460
5899

Digitally signed by
COLEMAN.EDWARD.SEAN.15
04605899
Date: 2020.05.22 11:09:17
-05'00'

EDWARD S. COLEMAN, Capt, USAF
Assistant Trial Counsel

8 of 13

Appellate Exhibit _____
Marked Page _____



**User Name:** Edward COLEMAN
**Date and Time:** Tuesday, May 19, 2020 3:12:00 PM CDT
**Job Number:** 117218675

## Document (1)

1. *United States v. Leyba, 2018 CCA LEXIS 394*
   Client/Matter: -None-

Appellate Exhibit _____
Marked Page _____

US v. Zier Military Record of Trial and Appellate Extracts 000339 of 902

## *United States v. Leyba*

United States Army Court of Criminal Appeals

August 13, 2018, Decided

ARMY 20160159

**Reporter**
2018 CCA LEXIS 394 *; 2018 WL 3933637

UNITED STATES, Appellee v. Corporal TERRY J. LEYBA, United States Army, Appellant

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Motion granted by *United States v. Leyba, 78 M.J. 159, 2018 CAAF LEXIS 635 (C.A.A.F., Oct. 9, 2018)*

Motion granted by *United States v. Leyba, 78 M.J. 176, 2018 CAAF LEXIS 669 (C.A.A.F., Oct. 24, 2018)*

Motion granted by *United States v. Leyba, 2018 CAAF LEXIS 811 (C.A.A.F., Dec. 7, 2018)*

Review denied by *United States v. Leyba, 2019 CAAF LEXIS 4 (C.A.A.F., Jan. 3, 2019)*

**Prior History:** [*1] Headquarters, United States Army South, Douglas K. Watkins, Military Judge, Lieutenant Colonel Jim Tripp, Staff Judge Advocate.

**Counsel:** For Appellant: Major Julie L. Borchers, JA; Jeffery C. King, Esquire (on brief); Captain Steven J. Dray, JA; Jeffery C. King, Esquire (on reply brief).

For Appellee: Colonel Tamia M. Martin, JA; Captain Marc B. Sawyer, JA; Captain Meredith M. Picard, JA (on brief).

**Judges:** Before WOLFE, SALUSSOLIA, and ALDYKIEWICZ, Appellate Military Judges.

## Opinion

SUMMARY DISPOSITION

Per Curiam:

A panel of officers and enlisted members sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications of sexual assault in violation of *Article 120*, Uniform Code of Military Justice, *10 U.S.C. § 920 (2012)* [UCMJ].[1] The panel sentenced appellant to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentenced as adjudged.

This case is before us for review pursuant to *Article 66*, UCMJ. Appellant raises two assignments of error, both of which merit discussion, but no relief.

## BACKGROUND

Appellant and Specialist (SPC) MO attended a barbecue while serving in Guantanamo Bay, [*2] Cuba. During the barbecue, SPC MO became extremely intoxicated and was assisted to her barracks room by appellant and two other male soldiers. Upon entering SPC MO's room, they placed her on the bed. The two male soldiers then departed the room, leaving appellant alone with SPC MO. After waiting several minutes for appellant to come out, one of the soldiers began knocking on SPC MO's bedroom door, which was locked. No one answered.

---

[1] Consistent with appellant's plea, the panel found appellant not guilty of two specifications of sexual assault charged in the alternative to the specifications of which appellant was convicted.

Specialist CM, a female soldier residing in the adjoining barracks room, heard noise, woke up and entered the hallway to ascertain what was going on. After speaking to the two soldiers standing outside SPC MO's room, SPC CM started banging on SPC MO's room door. Eventually, SPC MO's room door was opened. Upon entering the room, SPC CM saw SPC MO passed out on her bed and naked from the waist down. SPC CM also noticed appellant hiding behind the door and told the two soldiers to get him out of the room.

Shortly after appellant left SPC MO's room, SPC CM told another female soldier, SPC AL, what had just occurred. Specialist AL approached appellant and asked him what happened. Appellant, who appeared intoxicated, responded that he raped SPC MO and stated "I [*3] just wanted to stick my dick in something." Appellant then ran from the area. His departure resulted in a unit search that eventually located him.

During the subsequent CID investigation, appellant waived his rights and admitted to performing oral sex on SPC MO while she was asleep and engaging in sexual intercourse with her while she was unconscious. SPC MO had no memory of what occurred between her and appellant in her room that night. She stated her last memory of the night was drinking a shot of tequila during the barbecue and then, "everything went black." Specialist MO further testified the next thing she remembered was waking up in the emergency room.

When SPC MO arrived at the emergency room the morning of the assault, she was still extremely intoxicated.[2] Once she was able to consent, Specialist MO underwent a sexual assault forensic examination later that day. The examination revealed several injuries to her vaginal area to include a laceration to the vaginal wall, and bruising to the cervix and labia.

In preparation for trial, appellant's defense counsel requested the convening authority appoint an expert consultant in the fields of psychology and the psychological effects of [*4] alcohol on cognition and behavior. After the request was denied, defense counsel filed a motion to compel the appointment of such an expert. During the motion hearing, defense counsel amended their request to also have the forensic psychologist assist in the area of false confessions. Defense counsel argued an expert consultant in the area of false confessions was now necessary because recently provided DNA evidence "suggested" that appellant's admissions were false.[3] After considering the evidence

presented and the pleadings of the parties, the military judge denied appellant's motion to compel an expert consultant to assist in either area.[4]

## LAW AND DISCUSSION

### Denial of Expert Assistance

On appeal, appellant asserts that he was denied the right to expert assistance in the field of psychology where there was evidence that the victim was blacked out rather than incapacitated and there was scientific evidence involving blood alcohol content.

An accused is entitled to expert assistance when he can show necessity. *United States v. Gunkle, 55 M.J. 26, 31 (C.A.A.F. 2001)* (citing *United States v. Garries, 22 M.J. 288, 291 (C.M.A. 1986)*. The accused has the burden of establishing that a reasonable probability exists that an expert would be of assistance to the defense and that denial of expert assistance [*5] would result in a fundamentally unfair trial. *United States v. Freeman, 65 M.J. 451, 458 (C.A.A.F. 2008)* (citations omitted). There are three aspects to showing necessity: (1) why the expert assistance is needed; (2) what would the expert assistance accomplish for the accused; and (3) why is the defense counsel unable to gather and present the evidence that the expert assistance would be able to develop. *United States v. Gonzalez, 39 M.J. 459, 461 (C.A.A.F. 1994)* (citations omitted).

Courts review a military judge's ruling on a request for expert assistance for an abuse of discretion. *United States v. Lee, 64 M.J. 213, 217 (C.A.A.F. 2006)* (citing *Gunkle, 55 M.J. at 32*). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly

---

[2] Blood drawn approximately five hours after SPC MO took her last drink registered her blood alcohol content at 0.268.

[3] We reject the suggestion. The United States Army Criminal Investigative Laboratory (USACIL) DNA report showed no semen was detected on SPC MO and appellant's DNA was not detected on

SPC MO. While an amount of male DNA was found on SPC MO's pubic mound swabs and underwear swabs, that amount was insufficient for identification purposes. Foreign DNA was found on appellant's underwear and penile corona swabs, but could not be conclusively interpreted. Specialist MO's DNA was found on appellant's mouth and male DNA was detected on SPC MO's shorts, but it could not be conclusively interpreted.

[4] The military judge's written decision denying appellant's motion is contained in the record but not initially apparent to the parties or this court because it was not properly marked as an exhibit. Consequently, this court provided the parties an additional opportunity to amend their pleadings based on the military judge's written decision. Neither party modified its submissions.

erroneous.'" *United States v. Lloyd, 69 M.J. 95, 99 (C.A.A.F. 2010)* (citations omitted).

In this case, the military judge denied appellant's motion to compel an expert consultant, reasoning: (1) the defense did not meets its burden under Rule for Courts-Martial 905(c) because they failed to establish that they were unable to gather and present evidence that the expert assistance would be able to develop in these areas;[5] and (2) the defense failed to show why the denial of an expert consultant would result in an unfair trial.

We hold the military judge did not abuse his discretion in denying appellant's [*6] motion to compel an expert consultant because defense counsel clearly failed to meet the third prong of *Gonzalez* and also failed to show that denial of expert assistance would result in a fundamentally unfair trial. First, defense counsel provided virtually no evidence as to what efforts they made and why they were thus unable to understand, gather, develop, or present evidence in the areas of alcohol induced blackouts or false confessions. Rather, defense counsel attempted to meet their burden through unsupported assertions that they lacked the necessary education and experience to even attempt such a task.[6] Second, defense counsel offered nothing in either their written or oral pleadings that explained why a denial of expert assistance in either area would result in a fundamentally unfair trial. Third, defense counsel's motion for expert *assistance* repeatedly conflated the issues with those relevant to a request for an expert witness, to the point that it is difficult to make sense of the motion.

*Sixth Amendment Right to Effective Assistance of Counsel*

Next, we turn to appellant's second assignment of error, ineffective assistance of counsel. On appeal, appellant asserts he was denied his *Sixth Amendment* right to [*7] effective assistance of counsel when defense counsel failed to investigate the possibility of a false confession, failed to request a false confession expert, and were admonished on the record for lack of preparation. We find appellant has not met his burden.

To support an ineffective assistance of counsel claim, appellant must meet a two-prong test that his defense

counsels' performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); see also United States v. Green, 68 M.J. 360, 361-62 (C.A.A.F. 2010)*. We have the authority to resolve an ineffectiveness claim on the prejudice prong, without resolving the first prong.[7] See *Strickland, 466 U.S. at 697* ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Appellant has not met his burden of establishing prejudice, that being "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, 466 U.S. at 694*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Upon reviewing the record, we are convinced the result at trial would have been the same even if counsel had obtained an expert consultant [*8] in the area of false confessions.

First and foremost, appellant has not asserted to this court that the confession was indeed false, nor has he explained why additional investigation by counsel would have discovered evidence of this claim.

Additionally, appellant admitted on three different occasions that he sexually assaulted SPC MO in her barracks room. There is nothing to support a conclusion that appellant's statements to either a subordinate soldier or the CID agents were involuntary or coerced. Appellant's explanation of the circumstances surrounding his misconduct was also corroborated by credible witness testimony and physical evidence. This included medical proof of physical injuries to SPC MO's vaginal area.

The DNA results neither exonerated nor excluded appellant as a possible perpetrator. Rather the DNA results were inconclusive. Contrary to appellant's argument in support of the need for a false confession expert based on the DNA results, here the inconclusive DNA results were not inconsistent with, nor did they contradict, appellant's multiple admissions.

Lastly, appellant has not demonstrated that during the times of his admissions he was either suffering from a submissive [*9] personality or some other condition that rendered him susceptible to making false incriminatory statements in response to accusations of committing serious criminal

---

[5] The military judge reasoned that because defense failed to establish the third prong of *Gonzalez* it was unnecessary to address the remaining two prongs.

[6] Defense counsel asserted they needed a PhD to properly prepare a defense based on false confessions.

[7] That we skip to the prejudice prong is not a concession that counsels' performance was deficient; we simply need not resolve that question here.

Edward OOLEMAN    Appellate Exhibit _____

Marked Page _____

2018 CCA LEXIS 394, *9

offenses.

**CONCLUSION**

Upon consideration of the entire record, the findings of guilty and the sentence as approved by the convening authority are AFFIRMED.

**End of Document**

<div align="center">

**DEPARTMENT OF THE AIR FORCE**
**IN THE UNITED STATES AIR FORCE TRIAL JUDICIARY**

</div>

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| | ) | RULING ON DEFENSE |
| | ) | MOTION TO COMPEL |
| V. | ) | PRODUCTION OF EXPERT |
| | ) | CONSULTANT: |
| | ) | AIR FORCE RECRUITING SERVICE |
| SMSGT JEREMY M. ZIER | ) | |
| AIR FORCE PUBLIC AFFAIRS AGENCY | ) | 4 June 2020 |
| JOINT BASE SAN ANTONIO-RANDOLPH | ) | |

On 18 May 2020, the Defense filed a motion to compel the production of a government-appointed forensic psychologist as a Defense as expert consultant. On 22 May 2020, the Government submitted a written response petitioning this Court to deny the motion to compel. Neither the Defense, nor the Government requested a hearing on the matter.

After reviewing the written submissions, including all the documentary attachments, this Court finds as follows by at least a preponderance of the evidence:

<div align="center">

ESSENTIAL FINDINGS OF FACT

</div>

1.     On 25 March 2020, Col Jeffrey Carter referred one charge and one specification of Article 92, U.C.M.J, as well as one charge and three specifications or Article 120, U.C.M.J to this special court-martial.

2.     On 24 April 2020, the Defense requested the convening authority appoint an expert consultant in forensic psychology. On 1 May 2020, the convening authority denied the defense request.

3.     By agreement of the parties, this Court adopts as fact paragraphs 1-12 of the Defense motion to compel.[1]

4.     Specification 1 of Charge II allegedly occurred in Pamukkale, Turkey. After business hours on the second night of the TDY, the Accused asked C.F. about her sex life. Additionally, while in the hotel hot tub, the Accused allegedly placed his hand on C.F. multiple times, and ultimately slid his hand under her bathing suit and grazed her gentiles.[2] During both incidents, the Accused and C.F. consumed alcohol. C.F did not recall how much alcohol she consumed, but was cognizant of her surroundings. C.F.'s recall of events is corroborated by witness to whom she told close in time of the alleged touching.

---

[1] In paragraph 1 of the Government response to the Defense motion to compel, the Government states they" generally agree[s] with the recitation of facts in the Defense Motion, but offers…additional facts.
[2] Attachment 1 of the Defense motion to compel is highly redacted, and as such, offers limited facts.

<div align="center">

Page 1 of 5

</div>

Appellate Exhibit
Marked Page   8

5.    Specification 2 of Charge II is alleged to have occurred during a party at Joint Base Charleston. During the party, at least one witness saw the Accused place his hand upon E.P.'s buttocks. During the evening, E.P had consumed alcohol. She became noticeably intoxicated and later did not "recall the events that occurred throughout the night." She did not did not feel comfortable telling OSI how much she had to drink.

6.    Specification 3 of Charge II is alleged to have occurred at a Joint Base San Antonio Christmas party. The Accused is alleged to have touched T.W.'s buttocks while she was standing in line at the bar. T.W. drank alcohol that night, but asserts she was not intoxicated at the time of the touching.

## BURDEN OF PROOF AND PERSUASION

7.    "[T]he burden of proof on any factual issue the resolution of which is necessary to decide a motion shall be by a preponderance of the evidence." R.C.M. 905(c)(1). "[T]he burden of persuasion on any factual issue the resolution of which is necessary to decide a motion shall be on the moving party." R.C.M. 905(c)(2).

## CONCLUSIONS OF LAW

8.    At a court-martial, the parties and the court "shall have equal opportunity to obtain witnesses and other evidence." Article 46, U.C.M.J.

9.    Prior to trial, the Defense must submit a request for employment of an expert to the convening authority supported, in part, by a "statement of reasons why the employment of the expert is necessary." R.C.M. 703(d). If the request is denied by the convening authority, that request may be renewed at trial before the military judge. *Id.*

10.   An accused's entitlement to expert assistance is not limited to actual expert testimony at trial. *United States v. Lee*, 64 M.J. 213, 216 (C.A.A.F. 2006). The entitlement to that expertise is available "before trial to aid in the preparation of his defense upon a demonstration of necessity." *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005); *see also United States v. Kreutzer*, 61 M.J. 293, 305 (C.A.A.F. 2005).

11.   "[S]ervicemembers are entitled to investigative or other expert assistance when necessary for an adequate defense." *United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008); *see also United States v. Garries*, 22 M.J. 288, 291 (C.M.A. 1986), *cert. denied*, 479 U.S. 985 (1986) ("the defense, in an appropriate case, is entitled to the appointment and confidential assistance of expert consultants either provided by or paid for by the Government 'based upon a defense demonstration of the necessity for the services.'").[3] The mere possibility of assistance is not sufficient to prevail on the request. *Bresnahan*, 62 M.J. at 143.

---

[3] Although *Garries* couched the entitlement to expert assistance (when necessary for an adequate defense) as a matter of "military due process," that concept has since been rejected by the Court of Appeals for the Armed Forces (CAAF). *See United States v. Vazquez*, 72 M.J. 13, 19 (C.A.A.F. 2013) (The Air Force Court of Criminal Appeals "mistakenly relied on the concept of 'military due process,' an amorphous concept . . . that appears to suggest that servicemembers enjoy due process protections above and beyond the panoply of rights provided to them by the plain

Page 2 of 5

Appellate Exhibit _____
Marked Page _____

12.    The Government must provide the expert if the accused establishes that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial. *United States v. Hendrix*, 76 M.J. 283, 288 (C.A.A.F. 2017) (citing *United States v. Anderson*, 68 M.J. 378, 383 (C.A.A.F. 2010)); *see also United States v. Gonzalez*, 39 M.J. 459, 460 (C.A.A.F. 1994).

13.    To establish the first prong, the accused "must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop." *Id.* (quoting *Anderson*, 68 M.J. at 383).

14.    As to the second prong, a trial is fundamentally unfair where the government's conduct is "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Anderson*, 68 M.J. at 383 (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973)). *See also United States v. Chargualaf*, 2013 CCA LEXIS 484 (AFCCA 2013)(denial of forensic psychology expert to assist in sentencing not an abuse of discretion as request failed to demonstrate what the expert would accomplish or how denial would result in a fundamentally unfair trial); *United States v. Ramirez*, 2017 CCA LEXIS 494 (NMCCCA 2017)(defense request for expert to advise on likelihood of recidivism failed to demonstrate necessity or that denial would result in a fundamentally unfair trial). *United States v. Varniychuk*, 2010 CCA LEXIS 150 (AFCCA 2010) (denial of a defense request for a forensic psychologist to assist in preparing mitigation evidence was not an abuse of discretion).

15.    "Where the Government has found it necessary to grant itself an expert and present expert forensic analysis often involving novel or complex scientific disciplines, fundamental fairness compels the military judge to be vigilant to ensure that an accused is not disadvantaged by a lack of resources and denied necessary expert assistance in the preparation or presentation of his defense." *United States v. Lee*, 64 M.J. 213, 218 (C.A.A.F. 2006).

16.    But, "defense counsel are expected to educate themselves to attain competence in defending an issue presented in a particular case." *United States v. Kelly*, 39 M.J. 235, 238 (C.M.A. 1994). "Due process requires that the accused be given the 'basic tools' necessary to present a defense, but defense counsel is responsible for doing his or her homework." *United States v. Short*, 50 M.J. 370, 373 (C.A.A.F. 1999); *see also United States v. Ford*, 51 M.J. 445 (C.A.A.F. 1999).

*Analysis*

17.    Addressing prong one of the analysis—whether an expert would be of assistance to the Defense—CAAF has instructed that the Defense must meet three subfactors to satisfy this prong. *See Bresnahan*, 62 M.J. at 143.

18.    *Why is the expert assistance needed?* The first of those subfactors is that the Defense must show why the expert assistance is needed. They have not done so here.

---

text of the Constitution, the UCMJ, and the MCM. They do not.").

Appellate Exhibit \_\_\_\_
Marked Page \_\_\_\_

a.   The Defense asserts a forensic psychologist is "relevant and necessary in assisting the Defense in understanding how recollection of events is a reconstructive process, how alcohol can cause a person to perceive information inaccurately (also known as alcohol myopia) and, at times, deteriorate their memory of specific events." Additionally, the Defense maintains "a forensic psychologist [would] assist the Defense in understanding how subsequent interviews of individuals who were intoxicated at the time of an alleged offense can yield new details." And finally, could help identify "psychological clues" as to possible motivations behind statements of the alleged victims. As highlighted by the Defense, the consumption of alcohol is a common theme throughout most of the charged offenses. But, beyond general assertions of alcohol's effect on memory, the Defense has not shown the Court exactly why a forensic psychologist is needed. Indeed, the general effects of alcohol on memory is a subject matter commonly understood by both practitioners and members. Both counsel and the members are well equipped to make such generalized conclusions without reliance on expert assistance or expert testimony. Without more, Defense counsel have failed to provide sufficient detail to establish a nexus between the facts and circumstances and the need for a forensic psychologist.

b.   Additionally, this is not a case where the Government is calling an expert witness and the Defense is entitled to an expert of similar qualifications to assist the Defense. Instead, the Defense is searching for a possible theory. The Defense acknowledged as much: "a forensic psychologist is relevant and necessary in determining a defense for the allegations." Yet, the Defense neglects to factually demonstrate why expert assistance is specifically needed—not merely desirable. *See United States v. Tornowski*, 29 M.J. 578, 581 (A.F.C.M.R. 1989).

19.   *What would the expert assistance accomplish for the accused?* The second subfactor is that the Defense must articulate what the expert assistance would accomplish for the Accused. As regards this second subfactor, the Defense has met its burden.

a.   In addition to the above assertions, the Defense maintains a forensic psychologist can assist the Defense in understanding how alcohol affects women's reports more than men's, as it affects attention and memory consolidation at a lower dose for women than for men. The Defense also asserts "it is important that a forensic psychologist assists the Defense in understanding how the accuracy of alcohol consumption affects details in subsequent allegations and the credibility of the witness." Finally, the Defense avers "a forensic psychologist will be able to conduct a psychological evaluation on SMSgt Zier that will address psychological problems that could have led to the alleged misconduct or if any personality disorders are present. Although a forensic psychologist could assist in evaluating a person's mental health, there has been no indication so far that mental capacity or mental responsibility is at issue in this case. Nor has the Defense requested a sanity board or provided any notice of a defense involving the lack of mental responsibility. Still, a forensic psychologist could potentially assist the Defense in exploring *alcohol's* effects on memory, and perception, as well as other areas cited.

b.   As discussed above, although the Defense has not provided sufficient evidence or argument indicating how exactly this expert assistance is needed, it has sufficiently articulated areas of possible areas of assistance, and has thus met its burden.

Page 4 of 5

Appellate Exhibit _____
Marked Page _____

20.   *Why is the defense counsel unable to gather and present the evidence that the expert assistance would be able to develop?* The Defense states, "no member of the defense has the academic background or practical experience, despite experience with these types of cases, to perform the necessary forensic analysis..." Defense counsel assert they lack the academic or practical experience to undertake the "necessary forensic analysis" which require extensive education and training to apply. Although the Defense references psychological testing requiring expert assistance, they do not elaborate further. As a result, the Defense has not adequately demonstrated why it is either ill-equipped, or unqualified to discuss and investigate the relevant issues, including alcohol's impact on memory—beyond what is commonly known. *See, e.g., United States v. Kelly,* 39 M.J. 235, 238 (C.M.A. 1994) ("Defense counsel are expected to educate themselves to attain competence in defending an issue presented in a particular case," including consulting "a number of primary and secondary materials.").

21.   To the extent that there may be a more complex theory to be adduced from the evidence, the Defense has not yet met their burden of showing that such expertise is *likely* to uncover such favorable evidence, nor would its absence result in a *fundamentally unfair* trial. *See Anderson,* 68 M.J. at 383.

<u>RULING</u>

The Defense motion to compel the Government to appoint an expert in Forensic Psychology is hereby **DENIED**. The Court, however, will consider any requests for reconsideration supported with additional evidence or argument if timely raised by the Defense. This ruling also remains subject to revision and clarification until authentication of the record and I reserve the right to supplement the ruling as necessary and appropriate.

So ordered on this 4th day of June, 2020.

PENDLETON.STERL    Digitally signed by
ING.C.1259353102    PENDLETON.STERLING.C.125935
                    3102
                    Date: 2020.06.04 08:26:28 -05'00'

STERLING C. PENDLETON, Colonel, USAF
Military Judge

Page 5 of 5

Appellate Exhibit _____
Marked Page _____

# DEPARTMENT OF THE AIR FORCE
## UNITED STATES AIR FORCE TRIAL JUDICIARY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DEFENSE OBJECTION AND |
| v. | ) | MOTION IN LIMINE: |
| | ) | MRE 404 EVIDENCE |
| SMSgt Jeremy M. Zier | ) | |
| Air Force Public Affairs Agency (AETC) | ) | |
| Joint Base San Antonio – Randolph, TX 78150 | ) | |
| | ) | 12 June 2020 |

## MOTION

COMES NOW the Accused, SMSgt Jeremy M. Zier, by and through defense counsel, pursuant to the 5th, 6th, and 14th Amendments to the United States Constitution, Military Rules of Evidence (MRE) 401-403, 404(a), 404(b), 405, 413, 414, and Rules for Courts-Martial (RCM) 905 and 906(b)(13), and objects to items 1-3, and 5 described in the Government's previously submitted MRE 404(b) notice. The Defense does not request an Article 39(a) session to present additional evidence but instead requests this Court to rule prior to the upcoming trial.

## SUMMARY

On 5 May 2020, the Government provided the Defense with a notice of their intent to submit evidence under MRE 404(b). (Attachment 1). This MRE 404(b) notice describes five distinct acts (cited as numbers *1-5* in the notice), which the Government appears to wish to admit at trial. The Defense objects to the admission of Acts 1-3, and 5.

## FACTS

1. On 24 March 2020, one charge with one specification alleging a violation of Article 92, Uniform Code of Military Justice (UCMJ), and one charge and three specifications alleging a violation of Article 120, UCMJ, were referred against SMSgt Zier. (Attachment 2).[1]

2. On 5 May 2020, the Defense received a notice of intent to admit evidence under MRE 404(b) in this case. Specifically, the Government relayed that they intend to introduce (Act 1) statements made between the Accused, CF, and a witness related to "one night stands" while the Accused was allegedly intoxicated, (Act 2) statements made between the Accused and CF related to her involvement in the LGBTQ community and her sexual history while the Accused was allegedly intoxicated, (Act 3) statements made between the Accused and a witness related to walking around a house while nude, (Act 4) the Accused exiting a hot tub while nude, allegedly exposing his buttocks and genitals, and (Act 5) statements made between the Accused and EP related to her sexual life. Acts 1-2 of the uncharged crimes, wrongs, or other acts, the Government states, "the statements are being noticed pursuant to M.R.E. 404(b) as evidence of

---

[1] Attachment 2 is not physically attached and submitted with this motion due to its existence elsewhere in the record. The Defense respectfully requests consideration of the attachment to establish the factual predicate for the motion.

1

Appellate Exhibit IV
Admitted/Rejected Page 8

intent, plan, modus operandi, and absence of mistake on the part of the Accused." Acts 3-5 of the uncharged crimes, wrongs, or other acts, the Government states, "the statements are being noticed pursuant to M.R.E. 404(b) as evidence of intent, plan, and absence of mistake on the part of the Accused."

<div align="center">

**BURDEN of PROOF and PERSUASION**

</div>

3. Pursuant to RCM 905(C), the Defense bears the burden of persuasion for this motion. The burden of proof for any factual issue whose resolution is necessary to decide this motion, is a preponderance of the evidence.

<div align="center">

**LAW**

</div>

4. Prior to arraignment, "the prosecution must disclose to the defense the contents of all statements, oral or written, made by the accused that are relevant to the case, known to the trial counsel, and within the control of the Armed Forces, and all evidence derived from such statements, that the prosecution *intends to offer* against the accused." Mil. R. Evid. 304(d) (emphasis added)

5. Like the notice requirement under Mil. R. Evid. 304(d), the Government must provide reasonable notice under Mil. R. Evid. 404(b)(2) of the general nature and permissible use of evidence concerning crimes, wrongs, or other acts which they intend to offer for purposes other than to prove character. Mil. R. Evid. 404(b).

6. MRE 404(b) states:

> (b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided, that upon request by the accused, the prosecution shall provide reasonable notice in advance of trial, or during trial if the military judge excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

7. MRE 403 states:

> *Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.*

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

8. In *United States v. Reynolds*, 29 M.J. 105, 109 (CMA 1989), the Court of Military Appeals established a three-prong test applicable to consideration of the admissibility of prior acts under MRE 404(b): (1) Does the evidence reasonably support a finding that [the] accused committed

<div align="center">

2

</div>

US v. Zier Military Record of Trial and Appellate Extracts 000350 of 902

prior crimes, wrongs, or acts? (2) What "fact of consequence" is made more or less probable by the existence of this evidence? (3) Is the probative value substantially outweighed by the danger of unfair prejudice? In order for evidence of prior acts to be admissible, all three prongs must be met. *Id.* Whether or not the second prong is met is a question of logical relevance. *See* MRE 401. "If the evidence fails any of the three tests, it is inadmissible." *United States v. Cousins*, 35 M.J. 70, 74 (C.M.A. 1992).

9. "The test for admissibility of uncharged acts is 'whether the evidence of the misconduct is offered for some purpose other than to demonstrate the accused's predisposition to crime and thereby to suggest that the factfinder infer that he is guilty, as charged, because he is predisposed to commit similar offenses.'" *United States v. Thompson*, 63 MJ 228, 230 (C.A.A.F. 2006) (*citing United States v. Castillo*, 29 MJ 145, 150 (C.M.A. 1989); *United States v. Ruppel*, 49 MJ 247, 250 (C.A.A.F. 1998); *United States v. Miller*, 46 MJ 63, 65 (C.A.A.F. 1997)).

10. In *Cousins*, the accused was charged with wrongful use of cocaine based upon a positive urinalysis test. *Cousins*, 35 M.J. at 71. Over defense objection, the trial court judge permitted testimony that the accused used methamphetamines 9 to 11 times prior to the alleged cocaine use. *Id.* In reversing the lower court's decision, the Court of Military Appeals held that "the admission of…the testimony regarding [the accused's] prior drug use was plain error." *Id.* at 75. Even though the court concluded that the first prong of the three prong test was met, it found that "testimony that the [accused] used methamphetamines 9-11 times previously did not make it more or less probable that [dealer] provided [the accused] with cocaine at her house on July 29." *Id.* at 74. The court held that the evidence of the accused's prior drug use was irrelevant, and therefore, it failed the second test." *Id.* Further, the court found that even if it were to find minimal relevance to satisfy the second test, "the third test clearly was not met in this case, because its probative value was substantially outweighed by the danger of unfair prejudice." *Id.* The Court of Military Appeals even noted that a member instruction which stated that the prior drug use could only be used as "background information" did not cure the Mil. R. Evid. 403 prejudicial error. *Id.*

11. In *United States v. McDowell*, 30 MJ 796, 799 (AFCMR 1990), the court set out several additional, clarifying factors to be used when applying the *Reynolds* test:

   a. How persuasively does the evidence of the other act show that the charged act occurred and that the appellant was the perpetrator?

   b. Are the inferences to be drawn from the evidence clear, or are they likely to be misleading and create confusion?

   c. How forcefully does the evidence tend to establish the admissible purpose(s) for which it would be admitted?

   d. Will it have an undue tendency to resolve the disputed issue on the basis of the pertinent character trait?

   e. Will the evidence have an undue tendency to resolve the disputed issue on an improper or

3

Page 3 of 8

primarily emotional basis?

## ARGUMENT

12. The Government's MRE 404(b) notice contains five distinct acts which they seek to admit. All five acts relate to events occurring either throughout the charged timeframe or during times unknown to either party. Though prohibited from seeking to introduce evidence of SMSgt Zier's uncharged acts merely to prove his bad character under Mil. R. Evid. 404(b), the prosecution's notice purports to do just that. It is incumbent upon the prosecution to assert an actual theory of admissibility for this uncharged misconduct. It is not sufficient to provide a laundry list of potential theories that the rule permits. Here, the Government has provided the blanket use as outlined in MRE 404(b), it provides no specifics as to how any of these uses relate to each distinct act. SMSgt Zier is charged with discrete instances of sexual assault and a failure to maintain a professional relationship. None of the noticed conduct indicates an intent, motive or plan to commit the charged misconduct. Accordingly, the noticed conduct should be excluded.

13. In addition to the theory issue identified above, the Defense also argues there is a notice issue as to how each act relates to the charged misconduct and whether it is relevant or not. At the outset, assuming *arguendo* that evidence would reasonably support a finding of fact that Acts 1-3, and 5 occurred, these Acts clearly fail the second and third prongs of the *Reynolds* test, and therefore this evidence is inadmissible under MRE 404(b). These acts are unrelated to the charges and specifications. With the exception of Act (4), no "fact of consequence" is made more or less probable by the existence of evidence stated in Acts 1-3, and 5. Additionally, the probative value of Acts 1-3, and 5, does not substantially outweigh the potential of unfair prejudice.

    a. First, no fact of consequence is made more or less probable by the existence of the evidence cited in Acts 1-3, and 5, except under the forbidden reasoning "he did it before, he did it again." Whether SMSgt Zier had the conversations identified in these Acts while intoxicated is irrelevant. The Government has not cited any specifics behind the purpose for which they believe this evidence is admissible under MRE 404(b). By claiming that this evidence should be used for several reasons cited in the rule, the Government's notice instead reflects that they intend to use this evidence for forbidden propensity purposes. Under the circumstances, Acts 1-3, and 5 of the alleged conduct should not be admitted under MRE 404(b).

    b. Additionally, the probative value of this evidence does not substantially outweigh the potential of unfair prejudice. Under any theory of proffered admissibility under MRE 404(b), there is no probative value, yet there is significant danger of unfair prejudice and confusion of the issues. Any inferences the panel members could draw from the alleged statements made between SMSgt Zier and the complainants and his demeanor/appearance would only serve to mislead the members and create confusion about the alleged misconduct that is on the charge sheet. This evidence appears as though it is being offered as impermissible propensity evidence, which is precisely what MRE 404(b) was written to protect against. Therefore, the evidence should be excluded.

US v. Zier Military Record of Trial and Appellate Extracts 000352 of 902

## RELIEF REQUESTED

14. THEREFORE, the Defense respectfully requests this Honorable Court deny the admission into evidence of the items described within the Government's MRE 404(b) notice. The Defense does not request an Article 39(a) session for further argument on this matter.

*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Defense Counsel

2 Attachments:
1. Government MRE 304(d) and 404(b) Notice, dtd 5 May 20, 2 pgs
2. Charge Sheet, dtd 24 March 20, 3 pgs

## CERTIFICATE OF SERVICE

I certify that on 12 June 2020, I delivered a copy of this Defense Objection and Motion in Limine, MRE 404 Evidence, via e-mail to the Military Judge and Trial Counsel.

*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Defense Counsel

5

US v. Zier Military Record of Trial and Appellate Extracts 000353 of 902

# ATTACHMENT 1

US v. Zier Military Record of Trial and Appellate Extracts 000354 of 902

 

**DEPARTMENT OF THE AIR FORCE**
**502D SECURITY FORCES GROUP**
**JOINT BASE SAN ANTONIO**

5 May 2020

MEMORANDUM FOR DEFENSE COUNSEL (Mr. Lance Wood, Capt J. Dillon Emmanuel)

FROM: TRIAL COUNSEL (Maj John Malek, Capt Ted Coleman)

SUBJECT: Government M.R.E. 304(d) and 404(b) Notices – *U.S. v. SMSgt Jeremy M. Zier*

Pursuant to M.R.E. 304(d) and 404(b), the Government respectfully provides this notice of relevant statements of the Accused, SMSgt Jeremy M. Zier, be they oral or written, each of which to include electronic communications, that are relevant to this case, known to trial counsel and within the control of the Armed Forces; and other crimes, wrongs, or acts of the Accused. The Government further provides notice that all statements, crimes, wrongs, or acts discussed herein may also be introduced by the Government at trial. The Government reserves the right to supplement this notice in accordance with relevant Rules for Courts-Martial and applicable Scheduling Orders.

1. Statements by the Accused to C___ F___ and Sieana Mackiewicz inquiring whether or not they have had "one night stands" and asking them to walk him home while they were at the "smoke pit" at or near the Incirlik Air Base Enlisted Club between on or about May of 2014 and on or about September of 2015. F___ and Mackiewicz will describe the Accused as being highly intoxicated at the time he made these statements. These statements are being noticed pursuant to M.R.E. 404(b) as evidence of intent, plan, modus operandi, and absence of mistake on the part of the Accused.

2. Statements by the Accused to C___ F___ regarding her involvement in the Lesbian, Gay, Bi-Sexual, Transgender, and Questioning (LGBTQ) community, to include inquiring about specific sex acts between females, F___'s sexual history, and statements including "a female just can't satisfy you the way a man can" and "maybe you just haven't had the right dick yet" or words to that effect while they were at or near Pamukkale, Republic of Turkey between on or about 1 April 2015 and on or about 30 April 2015. F___ will describe the Accused as being highly intoxicated at the time he made these statements. These statements are being noticed pursuant to M.R.E. 404(b) as evidence of intent, plan, modus operandi, and absence of mistake on the part of the Accused.

3. Statements by the Accused to Natasha Mosquera on or about 8 December 2019 regarding meeting for brunch and, during the course of the brunch, statements advising that he did not understand how people could leave the blinds open in their homes because one cannot walk around naked, or words to that effect. These statements are being noticed pursuant to M.R.E. 404(b) as evidence of intent, plan, and absence of mistake on the part of the Accused.

4. Evidence that between on or about 1 April 2015 and on or about 30 April 2015, at or near Pamukkale, Republic of Turkey, the Accused briefly exited the hot tub occupied by several Airmen who were subordinate to him, while he was completely nude, such that these Airman were able to view the Accused's buttocks and genitals. These statements are being noticed pursuant to M.R.E.

404(b) as evidence of intent, plan, and absence of mistake on the part of the Accused.

5. Evidence that between on or about 7 December 2019, at or near Charleston, South Carolina the Accused was engaged in a conversation with E    P    regarding her sex life, to include discussing her desire to have sex with her husband when he returned from deployment. These statements are being noticed pursuant to M.R.E. 404(b) as evidence of intent, plan, and absence of mistake on the part of the Accused.

6. This notice is not exclusive and the Government reserves the right to give notice of additional statements crimes, wrongs, or acts of the Accused as they are discovered.

Respectfully,


EDWARD S. COLEMAN, Capt, USAF
Assistant Trial Counsel


## CERTIFICATE OF SERVICE


I hereby certify that I served the defense counsel in the case of *U.S. v. SMSgt Jeremy M. Zier* with a copy of this MRE 304(d) and 404(b) notice, via e-mail, on this 5th day of May 2020.


EDWARD S. COLEMAN, Capt, USAF
Assistant Trial Counsel

US v. Zier Military Record of Trial and Appellate Extracts 000356 of 902

**DEPARTMENT OF THE AIR FORCE**
**UNITED STATES AIR FORCE TRIAL JUDICIARY**

| | |
|---|---|
| UNITED STATES | GOVERNMENT RESPONSE TO DEFENSE MOTION TO EXCLUDE 404(b) EVIDENCE |
| v. | |
| SMSGT JEREMY M. ZIER Air Force Public Affairs Agency (AETC) JBSA-Randolph, Texas | 19 June 2020 |

## MOTION

The United States respectfully requests that this Honorable Court deny the Defense Motion to Exclude M.R.E. 404(b) evidence because M.R.E. 404(b) is a rule of inclusion, the notice was proper, and the evidence to be offered satisfies the legal requirements for admission under M.R.Es 401-403, 404(b), and *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989). The Defense has also not met their burden for exclusion. The Government **does** request a 39(a) session in order to provide witness testimony for this Honorable Court's consideration.

## SUMMARY

The Accused is charged with three specifications of Abusive Sexual Contact against three different women, and with failing to maintain professional relationships with Airmen under his supervision by getting naked with them in a hot tub. For clarity, the Government is using the Defense's naming convention for the noticed 404(b) conduct as Acts 1-5 for the purposes of this motion. The Government gave notice to Defense that these five instances of conduct will be offered to prove the *intent* to "willfully [fail] to maintain professional relationships" with subordinate Airmen in the case of Charge I and the *intent* to touch three different women for his own sexual gratification in the case of Charge II. Attachment 1 to the Defense Motion. The Government also noticed this uncharged conduct to show the *absence of mistake* in touching the three women and engaging in unprofessional relationships as charged, and moreover to show a *plan* to engage in the charged sexual and unprofessional conduct. Finally, the Government noticed Acts 1, 2, and 5 to show that the Accused had a common *modus operandi* in the manner with which he engaged in sexual conversations while intoxicated, and followed those conversations with abusive sexual contacts against the women he spoke to or attempted to flirt with.

## FACTS

1. The Government agrees with the facts as presented in the Defense Motion. Additional to the facts presented in the Defense motion: several of the uncharged acts outlined in Attachment 1 of the Defense Motion occurred with named victims. Acts 1 and 2 consist of words and deeds by the Accused with C.F., the named victim in Charge II, Specification 1.

Appellate Exhibit V
Admitted/Rejected Page 8

Act 5 was words and deeds by the Accused with E.P. the named victim in Charge II, Specification 3.

## BURDEN

2. As the moving party, the Defense bears the burden of persuasion by a preponderance of the evidence for this motion. *See* R.C.M. 905(c)(1) & (c)(2)(A).

## LAW AND ARGUMENT

3. M.R.E. 404(a) states that "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion…." M.R.E. 404(b), however, states that, "This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"

4. The Government must provide notice of the general nature of the evidence it intends to offer for a permissible non-propensity purpose. M.R.E. 404(b)(2)(A).

**The *Reynolds* Test**

5. There are three elements or prongs to determining whether evidence is properly offered under M.R.E. 404(b). *Reynolds*, at 109.

   a.  The first *Reynolds* prong is whether a factfinder could reasonably conclude by a preponderance of the evidence that the uncharged acts occurred. *Id.* The Defense does not appear to dispute this and has not met their burden to contend this prong. However, the Government intends to call witnesses in order to make a formal proffer of the proposed testimony, and will subsequently argue that this threshold for admissibility is met.

   b.  The second *Reynolds* prong is whether any "fact of consequence" is made more or less probable by the proffered evidence. *Id.* Again, the Government wishes to offer testimonial evidence in order to firmly establish this minimum standard of relevance per M.R.E. 401. The Government anticipates evidence that closely matches the noticed statements and conduct which were properly noticed to the Defense on 5 May 2020 (Attachment 1 to the Defense Motion):

   i.  The Accused asked C.F. and another female witness about whether they have had sexual encounters they would consider "one night stands" before asking whether the two women would walk with him to his home. This happened in 2015 while C.F. and Accused were stationed at Incirlik, Turkey together and occurred at most within months of the charged misconduct. The same night as the charged misconduct from 2015, the Accused also discussed C.F.'s sexuality in a crude manner by saying that women could not satisfy her sexually the way a man could and suggested that she needed the "right dick" to show her

US v. Zier Military Record of Trial and Appellate Extracts 000358 of 902

that. On a separate occasion in 2019 but on the same night as the charged misconduct against E.P., the Accused discussed E.P.'s desire to have sex with her husband upon his return from deployment. He went on to touch both of these women on those respective nights and had been consuming alcohol with both women when he did so.

    ii.  The Accused also discussed walking around naked in his home with another witness, and as testimony will elucidate, had in fact walked naked in front of Airmen he supervised years previous. In the case of Act 4, the exhibitionism in front of his subordinates, the Defense has not raised on objection, and while the Government agrees that it may be seen as part of the facts and circumstances of Charge I and is therefore not objectionable as evidence of Charge I, the Government is sponsoring this evidence as proof of intent and absence of mistake in engaging in sexual and unprofessional conduct, as well as evidence of a common plan and *modus operandi* as prefatory conduct to his sexual touching. That is, the Accused had a "common plan," or a "design," or a "system" of testing boundaries to see what the women he is interested in are willing to go along with. *Reynolds*, at 110; *see also United States v. Hyppolite*, 79 M.J. 161 (C.A.A.F. 2019)(in that case, the Court found that evidence of other charged acts was also permissible M.R.E. 404(b) evidence to show that the appellant had a "common plan" to drink with his victims and then commit abusive sexual contacts upon his victims once they were asleep).

    iii.  The Accused's sexualized conduct as noticed in Acts 1-5 is all relevant under M.R.E. 401 and the second prong of *Reynolds*. at 109. The Accused's conduct indicates an intent, or even a plan to engage in further unprofessional or sexualized conduct with the women involved. The evidence is admissible because the Accused is charged with, and the Government must prove beyond a reasonable doubt that the accused *intended* to engage in unprofessional relationships and unwanted sexual touching as charged, and that these actions were not mistakes. Furthermore, part of the Government's theory at trial will be that the Accused had a plan to engage in unprofessional relationships as charged and that he planned to engage in sexual touching. The noticed conduct is evidence of that plan. The Government also argues that the Accused had a particular *modus operandi*, "design, or system" when enacting his common plan to sexualize interactions and then touch women. *Reynolds*, at 110.

    iv.  The Defense has not met their burden to show that the purpose for which this evidence will be offered is an impermissible purpose. Furthermore, instructions on how the factfinder may consider M.R.E. 404(b) evidence are a critical part of the process and the Defense has not demonstrated any likelihood that a factfinder would consider the proposed evidence improperly.

    c. The third prong of the Reynolds is whether the evidence is *substantially* more unfairly prejudicial than probative. M.R.E. 403; *Reynolds*, at 109. Unfair prejudice is not simply prejudice to an accused's liberty interests. *Id.* Powerful and admissible evidence is prejudicial to liberty interests. *Id.* However, **unfair** prejudice arises from evidence that would cause a factfinder to decide guilt on an improper basis such as inflamed passions, confusion, or

US v. Zier Military Record of Trial and Appellate Extracts 000359 of 902

improper character or propensity evidence. *See United States v. Collier,* 67 M.J. 347, 355 (C.A.A.F. 2009); *see also United States v. Bellanger,* 1997 CCA LEXIS 671 (A.F.C.C.A. 1997)(unpublished opinion reviewed at C.A.A.F. on an unrelated issue). Beyond stating that the proposed evidence is improper character evidence, the Defense does not adequately address how Acts 1-3 and 5 are unfairly prejudicial. Evidence of Acts 1-5 is prejudicial, but not unfair given the close ties both temporally and factually to the charged misconduct. The proposed evidence is also extremely probative. In most cases, the uncharged acts occurred within mere days or hours of the charged misconduct, and is part of the factual narrative leading to or following the charged misconduct. The commonality also holds up over the years, with a similar *modus operandi* visible in 2015 and 2019. Given the temporal ties, factual similarity, and the apparently enduring *modus operandi,* the proposed evidence is extremely probative and useful to factfinders attempting to understand the factual narrative.

**The Evidence is Admissible**

6. Trial Counsel's M.R.E. 404(b) notice includes four non-propensity reasons for offering the evidence (intent, plan, *modus operandi,* and absence of mistake). Courts have treated these non-propensity purposes differently, with intent and absence of mistake requiring a lower degree of factual similarity for admission than other non-propensity purposes like a common plan or scheme, or *modus operandi. United States v. Ferguson,* 29 M.J. 559 (A.F.C.M.R. 1989)(C.A.A.F. petition denied) *citing United States v. Peterson,* 20 M.J. 806 (N.M.C.M.R. 1985). Acts 1-5 closely tie to the charged conduct temporally (within days or hours of the planned or intended charged misconduct) and factually (for instance drinking, followed by sexual conversations or sexualized conduct like nudity, followed by touching) and is therefore admissible for the noticed reasons. Again, the proposed evidence is too similar and factually intertwined in the narrative to the charged misconduct to realistically raise the specter of unfair prejudice or improper consideration. However, even if the evidence were not so strikingly similar, the uncharged misconduct would still be admissible evidence of intent and absence of mistake:

> "When considering whether uncharged misconduct constitutes admissible evidence of intent under M.R.E. 404(b), we consider "whether Appellant's state of mind in the commission of both the charged and uncharged acts was sufficiently similar to make the evidence of the prior acts relevant on the intent element of the charged offenses." *United States v. McDonald,* 59 M.J. 426, 430 (C.A.A.F. 2004). "Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, [**17] especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *United States v. Tanksley,* 54 M.J. 169, 176 (C.A.A.F. 2000) (quoting *Huddleston v. United States,* 485 U.S. 681, 685, 99 L. Ed. 2d 771, 108 S. Ct. 1496 (1988))."

*United States v. Hays,* 62 M.J. 158 (C.A.A.F. 2005). All the acts noticed by the Government on 5 May 2020 go to the Accused's state of mind, and are close enough

in time to the charged misconduct to be compelling evidence of the Accused's criminal intent.

## CONCLUSION

7. The proposed evidence is relevant, probative, not unfairly prejudicial, and is being offered for several non-propensity purposes. The Defense has not shown unfair prejudice, and has not demonstrated factual dissimilarity or that the proposed evidence has any likelihood of being considered for an improper purpose. Since the evidence is otherwise admissible and the Defense has not met their burden, the Defense motion should be denied.

## RELIEF REQUESTED

The Defense has failed to meet its burden, and the Government respectfully requests that this Honorable Court deny the Defense Motion to Exclude. In the alternative, if this Court finds that some purposes for which the evidence is offered to be improper, the Government asks that this Court limit the purposes for which the uncharged acts may be introduced. The Government respectfully requests an Article 39(a) session in order to present testimony for consideration.

Respectfully submitted.

JOHN M. MALEK, Maj, USAF
Trial Counsel

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the Government's Response to the Defense Motion to Exclude 404(b) evidence to the Military Judge and Defense Counsel via email on 19 June 2020.

JOHN M. MALEK, Maj, USAF
Trial Counsel

## DEPARTMENT OF THE AIR FORCE
## IN THE UNITED STATES AIR FORCE TRIAL JUDICIARY
## CENTRAL CIRCUIT

| | | |
|---|---|---|
| United States | ) | |
| | ) | |
| | ) | **RULING ON DEFENSE** |
| v. | ) | **MOTION** *IN LIMINE* – |
| | ) | MIL. R. EVID. 404 EVIDENCE |
| | ) | |
| SMSgt Jeremy M. Zier | ) | |
| Air Force Public Affairs Agency (AETC) | ) | 10 August 2020 |
| Joint Base San Antonio-Randolph, TX | ) | |

On 12 June 2020, the Defense filed a written motion *in limine* to exclude certain Accused's statements under Mil. R. Evid. 404(b). On 19 June 2020, the Government submitted its response, and requested this Court deny the motion *in limine*. On 10 August 2020, this Court held an Article 39(a), Uniform Code of Military Justice (UCMJ) hearing where the parties presented testimony, evidence, and argument.

After reviewing the written submissions, evidence, and arguments presented by both parties, including all the documentary attachments, this Court finds these essential facts by at least a preponderance of the evidence and rules as follows:

### FINDINGS OF FACT

1.    On 25 March 2020, Col Jeffrey Carter referred one charge and one specification of Article 92, U.C.M.J, as well as one charge and three specifications or Article 120, U.C.M.J to this special court-martial.

2.    Ms. Sienna Mackiewicz, formally a member of the USAF, was stationed at Incirlik Turkey in 2014 and 2015. During this time, she was an Amn or A1C. At the time the Accused was the station manager. She would see the Accused at the enlisted club. On one particular occasion, she remembers was talking with C        F        , the Accused asked if they had had a one-night stand. At the time Ms. Mackiewicz reported to the Accused and did not know what to say or how to react. Part of the conversation was sexually charged, but there were other parts of the conversation that were not. She continued to work with him and see him outside of work.

3.    SSgt C     F        was stationed at Incirlik, Turkey in 2015. She remembers a trip to Pamukkale, Turkey. On the trip, the Accused asked her questions regarding her involvement in LBGQT issues. Specifically, why she was passionate about it. At first, she did not mind, but the conversation got uncomfortable when it turned sexual. She remembers he made the comment, "you have not found the right dick yet," referencing her sexuality. Additionally, he asked questions about how two women have sexual intercourse. Scott Taylor was present. After the conversation she went to the hot tub—within 15 or 20 minutes. The Accused knew some details of SSgt F     's life, her break-up, for example. This is not the first time she has been

Page 1 of 8

asked about her sexuality, but she tries to steer the conversation toward the emotional aspect of a relationship.

## BURDEN OF PERSUASION AND PROOF

4.    "The structure of Mil. R. Evid. 404(b) permits admission of evidence of other crimes, wrongs, or acts only upon a showing by *the proponent* of a specifically relevant purpose to be served under the circumstances of the particular case." *United States v. Tanner*, 63 M.J. 445, 449 (C.A.A.F. 2006) (emphasis added) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)); *see also United States v. Smith*, 52 M.J. 337, 342 (C.A.A.F. 2000).

5.    This Court "need not make a finding that the government has proved other act(s) by a preponderance of the evidence before it submits 'similar acts' and other Rule 404(b) evidence to the [factfinder]." *United States v. Hughes*, 48 M.J. 700, 715 (A.F. Ct. Crim. App. 1998). Rather, "other acts" evidence should be admitted if the evidence is sufficient to enable a reasonable factfinder to conclude, by a preponderance of the evidence, that the accused committed the acts alleged. *See Hughes*, 48 M.J. at 715 (citing *United States v. Huddleston*, 485 U.S. 681, 689-90 (1988)); *see also United States v. Hueber*, No. ACM 37696, 2013 CCA LEXIS 492, at *12-13 (A.F. Ct. Crim. App. June 7, 2013) (citing *United States v. Levitt*, 35 M.J. 108 (C.M.A. 1992)).

6.    "Questions of fact in an interlocutory question shall be determined by a preponderance of the evidence, unless otherwise stated in" the Manual for Courts-Martial. R.C.M. 801(e)(4).

## CONCLUSIONS OF LAW

7.    Military Rule of Evidence 404(b), titled *"Crimes, Wrongs, or Other Acts"* provides:

(1) *Prohibited Uses*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses; Notice*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by the accused, the prosecution must:

(A) provide reasonable notice of the general nature of any such evidence that the prosecution intends to offer at trial; and

(B) do so before trial – or during trial if the military judge, for good cause, excuses lack of pre-trial notice.

Mil. R. Evid. 404(b).

US v. Zier Military Record of Trial and Appellate Extracts 000363 of 902

8.    Generally, "[r]elevant evidence is admissible . . . ." Mil. R. Evid. 402. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Mil. R. Evid. 401.

9.    "The military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." Mil. R. Evid. 403.

10.    "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

11.    In conducting the Mil. R. Evid. 403 balancing test for legal relevance, a military judge should consider the following factors: the strength of the proof of the prior act; the probative weight of the evidence; the potential to present less prejudicial evidence; the possible distraction of the fact-finder; the time needed to prove the prior conduct; the temporal proximity to the prior event; the frequency of the acts; the presence of any intervening circumstances; and the relationship between the parties. *See United States v. Barnett*, 63 M.J. 388, 396 (C.A.A.F. 2006) (quoting *United States v. Berry*, 61 M.J. 91, 95-96 (C.A.A.F. 2005)).

12.    Mil. R. Evid. 403 and 404(b) "recognize that such evidence [of uncharged misconduct] can be very damaging to the accused. Therefore, the evidence is inadmissible unless there is some purpose to be served by its reception other than to show the accused is predisposed to commit crime." *United States v. Ferguson*, 28 M.J. 104, 108 n.5 (C.M.A. 1989) (brackets in original) (quoting *United States v. Wingart*, 27 M.J. 128, 136 (C.M.A. 1988)).

13.    "The threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002) (quoting *Huddleston*, 485 U.S. at 686).

14.    When courts look to evidence of uncharged acts, it tests its admissibility under three standards:

    a.    Does the evidence reasonably support a finding by the court members that the accused committed prior crimes, wrongs, or acts?

    b.    What fact of consequence is made more or less probable by the existence of this evidence?

    c.    Is the probative value of the evidence substantially outweighed by the danger of unfair prejudice?

*United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989). The evidence at issue must fulfill all three prongs to be admissible. *See Barnett*, 63 M.J. at 394.

15.    Though Mil. R. Evid. 404(b) "is a rule of inclusion rather than exclusion," *United States v. Browning*, 54 M.J. 1, 6 (C.A.A.F. 2000), our superior courts nonetheless do not approve "of broad talismanic incantations of words such as intent, plan, or *modus operandi*, to secure the admission of evidence of other crimes or acts by an accused at a court-martial under Mil. R. Evid. 404(b)." *United States v. Brannan*, 18 M.J. 181, 185 (C.M.A. 1984) (citing *United States v. San Martin*, 505 F.2d 918, 923 (5th Cir. 1974) ("There is no talismanic effect to the words 'intent' or 'design,' and prior offenses must be carefully analyzed beyond the mere assertion of these code-words before the offenses are admitted into evidence lest the trial of fact devolve into a battle of innuendo.")).

16.    It is all-too "common for the prosecution to use short-hard expressions like *modus operandi*, common plan or scheme, etc., to account for an offer of evidence of other acts. A trial judge must be certain to make the prosecution state exactly what issues it is trying to prove in order to see whether the evidence is probative, how probative it is, and whether it should be admitted in light of other evidence in the case and the ever-present danger of prejudice." *Ferguson*, 28 M.J. at 108-09 (citations omitted); *accord Smith*, 52 M.J. at 342.

17.    For example, an oft-invoked relevant, non-propensity purpose under Mil. R. Evid. 404(b) is *modus operandi*. But *modus operandi* evidence is typically inadmissible to show lack of consent. *See Reynolds*, 29 M.J. at 109-10 (citing *United States v. Gamble*, 27 M.J. 298 (C.M.A. 1988). Normally, *modus operandi* evidence enjoys logical relevance *only* to show identity. *Id.* (citing *United States v. Rappaport*, 22 M.J. 445 (C.M.A. 1986)).

18.    Another frequently cited example is motive evidence. Evidence of motive is relevant within the meaning of Mil. R. Evid. 401 "to show the doing of an act by a person as an outlet for that emotion." *United States v. Watkins*, 21 M.J. 224, 227 (C.M.A. 1986). "However, the prior acts of conduct must be the type which reasonably could be viewed as 'the expression and effect of the existing internal emotion.'" *Id.* (emphasis added). "Moreover, this same motive must be shown to have existed in [the accused] at the time of the subsequently charged act." *Id.*

19.    Though evidence of a common plan or scheme can be admissible under Mil. R. Evid. 404(b)—*see, e.g., United States v. Munoz*, 32 M.J. 359 (C.M.A. 1991), *cert. denied*, 502 U.S. 967 (1991); *Reynolds*, 29 M.J. at 105-106; *United States v. Johnson*, 49 M.J. 467 (C.A.A.F. 1998)—for the other acts to be relevant, they must be shown to be more than just similar to the charged offense. *United States v. Brannan*, 18 M.J. 181, 183 (C.M.A. 1984).

20.    However, the Court of Appeals for the Armed Forces has held that a pattern of conduct is admissible, pursuant to M.R.E. 404(b), to support another unrelated charged offense. *United States v. Simpson*, 56 M.J. 462, 465 (C.A.A.F. 2002); *United States v. Barrow*, 42 M.J. 655 (A.F.C.C.A. 1995). In *Simpson*, the Court held that the accused's pattern of taking advantage of women who were intoxicated was admissible under M.R.E. 404(b) as a pattern of conduct. *Id.* at 464-65.

21.    Similarly, when it comes to intent evidence, CAAF considers whether an accused's "state of mind in the commission of both the charged and uncharged acts was sufficiently similar to make the evidence of the prior acts relevant on the intent element of the charged offense[]." *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004).   Though, to be used as evidence of intent, the "other wrongs or acts need only be similar to the offense charged and not too remote therefrom." *United States v. Woodyard*, 16 M.J. 715, 718 (A.F.C.M.R. 1983) (footnote omitted) (citing *United States v. Goodwin*, 492 F.2d 1141, 1153 (5th Cir. 1974)).

<div align="center">*Analysis*</div>

22.    In this ruling, the Court will only address those paragraphs from the Government's notice where there was a disagreement between the parties regarding admissibility.  Those disagreements are outlined below.

<div align="center">*Accused's Alleged Statement to CF: "One Night Stands"*</div>

23.    The Accused is alleged to have asked Cf and Siena Mackiewicz if they had engaged in a one-night stand.  To be admissible under MRE 404(b), evidence of misconduct must be offered for a valid purpose and not to demonstrate the Accused's criminal propensities.  In its filing, (App Ex V) the Government has offered this evidence to show the Accused's intent and absence of mistake, as well as a "common plan, or a design, or a system of testing the boundaries…" At the Article 39(a) the Government narrowed it down to intent and plan.

24.    The finder of fact could assess CF's or Sieana Mackiewicz credibility on the stand and determine that the uncharged acts occurred.  Second, the evidence of prior uncharged acts is not being offered for the purpose of proving the Accused's criminal propensity.  And third, the evidence is relevant to the offense charged in the Specification of Charge I and Specification 1 of Charge II for its tendency, if any, to prove the Accused's intent, for committing the alleged offenses.

25.    First, the Accused's prior act demonstrates the Accused's desire to direct the conversation or situation to one of a sexual nature to steer the relationship in an unprofessional direction or lower the professional barriers inherently in place between a SNCO and an airman. This act is alleged to have occurred "at most within months of the charged misconduct." This evidentiary rule does not have a temporal yardstick by which a trial judge is to gauge the evidentiary value of the other crimes, wrongs, or acts. *See* United States v. Tanksley, 54 M.J. 169, 175, 2000 CAAF LEXIS 1060, *17.  Here, the act is offered for other reasons than to show the Accused predisposition to commit a crime.

26.    The evidence is indicative of the Accused's intent under the third prong of the *Reynolds* test.  The law does not require the same exacting correlation between the charged and uncharged acts. *See Woodyard*, 16 M.J. at 718 ("other wrongs or acts need only be similar to the offense charged and not too remote therefrom.").  Though it does require that the accused's "state of

<div align="center">Page 5 of 8</div>

mind in the commission of both the charged and uncharged acts [be] sufficiently similar."
*McDonald*, 59 M.J. at 430.

27.    The prior act reasonably could be viewed as evidence that the Accused made the statements to CF in an effort—with the intent—to engage in sexual behavior that in this case ended in alleged abusive sexual contact, or to engage in an unprofessional relationship. If the alleged uncharged act of asking CF if she had had a one-night was committed with the same intent to engage in an abusive sexual contact, it may be inferred that the Accused acted with a similar intent.[1] There is no requirement that the uncharged acts be identical to the charged acts so long as there is sufficient similarity to logically conclude that a similar intent existed.[2] Here, the act of directing the topic of conversation to one of a sexual nature indicates a deliberate state of mind consistent with the criminal intent required for Specification 1, Charge 2. The act of directing conversations to a sexual nature in different situations indicate a deliberate state of mind consistent with the criminal intent required for that offense.

28.    Finally, the Court has applied the M.R.E. 403 balancing test to the proffered evidence, and finds that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. The probative value is significant as to the Accused's state of mind as it relates to the Specification of Charge 1, and Specification 1 of Charge II. The finder of fact will not be misled or confused by the proffered evidence, nor will they use it for an improper purpose. Any evidence admitted under M.R.E. 404(b) will be accompanied by an appropriate instruction directing the members as to how they may properly consider the evidence.

*Accused's Alleged Statements to CF: Sexuality & "Just haven't found the right dick yet"*

29.    The Accused discussed C.F.'s sexuality and suggested "she [had] just not found the right dick yet." To be admissible under MRE 404(b), evidence of misconduct must be offered for a valid purpose and not to demonstrate the Accused's criminal propensities. In its filing, (App Ex V) the Government has offered the following evidence to show the Accused's intent and absence of mistake, as well as a "common plan, or a design, or a system of testing the boundaries…" At the 39(a) session the Government narrowed it down to intent and/or plan.

30.    The finder of fact could assess CF's credibility on the stand and determine that the uncharged acts occurred. Second, the evidence of prior uncharged acts is not being offered for the purpose of proving the Accused's criminal propensity. And third, the evidence is relevant to the offenses charged in the Specification of Charge I and Specification I of Charge II for its tendency, if any, to prove the Accused's intent for committing the alleged offenses.

31.    First, the Accused's prior act, here, demonstrates the Accused's desire and intent to direct the conversation or situation to one of a sexual nature to engage in unprofessional relationships and/or test the boundaries of CF's willingness to engage in sexual activity. Here, it culminated with an unlawful touching. This prior act is alleged to have occurred on the same night as the charged misconduct.

---

[1] *United States v. Jenkins*, 48 M.J. 594, 599 (A.C.C.A. 1998)
[2] *United States v. Bender*, 33 M.J. 111 (C.M.A. 1991).

US v. Zier Military Record of Trial and Appellate Extracts 000367 of 902

32.   The evidence is indicative of the Accused's intent under the third prong of the *Reynolds* test.  The law does not require the same exacting correlation between the charged and uncharged acts.  *See Woodyard*, 16 M.J. at 718 ("other wrongs or acts need only be similar to the offense charged and not too remote therefrom.").

33.   The prior acts reasonably could be viewed as evidence that the Accused made the statements to CF in an effort to engage in an unprofessional relationship and/or sexual contact.  If the uncharged act was committed with the same intent to engage in an unprofessional relationship, it may be inferred that the Accused acted with a similar intent.[3]  There is no requirement that the uncharged acts be identical to the charged acts so long as there is sufficient similarity to logically conclude that a similar intent existed.[4]  Here, the act of directing the topic of conversation to one of a sexual nature indicates a deliberate state of mind consistent with the criminal intent required for Specification of Charge I and Specification 1 of Charge II.

34.   The proffered evidence is also indicative of the Accused's intent under the third prong of the *Reynolds* test.  Because these prior acts reasonably could be viewed as evidence of intent to engage in an unprofessional relationship or commit an unlawful touching with CF, and that the same motive existed at the time of the charged offenses, they survive the third prong of the *Reynolds* test.

35.   Considering the two prior acts, evidence is also indicative of the Accused's plan under the third prong of the *Reynolds* test.  The prior acts reasonably could be viewed as evidence of the Accused's plan to direct the conversation to one of a sexual nature so as to engage in an unprofessional relationship or sexual touching.  The Government has cited two occasions where the Accused directed the conversation with a junior airman to sex.  This common plan—as evidenced by the two acts—is indictive of the Accused's intent.  On these occasions, the Accused made inappropriate, sexual comments to CF (and Siena Mackiewicz once).  The logical relevance is the Accused's repeated steering of the conversation with a junior airman to a sexual nature to test the boundaries, that ultimately to an alleged unlawful touching.

36.   Finally, the Court has applied the M.R.E. 403 balancing test to the proffered evidence, and finds that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.  The probative value is significant as to the Accused's state of mind as it relates to the Specification of Charge 1 and Specification 1 of Charge II.  The finder of fact will not be misled or confused by the proffered evidence, nor will they use it for an improper purpose.  Any evidence admitted under M.R.E. 404(b) will be accompanied by an appropriate instruction directing the members as to how they may properly consider the evidence.

<u>RULING</u>

Therefore, the Defense motion *in limine* is **DENIED**.  The Court, however, will consider any requests for reconsideration supported with additional evidence or argument if timely raised.  This ruling also remains subject to revision and clarification until entry of judgment and I reserve the right to supplement the ruling as necessary and appropriate.

---

[3] *United States v. Jenkins*, 48 M.J. 594, 599 (A C C A. 1998)
[4] *United States v. Bender*, 33 M.J. 111 (C M A. 1991).

Page 7 of 8

So ordered on this 10th day of August, 2020.

PENDLETON.STERL
ING.C.1259353102

Digitally signed by
PENDLETON.STERLING.C.12593
53102
Date: 2020.08.11 06:01:36
-05'00'

STERLING C. PENDLETON, Colonel, USAF
Military Judge

Page 8 of 8



# DEPARTMENT OF THE AIR FORCE
## 502D SECURITY FORCES GROUP
### JOINT BASE SAN ANTONIO — RANDOLPH, TEXAS

10 August 2020

MEMORANDUM FOR  CHIEF MASTER SERGEANT JAMIE SANTIAGO
　　　　　　　　　　　 CHIEF MASTER SERGEANT CLINTON L. WILKERSON
　　　　　　　　　　　 CHIEF MASTER SERGEANT HARLEY DAVIS
　　　　　　　　　　　 CHIEF MASTER SERGEANT DAVID P. ARNETT

FROM:  502 SFG/CC

SUBJECT:  Special Order AB-1, *United States v. SMSgt Jeremy M. Zier*

You were previously detailed to the special court-martial convened by Special Order AB-1, dated 25 March 2020.  You are hereby excused from service on this court-martial.


　　　　　　　　　　　　　　　　　 ∕ JAMES H. MASONER, Colonel, USAF
　　　　　　　　　　　　　　　　　　 Commander


*Mission ~ Wingman ~ Partners*



APPELLATE EXHIBIT VII
MARKED PAGE 16
PAGE 1 OF 1




# DEPARTMENT OF THE AIR FORCE
## 502D SECURITY FORCES GROUP
### JOINT BASE SAN ANTONIO – RANDOLPH, TEXAS

5 Aug 20

MEMORANDUM FOR  MILITARY JUDGE (COLONEL STERLING C. PENDLETON)

FROM:  502 SFG/CC

SUBJECT:  Special Order AB-2, *United States v. SMSgt Jeremy M. Zier*

On 31 July 2020 502 SFG/JA executed Special Order AB-2, which relieved two individuals that had previously been detailed to the special court-martial convened by Special Order AB-1, dated 25 March 2020.  Special Order AB-2 also detailed two new individuals to serve in place of the individuals that were relieved.  It is my intent that Special Order AB-2 only modify Special Order AB-1 in so far as the members relieved from service and those appointed in their place. Special Order AB-2 in no way limits the provision of Special Order AB-1 authorizing the military judge to impanel alternate members if, after challenges for cause, excess members remain.



⁄ JAMES H. MASONER, Colonel, USAF
Commander

CHARGE I: Violation of the UCMJ, Article 92

Specification: In that SENIOR MASTER SERGEANT JEREMY M. ZIER, Air Force Public Affairs Agency, Joint Base San Antonio – Randolph, Texas, who knew of his duties at or near Pamukkale, Republic of Turkey, between on or about 1 April 2015 and on or about 30 April 2015, was derelict in the performance of those duties in that he willfully failed to maintain professional relationships with subordinate Airmen, as it was his duty to do, by wrongfully removing his clothing, such that he was completely nude, while he was in a hot tub with several Airmen who were junior in rank to him.

CHARGE II: Violation of the UCMJ, Article 120

Specification 1: In that SENIOR MASTER SERGEANT JEREMY M. ZIER, Air Force Public Affairs Agency, Joint Base San Antonio – Randolph, Texas, did, at or near Pamukkale, Republic of Turkey, between on or about 1 April 2015 and on or about 30 April 2015, touch directly the genitalia and inner thigh of C        F        by causing bodily harm to her, to wit: touching, directly her genitalia and inner thigh, with an intent to gratify his sexual desire, without her consent.

Specification 2: In that SENIOR MASTER SERGEANT JEREMY M. ZIER, Air Force Public Affairs Agency, Joint Base San Antonio – Randolph, Texas, did, at or near, Charleston, South Carolina, on or about 7 December 2019, touch the buttocks of E      . P      with his hand, with an intent to gratify his sexual desire, without her consent.

Specification 3: In that SENIOR MASTER SERGEANT JEREMY M. ZIER, Air Force Public Affairs Agency, Joint Base San Antonio – Randolph, Texas, did, at or near San Antonio, Texas, on or about 13 December 2019, touch the buttocks of T      . W      with his hand, with an intent to gratify his sexual desire, without her consent.



Page 1 of 1

Appellate Ex 7
Marked Page 13



# Panel Member Number Generator

ver. 1.0.1

| Rank | First Name | Last Name | Assigned Number |
|------|-----------|-----------|-----------------|
| COLONEL | Nicole | Francis | 1 |
| SECOND LIEUTENANT | Hai | Ricke | 2 |
| LIEUTENANT COLONEL | Virginia | Walker | 3 |
| LIEUTENANT COLONEL | Sammuel | Berenguer | 4 |
| CAPTAIN | Jennifer | Guion | 5 |
| CAPTAIN | Jeffery | Rueben | 6 |

Appellate Exhibit XI
Marked Page 25

US v. Zier Military Record of Trial and Appellate Extracts 000374 of 902

# Military Justice Online (MJO)
## Notes on the Integrity of Randomly-Generated Panel Selection

Application Design

The Panel Member Number Generator application is coded in such a way that members are assigned randomly and that only one set of assigned numbers can be generated per use without opportunity for manipulation or control.

The application was developed using the Angular JavaScript framework. Put simply, as names are entered into the generator, they are stored in what is called an "array item," which is essentially a list of data that keeps the name and rank of the panel member together. The application also calculates the number of items on the list.

Once the "Assign Random Numbers" button is clicked, the application implements what is known as a "while loop," which is a coding statement that executes a script of code for as long as the coding statement is true. In this case, there are two arrays (or tables): the list of names provided by the user, and the randomized list of names generated by the coding script. The coding statement takes the list of names provided by the user in the first table, randomly selects a name from the list and places it in the first slot on the second table. That name is removed from the first table, and the script runs again. The remaining names are processed again, and the coding statement randomly selects another name from the newly-processed list and places it in the second slot on the second table. That name is also removed from the first table, and the script runs again. This process repeats until each name has been assigned a slot on the second table and there are no more names on the first list, at which point the script terminates and the results are displayed.

Number Generation Process

The random numbers are generated through the "Math.random()" script, which is a two-step process. First, JavaScript produces what is known as the "seed." The seed is the number that is input into the algorithm to

produce the random numbers. In this case, the seed is pulled from the timestamp [1]; which in JavaScript is

produced by calculating the number of milliseconds since the Coordinated Universal Time of January 1, 1970 [2]. Therefore, no two "seeds" will ever be identical, because each unique seed only exists for a single millisecond.

The seed is then fed into the algorithm, which performs a series of complex mathematical formulas, and produces a random number. The specific algorithm used depends on the particular web browser running the application;

however, as of 2015 every major browser has utilized what is known as the "xorshift128+" algorithm [3]. This algorithm uses 128 bits of data, making it one of the highest-quality number generators available while using

minimal code space and computing power [4].

The unique seed coupled with the complex number generator ensures that the numbers generated are not controllable, configurable, or able to be manipulated.

Additional Safeguards

In addition to using non-duplicable seeds and a 128-bit algorithm, there are additional safeguards in place to ensure the integrity of the randomly assigned numbers. First, numbers can only be generated once for any given set of data. Any user wishing to generate a second set of numbers for a list must first re-enter all of the data; at which point the seed used in the algorithm will be vastly different from the previous entry and would therefore produce vastly different results. Second, using the browser's "Back" button once numbers have been assigned will clear all data from the table. This prevents a user from being able to quickly produce another set of assigned numbers.

---

[1] https://bocoup.com/blog/random-numbers

[2] https://www.toptal.com/software/definitive-guide-to-datetime-manipulation

[3] https://stackoverflow.com/questions/578700/how-trustworthy-is-javascripts-random-implementation-in-various-browsers

[4] https://en.wikipedia.org/wiki/Xorshift

Appellate Exhibit_____
Marked Page_____

# COURT MEMBER QUESTIONS FORM

Berenguer    LT Col
_____
Court Member's Name Grade

Sgt    Workman
_____
Name of Witness (if any)

Questions (s):

What was SMSgt Zrer's position in Squadron?
Rank in relation to others in Squadron (ie FLIGHT CHIEF)

Prosecution: _____ (Initials)

Objection: Yes____  No ✓

Object – Grounds: _____
_____
_____

Request Article 39(a):_____

Defense: _____ (Initials)

Objection: Yes____  No ✗

Object – Grounds: _____
_____
_____

Request Article 39(a):_____

APPELLATE EXHIBIT XII
PAGE MARKED 44

# COURT MEMBER QUESTIONS FORM

Col Francis
_____
**Court Member's Name Grade**

Scott Taylor
_____
**Name of Witness (if any)**

Questions (s):

Were SMSgt Zier and SSgt F _____ is
a relationship while in Turkey?

Was SMSgt Zier married while in Turkey?

Prosecution: _____ (Initials)

Objection: Yes____  No ✓

Object – Grounds: _____
_____
_____

Request Article 39(a): _____

Defense: _____ (Initials)

Objection: Yes____  No ✗

Object – Grounds: _____
_____
_____

Request Article 39(a): _____

APPELLATE EXHIBIT ____
PAGE MARKED 70

US v. Zier Military Record of Trial and Appellate Extracts 000377 of 902

# COURT MEMBER QUESTIONS FORM

Berenger LTCOL

**Court Member's Name Grade**

Sgt Wolf

**Name of Witness (if any)**

**Questions (s):**

DID You see MSgt Zier move to between C and
Katie or at any time during the time in the hot tub?
at some point closer to Katie in the hot tub.?

Prosecution: _____ (Initials)

Objection: Yes_____ No_ X

Object – Grounds: _____

_____

Request Article 39(a):_____

Defense: _____ (Initials)

Objection: Yes_____ No_ X

Object – Grounds: _____

_____

Request Article 39(a):_____

APPELLATE EXHIBIT _XIV_
PAGE MARKED _73_

Page 1 of 1

MSgt Zier,

Thank you for your guidance and leadership over the past 15 months. I don't know what I'd have done without you here. You helped me transition into professional life while also having the patience to deal with my budding AIC managerial skills. You pushed me back when I was over the line, but were also always very approachable. In my limited Air Force experience, I already find that sort of leadership rare. I know you don't really need my words to know you're a good boss or, really, to validate anything for you. But I wanted to let you know just how much I appreciate your personal and professional support, and for giving me a strong example of what senior leadership should be.

Thank you.

—S

AIC Sieguna Mackiewi
6 Apr 2015

APPELLATE EXHIBIT XV
MARKED PAGE 82
PAGE 1 OF 1

# COURT MEMBER QUESTIONS FORM

_Capt Jeffery Rueben_
**Court Member's Name  Grade**

_____
**Name of Witness (if any)**

**Questions (s):**

After the trip to Pamukkale, did you get a "compensatory day-off" From SMSgt Zier?

Prosecution: _____ (Initials)

Objection: Yes_____ No ✓

Object – Grounds: _____

_____

Request Article 39(a): _____

Defense: _____ (Initials)

Objection: Yes_____ No ✓

Object – Grounds: _____

_____

Request Article 39(a): _____

**APPELLATE EXHIBIT** XVI
**PAGE MARKED** 102

## COURT MEMBER QUESTIONS FORM

Hai Yan Ricke , 2nLt
Court Member's Name Grade

C          F
Name of Witness (if any)

Questions (s):

Did MSgt Zier have his swimsuit on when he pulled
your swimsuit off ?

Prosecution: _____ (Initials)

Objection: Yes____  No ✔

Object – Grounds: _____

_____

Request Article 39(a): _____

Defense: ⌒ (Initials)

Objection: Yes____  No ✔

Object – Grounds: _____

_____

Request Article 39(a): _____

APPELLATE EXHIBIT XVII
PAGE MARKED 102

Page 1 of 1

# COURT-MARTIAL FINDINGS WORKSHEET
## United States v. Senior Master Sergeant Jeremy M. Zier

*The President will read only bolded text.  Do not read the italicized instructions.*

~~I. Full Acquittal or Full Conviction~~

~~*NOTE:  If the accused is found guilty or not guilty of the Charges and all Specifications, announce:*~~

~~**SMSgt Jeremy M. Zier, this court-martial finds you:**~~

~~**Of all Charges and their Specifications (Not Guilty) (Guilty)**~~

## II. MIXED FINDINGS

**NOTE**: *If the accused is found guilty of SOME, but not ALL Charges and/or Specifications, use a combination of the following language:*

**SMSgt Jeremy M. Zier, this court-martial finds you:**

**Of Charge I and its Specification:  ~~(Not Guilty)~~ (Guilty);**

**AND**

**Of Specification 1 of Charge II:  ~~(Not Guilty)~~ (Guilty)**

~~*NOTE: If the accused is found guilty of the charged offense, by exception(s), announce:*~~

~~**Guilty, except the word(s)**~~

_____

~~**Substituting therefore the word(s) Of the excepted word(s)**~~

_____

~~**Of the excepted word(s), Not Guilty**~~

~~**Of the substituted word(s) Guilty**~~

**Of Specification 2 of Charge II:  (Not Guilty) ~~(Guilty)~~**

**Of Specification 3 of Charge II:  (Not Guilty) ~~(Guilty)~~**

**And of Charge II:  ~~(Not Guilty)~~ (Guilty)**

Appellate Exhibit XVIII
Marked 124
Pg 1 of 2

III. ~~MIXED FINDINGS – LESSOR INCLUDED OFFENSE~~

> *NOTE:* ~~*If the accused is found guilty of SOME or ALL Charges and/or Specifications, use a combination of the following language.*~~

~~SMSgt Jeremy M. Zier, this court-martial finds you:~~

~~Of Charge I and its Specification: Not Guilty, but Guilty of NEGLIGENT Dereliction of Duty in violation of Article 92, UCMJ.~~

~~AND~~

~~Of Specification 1 of Charge II: (Not Guilty) (Guilty)~~

~~Of Specification 1 of Charge II: (Not Guilty) (Guilty)~~

> *NOTE: If the accused is found guilty of the charged offense, by exception(s), announce:*

~~Guilty, except the word(s)~~

_____

~~Substituting therefore the word(s)~~

_____

~~Of the excepted word(s): Not Guilty~~

~~Of the substituted word(s) Guilty~~

~~Of Specification 2 of Charge II: (Not Guilty) (Guilty)~~

~~Of Specification 3 of Charge II: (Not Guilty) (Guilty)~~

~~And of Charge II: (Not Guilty) (Guilty)~~

_____
(Signature of President)

*NOTE: The court may not alter the formats on this worksheet without consulting with the military judge in open court. After the findings are determined by the vote of the members, cross-out all inapplicable portions of the worksheet.*

Pg 2 of 2





## COURT MEMBER QUESTIONS FORM

Court Member's Name Grade

Name of Witness (if any)

Questions (s):

What does it mean to gratify "sexual
desire?"

Sexual desire is not clearly defined within
the packet

Prosecution: _____ (Initials)

Objection: Yes____  No __✓

Object – Grounds: _____
_____
_____

Request Article 39(a): _____

Defense: _TDL_ (Initials)

Objection: Yes____  No __✗

Object – Grounds: _____
_____
_____

Request Article 39(a): _____

APPELLATE EXHIBIT __XX__
PAGE MARKED __136__

# SENTENCING WORKSHEET

**PRESIDENT:** Senior Master Sergeant Jeremy M. Zier, this court-martial sentences you as follows:

## ~~NO PUNISHMENT~~

~~To no punishment.~~

## ~~REPRIMAND~~

~~To be reprimanded.~~
*~~NOTE: The court may not specify the terms of wording of a reprimand.~~*

## REDUCTION

X To be reduced to the grade of E- 7 .

## ~~FINE AND FOREFEITURES~~

~~To forfeit $_____.00 of your pay per month for (_____ month(s)).~~
*~~NOTE: Forfeitures should be specified in whole dollar amounts. Any forfeitures in excess of one month should specify the amount per month to be deducted from the member's pay.~~*

## ~~RESTRAINT AND HARD LABOR~~

~~To be restricted to the limits of your base for a period of (_____ month(s)) (and) (_____ day(s)).~~
*~~NOTE: Restriction may not exceed two months.~~*

~~To perform hard labor without confinement for (_____ month(s)) (and) (_____ day(s)).~~
*~~NOTE: Hard labor without confinement may not exceed three months.~~*

~~To be confined for (_____ month(s)) (and) (_____ day(s)).~~
*~~NOTE: Confinement may not exceed one year. The court may not specify the place or manner of confinement.~~*

## ~~PUNITIVE DISCHARGE~~

~~To be discharged from the service with a bad-conduct discharge.~~


_____
(Signature of President)


Appellate Exhibit XVI
Page Marked 136
Page 1 of 1

SENTENCING INSTRUCTIONS – U.S. v. SMSGT JEREMY M. ZIER

Members of the court, you are about to deliberate and vote on the sentence in this case. It is the duty of each member to vote for a proper sentence for the offenses of which the accused has been found guilty. Your determination of the kind and amount of punishment, if any, is a grave responsibility requiring the exercise of wise discretion. Although you must give due consideration to all matters in mitigation and extenuation, as well as to those in aggravation, you must bear in mind that the accused is to be sentenced only for the offenses which he has been found guilty.

A single sentence shall be adjudged for all offenses of which the accused has been found guilty.

As I previously instructed, you are not to consider information from outside sources, to include sexual assault briefings or training.  To the extent you have received any information about the outcomes or trial proceedings of other cases, you may not consider those cases in deciding an appropriate sentence in this case.  Every case stands on its own.  Your sentencing decision is to be your own independent decision based only on the evidence and matters properly before this court, and applying the instructions on the law that I give you.  What may have happened in other cases, what you may have heard outside this courtroom, or any current policy in the Air Force are not matters for your consideration in this case.

No one in a position of authority over you expects you to return any particular sentence in this case.  No one is permitted to discover what occurred during your deliberations, what was said by any court member, or how any member voted.  As a sentence does not require a unanimous agreement, no one will ever know how you voted in this case or whether you concurred with the sentence ultimately announced. The sentence announced, regardless of what that is, will have neither a positive nor negative impact on your career.  You are simply required to be fair to both sides, have no preconceived ideas about what the outcome should be, and not be influenced by outside factors.

## MAXIMUM PUNISHMENT

The maximum punishment that may be adjudged in this case is:

a. Reduction to the grade of E-1.

b. Forfeiture of 2/3 pay per month for 12 months;

c. Confinement for 12 months; and

d. A bad conduct discharge

1 of 9

Appellate Exhibit XXII

Marked Page 163

1  The maximum punishment is a ceiling on your discretion. You are at liberty to
2  arrive at any lesser legal sentence.

3  In sentencing the accused, you must impose punishment that is sufficient, but not
4  greater than necessary, to promote justice and to maintain good order and
5  discipline in the armed forces. In doing so, you must take into consideration the
6  following factors:

7      (1) The nature and circumstances of the offenses and the history and
8      characteristics of the accused;

9      (2) The impact of the offenses on the financial, social, psychological, or
10     medical well-being of any victim of the offenses; and the mission,
11     discipline, or efficiency of the command of the accused and any victim of
12     the offenses;

13     (3) The need for the sentence to reflect the seriousness of the offenses;
14     promote respect for the law; provide just punishment for the offenses;
15     promote adequate deterrence of misconduct; protect others from further
16     crimes by the accused; rehabilitate the accused; and provide, in
17     appropriate cases, the opportunity for retraining and returning to duty to
18     meet the needs of the service; and

19     (4) The sentences available under these rules as I have instructed you.

20  In applying these factors, you may consider any evidence admitted during both
21  the findings proceeding and the presentencing proceeding of this court-martial.

22                              **TYPES OF PUNISHMENT**
23  In adjudging a sentence, you are restricted to the kinds of punishment which I will
24  now describe or you may adjudge no punishment.

25                              **REPRIMAND:**
26  This court may adjudge a reprimand, being in the nature of a censure. The court
27  shall not specify the terms or wording of any adjudged reprimand.

28                              **REDUCTION:**
29  This court may adjudge reduction to the lowest or any intermediate enlisted
30  grade, either alone or in connection with any other kind of punishment within the
31  maximum limitation. A reduction carries both the loss of military status and the
32  incidents thereof and results in a corresponding reduction of military pay. You
33  should designate only the pay grade to which the accused is to be reduced, for
34  example, E-4 or E-1.

2 of 9

Appellate Exhibit __

**RESTRICTION:**

This court may adjudge restriction to limits for a maximum period not exceeding two months. For such a penalty, it is necessary for the court to specify the limits of the restriction and the period it is to run. Restriction to limits will not exempt an accused from any assigned military duty.

**HARD LABOR WITHOUT CONFINEMENT:**

This court may sentence the accused to hard labor without confinement for a maximum period not exceeding three months. This form of punishment normally consists of extra duties before and/or after the accused's regular duties, and, upon their completion, the accused's liberties are not further restricted. In other words, such punishment would be performed in addition to other military duties which would normally be assigned. In the usual course of business, the immediate commanding officer assigns the amount and character of the hard labor to be performed.

**CONFINEMENT:**

As I have already indicated, this court may sentence the accused to confinement for a maximum of 12 months. A sentence to confinement should be adjudged in either full days, full months, fractions (such as one-half or one-third) should not be employed. So, for example, if you do adjudge confinement, confinement for a month and a half should instead be expressed as confinement for 45 days or confinement for 1 month and 15 days. This example should not be taken as a suggestion, only an illustration of how to properly announce your sentence.

**FORFEITURES—2/3ds ONLY:**

This court may sentence the accused to forfeit up to two-thirds pay per month for a period of 12 months. A forfeiture is a financial penalty which deprives an accused of military pay as it accrues. In determining the amount of forfeiture, if any, the court should consider the implications to the accused and his family of such a loss of income. A sentence to a forfeiture should include an express statement of a whole dollar amount to be forfeited each month and the number of months the forfeiture is to continue.

The accused is in pay grade E-8 with over 23 years of service, the total basic pay being $5,787.00 per month. If retained in that grade, the maximum forfeiture would be $3,819.42 pay per month for 12 months.

If reduced to the grade of E-7, the maximum forfeiture would be $3,384.81 pay per month for 12 months.

If reduced to the grade of E-6, the maximum forfeiture would be $2,753.59 pay per month for 12 months.

3 of 9

Appellate Exhibit __

1  If reduced to the grade of E-5, the maximum forfeiture would be $2,311.25 pay
2  per month for 12 months.

3  If reduced to the grade of E-4, the maximum forfeiture would be $1,812.69 pay
4  per month for 12 months.

5  If reduced to the grade of E-3, the maximum forfeiture would be $1,519.85 pay
6  per month for 12 months.

7  If reduced to the grade of E-2, the maximum forfeiture would be $1,282.05 pay
8  per month for 12 months.

9  If reduced to the grade of E-1, the maximum forfeiture would be $1,143.85 pay
10 per month for 12 months.

11 Any sentence which includes either (1) confinement for more than six months or
12 (2) any confinement and a bad-conduct discharge will require the accused, by
13 operation of law, to forfeit two-thirds of his pay during the period of confinement.
14 However, if the court wishes to adjudge any forfeitures of pay, the court should
15 explicitly state the forfeiture as a separate element of the sentence.

16              **58b AND IMPACT ON FAMILY**

17 The trial or defense counsel may make reference to the availability or lack
18 thereof of monetary support for the accused's family members. Again, by
19 operation of law, if you adjudge:

20 either (1) confinement for more than six months, or (2) any confinement and a
21 bad-conduct discharge, then the accused will forfeit two-thirds of all pay due him
22 during any period of confinement.

23 However, when the accused has dependents, the convening authority may direct
24 that any or all of the forfeiture of pay which the accused otherwise by law would
25 be required to forfeit be paid to the accused's dependents for a period not to
26 exceed six months.  This action by the convening authority is purely
27 discretionary. You should not rely upon the convening authority taking this action
28 when considering an appropriate sentence in this case.

29              **FINE SPECIAL COURT-MARTIAL:**

30 This court may adjudge a fine, either in lieu of, or in addition to, forfeitures. If you
31 should adjudge a fine, the amount of the fine, along with any forfeitures that you
32 adjudge, may not exceed the total amount of forfeitures which may be adjudged,
33 that is, forfeiture of two-thirds pay per month for 12 months. A fine, when ordered
34 executed makes the accused immediately liable to the United States for the
35 entire amount of the fine.

4 of 9

Appellate Exhibit __

1 In your discretion, you may adjudge a period of confinement to be served in the
2 event the fine is not paid. Such confinement to enforce payment of the fine would
3 be in addition to any other confinement you might adjudge and the fixed period
4 being an equivalent punishment to the fine. The total of all confinement
5 adjudged, however, may not exceed 12 months.

6                                   **PUNITIVE DISCHARGE:**

7 The stigma of a punitive discharge is commonly recognized by our society. A
8 punitive discharge will place limitations on employment opportunities and will
9 deny the accused other advantages which are enjoyed by one whose discharge
10 characterization indicates that he has served honorably. A punitive discharge will
11 affect an accused's future with regard to his legal rights, economic opportunities,
12 and social acceptability.

13 In addition, a punitive discharge terminates the accused's status and the benefits
14 that flow from that status, including the possibility of becoming a military retiree
15 and receiving retired pay and benefits.

16 On the issue of the possibility of becoming a military retiree and receiving retired
17 pay and benefits, you should consider the evidence submitted on the legal and
18 factual obstacles to retirement faced by the accused.

19 This court may adjudge a bad conduct discharge. Such a discharge deprives one
20 of substantially all benefits administered by the Department of Veterans Affairs
21 and the Air Force establishment. However, the opportunity to apply for benefits
22 from a prior period of honorable service is not forfeited by receipt of a bad-
23 conduct discharge that would terminate the accused's current term of service. A
24 bad conduct discharge is a severe punishment and may be adjudged for one
25 who in the discretion of the court warrants severe punishment for bad conduct.

26                                   **NO PUNISHMENT:**

27 Finally, if you wish, this court may sentence the accused to no punishment.

28

29

30

31                                   **OTHER INSTRUCTIONS**

32                                   **MATTERS TO CONSIDER:**

33 In determining the sentence, you should consider all the facts and circumstances
34 of the offenses of which the accused has been convicted and all matters
35 concerning the accused whether presented before or after findings. Thus, you
36 should consider the accused's background, character, service record, and all

5 of 9

Appellate Exhibit __

1   matters in extenuation and mitigation, and any other evidence he presented. You
2   should also consider any matters in aggravation.

3                    **VICTIM UNSWORN STATEMENT ELECTION:**

4   The court will not draw any adverse inference from the fact that the victim has
5   elected to make a statement in sentencing which is not under oath. An unsworn
6   statement is an authorized means for a victim to bring certain information to the
7   attention of the court and must be given appropriate consideration. This
8   information may be considered by you solely to evaluate the impact of the
9   accused's crime on this victim. The victim cannot be cross-examined by counsel,
10  or interrogated by court members or me upon an unsworn statement, but counsel
11  may offer evidence to rebut statements of fact contained in it. The weight and
12  significance to be attached to an unsworn statement rests within the sound
13  discretion of each court member. You may consider that the statement is not
14  under oath, its inherent probability or improbability, whether it is supported or
15  contradicted by evidence in the case, as well as any other matter that may have
16  a bearing upon its credibility. In weighing an unsworn statement, you are
17  expected to use your common sense and your knowledge of human nature and
18  the ways of the world.

19                   **ACCUSED'S ELECTION NOT TO TESTIFY:**

20  The court will not draw any adverse inference from the fact that the accused did
21  not elect to testify.

22                  **ACCUSED'S UNSWORN STATEMENT ELECTION:**

23  As with on unsworn statement by the victim, the court will not draw any adverse
24  inference from the fact that the accused has elected to make a statement which
25  is not under oath. An unsworn statement is an authorized means for an accused
26  to bring information to the attention of the court, and must be given appropriate
27  consideration. The accused cannot be cross-examined by the prosecution or
28  interrogated by court members or me upon an unsworn statement, but the
29  prosecution may offer evidence to rebut statements of fact contained in it. The
30  weight and significance to be attached to an unsworn statement rests within the
31  sound discretion of each court member. You may consider that the statement is
32  not under oath, its inherent probability or improbability, whether it is supported or
33  contradicted by evidence in the case, as well as any other matter that may have
34  a bearing upon its credibility. In weighing an unsworn statement, you are
35  expected to use your common sense and your knowledge of human nature and
36  the ways of the world.

37  The accused's unsworn statement included the accused's personal statements
38  about certain matters including registration as a sex offender. An unsworn
39  statement is a proper means to bring information to your attention, and you must
40  give it appropriate consideration. Your deliberations should focus on an

6 of 9

Appellate Exhibit __

1  appropriate sentence for the accused for the offenses of which the accused
2  stands convicted.

3  Under DOD Instructions, when convicted of certain offenses, including the
4  offenses here, the accused must register as a sex offender with the appropriate
5  authorities in the jurisdiction in which he resides, works, or goes to school. Such
6  registration is required in all 50 states; though requirements may differ between
7  jurisdictions. Thus, specific requirements are not necessarily predictable.

8  It is not your duty to determine relative blameworthiness of, and whether
9  appropriate disciplinary action has been taken against, others who might have
10 committed an offense, whether involved with this accused or not or to try to
11 anticipate discretionary actions that may be taken by the accused's chain of
12 command or other authorities or to attempt to predict sex offender registration
13 requirements, or the consequences thereof.

14 Whether or not the accused will be or should be registered as a sex offender, is
15 not a decision before you. Consequently, you are not instructed on the
16 procedural requirements of sex offender registration.

17 While the accused is permitted to address these matters in an unsworn
18 statement, possible collateral consequences should not be part of your
19 deliberations in arriving at a sentence. Your duty is to adjudge an appropriate
20 sentence for this accused based upon the offenses for which he has been found
21 guilty that you regard as fair and just when it is imposed and not one whose
22 fairness depends the possible requirements of sex offender registration, and the
23 consequences thereof, at certain locations in the future.

24                    **EVIDENCE OF REHABILITATIVE POTENTIAL:**
25 You have received evidence indicating an opinion regarding the accused's
26 rehabilitative potential. "Rehabilitative potential" refers to the accused's potential
27 to be restored, through vocational, correctional, or therapeutic training or other
28 corrective measures to a useful and constructive place in society. You may
29 consider this evidence in determining an appropriate sentence for the accused.

30 You may not consider testimony about an accused's rehabilitative potential as a
31 recommendation regarding the appropriateness of a punitive discharge or any
32 other specific sentence in this case, because no witness may suggest a specific
33 punishment or sentence. This rule does not apply to statements by the accused
34 regarding personal requests the accused may make in relation to specific
35 punishments. Whether the accused should receive a punitive discharge or any
36 other authorized legal punishment is a matter for you alone to decide in the
37 exercise of your independent discretion based on your consideration of all the
38 evidence.

7 of 9

Appellate Exhibit __

### ARGUMENT FOR A SPECIFIC SENTENCE:

During argument, counsel may recommend that you consider a specific sentence in this case. You are advised that the arguments and recommendations of trial counsel are only their individual suggestions and may not be considered as the recommendation or opinion of anyone other than such counsel. In contrast, you are advised that the defense counsel is speaking on behalf of the accused.

[COUNSEL ARGUMENT]

### CONCLUDING SENTENCING INSTRUCTIONS

When you close to deliberate and vote, only the members will be present. Alternate members will not, at this time, participate in deliberation or voting. I remind you that you all must remain together in the deliberation room during deliberations. I also remind you that you may not allow any unauthorized intrusion into your deliberations. You may not make communications to or receive communications from anyone outside the deliberations room, by telephone or otherwise. Should you need to take a recess or have a question, or when you have reached a decision, you may notify the Bailiff, who will then notify me of your desire to return to open court to make your desires or decision known.

Your deliberations should begin with a full and free discussion on the subject of sentencing. The influence of superiority in rank shall not be employed in any manner to control the independence of members in the exercise of your own, personal judgment. When you have completed your discussion, then any member who desires to do so may propose a sentence. You do that by writing out on a slip of paper a complete sentence.

The junior member collects the proposed sentences and submits them to the president, who will arrange them in order of their severity. You then vote on the proposed sentences by secret written ballot. All must vote; you may not abstain.

Vote on each proposed sentence in its entirety, beginning with the lightest, until you arrive at the required concurrence, which is three-fourths or 3 members.

The junior member will collect and count the votes. The count is then checked by the president who shall announce the result of the ballot to the members. If you vote on all of the proposed sentences without arriving at the required concurrence, you may then repeat the process of discussion, proposal of sentences and voting. But once a proposal has been agreed to by the required concurrence, then that is your sentence.

You may reconsider your sentence at any time prior to its being announced in open court. If after you determine your sentence, any member suggests you reconsider the sentence, open the court and the president should announce that reconsideration has been proposed without reference to whether the proposed

8 of 9

Appellate Exhibit __

1  reballot concerns increasing or decreasing the sentence. I will give you specific
2  instructions on the procedure for reconsideration at that time.

3  As an aid in putting the sentence in proper form, the court may use the Sentence
4  Worksheet which the Bailiff may now hand to the president.

5  Extreme care should be exercised in using this worksheet and in selecting the
6  sentence form which properly reflects the sentence of the court. If you have any
7  questions concerning sentencing matters, you should request further instructions
8  in open court in the presence of all parties to the trial.

9  In this connection, you are again reminded that you may not consult the Manual
10  for Courts-Martial or any other publication or writing not properly admitted or
11  received during this trial.

12  These instructions must not be interpreted as indicating an opinion as to the
13  sentence which should be adjudged, for you alone are responsible for
14  determining an appropriate sentence in this case.

15  When the court has determined a sentence, the inapplicable portions of the
16  Sentence Worksheet should be lined through. The only permissible punishments
17  are those listed on the Sentence Worksheet.  When the court returns, I will
18  examine the Sentence Worksheet.

9 of 9

Appellate Exhibit __

**DEPARTMENT OF THE AIR FORCE**
**UNITED STATES AIR FORCE TRIAL JUDICIARY**

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | POST-TRIAL |
| v. | ) | AND |
| | ) | APPELLATE RIGHTS |
| SMSGT JEREMY M. ZIER | ) | ADVISEMENT |
| Air Force Public Affairs Agency (AETC) | ) | |
| JBSA-Randolph, Texas | ) | |
| | ) | Dated: 8 August 2020 |

In accordance with the Rule for Courts-Martial (R.C.M.) 1010, *Notice concerning post-trial and appellate rights*, this memorandum shall serve as documentation of said advice.

## INTRODUCTION

1. If you are convicted in the upcoming court-martial proceeding, you have several important post-trial rights, including the right to request deferment, to submit matters requesting relief from the Convening Authority, and to have your conviction and/or sentence reviewed. In addition, you may be able to seek a remedy through one of several administrative offices. This advice incorporates recent substantial changes to the law that took effect for all courts-martial referred to trial on or after 1 January 2019, meaning few, if any, of these changes have been interpreted by courts of appeal. Future interpretations of these changes by courts could impact some of the matters set out below. As you read through the following information, make note of any questions you have and we will discuss them prior to you signing this document.

## DEFERMENT & WAIVER

2. **Overview of Deferment**: As will be explained below, you have the right to request the Convening Authority defer certain punishments. Punishments that may be deferred are confinement, reduction in rank, and forfeitures. If a punishment is deferred, it does not take effect for a certain amount of time.

3. **Requests for Deferment**: When requesting deferment of confinement, forfeitures and/or reduction in rank, you have the burden of showing that your interests and the interests of the community in support of deferral outweigh the community's interests in imposition of the punishment on its effective date. The Convening Authority has significant discretion whether to grant your request. Factors that the Convening Authority may consider include: the probability the you will flee, the probability that you will commit other offenses, the probability that you will intimidate witnesses, the probability that you will interfere with the administration of justice, the nature of the offense(s) of which you were convicted, the effect of the offense(s) of which you were convicted on a victim, your sentence, the command's immediate need for you, the effect of deferment on good order and discipline in your command, your character, your mental

Page 1 of 11

Appellate Exhibit XXIII
Marked Page 168

condition, your family situation, and your service record. Therefore, your request for deferment should address each of the factors that might apply in your situation.

4. **Deferment of Confinement**: If you are sentenced to any term of confinement, you will normally leave for confinement directly from the sentencing proceeding. You have the option of requesting that the Convening Authority defer the imposition of confinement. Be aware, however, that the Convening Authority is not obligated to grant your request, so it is wise to be prepared to enter confinement immediately at the end of the trial. In fact, requests for deferment of confinement are rarely granted. When these requests are granted, it is typically under unusual circumstances such as funerals, births of children, or hospital visits—not for failure to be packed and prepared to go to confinement. If you wish to submit a request to defer confinement, you should inform your defense counsel prior to trial.

5. **Deferment of Reduction in Rank**: Under R.C.M. 1102, if you are sentenced to any reduction in rank, the reduction becomes effective 14 days after the announcement of the sentence by the court. You have the option of requesting that the Convening Authority defer the imposition of the reduction in rank for a period of time up and until the Military Judge enters the judgment. A deferment permits you to retain your original rank for the duration of the deferment, until the deferment is rescinded, ends by its own terms, or until the Military Judge enters the judgment. If a deferment is not requested, or if the Convening Authority denies your request for deferment, then the reduction in grade will become effective 14 days after the announcement of the sentence by the court.

6. **Forfeitures**:

   a. **Types of Forfeitures and Effective Date**: There are two types of forfeitures; adjudged and automatic. Adjudged forfeitures are those forfeitures announced by the court during sentencing. Automatic forfeitures are those forfeitures which are not specifically announced by the court, but rather are required under Article 58b of the Uniform Code of Military Justice (UCMJ). Automatic forfeitures are required for the duration of confinement, up to the jurisdictional limit of the court-martial, if (1) the adjudged sentence includes confinement in excess of six months, or (2) the adjudged sentence includes punitive discharge and confinement of less than six months. The jurisdictional limit of a general court-martial is total forfeitures of pay and allowance, and the jurisdictional limit of a special court-martial is forfeiture of two-thirds of pay per month for up to 12 months. If you are not confined, adjudged forfeitures may not exceed two-thirds of pay per month. Forfeitures, whether adjudged or automatic, become effective 14 days after the announcement of the sentence by the court.

   b. **Deferment of Adjudged or Automatic Forfeitures of Pay**: Article 57 of the UCMJ permits the Convening Authority to defer a forfeiture of pay or allowances that would otherwise become effective as explained above. If your sentence includes forfeitures, whether adjudged or automatic, you may request that the Convening Authority defer the imposition of the forfeitures until the Convening Authority rescinds the deferment or until entry of judgment by the Military Judge. It is important to note that if you reach your ETS date while in confinement or waiting for an appeal, all pay and allowances will stop on your ETS date, even if a request for deferment

US v. Zier Military Record of Trial and Appellate Extracts 000397 of 902

or disapproval of adjudged forfeitures is granted.

    **c. Waiver of Automatic Forfeitures of Pay:** Under Article 58b(b), the Convening Authority may waive any or all of the automatic forfeitures for the purpose of providing support for your dependents. The Convening Authority can waive the automatic forfeitures for a period up to six months. Factors you may wish to address include, but are not limited to, the length of your confinement, the number and age(s) of your family members, any debts you owe, the ability of your family members to find employment, and the availability of transitional compensation for abused dependents. If you request this waiver and it is approved by the Convening Authority, then any amount of pay or allowances that would have been automatically forfeited must be paid to your dependents for the duration of the waiver period.

## CONFINEMENT

**7. <u>Confinement with Enemy Prisoners and Foreign Nationals (Article 12, UCMJ)</u>**: If you are sentenced to confinement, it is illegal for you to be confined with an enemy prisoner. It is also illegal for you to be confined with other individuals who are (1) detained under the law of war and are foreign nationals; and (2) who are not members of the armed forces. If you believe you are being confined in violation of these limitations, immediately notify me or your appellate defense counsel. Under current law, you may be able to get relief, such as reducing your confinement time.

**8. <u>Confinement Conditions</u>**: Under the Eighth Amendment of the United States Constitution and Article 55, UCMJ, you have the right to be confined in a way that does not amount to cruel or unusual punishment. In addition, for confinement conditions that are egregious but do not amount to cruel or unusual punishment, the Air Force Court of Criminal Appeals has the discretion to reduce your sentence. In order to get relief for the poor conditions of your confinement, you ordinarily must exhaust every administrative means available to attempt to correct the issue. This includes (1) submitting a complaint to the confinement facility (preferably in writing); (2) requesting relief through clemency (if known at that time); and (3) filing a complaint with the commander who ordered your confinement under Article 138, UCMJ[1]. By letting your trial defense counsel or your appellate counsel know of the issue as soon as possible, they can assist you with all of these procedures. If you have trouble reaching your attorney because of the conditions of your confinement, be sure to submit a complaint to the confinement facility promptly, repeatedly, and in writing (if possible).

## POST-TRIAL PROCESSING

**9. <u>Overview of Post-Trial Processing</u>**: After your trial, you can seek relief from the Military Judge and from the Convening Authority before entry of judgment. As will be explained below, the Military Judge and the Convening Authority have authority to do different things. Although the powers of the Convening Authority will be addressed first below, you do not necessarily

---

[1] An Article 138 complaint must be filed within 90 days of your discovery of the Article 12 violation. (See AFI 51-904, para. 4.3).

US v. Zier Military Record of Trial and Appellate Extracts 000398 of 902

have to seek relief from the Convening Authority before you request relief from the Military Judge.

10. **Statement of Trial Results**: After your trial, the first step in post-trial processing is known as the Statement of Trial Results. R.C.M. 1101. In short, this document will summarize each of the allegations against you, your plea(s) to the allegations, the findings for each allegation, your sentence, and any information the Military Judges determines to be necessary. You will receive a copy of the Statement of Trial Results.

11. **Right to Submit Matters**: After you are sentenced in a general or special court-martial, you have the right within 10 days to submit matters to the Convening Authority. The Convening Authority may extend the 10-day time limit for good cause, up to 20 additional days. Your submission may include any matters that may reasonably tend to inform the Convening Authority's decision whether to approve or disapprove the findings and/or sentence adjudged. This includes the right to submit matters in mitigation which were not available for consideration at the court-martial. In preparing your submission, you have the right to review the recording of the court-martial, evidence, and appellate exhibits in your case, though you may not access sealed portions of your case without approval by the Military Judge. Failure to submit matters in a timely manner will constitute a waiver of your right to submit matters. R.C.M. 1106.

12. **Right to Rebut Matters Submitted by a Victim**: In any case with a crime victim, the crime victim has the right to submit matters in writing to the Convening Authority. Like your submission, a victim's submission may include matters that may reasonably tend to inform the Convening Authority's decision whether to approve or disapprove the findings and/or sentence adjudged. You have the right to receive a copy of, and to rebut, the victim's submission. You only have five days to rebut anything the crime victim submits. Failure to submit matters in a timely manner will constitute a waiver of your right to submit matters. R.C.M. 1106.

13. **Convening Authority Action: Article 60, UCMJ, Post-24 June 2014 to Pre-1 January 2019**: Under the previous version of Article 60, UCMJ, the Convening Authority has the discretion to grant relief, called "clemency," only for "qualifying offenses" that occurred during the period between 24 June 2014 and 1 January 2019. A qualifying offense is defined as (1) offenses for which the maximum sentence that may be adjudged does not exceed two years and (2) the sentence adjudged does not include a dismissal, a dishonorable or bad-conduct discharge, or confinement for more than six months. For offenses that do not meet this criteria, the Convening Authority lacks the authority to grant relief in the clemency process. Pre-trial agreements and substantial assistance to the government in the investigation or prosecution of another person who has committed an offense are exceptions.

14. **Convening Authority Action, Articles 60a & 60b, UCMJ, Post-1 January 2019**:

      a. **Lack of Authority to Change Certain Findings**: In certain cases where the earliest convicted offense was committed on or after 1 January 2019, the Convening Authority cannot disapprove the findings in any way. This limitation prevents the Convening Authority from disapproving the findings or changing the findings to a lesser included offense for ANY of the convicted offenses. This limitation applies if any of the following is true: (1) any conviction is

Page 4 of 11

for an offense under Articles 120(a), 120(b) or 120b, or any other offense as the Secretary of Defense has specified by regulation; (2) any conviction is for an offense for which the maximum sentence of confinement authorized exceeds two years; (3) the adjudged sentence included a punitive discharge or dismissal; or (4) the adjudged term of confinement, or terms of confinement running consecutively, exceeds six months. R.C.M. 902A and 1109.

b. **Limited Authority to take Action on Sentence after Certain Findings**: For cases that fall into any category described in paragraph 14.a., the Convening Authority has limited options for sentence relief prior to the entry of judgment. Under the first option, the Convening Authority may disapprove, commute, or suspend the adjudged sentence in whole or in part, even with respect to an offense for which a mandatory minimum sentence exists if you provided "substantial assistance in the criminal investigation or prosecution of another person," *and* a prosecutor—ordinarily the trial counsel who prosecuted—recommends the Convening Authority reduce your sentence. Under the second option, the Convening Authority may suspend, in whole or part, a punitive discharge, dismissal, or confinement in excess of six months in accordance with a written Military Judge recommendation, but not in excess of the recommendation, and may not suspend a mandatory minimum sentence. Finally, the Convening Authority may reduce, commute, or suspend the following punishments imposed by a court-martial: (1) total confinement of less than or equal to six months, if the total sentence to be served is less than or equal to six months; (2) restriction; (3) forfeitures and fines; (4) reduction in grade; (5) hard labor without confinement; and (6) a reprimand. R.C.M. 1109(c).[2]

c. <u>**Catch-All Rule**</u>: In all other cases, the Convening Authority may disapprove some or all of the findings, or order a rehearing. The Convening Authority may also approve all, some, or none of the sentence adjudged in his or her sole discretion. R.C.M. 1110.

d. <u>**Service of Action**</u>: If the Convening Authority takes any action on (i.e., modifies) a finding and/or the sentence, you will be provided with a copy. If the Convening Authority declines to take action, the Military Judge will be notified. R.C.M. 1109(h).

15. <u>**Post-Trial Motions and Proceedings**</u>: After your trial, you may submit a motion requesting the Military Judge hold a post-trial hearing to look into and correct legal errors in your case. Requests are made through a written motion filed within certain time limits. Motions to correct an error in the action of the Convening Authority or the judgment must be filed within five days after you receive the erroneous document. Any other motions must be filed within 14 days after your defense counsel receives the Statement of Trial Results, although the Military Judge may extend that time by up to 30 more days for good cause. If you submit a motion to request post-trial proceedings, the Military Judge does not have to grant your request. However, because post-trial court proceedings are to inquire into and resolve anything that comes up after trial that substantially affects any offense of which you were convicted or the sentence, submitting a request may help highlight and/or preserve issues for appeal. Matters you may wish to take up include, but are not limited to: the Military Judge erroneously accepted a guilty plea (if applicable), the evidence is legally insufficient to support one or more of your convictions, and reconsideration of trial rulings by the Military Judge. R.C.M. 1104.

---

[2] Additional rules apply in capital cases and cases dealing with violations of the law of war.

Page 5 of 11

16. **Entry of Judgment**: After the Convening Authority takes action or informs the Military Judge that no action will be taken, the Military Judge is required to enter the judgment of the court, also known as entry of judgment. The judgment addresses the findings, the sentence, and anything that happened in your case after you were sentenced at trial. You will receive a copy. Entry of judgment marks the end of the trial process and the start of the appellate process. R.C.M. 1111.

17. **Record of Trial**: The government will prepare a record of trial after your court-martial is completed. The record is finalized after entry of judgment and includes, among other matters, a substantially verbatim recording of the court proceedings. Which portions must be transcribed verbatim depend in part on your sentence; however, any court-martial with a judgment that includes a sentence to a bad-conduct discharge, dishonorable discharge, dismissal, or confinement for more than six months must be transcribed verbatim in its entirety. The government is required to serve the record of trial on you when it is completed and also to send the record to the appropriate appellate review authority. The appellate process will be explained in greater detail below. R.C.M. 1112.

18. **Right to Speedy Post-Trial Processing**: Service members convicted at a court-martial have a due process right under the United States Constitution to a timely review of their convictions. Under the law in effect for cases referred to trial prior to 1 January 2019, there is a presumption of an unreasonable delay if the Convening Authority failed to take action on your case within 120 days of the completion of trial. Because post-trial processing has changed substantially with the changes in the law that affects cases referred to trial on or after 1 January 2019, this presumption no longer applies, and a new presumption has yet to be established by appellate courts. Regardless, one of the issues appellate courts look at to determine whether a delay warrants relief is whether you asserted your right to a timely review of your case. In some cases, there may be reasons why you would not want a quick and timely review. As a result, it is important that you consult with your defense counsel before determining whether asserting your right to a timely review of your case is in your best interest.

## RIGHT TO COUNSEL

19. During post-trial processing, you are entitled to the assistance of a detailed military defense counsel. You may also hire a civilian defense counsel at your own expense. Your detailed military trial defense counsel (or civilian counsel if applicable) who represented you during the court-martial will ordinarily assist you during the post-trial processing. If your sentence automatically results in an appeal and you do not waive your right to counsel, military appellate counsel will be appointed to represent you free of charge to provide timely and competent assistance with your appeal. If you choose, you may retain civilian counsel at no expense to the government in addition to or in lieu of military appellate counsel. If issues arise in your case after the Convening Authority has taken action but before your military appellate defense

US v. Zier Military Record of Trial and Appellate Extracts 000401 of 902

counsel has had a chance to work on your case, it is important that you notify your area defense counsel or the Appellate Defense Division as quickly as possible.[3]

## APPELLATE REVIEW

20. **Appeal of the Sentence by the United States (Article 56(d), UCMJ)**: Before addressing your appellate rights, it is important that you be aware of a right the government has that is new to the military justice system. Although the Military Judge and Convening Authority may NOT increase your punishment after it is announced, the government may appeal your sentence if it either violates the law or is "plainly unreasonable." The government may file such an appeal within 60 days of entry of judgment, and may only do so if each offense is charged as occurring after 1 January 2019.

21. **Air Force Court of Criminal Appeals (Article 66(b), UCMJ; R.C.M. 1203)**: Your case will be automatically reviewed by the Air Force Court of Criminal Appeals (AFCCA) for legal error, factual sufficiency, and sentence appropriateness if the judgment includes either (1) a bad conduct discharge, dishonorable discharge, or dismissal; or (2) confinement for two years or more <u>and</u> you do not waive or withdraw from appellate review. If these conditions are not met, but either your sentence includes confinement for more than six months or the government previously filed an interlocutory appeal in your case, you may choose to file an appeal with the AFCCA. A decision to waive or withdraw from appellate review, or to not file a timely appeal when your appeal is not automatic, generally cannot be reversed.

22. **The Judge Advocate General (Articles 65, UCMJ; R.C.M. 1201)**: Cases that are not reviewed by the AFCCA will be reviewed by The Judge Advocate General. These circumstances apply if (1) you withdrew or waived your right to an automatic appeal by the AFCCA, (2) you did not qualify for an automatic appeal to the AFCCA but did not file a timely appeal, or (3) the judgment includes a sentence of six months or less of confinement and lacks a bad conduct discharge, dishonorable discharge, or dismissal. A decision to waive or withdraw from appellate review, or to not file a timely appeal when your appeal is not automatic, generally limits this review to whether the court had jurisdiction over you, whether the charge and specification stated an offense, and whether the sentence was within the limits set by law.

23. **Request for Review by TJAG (Article 69, UCMJ; R.C.M. 1201)**: If your case is reviewed by The Judge Advocate General, you can ask that the findings and sentence be modified or set aside. Relief is granted, "on the grounds of newly discovered evidence, fraud on the court, lack of jurisdiction over the accused or the offense, error prejudicial to the substantial rights of the accused, or the appropriateness of the sentence." The application must be filed within one year of The Judge Advocate General's review under Article 65, UCMJ, but this deadline may be

---

[3] Contact information for the Air Force Appellate Defense Division is: AFLOA/JAJA; 1500 W. Perimeter Rd, Suite 1100; Joint Base Andrews, MD 20762 DSN 612-4770/ (240) 612-4770; usaf.pentagon.af-ja.mbx.afloa-jaja-filing-workflow@mail.mil.

Page 7 of 11

extended to three years from completion for good cause.[4]  However, if you waive or withdraw from appellate review, or do not file a timely appeal when your appeal is not automatic, then you must also show that your waiver, withdrawal, or failure to file was invalid under the law.

24.  **United States Court of Appeals for the Armed Forces (Article 67, UCMJ; R.C.M. 1204)**:  Following an appeal at the AFCCA, you can submit a petition to have your case reviewed by the U.S. Court of Appeals for the Armed Forces (CAAF) under Article 67(a), UCMJ, and R.C.M. 1205.  This request does not have to be granted. If you intend to request review from CAAF, you will have to communicate that decision to your appellate attorney.  The request must be made within 60 days of AFCCA's decision on your case.  In addition to directly asking the CAAF to review your case, you can request that The Judge Advocate General certify your case to the CAAF for consideration.  This certification from The Judge Advocate General is also due within 60 days of the AFCCA's decision on your case.

25. **Supreme Court of the United States (Article 67a, UCMJ; R.C.M. 1205)**:  The Supreme Court of the United States (SCOTUS) may also review your case under R.C.M. 1205 and Article 67a of the UCMJ.  However, the SCOTUS will not review CAAF decisions that refuse to grant a Petition for Review.  You have the same right to counsel at both the CAAF and SCOTUS as you have before the AFCCA.

26.  **Voluntary and Involuntary Excess Leave**:  While your case is being reviewed on appeal, it is possible that you may not be in confinement.  If that is the case, you will generally be placed on involuntary excess leave pending the final outcome of your case on appeal.  It is absolutely essential that you keep your appellate counsel informed of your whereabouts and provide up to date contact information, including a working telephone number and personal (not military) email address.  While on excess leave, you will be allowed to keep a military ID card and retain MWR privileges, including health care and commissary access, but you will not receive any pay.  You are permitted to seek other employment, but be aware that if your case is overturned on appeal you may be ordered back to duty status.  During the time you are on excess leave status, you are still subject to military jurisdiction.  The importance of staying in touch with your appellate counsel cannot be overemphasized.  If you are released from confinement *prior* to the entry of judgment, you will be permitted to take accrued leave, voluntary excess leave without pay, or return to duty.

27.  **Right to Speedy Appellate Review**:  You have a due process right under the United States Constitution to speedy appellate review.  Under the law in effect for cases referred to trial prior to 1 January 2019, there was a presumption of an unreasonable delay when appellate review was not completed and a decision was not rendered within 18 months of docketing the case before the AFCCA.  Because post-trial processing has changed substantially with the changes in the law, this presumption may no longer apply, and a new presumption has yet to be established by appellate courts.  Regardless, one of the issues appellate courts look at to determine whether a delay warrants relief is whether you asserted your right to a timely review of your case.  In some

---

[4] The Article 69, UCMJ, application is technically considered a collateral review procedure rather than an appeal, but TJAG has the authority to modify or vacate the findings and/or the sentence in whole or in part.

US v. Zier Military Record of Trial and Appellate Extracts 000403 of 902

cases, there may be reasons why you would not want a quick and timely review. As a result, it is important that you consult with your defense counsel before determining whether asserting your right to a timely review of your case is in your best interest.

28. **Waiver of Appellate Counsel and/or Appellate Review**: If you are entitled to appellate review as explained above, you are entitled to a dedicated military appellate defense counsel pursuant to Article 70, UCMJ, and R.C.M. 1202. However, you have the right to waive this right to counsel. Waiver of your right to counsel alone does not waive your right to appellate review. However, you may also waive your right to appellate review under R.C.M. 1115, giving up both the right to appellate review and the right to appellate counsel. In addition, if you initially seek appellate review, you may withdraw your case from appellate review at a later time. Once you file a waiver or withdrawal of appellate review, your decision is final and appellate review is barred. You have the right to the advice and assistance of counsel before making a decision to waive or withdraw your case from appellate review.

29. **Petition for a New Trial (Article 73, UCMJ)**: You have the right to petition for a new trial under Article 73, UCMJ, under more limited circumstances than the Article 69, UCMJ, application. A petition for a new trial must be based on either fraud on the court or newly discovered evidence. It must be made within three years after entry of judgment and must be submitted to The Judge Advocate General.

30. **Petitioning the Secretary of the Air Force (Article 74, UCMJ)**: Under Article 74(a), UCMJ, the Secretary or his designee may remit or suspend any part of an unexecuted sentence. Under Article 74(b), UCMJ, the Secretary of the Air Force may substitute an administrative discharge for a punitive discharge or dismissal.

## POTENTIAL ADMINSITRATIVE REMEDIES[5]

31. **Discharge Review Board (DRB)**: If you were convicted at a Special Court-Martial, you can ask the Air Force DRB to change the character of your discharge. The DRB does not have the power to make your discharge worse, otherwise change your military records, or make decisions about disability or retirement benefits. DRBs are not able to overturn a court-martial's conviction but, based on considerations of equity or propriety, may upgrade a bad conduct discharge to some form of administrative discharge. Applications to the DRB must be submitted using the DD-293 form within 15 years of your discharge.

32. **Board of Correction of Military Records (BCMR)**: BCMRs have more flexible powers than DRBs. They can upgrade any character of discharge and change any reason for discharge. They can also change reenlistment codes, change the date of your discharge, remove mistakes in your record, and either add or remove a note of medical retirement. BCMRs cannot make your discharge worse or overturn a court-martial conviction. Instead, BCMRs may upgrade a punitive discharge to a less severe punitive discharge, such as a dishonorable discharge to a bad conduct

---

[5] Please note that when pursuing any administrative options under this section, you are not entitled to the assistance of a detailed military defense or appellate counsel. However, you may hire a civilian attorney at your own expense.

Page 9 of 11

discharge, or to an administrative discharge. You must apply within 3 years of discovering the "error or injustice" that you are asking the Board to fix. The Board can ignore this deadline "in the interest of justice," so you should not let it stop you from applying. If you are arguing that your discharge was related to PTSD, the Board must ignore the deadline. If you were discharged within the past 15 years, you must apply to the DRB before you apply to the BCMR; however, this prerequisite does not apply if your conviction is from a General Court-Martial. Applications to the BCMR must be submitted using the DD-149 form.

33. **Air Force Clemency and Parole Board (AFC&PB)**: The AFC&PB is not a forum to appeal sentences or convictions. Rather, it makes decisions on behalf of the Secretary of the Air Force regarding clemency, restoration to duty/reenlistment, transfer to the Federal Bureau of Prisons (FBOP), parole, and mandatory supervised release (MSR). It also makes recommendations to the Secretary's designee on Return-to-Duty Program applications. In addition, the AFC&PB can (1) adjust significant disparities in approved sentences to affect uniformity for similar offenses and similar offenders and otherwise modify approved unexecuted sentences consistent with good order and discipline and in the best interest of the Air Force, society and the inmate; (2) release eligible inmates in military corrections facilities to parole or MSR; and (3) recommend to the Secretary the substitution of an administrative discharge for a punitive discharge or dismissal under Article 74(b), UCMJ.

34. **United States Court of Federal Claims**: Once you have exhausted your military appellate and administrative options listed above, you can file an action at the U.S. Court of Federal Claims (CFC). The principal source of the jurisdiction of the Court of Federal Claims is found in the Tucker Act, which waives sovereign immunity for claims, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract. (See 28 U.S.C. § 1491(a)(1). In addition, it has been established that "judgments by courts-martial, although not subject to direct review by federal civil courts, may nevertheless be subject to narrow collateral attack in [CFC] courts on constitutional grounds if the action is otherwise within a court's jurisdiction." *Bowling v. United States*, 713 F.2d 1558. As a result, if you are seeking compensation due to an alleged constitutional violation that pertains to your court-martial conviction, you may also challenge the conviction itself at the CFC.

35. **Presidential Pardon**: You also have the option of submitting a petition for a Presidential Pardon. Under current Department of Justice rules governing petitions for executive clemency, 28 C.F.R. §§ 1.1 *et seq.*, an applicant must satisfy a minimum waiting period of five years before he or she becomes eligible to apply for a presidential pardon of a federal conviction. The waiting period, which is designed to afford the petitioner a reasonable period of time in which to demonstrate an ability to lead a responsible, productive and law-abiding life, begins on the date of the petitioner's release from confinement. If the conviction resulted in a sentence that did not include any form of confinement or restriction to base, the waiting period begins on the date of sentencing. Pardon of a military offense will not change the character of a military discharge. An upgrade or other change to a military discharge may only be accomplished by action of the appropriate military authorities. More information can be found by contacting the Office of the Pardon Attorney at the U.S. Department of Justice.

(Acknowledgement and signatures are on the following page.)

Page 10 of 11

## <u>ACKNOWLEDGMENTS</u>

I hereby certify that I explained the foregoing *Post-Trial and Appellate Rights Advisement* to
SMSgt Zier on ___8 Aug 2020___. I have fully counseled my client, both orally and in
writing, concerning the above rights and procedures.


_8 August 2020_
Date

                              J. DILLON EMMANUEL, Capt, USAF
                              Area Defense Counsel


_8 Aug 20_
Date

                              LANCE WOOD, Civilian Defense Counsel


I have read and understand my post-trial rights and appellate rights, as stated above. I
(authorize) ~~(do not authorize)~~ my defense counsel to submit post-trial matters and submissions
pursuant to R.C.M. 1104 and 1106 on my behalf if my defense counsel is unable to contact me
after making reasonable efforts to find me.


_8 Aug 20_
Date

                              JEREMY M. ZIER, SMSgt, USAF


Page 11 of 11

# COURT EXHIBITS

# ATTACHMENTS & ALLIED PAPERS

# POST-SENTENCING

# UNITED STATES AIR FORCE

## COURT REPORTER CHRONOLOGY

### *United States v. Senior Master Sergeant Jeremy M. Zier*

Joint Base San Antonio-Randolph, Texas

Held on 10-14 August 2020

**2020**

| | |
|---|---|
| 10-14 Aug | Article 39(a) Session & Court Martial Called to order & Recessed Total Audio - 21 hours |
| 15-16 Aug | Weekend |
| 17-21 Aug | In court - *US v. Rodela* |
| 22-23 Aug | Weekend |
| 24-28 Aug | Uploaded *US v. Zier* for transcription Assistance.  Transcribing *US v. Cleek* |
| 27 Aug | *US v. Zier* assigned to court reporter for transcription assistance. |
| 29-30 Aug | Weekend |
| 31 Aug-3 Sep | Transcribing *US v. Cleek* |
| 4-7 Sep | Labor Day Weekend |
| 7-11 Sep | Transcribing *US v. Cleek.* |
| 12-13 Sep | Weekend |
| 14 Sep | In court - *US v. Murillo* |
| 15-17 Sep | In court - *US v. Harrison* |
| 18 Sep | Travel Day |

FOR OFFICIAL USE ONLY

ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

19-20 Sep        Weekend

21- 25 Sep       Transcribing *US v. Cleek*

26-27 Sep        Weekend

28 Sep           Received update from assigned Court Reporter stating there was a delay.

27-30 Sep-1 Oct        TDY, in court - *US v. Garcia Arcos*

3-4 Oct          Weekend

5-9 Oct          Finalizing *US v. Cleek* and *US v. Oyakawak*

13 Oct           Received Day 1 from Court Reporter. Sent to TC and DC

14-21 Oct        TDY/In court - *US v. Wells*

22 Oct           Received *US v. Zier* days 3, 4, and 5 from court reporter.

23               Transcribing *US v. Zier*, day 2.  Sent *US v. Zier* days 2-5 to TC and DC for
                 review.

24-25 Oct        Weekend

25 Oct           Received TC review of *US v. Zier* transcript

31 Oct-7 Nov  TDY - *US v. Borneman*

1 Nov            Received DC review of *US v. Zier* transcript

4 Nov            Finalized all US v. Zier docs and sent to case paralegal


STAATS
WALKER.MARY.ILEN
E.1287974147

Digitally signed by STAATS
WALKER.MARY.ILENE.128797414
7
Date: 2020.11.04 16:09:05 -05'00'

  4 November 2020  
Date

MARY I. STAATS-WALKER, TSgt, USAF
Court Reporter

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

# CERTIFICATION

# OF THE

# RECORD OF TRIAL

### in the case of

### *United States v. Senior Master Sergeant Jeremy M. Zier*

I examined the Record of Trial in the above-referenced case and find that it accurately reports the proceedings. I certify the Record of Trial as accurate and complete in accordance with RCM 1112(b) and (c)(1).

STAATS
WALKER.MARY.ILEN
E.1287974147

Digitally signed by STAATS
WALKER.MARY.ILENE.128797414
7
Date: 2020.09.03 09:22:30 -05'00'

 3 September 2020
Date

Mary Staats-Walker, TSgt, USAF Court Reporter

# CERTIFICATION
# OF THE
# TRANSCRIPT

### in the case of

### *United States v. Senior Master Sergeant JEREMY M. ZIER*

I hereby certify that I reviewed the transcript of this record and that it is an accurate reflection of the proceeding of the court. I used For the Record Gold (FTR) version 5.6 and Dragon Naturally Speaking (DNS) version 15.1 to create this transcript.

STAATS
WALKER.MARY.ILENE.
1287974147

Digitally signed by STAATS
WALKER.MARY.ILENE.128797414
7
Date: 2020.11.04 16:13:41 -05'00'

 4 November 2020
Date

_____
MARY I. STAATS-WALKER, TSgt, USAF
Court Reporter

| REQUEST FOR APPELLATE DEFENSE COUNSEL | DATE<br>Aug 14, 2020 |
|---|---|

**PRIVACY ACT STATEMENT**

**AUTHORITY:** 10 USC 8013, 10 USC 866, 10 USC 867, 10 USC 867a, 10 USC 869, 10 USC 870 and Executive Orders 11476 and 9397

**PRINCIPAL PURPOSE(S):** To provide information relating to appointment of appellate defense counsel. To authorize appellate defense counsel to enter into an attorney-client relationship with the accused. To document an accused's election concerning appointment of appellate defense counsel.

**ROUTINE USE(S):** None.

**DISCLOSURE:** Disclosure is voluntary, however, failure to provide the information may adversely affect the pursuit of the accused's appeal.

TO:
THE JUDGE ADVOCATE GENERAL
HEADQUARTERS USAF
WASHINGTON, DC 20330-5120

| NAME OF ACCUSED *(Last, First, Middle Initial)* | GRADE | SSN |
|---|---|---|
| ZIER, JEREMY, M. | E-8 | |

ORGANIZATION AND STATION

AIR FORCE PUBLIC AFFAIRS AGENCY, JBSA-RANDOLPH

I have been advised by my defense counsel of my appellate rights under Article 70, Uniform Code of Military Justice (UCMJ), and RCM 1202, Manual for Courts-Martial (MCM), United States. I am entitled to request that appellate defense counsel represent me before the Air Force Court of Criminal Appeals or Court of Appeals of the Armed Forces if the record of my trial is referred to that court under Article s 66, 67 or 69, UCMJ. I also understand that I am entitled to retain civilian counsel at no expense to the government, to represent me before the court.

Read the statements that follow and place an "X" in the box next to your response *(one box only)*.

☒ **I REQUEST APPELLATE DEFENSE COUNSEL TO REPRESENT ME** before the above named court(s) (if my case is referred to such court) and to urge on my behalf all efforts or other matters which appellate counsel may discover from the record of trial and accompanying papers.

The name and contact information of civilian counsel (if any) I provide to represent me before the court is

I will provide the name and address of civilian counsel on the following date.

(Must be within ten days of the date of this request)

**Please send future correspondence concerning this case to the address below:**

(Mailing address is REQUIRED; telephone number and email address is OPTIONAL)

I realize it is my responsibility to provide my appellate defense counsel (AFLOA/JAJA, 1500 West Perimeter Rd, Suite 1100, JB Andrew Naval Air Facility Washington MD 20762-6604, (800) 414-8847,(240) 612-4770 or DSN 612-4770) with any changes to this address.

If and when appropriate, I request my appellate defense counsel to advise me as to whether, in his or her opinion, there are meritorious grounds for petitioning the United States Court of Appeals for the Armed Forces for a grant of review and, if appropriate, to further petition the United States Supreme Court, and to render me all assistance necessary should I decide to petition.

☐    **I DO NOT REQUEST APPELLATE DEFENSE COUNSEL TO REPRESENT ME.**

SIGNATURE OF ACCUSED

**AF FORM 304,** 20191120    *(EF-V2)*        PREVIOUS EDITION IS OBSOLETE.
Prescribed by AFI 51-201

# CERTIFICATE OF SERVICE

I certify that a copy of the Statement of the Trial Results, AF Form 304, and the Submission of Matters for the case of *U.S. v. SMSgt Jeremy M. Zier*, to be served on SMSgt Jeremy M. Zier, on 14 August 2020 at 1644 _____ (time).

MATTHEW B. PALMA, SSgt, USAF
Military Justice Paralegal

I hereby acknowledge receipt of the of the Statement of the Trial Results, AF Form 304, and the Submission of Matters on 14 August 2020 at 1644 _____ (time).

JEREMY M. ZIER, SMSgt, USAF

# CERTIFICATE OF SERVICE

I certify that a copy of the Statement of the Trial Results, AF Form 304, and the Submission of Matters for the case of *U.S. v. SMSgt Jeremy M. Zier,* to be served on SMSgt Jeremy M. Zier, on 14 August 2020 at 1644 _____ (time).


MATTHEW B. PALMA, SSgt, USAF
Military Justice Paralegal


I hereby acknowledge receipt of the of the Statement of the Trial Results, AF Form 304, and the Submission of Matters for the case of *U.S. v. SMSgt Jeremy M. Zier*, on 14 August 2020 at _____ 1644 _____ (time).


JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel

# CERTIFICATE OF SERVICE

I certify that a copy of the Submission of Matters pertaining to SSgt C.F., for the case of *U.S. v. SMSgt Jeremy M. Zier,* was provided to SMSgt Jeremy M. Zier. via Capt Jamesian D. Emmanuel, on _26_ August 2020 at _1609_____(time).

WILLIAMS.DAVID.B RIAN.JR.1410216481
Digitally signed by WILLIAMS.DAVID.BRIAN.JR.1410 216481
Date: 2020.08.26 16:11:16 -05'00'

DAVID B. WILLIAMS JR., SSgt, USAF
NCOIC, Military Justice


I hereby acknowledge receipt of the of the Submission of Matters pertaining to SSgt C.F., for the case of *U.S. v. SMSgt Jeremy M. Zier*, on _26___ August 2020 at _1630_____(time).


JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel

# CERTIFICATE OF SERVICE

I certify that a copy of the Convening Authority Decision on Action for the case of *U.S. v. SMSgt Jeremy* M. *Zier,* was provided to SMSgt Jeremy M. Zier. via Capt Jamesian D. Emmanuel, on _01_ September 2020 at _____1528_____ (time).

SILVA.ISSEY
JEORGINA.HILA.15513
15270

Digitally signed by SILVA.ISSEY
JEORGINA.HILA.1551315270
Date: 2020.09.01 15:29:00
-05'00'

ISSEY JEORGINA H. SILVA, A1C, USAF
Paralegal, Military Justice

I hereby acknowledge receipt of the Convening Authority Decision on Action for the case of *U.S. v. S*MSgt *Jeremy* M. Z*ier*, on _01_ September 2020 at _____1600_____ (time).

JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel

## CERTIFICATE OF SERVICE

I certify that a copy of the Entry of Judgment with attached documents, dated 2 September 2020, 9 pages, in regard to the *US v. SMSgt Jeremy M. Zier,* Special Court-Martial, was provided to SSgt Kelly E. Pletz on, 15 September 2020 at 1004 (time).

WILLIAMS.DAVID.BR
IAN.JR.1410216481

Digitally signed by
WILLIAMS.DAVID.BRIAN.JR.141
0216481
Date: 2020.11.09 17:02:16 -06'00'

DAVID B. WILLIAMS JR., SSgt, USAF
NCOIC, Military Justice

I hereby acknowledge receipt of the Entry of Judgment with attached documents, dated 2 September 2020, 9 pages, in regard to the *US v. SMSgt Jeremy M. Zier,* Special Court-Martial on, ___15___ September 2020 at ___1005_____ (time).

PLETZ.KELLY.ELIZ
ABETH.1408793137

Digitally signed by
PLETZ.KELLY.ELIZABETH.1408793
137
Date: 2020.11.10 10:10:19 -06'00'

KELLY E. PLETZ, SSgt, USAF
Area Defense Counsel, Paralegal

# CERTIFICATE OF SERVICE

I certify that a copy of the audio of all open sessions and a copy of all unsealed exhibits, in regard to the *US v. SMSgt Jeremy M. Zier,* Special Court-Martial, were provided to Capt Jamesian D. Emmanuel on 19 August 2020 at 0920 (time).

WILLIAMS.DAVID.BR  Digitally signed by
IAN.JR.1410216481  WILLIAMS.DAVID.BRIAN.JR.14102
16481
Date: 2020.11.09 16:28:43 -06'00'

DAVID B. WILLIAMS JR., SSgt, USAF
NCOIC, Military Justice

I hereby acknowledge that a copy of the audio of all open sessions and a copy of all unsealed exhibits, in regard to the *US v. SMSgt Jeremy M. Zier,* Special Court-Martial, were provided to me on __19__ August 2020 at ___0920___ (time).

JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel



**DEPARTMENT OF THE AIR FORCE**
AIR FORCE LE AL OPERATIONS A ENC  (AFLOA)
WHITEMAN AIR FORCE BASE, MISSOURI

18 August 2020

MEMORANDUM FOR  TRIAL COUNSEL

FROM:  AFLOA/ADC (Capt Jamesian D. Emmanuel)

SUBJECT: Request for Copy of Audio and Exhibits from *US v. Zier*

1. I, Capt Jamesian D. Emmanuel, request on behalf of my client, SMSgt Zier, a copy of the audio of all open sessions of his Special Court-Martial, *US v. SMSgt Jeremy M. Zier*, along with a copy of all unsealed exhibits. I am specifically requesting these items to assist SMSgt Zier with his clemency submission.

2. Thank you in advance for your cooperation in this matter. If you have any questions, please contact me a

*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel

Page **1** of **1**

US v. Zier Military Record of Trial and Appellate Extracts 000421 of 902

# VICTIM ELECTION FOR RECORD OF TRIAL

## UNITED STATES v. SMSgt Jeremy M. Zier

### Privacy Act Statement

**AUTHORITY:** 10 U.S.C. 806b (Article 6b, UCMJ), Rights of a Victim of an Offense; 10 U.S.C. 854 (Article 54, UCMJ), Record of Trial; R.C.M. 1112, Certification of Record of Trial; General and Special Courts-Martial
**PURPOSE:** Information is collected to document your preferences with regards to receiving a copy of the Record of Trial in the court-martial named above, in which you were named as a victim in a specification of which the accused was charged.
**ROUTINE USE:** Information may be disclosed for any of the DoD Blanket Routine Uses.
**DISCLOSURES:** Voluntary; however, failure to provide the information may result in our inability to provide you with a copy of the record of trial or representation during appellate review.

## VICTIM INFORMATION

NAME

| Last | First | MI | Suffix | TELEPHONE NUMBER (Optional) |
|---|---|---|---|---|
| | C | | | |

MAILING ADDRESS

| Street | State | ZIP |
|---|---|---|
| | | |

## RECEIPT OF RECORD OF TRIAL

*In accordance with 10 U.S.C. 854 and R.C.M. 1112, you are entitled to receive a copy of the Record of Trial in the above-captioned court-martial. After carefully reviewing the options below, please annotate your elections by marking the appropriate boxes.*

☑ **I request a copy of the Record of Trial in this case. I desire that the record be provided to the mailing address annotated above in the following format (choose one):**

☐ Hard copy  ☑ Electronic

☐ **I do not request a copy of the Record of Trial in this case.**

*I certify that the information annotated above is correct to the best of knowledge, and I consent to the official release of this information to the extent such release is necessary to satisfy my elections.*

| SIGNATURE | DATE |
|---|---|
| C F | 28 AUG 2020 |

# VICTIM ELECTION FOR RECORD OF TRIAL

## UNITED STATES v. SMSgt Jeremy M. Zier

### Privacy Act Statement

**AUTHORITY:**  10 U.S.C. 806b (Article 6b, UCMJ), Rights of a Victim of an Offense; 10 U.S.C. 854 (Article 54, UCMJ), Record of Trial; R.C.M. 1112, Certification of Record of Trial; General and Special Courts-Martial
**PURPOSE:**  Information is collected to document your preferences with regards to receiving a copy of the Record of Trial in the court-martial named above, in which you were named as a victim in a specification of which the accused was charged.
**ROUTINE USE:**  Information may be disclosed for any of the DoD Blanket Routine Uses.
**DISCLOSURES:**  Voluntary; however, failure to provide the information may result in our inability to provide you with a copy of the record of trial or representation during appellate review.

## VICTIM INFORMATION

NAME | | | | TELEPHONE NUMBER (Optional)

| Last | First | MI | Suffix |
|---|---|---|---|
| F | E | | |

MAILING ADDRESS

| Street | State | ZIP |
|---|---|---|

## RECEIPT OF RECORD OF TRIAL

*In accordance with 10 U.S.C. 854 and R.C.M. 1112, you are entitled to receive a copy of the Record of Trial in the above-captioned court-martial.  After carefully reviewing the options below, please annotate your elections by marking the appropriate boxes.*

☑ **I request a copy of the Record of Trial in this case.  I desire that the record be provided to the mailing address annotated above in the following format (choose one):**

☑ Hard copy   ☐ Electronic

☐ **I do not request a copy of the Record of Trial in this case.**

*I certify that the information annotated above is correct to the best of knowledge, and I consent to the official release of this information to the extent such release is necessary to satisfy my elections.*

| SIGNATURE | DATE |
|---|---|
| P    E | 11/10/2020 |

# CERTIFICATE OF SERVICE

I certify that a copy of the Statement of the Trial Results, for the case of *U.S. v. SMSgt Jeremy M. Zier,* to be provided to SSgt C.F. via Capt Megan M. Teeple, on 26 August 2020 at 1620 (time).

WILLIAMS.DAVID.BR
IAN.JR.1410216481

Digitally signed by
WILLIAMS.DAVID.BRIAN.JR.1410
216481
Date: 2020.08.26 16:20:43 -05'00'

DAVID B. WILLIAMS JR., SSgt, USAF
NCOIC, Military Justice

I hereby acknowledge receipt of the of the Statement of the Trial Results, for the case of *U.S. v. SMSgt Jeremy M. Zier*, on 27 August 2020 at 0832 hours (time).

TEEPLE.MEGAN.MC
GRATH.1058103531

Digitally signed by
TEEPLE.MEGAN.MCGRATH.105
8103531
Date: 2020.08.27 08:32:58 -04'00'

MEGAN M. TEEPLE, Capt, USAF
Special Victims Counsel

# CERTIFICATE OF SERVICE

I certify that a copy of the Statement of the Trial Results, for the case of *U.S. v. S*MSgt *Jeremy* M. Z*ier,* provided to 2d Lt E    P    on 9 November 2020 at
___1530_____(time).

WILLIAMS.DAVID.B
RIAN.JR.1410216481

Digitally signed by
WILLIAMS.DAVID.BRIAN.JR.141
0216481
Date: 2020.11.09 15:17:29 -06'00'

DAVID B. WILLIAMS JR., SSgt, USAF
NCOIC, Military Justice

I hereby acknowledge receipt of the of the Statement of the Trial Results, on _10____
November 2020 at _1158_____(time).

E    P   , 2d Lt, USAF

The Statement of Trial Results was distributed on 26 Aug 2020.  The Statement of Trial Results was redistributed to 2d Lt E.P. for the purposes of obtaining a receipt, due to a failure to obtain a receipt after the initial distribution of the Statement of Trial Results.

The Statement of Trial Results was distributed on 26 Aug 2020.  The Statement of Trial Results was redistributed to Ms. T.W. for the purposes of obtaining a receipt, due to a failure to obtain a receipt after the initial distribution of the Statement of Trial Results.

# CERTIFICATE OF SERVICE

I certify that a copy of the Convening Authority Decision on Action for the case of *U.S. v. SMSgt Jeremy M. Zier,* was provided to SSgt C.F.. via Capt Megan M. Teeple, on ‗01‗ September 2020 at ‗1530‗‗‗‗‗(time).

SILVA.ISSEY
JEORGINA.HILA.1551
315270

Digitally signed by SILVA.ISSEY
JEORGINA.HILA.1551315270
Date: 2020.09.01 15:30:43
-05'00'

ISSEY JEORGINA H. SILVA, A1C, USAF
Paralegal, Military Justice


I hereby acknowledge receipt of the Convening Authority Decision on Action for the case of *U.S. v. SMSgt Jeremy M. Zier*, on ‗2‗‗‗ September 2020 at ‗2211‗‗‗‗‗(time).

TEEPLE.MEGAN.MC
GRATH.1058103531

Digitally signed by
TEEPLE.MEGAN.MCGRATH.105
8103531
Date: 2020.09.02 22:11:57 -04'00'

MEGAN M. TEEPLE, Capt, USAF
Special Victims Counsel

# CERTIFICATE OF SERVICE

I certify that a copy of the Entry of Judgment for the case of *U.S. v. SMSgt Jeremy* M. *Zier,* was provided to Capt Megan M. Teeple on behalf of SSgt C͏           ͏         via email, on 15 September 2020 at 1004 (time).

WILLIAMS.DAVID.BR
IAN.JR.1410216481
Digitally signed by
WILLIAMS.DAVID.BRIAN.JR.1410
216481
Date: 2020.11.09 13:05:21 -06'00'

DAVID B. WILLIAMS JR., SSgt, USAF
NCOIC, Military Justice

I hereby acknowledge receipt of the Entry of Judgment for the case of *U.S. v. S*M*Sgt Jeremy* M. *Zier*, on 15 September 2020 at 1004 (time).

TEEPLE.MEGAN
.MCGRATH.1058
103531
Digitally signed by
TEEPLE.MEGAN.MCGRATH
.1058103531
Date: 2020.11.10 11:47:25
-05'00'

MEGAN M. TEEPLE, Capt, USAF
Special Victims Counsel

There is no Entry of Judgment receipt within the Record of Trial for 2d Lt E.P. and Ms. T.W., due to 2d Lt E.P. and Ms. T.W. not requesting a copy of the Entry of Judgment.

## VICTIM ELECTION FOR REPRESENTATION DURING APPELLATE REVIEW

## UNITED STATES v. SMSgt Jeremy M. Zier

### Privacy Act Statement

**AUTHORITY:** 10 U.S.C. 806b (Article 6b, UCMJ), Rights of a Victim of an Offense; 10 U.S.C. 1044e, Special Victims' Counsel for Victims of Sex-Related Offenses

**PURPOSE:** Information is collected to document your preferences with regard to being represented by Special Victims' Counsel during the appellate review process.

**ROUTINE USE:** Information may be disclosed for any of the DoD Blanket Routine Uses.

**DISCLOSURES:** Voluntary; however, failure to provide the information may result in our inability to provide you with a copy of the record of trial or representation during appellate review.

### VICTIM INFORMATION

| NAME | | | | | TELEPHONE NUMBER (Optional) |
|---|---|---|---|---|---|
| *Last* | *First* | *MI* | *Suffix* | | |
| F | C | L. | | | |

| MAILING ADDRESS | | |
|---|---|---|
| *Street* | *State* | *ZIP* |

### REPRESENTATION DURING APPELLATE REVIEW

*In accordance with 10 U.S.C. 1044e, you are entitled to legal representation by a Special Victims' Counsel in matters related to the above-captioned court-martial, including (if desired) representation during the appellate review process. After carefully reviewing the options below, please annotate your elections by marking the appropriate box.*

☑ **I request Special Victims' Counsel representation during the appellate review process and request that the Air Force Special Victims' Counsel Division (AFLOA/CLSV) be informed of any appellate proceedings or hearings in this case.**

☐ **I do not request Special Victims' Counsel representation during the appellate review process at this time.**

***I certify that the information annotated above is correct to the best of knowledge, and I consent to the official release of this information to the extent such release is necessary to satisfy my elections.***

| SIGNATURE | DATE |
|---|---|
| C F | 28 AUG 2020 |



**DEPARTMENT OF THE AIR FORCE**
AREA DEFENSE COUNSEL (AFLOA)
WHITEMAN AIR FORCE BASE, MISSOURI

24 August 2020

MEMORANDUM FOR  502 SFG/CC
                502 SFG/SJA
                IN TURN

FROM:  AFLOA/ADC (CAPT JAMESIAN D. EMMANUEL)

SUBJECT:  Submission of Matters – Clemency and Deferment of Reduction in Rank, - *United States v. SMSgt Jeremy Zier*

1.  By and through counsel, SMSgt Jeremy M. Zier, hereby requests the Special Court-Martial Convening Authority reduce, commute, or suspend the adjudged reduction in grade pursuant to RCM 1109.  Alternatively, if the Convening Authority does not determine that request to be appropriate, SMSgt Zier, respectfully requests that the adjudged reduction in rank is deferred until entry of judgment pursuant to RCM 1103.  This request is made in consideration of the following matters, the totality of SMSgt Zier's career, the circumstances surrounding the adjudged sentence, recent events relating to the outcome of the case,  the effect it would have on good order and discipline, and for the benefit of SMSgt Zier's wife and two children.

2.  On 14 August 2020, SMSgt Zier was found guilty of one charge and one specification of dereliction of duty under Article 92, Uniform Code of Military Justice (UCMJ) and one charge and one specification of abusive sexual contact under Article 120, UCMJ.  Both offenses related to an encounter between SMSgt Zier and SSgt C          F          in Turkey in 2015.  Based on the evidence provided at both the findings and sentencing portion of the court-martial, a panel of four officers determined that SMSgt Zier should be reduced in grade by one rank to E7.

3.  **Totality of Service**:  SMSgt Zier has over twenty three years of active duty service.  In addition to his specific request, SMSgt Zier has also attached a copy of his sentencing package for your consideration.  This package contains character letters, awards, accolades, and other achievements that have been commonplace throughout SMSgt Zier's career.  I ask you to consider this package when determining SMSgt's character and service record, as well as, the effect this request would have on his command's good order and discipline.

4.  **Two Rank Reduction**:  Although a panel of four officers reduced SMSgt Zier to the rank of Master Sergeant, this court-martial effectively took away two ranks from SMSgt Zier.  Prior to his court-martial, SMSgt Zier was selected to the rank of E9.  A crowning achievement of over 20 years of hard work, dedication, and commitment, this rank was ultimately red-lined and he was not permitted to promote to the rank of Chief Master Sergeant.  Unfortunately, for SMSgt Zier, his panel of members were not permitted to determine the appropriateness, legality, or fairness of the withholding of his E9 rank.  Instead, after reviewing all the evidence provided by the Government, including hearing SSgt F          speak twice, they determined that SMSgt Zier should only be reduced by one rank.  Based on the timing of the red-lining of his E9 stripe, it is abundantly clear that had SMSgt Zier been CMSgt Zier at the time of his court-martial, he would

Page **1** of 3

have only been reduced to the rank of Senior Master Sergeant.  SMSgt Zier would not be permitted and does not request the reinstatement of his E9 promotion.  Instead, he humbly requests to not allow his reduction punishment to punish him with losing two stripes, one administratively and one judicially.  I ask you to consider this factor when weighing the nature of the offenses of which SMSgt was convicted versus the sentence adjudged.

5.  **Publicity**: Since the sentence was adjudged, SMSgt Zier has been inundated with public shaming, hate and vitriol, and online harassment.  On the same day as the announcement of the sentence, SSgt F          uploaded her victim impact statement to her own website.  She also publically shared this site on her Facebook page.  Friends and family members tagged local and national news networks to this page.  Additionally, the popular Facebook Page, "Air Force amn/nco/snco," shared this story and several local news stories about SMSgt Zier.  Without any context to the offenses to which he was found guilty of and without even requesting to speak to SMSgt Zier, these sites made outlandish comments about his character and reputation.  Within minutes of making these posts, thousands of people commented and hundreds shared the links.  In almost each of these posts, SMSgt Zier's name was slandered.  Some commenters mocked SMSgt Zier and called him several expletives, while others outright threatened him and his ability to care for his family.  Due to the incessant amount of online ridicule, both he and his spouse deactivated their social media accounts.  I ask you to consider this factor when considering the appropriateness of punishment, the impact this trial has had on his family, and SMSgt Zier's probability to commit any future misconduct.

6.  **Retirement and Effect on Family**:  SMSgt Zier has worked tirelessly for over two decades to retire as a member of the United States Air Force.  The rank he retires at will contribute to the amount of benefits and pay that he received.  In addition to his wife, Alejandra Zier, SMSgt Zier also has a young daughter, Zoey Zier, and a young son, Noah Zier.  As described in the attachments, Noah suffers for severe medical ailments that he has had since birth.  Despite recommending a late term abortion, SMSgt Zier and his wife chose to give Noah life and have been working with him, his physicians, and other medical providers to provide around the clock care for their son.  Any decreases in his retirement pay and benefits will have a disastrous effect on his children's livelihood.  I ask you to consider this factor when determining how this request will impact SMSgt Zier's family situation.

7.  Pursuant to Article 57(a)(1), UCMJ, any reduction in grade that is included in a sentence of a court-martial takes effect on the earlier of:  1) 14 days after the adjudged date of sentence; or  2) in the case of a summary court-martial, the date on which the sentence is approved by the convening authority.   Under RCM 1103(d)(2), an accused who is requesting a deferment, "shall have the burden of showing that the interests of the accused and the community in deferral outweigh the community's interests in imposition of the punishment on its effective date.  Factors that the authority acting on a deferment request may consider in determining whether to grant the deferment request include, where applicable: the probability of the accused's flight; the probability of the accused's commission of other offenses, intimidation of witnesses, or interference with the administration of justice; the nature of the offenses of the which the accused was convicted; the sentence adjudged ; the command's immediate need for the accused; the effect of deferment on good order and discipline in the command; the accused's character, mental condition, family situation, and service record."  Additionally, under RCM 1109(c)(5), a

convening authority may "reduce, commute, or suspend in whole or in part….(E) reduction in pay grade."

8.  It is clear that this request positively meets every criteria identified above.  In accordance with RCM 1103, 1109, relevant case law, and in the spirit of not inflicting further harm to SMSgt's Zier's dependents, the defense respectfully requests the Convening Authority reduce, commute, or suspend the adjudged reduction in grade.  Alternatively, the defense respectfully requests deferring the reduction in rank until entry of judgment, for the purpose of supporting SMSgt Zier's three dependents.

9.  Sir, eventually, SMSgt Zier will have to move past this court-martial and become a productive member of society again.  He is working and hoping to retire as soon as possible to begin the healing process for both himself and his family.  Granting this request will help his rehabilitation by lowering the financial strain currently hovering over his son, Noah Zier.  The requested action will give him the ability to support his wife, their young daughter, and their son as he begins to rebuild his life.  Thank you for considering this request.  I can be reached at DSN 975-5556 or at jamesian.emmanuel.2@us.af.mil should you have any questions.


*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel


3. Attachments
1. MFR from SMSgt Zier, dated 24 August 2020, 2 pages
2. Index - Exhibits in Extenuation and Mitigation for SMSgt Zier, undated, 5 pages
3. Sentencing Package for SMSgt Zier, various dates, 206 pages

US v. Zier Military Record of Trial and Appellate Extracts 000434 of 902

20 August 2020

MEMORANDUM FOR  ALL REVIEWING AUTHORITIES

FROM:  MSgt Jeremy M. Zier

SUBJECT:  Request to Commute and/or Defer Reduction in Grade - *United States v. SMSgt Jeremy Zier*

1.  At the conclusion of my trial, a panel of officers made a determination to reduce me by one rank. As a CMSgt-select the outcome ultimately penalized me two ranks. I am asking to commute the sentence and return my rank to SMSgt. Alternatively, I am respectfully requesting that the reduction in rank is deferred until entry of judgment so that I can continue to support my family and their growing needs.

2.  Sir, I joined when I was 17-years old and serving in the Air Force has been my entire life. Early on I had key mentors that helped me grow personally and professionally. I've always wanted to emulate their leadership styles to ensure Airmen were trained and ready when the nation called, which meant one day becoming a SNCO. When I received the notification that I made Chief after 22-years, I was overwhelmed by the thought that a dream, which appeared unlikely to a much younger version of myself, was now a reality. As a combat photographer during the ISIS insurrection, I've also endured the horrors of war that have forever shaped how I view service. Having worked directly for a Joint Special Operations Task Force and providing the Task Force with information related capabilities, I truly understood what it meant to be at the tip of the spear and to sacrifice my mind and body in the defense of this great nation. When my promotion to chief was red lined it was devastating to me and my family whom have sacrificed so much as they served alongside of me. Retiring in the grade of SMSgt would be a significant milestone that would more accurately reflect my long career. My career has taken me on five deployments, to include harrowing direct combat operations, a hand selected tour on the Air Staff, and numerous other assignments that I've been chosen by my career field leadership to fill and eventually excelled at.

3.  This entire court martial process has been hell. The most humbling part is that it wasn't even the most stressful event in my life to date. Just 2-years ago my unborn child was only given a 10% chance of survival. After a medical evacuation from my assignment in Germany back to the United States, the entire family had to sit and pray hoping our baby would be able to survive birth. After his birth he was placed on life support and we were faced with the grueling task of sitting by his bed daily as he fought to live. After four months and four surgeries he was finally cleared to go home. Unfortunately, he would still require home nursing care to manage his medical disabilities. These two stressful events have impacted my family to the point that I know we'll need family therapy to heal. This court martial was hard as we lived in constant fear of the unknown and what our future holds. These conversations have brought a tremendous amount of stress into our home and we are just starting to figure out how to pick up the pieces. My son Noah is now a 2-year old boy that still has long term health concerns. Keeping this stripe will provide the additional funding to ensure we can provide him the necessary care and resources to

Page **1** of **2**

thrive. Like I said, I joined at 17-years old and service to the nation is all I know. My family has stood by me through so much and they should not suffer due to a lack of resources.

4.  Given the enormous amount of stress from the trial and the lingering emotional effects from my child's extended hospital stay, and combat deployments, it's in my family's best interest for me to retire immediately so we can focus on our collective physical and mental health. This stripe will help this process as it provides more resources to better provide for my family.

5.  I appreciate and thank you for taking the time to consider my request. This trial has already punished me with a federal conviction and enrollment and registration as a sex offender. I am pleading for you to return me to the pay grade of E8 as the loss of E9 is already a devastating blow to my reputation and service record. If, however, you do view that request as appropriate then I respectfully request that you defer my reduction in rank to E&.  Please take an opportunity to look over my 23-years of stellar EPRs and my long list of decorations and accolades that demonstrate a long and sustained service record.

6.  I thank you for the consideration to this request.


//signed//

JEREMY M. ZIER, MSgt, USAF




# SMSGT JEREMY M. ZIER

## EXHIBITS IN EXTENUATION & MITIGATION
(Exhibits are one page unless otherwise noted)

Exhibit    D    Index, 5 pages

### STATEMENT

Exhibit    E    SMSgt Zier's Personal Statement, 6 pages

### CHARACTER LETTERS

Exhibit    F    Character Letter from Ofc Shawn Weismiller, dtd 6 Jul 20, 1 page
Exhibit    G    Character Letter from David Clark, dtd 29 Jun 20, 2 pages
Exhibit    H    Character Letter from Douglas Lefforge, dtd 17 Jun 20, 2 pages
Exhibit    I    Character Letter from Jeremy Webster, dtd 6 Jul 20, 1 page
Exhibit    J    Character Letter from Renee Tyron, dtd 30 Jun 20, 2 pages
Exhibit    K    Character Letter from Stephen Faulisi, dtd 16 Jun 20, 2 pages
Exhibit    L    Character Letter from Timothy Bailey, dtd 29 Jun 20, 2 pages
Exhibit    M    Character Letter from Bradley Gildea, dtd 21 Jul 20, 1 page
Exhibit    N    Character Letter from Lawrence Cox, dtd 21 Jul 20, 2 pages
Exhibit    O    Character Letter from Christopher Moore, dtd 21 Jul 20, 1 page
Exhibit    P    Character Letter from David Steele, dtd 23 Jul 20, 1 page
Exhibit    Q    Character Letter from Auburn Braithwaite, dtd 1 Jul 20, 2 pages
Exhibit    R    Character Letter from James Lotz, dtd 22 Jul 20, 1 page
Exhibit    S    Character Letter from Lt Col Johnston, dtd 30 Jun 20, 1 page
Exhibit    T    Character Letter from Maj Anderson, dtd 24 Jul 20, 2 pages
Exhibit    U    Character Letter from Capt Morales, dtd 29 Jun 20, 2 pages
Exhibit    V    Character Letter from Capt Pardini, dtd 26 Jun 20, 1 page
Exhibit    W    Character Letter from CMSgt Victor, dtd 23 Jul 20, 1 page
Exhibit    X    Character Letter from CMSgt David, dtd 25 Jun 20, 1 page
Exhibit    Y    Character Letter from CMSgt Suddeth, dtd 29 Jun 20, 2 pages
Exhibit    Z    Character Letter from SMSgt Martin, dtd 22 Jun 20, 2 pages
Exhibit    AA   Character Letter from MSgt Kin, dtd 27 Jun 20, 2 pages
Exhibit    BB   Character Letter from MSgt D. Dickens, dtd 28 Jun 20, 2 pages
Exhibit    CC   Character Letter from MSgt Robertson, dtd 25 Jun 20, 2 pages
Exhibit    DD   Character Letter from MSgt M. Dickens, dtd 25 Jun 20, 1 page

### PHOTOGRAPHS

Exhibit    EE   Family and Military Photographs, undated, 7 pages

### CERTIFICATES, COINS & AWARDS

Def Exhibit _____ for ID
Page Offered _____
Page Admitted _____

Exhibit    FF   Bronze Star Medal, dtd 3 Dec 07

Page 1 of 5

| Exhibit | GG   | Air Force Achievement Medal, dtd 1 Jun 00 |
|---------|------|---|
| Exhibit | HH   | Air Force Achievement Medal, dtd 31 Jan 01 |
| Exhibit | II   | Air Force Achievement Medal, dtd 30 Mar 01 |
| Exhibit | JJ   | Air Force Achievement Medal, dtd 27 Mar 02 |
| Exhibit | KK   | Air Force Achievement Medal, dtd 14 Jul 20 |
| Exhibit | LL   | Air Force Commendation Medal, dtd 20 Apr 02 |
| Exhibit | MM   | Air Force Commendation Medal, dtd 2 Jul 10 |
| Exhibit | NN   | Air Force Commendation Medal, dtd 14 Nov 11 |
| Exhibit | OO   | Air Force Commendation Medal, dtd 13 Aug 19 |
| Exhibit | PP   | Meritorious Service Medal, dtd 19 Jul 13 |
| Exhibit | QQ   | Meritorious Service Medal, dtd 5 Oct 17 |
| Exhibit | RR   | Meritorious Service Medal, dtd 26 May 18 |
| Exhibit | SS   | Joint Service Achievement Medal, dtd 22 May 03 |
| Exhibit | TT   | Joint Service Achievement Medal, dtd 1 Feb 05 |
| Exhibit | UU   | Joint Service Commendation Medal, dtd 1 Jul 05 |
| Exhibit | VV   | Defense Meritorious Service Medal, dtd 22 Jul 15 |
| Exhibit | WW   | Letter of Appreciation from Col Ward, undated |
| Exhibit | XX   | Letter of Appreciation from CMSgt Johnson, dtd 7 Aug 98 |
| Exhibit | YY   | Letter of Appreciation from Brig Gen Soligan, dtd 1 Mar 99 |
| Exhibit | ZZ   | Letter of Appreciation from Brig Gen Soligan, dtd 1 Mar 99 |
| Exhibit | AAA  | Letter of Appreciation from Brig Gen Soligan, dtd 19 Mar 99 |
| Exhibit | BBB  | Letter of Appreciation from Brig Gen Soligan, dtd 9 Jun 99 |
| Exhibit | CCC  | Letter of Appreciation from Brig Gen Diehl, dtd 12 Jul 00 |
| Exhibit | DDD  | Letter of Appreciation from Brig Gen Diehl, dtd 7 Sep 00 |
| Exhibit | EEE  | Letter of Appreciation from Gen Robertson, dtd 16 Mar 01 |
| Exhibit | FFF  | Letter of Appreciation from Maj Gen Williams, dtd 1 Apr 01 |
| Exhibit | GGG  | Letter of Appreciation, dtd 18 Apr 01 |
| Exhibit | HHH  | Letter of Appreciation from CMSgt Holbeck, dtd 14 May 01 |
| Exhibit | III  | Letter of Appreciation from Gen Robertson, dtd 15 May 01 |
| Exhibit | JJJ  | Letter of Appreciation from Brig Gen Diehl, dtd 18 Apr 01 |
| Exhibit | KKK  | Letter from Col Lord, dtd 5 Jun 01 |
| Exhibit | LLL  | Letter from Brig Gen Diehl, dtd 17 Jul 01 |
| Exhibit | MMM  | Letter from Brig Gen Diehl, dtd 28 Jul 01 |
| Exhibit | NNN  | Letter of Appreciation from Maj Gen (Sel) Hodges, dtd 11 Jul 02 |
| Exhibit | OOO  | Letter of Appreciation from Sgt Maj Tilley, dtd 26 Feb 03 |
| Exhibit | PPP  | Letter of Appreciation from Brig Gen Sealock, dtd 12 May 03 |
| Exhibit | QQQ  | Letter of Appreciation, dtd 3 Jun 03 |
| Exhibit | RRR  | Letters of Appreciation, dtd 16 Oct 03 and 23 Oct 04 |
| Exhibit | SSS  | Letter of Appreciation from Col Woodward, dtd 16 May 05 |
| Exhibit | TTT  | Letter of Appreciation from Maj Gen Wurster, dtd 18 May 05 |
| Exhibit | UUU  | Letter of Appreciation from Brig Gen Flynn, dtd 2 Jun 05 |
| Exhibit | VVV  | Letter of Appreciation from Maj Gen Parker, undated |
| Exhibit | WWW  | Recognition for being on the Dean's List, undated |
| Exhibit | XXX  | Letter of Appreciation from Gen Rice, dtd 20 Apr 11 |
| Exhibit | YYY  | Letter of Appreciation from Lt English, dtd 11 Jun 98 |
| Exhibit | ZZZ  | Letter of Appreciation from Col Conroy, dtd 9 Oct 98 |
| Exhibit | AAAA | Recommendation for Air Force Achievement Medal, undated |
| Exhibit | BBBB | Letter of Appreciation from Rhea Law, dtd 24 Feb 99, 2 pages |
| Exhibit | CCCC | Letter of Appreciation from Lt Col Cash, dtd 15 Mar 99 |

US v. Zier Military Record of Trial and Appellate Extracts 000438 of 902

| | | |
|---|---|---|
| Exhibit | DDDD | Congratulations Letter from Col Diehl, undated |
| Exhibit | EEEE | Letter of Appreciation from SMSgt Stewart, dtd 17 Mar 00 |
| Exhibit | FFFF | Letter of Recommendation from Col Isaac, dtd 4 Nov 00 |
| Exhibit | GGGG | Letter of Appreciation from Col Ward, dtd 13 Oct 00 |
| Exhibit | HHHH | Letter of Appreciation from Lt Col Volavcheck, undated |
| Exhibit | IIII | Letter of Appreciation from Col McCoy, dtd 26 Mar 01 |
| Exhibit | JJJJ | Letter of Appreciation from Brig Gen Diehl, dtd 24 May 01 |
| Exhibit | KKKK | Letter of Appreciation from Laura Simpson, dtd 20 Jun 01 |
| Exhibit | LLLL | Letter of Appreciation from Col Worthing, dtd 4 Sep 02 |
| Exhibit | MMMM | Letter of Appreciation from Maj General (Sel) Hodges, dtd 25 Sep 02 |
| Exhibit | NNNN | Letter of Appreciation from Maj Skinner, dtd 18 Nov 02 |
| Exhibit | OOOO | Letter of Appreciation from Maj Gen (Sel) Hodges, dtd 18 Dec 02 |
| Exhibit | PPPP | Letter of Appreciation from Hap Lutz, dtd 3 Jun 03 |
| Exhibit | QQQQ | Letter of Appreciation from Cheryl Tyo, dtd 20 Nov 03 |
| Exhibit | RRRR | Letter of Appreciation from Leo Smith, dtd 28 Jun 04 |
| Exhibit | SSSS | Letter of Appreciation from Justin Gates, dtd 13 May 05 |
| Exhibit | TTTT | Letter of Appreciation from Gwen Parmley, dtd 24 Aug 06 |
| Exhibit | UUUU | Letter of Appreciation from Elena Furnari, dtd 11 Sep 06 |
| Exhibit | VVVV | Letter of Appreciation, dtd 15 Aug 06 |
| Exhibit | WWWW | Letter of Appreciation, dtd 7 Oct 06 |
| Exhibit | XXXX | Letter of Appreciation from Maj McKee, dtd Oct 06 |
| Exhibit | YYYY | Letter of Appreciation, dtd 17 Nov 06 |
| Exhibit | ZZZZ | Letter of Appreciation from TSgt Murphy, dtd 14 Jan 08 |
| Exhibit | AAAAA | Letter of Appreciation from Lt Col Karns, dtd 12 Sep 12 |
| Exhibit | BBBBB | 81 TRW Certificate for Outstanding Leadership and Dedication |
| Exhibit | CCCCC | Certificate for Support Flight Performer of the Month, Jul 99 |
| Exhibit | DDDDD | Certificate of Appreciation for Support at the Airfest, 1999 |
| Exhibit | EEEEE | Certificate of Appreciation for Support to Partnership in Education, 1998-1999 |
| Exhibit | FFFFF | Certificate of Commendation in Support to AF Sergeants Association, 2000 |
| Exhibit | GGGGG | Certificate of Appreciation, dtd 20 July 00 |
| Exhibit | HHHHH | Certificate of Achievement as Performer of the Month, dtd Oct 00 |
| Exhibit | IIIII | Certificate of Appreciation for Support to the Hops Marathon, dtd 10 Dec 00 |
| Exhibit | JJJJJ | Certificate of Appreciation for Support the Special Olympics, dtd Jan 01 |
| Exhibit | KKKKK | Certificate of Appreciation for Support to Super Bowl XXXV, dtd 24 Jan 01 |
| Exhibit | LLLLL | Certificate of Appreciation from Brig Gen Diehl, dtd 15 Feb 01 |
| Exhibit | MMMMM | Certificate of Appreciation from SSgt Woodruff, undated |
| Exhibit | NNNNN | Certificate of Appreciation from Maj Hartford, dtd 15 May 02 |
| Exhibit | OOOOO | Award of Excellence from Lamar Hammer, dtd 6 Sep 02 |
| Exhibit | PPPPP | Certificate of Appreciation from Gen Holland, dtd 9 Jun 03 |
| Exhibit | QQQQQ | Certificate of Appreciation from Gen Brown, dtd 1 Jun 04 |
| Exhibit | RRRRR | Meritorious Service Certificate in Support of Combat Operations, 2007 |
| Exhibit | SSSSS | Certificate of Recognition from Gen Lichte, dtd 10 Aug 08 |
| Exhibit | TTTTT | Certificate of Appreciation from Lt Col Dollesin, Sep 09 |
| Exhibit | UUUUU | Air Force Combat Action Medal, dtd 23 Oct 09 |
| Exhibit | VVVVV | Certificate of Recognition from CMSgt McVicar, dtd 15 Dec 09 |
| Exhibit | WWWWW | Certificate of Appreciation for Emerald Warrior, 2011 |
| Exhibit | XXXXX | Certificate for AVA Awards Gold Winner, 2011 |
| Exhibit | YYYYY | Certificate for Promotion to Chief Master Sergeant, undated |
| Exhibit | ZZZZZ | Certificate of Training for AFJROTC 2 Year Program, dtd 5 Aug 97 |

| Exhibit | AAAAAA | Video Production/Documentation Course Diploma, dtd 25 Jun 98 |
|---------|--------|---------|
| Exhibit | BBBBBB | Certificate of Completion for Intro to Media Composer Editing, dtd 29 Sep 99 |
| Exhibit | CCCCCC | Certificate of Completion for Intro to Media Composer Effects, dtd 9 Jun 00 |
| Exhibit | DDDDDD | Certificate of Completion for Advanced Techniques for Media Composer, dtd 13 Jun 00 |
| Exhibit | EEEEE | MacDill AFB Honor Guard Certificate of Training, undated |
| Exhibit | FFFFFF | Certificate of Training for Block III Equipment Custodian Training, dtd 5 Jan 01 |
| Exhibit | GGGGGG | Electronic Imaging Course Diploma, dtd 12 Jun 01 |
| Exhibit | HHHHHH | Certificate of Training for Visual Information Craftsmen Course, dtd 14 Nov 02 |
| Exhibit | IIIIII | Certificate of Completion for Advanced Media Composer Effects, dtd 10 Nov 04 |
| Exhibit | JJJJJJ | Syracuse University Certificate of Completion for Military Motion Media, dtd 8 Aug 05 – 11 May 06 |
| Exhibit | KKKKKK | Certificate of Achievement for Patrol Rifle Instructor Training, dtd 2 – 4 Oct 06 |
| Exhibit | LLLLLL | Certificate of Training for Combat Lifesaver Course, dtd 18-21 Mar 07 |
| Exhibit | MMMMMM | Certificate of Training for M114 Up-Armored HMMWV, dtd 1 Mar 07 |
| Exhibit | NNNNNN | Certificate of Training for Emergency Parachute Training, dtd 22 Jan 08 |
| Exhibit | OOOOOO | Certificate of Training for Combat Skills Training, dtd 22 Feb-22 Mar 07 |
| Exhibit | PPPPPP | Certificate of Training for Combat Survival Training Course, dtd 8 Feb 08 |
| Exhibit | QQQQQQ | Certificate of Training for Water Survival Training Course, dtd 14 Feb 08 |
| Exhibit | RRRRRR | Certificate of Training for USAF Public Affairs/Multimedia Leadership Course, dtd 21 Mar 08 |
| Exhibit | SSSSSS | Certificate of Training for Combat Lifesaver Course, dtd 28 Sep – 1 Oct 08 |
| Exhibit | TTTTTT | Certificate of Training for Combat Skills Training, dtd 20 Sep – 17 Oct 08 |
| Exhibit | UUUUUU | Certificate of Training for Remote Weapon Systems, dtd 14 – 15 Dec 08 |
| Exhibit | VVVVVV | Certificate of Completion for NCOA, dtd 17 Dec 09 |
| Exhibit | WWWWWW | Certificate of Training for Combat Camera Leadership Course, dtd 14 Jan 11 |
| Exhibit | XXXXXX | Certificate of Completion for Location Lighting Workshop, dtd 3 – 9 Jul 11 |
| Exhibit | YYYYYY | Certificate of Completion for Air Force Public Affairs Management Workshop, dtd 12 – 16 Sep 11 |
| Exhibit | ZZZZZZ | Certificate of Completion for Military Newsvideo Workshop, undated |
| Exhibit | AAAAAAA | Certificate of Completion for USAF Senior Noncommissioned Officer Distance Learning Course, dtd 17 Jan 12 |
| Exhibit | BBBBBBB | Certificate of Completion for Senior Enlisted Professional Military Education Course, dtd 8 Mar 12 |
| Exhibit | CCCCCCC | Certificate of Training for Visual Information Management, dtd 15 Aug 12 |
| Exhibit | DDDDDDD | Certificate of Training for Joint Contingency Public Affairs Course, dtd 21 Jul 17 |
| Exhibit | EEEEEE | CCAF Diploma for Accocaite in Applied Science, Audiovisual Production Services, dtd 20 Aug 03 |
| Exhibit | FFFFFFF | Hillsborough Community College Associate in Arts Diploma, dtd 10 May 04 |
| Exhibit | GGGGGGG | Ashford University Diploma, Bachelor of Arts, Journalism and Mass Communication, dtd 28 Jul 14 |
| Exhibit | HHHHHHH | Newspaper photo of SMSgt Zier as the youngest member of the mess, undated |

Exhibit     IIIIIII          Newspaper photo of SMSgt Zier volunteering and newspaper clipping
                             Recognizing SMSgt Zier for Military Citizen of the Year Awards Banquet,
                             undated
Exhibit     JJJJJJJ          Newspaper clipping of SMSgt Zier being recognized as Diamond Sharp,
                             undated
Exhibit     KKKKKKK          6 CS Commander's Award, dtd Dec 99
Exhibit     LLLLLLL          6 CS Airman of the Year Award, 1999
Exhibit     MMMMMMM          6 CS Airman of the Year Award, 2000
Exhibit     NNNNNNN          6 ARW Airman of the Year Award, 2000
Exhibit     OOOOOOO          Airman Leadership School John L. Levitow Award
Exhibit     PPPPPPP          MacDill AFB Honor Guard Appreciation Award, dtd Feb 00 – May 02
Exhibit     QQQQQQQ          AFSA Certificate of Commendation, dtd 19 May 01
Exhibit     RRRRRRR          Headquarters AFPAA NCO of the Year Award, 2011
Exhibit     SSSSSSS          Incirlik First Sergeants Counsel Appreciation Plaque, dtd Dec 14 – May 15
Exhibit     TTTTTTT          AFN Europe Senior NCO of the Year Certificate, 2014
Exhibit     UUUUUUU          SAF/PA Appreciation Plaque, dtd 24 Jul 15 – 15 Sep 17
Exhibit     VVVVVVV          HQ SNCO of the Year Award, 2018
Exhibit     WWWWWWW          SNCO of the Year Award, 2018
Exhibit     XXXXXXX          SNCO Captain Lance P. Sijan Leadership Award, 2019
Exhibit     YYYYYYY          Coins, undated, 11 pages

The portion of Attachment 3 featuring exhibits E - YYYYYYY, of the Submission of Matters – Clemency and Deferment of Reduction in Rank, dated 24 August 2020,  submitted by Capt Jamesian D. Emmaneul, may be located within the Defense Exhibits section of Volume 1-2.




**DEPARTMENT OF THE AIR FORCE**
**502D AIR BASE WING**
**JOINT BASE SAN ANTONIO**

14 August 2020

MEMORANDUM FOR SMSGT JEREMY M. ZIER

FROM: 502 SFG/JA (LT COL JA RAI A. WILLIAMS)

SUBJECT: Submission of Matters to the Convening Authority – *United States. v. SMSgt Jeremy M. Zier*

1. Since you have been convicted and sentenced by court-martial, you have the right to submit matters for consideration by the convening authority of your court-martial before the convening authority takes action on your case. The matters you submit may include any matters that might affect the convening authority's decision to approve or disapprove findings of guilt or part of the sentence in your case as permitted by law. These matters may include:

    a. Allegations of errors affecting the legality of the findings or sentence in your case.

    b. Portions or summaries of your record of trial, or copies of evidence introduced at trial.

    c. Matters in mitigation that were not available for consideration at your trial.

    d. Clemency recommendations by any court member, the military judge, or any other person.

    e. Any other matters you or your counsel believe the convening authority should be aware of before taking action in your case, whether or not available or introduced into evidence at your trial.

    f. (*If the accused is enlisted*) Your desire to submit an application for Return to Duty. *See* AFI 31-105.

2. You should consult with your defense counsel to decide whether to submit such matters. The convening authority will consider all matters you submit before taking action in your case. Failure to submit matters within the time provided in paragraph 4 constitutes a waiver of your right to do so.

3. If you decide not to submit matters for the convening authority's consideration, you may waive, in writing, the right to submit such matters. Such a waiver may expedite the post-trial processing and review of your case, if that is what you desire. You should consult your defense counsel before waiving your rights to submit matters. Once you make such a written waiver, it may not be withdrawn or revoked. You may indicate any waiver of your rights to submit matters on the indorsement to this letter or by submitting a separate written waiver.

4.  You have 10 days to submit matters for consideration by the convening authority from the date you receive a copy of the authenticated Record of Trial or, if applicable, the date both you and your defense counsel receive a copy of the recommendation of the staff judge advocate, whichever is later.  If you are unable to submit your matters within this period, you may, for good reason, apply to the convening authority, through the convening authority's staff judge advocate for an extension of the period.

5.  In addition to the submissions described above, you may submit an application to the convening authority, through the servicing Staff Judge Advocate, to defer any forfeitures of pay or allowances, reduction in grade, or service of a sentence to confinement.  If you have dependents, you may also submit an application to the convening authority, through the servicing Staff Judge Advocate, to waive any mandatory forfeitures of pay and allowances under Article 58b(b), UCMJ, with the amount waived paid to your dependents.  Applications for deferral and/or waiver may be submitted immediately.  In order for the convening authority to give such requests proper consideration, they should normally be submitted no later than the time provided in paragraph 4 above.


                                                    J'A RAI A. WILLIAMS, Lt Col, USAF
                                                    Staff Judge Advocate

cc:  Defense Counsel

1st Indorsment, SMSGT JEREMY M. ZIER                              14 August 2020

MEMORANDUM FOR  502 SFG/JA (LT COL JA RAI A. WILLIAMS)

Receipt acknowledged at  _1607_  (time) on  _14 Aug 2020_  (date).

I have consulted with my defense counsel concerning my rights to submit matters for the convening authority's consideration before the convening authority takes action in my case.  After considering the advice of my defense counsel, I (waive)(do not waive) my right to submit such matters.  I (will)(will not) submit any matters for the convening authority's consideration.


                                                    JEREMY M. ZIER, SMSgt, USAF
                                                    Accused



**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS AIR FORCE LEGAL OPERATIONS AGENCY**
**JOINT BASE CHARLESTON SOUTH CAROLINA**

26 August 2020

MEMORANDUM FOR  CONVENING AUTHORITY

FROM:  SSGT C              F

SUBJECT:  Victim Impact Statement in *United States v. SMSgt Jeremy Zier*

1.  You've already heard my experience and I'm not fond of repeating it, so instead I ask you to consider how this has impacted my life since PCSing from Turkey. It wasn't a moment or a brief chapter, it was an awakening that permeates my perception of the Air Force every day I put on the uniform. And tragically, I'm not alone in sharing one of the most degrading experiences you can face as an E-3 at her first assignment. I lost sleep then and I lose sleep now (as an NCO) knowing leaders can act this way because of the perception that their middle and lower ranks will turn a blind eye. Senior Zier thought he was above accountability and the reality is... he served his entire career, even being selected for the rank of Chief Master Sergeant, while walking unchecked and unscathed.

2.  One question I was asked multiple times throughout the investigation is if I felt Senior Zier was still a good leader despite these "isolated" incidents. These behaviors do not align with ideals of a good father, a good role model or a good leader. These questions have made me angry and nauseous over the span of five years. I've had plenty of time to reflect over the course of three PCSes, six supervisors and four other superintendent leadership styles. I eventually realized Zier's go-to strategy is to manipulate and deceive. To twist and contort minds into knots that take years to unravel. So my answer to the question -"Is he still a good leader despite these incidents?"- is emphatically no. He is not a good leader, rather, this is how he chooses to abuse his power. He taught me superintendents can facilitate toxic work environments rather than be the ones to correct them. He knew alcohol was the perfect alibi in our institution for higher ranks to live consequence-free regardless of their routine choice to overindulge and overstep boundaries. I learned damage to government property only applies to metal scraps and weaponry, not the violated flesh or bruised self-worth of an Airman.

3.  What happened in Pamukkale didn't start and stop that night. This rendered me paranoid of every other NCO and SNCO I've met since. My ability to trust the chain of command was immediately slaughtered and I was left to pick up the pieces of what serving in the military was supposed to be and reconcile it with the bleak reality before me. I survived by hiding my hurt and confusion. Suffering in silence seemed like the safest option, but I didn't anticipate the uphill battle of learning how to cope with the resulting anxiety, depression and other trauma-related effects from assault.

4.  When you're a survivor, the world doesn't stop spinning... life just goes on in an eerie way. You keep busy and try to forget as best you can, though it never truly leaves you. I've asked myself so many times; what if I came forward today? Would they be angry I waited? Is what happened less relevant as time passes? Do my wingmen ever think about the trip? Does he think

about the trip? Does his wife know? Are his children safe? What if we work together again? What can I do to protect other females? Does my pain matter? Should I just let it go? These questions create a prison in a person's mind. For me, it became a cage with over a thousand tally marks clawed into the floor.

5.   The crippling self-doubt had me hoping for a long time that it was JUST me. Second-guessing everything, not just about that night but about my job performance as an Airman and my integrity as a human being keeping this toxic secret. I think about the times his wife had checked in on me, offered to help decorate my dorm room and invited me to their dining room table for supper. Did he exploit our friendship knowing I wouldn't want to hurt her? What if this is the product of successful gaslighting and victim blaming? And the bravest question of all - what if I deserve justice? Maybe the Air Force can't always be one big happy family because some people get too comfortable getting too close and feel too powerful to be stopped. This secret is now off my conscious, but I don't feel relief. Instead, I begin to face the guilt of not coming forward sooner.

6.   Reporting a predator does not ruin their lives, it seeks justice for the lives of victims. Reporting a predator does not damage their reputation, it makes it more accurate. Reporting a predator does not harm their family, it arms them with the truth. Reporting a predator aligns our core values in the United States Air Force of always having 'Integrity First.' I never wanted to be sitting in that chair, I never wanted this to be part of my story and I never wanted this to be the reality of our military.

7.   Being able to survive, and eventually thrive in my career, doesn't mean what happened that day will ever be okay. I am not sorry for going on an office trip. I am not sorry for going down to the hot tub. I am not sorry for feeling uncomfortable. I am not sorry for turning away. I am not sorry for being upset. I am not sorry for seeking guidance. I am not sorry for setting boundaries. I am not sorry for continuing to recover. And I am not sorry for reporting unrestricted. A person should not have to scream NO for their presence, their body and their lack of consent to be respected. Finally, I am not sorry for asking the standards to be enforced. I want to have confidence in knowing my chain of command is about their people,
and are here to grow us - not molest us.

8.   Those fears need to be addressed, for myself, and the 300,000 other airmen in our branch that he has had access to every single day. We can call a Chief a leader based on stripes, but regardless of smooth talking, networks of influential buddies, or fully stacked ribbon racks... true leadership is accountability no matter the rank. I love what we envision our Air Force to be and my work continues long after trial to make it a place Airmen can trust. A safer institution for survivors to heal. An organization that stops empowering these predators. And I believe this work is not mine alone, it's ours. Thank you for your time.

9.   SMSgt Zier's actions have greatly affected my life and I would respectfully ask you to uphold his sentence.  Thank you for considering my input on this matter.

C
F

C              F                 , SSGT, USAF




**DEPARTMENT OF THE AIR FORCE**
**502D AIR BASE WING**
**JOINT BASE SAN ANTONIO**

<u>25</u> August 2020

MEMORANDUM FOR  SSGT C.          F

FROM:  502 SFG/JA (LT COL JA RAI A. WILLIAMS)

SUBJECT:  Submission of matters, United States v. SMSgt Jeremy M. Zier

1.  On 14 August 2020, SMSgt Jeremy M. Zier was convicted by Special Court-Martial of one charge and one specification, in violation of Article 92 UCMJ, Willful Dereliction of Duty, and one charge and one specification, in violation Article 120 UCMJ, Abusive Sexual Contact. For these crimes, he was sentenced to reduction in rank to E-7. The next step in the process is for the Convening Authority, Colonel James H. Masoner, to review the findings and sentence. In certain cases, the Convening Authority has discretion to approve all or any portion of the findings and sentence. In other cases, the discretion of the Convening Authority is limited by law. I am writing to let you know how you can provide input to me for the Convening Authority's consideration.

2.  Before the Convening Authority takes action, I will, pursuant to Rule for Courts-Martial 1106, submit a recommendation to him, with a copy to defense counsel. I will review the record of trial and advise the Convening Authority on whether the court-martial was lawfully constituted and had jurisdiction over the accused and each offense, whether any errors were committed which materially prejudiced his substantial rights, whether there is enough evidence in the record to support each finding of guilty, and whether the adjudged sentence is lawful.

3.  You may submit a statement in writing to me for consideration in advising the Convening Authority. The choice is entirely yours. This statement could describe the impact SMSgt Zier's crime had on your life. You may also discuss whether you believe the Convening Authority should approve the findings and sentence or grant some form of clemency, if authorized by law. However, your statement should not reference any crimes for which SMSgt Zier was not convicted by the court-martial in order to avoid any prejudice to his post-trial rights.

4.  You have 10 days to submit matters for consideration by the convening authority from the date you receive a copy of the authenticated record of trial or the date you receive a copy of the recommendation of the staff judge advocate, whichever is later. If you want to submit a statement, please provide it to the following office or email address: 502 SFG/JA, 1 Washington Circle Ste 6, JBSA-Randolph, TX 78150,                                    . Your signature is required on any statement submitted. If you submit a statement, we will provide it, along with all of the relevant trial related documents, to SMSgt Zier and his attorney. SMSgt Zier and his attorney will then have an opportunity to comment on your statement, if submitted, and to provide our office with matters they want the Convening Authority to consider when making his decision on whether to approve the findings and sentence.

5. You may ask for additional time to submit your statement. I will provide your request to the Convening Authority who may grant up to an additional twenty days.

6. You may also consult Special Victims' Counsel on whether to submit a victim impact statement and the contents of such a statement in accordance with AFI 51-304, *Legal Assistance, Notary, and Preventive Law Programs*.

JA RAI A. WILLIAMS, Lt Col, USAF
Staff Judge Advocate

1st Indorsement, SSGT C.              F                                      __ August 2020

MEMORANDUM FOR 502 SFG/JA (LT COL JA RAI A. WILLIAMS)

I acknowledge receipt of this notification.

C             F                  , SSgt, USAF

2nd Indorsement, SSGT C              F                                      25 August 2020

MEMORANDUM FOR 502 SFG/JA (LT COL JA RAI A. WILLIAMS)

I understand that I may provide a statement to you for consideration in advising the Convening Authority on whether to approve all or any portion of the findings and sentence.

_____ I am submitting the attached statement
_____ I do not intend to submit a statement.

C             F                  , SSgt, USAF

3d Indorsement, 502 SFG/JA (LT COL JA RAI A. WILLIAMS)

MEMORANDUM FOR  SSGT C          F

(SSgt C        F      provided a statement) ~~(SSgt C~~      ~~F~~      ~~did not provide a~~
~~statement)~~. *jaw*

                                       JĀ RAI A. WILLIAMS, Lt Col, USAF
                                       Staff Judge Advocate

While the Submission of Matters notification was provided to SSgt C.F. on 25 August 2020, the 1st Indorsement was not signed until a later date by SSgt C.F.

20 August 2020

MEMORANDUM FOR  ALL REVIEWING AUTHORITIES

FROM:  MSgt Jeremy M. Zier

SUBJECT:  Request to Commute and/or Defer Reduction in Grade - *United States v. SMSgt Jeremy Zier*

1.  At the conclusion of my trial, a panel of officers made a determination to reduce me by one rank. As a CMSgt-select the outcome ultimately penalized me two ranks. I am asking to commute the sentence and return my rank to SMSgt. Alternatively, I am respectfully requesting that the reduction in rank is deferred until entry of judgment so that I can continue to support my family and their growing needs.

2.  Sir, I joined when I was 17-years old and serving in the Air Force has been my entire life. Early on I had key mentors that helped me grow personally and professionally. I've always wanted to emulate their leadership styles to ensure Airmen were trained and ready when the nation called, which meant one day becoming a SNCO. When I received the notification that I made Chief after 22-years, I was overwhelmed by the thought that a dream, which appeared unlikely to a much younger version of myself, was now a reality. As a combat photographer during the ISIS insurrection, I've also endured the horrors of war that have forever shaped how I view service. Having worked directly for a Joint Special Operations Task Force and providing the Task Force with information related capabilities, I truly understood what it meant to be at the tip of the spear and to sacrifice my mind and body in the defense of this great nation. When my promotion to chief was red lined it was devastating to me and my family whom have sacrificed so much as they served alongside of me. Retiring in the grade of SMSgt would be a significant milestone that would more accurately reflect my long career. My career has taken me on five deployments, to include harrowing direct combat operations, a hand selected tour on the Air Staff, and numerous other assignments that I've been chosen by my career field leadership to fill and eventually excelled at.

3.  This entire court martial process has been hell. The most humbling part is that it wasn't even the most stressful event in my life to date. Just 2-years ago my unborn child was only given a 10% chance of survival. After a medical evacuation from my assignment in Germany back to the United States, the entire family had to sit and pray hoping our baby would be able to survive birth. After his birth he was placed on life support and we were faced with the grueling task of sitting by his bed daily as he fought to live. After four months and four surgeries he was finally cleared to go home. Unfortunately, he would still require home nursing care to manage his medical disabilities. These two stressful events have impacted my family to the point that I know we'll need family therapy to heal. This court martial was hard as we lived in constant fear of the unknown and what our future holds. These conversations have brought a tremendous amount of stress into our home and we are just starting to figure out how to pick up the pieces. My son Noah is now a 2-year old boy that still has long term health concerns. Keeping this stripe will provide the additional funding to ensure we can provide him the necessary care and resources to

thrive. Like I said, I joined at 17-years old and service to the nation is all I know. My family has stood by me through so much and they should not suffer due to a lack of resources.

4.  Given the enormous amount of stress from the trial and the lingering emotional effects from my child's extended hospital stay, and combat deployments, it's in my family's best interest for me to retire immediately so we can focus on our collective physical and mental health. This stripe will help this process as it provides more resources to better provide for my family.

5.  I appreciate and thank you for taking the time to consider my request. This trial has already punished me with a federal conviction and enrollment and registration as a sex offender. I am pleading for you to return me to the pay grade of E8 as the loss of E9 is already a devastating blow to my reputation and service record. If, however, you do view that request as appropriate then I respectfully request that you defer my reduction in rank to E&.  Please take an opportunity to look over my 23-years of stellar EPRs and my long list of decorations and accolades that demonstrate a long and sustained service record.

6.  I thank you for the consideration to this request.


//signed//

JEREMY M. ZIER, MSgt, USAF

US v. Zier Military Record of Trial and Appellate Extracts 000452 of 902



**DEPARTMENT OF THE AIR FORCE**
**502D SECURITY FORCES GROUP**
**JOINT BASE SAN ANTONIO - RANDOLPH**



1 Sep 20

MEMORANDUM FOR  MILITARY JUDGE STERLING C. PENDLETON

FROM:  502 SFG/CC

SUBJECT:  Convening Authority Decision on Action – *United States v. SMSgt Jeremy M. Zier*

1.  In the case of SENIOR MASTER SERGEANT JEREMY M. ZIER, Air Force Public Affairs Agency, the sentence adjudged is approved and will be executed.  The accused requested relief from the adjudged reduction in grade in the form of deferment, commutation, or suspension.  The accused's request for relief is denied.

2.  Prior to coming to this decision, I consulted with my Staff Judge Advocate.  Before taking action, I considered matters timely submitted by the accused under R.C.M. 1106 and the victim under R.C.M. 1106A.  The accused did not submit matters in rebuttal.


                                                    ⁄ JAMES H. MASONER, Colonel, USAF
                                                    Commander

*Mission ~ Wingman ~ Partners*

# PRETRIAL

1st Indorsement, DD Form 458, *Charge Sheet*, dated 24 March 2020, SMSgt Jeremy M. Zier, Air Force Public Affairs Agency, Joint Base San Antonio-Randolph, TX

FROM: AFPAA/CC

MEMORANDUM FOR 502 SFG/CC

I recommend the charges be referred to trial by special court-martial. The Air Force Office of Special Investigation's report of investigation is attached and supports the charges. The victims and witnesses have been informed of the preferral of charges. Due to the severity of the charges, ~~I do not believe retention on active duty is appropriate if he is convicted.~~ *TMV  24 Mar 20*

TODD M. VICIAN, Colonel, USAF
Commander

2 Attachments:
1. Personal Data Sheet, dated 23 March 2020, 1 pg
2. Report of Investigation, dated 1 March 2020, 64 pgs

### PERSONAL DATA SHEET

DATE PREPARED:  23 Mar 20

NAME OF ACCUSED:  JEREMY M. ZIER

ORGANIZATION:  Air Force Public Affairs Agency    Rank:  Senior Master Sergeant

SSAN:    DATE OF RANK:  1 Oct 16

PAY GRADE:  E-8    DATE OF BIRTH:

TOTAL ACTIVE FEDERAL MILITARY SERVICE
DATE:  6 Aug 97    LENGTH OF SERVICE: 22 years, 7 months

AIR FORCE SPECIALTY CODE: 3N090    MILITARY TEST SCORES:
ADMIN: 71    ELECT: 85
GEN: 80    MECH: 73

BASIC PAY: $5,787.90    HARDSHIP DUTY PAY:  None

INITIAL DATE OF CURRENT SERVICE: 30 Jun 17    HOSTILE FIRE PAY:  None

TERM OF CURRENT SERVICE:  4 years    IMMINENT DANGER PAY:  None

PRIOR SERVICE:  None
SPECIAL PAY AND BONUSES:  None
OVERSEAS SERVICE (OCONUS):  Ramstein, Germany (20 Sep 17 – 28 May 18)
Incirlik, Turkey (23 Jul 13 – 22 Jul 15)
COMBAT SERVICE:  None

NATURE OF PRETRIAL RESTRAINT:  None

MARITAL STATUS:  Married    NUMBER OF DEPENDENTS: 3

NUMBER OF PREVIOUS COURT-MARTIAL
CONVICTIONS: 0

NUMBER OF PREVIOUS ARTICLE 15 ACTIONS: 0

AWARDS AND DECORATIONS:  Bronze Star, Defense Meritorious Service Medal, Meritorious Service Medal with two bronze oak leaf clusters, Joint Service Commendation Medal, Air Force Commendation Medal with three bronze oak leaf clusters, Joint Service Achievement Medal with one bronze oak leaf cluster, Air Force Achievement Medal with three bronze oak leaf clusters, Air Force Combat Action Medal, Meritorious Unit Award, Air Force Organizational Excellence Award, Combat Readiness Medal, Air Force Good Conduct Ribbon with one silver oak leaf cluster and one bronze oak leaf cluster, National Defense Service Medal, Iraq Campaign Medal with one bronze star, Global War on Terrorism Expeditionary Medal, Global War on Terrorism Service Medal, Sea Service Deployment Ribbon, Nuclear Deterrence Operations Service Medal, Air Force Overseas Ribbon Short Tour, Air Expeditionary Service Ribbon with one bronze oak leaf cluster, Air Force Longevity Service Award with one silver oak leaf cluster and one bronze oak leaf cluster, Air Force Noncommissioned Officer Professional Military Education Ribbon with two bronze oak leaf cluster, Air Force Training Ribbon, NATO Meritorious Service Medal.

### Personal Data – Privacy Act of 1974 (5 U.S.C. 552a)



**DEPARTMENT OF THE AIR FORCE**
OFFICE OF SPECIAL INVESTIGATIONS

# Report of Investigation

**REPORT BY:** SA LUKASZ K. MISINIEC    **FILE NO:** 310-C-120AA4-35221193511545

**PERIOD OF REPORT:** 10 Dec 19 – 28 Feb 20    **DATE OF REPORT:** 1 Mar 20

**SUBJECT:** JEREMY M ZIER; Male Born:                    E-8; SSN:                ; Air
Force Public Affair Agency (AETC), Joint Base San Antonio-Randolph, TX

**VICTIMS:**    E            P        , Female Born:              E-3; SSN:
        1st Combat Camera Squadron (ACC), Joint Base Charleston, SC

        C            F        Female Born:           ;            ; E-5; SSN:
        ; 4th Fighter Wing, Seymour Johnson AFB (ACC), NC

        T            W        Female Born:             ;         Civ; SSN:

| MATTERS INVESTIGATED | | | |
|---|---|---|---|
| **INCIDENT** | **OFFENSE DESCRIPTION** | **SUBJECT** | **VICTIM** |
| 2M206J3S | ABUSIVE SEXUAL CONTACT ON OR AFTER JUNE 28, 2012 | JEREMY M. ZIER | C        F |
| 2M206JNJ | ABUSIVE SEXUAL CONTACT ON OR AFTER JUNE 28, 2012 | JEREMY M. ZIER | T        W |
| 2M206JMJ | ABUSIVE SEXUAL CONTACT ON OR AFTER JUNE 28, 2012 | JEREMY M. ZIER | E        P |

**STATUS:**  Referred for Action. Action Authority or designee must report to OSI all dispositions on investigated offenses and specifications.  (AFI 71-101, Volume 1).

_____
DARREN R. HIGHT, SA, DAFC
Special Agent-in-Charge, OSI Det 404

**DISTRIBUTION:**

AFPAA/CC (Action)(w/ Exhibits)..................................................................................... 1
502 SFG/JA (Info)(w/ Exhibits) ..................................................................................... 1
File (w/ Exhibits) ......................................................................................................... 1

**SPECIAL HANDLING REQUIRED: This document is subject to a claim of privilege under military law.  Handle in accordance with AFI 71-101, Volume 1.**





**File No:  310-C-120AA4-35221193511545**

**TABLE OF CONTENTS**

SUMMARY OF INVESTIGATION

ELEMENTS OF PROOF                                             1-1

INVESTIGATIVE ACTIVITIES                                     2-1

EXHIBITS                                                     3-1

EVIDENCE                                                     4-1

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**

*35221193511545*

**ROI Page 2**



**File No: 310-C-120AA4-35221193511545**

## SUMMARY OF INVESTIGATION

This investigation was initiated on 10 Dec 19, based on information provided by SSgt IZABELLA WORKMAN, 1st Combat Camera Squadron (CTCS), Joint Base Charleston (JB CHS), SC, who observed SMSgt JEREMY ZIER (SUBJECT) Air Force Public Affairs Agency (AFPAA), Joint Base San Antonio – Randolph, TX, grab SSgt E    P        (VICTIM P    ), 1 CTCS, JB CHS, SC, buttocks while attending the 1 CTCS holiday party. WORKMAN also believed SUBJECT may have previously had inappropriate contact with SSgt C        F        , (VICTIM F        ), 4th Fighter Wing, Seymour Johnson AFB (SJAFB), NC.

OSI interviewed VICTIM P    who disclosed she was at the 1 CTCS holiday party on 7 Dec 19, at the North Charleston Marriott Hotel, and engaged in conversation with SUBJECT. VICTIM P    did not remember if SUBJECT grabbed her buttocks, but heard rumors about the incident. VICTIM P elected not to further participate in the investigation.

OSI interviewed SSgt KYLE HAGAN, 1 CTCS, JB CHS, SC, who disclosed he witnessed SUBJECT and VICTIM P    socializing at the holiday party and SUBJECT place his hand on VICTIM P    's lower back, and lower it onto her buttocks, where it remained long enough for him to point it out to WORKMAN. WORKMAN acknowledged she also witnessed SUBJECT's actions.

OSI interviewed VICTIM F        who disclosed that in April 2015, while on a trip with co-workers to Colossae Thermal Hotel, Pamukkale/Denizli, Turkey, SUBJECT, VICTIM F        , and their co-workers were in a hot tub at the hotel. While in the hot tub, SUBJECT touched VICTIM F        s inner thigh and moved his hand towards her swimsuit bottoms and placed it on the outside of her swimsuit bottoms along the top front waistband. SUBJECT then reached inside of her swimsuit bottoms, and grazed her vagina. VICTIM F        got out of the hot tub and SUBJECT followed her. SUBJECT attempted to get VICTIM F        s attention by grabbing her arm. VICTIM F        turned around at which point her breasts became exposed in front of SUBJECT and her co-workers. VICTIM F        was unsure as to whether her breasts came out of her top because SUBJECT untied her bathing suit top.

OSI interviewed Civ SCOTT TAYLOR,                                who related he was on the trip to to Colossae Thermal Hotel, Pamukkale/Denizli, Turkey and was present in the hot tub the night of the incident. TAYLOR observed SUBJECT exit the hot tub remove his shorts so that he was naked, and re-enter the hot tub. TAYLOR further observed SUBJECT move towards VICTIM F        where TAYLOR believed SUBJECT touched VICTIM F        with part of his body. TAYLOR was unsure where SUBJECT touched VICTIM F    , or if SUBJECT used his hands to touch VICTIM F        as the interaction was under water.

OSI interviewed Civ T    W        (VICTIM W        ), who disclosed SUBJECT attended a holiday party hosted by AFPAA, JBSA-Randolph, TX on 13 Dec 19, at the San Antonio Zoo, TX. While at the party, SUBJECT was in line behind VICTIM W        to purchase a drink. SUBJECT brushed his hand against her buttocks twice.

There were no witnesses who observed any contact between SUBJECT and VICTIM W

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**


*35221193511545*

**ROI Page 3**



**File No:  310-C-120AA4-35221193511545**

## 1-1. ELEMENTS OF PROOF

| Elements of Proof (Abusive Sexual Contact On Or After June 28, 2012) | Ref Para #: |
|---|---|
| Any person subject to this chapter who commits or causes sexual contact upon or by another person, if to do so would violate subsection (b) (sexual assault) had the sexual contact been a sexual act, is guilty of abusive sexual contact and shall be punished as a court-martial may direct. | 2-1, 2-3, 2-7, 2-22, 2-27, 2-28, 2-37, 2-40, 2-43 |

## 2-1. INVESTIGATIVE ACTIVITIES

2-1.  On 10 Dec 19, SA KYLE CARTER and SA JIHAD KANDIL, OSI Det 310, Joint Base Charleston (JB CHS), SC interviewed SSgt IZABELLA WORKMAN, 1st Combat Camera Squadron (CTCS), JB CHS, SC at OSI Det 310, JB CHS, SC, who verbally provided the following:  On 07 Dec 19, WORKMAN went to a holiday party at North Charleston Marriott Hotel, 4770 Goer Dr, North Charleston, SC, organized by 1 CTCS, JB CHS, SC.  Prior to attending the squadron holiday party, WORKMAN dropped off a few items with SrA HALEY PHILLIPS, 1 CTCS, JB CHS, SC, who hosted a small gathering at her residence,                                                        with her friends, SSgt E      P          , (VICTIM P          ), 1 CTCS, JB CHS, SC; SrA SEAN CAMPBELL, 1 CTCS, JB CHS, SC; SSgt CLAYTON CUPIT, 1 CTCS, JB CHS, SC; SSgt TAYLOR HARRISON, 1 CTCS, JB CHS, SC; SSgt CHRIS DRZAZGOWSKI, 1 CTCS, JB CHS, SC; TSgt GUSTAVO CASTILLO, 1 CTCS, JB CHS, SC; Civ IAN LEPLA, WORKMAN's boyfriend,                                           and Civ RYAN BAUMGART                              VICTIM P          consumed alcohol while at PHILLIPS' residence; however, WORKMAN did not know how many drinks VICTIM P          consumed.  WORKMAN and LEPLA took an Uber the North Charleston Marriott Hotel and sat at VICTIM P         s table.  VICTIM P          consumed more alcohol at the holiday party and became visibly intoxicated to the point that she stumbled while she walked.

SUBJECT followed VICTIM P          around throughout the event.  At one point, SUBJECT sat next to VICTIM P          and WORKMAN overheard a conversation between SUBJECT and VICTIM P          about her sexual practices with TSgt DOMINIC P          (VICTIM P         s husband), 628 Logistic Readiness Squadron (LRS), 1 CTCS, JB CHS, SC who was deployed.  Later that night, WORKMAN observed SUBJECT's hand on VICTIM P         s buttocks.  WORKMAN told LEPLA to go and separate VICTIM P          and SUBJECT due to SUBJECT placing his hand on VICTIM P         s buttocks.  LEPLA walked over to VICTIM P          and asked if she would like to "step outside for a smoke", which she did.

Once the function was over at 0030 hours, SUBJECT went outside and ordered an Uber.  SUBJECT asked VICTIM P          if she was going with him in his Uber.  WORKMAN declined the offer for VICTIM P          and VICTIM P          got in WORKMAN's Uber and left.  WORKMAN informed VICTIM P          of SUBJECT's behavior and his hand placement on her buttocks.  VICTIM P          appeared embarrassed by the situation since she did not recall the events that occurred throughout the night, due to her level of intoxication.  WORKMAN told VICTIM P          she would speak with MSgt KEVIN CARTINO, First Sergeant, 1 CTCS, JB CHS, SC to report SUBJECT's behavior.  VICTIM P          expressed she was nervous about WORKMAN speaking to CARTINO since she would be leaving for Officer Training School in January 2020.

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**





**File No: 310-C-120AA4-35221193511545**

WORKMAN also believed SUBJECT may have inappropriately touched SSgt C        F        , (VICTIM F        ), 4th Fighter Wing, Seymour Johnson AFB (SJAFB), NC.

2-2. On 10 Dec 19, SA RYAN VOTTERO and SA KANDIL, OSI Det 310, JB CHS, SC, interviewed Lt MICKEL MCGANN, 1 CTCS, JB CHS, SC, at OSI Det 310, JB CHS, SC, who verbally provided the following: On 07 Dec 19, while at the squadron holiday party at North Charleston Marriott Hotel, he overheard a conversation between VICTIM P        and SUBJECT where VICTIM P        told SUBJECT "We will have sex like bunnies when my husband gets back". MCGANN did not hear anything else in regards to that conversation. MCGANN added he did not observe any unprofessional conduct between SUBJECT and VICTIM P        .

2-3. **VICTIM F        Interview:** On 11 Dec 19, SA VOTTERO and SA CARTER, OSI Det 310, JB CHS, SC, conducted an interview of VICTIM F        , at OSI Det 310, JB CHS, SC. SA VOTTERO briefed VICTIM F        on the services available to her via the DD Form 2701, along with her right to a Special Victims' Counsel. VICTIM F        verbally provided the following details: She was stationed at Incirlik Air Base (AB), Turkey from May 2014 to August 2015. SUBJECT was her station manager at the Armed Forces Network (AFN). She related an incident which occurred while on a trip to Colossae Thermal Hotel, Pamukkale/Denizli, Turkey, in April 2015; which involved, SUBJECT, MSgt TSUYOSHI SHINZATO, Air Mobility Command, Public Affairs, Scott AFB, IL, Civ SCOTT TAYLOR        SSgt KATELYNN MOELLER, AFN Sembach, Germany (DEU) and SSgt AARON WOLFF, 23rd Combat Communications Squadron (CBCS), Travis (TAFB), CA. On the second night of the trip, SUBJECT socialized with VICTIM F        and TAYLOR who was staying in a room with VICTIM F        SUBJECT began a conversation with VICTIM F        regarding volunteer work bullets associated with the Lesbian Gay Bisexual Transsexual (LGBT) alliance on the installation. From those conversations, he asked VICTIM F        about her sex life with other women, and what it was like to be with them. SUBJECT told her "you just haven't had the right dick yet." VICTIM F        became uncomfortable with the conversation. After a while, VICTIM F        , TAYLOR, and SUBJECT left to meet with MOLLER, WOLFF and SHINZATO who were socializing in the hot tub in the rear of the hotel. In the hot tub, TAYLOR sat to the right of VICTIM F        and SUBJECT sat to the left of her. SHINZATO sat to the left of SUBJECT, MOELLER sat to the left of SHINZATO and WOLLF sat to the left of MOELLER. VICTIM F        provided a sketch of the seating arrangement in the hot tub (**Exhibit 1**). VICTIM F        and SUBJECT consumed alcohol while in VICTIM F        's room and in the hot tub. VICTIM F        did not recall the amount of alcohol consumed. She recalled that she was cognizant and aware of her surroundings but not account for how intoxicated others may have been.

While in the hot tub, SUBJECT consumed alcohol and sat next to VICTIM F        . VICTIM F        attempted to non-verbally signal TAYLOR that she was uncomfortable about SUBJECT trying to get close to her in the tub. (Agent Note: VICTIM F        did not recall how she attempted to non-verbally signal TAYLOR.) TAYLOR left to utilize the bathroom at which point SUBJECT moved next to VICTIM F        and put his right hand on her inner left thigh. VICTIM F        moved away from SUBJECT, and SUBJECT removed his hand. VICTIM F        recalled two instances where SUBJECT put his hand on her thigh and she moved away. At one point, VICTIM F        started to tell SUBJECT to stop; however, MOELLER seemed to notice what SUBJECT was doing, and offered him a drink to get his attention away from VICTIM F        .





**File No:  310-C-120AA4-35221193511545**

SUBJECT accepted the shot of alcohol and drank it.  SUBJECT touched VICTIM F          s inner thigh again and moved his hand towards her swimsuit bottoms and placed it on the outside of her swimsuit bottoms along the top front waistband with the palm side of his hand towards her body. SUBJECT attempted to put his hand inside her swimsuit bottom multiple times; however, she told him "stop" and said "no" in addition to pushing his hand away.  On the final attempt, SUBJECT got his hand inside VICTIM F          s swimsuit bottom and grazed her vagina.  VICTIM F          clarified that SUBJECT did not penetrate her vagina.  VICTIM F          again told SUBJECT "stop" in a louder tone.  VICTIM F          believed MOLLER heard her say stop.

VICTIM F          left the hot tub to go back to her room and SUBJECT followed her out.  SUBJECT then pulled the string on the back of her swimsuit top which was holding her swimsuit top closed. SUBJECT's actions untied VICTIM F          's top and exposed her breasts to SUBJECT and the others in the hot tub. VICTIM F          ran to her room and did not come down for the rest of the night because she was embarrassed.  VICTIM F          believed SUBJECT may have pulled her top as a joke for her not taking his sexual advances, and believed she was playing hard to get and for that reason continued to attempt advances on her.  VICTIM F          expressed her concerns to TAYLOR about being uncomfortable around SUBJECT, and he related to her he would be her "wingman" for the remainder of the trip to ensure there was a barrier between her and SUBJECT.    VICTIM never confronted SUBJECT about the incident and did not have any saved messages or communications between herself and SUBJECT.

VICTIM F          stated she filed a restricted report with Sexual Assault Response Coordinator's office at Incirlik AB, Turkey regarding this incident.

At the conclusion of the interview, VICTIM F          requested an SVC.

2-4.  **VICTIM P          Interview:** On 12 Dec 19, SA VOTTERO and SA KANDIL, OSI Det 310, JB CHS, SC, interviewed VICTIM P          , at OSI Det 310, JB CHS, SC, who verbally provided the following:  On 7 Dec 19, she took an Uber to PHILLIPS' residence.  While at PHILLIPS' residence, a bottle of Prosecco was served and VICTIM P          drank one flute-sized glass.  (Agent note: VICTIM P          did not feel comfortable revealing the total amount of alcohol consumed throughout the night.) VICTIM P          left PHILLIPS' residence and took an Uber to the squadron holiday party where she remembered SUBJECT asked about D. P          .  She added the question was sexual in nature, but did not recall specifics about the conversation.  In addition, she did not remember if SUBJECT touched or grabbed her buttocks.  VICTIM P          heard a rumor in her office that SUBJECT also made Lt NATASHA MOSQUERA, 1 CTCS, JB CHS, SC feel uncomfortable at the party and showed up at MOSQUERA's apartment complex where he messaged her and asked her to come downstairs to see him. (Agent Note: VICTIM P          did not provide any additional details about the allegation and subsequently elected not to participate in the investigation).

2-5.  On 12 Dec 19, SA VOTTERO and SA KANDIL, OSI Det 310, JB CHS, SC, interviewed MOSQUERA at OSI Det 310, JB CHS, SC, who verbally provided the following:  On 04 Dec 19, while sitting at the table with VICTIM P          and SUBJECT  at the squadron holiday party, MOSQUERA saw them conversing.  MOSQUERA was not sure what the conversation was about, but she saw VICTIM P          put her hand over SUBJECT's mouth in a joking manner, which was the only physical contact she witnessed.    MOSQUERA did not witness SUBJECT touch VICTIM P          s buttocks.

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**



**ROI Page 6**



**File No: 310-C-120AA4-35221193511545**

MOSQUERA added she was friends on Facebook with SUBJECT and when the party was over, SUBJECT sent her a message on Facebook messenger to ask if she made it home safe. On 7 Dec 19, SUBJECT was at her apartment complex and messaged her that he was in the area and the complex reminded him of her since she previously told him where she lived. MOSQUERA provided screen captures of her conversation with SUBJECT (**Exhibit 2**). On 8 Dec 19, she went out to brunch at Zen Asian Fusion, 2037 Sam Rittenberg Blvd, Charleston, SC, with SUBJECT due to his great leadership skills, and the mentorship he was willing to provide. At some point during their brunch, MOSQUERA recalled having a conversation about her apartment complex where she mentioned she preferred living on higher floors because she was not comfortable with people walking around and making noises late at night. SUBJECT replied he did not know how people left their blinds open because you cannot walk around naked that way. MOSQUERA claimed that conversation made her feel slightly uncomfortable for a professional setting. SUBJECT and MOSQUERA did not have any further pertinent contact.

2-6. On 31 Dec 19, SA VOTTERO and INV BARRERA, OSI Det 310, JB CHS, SC, interviewed PHILLIPS, at OSI Det 310, JB CHS, SC, who verbally provided the following: Prior to 1 CTCS, JB CHS, SC, holiday party, she hosted a small gathering of friends and coworkers at her residence. VICTIM P       , WORKMAN, LEPLA, CAMPBELL, CUPIT, BAUMGART, HARRISON, DRZAZGOWSKI, and CASTILLO, arrived at PHILLIPS' residence at approximately 1800 hours. PHILLIPS estimated everyone at the party probably had two drinks each. She believed VICTIM P       had one glass of champagne. PHILLIPS, CUPIT, VICTIM P       , and HARRISON took an Uber to the holiday party, from her residence, at approximately 1845 hours. Once at the holiday party, VICTIM P       left PHILLIPS to join TSgt SHELBY MATULLO, 4 CTCS, JB CHS, SC, at another table. PHILLIPS noticed VICTIM P       appeared to be intoxicated, as she was more social than normal. She also saw VICTIM P       communicating frequently with a man she did not know. She described him as having a darker skin complexion and dark hair color. She believed his name started with a "Z." PHILLIPS observed that individual following VICTIM P       around throughout the rest of the night. PHILLIPS did not hear any of their conversations and did not observe any touching or contact between VICTIM P       and the man. The man did not seem intoxicated as he did not slur his speech or stumble around. PHILLIPS left the party at approximately 2130 hours. PHILLIPS was close friends with VICTIM P       and had previously consumed alcohol with her on several occasions to the point of intoxication. VICTIM P       had never spoken to PHILLIPS about her sexual relationships.

2-7. On 6 Jan 19, WORKMAN provided SA VOTTERO, OSI Det 310, JB CHS, SC, a signed sworn written statement (**Exhibit 3**). In addition to the information provided during WORKMAN's interview, WORKMAN relayed the following information: WORKMAN asked MATULLO, and SSgt KYLE HAGAN, 1 CTCS, JB CHS, SC, to watch VICTIM P       as she did not trust SUBJECT's intentions because of past experience from other friends. HAGAN stated, "Is that why he is grabbing her ass right now". WORKMAN looked over and saw SUBJECT's hand resting on VICTIM P       s buttocks. SUBJECT removed his hand, WORKMAN grabbed VICTIM P       s arm and escorted her outside.

2-8. On 6 Jan 20, SA EXSENHAWER TOBON GALEANO, OSI Det 404 OL-A, JBSA-Randolph, TX, conducted a review of the National Crime Information Management System (NCIC) for SUBJECT, VICTIM F       and VICTIM P       . The review disclosed no records on file.

2-9. On 6 Jan 19, SA TOBON GALEANO, OSI Det 404 OL-A, JBSA-Randolph, conducted a review of the Investigative Information Management System (I2MS) for SUBJECT, VICTIM F       and

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**


*35221193511545*

**ROI Page 7**



**File No: 310-C-120AA4-35221193511545**

VICTIM P        .  The review disclosed no records on file for SUBJECT and VICTIM P        and nothing pertinent to this investigation for VICTIM F            .

2-10.  On 6 Jan 20, SA TOBON GALEANO, OSI Det 404 OL-A, JBSA-Randolph, conducted a review of the Defense Central Index of Investigations (DCII) and Automated Records Management System (ARMS) for SUBJECT, VICTIM F            and VICTIM          The review disclosed nothing pertinent to this investigation.

2-11.  On 6 Jan 20, SA JEFFREY HEINERT, OSI Det 404 OL-A, JBSA-Randolph, TX, conducted a review of the Law Enforcement Data Exchange (D-Dex) for SUBJECT, VICTIM F            and VICTIM P        . The review disclosed no records on file.

2-12.  On 7 Jan 20, SA DUSTIN DEBARGE, OSI Det 403, JBSA-Lackland, TX, conducted a review of the Classified Investigative Information Management System (CI2MS) and the Legacy Investigative Information Management System (LCI2MS) for SUBJECT, VICTIM F            and VICTIM P        The review disclosed no records on file.

2-13.  On 7 Jan 20, SA JARVIS BEAUCHAMP, OSI Det 404 OL-A, JBSA-Randolph, TX, conducted a review of the Legacy Investigative Information Management System (LI2MS) for records pertinent to SUBJECT, VICTIM F            and VICTIM P        The review disclosed no records on file.

2-14.  On 7 Jan 20, SA LUKASZ MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX coordinated with SMSgt ZACHARY CHRISTMAN, First Sergeant, AFPAA, JBSA-Randolph, TX, to review of SUBJECT's Personnel Information File (PIF).  The review disclosed no records on file.

2-15.  On 7 Jan 20, SA LUKASZ MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX coordinated with CARTINO to review of VICTIM P        's PIF.  The review disclosed no records on file.

2-16.  On 8 Jan 20, Inv JOSE SALINAS, 902nd Security Forces Squadron (SFS), Security Forces Investigations (S2I), JBSA-Randolph, TX conducted a review of the Air Force Justice Information System (AFJIS) for SUBJECT, VICTIM F            and VICTIM P        The review disclosed no records on file.

2-17. On 8 Jan 19, SA TOBON GALEANO, OSI Det 404 OL-A, JBSA-Randolph, coordinated with the Southwest Texas Fusion Center (SWTFC), San Antonio, TX via Aviation and Missile Research and Development Engineering Center (AMRDEC) Safe Access Exchange File (SAFE), who conducted the Bexar County Sheriff's Office (BCSO) and the San Antonio Police Department (SAPD) law enforcement records checks for SUBJECT, VICTIM F            and VICTIM P        , which disclosed no records on file.

2-18. On 9 Jan 20, SA ARMIN CEJVANOVIC and SA SKIP HO, OSI Det 301, Scott (SAFB), IL interviewed SHINZATO at OSI Det 301, SAFB, IL.  SHINZATO declined to provide a written statement and verbally provided the following information:  SHINZATO met SUBJECT and VICTIM at Incirlik AB, Turkey during SHINZATO's last three to four months there.  SHINZATO kept infrequent contact with both SUBJECT and VICTIM F            through Facebook and held a professional relationship with them.  SHINZATO believed SUBJECT tried to get to know people and people generally felt

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**



**ROI Page 8**



**File No: 310-C-120AA4-35221193511545**

comfortable around him.  SUBJECT had good professional relations with other female Airman, and SHINZATO never observed or heard of SUBJECT making any inappropriate comments.

SHINZATO was TDY in 2015 to the Colossae Thermal Hotel, Pamukkale/Denizli, Turkey, and believed everyone else had a good time for the few days they were there.  He had no knowledge of inappropriate comments or touching by SUBJECT nor anyone else.  SHINZATO recalled he spent approximately thirty minutes in a hot tub with SUBJECT, VICTIM F          , MOELLER, WOLFF and TAYLOR, but he never witnessed any inappropriate behavior.  Everyone in the hot tub consumed alcohol, but SHINZATO did not know how much.  VICTIM F          never told SHINZATO she was inappropriately touched or harassed.  SHINATO did not observed or have any knowledge of VICTIM F          having her breasts exposed.  SHINZATO did not have any pertinent messages between himself, SUBJECT nor VICTIM F          regarding the incident.

2-19. On 10 Jan 19, SA LUKASZ MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX, briefed Capt EDWARD COLEMAN, Assistant Staff Judge Advocate, 502nd Security Forces Group (SFG), JBSA – Randolph, TX, on the facts and circumstances of the investigation.

2-20. On 10 Jan 19, SA MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX, briefed Capt CRISTINA CURL, SVC, NC, on the facts and circumstances of the investigation.

2-21. On 13 Jan 20, Inv TREY DUTCHER, OSI Det 303, Travis (TAFB), CA, interviewed WOLFF at OSI Det 303, TAFB, CA, who verbally provided the following information:  In April 2015, WOLFF met SUBJECT prior to boarding the airplane for the three or four day trip to a resort in Pamukkale/Denizli, Turkey.  WOLFF described SUBJECT as a decent person, but appeared unprofessional due to his request to be called by his first name.  WOLFF had no interactions with SUBJECT before or after the trip and they never communicated.

WOLFF met VICTIM F          through Civ MARCUS F          VICTIM F          's ex-spouse,          in early 2014.  WOLFF described VICTIM F          as happy, outgoing, and talkative.  WOLFF described M. F          and VICTIM F          s relationship as excellent and he never witnessed a disagreement between them.  WOLFF's relationship with M. F          and VICTIM F          was close and he spent nearly every weekend with them.

WOLFF stated that himself, MOLLER, SHINZATO, SUBJECT, VICTIM F          , TAYLOR, an unknown male SSgt (NFI), and an unknown female TSgt (NFI) were present for the three or four day trip to Pamukkale/Denizli, Turkey.  WOLFF was only able to remember one specific instance during the trip, which involved a hot tub.  WOLFF explained it was dark outside and the hot tub was tucked away behind a pool by the hotel.  WOLFF explained the layout of people in the hot tub was TAYLOR, MOLLER, WOLFF, VICTIM F          SUBJECT, and SHINZATO, all of which were drinking alcohol.  WOLFF estimated each person may have had three or four beers.  WOLFF did not believe anyone was overly intoxicated, as no one had slurred speech or stumbled when they walked.  WOLFF did not recall any shots of alcohol.  At one point in the hot tub, TAYLOR removed his bathing suit.  Subsequently, WOLFF and SUBJECT removed their swim suits while MOELLER and VICTIM F          removed their tops, revealing their breasts.  Initially, SHINZATO declined to remove his swim suit, but SUBJECT convinced him to remove it like everyone else, which SHINZATO did.  WOLFF felt uncomfortable





**File No: 310-C-120AA4-35221193511545**

because SUBJECT was a Senior Non-Commissioned Officer (SNCO) naked in a hot tub with all his subordinates. WOLFF recalled VICTIM F         was equally close to him in proximity as she was to SUBJECT. At one point, VICTIM F         moved closer to WOLFF and asked him to move over so she did not have to be so close to SUBJECT. WOLFF was not aware why VICTIM F         did not want to be close to SUBJECT as he never saw any actions between the two of them. WOLFF never heard nor saw any inappropriate actions between SUBJECT and VICTIM F         . After an unknown amount of time, all the aforementioned members left the hot tub together. WOLFF did not recall anyone leaving the hot tub on their own.

The following morning, WOLFF was next to VICTIM F         while she spoke to the unknown female. WOLFF overheard the female state she did not go to the hot tub because SUBJECT gets "handsy" when under the influence of alcohol. WOLFF did not get further details to explain the meaning of "handsy", as he did not speak directly to the female. VICTIM F         did not tell WOLFF any information about what happened between her and SUBJECT in the hot tub, but believed VICTIM F         told the female. WOLFF stated he would be surprised if anything sexual took place over the trip because VICTIM F         was in a relationship with M. F         .

WOLFF last spoke to VICTIM F         and M. F         in March 2019 via a group Facebook video teleconference call, where SSgt TRAVIS AUSTIN, Det 1 Space and Missile Systems, Kirtland AFB (KAFB), NM, was also in the conversation. WOLFF could not recall specifics details of the conversation but noted it had nothing to do with SUBJECT. WOLFF provided AUSTIN and VICTIM F         were close friends and may have knowledge of the incident.

WOLFF declined to provide a written statement.

2-22. On 16 Jan 20, SA SKIP HO and SA KSANA BIALICK, OSI Det 301 Scott AFB, IL, interviewed Civ SCOTT TAYLOR,         who verbally provided the following information: TAYLOR had a good relationship with both SUBJECT and VICTIM F         , but at the time of this interview, they rarely kept in contact. TAYLOR met SUBJECT and VICTIM F         in approximately October 2014, at Incirlik AB, Turkey. Initially, SUBJECT and VICTIM F         had a good relationship, but became distant after an incident in the hot tub where SUBJECT may have inappropriately touched VICTIM F         . TAYLOR recalled SUBJECT was in the hot tub, briefly exited, and removed his shorts, which left him naked. SUBJECT entered the hot tub, and reached over and may have touched VICTIM F         under the water. TAYLOR was unsure of where SUBJECT touched VICTIM F         . All members present in the hot tub had been drinking; however, SUBJECT was heavily intoxicated and barely able to walk. TAYLOR could not recall any further details about the incident in the hot tub or any other details about her conversations with VICTIM F         . TAYLOR did not recall SUBJECT following VICTIM F         out of the hot tub or VICTIM F         s breasts being exposed throughout the incident; however, he could not recall most of the details due to his level of intoxication and the amount of time that has passed since the incident. TAYLOR believed he would have remembered if SUBJECT followed VICTIM F         out of the hot tub and if her breasts were exposed.

2-23. On 22 Jan 20, SA MISINIEC and SA JEFFEREY HEINERT, OSI Det 404 OL-A, JBSA-Randolph, TX, interviewed CMSgt QUINTON BURRIS, SUBJECT's Supervisor, Air Force Public Affairs Agency (AFPAA)/CCC, JBSA-Randolph, TX, at OSI Det 404 OL-A, JBSA-Randolph, TX, who verbally relayed





**File No:  310-C-120AA4-35221193511545**

the following information: BURRIS met SUBJECT in approximately 2007, or 2008, during a TDY and their friendship grew stronger over the years to present day.  SUBJECT was described as a family oriented, professional, and relaxed individual. BURRIS was surprised to hear about the allegations against SUBJECT.  SUBJECT was professional with Public Affairs (PA) Airmen and BURRIS never witnessed or was aware of any unusual behavior or sexual advances from SUBJECT.  SUBJECT looked up to him and could have hidden those types of behavior from him.  BURRIS did not have concerns about SUBJECT's relationship with his spouse.  BURRIS recalled SUBJECT was stationed at Incirlik AB, Turkey from approximately 2014, until 2016, or 2017, but was not aware of any indecent behavior during that time.

2-24. On 22 Jan 20, SA MISINIEC and SA HEINERT, OSI Det 404 OL-A, JBSA-Randolph, TX, interviewed MSgt CHRISTOPHER BOITZ, SUBJECT's co-worker, AFPAA, JBSA-Randolph, TX, at OSI Det 404 OL-A, JBSA-Randolph, TX, who verbally relayed the following information: BOITZ met SUBJECT in June 2018. SUBJECT was characterized as professional, smart and looked out for others. BOITZ and SUBJECT had a close relationship and went to each other's children's birthday parties. SUBJECT and his spouse appeared happy and faithful to each other.  SUBJECT's wife was with him during his time at Incirlik AB. BOITZ never heard SUBJECT make any sexual comments nor witnessed any indecent behavior with personnel of any rank. While TDY, SUBJECT and BOITZ occasionally ate together on their off time after duty hours, but did not interact much due to them being housed in separate locations. SUBJECT relayed to BOITZ he went to the Area Defense Counsel (ADC) for a serious allegation.  BOITZ did not know what the allegation was about.

2-25. On 22 Jan 20, SA MISINIEC and SA HEINERT, OSI Det 404 OL-A, JBSA-Randolph, TX, interviewed TSgt CIARA GOSIER, SUBJECT's co-worker, AFPAA, JBSA-Randolph, TX, at OSI Det 404 OL-A, JBSA-Randolph, TX, who verbally relayed the following information: GOSIER met SUBJECT in approximately January 2019. GOSIER provided SUBJECT appeared nice, but was hard to read. SUBJECT gave GOSIER a weird feeling and described him as "a little creepy," but could not pinpoint exactly what it was that made her feel that way. GOSIER never witnessed unusual or inappropriate behavior from SUBJECT. During a unit holiday party on 13 Dec 19, GOSIER's identical twin sister, Civ T       W         (VICTIM W         ,                              told GOSIER that the back of SUBJECT's hand brushed against her buttocks while they waited in a line to purchase alcohol. VICTIM W          stepped forward to create space from SUBJECT.  SUBJECT moved up and brushed VICTIM W         ' buttocks with the back of his hand for a second time. SUBJECT did not acknowledge the contact made with VICTIM W           ' buttocks. SUBJECT was drinking during the party, but GOSIER was unsure of how much SUBJECT drank or his level of intoxication.

2-26. On 22 Jan 20, SA MISINIEC and SA HEINERT, OSI Det 404 OL-A, JBSA-Randolph, TX, interviewed SSgt DANETTE BRUTON, SUBJECT's co-worker, AFPAA, JBSA-Randolph, TX, at OSI Det 404 OL-A, JBSA-Randolph, TX, who verbally relayed the following information: BRUTON met SUBJECT between January and March 2019. SUBJECT seemed attentive to BRUTON's concerns within the workplace. BRUTON interacted with SUBJECT almost daily regarding training within the unit. BRUTON never overheard inappropriate comments nor witnessed any inappropriate behavior from SUBJECT. BRUTON never heard of rumors about SUBJECT and sexual contact with anyone. BRUTON did note that since the beginning of January, SUBJECT has seemed more reserved and less upbeat.

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**

**ROI Page 11**



**File No:  310-C-120AA4-35221193511545**

2-27. On 23 Jan 20, SA JIMMIE HIGH, OSI Det 515, Ramstein Air Base (RAB), DEU, interviewed MOELLER, at OSI Det 515, DEU, who provided a signed sworn statement (**Exhibit 4**) which provided the following:  In April 2015, VICTIM F                , TAYLOR, SUBJECT and WOLFF went on a weekend trip to the Colossae Thermal Hotel, Pamukkale/Denizli, Turkey; MOELLER did not recall SHINZATO attending.  After a day of exploring in Turkey, everyone got into their bathing suits, got into the hot tub and consumed alcohol while at the resort.  There may have been a game of truth or dare where the context was borderline inappropriate. WOLFF suggested that MOELLER and WOLFF leave the hot tub due to WOLFF feeling uncomfortable.  MOELLER could not remember when VICTIM F
disclosed details regarding the incident but it may have been the same night or the following morning. VICTIM F                told MOELLER that SUBJECT touched VICTIM F                underneath the water while in the hot tub which made VICTIM F                uncomfortable.  At some point when SUBJECT touched VICTIM F              , VICTIM F                and TAYLOR switched positions in the hot tub so VICTIM F                was no longer beside SUBJECT.  MOELLER could not recall specifics regarding SUBJECT touching VICTIM F              , but VICTIM F                did express her discomfort to MOELLER, WOLFF and TAYLOR.

In addition to her statement, MOELLER verbally relayed the following:  MOELLER first met SUBJECT in 2015 while in Incirlik AB, Turkey; SUBJECT was in charge of the AFN section and therefore supervised MOELLER.  The work section was small and consequently everyone was close, and occasionally went on group outings.  MOELLER and SUBJECT maintained contact throughout the years, mostly on a professional level, with their last contact being sometime in April 2019.  SUBJECT and MOELLER were only stationed together in Turkey for approximately three months in 2015.  MOELLER met VICTIM F                sometime in 2015, with their last contact being sometime in 2016.  Outside of the hot tub incident, MOELLER did not identify any derogatory information involving SUBJECT or any other females.

While on their trip to Pamukkale/Denizli, Turkey, the group went on hikes, visited ancient ruins, visited hot springs, and did other sightseeing.  While in the hot tub at the resort, SUBJECT and VICTIM                sat next to each other while MOELLER sat next to WOLFF.  All were consuming alcohol and all individuals wore bathing suits. VICTIM F                s bathing suit top was described as a tank-kini with shoulder straps that covered her belly button and shorts for bottoms; MOELLER described VICTIM F                s suit as conservative.  During the game of truth and dare, MOELLER felt the context of the game was inappropriate but not to the point where she wanted to leave the hot tub. MOELLER further stated that she grew up with brothers so perhaps her level of inappropriateness might have been skewed.  MOELLER did not witness SUBJECT touch VICTIM F                nor did MOELLER witness anything out of the ordinary regarding SUBJECT's behavior.  Once VICTIM F                told MOELLER what SUBJECT did under the water, MOELLER was surprised, as MOELLER had no idea those actions were taking place, even though MOELLER sat in the same hot tub. MOELLER did not remember specifically what VICTIM F                stated but it was something to the effect that VICTIM F                felt SUBJECT crossed the line, VICTIM F                was disgusted by SUBJECT's actions.  VICTIM F                stated that SUBJECT touch her near VICTIM F                s vagina. MOELLER felt that one of the males might have taken off their swimming shorts but could not recall whom.  MOELLER did not recall VICTIM F                telling SUBJECT to stop; MOELLER felt that if that happened that either MOELLER or WOLFF would have said something. MOELLER did not recall seeing VICTIM F                s breast or any parts of VICTIM F                s naked body.





**File No: 310-C-120AA4-35221193511545**

SUBJECT was described as having the highest level of intoxication being a seven or eight on a scale of one to ten. SUBJECT was intoxicated that evening but was functioning. MOELLER was unsure how much alcohol SUBJECT consumed that evening. MOELLER was intoxicated that evening, but not as intoxicated as SUBJECT. MOELLER could not recall how much alcohol VICTIM F consumed. On 9 Jan 20, A1C MADISON SYLVESTER, MOELLER's friend, Broadcast Journalist, AFN, Dyess Air Force Base, TX reached out to MOELLER to see if MOELLER talked with OSI regarding the incident between SUBJECT and VICTIM F        SYLVESTER and MOELLER did not disclose details to each other but they both joked that neither of them remembered anything.

2-28. **VICTIM W            Interview:** On 24 Jan 20, SA MISINIEC and SA HEINERT OSI Det 404 OL-A, JBSA-Randolph, TX, interviewed VICTIM W        , at OSI Det 404 OL-A, JBSA-Randolph, TX, who verbally relayed the following information: On 13 Dec 20, VICTIM W        attended a holiday party at the San Antonio Zoo, 3903 N. Mary's St, San Antonio, TX, with her sister, GOSIER. VICTIM W        arrived at the holiday party at approximately 1800 hours. Once at the holiday party, VICTIM W        got in line to get a drink from the bar. While standing in line, SUBJECT got in line behind VICTIM W        . VICTIM W        felt something brush against her buttocks. VICTIM W        moved forward and felt something brush against her buttocks again. After the second contact, VICTIM W        turned her body and placed her buttocks against the wall and looked at SUBJECT but did not say anything. Initially, VICTIM W        believed the first contact was not intentional and it was incidental contact which could have happen while waiting in line. After the second occurrence, VICTIM W        believed both times were intentional. VICTIM W        believed SUBJECT though she was GOSIER as she overheard SUBJECT talking to the individual behind him about her (VICTIM W        did not know who SUBJECT was talking with). VICTIM W        got her drink and returned to her table where GOSIER was sitting. As VICTIM W        was walking away, she said out loud that she was "T    " not "Ciara". VICTIM W        did not know if SUBJECT heard her or what his reaction was. VICTIM W        told GOSIER what happened and pointed out SUBJECT to her. GOSIER told VICTIM W        who SUBJECT was. VICTIM W        described the brush as the back of SUBJECT's hand touching her buttocks with light to moderate pressure. VICTIM W        did not have contact with SUBJECT at any point after the incident. VICTIM W        declined to provide a written statement.

2-29. On 3 Feb 20, SA MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX, conducted a review of I2MS, LI2MS, NCIC and D-Dex for VICTIM W        The review of I2MS, LI2MS, and NCIC revealed no records on file. A review of D-Dex revealed nothing pertinent to this investigation.

2-30. On 4 Feb 20, SA MISINIEC and SA HEINERT, OSI Det 404 OL-A, JBSA-Randolph, TX, interviewed Civ ALEJANDRA ZIER, (SUBJECT's spouse) 332nd Training Squadron (TRS), AETC, JBSA-Lackland, TX, at OSI Det 404 OL-A, JBSA-Randolph, TX, who verbally relayed the following information: A. ZIER met SUBJECT between 2009 – 2010, and they married in 2011. A. ZIER described SUBJECT as kind and helpful to junior enlisted Airmen. SUBJECT did not like to hug or come into physical contact with anyone outside his family. A. ZIER accompanied SUBJECT during his two-year tour at Incirlik AB, Turkey from approximately 2014, to 2015, and they departed in approximately 2016. A. ZIER provided she and SUBJECT were close with the Airmen that worked within the AFN PA office. A. ZIER described close to mean as like a family. VICTIM F        and MSgt DOMINIQUE DICKENS, AETC/HQ, JBSA-Randolph, TX, were a part of SUBJECT's work center. A.





**File No: 310-C-120AA4-35221193511545**

ZIER was not aware of any questionable or inappropriate behavior SUBJECT exhibited at work. A. ZIER did not recall SUBJECT taking any trips during his time at Incirlik AB. A. ZIER described SUBJECT as relaxed and calm when he drank, but SUBJECT never became overly intoxicated at work events. A. ZIER never heard of previous allegations regarding unwanted touching and was not aware of any females that SUBJECT allegedly contacted.

A. ZIER did not attend the holiday party at JB CHS, SC, in Dec 19, but relayed SUBJECT attended the party while sick with the flu. A. ZIER provided she did not believe SUBJECT drank or danced that night due to his sickness.

A. ZIER attended SUBJECT's unit holiday party on 13 Dec 19, at the San Antonio Zoo. SUBJECT drank two mixed drinks, which consisted of Jack Daniel's whiskey and Coca-Cola. A. ZIER was unsure of the volume of alcohol in each of those two drinks.

2-31. On 5 Feb 20, Inv SALINAS, 902 SFS, S2I, JBSA-Randolph, TX conducted a review of the AFJIS for VICTIM W        . The review disclosed no records on file.

2-32. On 5 Feb 19, SA MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX, coordinated with the SWTFC, via DoD SAFE, who conducted the BCSO and SAPD law enforcement records checks for VICTIM W        . The review disclosed no records on file.

2-33. On 5 Feb 20, SA MISINIEC and SA HEINERT, OSI Det 404 OL-A, JBSA-Randolph, TX, interviewed DICKENS, at OSI Det 404 OL-A, JBSA-Randolph, TX, who verbally relayed the following information: DICKENS met SUBJECT in 2010, at Hurlburt Field, FL and again in 2013, at Incirlik AB, Turkey. DICKENS described SUBJECT as personable and well-liked by others. While stationed together at Incirlik AB, Turkey from approximately 2013, to 2015, SUBJECT and DICKENS primarily consumed alcohol together at their residences, which normally consisted of about two beers. SUBJECT was not combative or belligerent when he drank alcohol. DICKENS never heard of anything negative from peers or subordinates regarding SUBJECT. In approximately April 2015, SUBJECT went on a trip with Airmen from his work center. VICTIM F        and TAYLOR were also present on the trip. DICKENS was never notified of any unwanted touching by SUBJECT. DICKENS described VICTIM F        as smart and passionate. DICKENS found VICTIM F        to be honest and trustworthy. SUBJECT and VICTIM F        had a good relationship while DICKENS was at Incirlik AB. SUBJECT did not appear to pay more attention to VICTIM F        than anyone else. DICKENS noted at some point VICTIM F        removed SUBJECT as a Facebook friend.

2-34. On 6 Feb 20, SA JERLALD KINNISON, OSI Det 404, JBSA - Ft. Sam Houston (FSH), TX conducted a review of the DCII for VICTIM W        .

2-35. On 7 Feb 19, SA MISINIEC and SA HEINERT, OSI Det 404 OL-A, JBSA-Randolph, TX, conducted a photo line-up (**Exhibit 5**) with VICTIM W        at Travelcenter of America, 6170 I.H. 10 East, San Antonio, TX. SA MISINIEC read to VICTIM W        a brief set of instructions and asked to take her time in making identification. VICTIM W        was shown six photographs, one of which contained SUBJECT. VICTIM W        examined the photographs and picked photograph #3, SUBJECT's photograph. VICTIM W        initialed, circled, and dated the selected photograph. SA MISINIEC initialed, dated, and wrote the case file number below the selected photograph.

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**



**ROI Page 14**



**File No: 310-C-120AA4-35221193511545**

2-36. On 11 Feb 20, SA DEBARGE, OSI Det 403, JBSA - Lackland, TX, conducted a review of CI2MS and LCI2MS for VICTIM W       . The review disclosed no records on file.

2-37. **VICTIM                      Re-Interview:** On 11 Feb 20, INV PAIGE JOHNSON and SA MICHAEL CLAYTON, OSI Det 216, SJAFB, NC interviewed VICTIM F                in the presence of CURL. VICTIM F               verbally relayed the following information: Prior to the interview, VICTIM F            conducted an open media search for resorts and believed she stayed at the Colossae Thermal Hotel, Pamukkale/Denizli, Turkey around 5 Apr 15. VICTIM F              recalled TAYLOR, MOELLER, WOLFF, SHINZATO, and MSgt VERONICA PIERCE, 612 Air Operation Center (AOC), Davis Monthan AFB, AZ went with her on the trip. VICTIM F              was unable to provide any more identifiable information for the personnel she stayed with at the hotel. VICTIM F              , SUBJECT and TAYLOR left the hotel room together to go downstairs to the hot tub, which was located on the main floor in the back of the hotel, near a few other pools. VICTIM F              recalled SUBJECT drank clear liquor from red solo cups, but she did not recall how much he drank or the type of liquor. VICTIM F              described SUBJECT as "tipsy", but not incoherent. VICTIM F
drank approximately three glasses of wine and/or pina-coladas from the resort earlier in the day. SUBJECT sat to the left of VICTIM F              in the hot tub. Every time he got up to refill his drink, SUBJECT got closer to VICTIM F              until eventually he was inches away from her. VICTIM F              attempted to give TAYLOR nonverbal cues to indicate how uncomfortable she was, next to SUBJECT. VICTIM F              bumped TAYLOR to get his attention, but TAYLOR did not acknowledge her.

Initially, SUBJECT put his hand on VICTIM F              s thigh and eventually slid his hand under VICTIM F              s swimsuit bottom. SUBJECT touched the top of VICTIM F              s vagina with his hand, but he did not penetrate her vagina. VICTIM F              stood up and started to walk to her room when SUBJECT followed her and grabbed her arm. SUBJECT tried to get her to turn around. As VICTIM F              turned around, her swimsuit top fell down, which exposed her breasts. VICTIM F              was not sure if SUBJECT's intention was to expose her breasts but only felt his hand on her left arm. VICTIM F              believed he may have untied her swim suit top but was not certain because she did not feel any contact. VICTIM F              went to her hotel room where she spoke to TAYLOR about the incident. VICTIM F              recalled MOELLER and WOLFF being in the hot tub during the incident. VICTIM F              did not know if they saw SUBJECT's interactions with her, because they were kissing each other. VICTIM F              went to the SAPR office on IAB and talked to them about the incident. VICTIM F              did not recall filling out any paperwork, but was under the assumption she completed a restricted report.

Additionally, VICTIM F              recalled she had a conversation with SUBJECT prior to the incident wherein SUBJECT created a Snapchat. SUBJECT messaged her throughout the day on Snapchat, but the conversation was deleted and did not pertain to the incident. VICTIM F              blocked SUBJECT after the incident. VICTIM F              provided verbal consent for INV JOHNSON to take a screenshot of her blocked list on Snapchat. INV JOHNSON took one photograph of VICTIM F              s phone. SUBJECT's Snapchat name was              .



**File No: 310-C-120AA4-35221193511545**

VICTIM F          clarified that while she was present in the hot tub everyone was wearing their swim wear and at no point in time while she was present did anyone remove their swim suits. VICTIM F          did not know what happened after she left the hot tub area.

2-38. On 11 Feb 20, SA CARTER, OSI Det 310, JB CHS, SC, conducted a re-interview of MCGANN at OSI Det 310, JB CHS, SC who provided a signed, sworn statement (**Exhibit 6**) which provided the following: MCGANN overheard one conversation between SUBJECT and VICTIM P          throughout the night of the 1 CTCS holiday party. The conversation between SUBJECT and VICTIM P consisted of VICTIM P          discussing having sex with D. P          . MCGANN felt the conversation was inappropriate, but became more concerned with Capt JHANELLE HAAG, 1 CTCS, JB CHS, SC, due to her level of intoxication.

In addition to his written statement, MCGANN verbally relayed the following: 1 CTCS booster club organized the holiday party at North Charleston Marriott hotel. MCGANN did not observe inappropriate behavior by SUBJECT with anyone throughout the night. MCGANN did not hear SUBJECT say anything inappropriate towards VICTIM P          .

2-39. On 12 Feb 20, SA JOSEPH HONIOUS and SA JONATHAN PARKER, OSI Det 405, Maxwell AFB, AL, conducted a re-interview of VICTIM P          at OSI Det 405, Maxwell AFB, AL, who verbally provided the following: VICTIM P          recalled she went to the holiday party with friends, and they took an Uber to get there. VICTIM P          recalled having a good time and did not remember any more information than she provided in her initial interview. VICTIM P          indicated after WORKMAN told her about SUBJECT touching her buttocks at the party, she called D. P          to talk about it. VICTIM P          said she had no desire to pursue anything, and did not recall what happened regarding the allegation. VICTIM P          signed a declination statement indicating she did not want to participate in this investigation.

2-40. On 13 Feb 2020, SA KENNETH CAISSIE, OSI Det 310, JB CHS, SC, interviewed SSgt KYLE HAGAN, 1 CTCS, JB CHS, SC, at OSI Det 310, JB CHS, SC, who provided a signed, sworn statement (**Exhibit 7**) which provided the following: HAGAN witnessed SUBJECT place his hand on VICTIM P          's lower back, and lower it onto her buttocks, where it remained long enough for him to point it out to WORKMAN. WORKMAN acknowledged she also witnessed SUBJECT's actions. As a result, either WORKMAN or MATULLO removed VICTIM P          from the situation. At the end of the evening, everyone went their separate ways. To his knowledge, SUBJECT left alone in an Uber, and WORKMAN escorted VICTIM P          home in a separate Uber.

In addition to his written statement, HAGAN verbally relayed the following: HAGAN attended the 1 CTCS's 2019 holiday party with MATULLO whom he knew for the past two years. Prior to SUBJECT touching VICTIM P          's buttocks, SUBJECT hugged her from the side. HAGAN believed alcohol definitely played a part in SUBJECT's interactions with VICTIM P          , who was also extremely intoxicated, however she did not display any behavior or indicate in any way that SUBJECT's actions were appropriate or invited. HAGAN doubted VICTIM P          was even aware SUBJECT touched her.

2-41. On 18 Feb 19, SA LUKASZ MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX coordinated with MSgt AMBER PFARR, First Sergeant, 4 FW, SJAFB, NC, to review of VICTIM F          's PIF. The review disclosed no records on file.





**File No:  310-C-120AA4-35221193511545**

2-42.  On 14 Feb 20, SA MISINIEC contacted PIERCE to arrange for an interview.  PIERCE provided she was on the trip to Colossae Thermal Hotel, Pamukkale/Denizli, Turkey, in Apr 15, but did not attend the gathering at the hot tub and did not know anything about the incident.  PIERCE did not recall a conversation with VICTIM F             and had never heard anything about SUBJECT being "handsy" and never observed any inappropriate behavior.

2-43.  On 18 Feb 20, INV BARRERA, OSI Det 310, JB CHS, SC, re-interviewed SSgt IZABELLA WORKMAN, 1 CTCS, at OSI Det 310, JB CHS, SC, who verbally provided the following:  On 7 Dec 19, the night of the holiday party, WORKMAN and LEPLA were invited to PHILLIPS residence for a few drinks prior to attending the event.  She did not recall who invited her.  CAMPBELL, CASTILLO, CUPIT, PHILIPS, herself, and LEPLA were present.  She believed HARRISON, BAUMGART, and VICTIM P         , attended PHILIPS' party after WORKMAN left.  Due to her not being present at PHILIPS' residence, she did not know how much alcohol she consumed and related PHILIPS would likely know.  She believed VICTIM P         took an Uber with PHILIPS from her residence to the holiday party due to them arriving together.  VICTIM P         was "definitely drunk" when she arrived at the party.  For the duration of the event VICTIM P         consumed gin and tonics.  WORKMAN observed VICTIM P         remove her shoes and had a look in her eyes as if she was unable to focus on objects, which were indications of her intoxication level.  WORKMAN related MCGANN and MATULLO also observed VICTIM P         s intoxication level and SUBJECT following her around throughout the event.

MCGANN informed WORKMAN that SUBJECT and VICTIM P         had an inappropriate conversation at the table about her sexual behaviors with D. P         VICTIM P         sat facing SUBJECT and was slightly canted toward his direction.  WORKMAN observed them from afar and they seemed to be sharing a normal conversation.  At no point did VICTIM P         appear to be in distress throughout their conversation.  At approximately 0030 hours, the event ended and people were leaving.  WORKMAN was with HAGAN, MATULLO, and LEPLA and they shared casual conversations when she observed SUBJECT resting his open hand on VICTIM P         's buttocks.  SUBJECT was on her left side where she observed VICTIM P         s back and SUBJECT's right side.  SUBJECT and VICTIM P         stood in a group of approximately six people including them.  WORKMAN could not recall who was in the group with SUBJECT and VICTIM P         .

SUBJECT had his right hand on the center of her buttocks, which appeared to be firm enough for VICTIM P         to know it was placed there.  She did not seem to mind his hand there; however, WORKMAN believed VICTIM P         did not react due to her intoxication level and her being "out of it".  She confided in LEPLA and related they needed to separate them and get her home.  Together they approached her where they said "something verbally" (Agent Note: WORKMAN did not recall what they said to VICTIM P         ) to get her to come outside with them.  She linked her right arm to VICTIM P         s left arm and escorted her outside to get an Uber.  Approximately 2 minutes later, SUBJECT came outside with MSgt JASON ROBERTSON, 24th Special Operations Wing, Hurlburt Field, FL.  SUBJECT asked VICTIM P         "hey you coming" and before she could respond WORKMAN intervened and asked her to take selfie photographs.  VICTIM P         did not respond to SUBJECT and SUBJECT got into an Uber with ROBERTSON and left.  She related HAGAN, LEPLA and MATULLO heard SUBJECT offer VICTIM P         a ride.  WORKMAN related she intervened because it was inappropriate for a "drunk woman" to get into a car with higher ranking individuals.  WORKMAN,

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**



**ROI Page 17**



**File No: 310-C-120AA4-35221193511545**

LEPLA, and VICTIM          got into the Uber she ordered and went to VICTIM F          s residence and helped her to bed.          KMAN and LEPLA departed her residence and went to WORKMAN's residence for the remainder of the night.  WORKMAN related VICTIM P          was "the most drunk I have ever seen her".  On 9 Dec 19, she informed VICTIM P          about what happened at the holiday party between her and SUBJECT.  VICTIM P          did not recall the details about the party or the Uber ride home.  On 10 Dec 19, WORKMAN reported the incident to CARTINO.

WORKMAN provided six screenshots (**Exhibit 8**) of her conversation with VICTIM P          .

2-44. On 18 Feb 20, SA MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX, reviewed screen captures provided by WORKMAN of her conversations with VICTIM P          .  A review of the messages disclosed the following:  WORKMAN encouraged VICTIM P          to report SUBJECT's actions at the holiday party.  MCGANN overheard the conversation between VICTIM P          and SUBJECT at the holiday party.  Additionally, MCGANN was going to inquire if VICTIM F          would want to report the incident she had with SUBJECT.

2-45. On 18 Feb 20, SA CAISSIE, OSI Det 310, JB CHS, SC, interviewed CARTINO, at OSI Det 310, JB CHS, SC.  CARTINO declined to provide a written statement and verbally provided the following information:  CARTINO attended the holiday party on 07 Dec 19, accompanied by Civ TIFFANY CARTINO, CARTINO's spouse,          CARTINO was introduced to SUBJECT that same week.  During the party, he did not witness any interactions between VICTIM P          and SUBJECT; however, he observed VICTIM P          was heavily intoxicated.  On 10 Dec 19, WORKMAN reported an alleged incident between SUBJECT and VICTIM P          during which she quoted, he "ass grabbed" VICTIM P          .  After hearing this, CARTINO informed Civ MAMIE FUTRELL, Sexual Assault Response Coordinator (SARC), Lt Col TONY WICKMAN, Commander, 1 CTCS, JB CHS, SC, and escorted WORKMAN to OSI.  CARTINO was familiar with VICTIM F          as she was an incoming NCO to 1 CTCS from SJAFB and was on house hunting leave at JB CHS.  VICTIM F          learned of the alleged incident between SUBJECT and VICTIM P and told CARTINO she wanted to report her own allegation involving SUBJECT.  CARTINO spoke with VICTIM F          telephonically and provided her options for reporting her allegation.

2-46. On 20 Feb 20, SA MISINIEC, OSI Det 404 OL-A, JBSA - Randolph, conducted a telephonic interview of D. P          .  VICTIM P          and D. P          met in December 2014, and married in August 2016.  D. P          described VICTIM P          as a kind and hardworking individual.  D. P          provided that VICTIM P          attended the 1 CTCS holiday party on 7 Dec 19, without him as he was deployed to Incirlik AB, Turkey.  VICTIM P          told D. P          that WORKMAN told her SUBJECT grabbed her buttocks at the holiday party.  D. P          told VICTIM P          that he would support her decision on what she want to do about the incident.  D. P          believed that VICTIM P          was intoxicated while at the holiday party and did not know what was happening to her.  D. P          did not know what and how much alcohol VICTIM P          drank while at the event.  D. P          had never had any interaction with SUBJECT and was not aware of any other actions associated with SUBJECT.

2-47. On 21 Feb 20, SA MISINIEC, OSI Det 404 OL-A, JBSA - Randolph, conducted a telephonic interview of M. F          .  M. F          met VICTIM F          at Incirlik, AB Turkey in November 2014.  M F          and VICTIM F          married in January 2016, and filed for a





**File No: 310-C-120AA4-35221193511545**

mutual divorce in December 2018. M. F          and VICTIM F          remained good friends after their divorce and kept in touch through text messages approximately a couple of times a month. M. F          described VICTIM F          as a hard working individual who cared about her job. M F          provided, while at Incirlik AB, Turkey, VICTIM F          went on a work related trip. (Agent Note: M. F          did not recall the location of the trip.) When VICTIM F          returned from the trip, she told M. F          about an incident. M. F          did not recall details of the conversation or the incident but believed VICTIM F          said SUBJECT grabbed her upper thigh. M. F          did not have any further details about SUBJECT's interactions with VICTIM F          .

2-48. On 21 Feb 20, SA MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX, obtained three photographs (**Exhibit 9**) from http://www.colossaehotel.com/colossae/menu/en/1/hotel.aspx of the approximate location of the hot tubs at the Colossae Thermal Hotel, Pamukkale/Denizli, Turkey.

2-49. On 21 Feb 20, SA MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX, obtained one photograph (**Exhibit 10**) from https://www.marriott.com/hotels/travel/chsmn-north-charleston-marriott/ of the approximate location of the incident at North Charleston Marriott Hotel, 4770 Goer Dr, North Charleston, SC.

2-50. On 21 Feb 20, SA HEINERT, AFOSI Det 404 OL-A, JBSA-Randolph, TX, took 15 photographs (**Exhibit 11**) of the approximate location of the incident at the San Antonio Zoo, 3903 N. Mary's St, San Antonio, TX.

2-51. On 21 Feb 20, VICTIM F          provided SA MISINIEC, screen captures (**Exhibit 12**) of her conversations with Civ SIEANA MACKIEWICZ, (VICTIM F          friend).          . A review of the messages disclosed SUBJECT engaged in inappropriate conversations to include "getting handsy" while at Incirlik AB, Turkey. (Agent Note: The messages did not explain what "getting handsy" referred to.)

2-52. On 23 Feb 20, SA MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX, telephonically interviewed MACKIEWICZ, who verbally provided the following details:    MACKIEWICZ met VICTIM F          while attending technical training at Ft. Meade, MD between Dec 2013, and Jan 2014. MACKIEWICZ and VICTIM F          became close friends when VICTIM F          arrived at Incirlik AB, Turkey in May 2014.  MACKIEWICZ and VICTIM F          s friendship became distant when MACKIEWICZ separated from the USAF in Jul 2017.  VICTIM F          and MACKIEWICZ last spoke in Jan 2018.  MACKIEWICZ did not go to on the trip to Colossae Thermal Hotel, Pamukkale/Denizli, Turkey in Apr 2015, because she was preparing to depart Incirlik AB, Turkey. VICTIM F          told MACKIEWICZ, SUBJECT touched her bikini area in the hot tub when VICTIM F          returned from the trip.  MACKIEWICZ did not recall the details of the conversation nor if VICTIM F          told anyone else about the incident.  MACKIEWICZ also sent messages to VICTIM F          (Exhibit 12) which discussed her dislike for certain personnel in the unit.  MACKIEWICZ specifically stated that some other members of her unit would say inappropriate jokes that she felt leadership should have addressed; however, she never witnessed or heard of any type of sexual contact or assault outside of what VICTIM F          informed her in regards to SUBJECT.

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**

**ROI Page 19**



**File No: 310-C-120AA4-35221193511545**

2-53. **SUBJECT INTERVIEW:** On 24 Feb 20, SA MISINIEC contacted Capt JAMESIAN EMMANUEL, Area Defense Counsel, Whiteman AFB, MO, to determine if SUBJECT was willing to conduct an interview with OSI. EMMANUEL confirmed that SUBJECT declined to conducted an interview or provide a statement.

2–54. On 24 Feb 20, SA MISINIEC conducted a review of social media platforms, Facebook, Instagram, and Twitter for VICTIM P      , VICTIM F         , VICTIM W       and SUBJECT.  The review revealed the Facebook profiles for VICTIM P       , VICTIM W       and SUBJECT were private.  A Facebook profile for VICTIM W      was not be located.  A review of Instagram revealed no pertinent information for SUBJECT and VICTIM F          and no profiles for VICTIM P and VICTIM W      .  A review of Twitter revealed no pertinent information for SUBJECT and VICTIM F        and no profiles for VICTIM F       and VICTIM W      .

2-55.  On 28 Feb 20, SHINZATO contacted SA MISINIEC, OSI Det 404 OL-A, JBSA-Randolph, TX, in regards to the incident while at the Colossae Thermal Hotel, Pamukkale/Denizli, Turkey.  SHINZATO provided that while in the hot tub there was a group decision for everyone to remove their swimsuits and experience the hot tub naked.  SHINZATO was reluctant to get naked at first but agreed because he did not want to be the only person to say no.  SHINZATO did not recall who thought of the idea or who removed their swimsuit first.  The group agreed upon rules such as "if you are opposite sex, then you must keep distance between one another unless you are a couple and then you can sit close to each other".  SHINZATO spent about 30 to 40 minutes in the hot tub before returning to his room.  SHINZATO did not observe any interaction between SUBJECT and VICTIM F          .  SHINZATO had no further details about the incident.

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**

*35221193511545*

**ROI Page 20**



**File No:  310-C-120AA4-35221193511545**

---

**3-1. EXHIBITS**

| | |
|---|---|
| 1. Hot Tub Sketch | (Ref. para 2-3) |
| 2. MOSQUERA Text Messages between SUBJECT | (Ref. para 2-5) |
| 3. AF IMT 1168 – WORKMAN | (Ref. para 2-7) |
| 4. AF IMT 1168 – MOELLER | (Ref. para 2-27) |
| 5. VICTIM W          Photo Line Up | (Ref. para 2-35) |
| 6. AF IMT 1168 – MCGANN | (Ref. para 2-38) |
| 7. AF IMT 1168 – HAGAN | (Ref. para 2-40) |
| 8. WORKMAN Text Messages between VICTIM P | (Ref. para 2-43) |
| 9. Photographs - Colossae Thermal Hotel, Pamukkale/Denizli, Turkey | (Ref. para 2-48) |
| 10. Photographs - North Charleston Marriott Hotel, North Charleston, SC. | (Ref. para 2-49) |
| 11. Photographs – San Antonio Zoo | (Ref. para 2-50) |
| 12. Instagram Messages between Victim F          and Mackiewicz | (Ref. para 2-51) |

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**

*35221193511545*

**ROI Page 21**



**File No:  310-C-120AA4-35221193511545**

**PHYSICAL EVIDENCE LISTING**

No evidence was collected as part of this investigation.



# AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

---

# Exhibit 1

**FOUO**



**DEFENSE COUNSEL**

SUMMARIZED

# RECORD OF TRIAL

(and accompanying papers)

**of**

ZIER, JEREMY, M.
_____
(Name: Last, First, Middle Initial)

_____
(Social Security Number)

Senior Master Sergeant (E-8)
_____
(Rank)

Air Force Public Affairs Agency (AETC)
_____
(Unit/Command Name)

United States Air Force
_____
(Branch of Service)

JBSA-Randolph, TX
_____
(Station or Ship)

**By**

**SPECIAL** _____ **COURT-MARTIAL**

Convened by _____ **COMMANDER** _____
(Title of Convening Authority)

AIR FORCE PUBLIC AFFAIRS AGENCY (AETC)
_____

**Tried at**

JBSA-Randolph, TX
_____
(Place or Places of Trial)

**on**

10 August 2020 – 14 August 2020
_____
(Date or Dates of Trial)

Volume 3 of 4 Volumes

**PRETRIAL**
**TRANSCRIPT PAGES 1 - 139**

**Personal Data – Privacy Act of 1974 (5 U.S.C. 552a)**



# AIR FORCE
# OFFICE OF
# SPECIAL INVESTIGATIONS

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

---

# Exhibit 2

**FOUO**













# AIR FORCE
# OFFICE OF
# SPECIAL INVESTIGATIONS

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

# Exhibit 3

**FOUO**

| STATEMENT OF SUSPECT/WITNESS/COMPLAINANT | SUSPECT |
|---|---|
| | X WITNESS/COMPLAINANT |

### PRIVACY ACT STATEMENT

AUTHORITY: 10 U.S.C. 8013; 44 U.S.C. 3101; and EO 9397

PRINCIPAL PURPOSES: Used to record information and details of criminal activity which may require investigative action by commanders, supervisors, security police, AFOSI special agents, etc.; and to provide information to appropriate individuals within DoD organizations who ensure proper legal and administrative action is taken.

ROUTINE USES: Information may be disclosed to local, county, state, and federal law enforcement/investigative authorities for investigation and possible criminal prosecution or civil court action. Information extracted from this form may be used in other related criminal and/or civil proceedings.

DISCLOSURE IS VOLUNTARY: SSN is used to positively identify the individual making the statement.

### I. STATEMENT INFORMATION

| DATE (YYYYMMDD) | TIME | LOCATION AND INSTALLATION (Bldg/Room No) JB CHS, DET 310 | UNIT TAKING STATEMENT | REPEAT (If known) |
|---|---|---|---|---|
| 20200106 | 14:00 | | DET 310 | OFFENSE / COMPLAINT |

### II. PERSONAL IDENTIFICATION (Print or Type)

| NAME (Last, First, Middle Initial) Workman, Izabella R | SSN | STATUS/GRADE AD/ E5 |
|---|---|---|

| LOCAL ADDRESS (Include Zip Code) | DATE AND PLACE OF BIRTH (If required) | TELEPHONE |
|---|---|---|
| | | HOME    DUTY    A |

| PERMANENT ADDRESS OR HOME OF RECORD (Include Zip Code) | MILITARY ORGANIZATION/EMPLOYER USAF, 1 CTCS JB CHS | DEROS N/A |
|---|---|---|

### SPONSOR INFORMATION

| NAME (Last, First, Middle Initial) Self | GRADE | SSN | ORGANIZATION | DUTY PHONE |
|---|---|---|---|---|

### III. ACKNOWLEDGEMENT OF OFFENSES AND 5TH AMENDMENT/ARTICLE 31 RIGHTS ADVISEMENT    (Suspect Only)

I have been advised that I am suspected of the following offenses:

| ADVISED BY (Full Name and Rank) | INDIVIDUAL IDENTIFIED HIMSELF/HERSELF AS A (SF, special agent, etc.) |
|---|---|

| SUSPECT INITIALS | and advised me that I have the following rights according to the 5th Amendment of the U.S. Constitution/Article 31 of the Uniform Code of Military Justice. |
|---|---|
| | I have the right to remain silent - that is to say nothing at all. |
| | Any statement I make, oral or written, may be used as evidence against me in a trial or in other judicial, non-judicial, or administrative proceedings. |
| | I have the right to consult with a lawyer. |
| | I have the right to have a lawyer present during this interview. |
| | I may obtain a civilian lawyer of my own choice at no expense to the government. |
| | I may request a lawyer any time during this interview. |
| | If I decide to answer questions with or without a lawyer present, I may stop the questioning at any time. |
| | MILITARY ONLY: If I want a military lawyer, one will be appointed for me free of charge. |
| | CIVILIANS ONLY: If I cannot afford a lawyer and want one, a lawyer will be appointed for me by civilian authorities. |

| SUSPECT INITIALS | I have read my rights as listed above and I fully understand my rights. No promises, threats, or inducements of any kind have been made to me. No pressure or coercion has been used against me. I make the following choice. (Initial One) |
|---|---|
| | I do not want a lawyer. I am willing to answer questions or make a statement or both, about the offense(s) under investigation. |
| | I do not want a lawyer and I do not wish to make a statement or answer any questions. |
| | I want a lawyer. I will not make any statement or answer any questions until I talk to a lawyer. |

I fully understand my rights and that my signature does not constitute an admission of guilt.

| SIGNATURE OF SUSPECT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|

**AF IMT 1168, 19980401, V2**    PREVIOUS EDITIONS ARE OBSOLETE.    PAGE 1 OF 2    PAGES    IRW

## IV. STATEMENT

On December 7th, 2019, I attended my Holiday Party for the 1st Combat Camera Squadron. While I was there I noticed Chief Zier lingering around SSgt E    P    who was highly intoxicated before she even arrived to the party. As the night continued, both parties increasingly got more intoxicated as the night went on. I was throwing the party so I was responsible for ensuring everything went as planned. So, I wanted to make sure SSgt P    was okay, so I asked a friend to keep an eye on her while I was busy because I didn't trust Chief's intentions. When the party was over I was cleaning up and noticed Chief wasn't helping clean, but wasn't leaving either. When we were finished, I walked over towards P    and the friend that was keeping an eye on her. She was talking to Chief, I went to the friend (Shelby Matulo) and her date (Kyle Hagan) and they asked why I asked them to watch her and I told them I didn't trust his intentions because of past experiences from other friends. Kyle then said "is that why he is grabbing her ass right now" I immediately looked over and his hand was resting on E    butt. He then removed it and I grabbed her to go outside. When we went outside, he also went outside. I called E    , my boyfriend and I an Uber, but Chief's Uber arrived first and he asked if she was going with him. I told him that she wasn't and he left. ///End of Statement///

## V. OATH/SIGNATURE

*"I hereby voluntarily and of my own free will make this statement without having been subjected to any coercion, unlawful influence, or unlawful inducement. I swear (or affirm) I have read this statement, initialed all pages and corrections, and it is true and correct to the best of my knowledge."*

SIGNATURE OF PERSON MAKING STATEMENT                    SIGNATURE OF WITNESS/INTERVIEWER

Kyle Carter, SA, USAF

*Subscribed and sworn to before me, a person authorized by law to administer oaths, this*    6th    *day*

*of*  January    ,  2020    *(year).*

SIGNATURE OF PERSON ADMINISTERING OATH

SA  Ryan  Voltoo

## VI. INSTRUCTIONS FOR CONTINUATION PAGE(S)

*Use plain bond paper (both sides optional). At the top right of each page, print or type "(Last name of individual making the Statement) on (Date)." At the bottom of each page, print or type: "Page    of    Pages." The individual must initial the top and bottom entries and sign his/her name at the bottom of each page.*

AF IMT 1168, 19980401, V2    **(REVERSE)**                    PAGE 2 OF 2    PAGES



# AIR FORCE
# OFFICE OF
# SPECIAL INVESTIGATIONS

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

# Exhibit 4

**FOUO**

# STATEMENT OF SUSPECT/WITNESS/COMPLAINANT

SUSPECT

☒ WITNESS/COMPLAINANT

### PRIVACY ACT STATEMENT

**AUTHORITY:** 10 U.S.C. 8013; 44 U.S.C. 3101; and EO 9397

**PRINCIPAL PURPOSES:** Used to record information and details of criminal activity which may require investigative action by commanders, supervisors, security police, AFOSI special agents, etc.; and to provide information to appropriate individuals within DoD organizations who ensure proper legal and administrative action is taken.

**ROUTINE USES:** Information may be disclosed to local, county, state, and federal law enforcement/investigative authorities for investigation and possible criminal prosecution or civil court action. Information extracted from this form may be used in other related criminal and/or civil proceedings.

**DISCLOSURE IS VOLUNTARY:** SSN is used to positively identify the individual making the statement

## I. STATEMENT INFORMATION

| DATE (YYYYMMDD) | TIME | LOCATION AND INSTALLATION (Bldg/Room No) | UNIT TAKING STATEMENT | REPEAT (If known) |
|---|---|---|---|---|
| 2020 01 23 | 1137 | Bldg 2401 Ramstein AB | AFOSI Det 515 | ☐ OFFENSE ☐ COMPLAINT |

## II. PERSONAL IDENTIFICATION (Print or Type)

| NAME (Last, First, Middle Initial) | SSN | STATUS/GRADE |
|---|---|---|
| MOELLER, KATELYNN NMN | | AD/ E5 |

| LOCAL ADDRESS (Include Zip Code) | DATE AND PLACE OF BIRTH (If required) | TELEPHONE | |
|---|---|---|---|
| | | HOME | DUTY |

| PERMANENT ADDRESS OR HOME OF RECORD (Include Zip Code) | MILITARY ORGANIZATION/EMPLOYER | DEROS |
|---|---|---|
| | AFN / USAF | Jun '21 |

### SPONSOR INFORMATION

| NAME (Last, First, Middle Initial) | GRADE | SSN | ORGANIZATION | DUTY PHONE |
|---|---|---|---|---|
| | | SELF | | |

## III. ACKNOWLEDGEMENT OF OFFENSES AND 5TH AMENDMENT/ARTICLE 31 RIGHTS ADVISEMENT (Suspect Only)

I have been advised that I am suspected of the following offenses:

| ADVISED BY (Full Name and Rank) | INDIVIDUAL IDENTIFIED HIMSELF/HERSELF AS A (SF, special agent, etc.) |
|---|---|

| SUSPECT INITIALS | and advised me that I have the following rights according to the 5th Amendment of the U.S. Constitution/Article 31 of the Uniform Code of Military Justice. |
|---|---|
| | I have the right to remain silent - that is to say nothing at all. |
| | Any statement I make, oral or written, may be used as evidence against me in a trial or in other judicial, non-judicial, or administrative proceedings. |
| | I have the right to consult with a lawyer. |
| | I have the right to have a lawyer present during this interview. |
| | I may obtain a civilian lawyer of my own choice at no expense to the government. |
| | I may request a lawyer any time during this interview. |
| | If I decide to answer questions with or without a lawyer present, I may stop the questioning at any time. |
| | MILITARY ONLY: If I want a military lawyer, one will be appointed for me free of charge. |
| | CIVILIANS ONLY: If I cannot afford a lawyer and want one, a lawyer will be appointed for me by civilian authorities. |

| SUSPECT INITIALS | I have read my rights as listed above and I fully understand my rights. No promises, threats, or inducements of any kind have been made to me. No pressure or coercion has been used against me. I make the following choice. (Initial One) |
|---|---|
| | I do not want a lawyer. I am willing to answer questions or make a statement or both, about the offense(s) under investigation. |
| | I do not want a lawyer and I do not wish to make a statement or answer any questions. |
| | I want a lawyer. I will not make any statement or answer any questions until I talk to a lawyer. |

I fully understand my rights and that my signature does not constitute an admission of guilt.

| SIGNATURE OF SUSPECT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|

**AF IMT 1168, 19980401, V2**    PREVIOUS EDITIONS ARE OBSOLETE.    PAGE 1 OF 3 PAGES

## IV. STATEMENT

In April 2015 I went on a weekend trip to a resort in Pamukkale, Turkey with coworkers: (C___ G___. Scott Taylor, Jeremy Zier, my bf at the time. Aaron Wolff (who did not work with us). I don't remember Sgt Shinzato being there, but it was a long time ago. So we went on this trip and I believe it was a Saturday that we started exploring. we saw a bunch of historical sites during the day and a couple of beers were consumed here and there like at lunch throughout the day. Aaron and I shared a room at the hotel, C___ and Scott shared a room and I imagine Zier and Shinzato shared a room. So after a day of exploring we decide later that evening to get in our bathing suits and all go down to the hot tub. I remember being buzzed from drinking, Scott and C___ I also believe had a few drinks, and I remember Zier being drunker than everyone else. I don't remember Zier being sloppy drunk in the hot tub, just a bit wilder than the rest of us. I can't say for sure but I believe there may have been a game of truth or dare that got a little wild. Its hard to remember anything specific in regards to the game. I do know that with all the alcohol and things borderlining in-appropriate conversation wise, Aaron Wolff suggested him and I leave and head up to the room for bed. Now I can't remember if Scott and C___. came with us when we wanted to leave for bed, or talked to us (us being Aaron and I) the next

## V. OATH/SIGNATURE

I hereby voluntarily and of my own free will make this statement without having been subjected to any coercion, unlawful influence, or unlawful inducement. I swear (or affirm) I have read this statement, initialed all pages and corrections, and it is true and correct to the best of my knowledge.

| SIGNATURE OF PERSON MAKING STATEMENT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|
| KATELYNN MOELLER | SA, OAF |

Subscribed and sworn to before me, a person authorized by law to administer oaths, this **23** day of **January** . **2020** (year).

SIGNATURE OF PERSON ADMINISTERING OATH

SA Jimmie High

## VI. INSTRUCTIONS FOR CONTINUATION PAGE(S)

Use plain bond paper (both sides optional). At the top right of each page, print or type "(Last name of individual making the Statement) on (Date)." At the bottom of each page, print or type: "Page ____ of ____ Pages." The individual must initial the top and bottom entries and sign his/her name at the bottom of each page.

AF IMT 1168, 19980401, V2     (REVERSE)                     PAGE 2 OF 3 PAGES

CONTINUATION OF AF FORM 1168          MOELLER, Katlynn    ON 23 Jan 20

morning about the events that made C_____ uncomfortable in the hot tub. What I'm about to write below is not a direct quote from C_____, but is what I can still remember from the conversation or the general feel of what was said. C_____ said that Zier had been touching her underneath the water in a way that made her uncomfortable. The discomfort in the situation once the touching got to be too weird made her look at Scott who could tell something was up, and they either communicated verbally or non-verbally (as they were very good friends and could read each others expressions) that C_____ wanted to move and she switched spots with him to get away from Zier. I can't recall how far C_____ said the touching went beneath the water, but I know she didn't want him touching her in that way, and that she expressed that discomfort in the situation with myself and Aaron. I remember Aaron who did not work with us, being uncomfortable about how the night in the hot tub had turned to a level of inappropriate with my coworkers. I don't believe that besides of the initial shock of what hearing C_____ had to say about Zier touching her beneath the water, that the incident was ever discussed with me again until now. ENDOFSTATEMENT\\\

KATELYNN MOELLER

(Signature of Person Making Statement)          Page 3 of 3 Pages



# AIR FORCE
# OFFICE OF
# SPECIAL INVESTIGATIONS

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

# Exhibit 5

**FOUO**





# AIR FORCE
# OFFICE OF
# SPECIAL INVESTIGATIONS

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

---

# Exhibit 6

**FOUO**

| STATEMENT OF SUSPECT/WITNESS/COMPLAINANT | | SUSPECT |
|---|---|---|
| | | ☒ WITNESS/COMPLAINANT |

**PRIVACY ACT STATEMENT**

*AUTHORITY: 10 U.S.C. 8013; 44 U.S.C. 3101; and EO 9397*
*PRINCIPAL PURPOSES: Used to record information and details of criminal activity which may require investigative action by commanders, supervisors, security police, AFOSI special agents, etc.; and to provide information to appropriate individuals within DoD organizations who ensure proper legal and administrative action is taken.*
*ROUTINE USES: Information may be disclosed to local, county, state and federal law enforcement/investigative authorities for investigation and possible criminal prosecution or civil court action. Information extracted from this form may be used in other related criminal and/or civil proceedings.*
*DISCLOSURE IS VOLUNTARY: SSN is used to positively identify the individual making the statement.*

## I. STATEMENT INFORMATION

| DATE (YYYYMMDD) | TIME | LOCATION AND INSTALLATION (Bldg/Room No) | UNIT TAKING STATEMENT | REPEAT (If known) |
|---|---|---|---|---|
| 2020 0211 | 1158 | JBCHS Bk. #203 | AFOSI Det 310 | ☐ OFFENSE |
| | | | | ☐ COMPLAINT |

## II. PERSONAL IDENTIFICATION (Print or Type)

| NAME (Last, First, Middle Initial) | SSN | STATUS/GRADE |
|---|---|---|
| McGann, Mickel, P | | AD/O2 |

| LOCAL ADDRESS (Include Zip Code) | DATE AND PLACE OF BIRTH (If required) | TELEPHONE |
|---|---|---|
| | | ~~HOME~~ CELL      DUTY |

| PERMANENT ADDRESS OR HOME OF RECORD (Include Zip Code) | MILITARY ORGANIZATION/EMPLOYER | DEROS |
|---|---|---|
| " " | 1 Combat Camera Sq | |

**SPONSOR INFORMATION**

| NAME (Last, First, Middle Initial) | GRADE | SSN | ORGANIZATION | DUTY PHONE |
|---|---|---|---|---|
| SELF | | | | |

## III. ACKNOWLEDGEMENT OF OFFENSES AND 5TH AMENDMENT/ARTICLE 31 RIGHTS ADVISEMENT     (Suspect Only)

*I have been advised that I am suspected of the following offenses:*

| ADVISED BY (Full Name and Rank) | INDIVIDUAL IDENTIFIED HIMSELF/HERSELF AS A (SF, special agent, etc.) |
|---|---|
| | |

| SUSPECT INITIALS | and advised me that I have the following rights according to the 5th Amendment of the U.S. Constitution/Article 31 of the Uniform Code of Military Justice. |
|---|---|
| | I have the right to remain silent - that is to say nothing at all. |
| | Any statement I make, oral or written, may be used as evidence against me in a trial or in other judicial, non-judicial, or administrative proceedings. |
| | I have the right to consult with a lawyer. |
| | I have the right to have a lawyer present during this interview. |
| | I may obtain a civilian lawyer of my own choice at no expense to the government. |
| | I may request a lawyer any time during this interview. |
| | If I decide to answer questions with or without a lawyer present, I may stop the questioning at any time. |
| | MILITARY ONLY: If I want a military lawyer, one will be appointed for me free of charge. |
| | CIVILIANS ONLY: If I cannot afford a lawyer and want one, a lawyer will be appointed for me by civilian authorities. |

| SUSPECT INITIALS | I have read my rights as listed above and I fully understand my rights. No promises, threats, or inducements of any kind have been made to me. No pressure or coercion has been used against me. I make the following choice. (Initial One) |
|---|---|
| | I do not want a lawyer. I am willing to answer questions or make a statement or both, about the offense(s) under investigation. |
| | I do not want a lawyer and I do not wish to make a statement or answer any questions. |
| | I want a lawyer. I will not make any statement or answer any questions until I talk to a lawyer. |

*I fully understand my rights and that my signature does not constitute an admission of guilt.*

| SIGNATURE OF SUSPECT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|
| | |

**AF IMT 1168, 19980401, V2**          PREVIOUS EDITIONS ARE OBSOLETE.          PAGE 1 OF 3 PAGES

MM

## IV. STATEMENT

MM During the ICICS Christmas Party I overheard SMSgt Zier and SSgt F          having a conversation about SSgt F          sexual relations with her husband. I was alerted to the conversation when I heard SSgt F          say "sex with my husband". I felt at that time a SSgt and SMSgt should not be having that form of conversation. After about 3 min my attention was diverted to my Operations Officer who was a little drunk and my wife, best friend, his wife and myself offered to take her home. Once I got up from the table I didn't see or hear anything concerning SMSgt Zier and SSgt F          . (See Attached Table Diagram)

MM // End of Statement /// MM

## V. OATH/SIGNATURE

MM "I hereby voluntarily and of my own free will make this statement without having been subjected to any coercion, unlawful influence, or unlawful inducement. I swear (or affirm) I have read this statement, initialed all pages and corrections, and it is true and correct to the best of my knowledge."

SIGNATURE OF PERSON MAKING STATEMENT          SIGNATURE OF WITNESS/INTERVIEWER

Subscribed and sworn to before me, a person authorized by law to administer oaths, this   11th   day of   February   ,   2020   (year).

SIGNATURE OF PERSON ADMINISTERING OATH

*Kyle D. Carter, SA, USAF*

## VI. INSTRUCTIONS FOR CONTINUATION PAGE(S)

Use plain bond paper (both sides optional). At the top right of each page, print or type "(Last name of individual making the Statement) on (Date)." At the bottom of each page, print or type: "Page _____ of _____ Pages." The individual must initial the top and bottom entries and sign his/her name at the bottom of each page.

AF IMT 1168, 19980401, V2    (REVERSE)                    PAGE 2 OF 3 PAGES

MM



Date: February 11, 2020
Name: ILT Michel McGann
X

Pg 3 of 3 MM



# AIR FORCE
# OFFICE OF
# SPECIAL INVESTIGATIONS

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

# Exhibit 7

**FOUO**

| STATEMENT OF SUSPECT/WITNESS/COMPLAINANT | | SUSPECT | |
|---|---|---|---|
| | | ✓ | WITNESS/COMPLAINANT |

### PRIVACY ACT STATEMENT

AUTHORITY: 10 U.S.C. 8013; 44 U.S.C. 3101; and EO 9397
PRINCIPAL PURPOSES: Used to record information and details of criminal activity which may require investigative action by commanders, supervisors, security police, AFOSI special agents, etc.; and to provide information to appropriate individuals within DoD organizations who ensure proper legal and administrative action is taken.
ROUTINE USES: Information may be disclosed to local, county, state,and federal law enforcement/investigative authorities for investigation and possible criminal prosecution or civil court action. Information extracted from this form may be used in other related criminal and/or civil proceedings.
DISCLOSURE IS VOLUNTARY: SSN is used to positively identify the individual making the statement.

### I. STATEMENT INFORMATION

| DATE (YYYYMMDD) | TIME | LOCATION AND INSTALLATION (Bldg/Room No) | UNIT TAKING STATEMENT | REPEAT (If known) | |
|---|---|---|---|---|---|
| 2026 02 13 | 1400 | OSI Det 310 / Bldg 203 | OSI | OFFENSE | |
| | | | | COMPLAINT | |

### II. PERSONAL IDENTIFICATION (Print or Type)

| NAME (Last, First, Middle Initial) | SSN | STATUS/GRADE |
|---|---|---|
| Hagan, Kyle P | | ADAF/E5 |

| LOCAL ADDRESS (Include Zip Code) | DATE AND PLACE OF BIRTH (If required) | TELEPHONE | |
|---|---|---|---|
| | | HOME | DUTY |

| PERMANENT ADDRESS OR HOME OF RECORD (Include Zip Code) | MILITARY ORGANIZATION/EMPLOYER | DEROS |
|---|---|---|
| N/A | ICTCS JBCHS | |

### SPONSOR INFORMATION

| NAME (Last, First, Middle Initial) | GRADE | SSN | ORGANIZATION | DUTY PHONE |
|---|---|---|---|---|
| N/A | | | N/A | |

### III. ACKNOWLEDGEMENT OF OFFENSES AND 5TH AMENDMENT/ARTICLE 31 RIGHTS ADVISEMENT    (Suspect Only)

I have been advised that I am suspected of the following offenses:

| ADVISED BY (Full Name and Rank) | INDIVIDUAL IDENTIFIED HIMSELF/HERSELF AS A (SF, special agent, etc.) |
|---|---|

| SUSPECT INITIALS | and advised me that I have the following rights according to the 5th Amendment of the U.S. Constitution/Article 31 of the Uniform Code of Military Justice. |
|---|---|
| | I have the right to remain silent - that is to say nothing at all. |
| | Any statement I make, oral or written, may be used as evidence against me in a trial or in other judicial, non-judicial, or administrative proceedings. |
| | I have the right to consult with a lawyer. |
| | I have the right to have a lawyer present during this interview. |
| | I may obtain a civilian lawyer of my own choice at no expense to the government. |
| | I may request a lawyer any time during this interview. |
| | If I decide to answer questions with or without a lawyer present, I may stop the questioning at any time. |
| | MILITARY ONLY: If I want a military lawyer, one will be appointed for me free of charge. |
| | CIVILIANS ONLY: If I cannot afford a lawyer and want one, a lawyer will be appointed for me by civilian authorities. |

| SUSPECT INITIALS | I have read my rights as listed above and I fully understand my rights. No promises, threats, or inducements of any kind have been made to me. No pressure or coercion has been used against me. I make the following choice. (Initial One) |
|---|---|
| | I do not want a lawyer. I am willing to answer questions or make a statement or both, about the offense(s) under investigation. |
| | I do not want a lawyer and I do not wish to make a statement or answer any questions. |
| | I want a lawyer. I will not make any statement or answer any questions until I talk to a lawyer. |
| | I fully understand my rights and that my signature does not constitute an admission of guilt. |

| SIGNATURE OF SUSPECT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|

| AF IMT-1168, 19980401, V2 | PREVIOUS EDITIONS ARE OBSOLETE. | PAGE 1 OF 2 PAGES |
|---|---|---|

**IV. STATEMENT**

I saw what I ~~believe~~ thought was SMgt Zier's hand on then SSgt E P 's rear end. When I saw said event I pointed it out to SSgt Wrokman and she said she saw the same thing. It was at this time someone from my group (Workman or Matullo) grabbed her and brought her over towards us and away from Zier. At the end of the night Workman and her boyfriend took E home in an uber. Zier left in a different uber.

END

VM

**V. OATH/SIGNATURE**

"I hereby voluntarily and of my own free will make this statement without having been subjected to any coercion, unlawful influence, or unlawful inducement. I swear (or affirm) I have read this statement, initialed all pages and corrections, and it is true and correct to the best of my knowledge."

SIGNATURE OF PERSON MAKING STATEMENT                    SIGNATURE OF WITNESS/INTERVIEWER

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _13_ day

of _____, _2026_ (year).

SIGNATURE OF PERSON ADMINISTERING OATH

**VI. INSTRUCTIONS FOR CONTINUATION PAGE(S)**

Use plain bond paper (both sides optional). At the top right of each page, print or type "(Last name of individual making the Statement) on (Date)." At the bottom of each page, print or type: "Page ____ of ____ Pages." The individual must initial the top and bottom entries and sign his/her name at the bottom of each page.

AF IMT 1168, 19980401, V2    (REVERSE)                    PAGE 2 OF 2 PAGES



# AIR FORCE
# OFFICE OF
# SPECIAL INVESTIGATIONS

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

# Exhibit 8

**FOUO**















# AIR FORCE
# OFFICE OF
# SPECIAL INVESTIGATIONS

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

# Exhibit 9

**FOUO**









# AIR FORCE
# OFFICE OF
# SPECIAL INVESTIGATIONS

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

# Exhibit 10

**FOUO**





# AIR FORCE
# OFFICE OF
# SPECIAL INVESTIGATIONS

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

# Exhibit 11

**FOUO**

























**AIR FORCE
OFFICE OF
SPECIAL INVESTIGATIONS**

Detachment 404
Dragon Valley Rd
JBSA-FSH, TX 78234

# Exhibit 12

**FOUO**















MAR 2 5 2020

Disposition of Court-Martial Charges – *United States v. Senior Master Sergeant Jeremy M. Zier*, , Air Force Public Affairs Agency, JBSA-Randolph Air Force Base, Texas 78150

1. I direct the charges and specifications preferred against SMSgt Jeremy M. Zier, in violation of Articles 92 and 120 be referred to a special court-martial.

2. Pursuant to Article 25, UCMJ, the following persons are detailed to serve as court members in the special court-martial of *United States v. Senior Master Sergeant Jeremy M. Zier*.

3. I have selected eight (8) officers and four (4) enlisted persons to serve as members by initialing the "Mbr" column.

| Mbr | RANK | NAME | UNIT | MAJCOM | BASE |
|---|---|---|---|---|---|
| | *COL | SEAN S. MCKENNA | AFRS | AETC | JBSA-RANDOLPH |
| SC | *COL | ANDREW C. LATTIMORE | AETC | AETC | JBSA-RANDOLPH |
| SC | *COL | NICOLE H. FRANCIS | AFPC | HAF | JBSA-RANDOLPH |
| | LT COL | RYAN M. WONG | 99 FTS | AETC | JBSA-RANDOLPH |
| SC | LT COL | VIRGINIA S. WALKER | 99 FTS | AETC | JBSA-RANDOLPH |
| | *MAJ | DIANA M. MAZZOTTA | AFPC | HAF | JBSA-RANDOLPH |
| SC | *MAJ | CASSANDRA H. RICHARDSON | AFPC | HAF | JBSA-RANDOLPH |
| | *CAPT | LORI M. WILHELM | AFMAA | HAF | JBSA-RANDOLPH |
| SC | *CAPT | JEFFERY A. RUEBEN | AFRS | AETC | JBSA-RANDOLPH |
| SC | *CAPT | JENNIFER L. GUION | AFRS | AETC | JBSA-RANDOLPH |
| SC | *2LT | NORMA GHANEM | AFMAA | HAF | JBSA-RANDOLPH |
| SC | *2LT | HAI Y. RICKE | AFMAA | HAF | JBSA-RANDOLPH |
| | *CMSGT | WILLIAM F. RAWLS | AFRS | AETC | JBSA-RANDOLPH |
| SC | *CMSGT | JAMIE SANTIAGO | AFPC | HAF | JBSA-RANDOLPH |
| SC | *CMSGT | CLINTON L. WILKERSON | AFPC | HAF | JBSA-RANDOLPH |
| SC | *CMSGT | HARLEY DAVIS | AFPC | HAF | JBSA-RANDOLPH |
| SC | *CMSGT | DAVID P. ARNETT | AETC | AETC | JBSA-RANDOLPH |
| | *CMSGT | ERIC S. JOHNSON | AETC | AETC | JBSA-RANDOLPH |

*With concurrence of commander concerned.

4. In accordance with R.C.M 912A:

    a. ____ I authorize the military judge to impanel ____ (insert specific number) of alternates.

    b. SC I authorize the military judge to impanel alternate members only if, after the exercise of challenges for cause, excess members remain.

    c. ____ Alternate members are not authorized.

5. Each of the officers selected is best qualified for court-martial duty by reason of age, education, training, experience, length of service, and judicial temperament. I am aware I may consider all officers assigned to JBSA-Randolph, and am not limited by any proposed list.

JEFFREY F. CARTER, Colonel, USAF
Commander, 502d Security Forces Group

## CERTIFICATE OF SERVICE

I certify that a copy of the Charge Sheet dated 25 March 2020, and Convening Order dated 25 March 2020 in the case of *U.S. v. Senior Master Sergeant Jeremy M. Zier* were served on the accused on or about 27 March 2020.

DAVID B. WILLIAMS JR., SSgt, USAF
Military Justice Paralegal

I hereby acknowledge receipt of a copy of the Charge Sheet dated 25 March 2020 and Convening Order dated 25 March 2020 in the case against *U.S. v. Senior Master Sergeant Jeremy M. Zier* were served on me, the accused, on 27 March 2020 at 0930 (time).

JEREMY M. ZIER, SMSgt, USAF
Accused

**CERTIFICATE OF SERVICE**

I certify that a copy of the Charge Sheet, Recoupment Statement, PDS, 1st Indorsement dated 24 March 2020, and Report of Investigation, dated 1 March 2020, 64 pgs in the case of *U.S. v. SMSgt Jeremy Zier* was served on the defense counsel for the accused on 24 March 2020 at 1320 (time).


DAVID B. WILLIAMS JR., SSgt, USAF
Military Justice Paralegal


I hereby acknowledge receipt of the Charge Sheet, Recoupment Statement, PDS, 1st Indorsement dated 24 March 2020, and Report of Investigation, dated 1 March 2020, 64 pgs in the case of *U.S. v. SMSgt Jeremy Zier*, on  26  March 2020 at 0830.


KELLY E. PLETZ, SSgt, USAF
Defense Paralegal



**DEPARTMENT OF THE AIR FORCE**
AIR FORCE MANPOWER ANALYSIS AGENCY
JOING BASE SAN ANTONIO-RANDOLPH TEXAS 78150



27 July 2020

MEMORANDUM FOR  AFMAA/CD
                502 SFG/JA
                502 SFG/CC
                IN TURN

FROM:  2D LT NORMA GHANEM

SUBJECT:  Request for Release from Court-Martial Panel Member Duty

On 28 April 2020, 502d Security Forces Group (SFG) Legal Office notified me that I had been selected by Colonel Jeffrey F. Carter, 502 SFG/CC, via Special Order AB-1, dated 25 March 2020, to serve as a special court-martial panel member.  I have received orders to PCS with a RNLTD of 5 Aug 2020 to Wright Patterson, AFB and will not be in Texas for the court martial.  Consequently, I request to be excused from service on this court-martial.

GHANEM.NOR  Digitally signed by
            GHANEM.NORMA.1522641436
MA.1522641436  Date: 2020.07.27 11:15:18
               -05'00'

NORMA GHANEM, 2d Lt, USAF


1st Ind, AFMAA/CD

MEMORANDUM FOR  502 SFG/JA
                502 SFG/CC

Concur/Nonconcur.  I respectfully request you excuse 2d Lt Norma Ghanem from this court-martial panel for the reason listed above.

COREA.JESSIC  Digitally signed by
              COREA.JESSICA.C.1244541816
A.C.1244541816  Date: 2020.07.29 09:05:34
                -05'00'

JESSICA C. COREA, Lt Col, USAF
Deputy Commander



### DEPARTMENT OF THE AIR FORCE
#### HEADQUARTERS AIR FORCE PERSONNEL CENTER
#### JOINT BASE SAN ANTONIO-RANDOLPH TEXAS

29 Jul 20

MEMORANDUM FOR DPFAM/CC
                           502 SFG/JA
                           502 SFG/CC
                           IN TURN

FROM:  MAJ CASSANDRA RICHARDSON

SUBJECT:  Request for Release from Court-Martial Panel Member Duty

On 28 April 2020, 502d Security Forces Group (SFG) Legal Office notified me that I had been selected by Colonel Jeffrey F. Carter, 502 SFG/CC, via Special Order AB-1, dated 25 March 2020, to serve as a special court-martial panel member. At this time our division is suffering from severe manning shortages due to retirements, medical conditions, TDY's and PCS movements.  Although this duty was scheduled several months ago, we could not predict the changes that were forthcoming with our current and future manning. Consequently, I request to be excused from service on this court-martial.

RICHARDSON.CASSA
NDRA.H.1061255512
Digitally signed by
RICHARDSON.CASSANDRA.H.1061255512
Date: 2020.07.29 11:41:23 -05'00'

CASSANDRA RICHARDSON, Maj, USAF


1st Ind, DPFAM/CC

MEMORANDUM FOR  502 SFG/JA
                                  502 SFG/CC

Concur/Nonconcur.  I respectfully request you excuse Maj Cassandra Richardson from this court-martial panel for the reason listed above.

SCOTT.JULIE.CATH
ERINE.1168242057
Digitally signed by
SCOTT.JULIE.CATHERINE.11682420
57
Date: 2020.07.29 12:01:47 -05'00'

JULIE C. SCOTT, Col, USAF
Chief, ARC Case Management Division


### BREAKING BARRIERS...SINCE 1947



# DEPARTMENT OF THE AIR FORCE
## 502D AIR BASE WING
## JOINT BASE SAN ANTONIO



$\mathcal{J}0$ July 2020

MEMORANDUM FOR  502 SFG/CC

FROM:  502 SFG/SJA

SUBJECT:  Excusal and Selection of New Court Members – *U.S v. SMSgt Jeremy M. Zier*

1.  I recommend excusal of Major Cassandra H. Richardson, and Second Lieutenant Norma Ghanem, as members in the special court-martial convened by Court-Martial Convening Order AB-1, dated 25 March 2020.  The above members were selected as court members prior to docketing of the trial.  Major Cassandra H. Richardson is unavailable due to her section being extremely low manned.  Second Lieutenant Norma Ghanem is unavailable due to her permanent change of station.

2.  In order to replace the selected members that are unable to serve, I recommend detailing two new officers to serve as court-martial members.  Annotate your selection by placing your initials next to each of the selected members name on the attached indorsement memorandum.

BENJAMIN F. MARTIN, Lt Col, USAF
Staff Judge Advocate
502 Security Forces Group

Attachment:
Indorsement w/attachments

*Mission ~ Wingman ~ Partners*

1st Ind, 502 SFG/SJA, Excusal and Selection of New Court Members, dated ᴐ◯ July 2020, *United States v. SMSgt Jeremy M. Zier*, Air Force Public Affairs Agency, JBSA-Randolph, TX.

1. DIRECTION OF THE CONVENING AUTHORITY:  The court members previously detailed to the special court-martial convened by Special Order AB-1, this headquarters, dated 25 March 2020, namely, Major Cassandra H. Richardson, and Second Lieutenant Norma Ghanem are hereby excused from the above mentioned court in accordance with the member excusal letters.

2. Pursuant to Article 25, UCMJ, the following people denoted by my initials or written below are detailed to serve as court members in the special court-martial of *U.S. v. SMSgt Zier*.  I have selected the following replacements to serve as court-martial panel members.  I direct that the appropriate convening order be amended accordingly.

| Prim | Alt | | | | | |
|------|-----|------|------|------|------|------|
| *JHm* | ___ | *LT COL | SAMMUEL C. BERENGUER | 560 FTS | AETC | JBSA-RND |
| ___ | ___ | *MAJ | BENJAMIN H. QUIGLEY | AFPC | AFPC | JBSA-RND |
| ___ | ___ | *MAJ | ZACHARY A. JAEGER | 560 FTS | AETC | JBSA-RND |
| *JHm* | ___ | *1ST LT | KATELYN C. KOHN | AFPC | AFPC | JBSA-RND |

*with concurrence of the commander concerned

3. I have made the selection indicated above based on the best qualified people for court-martial duty by reason of age, education, training, experience, length of service, and judicial temperament.  I am aware I am not limited by any proposed list.


                                        Commander, 502d Security Forces Group

2 Attachments:
1. Member Excusal Letters (2 pages)
2. Court-Member Data Sheets (12 pages)

Attachment 1 to the 1st Indorsement, 502 SFG/SJA, Excusal and Selection of New Court Members, dated 30 July 2020, is located within the Pretrial section of the Record of Trial.  Attachment 2 was not included within the Record of Trial due to adherence to checklist guidance.

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS, 502D SECURITY FORCES GROUP (AETC)**
**JOINT BASE SAN ANTONIO-RANDOLPH, TEXAS 78150**

SPECIAL ORDER                                                31 July 2020
AB-2

The following members are detailed to the special court-martial convened by Special Order AB-1, this
headquarters, dated 25 March 2020, vice MAJOR CASSANDRA H. RICHARDSON, AND SECOND
LIEUTENANT NORMA GHANEM, relieved.

\*\*LIEUTENANT COLONEL SAMMUEL C. BERENGUER    560 FTS    AETC    THIS STATION
\*\*1ST LIEUTENANT KATELYN C. KOHN             AFPC       AFPC    THIS STATION

\*\*With concurrence of the commander concerned.


                                        JAMES H. MASONER, Colonel, USAF
                                        Commander, 502d Security Forces Group

FOR THE COMMANDER



BENJAMIN F. MARTIN, Lt Col, USAF         DISTRIBUTION
Staff Judge Advocate                     - 1 – Each Individual
                                         - 1 – Each Organization
                                         - 1 – Central Docketing Office
                                         - 1 – 502 SFG/JA




# DEPARTMENT OF THE AIR FORCE
## 502D SECURITY FORCES GROUP
### JOINT BASE SAN ANTONIO – RANDOLPH, TEXAS

5 Aug 20

MEMORANDUM FOR  MILITARY JUDGE (COLONEL STERLING C. PENDLETON)

FROM:  502 SFG/CC

SUBJECT:  Special Order AB-2, *United States v. SMSgt Jeremy M. Zier*

On 31 July 2020 502 SFG/JA executed Special Order AB-2, which relieved two individuals that had previously been detailed to the special court-martial convened by Special Order AB-1, dated 25 March 2020.  Special Order AB-2 also detailed two new individuals to serve in place of the individuals that were relieved.  It is my intent that Special Order AB-2 only modify Special Order AB-1 in so far as the members relieved from service and those appointed in their place. Special Order AB-2 in no way limits the provision of Special Order AB-1 authorizing the military judge to impanel alternate members if, after challenges for cause, excess members remain.


⁄ JAMES H. MASONER, Colonel, USAF
Commander

Appellate Exhibit VIII
Admitted/Rejected Page  18

US v. Zier Military Record of Trial and Appellate Extracts 000532 of 902



**DEPARTMENT OF THE AIR FORCE**
**502D SECURITY FORCES GROUP**
**JOINT BASE SAN ANTONIO — RANDOLPH, TEXAS**

10 August 2020

MEMORANDUM FOR  CHIEF MASTER SERGEANT JAMIE SANTIAGO
                CHIEF MASTER SERGEANT CLINTON L. WILKERSON
                CHIEF MASTER SERGEANT HARLEY DAVIS
                CHIEF MASTER SERGEANT DAVID P. ARNETT

FROM:  502 SFG/CC

SUBJECT:  Special Order AB-1, *United States v. SMSgt Jeremy M. Zier*

You were previously detailed to the special court-martial convened by Special Order AB-1, dated 25 March 2020.  You are hereby excused from service on this court-martial.


                        / JAMES H. MASONER, Colonel, USAF
                        Commander

*Mission ~ Wingman ~ Partners*



APPELLATE EXHIBIT VII
MARKED PAGE 16
PAGE    1    OF    1



**DEPARTMENT OF THE AIR FORCE**
AREA DEFENSE COUNSEL (AFLOA)
WHITEMAN AIR FORCE BASE, MISSOURI

24 March 2020

MEMORANDUM FOR  502 SFG/JA

FROM:  AFLOA/ADC (Capt Jamesian D. Emmanuel)

SUBJECT:  First Defense Request for Information – *U.S. v. SMSgt Jeremy M. Zier*

1.  In anticipation of referral of charges, the Defense submits the following discovery request pursuant to the Fifth and Sixth Amendments to the U.S. Constitution; Article 46 of the Uniform Code of Military Justice (U.C.M.J.); the Jencks Act (18 U.S.C. §3500); the Military Rules of Evidence (M.R.E.); the Rules for Courts-Martial (R.C.M.); Chapter 5 of the Air Force Standards of Criminal Justice; Rules 3.3, 3.4, 3.8, and 4.2 of the Air Force Rules of Professional Conduct (AFRPC), Uniform Rules of Practice Before Air Force Courts-Martial, *United States v. Jackson*, 59 M.J. 330, 333-334 (C.A.A.F. 2004); *Brady v. Maryland,* 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and additional citations infra.  The Accused, SMSgt Jeremy M. Zier, respectfully requests that the Government, to the extent not done so already, provide the information listed below.

2.  In reviewing and responding to the Defense request for discovery, please bear in mind that the analysis of discoverability is not equivalent to the analysis of admissibility.  *See* R.C.M. 701.  In addition, the Government has a duty to obtain information beyond what may be contained in the Trial Counsel's file.

3.  **Privileged Information and Non-Disclosure Log**:  Applicable to all Defense requests for information, the Defense respectfully requests if the Government knows of the existence of items or information responsive to a Defense request, but does not consider the information to be discoverable due to relevance, privilege, or any other justification for non-disclosure, that the Government identify the items or information in a *privilege/non-disclosure log* to be presented to a judge for inspection and judicial determination of discoverability.

4.  **General Discovery**:  The Defense requests the following information related to the above styled case:

   a.  Any information or evidence obtained from inspections and inventories.  [M.R.E. 313]

   b.  Any information or evidence obtained from searches not deemed to require probable cause.  [M.R.E. 314]

   c.  Any information or evidence obtained from searches deemed to require probable cause.  [M.R.E. 315]

   d.  Any information or evidence obtained from seizures.  [M.R.E. 316]

Page **1** of 12

e.  Any evidence which the Government intends to introduce pursuant to M.R.E. 404 during any pretrial hearing, findings or in sentencing regarding any witness, party or SMSgt Zier.  The Defense further requests that the Government articulate the permissible purposes under 404(b) that justify consideration of this evidence and how the evidence is more probative than prejudicial under the M.R.E. 403 balancing test.

f.  Any information or evidence addressed in M.R.E. 608, relevant to this case, or which the government intends to use during any phase of trial, or pretrial hearing, regarding any witness, party, alleged victim or accused.

g.  Any information or evidence addressed in M.R.E. 609, relevant to this case, or which the government intends to use during any phase of trial, or pretrial hearing, regarding any witness, party, alleged victim or accused.

h.  Any lay opinion testimony that the government intends to elicit during any phase of trial, or pretrial hearing, in accordance with M.R.E. 701.

i.  Any expert opinion testimony that the government intends to elicit during any phase of trial, or pretrial hearing, in accordance with M.R.E. 702.

j.  Any matter the government intends to have judicially noticed.  M.R.E. 201, M.R.E. 202, *U.S. v. McShane*, 28 M.J. 1036 (A.F.C.M.R. 1989).

k.  Access to, copies of, and a descriptive list of any real or physical evidence (and its location), in the Government's custody and control, seized, recorded, or reviewed during this investigation of this case, whether relied upon in charging or not. A list or copy of documents and other real evidence and location the Government intends to use at any pre-trial hearings, trial findings or sentencing, including rebuttal.  This includes the substance of any conversations which occurred that contained any evidence not disclosed under another paragraph.

l.  Background information of the prospective court members, as available, including the information in R.C.M. 912(a)(1).  See, *United States v. Credit*, 2 M.J. 631, 642 (A.F.C.M.R. 1976). This includes, but is not limited to:

i.  Court member data sheets for members selected to serve on the court.

ii. Court member data sheets for members not selected to serve on the court but whose names were submitted to the Convening Authority as possible court members;

iii. All documentation generated in the referral process to include, but not limited to, communications between the base legal office and numbered air force legal office, if applicable, and the Special Court-Martial Convening Authority and the General Court-Martial Convening Authority, if applicable, such as initial disposition memorandums/MFRs, pretrial advice, court member selection documents, court member data, and court member selection legal advice; and

iv.  All information, written or otherwise, used by the Convening Authority and the various advisory personnel to nominate and/or select prospective or final members for all court-martial orders in this case, including any amending orders, and in particular, the reason for removing any previously detailed court-member.

m.  Any subpoena and subpoena duces tecum issued by the Government to any entity.

n.  All evidence in the Government's possession or otherwise known to Trial Counsel or members of the 502 ISG/JA office that may reasonably tend to negate the guilt of SMSgt Zier, reduce the guilt of SMSgt Zier of any of the offenses charged, or reduce SMSgt Zier's punishment.  R.C.M. 701(a)(6).

o.  Any evidence in the Government's possession, or reasonably available to the Government, favorable to SMSgt Zier.  R.C.M. 701(a)(6).

p.  Any results of scientific reports or experiments in the Government's custody or control, known to the Government, or that may, through due diligence, be known to the Government and that are material to SMSgt Zier's defense preparation or to be used by the Government as evidence at a pretrial hearing, findings or sentencing. R.C.M. 701(a)(2)(B).  This includes any reports or test results from any scientific test performed in SMSgt Zier's case.

q.  Any evidence, witnesses or other evidence the Government anticipates it may introduce in rebuttal at trial.  This includes notice of any prior consistent statements, whether written or not, the prosecution intends to use when examining either prosecution or defense witnesses. M.R.E. 613.

r.  A copy of all charge sheets and findings worksheets that will be used in the court-martial. Any findings or sentencing instructions the prosecution intends to request at trial.

s.  If SMSgt Zier was subjected to a pre-text phone call or meeting, whether recorded or not, the Defense requests notice of time, date, and persons involved and copies of all documentation relating to such call(s) or meeting(s), whether in electronic or paper format.

t.  Any hearsay evidence that the Government intends to introduce as an exception to M.R.E. 802. *See* M.R.E. 803 and M.R.E. 804.  The Defense further requests to be notified of the specific provisions that the Government will rely on to seek admission of the hearsay statement.

u.  Any testimony which has not been transcribed, but is available on tape or some other source made in relation to this case or relates in any manner to SMSgt Zier in this case.  R.C.M. 914.

v.  All pretrial publicity, including statements made at relevant wing/installation/squadron functions, that is in any way relevant to this case.  This discovery is necessary so that the Defense may properly conduct voir dire and may examine the necessity of raising a motion for a change of venue.  See *United States v. Chambers*, 49 C.M.R. 220 (A.F.C.M.R. 1974).

w. Copies of all documents pertaining to any pre-trial confinement or restrictions on the liberty of SMSgt Zier.

x. Results of any polygraph or other "truth detecting" examination with all relevant charts, graphs, questions and other documents for any witness, including SMSgt Zier, that may be called to testify. This request includes, but is not limited to, any psychiatric or psychological testimony designed to assess the "credibility" of the potential witnesses and/or SMSgt Zier.

y. Should mental health examination be ordered pursuant to R.C.M. 706, notice of any statement that the Government is aware of made by SMSgt Zier and any evidence derived from knowledge of said statement. M.R.E. 302.

z. The pretrial advice of the staff judge advocate (R.C.M. 406), forwarding memorandums from subordinate commanders (R.C.M. 402, R.C.M. 403, and R.C.M. 404), and the Convening Order and any amending order (R.C.M. 505(b)).

aa. Copies of all documents relating to requests for jurisdiction from civilian authorities for any offense in which SMSgt Zier has been charged or any other uncharged misconduct.

bb. Any and all victim input sought and/or received prior to, throughout, and following the investigation.

5. **Information about SMSgt Zier**: The defense requests the following information about SMSgt Zier.

a. Statements: Any handwritten, typed or recorded statements by any potential witness or co-actor in connection with the investigation of this case, to include any summaries of conversations with any civilian or military investigator or any other representatives of the government. This includes responses/statements to social workers, school counselors, and civilian law enforcement, in addition to AFOSI agents, military law enforcement and any other agent/representative of the military.

b. *304(d) Notice:* Written notice of all statements, oral or written, made by SMSgt Zier that are relevant to this case, known to the trial counsel/Government, and within the care, custody or control of the Armed Forces. This disclosure must state the specific content of each individual statement, who the statement was made to, and when the statement was made. Disclosure is requested prior to arraignment pursuant to M.R.E. 304(d)(1). If any statements (such as drafts) have been destroyed or lost, notice of their one-time existence is also requested.

c. *Evidence:* Disclosure of all evidence seized from the person or property of SMSgt Zier or believed to be owned by SMSgt Zier that the Government took possession of or exercises care, custody or control over during the investigation of this matter and/or that may be admissible at trial. The Defense requests disclosure prior to arraignment. In addition to the items listed in this discovery request, the Defense requests disclosure of all evidence the Government intends to offer into evidence against SMSgt Zier at trial during findings or

sentencing phase of trial. The Defense further requests a printout from the AFOSI or SFOI (whichever may be applicable) evidence tracking system for all evidence seized in this case. Please provide any search warrants obtained, supporting affidavits, written orders, or consent form for the items.

    d. *Inspection*: The right to inspect at a mutually agreed upon time and place all original documents in the AFOSI, SF, or civilian (local, state or federal) law enforcement agency's case file, the real evidence, and the accompanying AF Forms 52 (back and front) reflecting the chain of custody for each item the Government has seized. R.C.M. 701.

    e *Personnel File*: Copies of all documentation contained in SMSgt Zier's personnel records, at all levels of command, to include her Personnel Information Files (PIF), Unfavorable Information File (UIF), Personnel Records Display Application (PRDA), and Enlisted Personnel Reports (EPRs). If the Government refused to provide such information, the Defense requests the information be compelled through the issuance of a subpoena and provided to the military judge for an in camera review.

    f. *Article 31 Rights*: Copies of all documents that indicate the occasions in which SMSgt Zier was read his constitutional and Article 31 rights.

    g. *Records Request for Records*: Requests, subpoenas, and supporting affidavits used to obtain any of SMSgt Zier's financial or medical records or any other evidence in this case.

    h. *Duty Information*: Documents concerning reassignment and/or placement of SMSgt Zier's incident to this investigation including, but not limited to, the denial of any leave or cancellation of any projected temporary duty (TDY) assignments/trainings.

6. **Information about Witnesses:** The Defense requests the following information concerning any and all potential witnesses including, but not limited to, AFOSI agents, SFOI detectives and personnel, and federal and state law enforcement agents in this case:

    a. *Statements*: Any handwritten, typed or recorded statements by any potential witness or co- actor in connection with the investigation of this case, to include summaries of conversations with any civilian or military investigators or any other representatives of the federal or state government. R.C.M. 701(a)(1)(C). If any statements (such as drafts) have been destroyed or lost, notice of their one-time existence is also requested. This request includes recordings of any interviews of potential witnesses, to the extent that such exists. This also includes responses/statements to civilian law enforcement or government agencies, in addition to AFOSI agents, military law enforcement and any other agent/representatives of the military. Please provide any draft statements or affidavits provided to any witness in this case for edits regardless of the author of the statement. For example, if a witness had a statement or affidavit drafted by someone else that was subsequently edited for finalization, we request copies of the originally drafted statement.

    b. *Written Accounts, Notes, and Documentation*: All written recordings by any potential witnesses pertaining to the incidents alleged on the charge sheet to include, but not limited to,

formal statements, personal notes, diaries, journals, letters, notes, emails, text messages, instant messages, and the likes. If such information exists, please further indicate whether any documents or pages have been altered or destroyed in some manner.

c. *Disciplinary Records/Witness Credibility*: Any evidence tending to diminish the credibility of any potential witnesses including, but not limited to, prior civil, foreign, or military convictions as stated in M.R.E. 609, and evidence of other character, conduct, or bias bearing on any witness credibility, including, but not limited to, disciplinary records in the form of an Article 15 nonjudicial punishment, Letters of Counseling, Letters of Reprimand, and any other evidence of verbal counseling, reprimand, investigation, or adverse administrative action in the possession of, or reasonably available or obtainable by the Government. M.R.E. 405(a), M.R.E. 608(b), M.R.E. 806, R.C.M. 701(a); *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. U.S.*, 405 U.S. 150 (1972). Please state which specific witnesses have had, or currently have, a UIF, Control Roster, Article 15 nonjudicial punishment, or referral EPR. This request includes any information contained on social media websites controlled by, but not limited to, any witness whom the Government intends to call. This request also includes evidence that could be used at trial to impeach witnesses. *U.S. v. Agurs*, 427 U.S. 97 (1976); *U.S. v. Brickey*, 16 M.J. 258 (C.M.A. 1983), *U.S. v. Gabrels*, 33 M.J. 622 (AFCMR 1991).

d. *M.R.E. 612 Evidence*: Any document or writing used by a witness to prepare for trial or pretrial hearing. This includes any "proposed questions" written down, given to, or shown to a witness by a Government representative in order to prepare for trial. M.R.E. 612.

e. *Immunity and Orders to Testify*: Disclosure of any and all immunity or leniency offered and/or granted to witnesses or to potential witnesses. M.R.E. 301(c)(2); *United States v. Webster*, 1 M.J. 216 (C.M.A. 1975). This includes the text or other evidence of any promises of immunity or leniency made to SMSgt Zier or to any Government witness. The Defense further requests notification if any Government agent or representative of any Government agency offered to assist or "help out" any witness in return for their cooperation. This request would extend, for example, to an OSI agent telling a witness they would speak to the witness' commander about retaining them in the Air Force or reducing their punishment if the witness cooperates with the OSI or informal comments to a witness or their attorney by law enforcement officers or members of the Judge Advocate General's Corps (JAGC). This includes, but is not limited to, promises or assurances of immunity or leniency of some type that have not been reduced to writing. This also includes, but is not limited to, associated orders to testify. Disclosure is requested pursuant to M.R.E. 301(c)(2). Please provide the specific document, if any that was made pursuant to such an offer.

f. *Additional Personnel Records*: Access to all relevant personnel records of all potential witnesses who may testify against SMSgt Zier at trial on the merits or during the sentencing phase whether they are presently in the military or have been discharged at an earlier date. *U.S. v. Reece*, 25 M.J. 93 (C.M.A. 1987).

g. *Trial Witness List*: Identification of all witnesses, including name, addresses, telephone numbers, and relevant statements and/or reports discoverable under the Jencks Act, 18 U.S.C. §3500, of all witnesses/potential witnesses the Government:

i.  Used to develop the case (including potential rebuttal) against SMSgt Zier;

ii.  Intends to call at any deposition;

iii.  Intends to call for the Government case-in-chief.  R.C.M. 701(a)(3)(A);

iv.  Intends to call for rebuttal.  *U.S. v. Trimper*, 28 M.J. 460 (CMA 1989);

v.  Intends to call for presentencing.  R.C.M. 1001(b); or

vi.  Intends to call to rebut a defense of lack of mental responsibility, if notice of such defense is given to the prosecution.  R.C.M. 701(a)(3)(B).

h.  *Witness' Military Status*:  Identification of all witnesses' military status, or, for witnesses with prior military service now in civilian status, their date, basis, and characterization of discharge from the military, and details of any discharge prior to completing their term of enlistment.

i.  *Polygraphs*: If any relevant witness in this case has been subject to a polygraph or other "truth detecting" examination, the Defense requests the results of this testing, together with all relevant charts, graphs, questions and other documents. This request includes, but is not limited to, any psychiatric or psychological testing designed to assess the "credibility" of a witness's statement.

j.  *ROIs for Witnesses/Related Cases:* If any witness has been or is the subject of an investigation, or has made statements to investigators in other investigations, the Defense requests disclosure of that fact and a copy of the Report(s) of Investigation and other similar documents.

k.  *Witnesses - Mental Health Information*:  The Defense requests all relevant mental health records of potential witnesses in the case.  If such records exist and the Government believes they are privileged, please so specify.

7.  **Information about the Investigation:**  The defense requests the Government provide the following information from the SF investigation of SMSgt Zier or any other investigations concerning SMSgt Zier or any other Government witness or matters otherwise relevant to this case, to include any other local law enforcement agencies that may have been involved. This request includes copies of and the right to inspect all documentation generated in the investigation of this case to include, but not limited to:

a.  The names, locations, and telephone numbers of all investigators, military and civilian, including local, state and federal level agencies who have participated in or are presently participating in the investigation of this case.

b.  The names, locations, and telephone numbers of all persons or potential witnesses used

US v. Zier Military Record of Trial and Appellate Extracts 000540 of 902

in developing the case against SMSgt Zier.

c.  All AFOSI, military police, security forces, or other investigative agency documents resulting from any investigation into any other military member accused of the offenses SMSgt Zier is accused of committing.

d.  All AFOSI, military police, security forces, federal & state law enforcement agencies, or other investigative agency documents, regulations, policies, guidelines, and any other such guidance concerning:

i.  Investigations of military members accused of the offenses SMSgt Zier is accused of committing;

ii.  Questioning – particularly forensic interviews; and

iii.  Policies regarding audio or video recordation of witness, suspect or alleged victim interviews.

e.  Investigative Reports:  Copies of all investigative reports generated in this case by any investigative agency, to include AFOSI, security forces, or civilian law enforcement.  This includes, but is not limited to:

i.  Final reports;

ii.  Interim reports;

iii.  Addendums;

iv.  Inserts;

v.  Supplemental reports; and/or,

vi.  Reports by experts or consultants.

f.  Other Investigative Materials:

i.  Copies of all notes generated in this case by any investigator or investigative agency.  This includes all documentation relating to investigative steps taken. This includes, but is not limited to AFOSI, security forces, or civilian law enforcement.

ii.  Personal or business notes (handwritten or otherwise);

iii.  USAF or DoD forms, specifically including the DCFL Form 1 or equivalent;

iv.  Interview logs;

US v. Zier Military Record of Trial and Appellate Extracts 000541 of 902

v.  Checklists;

vi.  Internal data pages;

vii.  Communications to include emails between levels of investigative agents, consultants, and/or command;

viii.  Summaries;

ix.  Investigative interview log documentation;

x.  The investigative agency Operations Plan and all addendums in this case;

xi.  The Complaint Form and any continuation sheets;

xii.  All messages and documents used to communicate between various levels of investigative agencies and government on the case (e.g. base level, command level, department level);

xiii.  Staff Summary Sheets or memoranda sent to headquarters and its staff to keep the investigative agency's superiors appraised of the particular situation or operation;

xiv.  Attachments, addenda, and post-operational assessment reports;

xv.  All documents relating to agent misconduct of the agents assigned to the investigation of this case.  This includes, but is not limited to: information as to whether the case agent's credentials were ever revoked or suspended; information as to whether the case agent was ever a suspect in any internal investigation; all disciplinary records, to include, but not be limited to, records of counselings, reprimands, admonitions, non-judicial punishment, etc.; all complaints, allegations or charges made against the case agent by any military member or civilian.  All documents relating to the records check of every agent assigned to the investigation as submitted to and completed by AFOSI/JA.

xvi.  Relevant documents pertaining to the training of the agents involved in this case to include, but not be limited to, OJT records, CDC records, specialty training forms, and any criminal investigative courses attended by the case agent;

xvii.  Any checklists used in the case;

xviii.  Notification of any information that has been destroyed;

xix.  Complete copies of any documentation pertaining to any search or seizure conducted in this case, to include, but not be limited to, memoranda prepared concerning any oral search or seizure authorization, any affidavits or statements in support of a search or seizure authorization, any recording of any oral search or seizure authorization, any writings prepared by the authorizing authority, law enforcement agents, or judge advocates in support of such authorizations or during

the obtaining of the authority, and any documentation relating to any search or seizure conducted without authorization from a judge or magistrate;

    xx.  Copies of all evidence tags of other chain of custody documents concerning evidence the government intends to offer at trial or at any hearings;

    xxi.  Any and all "developmental files" pertinent to this case;

8. **Confidential Informant/Confidential Source Information**: The Defense requests any relevant information regarding any confidential informants/confidential sources used in this case, specifically, the complete informant file(s) and dossiers associated with any and all informants or sources.

9. **Scientific Data/Reports:**  The Defense requests complete copies of any reports and results of scientific/laboratory tests or computer based testing or extraction created or obtained in the investigation against SMSgt Zier.  This includes, but is not limited to, any cellphone/computer/hard drive extractions results, drug testing results/reports, or DNA test reports. In addition please provide any reports and derogatory data from the lab associated with the testing.

10. **Experts:**  Pursuant to R.C.M. 703(d), any Government request(s) to the Convening Authority for any expert witness and/or consultants, in advance of employment of any such expert, including the expert's name, address, phone number, resume, Curriculum Vitae (CV) and all documents used by the expert to prepare for trial/sentencing.  M.R.E. 612, M.R.E. 803(18). Copies of all reports, statements, or conclusions of experts, consultants, or technicians made in connection with this case.  This request includes, but is not limited to, interim and final reports, addenda, inserts, and attachments, expert's notes (handwritten, recorded, or otherwise), written opinions, assessments, and/or analyses, the contents of any and all communications between any and all analyst(s) and/or expert(s) and any governmental agency by any means, and copies of any and all literature, reference materials, learned treatises, texts or other authoritative sources specifically referred to or relied upon by analysts and/or experts in formulating his opinion.

11. **Draft Statements/Affidavits:**  Please provide any draft statements or affidavits provided to any witness in this case for edits, regardless of the author of the statement.  For example, if a witness had a statement or affidavit drafted by someone else that was subsequently edited for finalization – the Defense requests a copy of the originally drafted statement.

12.  **Photographs, Video, or other Pictorial or Video Media (i.e. photo, CD, DVD, digital, etc.)**: The Defense respectfully requests the following evidence regarding the above-styled case:

    a.  All photographs or images taken by any person including but not limited to all potential witnesses and law enforcement agents – military and civilian. All photographs or images taken by any person including, but not limited to, all potential witnesses and law enforcement agents – military and civilian – which the government intends to offer into evidence at any phase of

trial. To include:

   b.  Photographic/images of the interior and exterior of any location or item that was searched whether or not evidence was seized, including but not limited to, photographs or images taken while the evidence was being seized, processed, logged, and entered into any and all evidence lockers; and

   c.  All video recordings made in the investigation of this case, recordings made prior to this case, or recordings made during the alleged misconduct.  This includes but is not limited to:

      i.  Video of any locations which were searched whether or not evidence was seized;

      ii.  Video, or photographs, taken by surveillance cameras located at or near the location of the alleged offense;

      iii.  Video of all evidence;

      iv.  Video of any interviews of SMSgt Zier; and

      v.  Video of any witness interviews.

13.  **Audio Recordings:**  The Defense respectfully requests all audio recordings made in this case. This includes, but is not limited to, interviews of SMSgt Zier, interviews of any potential witnesses, dictated notes made by investigators and/or experts, and any other audiotape recordings that relate to the investigation or trial in this case.

## *CONCLUSION*

14.  The Defense is making this request on the grounds that SMSgt Zier cannot properly prepare his case for trial without production and inspection of the documents, items and information requested.  The Defense expects the government will make a reasonably diligent effort to comply with this discovery request; and, as to any particular requested information, the Defense will regard any non-response or response without comment as an affirmative assertion by the government that the requested information does not exist.  *United States v. Green,* 37 M.J. 88 (C.M.A. 1993).  The Defense requests that any and all real evidence within the Government's possession be preserved.  Additionally, the Defense demands a speedy trial for SMSgt Zier pursuant to the Sixth Amendment of the U.S. Constitution, R.C.M. 707 and Article 10 of the U.C.M.J.

15.  The Defense requests the Government inform Defense counsel if it does not intend to comply with any of the provisions of this request.  This discovery request is a continuing request and applies to any pretrial hearing and up to, and through, trial in this case. *United States v. Stellato*, 74 M.J. 473, 478 n.5 (C.A.A.F. 2015).  It seeks information developed subsequent to the Government's initial response as well as information obtained prior to, during, and following

trial.  RCM 701(d); *United States v. Brickey*, 16 M.J. 258 (C.M.A. 1983); *United States v. Eshalomi*, 23 M.J. 12 (C.M.A. 1986).

16.  If you have any questions or wish to discuss this case further, please feel free to contact me at

*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel

---

## CERTIFICATE OF SERVICE

I certify that I served a copy of this First Defense Request for Information via email transmission to the Trial Counsel on 24 March 2020.

*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel

Page **12** of **12**

**DEPARTMENT OF THE AIR FORCE**
AIR FORCE LEGAL OPERATIONS AGENCY
JOINT BASE SAN ANTONIO-RANDOLPH, TEXAS

27 March 2020

MEMORANDUM FOR  DEFENSE COUNSEL (CAPT JAMESIAN D. EMMANUEL AND MR.
                LANCE WOOD)

FROM:  Trial Counsel (Maj John Malek, Capt Edward (Ted) Coleman)

SUBJECT:  First Defense Request for Information – *U.S. v. SMSgt Jeremy M. Zier*

1.  Pursuant to the Rules for Courts-Martial (R.C.M.) and related authorities, the United States in the above-styled case hereby provides the defense with the following discovery responses.  This response is generated in response to a request filed by Capt Jamesian Emmanuel on 24 March 2020.  Responses to each defense request are provided in bold.

2.  **General Discovery**:  The Defense requests the following information related to the above styled case:

   a.  Any information or evidence obtained from inspections and inventories.  [M.R.E. 313]

**The Government is not aware of any such evidence.  Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

   b.  Any information or evidence obtained from searches not deemed to require probable cause. [M.R.E. 314]

**The Government is not aware of any such evidence.  Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

   c.  Any information or evidence obtained from searches deemed to require probable cause.  [M.R.E. 315]

**The Government is not aware of any such evidence.  Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

   d.  Any information or evidence obtained from seizures.  [M.R.E. 316]

**The Government is not aware of any such evidence.  Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

   e.  Any evidence which the Government intends to introduce pursuant to M.R.E. 404  during any pretrial hearing, findings or in sentencing regarding any witness, party or SMSgt Zier.  The Defense further requests that the Government articulate the permissible purposes under 404(b) that justify consideration of this evidence and how the evidence is more probative than prejudicial under the M.R.E. 403 balancing test.

Page **1** of 18

**The Government will comply with this request in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

f.  Any information or evidence addressed in M.R.E. 608, relevant to this case, or which the government intends to use during any phase of trial, or pretrial hearing, regarding any witness, party, alleged victim or accused.

**The Government will comply with this request in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

g.  Any information or evidence addressed in M.R.E. 609, relevant to this case, or which the government intends to use during any phase of trial, or pretrial hearing, regarding any witness, party, alleged victim or accused.

**The Government is not aware of any such evidence.  Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

h.  Any lay opinion testimony that the government intends to elicit during any phase of trial, or pretrial hearing, in accordance with M.R.E. 701.

**The Government will comply with this request in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

i.  Any expert opinion testimony that the government intends to elicit during any phase of trial, or pretrial hearing, in accordance with M.R.E. 702.

**The Government will comply with this request in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

j.  Any matter the government intends to have judicially noticed.  M.R.E. 201, M.R.E. 202, *U.S. v. McShane*, 28 M.J. 1036 (A.F.C.M.R. 1989).

**The Government will comply with this request in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

k.  Access to, copies of, and a descriptive list of any real or physical evidence (and its location), in the Government's custody and control, seized, recorded, or reviewed during this investigation of this case, whether relied upon in charging or not. A list or copy of documents and other real evidence and location the Government intends to use at any pre-trial hearings, trial findings or sentencing, including rebuttal. This includes the substance of any conversations which occurred that contained any evidence not disclosed under another paragraph.

**The Government is not aware of any such evidence.  Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

l.  Background information of the prospective court members, as available, including the information in R.C.M. 912(a)(1).  See, *United States v. Credit*, 2 M.J. 631, 642 (A.F.C.M.R. 1976). This includes, but is not limited to:

i. Court member data sheets for members selected to serve on the court.

**The Government will comply with this request and anticipates producing these materials on or before 1 April 2020.**

ii. Court member data sheets for members not selected to serve on the court but whose names were submitted to the Convening Authority as possible court members;

**The Government will comply with this request and anticipates producing these materials on or before 1 April 2020.**

iii. All documentation generated in the referral process to include, but not limited to, communications between the base legal office and numbered air force legal office, if applicable, and the Special Court-Martial Convening Authority and the General Court-Martial Convening Authority, if applicable, such as initial disposition memorandums/MFRs, pretrial advice, court member selection documents, court member data, and court member selection legal advice; and

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. The Government will provide the referral documents actually provided to the Special Court-Martial Convening Authority for purposes of rendering a referral decision. With respect to any materials generated by the base legal office in preparation for referral which were not actually forwarded to the Special Court-Martial Convening Authority, the Government objects to the production of such materials as protected attorney-work product.**

iv. All information, written or otherwise, used by the Convening Authority and the various advisory personnel to nominate and/or select prospective or final members for all court-martial orders in this case, including any amending orders, and in particular, the reason for removing any previously detailed court-member.

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. The Government will provide the court member data sheets for all potential court-members evaluated by the Special Court-Martial Convening Authority before detailing court-members for this case as well as any other materials provided to the Special Court-Martial Convening Authority as part of the Referral package.**

m. Any subpoena and subpoena duces tecum issued by the Government to any entity.

**The Government is not aware of any such evidence. Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

n. All evidence in the Government's possession or otherwise known to Trial Counsel or members of the 502 ISG/JA office that may reasonably tend to negate the guilt of SMSgt Zier, reduce the guilt of SMSgt Zier of any of the offenses charged, or reduce SMSgt Zier's punishment. R.C.M. 701(a)(6).

**The Government is not aware of any such evidence which has not already been produced. Should the Government become aware of any such evidence, which has not already been produced, the**

**Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

o. Any evidence in the Government's possession, or reasonably available to the Government, favorable to SMSgt Zier. R.C.M. 701(a)(6).

**The Government is not aware of any such evidence which has not already been produced. Should the Government become aware of any such evidence, which has not already been produced, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

p. Any results of scientific reports or experiments in the Government's custody or control, known to the Government, or that may, through due diligence, be known to the Government and that are material to SMSgt Zier's defense preparation or to be used by the Government as evidence at a pretrial hearing, findings or sentencing. R.C.M. 701(a)(2)(B). This includes any reports or test results from any scientific test performed in SMSgt Zier's case.

**The Government is not aware of any such evidence. Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

q. Any evidence, witnesses or other evidence the Government anticipates it may introduce in rebuttal at trial. This includes notice of any prior consistent statements, whether written or not, the prosecution intends to use when examining either prosecution or defense witnesses. M.R.E. 613.

**The Government will comply with this request in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

r. A copy of all charge sheets and findings worksheets that will be used in the court-martial. Any findings or sentencing instructions the prosecution intends to request at trial.

**The Government will comply with this request in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

s. If SMSgt Zier was subjected to a pre-text phone call or meeting, whether recorded or not, the Defense requests notice of time, date, and persons involved and copies of all documentation relating to such call(s) or meeting(s), whether in electronic or paper format.

**The Government is not aware of any such evidence. Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

t. Any hearsay evidence that the Government intends to introduce as an exception to M.R.E. 802. *See* M.R.E. 803 and M.R.E. 804. The Defense further requests to be notified of the specific provisions that the Government will rely on to seek admission of the hearsay statement.

**The Government will comply with this request in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

u. Any testimony which has not been transcribed, but is available on tape or some other source

made in relation to this case or relates in any manner to SMSgt Zier in this case.  R.C.M. 914.

**The Government will comply with this request in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

    v.  All pretrial publicity, including statements made at relevant wing/installation/squadron functions, that is in any way relevant to this case.  This discovery is necessary so that the Defense may properly conduct voir dire and may examine the necessity of raising a motion for a change of venue.  See *United States v. Chambers*, 49 C.M.R. 220 (A.F.C.M.R. 1974).

**The Government is not aware of any such evidence.  Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

    w.  Copies of all documents pertaining to any pre-trial confinement or restrictions on the liberty of SMSgt Zier.

**The Government is not aware of any such evidence.  Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

    x.  Results of any polygraph or other "truth detecting" examination with all relevant charts, graphs, questions and other documents for any witness, including SMSgt Zier, that may be called to testify.  This request includes, but is not limited to, any psychiatric or psychological testimony designed to assess the "credibility" of the potential witnesses and/or SMSgt Zier.

**The Government is not aware of any such evidence.  Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

    y.  Should mental health examination be ordered pursuant to R.C.M. 706, notice of any statement that the Government is aware of made by SMSgt Zier and any evidence derived from knowledge of said statement. M.R.E. 302.

**The Government is not aware of any such evidence.  Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

    z.  The pretrial advice of the staff judge advocate (R.C.M. 406), forwarding memorandums from subordinate commanders (R.C.M. 402, R.C.M. 403, and R.C.M. 404), and the Convening Order and any amending order (R.C.M. 505(b)).

**The Government is not aware of any such evidence which has not previously been provided. Should the Government become aware of any such evidence which has not previously been provided the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

    aa.  Copies of all documents relating to requests for jurisdiction from civilian authorities for any offense in which SMSgt Zier has been charged or any other uncharged misconduct.

Page **5** of **18**

**The Government is not aware of any such evidence. Should the Government become aware of any such evidence, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

   bb.  Any and all victim input sought and/or received prior to, throughout, and following the investigation.

**The Government is not aware of any such evidence which has not already been produced. Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

   5.  **Information about SMSgt Zier**: The defense requests the following information about SMSgt Zier.

   a.  Statements:  Any handwritten, typed or recorded statements by any potential witness  or co-actor in connection with the investigation of this case, to include any summaries of conversations with any civilian or military investigator or any other representatives of the government.  This includes responses/statements to social workers, school counselors, and civilian law enforcement, in addition to AFOSI agents, military law enforcement and any other agent/representative of the military.

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.  The Government is not aware of any such evidence generated in connection with the investigation of this case which has not already been produced or which is not subject to applicable privilege.  Specifically, the Government objects to the production of any responsive materials generated by trial counsel or other members of the legal office in the course of conducting witness interviews in the course of preparations for trial.  Should the Government become aware of any such evidence which has not previously been produced the Government and is not subject to a claim of privilege it will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

   b.  304(*d*) N*otice*: Written notice of all statements, oral or written, made by SMSgt Zier that are relevant to this case, known to the trial counsel/Government, and within the care, custody or control of the Armed Forces.  This disclosure must state the specific content of each individual statement, who the statement was made to, and when the statement was made. Disclosure is requested prior to arraignment pursuant to M.R.E. 304(d)(1).  If any statements (such as drafts) have been destroyed or lost, notice of their one-time existence is also requested.

**The Government will comply with this request in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

   c.  E*vidence*: Disclosure of all evidence seized from the person or property of
SMSgt Zier or believed to be owned by SMSgt Zier that the Government took possession of or exercises care, custody or control over during the investigation of this matter and/or that may be admissible at trial.  The Defense requests disclosure prior to arraignment.  In addition to the items listed in this discovery request, the Defense requests disclosure of all evidence the Government intends to offer into evidence against SMSgt Zier at trial during findings or sentencing phase of trial.  The Defense further requests a printout from the AFOSI or SFOI (whichever may be applicable) evidence tracking system

for all evidence seized in this case. Please provide any search warrants obtained, supporting affidavits, written orders, or consent form for the items.

**The Government is not aware of any evidence owned by or otherwise believed to be owned by SMSgt Zier which was seized from or otherwise taken into the possession or custody of the Government in the course of the investigation. With respect to the defense request for disclosure of evidence the Government intends to offer into evidence at trial, the Government will comply with this request in accordance with applicable Rules and/or the Military Judge's Scheduling Order. The Government is unaware of any evidence relating to AFOSI evidence tracking which has not been previously been produced as part of the AFOSI case file; however, should the Government become aware of any such evidence which has not previously been produced, the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

   d.  *Inspection*:  The right to inspect at a mutually agreed upon time and place all original documents in the AFOSI, SF, or civilian (local, state or federal) law enforcement agency's case file, the real evidence, and the accompanying AF Forms 52 (back and front) reflecting the chain of custody for each item the Government has seized. R.C.M. 701.

**Members of the defense can arrange to inspect non-privileged portions of the AFOSI case file by contacting the case agent, SA Lukaz Misiniec at Detachment 404 OL-A, JBSA-Randolph, TX at (210) 652-1487 or lukasz.mininiec@us.af.mil.**

   e  P*ersonnel File*:  Copies of all documentation contained in SMSgt Zier's personnel records, at all levels of command, to include her Personnel Information Files (PIF), Unfavorable Information File (UIF), Personnel Records Display Application (PRDA), and Enlisted Personnel Reports (EPRs).  If the Government refused to provide such information, the Defense requests the information be compelled through the issuance of a subpoena and provided to the military judge for an in camera review.

**The Government has requested these materials will comply with this request.**

   f.  *Article* 31 *Rights*: Copies of all documents that indicate the occasions in which SMSgt Zier was read his constitutional and Article 31 rights.

**The Government is not aware of any such evidence which has not already been produced.  Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

   g.  *Records Request for Records*: Requests, subpoenas, and supporting affidavits used to obtain any of SMSgt Zier's financial or medical records or any other evidence in this case.

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.  The Government has previously provided the AFOSI case file, which includes the results of all records checks conducted pursuant to the investigation.  No records were sought or obtained via the subpoena process as part of this investigation.**

   h.  D*uty Information*: Documents concerning reassignment and/or placement of SMSgt Zier's incident to this investigation including, but not limited to, the denial of any leave or cancellation of any projected temporary duty (TDY) assignments/trainings.

**The Government is not aware of any such evidence which have not previously been produced. Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

6. **Information about Witnesses:** The Defense requests the following information concerning any and all potential witnesses including, but not limited to, AFOSI agents, SFOI detectives and personnel, and federal and state law enforcement agents in this case:

a. *Statements*: Any handwritten, typed or recorded statements by any potential witness or co- actor in connection with the investigation of this case, to include summaries of conversations with any civilian or military investigators or any other representatives of the federal or state government. R.C.M. 701(a)(1)(C). If any statements (such as drafts) have been destroyed or lost, notice of their one-time existence is also requested. This request includes recordings of any interviews of potential witnesses, to the extent that such exists. This also includes responses/statements to civilian law enforcement or government agencies, in addition to AFOSI agents, military law enforcement and any other agent/representatives of the military. Please provide any draft statements or affidavits provided to any witness in this case for edits regardless of the author of the statement. For example, if a witness had a statement or affidavit drafted by someone else that was subsequently edited for finalization, we request copies of the originally drafted statement.

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. The Government is not aware of any such evidence generated in connection with the investigation of this case which has not already been produced or which is not subject to applicable privilege. Specifically, the Government objects to the production of any responsive materials generated by trial counsel or other members of the legal office in the course of conducting witness interviews in the course of preparations for trial. Should the Government become aware of any such evidence which has not previously been produced the Government and is not subject to a claim of privilege it will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

b. *Written Accounts, Notes, and Documentation*: All written recordings by any potential witnesses pertaining to the incidents alleged on the charge sheet to include, but not limited to, formal statements, personal notes, diaries, journals, letters, notes, emails, text messages, instant messages, and the likes. If such information exists, please further indicate whether any documents or pages have been altered or destroyed in some manner.

**The Government is not aware of any such evidence which has not already been produced. Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

c. *Disciplinary Records/Witness Credibility*: Any evidence tending to diminish the credibility of any potential witnesses including, but not limited to, prior civil, foreign, or military convictions as stated in M.R.E. 609, and evidence of other character, conduct, or bias bearing on any witness credibility, including, but not limited to, disciplinary records in the form of an Article 15 nonjudicial punishment, Letters of Counseling, Letters of Reprimand, and any other evidence of verbal counseling, reprimand, investigation, or adverse administrative action in the possession of, or reasonably available or obtainable

by the Government.  M.R.E. 405(a), M.R.E. 608(b), M.R.E. 806, R.C.M. 701(a); *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. U.S.*, 405 U.S. 150 (1972).  Please state which specific witnesses have had, or currently have, a UIF, Control Roster, Article 15 nonjudicial punishment, or referral EPR.  This request includes any information contained on social media websites controlled by, but not limited to, any witness whom the Government intends to call.  This request also includes evidence that could be used at trial to impeach witnesses. *U.S. v. Agurs*, 427 U.S. 97 (1976); *U.S. v. Brickey*, 16 M.J. 258 (C.M.A. 1983), *U.S. v. Gabrels*, 33 M.J. 622 (AFCMR 1991).

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. The Government will comply with this request in so far as it relates to those witnesses listed on the Government and Defense witness lists, as filed in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

 d.  M.*R.E.* 612 E*vidence*: Any document or writing used by a witness to prepare for trial or pretrial hearing. This includes any "proposed questions" written down, given to, or shown to a witness by a Government representative in order to prepare for trial. M.R.E. 612.

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. The Government will comply with this request in so far as it relates to those witnesses listed on the Government and Defense witness lists, as filed in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

 e.  *Immunity and Orders to Testify*:  Disclosure of any and all immunity or leniency offered and/or granted to witnesses or to potential witnesses.  M.R.E. 301(c)(2); *United States v. Webster,* 1 M.J. 216 (C.M.A. 1975).  This includes the text or other evidence of any promises of immunity or leniency made to SMSgt Zier or to any Government witness.  The Defense further requests notification if any Government agent or representative of any Government agency offered to assist or "help out" any witness in return for their cooperation.  This request would extend, for example, to an OSI agent telling a witness they would speak to the witness' commander about retaining them in the Air Force or reducing their punishment if the witness cooperates with the OSI or informal comments to a witness or their attorney by law enforcement officers or members of the Judge Advocate General's Corps (JAGC).  This includes, but is not limited to, promises or assurances of immunity or leniency of some type that have not been reduced to writing. This also includes, but is not limited to, associated orders to testify. Disclosure is requested pursuant to M.R.E. 301(c)(2).  Please provide the specific document, if any that was made pursuant to such an offer.

**The Government is not aware of any such evidence.  Should the Government become aware of any such evidence the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

 f.  *Additional Personnel Records*:  Access to all relevant personnel records of all potential witnesses who may testify against SMSgt Zier at trial on the merits or during the sentencing phase whether they are presently in the military or have been discharged at an earlier date.  *U.S. v. Reece*, 25 M.J. 93 (C.M.A. 1987).

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. The Government will comply with this request in so far as it relates to those witnesses listed on the Government and Defense witness lists, as filed in**

accordance with applicable Rules and/or the Military Judge's Scheduling Order.

g. *Trial Witness List*: Identification of all witnesses, including name, addresses, telephone numbers, and relevant statements and/or reports discoverable under the Jencks Act,
18 U.S.C. §3500, of all witnesses/potential witnesses the Government:

i. Used to develop the case (including potential rebuttal) against SMSgt Zier;

ii. Intends to call at any deposition;

iii. Intends to call for the Government case-in-chief. R.C.M. 701(a)(3)(A);

iv. Intends to call for rebuttal. *U.S. v. Trimper*, 28 M.J. 460 (CMA 1989);

v. Intends to call for presentencing. R.C.M. 1001(b); or

vi. Intends to call to rebut a defense of lack of mental responsibility, if notice of such defense is given to the prosecution. R.C.M. 701(a)(3)(B).

**The Government will comply with this request – to include sub-sections i – vi - in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

h. *Witness' Military Status*: Identification of all witnesses' military status, or, for witnesses with prior military service now in civilian status, their date, basis, and characterization of discharge from the military, and details of any discharge prior to completing their term of enlistment.

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. The Government will comply with this request in so far as it relates to those witnesses listed on the Government and Defense witness lists, as filed in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

i. *Polygraphs*: If any relevant witness in this case has been subject to a polygraph or other "truth detecting" examination, the Defense requests the results of this testing, together with all relevant charts, graphs, questions and other documents. This request includes, but is not limited to, any psychiatric or psychological testing designed to assess the "credibility" of a witness's statement.

**The Government is not aware of any such evidence. Should the Government become aware of any such evidence the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

j. *ROIs for Witnesses/Related Cases*: If any witness has been or is the subject of an investigation, or has made statements to investigators in other investigations, the Defense requests disclosure of that fact and a copy of the Report(s) of Investigation and other similar documents.

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.**

k. *Witnesses* - M*ental Health Information*:  The Defense requests all relevant mental health records of potential witnesses in the case.  If such records exist and the Government believes they are privileged, please so specify.

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.**

7. **Information about the Investigation:**  The defense requests the Government provide the following information from the SF investigation of SMSgt Zier or any other investigations concerning SMSgt Zier or any other Government witness or matters otherwise relevant to this case, to include any other local law enforcement agencies that may have been involved. This request includes copies of and the right to inspect all documentation generated in the investigation of this case to include, but not limited to:

a.  The names, locations, and telephone numbers of all investigators, military and civilian, including local, state and federal level agencies who have participated in or are presently participating in the investigation of this case.

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. The Government will comply with this request in so far as it relates to those investigators listed on the Government and Defense witness lists, as filed in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

b.  The names, locations, and telephone numbers of all persons or potential witnesses used in developing the case against SMSgt Zier.

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. The Government will comply with this request in so far as it relates to those witnesses listed on the Government and Defense witness lists, as filed in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

c.  All AFOSI, military police, security forces, or other investigative agency documents resulting from any investigation into any other military member accused of the offenses SMSgt Zier is accused of committing.

**Absent additional justification the Government objects to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.**

d.  All AFOSI, military police, security forces, federal & state law enforcement agencies, or other investigative agency documents, regulations, policies, guidelines, and any other such guidance concerning:

i.  Investigations of military members accused of the offenses SMSgt Zier is accused of committing;

ii.  Questioning – particularly forensic interviews; and

iii.  Policies regarding audio or video recordation of witness, suspect or alleged victim interviews.

**Absent additional justification the Government objects to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.**

e.  Investigative Reports:  Copies of all investigative reports generated in this case by any investigative agency, to include AFOSI, security forces, or civilian law enforcement.  This includes, but is not limited to:

i.  Final reports;

ii.  Interim reports;

iii.  Addendums;

iv.  Inserts;

v.  Supplemental reports; and/or,

vi.  Reports by experts or consultants.

**Absent additional justification the Government objects in part to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. The Government has previously provided copies of the AFOSI case file for this case.**

f.  Other Investigative Materials:

i.  Copies of all notes generated in this case by any investigator or investigative agency.  This includes all documentation relating to investigative steps taken. This includes, but is not limited to AFOSI, security forces, or civilian law enforcement.

**The Government is not aware of any such evidence which has not already been produced.  Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

ii.  Personal or business notes (handwritten or otherwise);

**The Government is not aware of any such evidence which has not already been produced.  Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

iii.  USAF or DoD forms, specifically including the DCFL Form 1 or equivalent;

Page **12** of **18**

**The Government is not aware of any such evidence which has not already been produced. Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

    iv.  Interview logs;

**The Government is not aware of any such evidence which has not already been produced. Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

    v.  Checklists;

**The Government is not aware of any such evidence which has not already been produced. Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

    vi.  Internal data pages;

**The Government is not aware of any such evidence which has not already been produced. Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

    vii.  Communications to include emails between levels of investigative agents, consultants, and/or command;

**Absent additional justification the Government objects to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.**

    viii.  Summaries;

**Absent additional justification the Government objects to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.**

    ix.  Investigative interview log documentation;

**The Government is not aware of any such evidence which has not already been produced. Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

US v. Zier Military Record of Trial and Appellate Extracts 000558 of 902

x.  The investigative agency Operations Plan and all addendums in this case;

**The Government is not aware of any such evidence which has not already been produced.  Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

xi.  The Complaint Form and any continuation sheets;

**The Government is not aware of any such evidence which has not already been produced.  Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

xii.  All messages and documents used to communicate between various levels of investigative agencies and government on the case (e.g. base level, command level, department level);

**Absent additional justification the Government objects to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.**

xiii.  Staff Summary Sheets or memoranda sent to headquarters and its staff to keep the investigative agency's superiors appraised of the particular situation or operation;

**Absent additional justification the Government objects to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.**

xiv.  Attachments, addenda, and post-operational assessment reports;

**Absent additional justification the Government objects to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.**

xv.  All documents relating to agent misconduct of the agents assigned to the investigation of this case.  This includes, but is not limited to: information as to whether the case agent's credentials were ever revoked or suspended; information as to whether the case agent was ever a suspect in any internal investigation; all disciplinary records, to include, but not be limited to, records of counselings, reprimands, admonitions, non-judicial punishment, etc.; all complaints, allegations or charges made against the case agent by any military member or civilian.  All documents relating to the records check of every agent assigned to the investigation as submitted to and completed by AFOSI/JA.

**Absent additional justification the Government objects, in part, to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.  The Government will comply with this request in so far as it relates to those witnesses listed on the Government and Defense**

**witness lists, as filed in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

xvi.  Relevant documents pertaining to the training of the agents involved in this case to include, but not be limited to, OJT records, CDC records, specialty training forms, and any criminal investigative courses attended by the case agent;

**Absent additional justification the Government objects to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.**

xvii.  Any checklists used in the case;

**The Government is not aware of any such evidence which has not already been produced.  Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

xviii.  Notification of any information that has been destroyed;

**The Government is not aware of any such evidence which has not already been produced.  Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

xix.  Complete copies of any documentation pertaining to any search or seizure conducted in this case, to include, but not be limited to, memoranda prepared concerning any oral search or seizure authorization, any affidavits or statements in support of a search or seizure authorization, any recording of any oral search or seizure authorization, any writings prepared by the authorizing authority, law enforcement agents, or judge advocates in support of such authorizations or during the obtaining of the authority, and any documentation relating to any search or seizure conducted without authorization from a judge or magistrate;

**The Government is not aware of any such evidence which has not already been produced.  Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

xx.  Copies of all evidence tags of other chain of custody documents concerning evidence the government intends to offer at trial or at any hearings;

**The Government is not aware of any such evidence which has not already been produced.  Should the Government become aware of any such evidence which has not previously been produced the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

xxi.  Any and all "developmental files" pertinent to this case;

**Absent additional justification the Government objects to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence.**

8. **Confidential Informant/Confidential Source Information**: The Defense requests any relevant information regarding any confidential informants/confidential sources used in this case, specifically, the complete informant file(s) and dossiers associated with any and all informants or sources.

**The Government is not aware of any such evidence. Should the Government become aware of any such evidence the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

9. **Scientific Data/Reports:** The Defense requests complete copies of any reports and results of scientific/laboratory tests or computer based testing or extraction created or obtained in the investigation against SMSgt Zier. This includes, but is not limited to, any cellphone/computer/hard drive extractions results, drug testing results/reports, or DNA test reports. In addition please provide any reports and derogatory data from the lab associated with the testing.

**The Government is not aware of any such evidence. Should the Government become aware of any such evidence the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

10. **Experts:** Pursuant to R.C.M. 703(d), any Government request(s) to the Convening Authority for any expert witness and/or consultants, in advance of employment of any such expert, including the expert's name, address, phone number, resume, Curriculum Vitae (CV) and all documents used by the expert to prepare for trial/sentencing. M.R.E. 612,
M.R.E. 803(18). Copies of all reports, statements, or conclusions of experts, consultants, or technicians made in connection with this case. This request includes, but is not limited to, interim and final reports, addenda, inserts, and attachments, expert's notes (handwritten, recorded, or otherwise), written opinions, assessments, and/or analyses, the contents of any and all communications between any and all analyst(s) and/or expert(s) and any governmental agency by any means, and copies of any and all literature, reference materials, learned treatises, texts or other authoritative sources specifically referred to or relied upon by analysts and/or experts in formulating his opinion.

**Absent additional justification the Government objects, in part, to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. Requests for the appointment of any expert – and any work product produced by such experts – are subject to a claim of privilege in accordance with M.R.E. 502. The Government will comply with this request in so far as it relates to the contact information, resume, and CV of those experts listed on the Government and Defense witness lists, as filed in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

11. **Draft Statements/Affidavits:** Please provide any draft statements or affidavits provided to any witness in this case for edits, regardless of the author of the statement. For example, if a witness had a statement or affidavit drafted by someone else that was subsequently edited for finalization – the Defense requests a copy of the originally drafted statement.

**The Government is not aware of any such evidence. Should the Government become aware of any such evidence the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

12.  **Photographs, Video, or other Pictorial or Video Media (i.e. photo, CD, DVD, digital, etc.)**: The Defense respectfully requests the following evidence regarding the above-styled case:

   a.  All photographs or images taken by any person including but not limited to all potential witnesses and law enforcement agents – military and civilian. All photographs or images taken by any person including, but not limited to, all potential witnesses and law enforcement agents – military and civilian – which the government intends to offer into evidence at any phase of trial. To include:

**Absent additional justification the Government objects, in part, to this discovery request as it is overbroad, not relevant to the defense's trial preparation, not is it reasonably calculated to lead to the discovery of admissible evidence. The Government will comply with this request in so far as it relates to responsive materials which the Government intends to offer into evidence at trial and will do so in accordance with applicable Rules and/or the Military Judge's Scheduling Order.**

   b.  Photographic/images of the interior and exterior of any location or item that was searched whether or not evidence was seized, including but not limited to, photographs or images taken while the evidence was being seized, processed, logged, and entered into any and all evidence lockers; and

**The Government is not aware of any such evidence which has not previously been provided. Should the Government become aware of any such evidence which has not previously been provided the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

   c.  All video recordings made in the investigation of this case, recordings made prior to this case, or recordings made during the alleged misconduct. This includes but is not limited to:

      i.  Video of any locations which were searched whether or not evidence was seized;

      ii.  Video, or photographs, taken by surveillance cameras located at or near the location of the alleged offense;

      iii.  Video of all evidence;

      iv.  Video of any interviews of SMSgt Zier; and

      v.  Video of any witness interviews.

**The Government is not aware of any such evidence which has not previously been provided. Should the Government become aware of any such evidence which has not previously been provided the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

13.  **Audio Recordings:**  The Defense respectfully requests all audio recordings made in this case. This includes, but is not limited to, interviews of SMSgt Zier, interviews of any potential witnesses, dictated

notes made by investigators and/or experts, and any other audiotape recordings that relate to the investigation or trial in this case.

**The Government is not aware of any such evidence which has not previously been provided. Should the Government become aware of any such evidence which has not previously been provided the Government will discover it to the Defense pursuant to the Rules of Evidence and its Discovery obligations.**

16.  If you have any questions or wish to discuss this case further, please feel free to contact me at .

COLEMAN.EDWAR
D.SEAN.15046058
99

Digitally signed by
COLEMAN.EDWARD.SEAN.1504
605899
Date: 2020.03.27 17:33:29
-05'00'

EDWARD (TED) COLEMAN, Capt, USAF
Assistant Trial Counsel

---

## CERTIFICATE OF SERVICE

I certify that I served a copy of this Government Response to the First Defense Request for Information via email transmission to the Defense Counsel on 27 March 2020.

COLEMAN.EDWA
RD.SEAN.150460
5899

Digitally signed by
COLEMAN.EDWARD.SEAN.15
04605899
Date: 2020.03.27 17:33:47
-05'00'

EDWARD (TED) COLEMAN, Capt, USAF
Assistant Trial Counsel




# DEPARTMENT OF THE AIR FORCE
## 502D AIR BASE WING
## JOINT BASE SAN ANTONIO

27 March 2020

MEMORANDUM FOR  CENTRAL DOCKETING OFFICE/CCMJ

FROM:  502 SFG/JA

SUBJECT:  Notice of Referral and Identification of Counsel, *United States v. Senior Master Sergeant Jeremy M. Zier*

1.  On 25 March 2020, charges in the case of *United States v. Senior Master Sergeant Jeremy M. Zier* were referred for trial by special court-martial.  Charges were served on the accused on 27 March 2020. After consultation with the detailed defense counsels, we request that the case be docked for trial.  The alleged offenses occurred both before and after 1 January 2019.  The following information is provided:

Detailed Trial Counsel:  Maj John M. Malek; Capt Edward S. Coleman
Detailed Defense Counsel:  Mr. Lance Wood  (Lance@mtdjustice.com); Captain Jamesian D. Emmanuel
Detailed Special Victims' Counsel: Capt Megan Teeple
If known, Detailed Court Reporter:  _____
Base-level SJA:  Lieutenant Colonel Benjamin F. Martin

Estimated Length of Trial:  4 days  Need for separate arraignment/bifurcation? Y
Agreed-upon arraignment/bifurcation dates:  _____

Government Ready Date:  15 May 20      Defense Ready Date:  10 August 20

Considering the ready dates identified above, is there an agreed upon trial date between the parties? (Choose one of the following)
____ Yes; the agreed-upon date(s) is/are:  _____
__X__ No; a docketing conference is requested

Do counsel agree to an exclusion of time under RCM 707?  Y
If so, what dates are agreed-upon exclusion dates? 18 May 2020 to 9 August 2020 (83 Days)

For this case, did the Judiciary provide a military judge for a search warrant, a proceeding under Art 32 or Art 30a? N;
If so, who was/were the presiding military judge(s)? _____

COLEMAN.EDWA
RD.SEAN.150460
5899
Digitally signed by
COLEMAN.EDWARD.SEAN.15
04605899
Date: 2020.03.27 17:11:59
-05'00'

EDWARD S. COLEMAN, Capt, USAF
Chief of Military Justice
502 Security Forces Group

2 Attachments:
1.  DD Form 458, 27 March 2020, 3 pgs
2.  Convening Order, 25 March 2020, XX pgs

Attachment 1 and 2 to the Notice of Referral and Identification of Counsel, dated 27 March 2020, is located within the the first volume of the Record of Trial.



**DEPARTMENT OF THE AIR FORCE**
AREA DEFENSE COUNSEL (AFLOA)
WHITEMAN AIR FORCE BASE, MISSOURI

24 April 2020

MEMORANDUM FOR  ALL REVIEWING AUTHORITIES

FROM:  AFLOA/ADC (Capt Jamesian D. Emmanuel)

SUBJECT:  Defense Request for Expert Consultant in Forensic Psychology –
        *United States v. SMSgt Jeremy M. Zier*

1.  Pursuant to Article 46, Uniform Code of Military Justice (UCMJ), and Rules for Courts-Martial (RCM) 703(d), the defense respectfully requests you appoint an expert consultant in the field of forensic psychology to assist the defense in its preparation for *United States v. SMSgt Jeremy M. Zier*.  The defense requests the consultant be appointed as a representative of the defense so that any communications between the expert, SMSgt Zier, and/or the Defense Counsel will be privileged with the attorney-client privileged outlined in Military Rule of Evidence (MRE) 502.  This is not a request for an expert testifying witness, although information discovered by the expert consultant may result in the defense later requesting that the expert consultant become a testifying witness at trial.

2.  *Request for forensic psychologist.*  The Defense requests the appointment of a forensic psychologist as its confidential expert consultant in forensic psychology.  Specifically, the Defense requests a forensic psychologist with significant experience and expertise in criminal cases such as this one, including experience both in forensic psychology and clinical psychology, specialized experience in working with Veterans, and one who has been contracted by the USAF on several occasions to serve as a forensic expert for either the Government and/or Defense.

3.  *Law.*  RCM 703(d) provides for the employment of an expert witness I military courts-martial.  Although RCM 703(d) does not specifically address expert consultants, military courts have recognized that RCM 703(d) is generally applicable to expert consultants in the same way it is applicable to expert witnesses.  *See United States v. Warner*, 59 MJ 573, 578 (A.F. Ct. Crim. App. 2003)

   a.  When the accused applies for the employment of an expert, he must demonstrate the necessity for the services.  *United States v. Garries*, 22 MJ 288 (CMA 1986).  In showing this necessity, "the defense [must be] specific enough in defining the issues they [hope] to develop with expert assistance [and must] demonstrate that they [have] sufficiently educated themselves as to such potential issues that might be developed with expert assistance." *United States v. Tornowski*, 29 MJ 578 (A.F.C.M.R. 1989). Furthermore, "a trial defense counsel who seeks the services of an expert consultant cannot play coy. He must show whatever cards he either thinks he holds or may acquire with such expert assistance." *Id.* In general, the accused has the burden of demonstrating that the testimony or assistance is relevant and necessary. *United States v. Van Horn*, 26 MJ 434 (1988). Once this showing has been made, the Government must either provide the expert or an adequate substitute.

Page **1** of **4**

b.  Article 46, UCMJ, provides that trial counsel and defense counsel shall have equal opportunity to obtain witnesses and other evidence in accordance with appropriate regulations. In *Garries*, the Court of Military Appeals stated, "[a]s a matter of military due process, service members are entitled to . . . expert assistance when necessary for an adequate defense." *Id.* at 290.

c.  Courts have applied a three-part analysis to determine whether an accused has established the need for expert assistance, namely: (1) why the expert is needed, (2) what the expert would accomplish for the defense, and (3) why the defense is unable to gather and present the evidence that the expert assistant would be able to develop. *United States v. Gonzalez*, 39 M.J. 459, 461 (CMA 1994); *United States v. Danyi*, 45 MJ 315 (CAAF 1996).

4.  *Justification for expert consultant in forensic psychology.*  SMSgt Zier is charged with multiple offenses including one charge and one specification of dereliction of duty, in violation of Article 92, Uniform Code of Military Justice (UCMJ) and one charge and three specifications of abusive sexual contact in violation of Article 120, UCMJ.  All four specifications relate to three separate incidents of alleged indecent conduct between SMSgt Zier and three complainants, EP, CF, and TW.  These separate incidents occurred over the course of five (5) years with the earliest conduct occurring in April 2015.  Additionally, alcohol consumption was a prevalent factor in all three incidents and in multiple incidents, evidence suggests that SMSgt Zier, witnesses, and/or the complainants were intoxicated at the time of the alleged offenses.  The evidence used to support these allegations in the Report of Investigation, include statements made between various witnesses and SMSgt Zier and complainants' statements.  Currently, there does not appear to be any physical evidence that directly substantiates the complainants' allegations.

A forensic psychologist is both relevant and necessary in determining a defense for these allegations as well as putting forward mitigation and rehabilitation evidence if SMSgt Zier is convicted of any specification. The defense needs expert assistance related to the following issues: (1) the mental state of SMSgt Zier during and after the alleged offenses to determine whether any defense exists for lack of mental responsibility to commit any of these crimes and/or his competency to stand trial; (2) evaluate the effects of alcohol on the memory as it relates to the allegations made by the complainants, described by witnesses, or defended by SMSgt Zier; and (3) assist in identifying extenuation and mitigation for purposes of a potential sentencing case.  A more thorough justification for an expert consultant in forensic psychology is included below.

As SMSgt Zier's alleged conduct occurred over the past five years, the government's case will be contingent on the testimony of several complainants who had either consumed alcohol or were intoxicated at the time of the alleged incidents.  As such, alcohol and its impact on the memory of the complainants and the witnesses will be an issue that is expected to come up at trial.  As the Defense is not adequately trained on the role of alcohol in sexual assault cases, a forensic psychologist will be vital to describe how alcohol, as a central nervous system depressant, can cause confusion, memory loss, impaired judgment, behavioral changes, cognitive impairment, and reduced inhibitions.  In regards to memory recall, a forensic psychologist can assist the Defense in understanding how recollection of events is a reconstructive process, how

alcohol can cause a person to perceive information inaccurately (also known as alcohol myopia) and, at times, deteriorate their memory of specific events. In regards to reporting, a forensic psychologist can assist the Defense in understanding how alcohol affects women's reports more than men's, as it affects attention and memory consolidation at a lower dose for women than for men. This will be especially important for the Defense as SMSgt Zier is alleged to have been intoxicated at certain times during the charged misconduct.

Additionally, as the crimes were not immediately reported, a forensic psychologist will be useful for the Defense because they will be able to identify how details for a crime can occur during subsequent interviews following intoxication. Here, all three reports were not made at the time of the alleged misconduct. Although one complainant states that she reported an incident to the Sexual Assault Response Coordinator's office at Incirlik, Turkey, no such report has been found. As such, it is very likely that the complainants' allegations occurred following the consumption of alcoholic beverages and were either made to OSI investigators, witnesses, or trial counsel. A forensic psychologist can assist the Defense in understanding how subsequent interviews of individuals who were intoxicated at the time of an alleged offense can yield new details.

A forensic psychologist can also assist the Defense in understanding how and why people regularly underestimate their own alcohol consumption when engaging in heavy drinking. Studies suggest that this underestimation is especially common for women and young adults. Here, according to OSI agents' notes, complainant EP was not comfortable revealing the total number of alcoholic beverages she consumed during the night of the alleged offense. It is important that a forensic psychologist assists the Defense in understanding how the accuracy of alcohol consumption affects details in subsequent allegations and the credibility of the witness.

In addition to the above, an expert consultant can assist the Defense in analyzing the statements given by government witnesses, looking for psychological clues as to the possible motivation behind these statements, and assist defense counsel in developing further discovery, trial strategy and witness cross-examination from this. Lastly, expert consultation can assess the named victims; background and history, and what impact this could have on witness credibility or the believability of the charged offenses. This includes inconsistencies, motives to fabricate, perception of events, memory of events, reconstruction of events, and reporting of events. Should SMSgt Zier be convicted of any specification, a forensic psychologist is relevant and necessary to analyze his recidivism and general rehabilitation potential. A forensic psychologist will be able to conduct a psychological evaluation on SMSgt Zier that will address psychological problems that could have led to the alleged misconduct or if any personality disorders are present. These sort of evaluations of SMSgt Zier are necessary for the Defense to present a zealous sentencing case that provides all perspectives to the members.

5. *Anticipated duties of expert consultant.* The defense anticipates a forensic psychologist will perform several roles, including, but not limited to: reviewing investigative reports, video recorded interviews, statements, and other case discovery to identify and assist with memory recollection and alcohol related impairment aspects of witnesses and complainants for of the defense; conducting a series of in-depth clinical interviews of SMSgt Zier and available

witnesses and complainants; and evaluate how alcohol related consumption on the complainants impacted their actions during the alleged offenses and recollection during subsequent reporting.

6. *Why Defense Counsel cannot perform the duties requested of a forensic psychologist.* No member of the defense has the academic background or practical experience, despite experience with these types of cases, to perform the necessary forensic analysis discussed above. The psychological testing instruments required to carry out these duties require many years of education, training, and practical application to ensure accuracy in testing. Furthermore, these evaluations involve illuminating some of the complex and unique dynamics involved with alcohol based offenses and must be conducted by a practitioner with specialized training and experience in the field. No member of the defense holds a doctoral degree or certification in forensic psychology or has any experience in psychology sufficient to perform even a clinical interview. Finally, no member of the defense is qualified to educate the factfinder on these matter should testimony be required on this subject.

7. For the abovementioned reasons, the Defense request a forensic psychologist be appointed as the Defense's confidential expert consultant in forensic psychology. We specifically request that this expert be appointed as a representative of the defense so that any communications between him, and/or the Defense Counsel will be privileged within the attorney-client privilege outlined in MRE 502. At this time, we are not requesting that this expert be appointed as an expert witness. However, in the event that the defense needs the expert to serve an as expert witness, we will submit a follow-on request to the government as soon as practicable.

8. Based on the anticipated duties, the defense is requesting a forensic psychologist be approved for **twelve hours of pre-trial consultation with defense; one day in person consultation with the defense prior to the first day of trial; presence for the duration of the anticipated trial; and two days of travel to and from Randolph AFB**.

9. If you have any questions, please contact my office at DSN            during duty hours, or                              Thank you for your time and consideration.


J. Dillon Emmanuel
JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel

US v. Zier Military Record of Trial and Appellate Extracts 000570 of 902



**DEPARTMENT OF THE AIR FORCE**
**502D AIR BASE WING**
**JOINT BASE SAN ANTONIO**



1 May 2020

MEMORANDUM FOR  502 SFG/CC

FROM:  502 SFG/JA

SUBJECT:  Request for Defense Expert Consultant Forensic Psychologist –
*U.S. v. SMSgt Jeremy M. Zier*

1. BLUF:  I recommend you disapprove the attached Defense request for the appointment of a Defense expert consultant in forensic psychology in the above-referenced case.

2. BACKGROUND:  On 25 March 2020, *U.S. v. SMSgt Jeremy M. Zier* was referred to a Special Court-Martial.  The referred charges and specifications consist of:  one charge with one specification for violation of Article 92, Uniform Code of Military Justice (UCMJ) and one charge and three specifications for violation of Article 120, UCMJ.  Specifically, the Article 92 Charge and one Specification of the Article 120 Charge relate to an incident in April of 2015 where the Accused failed to maintain professional relationships with subordinate Airmen and touched the inner-thigh and genitals of a female Airman.  Specifications 2 and 3 of the Article 120 Charge arise out of 2 distinct incidents in December of 2019 in which Accused touched the buttocks of a female Airman and a female civilian.

3. LAW:  R.C.M. 703(d) provides for the employment of an expert witness in military courts-martial.  Although R.C.M. 703(d) does not specifically address expert consultants, military courts have recognized that R.C.M. 703(d) is generally applicable to expert consultants in the same way it is applicable to expert witnesses.  *See United States v. Warner*, 59 M.J. 573, 578 (A.F.C.C.A. 2003).  "The accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial."  *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (quoting *United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008))(internal citations omitted).  "A trial is fundamentally unfair where the government's conduct is 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  *United States v. Anderson*, 68 M.J. 378, 383, (C.A.A.F. 2010)(citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973)).  To show that an expert would be of assistance "[t]he defense must show (1) why the expert is necessary; (2) what the expert would accomplish for the accused; and (3) why defense counsel is unable to gather and present the evidence that the expert would be able to develop.'"  *Lloyd*, 69 M.J. at 99 (citing *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994)).

4. DISCUSSION:  The Accused faces charges arising from three distinct incidents.

   a. *The April 2015 incident in Pammukale, Republic of Turkey*.  In April of 2015, while he was the American Forces Network Station Chief at Incirlik Air Base, the Accused organized a trip to Pamukkale, Republic of Turkey for the members of his Flight.  After a day of sightseeing, the Accused joined members of the flight at the hotel's hot tub and repeatedly placed his hand on the upper-thigh of a female Airman, C.F., eventually sliding his hand under her bikini bottoms and grazing her genitals.  During the same evening in which the incident involving C.F. took place, the Accused removed his bathing suit and, at one point, exited the hot tub while completely nude.  The Accused, C.F., and the Airmen in the hot tub were all consuming alcohol at the time these incidents took place.

b. *The December 2019 incident at the Joint Base Charleston Christmas party.* While attending a unit Christmas party at Joint Base Charleston in December of 2019 the Accused was observed interacting with a female Staff Sergeant, E.P., who multiple witnesses describe as being visibly intoxicated. At the conclusion of the party two witnesses saw the Accused wrap his arm around E.P. and place his hand on her buttocks. E.P. has no recollection of the touching, but advises that she would not have consented to such contact by the Accused.

c. *The December 2019 incident at the Joint Base San Antonio Christmas party.* While attending a unit Christmas party at Joint Base San Antonio in December of 2019 the Accused touched the buttocks of civilian T.W. while the two were standing in line at the bar. Shortly after arriving at the party T.W. stood in line at the bar and noted that the individual standing behind her brushed her buttocks with his hand. T.W. assumed the contact was inadvertent and stepped forward to create space between her and the individual; following which he stepped forward and again touched her buttocks with his hand.

d. *The investigation.* Following the Joint Base Charleston Christmas party the Air Force Office of Special Investigations (AFOSI) was notified of an alleged instance of Abusive Sexual Contact against SSgt E.P. and resulted in the initiation of a formal investigation. During the course of investigating the allegations involving SSgt E.P., AFOSI investigators were advised to speak with SSgt C.F. who, in turn, disclosed the allegations involving the Accused from the 2015 trip to Pamukkale, Republic of Turkey. As the investigation was ongoing AFOSI became aware of additional allegations arising from the December 2019 Christmas party at Joint Base San Antonio, and obtained statements from civilian T.W. and her sister TSgt C.G.

e. *The evidence.* The evidence against the Accused is comprised entirely of eyewitness testimony regarding the allegations. In the case of the 2015 incident in Pamukkale, Republic of Turkey, all of the individuals who were present in the hot tub describe varying levels of intoxication among all of the parties who were present. In the case of the incident at the Joint Base Charleston Christmas party, while E.P. is described as highly intoxicated and does not recall the contact, the other witnesses' perception of events does not appear to have been impaired by alcohol consumption. Finally, in the case of the conduct occurring at the Joint Base San Antonio Christmas party, T.W. was not impaired by alcohol at the time the acts transpired.

5. NECESSITY OF THE EXPERT: The defense has failed to meet their burden to demonstrate: 1) how the expert would be of assistance to counsel; and 2) why denial of the expert request would result in a fundamentally unfair trial.

a. *How the expert would be of assistance to counsel.* The defense's request articulates three bases for their position that expert assistance is necessary to assist counsel: 1) to assist in evaluating the Accused's mental state at the time of the alleged acts and competency to stand trial; 2) to assess the impact of alcohol on memory; and 3) to assist in identifying potential matters in mitigation and extenuation at sentencing. These basis must be evaluated under the relevant factors outlined in *Gonzalez*, specifically: 1) why the expert is necessary; 2) what the expert would accomplish for the accused; and 3) why defense counsel is unable to gather and present the evidence that the expert would be able to develop.

b. The defense has failed to demonstrate why an expert is *necessary* to address any of the three bases for their request. Specifically, if there are concerns regarding the Accused's culpability and/or ability to participate in his own defense, a Sanity Board under R.C.M. 706 is the appropriate avenue for addressing these concerns. With respect to the impact of alcohol on memory, the defense has failed to articulate more than a broad statement that alcohol consumption took place at the time of the incidents. Absent a showing that there are finite concerns with regard to the ability of witnesses to perceive and accurately

recall events, the broad-brush assertion that merely because alcohol consumption occurred is insufficient to demonstrate the necessity of the expert. The same is true with respect to matters in mitigation. The services of a forensic psychologist have not been shown to be strictly necessary based upon the information provided by the defense.

c. Turning to the second *Gonzalez* factor, the defense has failed to demonstrate with any degree of specificity precisely what an expert would accomplish for the defense. Instead, they have offered general areas or topics of interest that the forensic psychologist may explore, but have done so with no promise that the exercise will yield any viable defense strategy or specific result. The defense highlights issues with memory, perception, "alcohol myopia", and related topics, but has not articulated its specific theory of how these topics are specifically relevant to achieving a particular outcome or objective requiring the requested expert. The mere possibility that an expert may identify something of value from among a broad array of possible topics falls short of demonstrating what discrete value an expert would provide to the Accused's defense.

d. Regarding the final *Gonzalez* factor, the defense has failed to demonstrate why the defense is unable to gather and present the evidence the defense hopes the expert would develop. As there is no specific deliverable for the requested expert, the defense has merely asserted that they lack training and experience "necessary to perform the forensic analysis discussed above… ." Barring a more specific assertion of a definite, measurable work product to be provided by the requested expert, the defense's assertion that it cannot gather and present the evidence it hopes to develop is unsubstantiated.

e. *Why denial would result in a fundamentally unfair trial.* Following the analysis under *Gonzalez*, the defense must also articulate why the denial of their request would result in a "fundamentally unfair trial", meaning that the denial is so outrageous it undermines notions of due process. The defense request is silent on this matter and, as such, they have failed to demonstrate necessity under *Lloyd* and *Gunkle*. Additionally, the government is not utilizing the services of an expert, so there is no grounds for an argument for necessity on the basis of parity.

6. REQUESTED SERVICES: The defense has requested a forensic psychologist to perform 12 hours of pre-trial consultation, one day of on-site pretrial consultation, presence for the duration of the trial, and two travel days.

7. RECOMMENDATION: I recommend you execute the attached Memorandum disapproving the attached Defense request for the appointment of a Defense expert consultant in forensic psychology in this case. If you have any questions or concerns please feel free to contact me at DSN

BENJAMIN F. MARTIN, Lt Col, USAF
Staff Judge Advocate
502d Security Forces Group

3 Attachments:
1. Defense Request for Confidential Expert Consultant, 24 April 2020
2. Referred Charge Sheet, 25 March 2020
3. Memorandum Denying Defense Request, 1 May 2020

Attachment 1 of the Request for Defense Expert Consultant Forensic Psychologist, dated 1 May 20, is located within the Pretrial section of the Record of Trial.  Attachment 2 of the Request for Defense Expert Consultant Forensic Psychologist is located within volume 1 of the Record of Trial..



# DEPARTMENT OF THE AIR FORCE
## 502D AIR BASE WING
### JOINT BASE SAN ANTONIO



1 May 2020

MEMORANDUM FOR  502 SFG/JA

FROM:  502 SFG/CC

SUBJECT:  Request for Defense Expert Consultant in Forensic Psychology –
*U.S. v. SMSgt Jeremy M. Zier*

I hereby deny the defense request for the appointment of a confidential expert consultant in the field of forensic psychology in the abovementioned case.  I find the request does not adequately demonstrate a reasonable probability that the expert will be of assistance to the defense.  The defense may submit additional matters for my consideration.


JEFFREY F. CARTER, Colonel, USAF
Commander



# DEPARTMENT OF THE AIR FORCE
## 502D SECURITY FORCES GROUP
## JOINT BASE SAN ANTONIO



5 May 2020

MEMORANDUM FOR  DEFENSE COUNSEL (Mr. Lance Wood, Capt J. Dillon Emmanuel)

FROM:  TRIAL COUNSEL (Maj John Malek, Capt Ted Coleman)

SUBJECT:  Government M.R.E. 304(d) and 404(b) Notices – *U.S. v. SMSgt Jeremy M. Zier*

Pursuant to M.R.E. 304(d) and 404(b), the Government respectfully provides this notice of relevant statements of the Accused, SMSgt Jeremy M. Zier, be they oral or written, each of which to include electronic communications, that are relevant to this case, known to trial counsel and within the control of the Armed Forces; and other crimes, wrongs, or acts of the Accused.  The Government further provides notice that all statements, crimes, wrongs, or acts discussed herein may also be introduced by the Government at trial.  The Government reserves the right to supplement this notice in accordance with relevant Rules for Courts-Martial and applicable Scheduling Orders.

1.  Statements by the Accused to C        F        and Sieana Mackiewicz inquiring whether or not they have had "one night stands" and asking them to walk him home while they were at the "smoke pit" at or near the Incirlik Air Base Enlisted Club between on or about May of 2014 and on or about September of 2015.  F        and Mackiewicz will describe the Accused as being highly intoxicated at the time he made these statements.  These statements are being noticed pursuant to M.R.E. 404(b) as evidence of intent, plan, modus operandi, and absence of mistake on the part of the Accused.

2.  Statements by the Accused to C        F        regarding her involvement in the Lesbian, Gay, Bi-Sexual, Transgender, and Questioning (LGBTQ) community, to include inquiring about specific sex acts between females, F        sexual history, and statements including "a female just can't satisfy you the way a man can" and "maybe you just haven't had the right dick yet" or words to that effect while they were at or near Pamukkale, Republic of Turkey between on or about 1 April 2015 and on or about 30 April 2015.  F        will describe the Accused as being highly intoxicated at the time he made these statements.  These statements are being noticed pursuant to M.R.E. 404(b) as evidence of intent, plan, modus operandi, and absence of mistake on the part of the Accused.

3.  Statements by the Accused to Natasha Mosquera on or about 8 December 2019 regarding meeting for brunch and, during the course of the brunch, statements advising that he did not understand how people could leave the blinds open in their homes because one cannot walk around naked, or words to that effect.  These statements are being noticed pursuant to M.R.E. 404(b) as evidence of intent, plan, and absence of mistake on the part of the Accused.

4. Evidence that between on or about 1 April 2015 and on or about 30 April 2015, at or near Pamukkale, Republic of Turkey, the Accused briefly exited the hot tub occupied by several Airmen who were subordinate to him, while he was completely nude, such that these Airman were able to view the Accused's buttocks and genitals.  These statements are being noticed pursuant to M.R.E.

404(b) as evidence of intent, plan, and absence of mistake on the part of the Accused.

5.  Evidence that between on or about 7 December 2019, at or near Charleston, South Carolina the Accused was engaged in a conversation with E    P    regarding her sex life, to include discussing her desire to have sex with her husband when he returned from deployment.  These statements are being noticed pursuant to M.R.E. 404(b) as evidence of intent, plan,  and absence of mistake on the part of the Accused.

6.  This notice is not exclusive and the Government reserves the right to give notice of additional statements crimes, wrongs, or acts of the Accused as they are discovered.

Respectfully,

COLEMAN.EDWAR D.SEAN.15046058 99

Digitally signed by
COLEMAN.EDWARD.SEAN.1504
605899
Date: 2020.05.05 12:45:20
-05'00'

EDWARD S. COLEMAN, Capt, USAF
Assistant Trial Counsel

## CERTIFICATE OF SERVICE

I hereby certify that I served the defense counsel in the case of *U.S. v. SMSgt Jeremy M. Zier* with a copy of this MRE 304(d) and 404(b) notice, via e-mail, on this 5th day of May2020.

COLEMAN.EDW ARD.SEAN.1504 605899

Digitally signed by
COLEMAN.EDWARD.SEAN.1
504605899
Date: 2020.05.05 12:46:00
-05'00'

EDWARD S. COLEMAN, Capt, USAF
Assistant Trial Counsel

DEPARTMENT OF THE AIR FORCE
UNITED STATES AIR FORCE TRIAL JUDICIARY

| | | |
|---|---|---|
| United States | ) | |
| | ) | MOTION FOR APPROPRIATE RELIEF: |
| | ) | COMPEL CONFIDENTIAL EXPERT |
| | ) | CONSULTANT (FORENSIC |
| v. | ) | PSYCHOLOGIST) |
| | ) | |
| SMSgt Jeremy M. Zier | ) | |
| Air Force Public Affairs Agency (AETC) | ) | |
| Joint Base San Antonio – Randolph, TX 78150 | ) | 18 May 2020 |

Now comes the Accused, SMSgt Jeremy M. Zier, by and through defense counsel, pursuant to Article 46 of the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial (RCM) 703(d), 905(b)(4), and 906(b)(7), and respectfully requests that this Honorable Court compel the government to appoint a confidential forensic psychologist for the defense.

### Summary

SMSgt Zier is charged with one charge and one specification of dereliction of duty, in violation of Article 92, Uniform Code of Military Justice (UCMJ) and one charge and three specifications of abusive sexual contact in violation of Article 120, UCMJ. All four specifications relate to three separate incidents of alleged indecent conduct between SMSgt Zier and three complainants, EP, CF, and TW. A forensic psychologist is both relevant and necessary in this case in evaluating the effects alcohol has on the memory as it relates to the allegations made by the complainants, described by witnesses, and/or defended by SMSgt Zier. Additionally, a forensic psychologist is relevant and necessary in determining a defense for these allegations as well as putting forward mitigation and rehabilitation evidence if SMSgt Zier is convicted of any specification. The Defense requests this confidential expert consultant (forensic psychologist) be compelled and approved for twelve hours of pretrial consultation, one day of in person trial preparation, presence during the entirety of trial, and two travel days.

### Facts

1. On 24 March 2020, one charge and one specification of dereliction of duty in violation of Article 92, UCMJ and one charge and three specifications of abusive sexual contact in violation of Article 120, UCMJ were preferred on SMSgt Zier.

2. The charged misconduct covers alleged sexual acts that occurred at three separate locations over the span of 4.5 years. The sexual acts were alleged to have occurred between SMSgt Zier and three victims, EP, CF, and TW. In these allegations, SMSgt Zier is accused of touching the buttocks and genitalia of these women during social gatherings and holiday parties.

Appellate Exhibit _____
Page Marked _____

3.  Alcohol was available and consumed during all three alleged acts.  Victims EP and CF state that they consumed alcohol during their encounters with SMSgt Zier.  Additionally, victim TW states that she consumed alcohol on the night of her alleged encounter with SMSgt Zier; however she claims that she was not intoxicated when the alleged contact occurred.  Attachment 1 at 4-6.

4.  SMSgt Zier is alleged to have inappropriately touched EP's buttocks during a holiday party. When interviewed by AFOSI agents, however, witnesses state that on the night of the incident, EP was so intoxicated that she was "stumb[ling] while she walked."  *Id*. at 4. EP would later state to AFOSI agents that she was embarrassed by the incident and could "not recall the events that occurred throughout the night, due to her level of intoxication."  *Id*.  AFOSI agents would later note in their report that EP "did not feel comfortable revealing the total amount of alcohol consumed throughout the night." Id. at 6.

5.  SMSgt Zier is alleged to have inappropriately touched the genitalia of CF during a social gathering in a hot-tub.  CF was interviewed by AFOSI agents and said that on the day of the incident, both she and SMSgt Zier had consumed alcohol.  CF further stated that she could not recall how many alcoholic drinks she had consumed.  *Id*. at 6.  Witnesses at trial are expected to testify that CF was heavily intoxicated during the hot-tub party.

6.  In addition to EP and CF, SMSgt Zier is alleged to have been intoxicated at various times throughout the charged misconduct.

7.  Accordingly, the Defense believes that alcohol use may have played a major role in his alleged misconduct.

8.  Both EP and CF delayed reporting the alleged incidents to law enforcement.

9.  On 25 March 2020, both charges were referred to trial.

10.  On 24 April 2020, the Defense submitted a request for an expert consultant in forensic psychology to the Government.  Attachment 2.

11.  On 1 May 2020, Col Jeffrey F. Carter denied the Defense's request.  Attachment 3.  In the denial, Col Carter stated that he "[found] the request does not adequately demonstrate a reasonable probability that the expert will be of assistance to the defense."  *Id.*

12.  On 5 May 2020, the Government sent the denial of the forensic psychologist request to the Defense.

## **Burden**

13.  The burden of persuasion in this matter rests with the defense as the moving party.  RCM 905(c)(2)(A).  The burden of proof is by a preponderance of the evidence.  RCM 905(c)(1).

## **Law**

14.  RCM 703(d) provides for the employment of an expert witness in military courts-martial. Although RCM 703(d) does not specifically address expert consultants, military courts have recognized that RCM 703(d) is generally applicable to expert consultants in the same way it is applicable to expert witnesses.  *See United States v. Warner*, 59 M.J. 573, 578 (A.F. Ct. Crim. App. 2003).

15.  When the accused applies for the employment of an expert, he must demonstrate the necessity for the services.  *United States v. Garries*, 22 M.J. 288 (C.M.A. 1986).  In showing this necessity, "the defense [must be] specific enough in defining the issues they [hope] to develop with expert assistance [and must] demonstrate that they [have] sufficiently educated themselves as to such potential issues that might be developed with expert assistance."  *United States v. Tornowski*, 29 M.J. 578 (A.F.C.M.R. 1989).  Furthermore, "a trial defense counsel who seeks the services of an expert consultant cannot play coy.  He must show whatever cards he either thinks he holds or may acquire with such expert assistance."  *Id.*  In general, the accused has the burden of demonstrating that the testimony or assistance is relevant and necessary.  *United States v. Van Horn*, 26 M.J. 434 (1988).  Once this showing has been made, the Government must either provide the expert or an adequate substitute.

16.  Article 46, UCMJ, provides that Trial Counsel and Defense Counsel shall have equal opportunity to obtain witnesses and other evidence in accordance with appropriate regulations. In *Garries*, the Court of Military Appeals stated, "[a]s a matter of military due process, service members are entitled to . . . expert assistance when necessary for an adequate defense."  *Id.* at 290.

17.  Courts have applied a three-part analysis to determine whether an accused has established the need for expert assistance, namely: (1) why the expert is needed, (2) what the expert would accomplish for the defense, and (3) why the defense is unable to gather and present the evidence that the expert assistant would be able to develop.  *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994); *United States v. Danyi*, 45 M.J. 315 (C.A.A.F. 1996).

<u>**Argument**</u>

*A forensic psychologist is relevant and necessary for the Defense's preparation in understanding the effect alcohol had on the memory of the witnesses, their subsequent reporting of their allegations against SMSgt Zier, and the differences that it plays between men and women*

18.  SMSgt Zier's charges span over the course of 4.5 years.  The evidence provided to defense suggests the government's case will be contingent on the testimony of several victims and witnesses.  The victims in several specifications either consumed alcohol or were intoxicated at the time of the alleged incidents.  As such, alcohol and its impact on the memory of the complainants and the witnesses will be an issue that is expected to come up at trial.

19.  Victim EP stated to OSI that she could not remember details of the incident due to her level of intoxication. The Defense is not adequately trained on the role of alcohol in sexual assault cases.  A forensic psychologist will be necessary in assisting the Defense in understanding how alcohol, as a central nervous system depressant, can cause confusion, memory loss, impaired

judgment, behavioral changes, cognitive impairment, and reduced inhibitions on the alleged victims.

20.  In regards to memory recall, a forensic psychologist is relevant and necessary in assisting the Defense in understanding how recollection of events is a reconstructive process, how alcohol can cause a person to perceive information inaccurately (also known as alcohol myopia) and, at times, deteriorate their memory of specific events.  In regards to reporting, a forensic psychologist can assist the Defense in understanding how alcohol affects women's reports more than men's, as it affects attention and memory consolidation at a lower dose for women than for men.  Here, SMSgt Zier is alleged to have been intoxicated at certain times during the charged misconduct.

21.  A forensic psychologist will be relevant and necessary for the Defense because they will be able to identify how details for a crime can occur during subsequent interviews following intoxication.  Here, all three reports were not made at the time of the alleged misconduct.  It is very likely that the complainants' allegations occurred following the consumption of alcoholic beverages and were either made to OSI investigators, witnesses, or trial counsel.  A forensic psychologist can assist the Defense in understanding how subsequent interviews of individuals who were intoxicated at the time of an alleged offense can yield new details.

22.  A forensic psychologist will be relevant and necessary for the Defense because they will be able to assist the Defense in understanding how and why people regularly underestimate their own alcohol consumption when engaging in heavy drinking.  Studies suggest that this underestimation is especially common for women and young adults.  Here, according to OSI agents' notes, complainant EP was not comfortable revealing the total number of alcoholic beverages she consumed during the night of the alleged offense.  It is important that a forensic psychologist assists the Defense in understanding how the accuracy of alcohol consumption affects details in subsequent allegations and the credibility of the witness.

23.  In addition to the above, an expert consultant will be relevant and necessary for the Defense in analyzing the statements given by government witnesses, looking for psychological clues as to the possible motivation behind these statements, and assist the Defense in developing further discovery, trial strategy and witness cross-examination from this.  Lastly, expert consultation can assess the named victims; background and history, and what impact this could have on witness credibility or the believability of the charged offenses.  This includes inconsistencies, motives to fabricate, perception of events, memory of events, reconstruction of events, and reporting of events.  Should SMSgt Zier be convicted of any specification, a forensic psychologist is relevant and necessary to analyze his recidivism and general rehabilitation potential. A forensic psychologist will be able to conduct a psychological evaluation on SMSgt Zier that will address psychological problems that could have led to the alleged misconduct or if any personality disorders are present. These sort of evaluations of SMSgt Zier are necessary for the Defense to present a zealous sentencing case that provides all perspectives to the members.

*The Defense Counsel is unable to gather and present the evidence that a forensic psychologist would be able to develop.*

24.  No member of the defense has the academic background or practical experience, despite experience with these types of cases, to perform the necessary forensic analysis discussed above. The psychological testing instruments required to carry out these duties require many years of education, training, and practical application to ensure accuracy in testing.  Furthermore, these evaluations involve illuminating some of the complex and unique dynamics involved with alcohol based offenses and must be conducted by a practitioner with specialized training and experience in the field.  No member of the defense holds a doctoral degree or certification in forensic psychology or has any experience in psychology sufficient to perform even a clinical interview. Finally, no member of the defense is qualified to educate the factfinder on these matter should testimony be required on this subject.

### **Relief Requested**

25.  Wherefore, SMSgt Zier, by and through counsel, moves this Honorable Court to compel the government to appoint a confidential forensic psychologist for the defense and approve twelve hours of pretrial consultation, one day of in person trial preparation, presence during the entirety of trial, and two travel days.

26.  The Defense does not request an Article 39(a) hearing to present additional evidence and argument on this motion in hopes of maintaining the current trial date.  However, the Defense does request a right to respond to the Government's motion, given that no basis for the denial, absent the brief sentence from the CA's MFR, has been provided at this time.

Respectfully submitted, this the 18th day of May 2020.

*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Defense Counsel

3 Attachments:
1.  AFOSI ROI excerpt, dtd 1 March 2020 (6 pages)
2.  Defense Expert Request for Forensic Psychologist, dtd 24 April 2020 (4 pgs)
3.  Denial of Defense request for Forensic Psychologist, dtd 1 May 2020 (1 pg)

CERTIFICATE OF SERVICE

I hereby certify that I caused the above *Motion for Appropriate Relief: Compel Confidential Expert Consultant (Forensic Psychologist)* to be served on the Military Judge and Trial Counsel via e-mail on 18 May 2020.


*J. Dillon Emmanuel*

JAMESIAN D. EMMANUEL, Capt, USAF
Defense Counsel

# ATTACHMENT 1



**DEPARTMENT OF THE AIR FORCE**
OFFICE OF SPECIAL INVESTIGATIONS

# Report of Investigation

**REPORT BY:** SA LUKASZ K. MISINIEC          **FILE NO:** 310-C-120AA4-35221193511545

**PERIOD OF REPORT:** 10 Dec 19 – 28 Feb 20          **DATE OF REPORT:** 1 Mar 20

**SUBJECT:** JEREMY M ZIER; Male Born ███████████████
Force Public Affair Agency (AETC), Joint Base San Antonio-Randolph, TX

**VICTIMS:** E████████ F██████, Female Born: ███████; ██ E-3; SSN: ███
████; 1st Combat Camera Squadron (ACC), Joint Base Charleston, SC

C████████ F████████; Female Born: ███████; ████████ E-5; SSN: ███
██████ 4th Fighter Wing, Seymour Johnson AFB (ACC), NC

T███████ W████; Female Born: ███████████; Civ; SSN ███
█;

| MATTERS INVESTIGATED | | | |
|---|---|---|---|
| **INCIDENT** | **OFFENSE DESCRIPTION** | **SUBJECT** | **VICTIM** |
| 2M206J3S | ABUSIVE SEXUAL CONTACT ON OR AFTER JUNE 28, 2012 | JEREMY M. ZIER | C█████ F█████ |
| 2M206JNJ | ABUSIVE SEXUAL CONTACT ON OR AFTER JUNE 28, 2012 | JEREMY M. ZIER | T████ W████ |
| 2M206JMJ | ABUSIVE SEXUAL CONTACT ON OR AFTER JUNE 28, 2012 | JEREMY M. ZIER | E███ P███ |

**STATUS:** Referred for Action. Action Authority or designee must report to OSI all dispositions on investigated offenses and specifications. (AFI 71-101, Volume 1).

HIGHT.DARREN.R.11  Digitally signed by
                   HIGHT.DARREN.R.1164601052
64601052           Date: 2020.03.01 12:35:42 -06'00'

DARREN R. HIGHT, SA, DAFC
Special Agent-in-Charge, OSI Det 404

**DISTRIBUTION:**

AFPAA/CC (Action)(w/ Exhibits)...................................................................................... 1
502 SFG/JA (Info)(w/ Exhibits) ...................................................................................... 1
File (w/ Exhibits) ...................................................................................... 1

**SPECIAL HANDLING REQUIRED: This document is subject to a claim of privilege under military law. Handle in accordance with AFI 71-101, Volume 1.**





File No: **310-C-120AA4-35221193511545**

## TABLE OF CONTENTS

SUMMARY OF INVESTIGATION
ELEMENTS OF PROOF                                    1-1
INVESTIGATIVE ACTIVITIES                             2-1
EXHIBITS                                             3-1
EVIDENCE                                             4-1



File No: **310-C-120AA4-35221193511545**



FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE



**ROI Page 3**



**File No: 310-C-120AA4-35221193511545**

---

## 1-1. ELEMENTS OF PROOF

| Elements of Proof (Abusive Sexual Contact On Or After June 28, 2012) | Ref Para #: |
|---|---|
| Any person subject to this chapter who commits or causes sexual contact upon or by another person, if to do so would violate subsection (b) (sexual assault) had the sexual contact been a sexual act, is guilty of abusive sexual contact and shall be punished as a court-martial may direct. | 2-1, 2-3, 2-7, 2-22, 2-27, 2-28, 2-37, 2-40, 2-43 |

## 2-1. INVESTIGATIVE ACTIVITIES

2-1. On 10 Dec 19, SA KYLE CARTER and SA JIHAD KANDIL, OSI Det 310, Joint Base Charleston (JB CHS), SC interviewed SSgt IZABELLA WORKMAN, 1st Combat Camera Squadron (CTCS), JB CHS, SC at OSI Det 310, JB CHS, SC, who verbally provided the following: On 07 Dec 19, WORKMAN went to a holiday party at North Charleston Marriott Hotel, 4770 Goer Dr, North Charleston, SC, organized by 1 CTCS, JB CHS, SC. Prior to attending the squadron holiday party, WORKMAN dropped off a few items with SrA HALEY PHILLIPS, 1 CTCS, JB CHS, SC, who hosted a small gathering at her residence,      with her friends, SSgt █ P█████ , (VICTIM P█████ ), 1 CTCS, JB CHS, SC; SrA SEAN CAMPBELL, 1 CTCS, JB CHS, SC; SSgt CLAYTON CUPIT, 1 CTCS, JB CHS, SC; SSgt TAYLOR HARRISON, 1 CTCS, JB CHS, SC; SSgt CHRIS DRZAZGOWSKI, 1 CTCS, JB CHS, SC; TSgt GUSTAVO CASTILLO, 1 CTCS, JB CHS, SC; Civ IAN LEPLA, WORKMAN's boyfriend,      and Civ RYAN BAUMGART,      VICTIM P█████ consumed alcohol while at PHILLIPS' residence; however, WORKMAN did not know how many drinks VICTIM P consumed. WORKMAN and LEPLA took an Uber the North Charleston Marriott Hotel and sat at VICTIM P█████ 's table. VICTIM P█████ consumed more alcohol at the holiday party and became visibly intoxicated to the point that she stumbled while she walked.

SUBJECT followed VICTIM P█████ around throughout the event. At one point, SUBJECT sat next to VICTIM P█████ and WORKMAN overheard a conversation between SUBJECT and VICTIM P█ about her sexual practices with TSgt D█████ P█████ (VICTIM P█████ husband), 628 Logistic Readiness Squadron (LRS), 1 CTCS, JB CHS, SC who was deployed. Later that night, WORKMAN observed SUBJECT's hand on VICTIM P█████ buttocks. WORKMAN told LEPLA to go and separate VICTIM P█████ and SUBJECT due to SUBJECT placing his hand on VICTIM P█████ s buttocks. LEPLA walked over to VICTIM P█████ and asked if she would like to "step outside for a smoke", which she did.

[black redaction box]      VICTIM P█

appeared embarrassed by the situation since she did not recall the events that occurred throughout the night, due to her level of intoxication. WORKMAN told VICTIM P█████ she would speak with MSgt KEVIN CARTINO, First Sergeant, 1 CTCS, JB CHS, SC to report SUBJECT's behavior. VICTIM P█████ expressed she was nervous about WORKMAN speaking to CARTINO since she would be leaving for Officer Training School in January 2020.

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**



**ROI Page 4**



**File No: 310-C-120AA4-35221193511545**

WORKMAN also believed SUBJECT may have inappropriately touched SSgt C      F
(VICTIM F     ), 4th Fighter Wing, Seymour Johnson AFB (SJAFB), NC.



**2-3. VICTIM F**      **Interview:** On 11 Dec 19, SA VOTTERO and SA CARTER, OSI Det 310, JB CHS, SC, conducted an interview of VICTIM F     , at OSI Det 310, JB CHS, SC. SA VOTTERO briefed VICTIM F      on the services available to her via the DD Form 2701, along with her right to a Special Victims' Counsel. VICTIM F      verbally provided the following details: She was stationed at Incirlik Air Base (AB), Turkey from May 2014 to August 2015. SUBJECT was her station manager at the Armed Forces Network (AFN). She related an incident which occurred while on a trip to Colossae Thermal Hotel, Pamukkale/Denizli, Turkey, in April 2015; which involved, SUBJECT, MSgt TSUYOSHI SHINZATO, Air Mobility Command. Public Affairs, Scott AFB, IL, Civ SCOTT TAYLOR,      SSgt KATELYNN MOELLER, AFN Sembach, Germany (DEU) and SSgt AARON WOLFF, 23rd Combat Communications Squadron (CBCS), Travis (TAFB), CA. On the second night of the trip, SUBJECT socialized with VICTIM F      and TAYLOR who was staying in a room with VICTIM F     . SUBJECT began a conversation with VICTIM F      regarding volunteer work bullets associated with the Lesbian Gay Bisexual Transsexual (LGBT) alliance on the installation. From those conversations, he asked VICTIM F      about her sex life with other women, and what it was like to be with them. SUBJECT told her "you just haven't had the right dick yet." VICTIM F      became uncomfortable with the conversation. After a while, VICTIM F     , TAYLOR, and SUBJECT left to meet with MOLLER, WOLFF and SHINZATO who were socializing in the hot tub in the rear of the hotel. In the hot tub, TAYLOR sat to the right of VICTIM F      and SUBJECT sat to the left of her. SHINZATO sat to the left of SUBJECT, MOELLER sat to the left of SHINZATO and WOLLF sat to the left of MOELLER. VICTIM F      provided a sketch of the seating arrangement in the hot tub (**Exhibit 1**). VICTIM F      and SUBJECT consumed alcohol while in VICTIM FERGUSON's room and in the hot tub. VICTIM F      did not recall the amount of alcohol consumed. She recalled that she was cognizant and aware of her surroundings but not account for how intoxicated others may have been.

While in the hot tub, SUBJECT consumed alcohol and sat next to VICTIM F     .





**File No: 310-C-120AA4-35221193511545**



**2-4. VICTIM P[____] Interview:** On 12 Dec 19, SA VOTTERO and SA KANDIL, OSI Det 310, JB CHS, SC, interviewed VICTIM P[____], at OSI Det 310, JB CHS, SC, who verbally provided the following: On 7 Dec 19, she took an Uber to PHILLIPS' residence. While at PHILLIPS' residence, a bottle of Prosecco was served and VICTIM P[____] drank one flute-sized glass. (Agent note: VICTIM P[____] did not feel comfortable revealing the total amount of alcohol consumed throughout the night.) VICTIM P[____] left PHILLIPS' residence and took an Uber to the squadron holiday party where she remembered SUBJECT asked about D. P[____]. She added the question was sexual in nature, but did not recall specifics about the conversation. In addition, she did not remember if SUBJECT touched or grabbed her buttocks. VICTIM P[____] heard a rumor in her office that SUBJECT also made Lt NATASHA MOSQUERA, 1 CTCS, JB CHS, SC feel uncomfortable at the party and showed up at MOSQUERA's apartment complex where he messaged her and asked her to come downstairs to see him. (Agent Note: VICTIM P[____] did not provide any additional details about the allegation and subsequently elected not to participate in the investigation).

**FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**



# ATTACHMENT 2



**DEPARTMENT OF THE AIR FORCE**
AREA DEFENSE COUNSEL (AFLOA)
WHITEMAN AIR FORCE BASE, MISSOURI

24 April 2020

MEMORANDUM FOR  ALL REVIEWING AUTHORITIES

FROM:  AFLOA/ADC (Capt Jamesian D. Emmanuel)

SUBJECT:  Defense Request for Expert Consultant in Forensic Psychology –
    *United States v. SMSgt Jeremy M. Zier*

1.  Pursuant to Article 46, Uniform Code of Military Justice (UCMJ), and Rules for Courts-Martial (RCM) 703(d), the defense respectfully requests you appoint an expert consultant in the field of forensic psychology to assist the defense in its preparation for *United States v. SMSgt Jeremy M. Zier*.  The defense requests the consultant be appointed as a representative of the defense so that any communications between the expert, SMSgt Zier, and/or the Defense Counsel will be privileged with the attorney-client privileged outlined in Military Rule of Evidence (MRE) 502.  This is not a request for an expert testifying witness, although information discovered by the expert consultant may result in the defense later requesting that the expert consultant become a testifying witness at trial.

2.  *Request for forensic psychologist.*  The Defense requests the appointment of a forensic psychologist as its confidential expert consultant in forensic psychology.  Specifically, the Defense requests a forensic psychologist with significant experience and expertise in criminal cases such as this one, including experience both in forensic psychology and clinical psychology, specialized experience in working with Veterans, and one who has been contracted by the USAF on several occasions to serve as a forensic expert for either the Government and/or Defense.

3.  *Law.*  RCM 703(d) provides for the employment of an expert witness I military courts-martial.  Although RCM 703(d) does not specifically address expert consultants, military courts have recognized that RCM 703(d) is generally applicable to expert consultants in the same way it is applicable to expert witnesses.  *See United States v. Warner*, 59 MJ 573, 578 (A.F. Ct. Crim. App. 2003)

    a.  When the accused applies for the employment of an expert, he must demonstrate the necessity for the services.  *United States v. Garries*, 22 MJ 288 (CMA 1986).  In showing this necessity, "the defense [must be] specific enough in defining the issues they [hope] to develop with expert assistance [and must] demonstrate that they [have] sufficiently educated themselves as to such potential issues that might be developed with expert assistance."  *United States v. Tornowski*, 29 MJ 578 (A.F.C.M.R. 1989). Furthermore, "a trial defense counsel who seeks the services of an expert consultant cannot play coy. He must show whatever cards he either thinks he holds or may acquire with such expert assistance."  *Id.* In general, the accused has the burden of demonstrating that the testimony or assistance is relevant and necessary. *United States v. Van Horn*, 26 MJ 434 (1988). Once this showing has been made, the Government must either provide the expert or an adequate substitute.

Page **1** of **4**

b. Article 46, UCMJ, provides that trial counsel and defense counsel shall have equal opportunity to obtain witnesses and other evidence in accordance with appropriate regulations. In *Garries*, the Court of Military Appeals stated, "[a]s a matter of military due process, service members are entitled to . . . expert assistance when necessary for an adequate defense." *Id.* at 290.

c. Courts have applied a three-part analysis to determine whether an accused has established the need for expert assistance, namely: (1) why the expert is needed, (2) what the expert would accomplish for the defense, and (3) why the defense is unable to gather and present the evidence that the expert assistant would be able to develop. *United States v. Gonzalez*, 39 M.J. 459, 461 (CMA 1994); *United States v. Danyi*, 45 MJ 315 (CAAF 1996).

4. *Justification for expert consultant in forensic psychology.* SMSgt Zier is charged with multiple offenses including one charge and one specification of dereliction of duty, in violation of Article 92, Uniform Code of Military Justice (UCMJ) and one charge and three specifications of abusive sexual contact in violation of Article 120, UCMJ. All four specifications relate to three separate incidents of alleged indecent conduct between SMSgt Zier and three complainants, EP, CF, and TW. These separate incidents occurred over the course of five (5) years with the earliest conduct occurring in April 2015. Additionally, alcohol consumption was a prevalent factor in all three incidents and in multiple incidents, evidence suggests that SMSgt Zier, witnesses, and/or the complainants were intoxicated at the time of the alleged offenses. The evidence used to support these allegations in Report of Investigation, include statements made between various witnesses and SMSgt Zier and complainants' statements. Currently, there does not appear to be any physical evidence that directly substantiates the complainants' allegations.

A forensic psychologist is both relevant and necessary in determining a defense for these allegations as well as putting forward mitigation and rehabilitation evidence if SMSgt Zier is convicted of any specification. The defense needs expert assistance related to the following issues: (1) the mental state of SMSgt Zier during and after the alleged offenses to determine whether any defense exists for lack of mental responsibility to commit any of these crimes and/or his competency to stand trial; (2) evaluate the effects of alcohol on the memory as it relates to the allegations made by the complainants, described by witnesses, or defended by SMSgt Zier; and (3) assist in identifying extenuation and mitigation for purposes of a potential sentencing case. A more thorough justification for an expert consultant in forensic psychology is included below.

As SMSgt Zier's alleged conduct occurred over the past five years, the government's case will be contingent on the testimony of several complainants who had either consumed alcohol or were intoxicated at the time of the alleged incidents. As such, alcohol and its impact on the memory of the complainants and the witnesses will be an issue that is expected to come up at trial. As the Defense is not adequately trained on the role of alcohol in sexual assault cases, a forensic psychologist will be vital to describe how alcohol, as a central nervous system depressant, can cause confusion, memory loss, impaired judgment, behavioral changes, cognitive impairment, and reduced inhibitions. In regards to memory recall, a forensic psychologist can assist the Defense in understanding how recollection of events is a reconstructive process, how

alcohol can cause a person to perceive information inaccurately (also known as alcohol myopia) and, at times, deteriorate their memory of specific events. In regards to reporting, a forensic psychologist can assist the Defense in understanding how alcohol affects women's reports more than men's, as it affects attention and memory consolidation at a lower dose for women than for men. This will be especially important for the Defense as SMSgt Zier is alleged to have been intoxicated at certain times during the charged misconduct.

Additionally, as the crimes were not immediately reported, a forensic psychologist will be useful for the Defense because they will be able to identify how details for a crime can occur during subsequent interviews following intoxication. Here, all three reports were not made at the time of the alleged misconduct. Although one complainant states that she reported an incident to the Sexual Assault Response Coordinator's office at Incirlik, Turkey, no such report has been found. As such, it is very likely that the complainants' allegations occurred following the consumption of alcoholic beverages and were either made to OSI investigators, witnesses, or trial counsel. A forensic psychologist can assist the Defense in understanding how subsequent interviews of individuals who were intoxicated at the time of an alleged offense can yield new details.

A forensic psychologist can also assist the Defense in understanding how and why people regularly underestimate their own alcohol consumption when engaging in heavy drinking. Studies suggest that this underestimation is especially common for women and young adults. Here, according to OSI agents' notes, complainant EP was not comfortable revealing the total number of alcoholic beverages she consumed during the night of the alleged offense. It is important that a forensic psychologist assists the Defense in understanding how the accuracy of alcohol consumption affects details in subsequent allegations and the credibility of the witness.

In addition to the above, an expert consultant can assist the Defense in analyzing the statements given by government witnesses, looking for psychological clues as to the possible motivation behind these statements, and assist defense counsel in developing further discovery, trial strategy and witness cross-examination from this. Lastly, expert consultation can assess the named victims; background and history, and what impact this could have on witness credibility or the believability of the charged offenses. This includes inconsistencies, motives to fabricate, perception of events, memory of events, reconstruction of events, and reporting of events. Should SMSgt Zier be convicted of any specification, a forensic psychologist is relevant and necessary to analyze his recidivism and general rehabilitation potential. A forensic psychologist will be able to conduct a psychological evaluation on SMSgt Zier that will address psychological problems that could have led to the alleged misconduct or if any personality disorders are present. These sort of evaluations of SMSgt Zier are necessary for the Defense to present a zealous sentencing case that provides all perspectives to the members.

5. *Anticipated duties of expert consultant.* The defense anticipates a forensic psychologist will perform several roles, including, but not limited to: reviewing investigative reports, video recorded interviews, statements, and other case discovery to identify and assist with memory recollection and alcohol related impairment aspects of witnesses and complainants for of the defense; conducting a series of in-depth clinical interviews of SMSgt Zier and available

witnesses and complainants; and evaluate how alcohol related consumption on the complainants impacted their actions during the alleged offenses and recollection during subsequent reporting.

6. *Why Defense Counsel cannot perform the duties requested of a forensic psychologist.* No member of the defense has the academic background or practical experience, despite experience with these types of cases, to perform the necessary forensic analysis discussed above. The psychological testing instruments required to carry out these duties require many years of education, training, and practical application to ensure accuracy in testing. Furthermore, these evaluations involve illuminating some of the complex and unique dynamics involved with alcohol based offenses and must be conducted by a practitioner with specialized training and experience in the field. No member of the defense holds a doctoral degree or certification in forensic psychology or has any experience in psychology sufficient to perform even a clinical interview. Finally, no member of the defense is qualified to educate the factfinder on these matter should testimony be required on this subject.

7. For the abovementioned reasons, the Defense request a forensic psychologist be appointed as the Defense's confidential expert consultant in forensic psychology. We specifically request that this expert be appointed as a representative of the defense so that any communications between him, and/or the Defense Counsel will be privileged within the attorney-client privilege outlined in MRE 502. At this time, we are not requesting that this expert be appointed as an expert witness. However, in the event that the defense needs the expert to serve an as expert witness, we will submit a follow-on request to the government as soon as practicable.

8. Based on the anticipated duties, the defense is requesting a forensic psychologist be approved for **twelve hours of pre-trial consultation with defense; one day in person consultation with the defense prior to the first day of trial; presence for the duration of the anticipated trial; and two days of travel to and from Randolph AFB**.

9. If you have any questions, please contact my office at DSN       during duty hours, or       Thank you for your time and consideration.

*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Area Defense Counsel

US v. Zier Military Record of Trial and Appellate Extracts 000595 of 902

# ATTACHMENT 3



# DEPARTMENT OF THE AIR FORCE
## 502D AIR BASE WING
### JOINT BASE SAN ANTONIO



1 May 2020

MEMORANDUM FOR  502 SFG/JA

FROM:  502 SFG/CC

SUBJECT:  Request for Defense Expert Consultant in Forensic Psychology –
*U.S. v. SMSgt Jeremy M. Zier*

I hereby deny the defense request for the appointment of a confidential expert consultant in the field of forensic psychology in the abovementioned case.  I find the request does not adequately demonstrate a reasonable probability that the expert will be of assistance to the defense.  The defense may submit additional matters for my consideration.

JEFFREY F. CARTER, Colonel, USAF
Commander

**DEPARTMENT OF THE AIR FORCE**
**UNITED STATES AIR FORCE TRIAL JUDICIARY**

| | |
|---|---|
| **UNITED STATES**<br><br>**v.**<br><br>**SMSGT JEREMY M. ZIER**<br>**AIR FORCE PUBLIC AFFAIRS**<br>**AGENCY (AETC)**<br>**JBSA-Randolph, Texas** | **GOVERNMENT RESPONSE TO**<br>**DEFENSE MOTION FOR**<br>**APPROPRIATE RELIEF: COMPEL**<br>**CONFIDENTIAL EXPERT**<br>**CONSULTANT (FORENSIC**<br>**PSYCHOLOGY)**<br><br>**22 May 2020** |

**MOTION**

The United States, by and through counsel, respectfully requests the Military Judge deny the Defense motion to compel the appointment of a confidential expert consultant in the field of forensic psychology.

**SUMMARY**

On 25 March 2020, *U.S. v. SMSgt Jeremy M. Zier* was referred to a Special Court-Martial. The referred charges and specifications consist of: one charge with one specification for violation of Article 92, Uniform Code of Military Justice (UCMJ) and one charge and three specifications for violation of Article 120, UCMJ. Specifically, the Article 92 Charge and one Specification of the Article 120 Charge relate to an incident in April of 2015 where the Accused failed to maintain professional relationships with subordinate Airmen and touched the inner-thigh and genitals of a female Airman. Specifications 2 and 3 of the Article 120 Charge arise out of 2 distinct incidents in December of 2019 in which Accused touched the buttocks of a female Airman and a female civilian. The Government opposes the request because the Defense has failed to demonstrate the specific manner in which the requested expert would assist the Defense or why the denial of such a request would result in a fundamentally unfair trial. Furthermore, the Defense has failed to show why denial of these requests would result in a fundamentally unfair trial.

**FACTS**

1. The Government generally agrees with the recitation of facts in the Defense Motion, but offers the following additional facts. The Accused faces charges arising from three distinct incidents that occurred between April of 2015 and December of 2019.

    a. *The April 2015 incident in Pammukale, Republic of Turkey.* In April of 2015, while he was the American Forces Network Station Chief at Incirlik Air Base, the Accused organized a trip to Pamukkale, Republic of Turkey for the members of his Flight. After a day of sightseeing, the Accused joined members of the flight at the hotel's hot tub and repeatedly placed his hand on the upper-thigh of a female Airman, C.F., eventually sliding his hand under her bikini bottoms and grazing her genitals. During the same evening in which the incident involving C.F. took

place, the Accused removed his bathing suit and, at one point, exited the hot tub while completely nude.  The Accused, C.F., and the Airmen in the hot tub were all consuming alcohol at the time these incidents took place.

b.  *The December 2019 incident at the Joint Base Charleston Christmas party*.  While attending a unit Christmas party at Joint Base Charleston in December of 2019 the Accused was observed interacting with a female Staff Sergeant, E.P., who multiple witnesses describe as being visibly intoxicated.  At the conclusion of the party two witnesses saw the Accused wrap his arm around E.P. and place his hand on her buttocks.  SSgt E.P. has no recollection of the touching, but advises that she would not have consented to such contact by the Accused.

c.  *The December 2019 incident at the Joint Base San Antonio Christmas party*.  While attending a unit Christmas party at Joint Base San Antonio in December of 2019 the Accused touched the buttocks of civilian T.W. while the two were standing in line at the bar.  Shortly after arriving at the party T.W. stood in line at the bar and noted that the individual standing behind her brushed her buttocks with his hand.  T.W. assumed the contact was inadvertent and stepped forward to create space between her and the individual; following which he stepped forward and again touched her buttocks with his hand.

d.  *The investigation.*  Following the Joint Base Charleston Christmas party the Air Force Office of Special Investigations (AFOSI) was notified of an alleged instance of Abusive Sexual Contact against SSgt E.P. which resulted in the initiation of a formal investigation.  During the course of investigating the allegations involving SSgt E.P., AFOSI investigators were advised to speak with SSgt C.F. who, in turn, disclosed the allegations involving the Accused from the 2015 trip to Pamukkale, Republic of Turkey.  As the investigation was ongoing AFOSI became aware of additional allegations arising from the December 2019 Christmas party at Joint Base San Antonio, and obtained statements from civilian T.W. and her sister TSgt C.G.

e.  *The evidence.*  The evidence against the Accused is comprised entirely of eyewitness testimony regarding the allegations.  In the case of the 2015 incident in Pamukkale, Republic of Turkey, all of the individuals who were present in the hot tub describe varying levels of intoxication among all of the parties who were present.  In the case of the incident at the Joint Base Charleston Christmas party, while E.P. is described as highly intoxicated and does not recall the contact, the other witnesses' perception of events does not appear to have been impaired by alcohol consumption.  Finally, in the case of the conduct occurring at the Joint Base San Antonio Christmas party, T.W. was not impaired by alcohol at the time the acts transpired.

2. The Government offers the following additional facts for the Court's consideration:

a.  SSgt C.F.'s recollection of events is supported by contemporaneous reports to outcry witnesses which do not show any material indicia of unreliability or incomplete recollection.

b.  While SSgt E.P. is described as highly intoxicated at the time of the charged misconduct, the relevant acts were witnessed by two separate witnesses, neither of whom report appreciable levels of impairment from alcohol at the time they observed the misconduct.

Appellate Exhibit _____

Page _____

c.  The Defense has not filed notice of a lack of mental responsibility defense in accordance with the 15 May 2020 deadline contained in the Court's Scheduling Order dated 6 April 2020.

d.  The Government has not sought assistance from a forensic psychologist.

## BURDEN

3.  The burden of proof and persuasion rests on the Defense for this motion. The standard as to any factual issue necessary to resolve this motion is to a preponderance of the evidence.  R.C.M. 905(c)(1).

## LAW

4.  "'The accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial.'"  *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (quoting *United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008))(internal citations omitted). "A trial is fundamentally unfair where the government's conduct is 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Anderson*, 68 M.J. 378, 383, (C.A.A.F. 2010)(citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973)).  To show that an expert would be of assistance "[t]he defense must show (1) why the expert is necessary; (2) what the expert would accomplish for the accused; and (3) why defense counsel is unable to gather and present the evidence that the expert would be able to develop.'"  *Lloyd*, 69 M.J. at 99 (citing *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994)).

5.  It is not enough for defense to articulate how an expert could assist defense counsel, the defense must also demonstrate *why* defense counsel is unable to educate themselves to attain competence in defending an issue presented in a particular case, using primary and secondary materials that are readily available.  *United States v. Short*, 50 M.J. 370, 373 (C.A.A.F. 1999)(citing *United States v. Kelly*, 39 M.J. 235, 238 (C.M.A. 1994).  For example, in *United States v. Bresnahan*, 62 M.J. 137, the accused confessed to shaking his three-month-old baby in a manner that eventually caused death after being told that, in order to save the baby's life, the doctors need to know exactly what he had done.  62 M.J. at 140 (C.A.A.F. 2005).  At trial, he asked for expert assistance to determine if his confession was unreliable because of the techniques employed by the interviewing detective.  *Id.* at 139.  C.A.A.F. held that the military judge did not abuse his discretion in denying the defense request for expert assistance because defense counsel never established why they themselves were unable to gather and present the evidence the expert would have developed. *Id.* at 143-44.

6.  Similarly, in *Freeman,* the police interrogated the accused for ten hours and he eventually admitted to some wrongdoing.  65 M.J. 451 at 456.  Before trial, defense requested a confidential consultant in sociology with a specialty in police interrogation techniques.  *Id.* at 457.  The request was denied but defense renewed the request at trial, arguing the expert would help reconstruct interrogations and this was necessary for the defense team to determine the likelihood that the accused confessed to a crime he did not commit.  Defense argued that defense

counsel were unable to gather and present the evidence that the expert assistance would be able to develop, saying:

> [T]he defense team does not possess the academic or practical experience to perform the necessary analysis the expert consultant would be able to perform. Reading the literature on the subject and interviewing the interrogators is not sufficient to ensure that SrA Freeman is able to present a defense in this area. . . . It is absolutely vital that an expert in the field be appointed to assist the defense in knowing which questions to ask and which areas to address during their interviews and cross examination. *Id*. at 458-459.

C.A.A.F. rejected this argument, holding that the appellant failed to establish necessity for assistance. *Id.* at 459. C.A.A.F. concluded that defense counsel was asking for information they could have obtained themselves. C.A.A.F. also held that the defense failed to establish why they were unable to gather the relevant information and cross-examine the investigators on their interrogation techniques and their use of those techniques in eliciting a confession. *Id*.

7. In the specific context of demonstrating the necessity of a consultant in forensic psychology, courts have maintained that defense counsel must demonstrate with specificity how the requested consultant and the various psychological topics raised would create a reasonable probability of assistance to the defense. *United States v. Salas*, 2013 C.C.A. LEXIS 676 (A.F.C.C.A. 2013). In the narrower context of expert consultants regarding the impact of alcohol on memory and cognition, the Army Court of Criminal Appeals has held that defense counsel must put forth evidence demonstrating their efforts to understand, gather, develop, or present evidence in order to support their motion to compel appointment of an expert consultant. *United States v. Leyba*, 2018 CCA LEXIS 394 (A.C.C.A. 2018)(rev denied, *See United States v. Leyba*, 2019 C.A.A.F. LEXIS 4 (2019). (Attachment 1)

8. A trial is fundamentally unfair when the government's conduct is "so outrageous" that due process principals are violated. *United States v. Anderson*, 68 M.J. 378, 382 (C.A.A.F. 2010). Denial of a defense expert that was requested to assist in developing and presenting mitigation evidence at sentencing does not result in a fundamentally unfair trial. *See*, *United States v. Varniychuck*, 2010 CCA LEXIS 150, page 4 (A.F. Ct. Crim. App. 2010)(Denial of a defense request for a forensic psychologist to assist in preparing mitigation evidence was not an abuse of discretion); *See also*, *U.S. v. Cook*, 61 M.J. 757, 760 (A.F. Ct. Crim. App. 2005)(Defense request for forensic psychologist to assist with extenuation and mitigation evidence and to educate the defense on the issues of recidivism and rehabilitation potential was found to not qualify as necessary and so denial was appropriate).

## ARGUMENT

9. The defense has the burden of proof. In this case, the defense has failed to meet its burden with respect to both the necessity of the requested expert and by failing to demonstrate how the denial of the requested expert would result in a *fundamentally* unfair trial.

*A Forensic Psychologist Is Not Necessary*

10. **Necessity of the expert.**  The defense's request articulates several bases for their position that expert assistance is necessary to assist counsel:  1) in evaluating the impact of alcohol consumption on the memory of witnesses and victims at trial; 2) in the context of SSgt E.P., to assess the impact of alcohol consumption on her memory, judgement, behavior, and inhibition; 3) in understanding alcohol's impact on memory and recollection broadly and how those impacts differ based on gender; 4) in evaluating how alcohol consumption may impact reporting and subsequent recollection of details during interviews; 5) understanding how and why individuals underestimate their own alcohol consumption and its impact on witness credibility; 6) understanding "psychological clues" and potential motivations for witness testimony in order to develop trial strategy; and 7) identifying potential matters in mitigation and extenuation at sentencing.  These basis must be evaluated under the relevant factors outlined in *Gonzalez*, specifically:  1) why the expert is necessary; 2) what the expert would accomplish for the accused; and 3) why defense counsel is unable to gather and present the evidence that the expert would be able to develop.

11. **Why the expert is necessary.**  The Defense Motion proposes a number of discrete topics which an expert in forensic psychology may provide additional understanding of or render professional opinions regarding; however, it fails to demonstrate the *necessity* of an expert in the current case.  For example, the Defense Motion discusses several different bases for exploring what is, broadly speaking, a series of variations on the impact of alcohol on memory. However, the defense has failed to articulate more than a broad statement that alcohol consumption took place at the time of the incidents without elaborating on the basis for any conclusion that this has resulted in a measurable impact on the witnesses' ability to perceive or recall events.  Moreover, the Motion fails to describe why defense counsel are unable to identify develop testimony relevant to these issues without the assistance of an expert consultant.  For example, in the case of SSgt E.P., who concedes she was intoxicated and does not recall the charged acts, defense counsel are readily able to draw out testimony to that effect and effectively cross-examine SSgt E.P. as to any failings in her memory of the night of the charged acts, including the possibility that she consented to the conduct and does not remember.  Absent a showing that there are finite concerns with regard to the ability of witnesses to perceive and accurately recall events which defense counsel cannot effectively cross-examine them on, the broad-brush assertion that merely because alcohol consumption occurred is insufficient to demonstrate the necessity of the expert.

12. **What the expert assistance would accomplish.**  Turning to the second *Gonzalez* factor, the defense has failed to demonstrate with any degree of specificity precisely what an expert would accomplish for the defense.  Instead, they have offered general areas or topics of interest that the forensic psychologist may explore, but have done so with no promise that the exercise will yield any viable defense strategy or specific result.  The Defense Motion highlights issues with memory, perception, "alcohol myopia", and related topics, but has not articulated its specific theory of how these topics are specifically relevant to achieving a particular outcome or objective requiring the requested expert.

13. The mere possibility that an expert may identify something of value from among a broad array of possible topics falls short of demonstrating what discrete value an expert would provide to the Accused's defense.  As detailed in *Lloyd*, the defense must demonstrate a *reasonable probability* that the requested expert would be of assistance to the defense.  Additionally, in the

context of forensic psychology, appeals courts have held that one must have a reasonably articulable basis for the manner in which the requested consultant would assist the defense.

14. **Why the Defense is unable to gather and present the evidence the expert assistance would be able to develop.** Regarding the final *Gonzalez* factor, the defense has failed to demonstrate why they are unable to gather and present the evidence the expert consultant is needed to develop. The Defense Motion asserts that counsel lack academic or practical experience to undertake the "necessary forensic analysis" which require extensive education and training to apply; however, as cited above, there is no specific request for a particularized battery of psychological testing or interpretation of previously administered testing. The Defense Motion merely asserts that an expert consultant would be available to discuss topics including alcohols impact on memory generally, with the hope of developing a more particularized application of this knowledge at trial. Barring a more specific assertion of a definite, measurable work product to be provided by the requested expert, at this time the defense's assertion that it cannot gather and present the evidence it hopes to develop is unsubstantiated.

*Denial of a Forensic Psychologist Would Not Result in a Fundamentally Unfair Trial*

15. While not addressed in the Defense Motion, the Defense must also demonstrate that the denial of the requested expert would result in a fundamentally unfair trial. Fundamental unfairness is predicated on conduct "so outrageous" that the fundamental elements of due process are violated. *See Anderson* at 382 (C.A.A.F. 2010). While the use of an expert consultant in forensic psychology has undoubted utility, the denial of such services in the present context does not result in a fundamentally unfair trial. The Defense has raised several arguments relating to the possibility that alcohol's impact on memory, reporting of the misconduct, and how its impact is manifested in different genders; however, they have failed to show how any of these specific considerations relate to fundamental principles of due process. The Government, which bears the burden of proof at trial, has not availed itself of any comparable expert services and must take their witnesses as they find them. The Defense has not demonstrated an inability to effectively utilize means at their disposal, such as academic journals, and traditional forms of cross-examination to address witnesses' use of alcohol as a means of impeachment. Moreover, the Defense has not presented any affirmative defenses that rely upon the use of a forensic psychologist to present such a defense to the fact finder.

16. The Defense Motion fails to assert that denial of the requested expert would result in a fundamentally unfair trial and, even if such an assertion were made, the facts and circumstances of the specific case are such that the impact of denial of the expert request is *de minimis*. The present case does not rely upon interpretation of scientific data relating to levels of impairment at a given blood-alcohol content, such as the ability to operate an automobile, or specific phenomena, such as brown-outs or black-outs resulting from alcohol consumption. The examination of the impact of alcohol on Government witnesses is no different in this context than are factors regularly addressed by counsel at trial, such as the impact of the passage of time, age, distance from the perceived events, and physical impairments such as vision or hearing problems – all of which are routinely addressed on cross-examination without the assistance of experts.

*The Defense Burden*

17. The Defense has failed to meet its burden under both the necessity and fundamental unfairness standards outlined in *Gunkle* and its progeny.  As detailed above, in each instance the Defense Motion fails to articulate the necessity of the requested expert consultant in terms of specific, articulable evidence to be gathered and presented in the case at bar.  More importantly, the Defense Motion has failed to put forth *any* argument regarding the second-prong of the analysis, requiring that the defense demonstrate that the denial of the expert consultant request would result in "fundamental unfairness."  As *Gunkle* and its progeny make clear, it is the defense's burden to demonstrate both prongs of this analysis and the Defense has failed to do so in the present instance.

## MOTION HEARING

18. The Government does *not* require an Article 39(a) hearing and argument on this matter.

## RELIEF REQUESTED

19.  WHEREFORE, the Government respectfully requests that this Honorable Court deny defense's motion to compel production of a forensic psychologist.

Respectfully Submitted,

COLEMAN.EDW ARD.SEAN.1504 605899

Digitally signed by COLEMAN.EDWARD.SEAN.1 504605899
Date: 2020.05.22 11:08:50 -05'00'

EDWARD S. COLEMAN, Capt, USAF
Assistant Trial Counsel

Attachment:
1.  *United States v. Leyba*, 2018 CCA LEXIS 394 (A.C.C.A. 2018)

**Certificate of Service**

I hereby certify that I caused to be served a copy of this Government Response to Defense's Motion for Appropriate Relief: Compel Confidential Expert Consultant (Forensic Psychology) on the Military Judge (Colonel Sterling Pendleton) and the Defense Counsel (Mr. Lance Wood and Capt J. Dillon Emmanuel), via e-mail on 22 May 2020.

COLEMAN.EDWA
RD.SEAN.150460
5899

Digitally signed by
COLEMAN.EDWARD.SEAN.15
04605899
Date: 2020.05.22 11:09:17
-05'00'

EDWARD S. COLEMAN, Capt, USAF
Assistant Trial Counsel

Appellate Exhibit _____



**User Name:** Edward COLEMAN
**Date and Time:** Tuesday, May 19, 2020 3:12:00 PM CDT
**Job Number:** 117218675

## Document (1)

1. _United States v. Leyba, 2018 CCA LEXIS 394_
   **Client/Matter:** -None-

# *United States v. Leyba*

United States Army Court of Criminal Appeals

August 13, 2018, Decided

ARMY 20160159

**Reporter**
2018 CCA LEXIS 394 *; 2018 WL 3933637

UNITED STATES, Appellee v. Corporal TERRY J. LEYBA, United States Army, Appellant

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Motion granted by *United States v. Leyba,* 78 M.J. 159, 2018 *CAAF LEXIS* 635 (*C.A.A.F., O*ct. 9, 2018)

Motion granted by *United States v. Leyba,* 78 M.J. 176, 2018 *CAAF LEXIS 669 (C.A.A.F., O*ct. 24, 2018)

Motion granted by *United States v. Leyba, 2018 CAAF LEXIS 811 (C.A.A.F., D*ec. 7, 2018)

Review denied by *United States v. Leyba, 2019 CAAF LEXIS 4 (C.A.A.F., J*an. 3, 2019)

**Prior History: [*1]** Headquarters, United States Army South, Douglas K. Watkins, Military Judge, Lieutenant Colonel Jim Tripp, Staff Judge Advocate.

**Counsel:** For Appellant: Major Julie L. Borchers, JA; Jeffery C. King, Esquire (on brief); Captain Steven J. Dray, JA; Jeffery C. King, Esquire (on reply brief).

For Appellee: Colonel Tamia M. Martin, JA; Captain Marc B. Sawyer, JA; Captain Meredith M. Picard, JA (on brief).

**Judges:** Before WOLFE, SALUSSOLIA, and ALDYKIEWICZ, Appellate Military Judges.

## Opinion

SUMMARY DISPOSITION

Per Curiam:

A panel of officers and enlisted members sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications of sexual assault in violation of *Article* 120, Uniform Code of Military Justice, 10 *U.S.C. §* 920 (2012) [UCMJ].[1] The panel sentenced appellant to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentenced as adjudged.

This case is before us for review pursuant to *Article 66,* UCMJ. Appellant raises two assignments of error, both of which merit discussion, but no relief.

## BACKGROUND

Appellant and Specialist (SPC) MO attended a barbecue while serving in Guantanamo Bay, **[*2]** Cuba. During the barbecue, SPC MO became extremely intoxicated and was assisted to her barracks room by appellant and two other male soldiers. Upon entering SPC MO's room, they placed her on the bed. The two male soldiers then departed the room, leaving appellant alone with SPC MO. After waiting several minutes for appellant to come out, one of the soldiers began knocking on SPC MO's bedroom door, which was locked. No one answered.

---

[1] Consistent with appellant's plea, the panel found appellant not guilty of two specifications of sexual assault charged in the alternative to the specifications of which appellant was convicted.

Edward COLEMAN        Appellate Exhibit _____

US v. Zier Military Record of Trial and Appellate Extracts 000607 of 902        Marked Page _____

Specialist CM, a female soldier residing in the adjoining barracks room, heard noise, woke up and entered the hallway to ascertain what was going on. After speaking to the two soldiers standing outside SPC MO's room, SPC CM started banging on SPC MO's room door. Eventually, SPC MO's room door was opened. Upon entering the room, SPC CM saw SPC MO passed out on her bed and naked from the waist down. SPC CM also noticed appellant hiding behind the door and told the two soldiers to get him out of the room.

Shortly after appellant left SPC MO's room, SPC CM told another female soldier, SPC AL, what had just occurred. Specialist AL approached appellant and asked him what happened. Appellant, who appeared intoxicated, responded that he raped SPC MO and stated "I [*3] just wanted to stick my dick in something." Appellant then ran from the area. His departure resulted in a unit search that eventually located him.

During the subsequent CID investigation, appellant waived his rights and admitted to performing oral sex on SPC MO while she was asleep and engaging in sexual intercourse with her while she was unconscious. SPC MO had no memory of what occurred between her and appellant in her room that night. She stated her last memory of the night was drinking a shot of tequila during the barbecue and then, "everything went black." Specialist MO further testified the next thing she remembered was waking up in the emergency room.

When SPC MO arrived at the emergency room the morning of the assault, she was still extremely intoxicated.[2] Once she was able to consent, Specialist MO underwent a sexual assault forensic examination later that day. The examination revealed several injuries to her vaginal area to include a laceration to the vaginal wall, and bruising to the cervix and labia.

In preparation for trial, appellant's defense counsel requested the convening authority appoint an expert consultant in the fields of psychology and the psychological effects of [*4] alcohol on cognition and behavior. After the request was denied, defense counsel filed a motion to compel the appointment of such an expert. During the motion hearing, defense counsel amended their request to also have the forensic psychologist assist in the area of false confessions. Defense counsel argued an expert consultant in the area of false confessions was now necessary because recently provided DNA evidence "suggested" that appellant's admissions were false.[3] After considering the evidence

presented and the pleadings of the parties, the military judge denied appellant's motion to compel an expert consultant to assist in either area.[4]

**LAW AND DISCUSSION**

*Denial of Expert Assistance*

On appeal, appellant asserts that he was denied the right to expert assistance in the field of psychology where there was evidence that the victim was blacked out rather than incapacitated and there was scientific evidence involving blood alcohol content.

An accused is entitled to expert assistance when he can show necessity. *United States v. Gunkle,* 55 M.J. 26, 31 (*C.A.A.F.* 2001) (citing *United States v. Garries,* 22 M.J. 288, 291 (*C.M.A.* 1986). The accused has the burden of establishing that a reasonable probability exists that an expert would be of assistance to the defense and that denial of expert assistance [*5] would result in a fundamentally unfair trial. *United States v. Freeman,* 65 M.J. 451, 458 (*C.A.A.F.* 2008) (citations omitted). There are three aspects to showing necessity: (1) why the expert assistance is needed; (2) what would the expert assistance accomplish for the accused; and (3) why is the defense counsel unable to gather and present the evidence that the expert assistance would be able to develop. *United States v. Gonzalez,* 39 M.J. 459, 461 (*C.A.A.F.* 1994) (citations omitted).

Courts review a military judge's ruling on a request for expert assistance for an abuse of discretion. *United States v. Lee,* 64 M.J. 213, 217 (*C.A.A.F.* 2006) (citing *Gunkle,* 55 M.J. at 32). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly

---

[2] Blood drawn approximately five hours after SPC MO took her last drink registered her blood alcohol content at 0.268.

[3] We reject the suggestion. The United States Army Criminal Investigative Laboratory (USACIL) DNA report showed no semen was detected on SPC MO and appellant's DNA was not detected on

SPC MO. While an amount of male DNA was found on SPC MO's pubic mound swabs and underwear swabs, the amount was insufficient for identification purposes. Foreign DNA was found on appellant's underwear and penile corona swabs, but could not be conclusively interpreted. Specialist MO's DNA was found on appellant's mouth and male DNA was detected on SPC MO's shorts, but it could not be conclusively interpreted.

[4] The military judge's written decision denying appellant's motion is contained in the record but not initially apparent to the parties or this court because it was not properly marked as an exhibit. Consequently, this court provided the parties an additional opportunity to amend their pleadings based on the military judge's written decision. Neither party modified its submissions.

2018 CCA LEXIS 394, *5

erroneous.'" *United States v. Lloyd,* 69 M.J. 95, 99 (*C.A.A.F.* 2010) (citations omitted).

In this case, the military judge denied appellant's motion to compel an expert consultant, reasoning: (1) the defense did not meets its burden under Rule for Courts-Martial 905(c) because they failed to establish that they were unable to gather and present evidence that the expert assistance would be able to develop in these areas;[5] and (2) the defense failed to show why the denial of an expert consultant would result in an unfair trial.

We hold the military judge did not abuse his discretion in denying appellant's **[*6]** motion to compel an expert consultant because defense counsel clearly failed to meet the third prong of *Gonzalez* and also failed to show that denial of expert assistance would result in a fundamentally unfair trial. First, defense counsel provided virtually no evidence as to what efforts they made and why they were thus unable to understand, gather, develop, or present evidence in the areas of alcohol induced blackouts or false confessions. Rather, defense counsel attempted to meet their burden through unsupported assertions that they lacked the necessary education and experience to even attempt such a task.[6] Second, defense counsel offered nothing in either their written or oral pleadings that explained why a denial of expert assistance in either area would result in a fundamentally unfair trial. Third, defense counsel's motion for expert *assistance* repeatedly conflated the issues with those relevant to a request for an expert witness, to the point that it is difficult to make sense of the motion.

*Sixth Amendment Right to Effective Assistance of Counsel*

Next, we turn to appellant's second assignment of error, ineffective assistance of counsel. On appeal, appellant asserts he was denied his *Sixth Amendment* right to **[*7]** effective assistance of counsel when defense counsel failed to investigate the possibility of a false confession, failed to request a false confession expert, and were admonished on the record for lack of preparation. We find appellant has not met his burden.

To support an ineffective assistance of counsel claim, appellant must meet a two-prong test that his defense

counsels' performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see also United States v. Green,* 68 M.J. 360, 361-62 (*C.A.A.F.* 2010). We have the authority to resolve an ineffectiveness claim on the prejudice prong, without resolving the first prong.[7] *See Strickland,* 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Appellant has not met his burden of establishing prejudice, that being "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Upon reviewing the record, we are convinced the result at trial would have been the same even if counsel had obtained an expert consultant **[*8]** in the area of false confessions.

First and foremost, appellant has not asserted to this court that the confession was indeed false, nor has he explained why additional investigation by counsel would have discovered evidence of this claim.

Additionally, appellant admitted on three different occasions that he sexually assaulted SPC MO in her barracks room. There is nothing to support a conclusion that appellant's statements to either a subordinate soldier or the CID agents were involuntary or coerced. Appellant's explanation of the circumstances surrounding his misconduct was also corroborated by credible witness testimony and physical evidence. This included medical proof of physical injuries to SPC MO's vaginal area.

The DNA results neither exonerated nor excluded appellant as a possible perpetrator. Rather the DNA results were inconclusive. Contrary to appellant's argument in support of the need for a false confession expert based on the DNA results, here the inconclusive DNA results were not inconsistent with, nor did they contradict, appellant's multiple admissions.

Lastly, appellant has not demonstrated that during the times of his admissions he was either suffering from a submissive **[*9]** personality or some other condition that rendered him susceptible to making false incriminatory statements in response to accusations of committing serious criminal

---

[5] The military judge reasoned that because defense failed to establish the third prong of *Gonzalez* it was unnecessary to address the remaining two prongs.

[6] Defense counsel asserted they needed a PhD to properly prepare a defense based on false confessions.

[7] That we skip to the prejudice prong is not a concession that counsels' performance was deficient; we simply need not resolve that question here.

2018 CCA LEXIS 394, *9

offenses.

**CONCLUSION**

Upon consideration of the entire record, the findings of guilty and the sentence as approved by the convening authority are AFFIRMED.

**DEPARTMENT OF THE AIR FORCE**
**UNITED STATES AIR FORCE TRIAL JUDICIARY**

| | | |
|---|---|---|
| **UNITED STATES** | ) | **GOVERNMENT WITNESS LIST** |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **SMSgt Jeremy M. Zier** | ) | |
| **Air Force Public Affairs Agency** | ) | |
| **JBSA-Randolph, TX** | ) | **29 May 2020** |

1.   The Government intends to call the following witnesses during trial in the above-referenced case:

   a.   SSgt C       F      *
      Unit:  1 CTCS/AFPAA
      Current Duty Station:  JB-Charleston

    *This individual is represented by Special Victim's Counsel, Capt Megan Teeple.  All contact with this individual should be via her SVC at

   b.   Special Agent Lukasz Misiniec

      Unit:  OSI Det 404 OL-A
      Current Duty Station:  JBSA-Randolph
      Address:  225 Grand Rapids, Cibolo, Texas 78108

   c.   SSgt Aaron Wolff

      Unit:  23 CBCS/AMC
      Current Duty Station:  Travis AFB

   d.   Mr. Scott Taylor

   e.   SSgt Katelyn Moeller

      Unit:  AFN Europe/SEMBACH
      Current Duty Station:  SEMBACH

Appellate Ex ____
Marked Page ____
Page **1** of **3**

f.  Ms. Sieana Mackiewicz

    Current Address:


g.  Capt Mickel McGann

    Unit:  1 CTCS/AFPAA
    Current Duty Station:  JB-Charleston


h.  SSgt Izabella Workman

    Unit:  1 CTCS/AFPAA
    Current Duty Station:  JB-Charleston


i.  SSgt Kyle Hagan

    Unit:  1 CTCS/AFPAA
    Current Duty Station:  JB-Charleston


j.  2d Lt E    P
    C/O 502 SFG/JA
    POC: Maj John M. Malek,  john.malek@us.af.mil or
    Capt Ted Coleman, edward.coleman.11@us.af.mil

k.  Ms. T    W
    C/O 502 SFG/JA
    POC: Maj John M. Malek,  john.malek@us.af.mil or
    Capt Ted Coleman, edward.coleman.11@us.af.mil

l.  TSgt Ciara Gosier

    Unit:  AFPAA/AFPAA
    Current Duty Station:  JBSA-Randolph

Appellate Ex ___
Marked Page ___
Page **2** of **3**

2.  The Government reserves the right to supplement this list as the circumstances may require.

Respectfully Submitted,

Trial Counsel

CERTIFICATE OF SERVICE

I certify that I have served a true copy (via e-mail) of the above on the Military Judge (Colonel Sterling Pendleton), Defense Counsel (Mr. Lance Wood and Capt J. Dillon Emmanuel), and Special Victims' Counsel (Capt Megan Teeple) on 29 May 2020.

Trial Counsel

Appellate Ex ____
Marked Page ___
Page **3** of **3**

**DEPARTMENT OF THE AIR FORCE**
**IN THE UNITED STATES AIR FORCE TRIAL JUDICIARY**

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | RULING ON DEFENSE |
| | ) | MOTION TO COMPEL |
| V. | ) | PRODUCTION OF EXPERT |
| | ) | CONSULTANT: |
| | ) | AIR FORCE RECRUITING SERVICE |
| SMSGT JEREMY M. ZIER | ) | |
| AIR FORCE PUBLIC AFFAIRS AGENCY | ) | 4 June 2020 |
| JOINT BASE SAN ANTONIO-RANDOLPH | ) | |

On 18 May 2020, the Defense filed a motion to compel the production of a government-appointed forensic psychologist as a Defense as expert consultant.  On 22 May 2020, the Government submitted a written response petitioning this Court to deny the motion to compel. Neither the Defense, nor the Government requested a hearing on the matter.

After reviewing the written submissions, including all the documentary attachments, this Court finds as follows by at least a preponderance of the evidence:

<u>ESSENTIAL FINDINGS OF FACT</u>

1.    On 25 March 2020, Col Jeffrey Carter referred one charge and one specification of Article 92, U.C.M.J, as well as one charge and three specifications or Article 120, U.C.M.J to this special court-martial.

2.    On 24 April 2020, the Defense requested the convening authority appoint an expert consultant in forensic psychology.  On 1 May 2020, the convening authority denied the defense request.

3.    By agreement of the parties, this Court adopts as fact paragraphs 1-12 of the Defense motion to compel.[1]

4.    Specification 1 of Charge II allegedly occurred in Pamukkale, Turkey.  After business hours on the second night of the TDY, the Accused asked C.F. about her sex life.  Additionally, while in the hotel hot tub, the Accused allegedly placed his hand on C.F. multiple times, and ultimately slid his hand under her bathing suit and grazed her gentiles.[2] During both incidents, the Accused and C.F. consumed alcohol.  C.F did not recall how much alcohol she consumed, but was cognizant of her surroundings. C.F.'s recall of events is corroborated by witness to whom she told close in time of the alleged touching.

---

[1] In paragraph 1 of the Government response to the Defense motion to compel, the Government states they" generally agree[s] with the recitation of facts in the Defense Motion, but offers…additional facts.
[2] Attachment 1 of the Defense motion to compel is highly redacted, and as such, offers limited facts.

Appellate Exhibit _____
Marked Page _____

5.    Specification 2 of Charge II is alleged to have occurred during a party at Joint Base Charleston.  During the party, at least one witness saw the Accused place his hand upon E.P.'s buttocks.  During the evening, E.P had consumed alcohol.  She became noticeably intoxicated and later did not "recall the events that occurred throughout the night." She did not did not feel comfortable telling OSI how much she had to drink.

6.    Specification 3 of Charge II is alleged to have occurred at a Joint Base San Antonio Christmas party.  The Accused is alleged to have touched T.W.'s buttocks while she was standing in line at the bar.  T.W. drank alcohol that night, but asserts she was not intoxicated at the time of the touching.

<div align="center">BURDEN OF PROOF AND PERSUASION</div>

7.    "[T]he burden of proof on any factual issue the resolution of which is necessary to decide a motion shall be by a preponderance of the evidence."  R.C.M. 905(c)(1).  "[T]he burden of persuasion on any factual issue the resolution of which is necessary to decide a motion shall be on the moving party."  R.C.M. 905(c)(2).

<div align="center">CONCLUSIONS OF LAW</div>

8.    At a court-martial, the parties and the court "shall have equal opportunity to obtain witnesses and other evidence."  Article 46, U.C.M.J.

9.    Prior to trial, the Defense must submit a request for employment of an expert to the convening authority supported, in part, by a "statement of reasons why the employment of the expert is necessary."  R.C.M. 703(d).  If the request is denied by the convening authority, that request may be renewed at trial before the military judge.  *Id.*

10.    An accused's entitlement to expert assistance is not limited to actual expert testimony at trial.  *United States v. Lee*, 64 M.J. 213, 216 (C.A.A.F. 2006).  The entitlement to that expertise is available "before trial to aid in the preparation of his defense upon a demonstration of necessity." *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005); *see also United States v. Kreutzer*, 61 M.J. 293, 305 (C.A.A.F. 2005).

11.    "[S]ervicemembers are entitled to investigative or other expert assistance when necessary for an adequate defense."  *United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008); *see also United States v. Garries*, 22 M.J. 288, 291 (C.M.A. 1986), *cert. denied*, 479 U.S. 985 (1986) ("the defense, in an appropriate case, is entitled to the appointment and confidential assistance of expert consultants either provided by or paid for by the Government 'based upon a defense demonstration of the necessity for the services.'").[3]  The mere possibility of assistance is not sufficient to prevail on the request.  *Bresnahan*, 62 M.J. at 143.

---

[3] Although *Garries* couched the entitlement to expert assistance (when necessary for an adequate defense) as a matter of "military due process," that concept has since been rejected by the Court of Appeals for the Armed Forces (CAAF).  *See United States v. Vazquez*, 72 M.J. 13, 19 (C.A.A.F. 2013) (The Air Force Court of Criminal Appeals "mistakenly relied on the concept of 'military due process,' an amorphous concept . . . that appears to suggest that servicemembers enjoy due process protections above and beyond the panoply of rights provided to them by the plain

<div align="center">Page 2 of 5</div>

Appellate Exhibit _____
Marked Page _____

12.    The Government must provide the expert if the accused establishes that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial. *United States v. Hendrix*, 76 M.J. 283, 288 (C.A.A.F. 2017) (citing *United States v. Anderson*, 68 M.J. 378, 383 (C.A.A.F. 2010)); *see also United States v. Gonzalez*, 39 M.J. 459, 460 (C.A.A.F. 1994).

13.    To establish the first prong, the accused "must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop." *Id.* (quoting *Anderson*, 68 M.J. at 383).

14.    As to the second prong, a trial is fundamentally unfair where the government's conduct is "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Anderson*, 68 M.J. at 383 (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973)). *See also United States v. Chargualaf*, 2013 CCA LEXIS 484 (AFCCA 2013)(denial of forensic psychology expert to assist in sentencing not an abuse of discretion as request failed to demonstrate what the expert would accomplish or how denial would result in a fundamentally unfair trial); *United States v. Ramirez*, 2017 CCA LEXIS 494 (NMCCCA 2017)(defense request for expert to advise on likelihood of recidivism failed to demonstrate necessity or that denial would result in a fundamentally unfair trial). *United States v. Varniychuk*, 2010 CCA LEXIS 150 (AFCCA 2010) (denial of a defense request for a forensic psychologist to assist in preparing mitigation evidence was not an abuse of discretion).

15.    "Where the Government has found it necessary to grant itself an expert and present expert forensic analysis often involving novel or complex scientific disciplines, fundamental fairness compels the military judge to be vigilant to ensure that an accused is not disadvantaged by a lack of resources and denied necessary expert assistance in the preparation or presentation of his defense." *United States v. Lee*, 64 M.J. 213, 218 (C.A.A.F. 2006).

16.    But, "defense counsel are expected to educate themselves to attain competence in defending an issue presented in a particular case." *United States v. Kelly*, 39 M.J. 235, 238 (C.M.A. 1994). "Due process requires that the accused be given the 'basic tools' necessary to present a defense, but defense counsel is responsible for doing his or her homework." *United States v. Short*, 50 M.J. 370, 373 (C.A.A.F. 1999); *see also United States v. Ford*, 51 M.J. 445 (C.A.A.F. 1999).

*Analysis*

17.    Addressing prong one of the analysis—whether an expert would be of assistance to the Defense—CAAF has instructed that the Defense must meet three subfactors to satisfy this prong. *See Bresnahan*, 62 M.J. at 143.

18.    *Why is the expert assistance needed?*  The first of those subfactors is that the Defense must show why the expert assistance is needed.  They have not done so here.

---

text of the Constitution, the UCMJ, and the <u>MCM</u>. They do not.").

Appellate Exhibit _____
Marked Page _____

a.   The Defense asserts a forensic psychologist is "relevant and necessary in assisting the Defense in understanding how recollection of events is a reconstructive process, how alcohol can cause a person to perceive information inaccurately (also known as alcohol myopia) and, at times, deteriorate their memory of specific events."  Additionally, the Defense maintains "a forensic psychologist [would] assist the Defense in understanding how subsequent interviews of individuals who were intoxicated at the time of an alleged offense can yield new details." And finally, could help identify "psychological clues" as to possible motivations behind statements of the alleged victims.  As highlighted by the Defense, the consumption of alcohol is a common theme throughout most of the charged offenses.  But, beyond general assertions of alcohol's effect on memory, the Defense has not shown the Court exactly why a forensic psychologist is needed.  Indeed, the general effects of alcohol on memory is a subject matter commonly understood by both practitioners and members.  Both counsel and the members are well equipped to make such generalized conclusions without reliance on expert assistance or expert testimony.  Without more, Defense counsel have failed to provide sufficient detail to establish a nexus between the facts and circumstances and the need for a forensic psychologist.

b.   Additionally, this is not a case where the Government is calling an expert witness and the Defense is entitled to an expert of similar qualifications to assist the Defense.  Instead, the Defense is searching for a possible theory.  The Defense acknowledged as much: "a forensic psychologist is relevant and necessary in determining a defense for the allegations."  Yet, the Defense neglects to factually demonstrate why expert assistance is specifically needed—not merely desirable.  *See United States v. Tornowski*, 29 M.J. 578, 581 (A.F.C.M.R. 1989).

19.  *What would the expert assistance accomplish for the accused?*  The second subfactor is that the Defense must articulate what the expert assistance would accomplish for the Accused.  As regards this second subfactor, the Defense has met its burden.

a.   In addition to the above assertions, the Defense maintains a forensic psychologist can assist the Defense in understanding how alcohol affects women's reports more than men's, as it affects attention and memory consolidation at a lower dose for women than for men.  The Defense also asserts "it is important that a forensic psychologist assists the Defense in understanding how the accuracy of alcohol consumption affects details in subsequent allegations and the credibility of the witness."  Finally, the Defense avers "a forensic psychologist will be able to conduct a psychological evaluation on SMSgt Zier that will address psychological problems that could have led to the alleged misconduct or if any personality disorders are present.  Although a forensic psychologist could assist in evaluating a person's mental health, there has been no indication so far that mental capacity or mental responsibility is at issue in this case.  Nor has the Defense requested a sanity board or provided any notice of a defense involving the lack of mental responsibility.  Still, a forensic psychologist could potentially assist the Defense in exploring *alcohol's* effects on memory, and perception, as well as other areas cited.

b.   As discussed above, although the Defense has not provided sufficient evidence or argument indicating how exactly this expert assistance is needed, it has sufficiently articulated areas of possible areas of assistance, and has thus met its burden.

Page 4 of 5

Appellate Exhibit _____
Marked Page _____

20.  *Why is the defense counsel unable to gather and present the evidence that the expert assistance would be able to develop?*  The Defense states, "no member of the defense has the academic background or practical experience, despite experience with these types of cases, to perform the necessary forensic analysis…"  Defense counsel assert they lack the academic or practical experience to undertake the "necessary forensic analysis" which require extensive education and training to apply.  Although the Defense references psychological testing requiring expert assistance, they do not elaborate further.  As a result, the Defense has not adequately demonstrated why it is either ill-equipped, or unqualified to discuss and investigate the relevant issues, including alcohol's impact on memory—beyond what is commonly known.  *See, e.g.*, *United States v. Kelly*, 39 M.J. 235, 238 (C.M.A. 1994) ("Defense counsel are expected to educate themselves to attain competence in defending an issue presented in a particular case," including consulting "a number of primary and secondary materials.").

21.   To the extent that there may be a more complex theory to be adduced from the evidence, the Defense has not yet met their burden of showing that such expertise is *likely* to uncover such favorable evidence, nor would its absence result in a *fundamentally unfair* trial.  *See Anderson*, 68 M.J. at 383.

<u>RULING</u>

The Defense motion to compel the Government to appoint an expert in Forensic Psychology is hereby **DENIED**.  The Court, however, will consider any requests for reconsideration supported with additional evidence or argument if timely raised by the Defense.  This ruling also remains subject to revision and clarification until authentication of the record and I reserve the right to supplement the ruling as necessary and appropriate.

So ordered on this 4th day of June, 2020.

PENDLETON.STERL
ING.C.1259353102
Digitally signed by
PENDLETON.STERLING.C.125935
3102
Date: 2020.06.04 08:26:28 -05'00'

STERLING C. PENDLETON, Colonel, USAF
Military Judge

Appellate Exhibit _____
Marked Page _____

DEPARTMENT OF THE AIR FORCE
UNITED STATES AIR FORCE TRIAL JUDICIARY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | DEFENSE WITNESS LIST |
| SMSgt Jeremy M. Zier | ) | |
| Air Force Public Affairs Agency | ) | |
| JBSA-Randolph, TX | ) | 5 June 2020 |
| | ) | |

1. In accordance with Rule for Courts-Martial 703, the defense hereby respectfully requests production of the witnesses set out below in the above-captioned case. Where a subpoena is required to ensure the presence of a witness for trial, the defense requests that the government serve a subpoena on behalf of the accused, SMSgt Jeremy M. Zier. Additionally, the defense reserves the right to call any witness on any witness list later produced by the prosecution and requests notice if the government will not produce any of its identified witnesses.

     a. MSgt Jason  Robertson - Merits and Presentencing.
     Unit: 1CTCS OL-A Hurlburt Field, Fl

     b.  MSgt Tsuyoshi Shinzato – Merits and Presentencing.
     Unit: AMC/PAR

     c. SSgt Samuel O'Brien – Merits and Presentencing.
     Unit: AFN-Europe – Sembach, Germany

     d.  Mrs. Aleiandra Zier (Wife) – Merits and Presentencing.

     e.  CMSgt Quinton Burris (Supervisor) – Merits and Presentencing.
     Unit: AFPAA/CCC

     f.  MSgt Daniel DeCook – Merits and Presentencing.
     Unit: AFPAA/AOW

2.  If defense counsel becomes aware of additional witnesses, opposing counsel will be notified accordingly. The defense will provide the names and contact information for sentencing letter affiants at a later date.

3.  The defense requests notice as soon as possible should the government contend that the production of the foregoing witness is not required.


JAMESIAN D. EMMANUEL, Capt, USAF
Defense Counsel

CERTIFICATE OF SERVICE

I certify that I served a copy of this Defense Witness List via email transmission to the Military Judge and Trial Counsel on 5 June 2020.


JAMESIAN D. EMMANUEL, Capt, USAF
Defense Counsel

**DEPARTMENT OF THE AIR FORCE**
**UNITED STATES AIR FORCE TRIAL JUDICIARY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DEFENSE OBJECTION AND |
| v. | ) | MOTION IN LIMINE: |
| | ) | MRE 404 EVIDENCE |
| SMSgt Jeremy M. Zier | ) | |
| Air Force Public Affairs Agency (AETC) | ) | |
| Joint Base San Antonio – Randolph, TX 78150 | ) | |
| | ) | 12 June 2020 |

## MOTION

COMES NOW the Accused, SMSgt Jeremy M. Zier, by and through defense counsel, pursuant to the 5th, 6th, and 14th Amendments to the United States Constitution, Military Rules of Evidence (MRE) 401-403, 404(a), 404(b), 405, 413, 414, and Rules for Courts-Martial (RCM) 905 and 906(b)(13), and objects to items 1-3, and 5 described in the Government's previously submitted MRE 404(b) notice. The Defense does not request an Article 39(a) session to present additional evidence but instead requests this Court to rule prior to the upcoming trial.

## SUMMARY

On 5 May 2020, the Government provided the Defense with a notice of their intent to submit evidence under MRE 404(b). (Attachment 1). This MRE 404(b) notice describes five distinct acts (cited as numbers *1-5* in the notice), which the Government appears to wish to admit at trial. The Defense objects to the admission of Acts 1-3, and 5.

## FACTS

1. On 24 March 2020, one charge with one specification alleging a violation of Article 92, Uniform Code of Military Justice (UCMJ), and one charge and three specifications alleging a violation of Article 120, UCMJ, were referred against SMSgt Zier. (Attachment 2).[1]

2. On 5 May 2020, the Defense received a notice of intent to admit evidence under MRE 404(b) in this case. Specifically, the Government relayed that they intend to introduce (Act 1) statements made between the Accused, CF, and a witness related to "one night stands" while the Accused was allegedly intoxicated, (Act 2) statements made between the Accused and CF related to her involvement in the LGBTQ community and her sexual history while the Accused was allegedly intoxicated, (Act 3) statements made between the Accused and a witness related to walking around a house while nude, (Act 4) the Accused exiting a hot tub while nude, allegedly exposing his buttocks and genitals, and (Act 5) statements made between the Accused and EP related to her sexual life. Acts 1-2 of the uncharged crimes, wrongs, or other acts, the Government states, "the statements are being noticed pursuant to M.R.E. 404(b) as evidence of

---

[1] Attachment 2 is not physically attached and submitted with this motion due to its existence elsewhere in the record. The Defense respectfully requests consideration of the attachment to establish the factual predicate for the motion.

1

intent, plan, modus operandi, and absence of mistake on the part of the Accused." Acts 3-5 of the uncharged crimes, wrongs, or other acts, the Government states, "the statements are being noticed pursuant to M.R.E. 404(b) as evidence of intent, plan, and absence of mistake on the part of the Accused."

## BURDEN of PROOF and PERSUASION

3. Pursuant to RCM 905(C), the Defense bears the burden of persuasion for this motion. The burden of proof for any factual issue whose resolution is necessary to decide this motion, is a preponderance of the evidence.

## LAW

4. Prior to arraignment, "the prosecution must disclose to the defense the contents of all statements, oral or written, made by the accused that are relevant to the case, known to the trial counsel, and within the control of the Armed Forces, and all evidence derived from such statements, that the prosecution *intends to offer* against the accused." Mil. R. Evid. 304(d) (emphasis added)

5. Like the notice requirement under Mil. R. Evid. 304(d), the Government must provide reasonable notice under Mil. R. Evid. 404(b)(2) of the general nature and permissible use of evidence concerning crimes, wrongs, or other acts which they intend to offer for purposes other than to prove character. Mil. R. Evid. 404(b).

6. MRE 404(b) states:

> (b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided, that upon request by the accused, the prosecution shall provide reasonable notice in advance of trial, or during trial if the military judge excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

7. MRE 403 states:

> *Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.*

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

8. In *United States v. Reynolds*, 29 M.J. 105, 109 (CMA 1989), the Court of Military Appeals established a three-prong test applicable to consideration of the admissibility of prior acts under MRE 404(b): (1) Does the evidence reasonably support a finding that [the] accused committed

2

prior crimes, wrongs, or acts? (2) What "fact of consequence" is made more or less probable by the existence of this evidence? (3) Is the probative value substantially outweighed by the danger of unfair prejudice?  In order for evidence of prior acts to be admissible, all three prongs must be met.  *Id.*  Whether or not the second prong is met is a question of logical relevance.  *See* MRE 401.  "If the evidence fails any of the three tests, it is inadmissible."  *United States v. Cousins*, 35 M.J. 70, 74 (C.M.A. 1992).

9.  "The test for admissibility of uncharged acts is 'whether the evidence of the misconduct is offered for some purpose other than to demonstrate the accused's predisposition to crime and thereby to suggest that the factfinder infer that he is guilty, as charged, because he is predisposed to commit similar offenses.'"  *United States v. Thompson,* 63 MJ 228, 230 (C.A.A.F. 2006) (*citing United States v. Castillo*, 29 MJ 145, 150 (C.M.A. 1989); *United States v. Ruppel*, 49 MJ 247, 250 (C.A.A.F. 1998); *United States v. Miller,* 46 MJ 63, 65 (C.A.A.F. 1997)).

10.  In *Cousins*, the accused was charged with wrongful use of cocaine based upon a positive urinalysis test.  *Cousins*, 35 M.J. at 71.  Over defense objection, the trial court judge permitted testimony that the accused used methamphetamines 9 to 11 times prior to the alleged cocaine use.  *Id*.  In reversing the lower court's decision, the Court of Military Appeals held that "the admission of…the testimony regarding [the accused's] prior drug use was plain error."  *Id*. at 75.  Even though the court concluded that the first prong of the three prong test was met, it found that "testimony that the [accused] used methamphetamines 9-11 times previously did not make it more or less probable that [dealer] provided [the accused] with cocaine at her house on July 29."  *Id*. at 74.  The court held that the relevance of the accused's prior drug use was irrelevant, and therefore, it failed the second test."  *Id*.  Further, the court found that even if it were to find minimal relevance to satisfy the second test, "the third test clearly was not met in this case, because its probative value was substantially outweighed by the danger of unfair prejudice."  *Id*.  The Court of Military Appeals even noted that a member instruction which stated that the prior drug use could only be used as "background information" did not cure the Mil. R. Evid. 403 prejudicial error.  *Id*.

11.  In *United States v. McDowell*, 30 MJ 796, 799 (AFCMR 1990), the court set out several additional, clarifying factors to be used when applying the *Reynolds* test:

a.  How persuasively does the evidence of the other act show that the charged act occurred and that the appellant was the perpetrator?

b.  Are the inferences to be drawn from the evidence clear, or are they likely to be misleading and create confusion?

c.  How forcefully does the evidence tend to establish the admissible purpose(s) for which it would be admitted?

d.  Will it have an undue tendency to resolve the disputed issue on the basis of the pertinent character trait?

e.  Will the evidence have an undue tendency to resolve the disputed issue on an improper or

3

primarily emotional basis?

**ARGUMENT**

12. The Government's MRE 404(b) notice contains five distinct acts which they seek to admit. All five acts relate to events occurring either throughout the charged timeframe or during times unknown to either party. Though prohibited from seeking to introduce evidence of SMSgt Zier's uncharged acts merely to prove his bad character under Mil. R. Evid. 404(b), the prosecution's notice purports to do just that. It is incumbent upon the prosecution to assert an actual theory of admissibility for this uncharged misconduct. It is not sufficient to provide a laundry list of potential theories that the rule permits. Here, the Government has provided the blanket use as outlined in MRE 404(b), it provides no specifics as to how any of these uses relate to each distinct act. SMSgt Zier is charged with discrete instances of sexual assault and a failure to maintain a professional relationship. None of the noticed conduct indicates an intent, motive or plan to commit the charged misconduct. Accordingly, the noticed conduct should be excluded.

13. In addition to the theory issue identified above, the Defense also argues there is a notice issue as to how each act relates to the charged misconduct and whether it is relevant or not. At the outset, assuming *arguendo* that evidence would reasonably support a finding of fact that Acts 1-3, and 5 occurred, these Acts clearly fail the second and third prongs of the *Reynolds* test, and therefore this evidence is inadmissible under MRE 404(b). These acts are unrelated to the charges and specifications. With the exception of Act (4), no "fact of consequence" is made more or less probable by the existence of evidence stated in Acts 1-3, and 5. Additionally, the probative value of Acts 1-3, and 5, does not substantially outweigh the potential of unfair prejudice.

   a. First, no fact of consequence is made more or less probable by the existence of the evidence cited in Acts 1-3, and 5, except under the forbidden reasoning "he did it before, he did it again." Whether SMSgt Zier had the conversations identified in these Acts while intoxicated is irrelevant. The Government has not cited any specifics behind the purpose for which they believe this evidence is admissible under MRE 404(b). By claiming that this evidence should be used for several reasons cited in the rule, the Government's notice instead reflects that they intend to use this evidence for forbidden propensity purposes. Under the circumstances, Acts 1-3, and 5 of the alleged conduct should not be admitted under MRE 404(b).

   b. Additionally, the probative value of this evidence does not substantially outweigh the potential of unfair prejudice. Under any theory of proffered admissibility under MRE 404(b), there is no probative value, yet there is significant danger of unfair prejudice and confusion of the issues. Any inferences the panel members could draw from the alleged statements made between SMSgt Zier and the complainants and his demeanor/appearance would only serve to mislead the members and create confusion about the alleged misconduct that is on the charge sheet. This evidence appears as though it is being offered as impermissible propensity evidence, which is precisely what MRE 404(b) was written to protect against. Therefore, the evidence should be excluded.

4

## RELIEF REQUESTED

14. THEREFORE, the Defense respectfully requests this Honorable Court deny the admission into evidence of the items described within the Government's MRE 404(b) notice. The Defense does not request an Article 39(a) session for further argument on this matter.

*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Defense Counsel

2 Attachments:
1. Government MRE 304(d) and 404(b) Notice, dtd 5 May 20, 2 pgs
2. Charge Sheet, dtd 24 March 20, 3 pgs

## CERTIFICATE OF SERVICE

I certify that on 12 June 2020, I delivered a copy of this Defense Objection and Motion in Limine, MRE 404 Evidence, via e-mail to the Military Judge and Trial Counsel.

*J. Dillon Emmanuel*
JAMESIAN D. EMMANUEL, Capt, USAF
Defense Counsel

Attachment 1 to the Defense Objection and Motion in Limine:  MRE 404 Evidence, dated 12 June 2020, is located within the Pretrial section of the Record of Trial.  Attachment 2 to the Defense Objection and Motion in Limine:  MRE 404 Evidence, dated 2020, is located within volume 1 of the Record of Trial.

**DEPARTMENT OF THE AIR FORCE**
**UNITED STATES AIR FORCE TRIAL JUDICIARY**

| | |
|---|---|
| UNITED STATES | GOVERNMENT RESPONSE TO DEFENSE |
| | MOTION TO EXCLUDE 404(b) EVIDENCE |
| v. | |
| | |
| SMSGT JEREMY M. ZIER | |
| Air Force Public Affairs Agency (AETC) | 19 June 2020 |
| JBSA-Randolph, Texas | |

## MOTION

The United States respectfully requests that this Honorable Court deny the Defense Motion to Exclude M.R.E. 404(b) evidence because M.R.E. 404(b) is a rule of inclusion, the notice was proper, and the evidence to be offered satisfies the legal requirements for admission under M.R.Es 401-403, 404(b), and *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989). The Defense has also not met their burden for exclusion. The Government **does** request a 39(a) session in order to provide witness testimony for this Honorable Court's consideration.

## SUMMARY

The Accused is charged with three specifications of Abusive Sexual Contact against three different women, and with failing to maintain professional relationships with Airmen under his supervision by getting naked with them in a hot tub. For clarity, the Government is using the Defense's naming convention for the noticed 404(b) conduct as Acts 1-5 for the purposes of this motion. The Government gave notice to Defense that these five instances of conduct will be offered to prove the *intent* to "willfully [fail] to maintain professional relationships" with subordinate Airmen in the case of Charge I and the *intent* to touch three different women for his own sexual gratification in the case of Charge II. Attachment 1 to the Defense Motion. The Government also noticed this uncharged conduct to show the *absence of mistake* in touching the three women and engaging in unprofessional relationships as charged, and moreover to show a *plan* to engage in the charged sexual and unprofessional conduct. Finally, the Government noticed Acts 1, 2, and 5 to show that the Accused had a common *modus operandi* in the manner with which he engaged in sexual conversations while intoxicated, and followed those conversations with abusive sexual contacts against the women he spoke to or attempted to flirt with.

## FACTS

1. The Government agrees with the facts as presented in the Defense Motion. Additional to the facts presented in the Defense motion: several of the uncharged acts outlined in Attachment 1 of the Defense Motion occurred with named victims. Acts 1 and 2 consist of words and deeds by the Accused with C.F., the named victim in Charge II, Specification 1.

Act 5 was words and deeds by the Accused with E.P. the named victim in Charge II, Specification 3.

## BURDEN

2. As the moving party, the Defense bears the burden of persuasion by a preponderance of the evidence for this motion. *See* R.C.M. 905(c)(1) & (c)(2)(A).

## LAW AND ARGUMENT

3. M.R.E. 404(a) states that "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion…." M.R.E. 404(b), however, states that, "This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"

4. The Government must provide notice of the general nature of the evidence it intends to offer for a permissible non-propensity purpose. M.R.E. 404(b)(2)(A).

### The *Reynolds* Test

5. There are three elements or prongs to determining whether evidence is properly offered under M.R.E. 404(b). *Reynolds*, at 109.

   a.  The first *Reynolds* prong is whether a factfinder could reasonably conclude by a preponderance of the evidence that the uncharged acts occurred. *Id.* The Defense does not appear to dispute this and has not met their burden to contend this prong. However, the Government intends to call witnesses in order to make a formal proffer of the proposed testimony, and will subsequently argue that this threshold for admissibility is met.

   b.  The second *Reynolds* prong is whether any "fact of consequence" is made more or less probable by the proffered evidence. *Id.* Again, the Government wishes to offer testimonial evidence in order to firmly establish this minimum standard of relevance per M.R.E. 401. The Government anticipates evidence that closely matches the noticed statements and conduct which were properly noticed to the Defense on 5 May 2020 (Attachment 1 to the Defense Motion):

     i.  The Accused asked C.F. and another female witness about whether they have had sexual encounters they would consider "one night stands" before asking whether the two women would walk with him to his home. This happened in 2015 while C.F. and Accused were stationed at Incirlik, Turkey together and occurred at most within months of the charged misconduct. The same night as the charged misconduct from 2015, the Accused also discussed C.F.'s sexuality in a crude manner by saying that women could not satisfy her sexually the way a man could and suggested that she needed the "right dick" to show her

that. On a separate occasion in 2019 but on the same night as the charged misconduct against E.P., the Accused discussed E.P.'s desire to have sex with her husband upon his return from deployment. He went on to touch both of these women on those respective nights and had been consuming alcohol with both women when he did so.

    ii.  The Accused also discussed walking around naked in his home with another witness, and as testimony will elucidate, had in fact walked naked in front of Airmen he supervised years previous. In the case of Act 4, the exhibitionism in front of his subordinates, the Defense has not raised on objection, and while the Government agrees that it may be seen as part of the facts and circumstances of Charge I and is therefore not objectionable as evidence of Charge I, the Government is sponsoring this evidence as proof of intent and absence of mistake in engaging in sexual and unprofessional conduct, as well as evidence of a common plan and *modus operandi* as prefatory conduct to his sexual touching. That is, the Accused had a "common plan," or a "design," or a "system" of testing boundaries to see what the women he is interested in are willing to go along with. *Reynolds*, at 110; *see also United States v. Hyppolite*, 79 M.J. 161 (C.A.A.F. 2019)(in that case, the Court found that evidence of other charged acts was also permissible M.R.E. 404(b) evidence to show that the appellant had a "common plan" to drink with his victims and then commit abusive sexual contacts upon his victims once they were asleep).

    iii.  The Accused's sexualized conduct as noticed in Acts 1-5 is all relevant under M.R.E. 401 and the second prong of *Reynolds*. at 109. The Accused's conduct indicates an intent, or even a plan to engage in further unprofessional or sexualized conduct with the women involved. The evidence is admissible because the Accused is charged with, and the Government must prove beyond a reasonable doubt that the accused *intended* to engage in unprofessional relationships and unwanted sexual touching as charged, and that these actions were not mistakes. Furthermore, part of the Government's theory at trial will be that the Accused had a plan to engage in unprofessional relationships as charged and that he planned to engage in sexual touching. The noticed conduct is evidence of that plan. The Government also argues that the Accused had a particular *modus operandi*, "design, or system" when enacting his common plan to sexualize interactions and then touch women. *Reynolds*, at 110.

    iv.  The Defense has not met their burden to show that the purpose for which this evidence will be offered is an impermissible purpose. Furthermore, instructions on how the factfinder may consider M.R.E. 404(b) evidence are a critical part of the process and the Defense has not demonstrated any likelihood that a factfinder would consider the proposed evidence improperly.

    c.  The third prong of the Reynolds is whether the evidence is *substantially* more unfairly prejudicial than probative. M.R.E. 403; *Reynolds*, at 109. Unfair prejudice is not simply prejudice to an accused's liberty interests. *Id*. Powerful and admissible evidence is prejudicial to liberty interests. *Id*. However, **unfair** prejudice arises from evidence that would cause a factfinder to decide guilt on an improper basis such as inflamed passions, confusion, or

improper character or propensity evidence. *See United States v. Collier*, 67 M.J. 347, 355 (C.A.A.F. 2009); *see also United States v. Bellanger*, 1997 CCA LEXIS 671 (A.F.C.C.A. 1997)(unpublished opinion reviewed at C.A.A.F. on an unrelated issue). Beyond stating that the proposed evidence is improper character evidence, the Defense does not adequately address how Acts 1-3 and 5 are unfairly prejudicial. Evidence of Acts 1-5 is prejudicial, but not unfair given the close ties both temporally and factually to the charged misconduct. The proposed evidence is also extremely probative. In most cases, the uncharged acts occurred within mere days or hours of the charged misconduct, and is part of the factual narrative leading to or following the charged misconduct. The commonality also holds up over the years, with a similar *modus operandi* visible in 2015 and 2019. Given the temporal ties, factual similarity, and the apparently enduring *modus operandi*, the proposed evidence is extremely probative and useful to factfinders attempting to understand the factual narrative.

**The Evidence is Admissible**

6. Trial Counsel's M.R.E. 404(b) notice includes four non-propensity reasons for offering the evidence (intent, plan, *modus operandi*, and absence of mistake). Courts have treated these non-propensity purposes differently, with intent and absence of mistake requiring a lower degree of factual similarity for admission than other non-propensity purposes like a common plan or scheme, or *modus operandi. United States v. Ferguson,* 29 M.J. 559 (A.F.C.M.R. 1989)(C.A.A.F. petition denied) *citing United States v. Peterson,* 20 M.J. 806 (N.M.C.M.R. 1985). Acts 1-5 closely tie to the charged conduct temporally (within days or hours of the planned or intended charged misconduct) and factually (for instance drinking, followed by sexual conversations or sexualized conduct like nudity, followed by touching) and is therefore admissible for the noticed reasons. Again, the proposed evidence is too similar and factually intertwined in the narrative to the charged misconduct to realistically raise the specter of unfair prejudice or improper consideration. However, even if the evidence were not so strikingly similar, the uncharged misconduct would still be admissible evidence of intent and absence of mistake:

> "When considering whether uncharged misconduct constitutes admissible evidence of intent under M.R.E. 404(b), we consider "whether Appellant's state of mind in the commission of both the charged and uncharged acts was sufficiently similar to make the evidence of the prior acts relevant on the intent element of the charged offenses." *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004). "Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue,  [**17]  especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *United States v. Tanksley*, 54 M.J. 169, 176 (C.A.A.F. 2000) (quoting *Huddleston v. United States*, 485 U.S. 681, 685, 99 L. Ed. 2d 771, 108 S. Ct. 1496 (1988))."

*United States v. Hays*, 62 M.J. 158 (C.A.A.F. 2005). All the acts noticed by the Government on 5 May 2020 go to the Accused's state of mind, and are close enough

in time to the charged misconduct to be compelling evidence of the Accused's criminal intent.

## CONCLUSION

7. The proposed evidence is relevant, probative, not unfairly prejudicial, and is being offered for several non-propensity purposes. The Defense has not shown unfair prejudice, and has not demonstrated factual dissimilarity or that the proposed evidence has any likelihood of being considered for an improper purpose. Since the evidence is otherwise admissible and the Defense has not met their burden, the Defense motion should be denied.

## RELIEF REQUESTED

The Defense has failed to meet its burden, and the Government respectfully requests that this Honorable Court deny the Defense Motion to Exclude. In the alternative, if this Court finds that some purposes for which the evidence is offered to be improper, the Government asks that this Court limit the purposes for which the uncharged acts may be introduced. The Government respectfully requests an Article 39(a) session in order to present testimony for consideration.

Respectfully submitted,

JOHN M. MALEK, Maj, USAF
Trial Counsel

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the Government's Response to the Defense Motion to Exclude 404(b) evidence to the Military Judge and Defense Counsel via email on 19 June 2020.

JOHN M. MALEK, Maj, USAF
Trial Counsel

**DEPARTMENT OF THE AIR FORCE**
**IN THE UNITED STATES AIR FORCE TRIAL JUDICIARY**
**CENTRAL CIRCUIT**

| | | |
|---|---|---|
| United States | ) | |
| | ) | |
| | ) | **RULING ON DEFENSE** |
| v. | ) | **MOTION** *IN LIMINE* – |
| | ) | MIL. R. EVID. 404 EVIDENCE |
| | ) | |
| SMSgt Jeremy M. Zier | ) | |
| Air Force Public Affairs Agency (AETC) | ) | 10 August 2020 |
| Joint Base San Antonio-Randolph, TX | ) | |

On 12 June 2020, the Defense filed a written motion *in limine* to exclude certain Accused's statements under Mil. R. Evid. 404(b). On 19 June 2020, the Government submitted its response, and requested this Court deny the motion *in limine*. On 10 August 2020, this Court held an Article 39(a), Uniform Code of Military Justice (UCMJ) hearing where the parties presented testimony, evidence, and argument.

After reviewing the written submissions, evidence, and arguments presented by both parties, including all the documentary attachments, this Court finds these essential facts by at least a preponderance of the evidence and rules as follows:

## FINDINGS OF FACT

1.    On 25 March 2020, Col Jeffrey Carter referred one charge and one specification of Article 92, U.C.M.J, as well as one charge and three specifications or Article 120, U.C.M.J to this special court-martial.

2.    Ms. Sienna Mackiewicz, formally a member of the USAF, was stationed at Incirlik Turkey in 2014 and 2015. During this time, she was an Amn or A1C. At the time the Accused was the station manager. She would see the Accused at the enlisted club. On one particular occasion, she remembers was talking with C      F      , the Accused asked if they had had a one-night stand. At the time Ms. Mackiewicz reported to the Accused and did not know what to say or how to react. Part of the conversation was sexually charged, but there were other parts of the conversation that were not. She continued to work with him and see him outside of work.

3.    SSgt C      F      was stationed at Incirlik, Turkey in 2015. She remembers a trip to Pamukkale, Turkey. On the trip, the Accused asked her questions regarding her involvement in LBGQT issues. Specifically, why she was passionate about it. At first, she did not mind, but the conversation got uncomfortable when it turned sexual. She remembers he made the comment, "you have not found the right dick yet," referencing her sexuality. Additionally, he asked questions about how two women have sexual intercourse. Scott Taylor was present. After the conversation she went to the hot tub—within 15 or 20 minutes. The Accused knew some details of SSgt F      's life, her break-up, for example. This is not the first time she has been

Page 1 of 8

asked about her sexuality, but she tries to steer the conversation toward the emotional aspect of a relationship.

## BURDEN OF PERSUASION AND PROOF

4.    "The structure of Mil. R. Evid. 404(b) permits admission of evidence of other crimes, wrongs, or acts only upon a showing by *the proponent* of a specifically relevant purpose to be served under the circumstances of the particular case." *United States v. Tanner*, 63 M.J. 445, 449 (C.A.A.F. 2006) (emphasis added) (citing *United States v. Humphreys*, 57 M.J. 83, 90 (C.A.A.F. 2002)); *see also United States v. Smith*, 52 M.J. 337, 342 (C.A.A.F. 2000).

5.    This Court "need not make a finding that the government has proved other act(s) by a preponderance of the evidence before it submits 'similar acts' and other Rule 404(b) evidence to the [factfinder]." *United States v. Hughes*, 48 M.J. 700, 715 (A.F. Ct. Crim. App. 1998). Rather, "other acts" evidence should be admitted if the evidence is sufficient to enable a reasonable factfinder to conclude, by a preponderance of the evidence, that the accused committed the acts alleged. *See Hughes*, 48 M.J. at 715 (citing *United States v. Huddleston*, 485 U.S. 681, 689-90 (1988)); *see also United States v. Hueber*, No. ACM 37696, 2013 CCA LEXIS 492, at *12-13 (A.F. Ct. Crim. App. June 7, 2013) (citing *United States v. Levitt*, 35 M.J. 108 (C.M.A. 1992)).

6.    "Questions of fact in an interlocutory question shall be determined by a preponderance of the evidence, unless otherwise stated in" the Manual for Courts-Martial. R.C.M. 801(e)(4).

## CONCLUSIONS OF LAW

7.    Military Rule of Evidence 404(b), titled *"Crimes, Wrongs, or Other Acts"* provides:

(1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses; Notice.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by the accused, the prosecution must:

(A) provide reasonable notice of the general nature of any such evidence that the prosecution intends to offer at trial; and

(B) do so before trial – or during trial if the military judge, for good cause, excuses lack of pre-trial notice.

Mil. R. Evid. 404(b).

US v. Zier Military Record of Trial and Appellate Extracts 000634 of 902

8.    Generally, "[r]elevant evidence is admissible . . . ." Mil. R. Evid. 402. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Mil. R. Evid. 401.

9.    "The military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." Mil. R. Evid. 403.

10.   "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

11.   In conducting the Mil. R. Evid. 403 balancing test for legal relevance, a military judge should consider the following factors: the strength of the proof of the prior act; the probative weight of the evidence; the potential to present less prejudicial evidence; the possible distraction of the fact-finder; the time needed to prove the prior conduct; the temporal proximity to the prior event; the frequency of the acts; the presence of any intervening circumstances; and the relationship between the parties. *See United States v. Barnett*, 63 M.J. 388, 396 (C.A.A.F. 2006) (quoting *United States v. Berry*, 61 M.J. 91, 95-96 (C.A.A.F. 2005)).

12.   Mil. R. Evid. 403 and 404(b) "recognize that such evidence [of uncharged misconduct] can be very damaging to the accused. Therefore, the evidence is inadmissible unless there is some purpose to be served by its reception other than to show the accused is predisposed to commit crime." *United States v. Ferguson*, 28 M.J. 104, 108 n.5 (C.M.A. 1989) (brackets in original) (quoting *United States v. Wingart*, 27 M.J. 128, 136 (C.M.A. 1988)).

13.   "The threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002) (quoting *Huddleston*, 485 U.S. at 686).

14.   When courts look to evidence of uncharged acts, it tests its admissibility under three standards:

   a.    Does the evidence reasonably support a finding by the court members that the accused committed prior crimes, wrongs, or acts?

   b.    What fact of consequence is made more or less probable by the existence of this evidence?

   c.    Is the probative value of the evidence substantially outweighed by the danger of unfair prejudice?

Page 3 of 8

*United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989). The evidence at issue must fulfill all three prongs to be admissible. *See Barnett*, 63 M.J. at 394.

15.    Though Mil. R. Evid. 404(b) "is a rule of inclusion rather than exclusion," *United States v. Browning*, 54 M.J. 1, 6 (C.A.A.F. 2000), our superior courts nonetheless do not approve "of broad talismanic incantations of words such as intent, plan, or *modus operandi*, to secure the admission of evidence of other crimes or acts by an accused at a court-marital under Mil. R. Evid. 404(b)." *United States v. Brannan*, 18 M.J. 181, 185 (C.M.A. 1984) (citing *United States v. San Martin*, 505 F.2d 918, 923 (5th Cir. 1974) ("There is no talismanic effect to the words 'intent' or 'design,' and prior offenses must be carefully analyzed beyond the mere assertion of these code-words before the offenses are admitted into evidence lest the trial of fact devolve into a battle of innuendo.")).

16.    It is all-too "common for the prosecution to use short-hard expressions like *modus operandi*, common plan or scheme, etc., to account for an offer of evidence of other acts. A trial judge must be certain to make the prosecution state exactly what issues it is trying to prove in order to see whether the evidence is probative, how probative it is, and whether it should be admitted in light of other evidence in the case and the ever-present danger of prejudice." *Ferguson*, 28 M.J. at 108-09 (citations omitted); *accord Smith*, 52 M.J. at 342.

17.    For example, an oft-invoked relevant, non-propensity purpose under Mil. R. Evid. 404(b) is *modus operandi*. But *modus operandi* evidence is typically inadmissible to show lack of consent. *See Reynolds*, 29 M.J. at 109-10 (citing *United States v. Gamble*, 27 M.J. 298 (C.M.A. 1988). Normally, *modus operandi* evidence enjoys logical relevance *only* to show identity. *Id.* (citing *United States v. Rappaport*, 22 M.J. 445 (C.M.A. 1986)).

18.    Another frequently cited example is motive evidence. Evidence of motive is relevant within the meaning of Mil. R. Evid. 401 "to show the doing of an act by a person as an outlet for that emotion." *United States v. Watkins*, 21 M.J. 224, 227 (C.M.A. 1986). "However, the prior acts of conduct must be the type which reasonably could be viewed as 'the expression and effect of the existing internal emotion.'" *Id.* (emphasis added). "Moreover, this same motive must be shown to have existed in [the accused] at the time of the subsequently charged act." *Id.*

19.    Though evidence of a common plan or scheme can be admissible under Mil. R. Evid. 404(b)—*see, e.g., United States v. Munoz*, 32 M.J. 359 (C.M.A. 1991), *cert. denied*, 502 U.S. 967 (1991); *Reynolds*, 29 M.J. at 105-106; *United States v. Johnson*, 49 M.J. 467 (C.A.A.F. 1998)—for the other acts to be relevant, they must be shown to be more than just similar to the charged offense. *United States v. Brannan*, 18 M.J. 181, 183 (C.M.A. 1984).

20.    However, the Court of Appeals for the Armed Forces has held that a pattern of conduct is admissible, pursuant to M.R.E. 404(b), to support another unrelated charged offense. *United States v. Simpson*, 56 M.J. 462, 465 (C.A.A.F. 2002); *United States v. Barrow*, 42 M.J. 655 (A.F.C.C.A. 1995). In *Simpson*, the Court held that the accused's pattern of taking advantage of women who were intoxicated was admissible under M.R.E. 404(b) as a pattern of conduct. *Id.* at 464-65.

Page 4 of 8

21.   Similarly, when it comes to intent evidence, CAAF considers whether an accused's "state of mind in the commission of both the charged and uncharged acts was sufficiently similar to make the evidence of the prior acts relevant on the intent element of the charged offense[]." *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004). Though, to be used as evidence of intent, the "other wrongs or acts need only be similar to the offense charged and not too remote therefrom." *United States v. Woodyard*, 16 M.J. 715, 718 (A.F.C.M.R. 1983) (footnote omitted) (citing *United States v. Goodwin*, 492 F.2d 1141, 1153 (5th Cir. 1974)).

*Analysis*

22.   In this ruling, the Court will only address those paragraphs from the Government's notice where there was a disagreement between the parties regarding admissibility. Those disagreements are outlined below.

*Accused's Alleged Statement to CF: "One Night Stands"*

23.   The Accused is alleged to have asked Cf and Siena Mackiewicz if they had engaged in a one-night stand. To be admissible under MRE 404(b), evidence of misconduct must be offered for a valid purpose and not to demonstrate the Accused's criminal propensities. In its filing, (App Ex V) the Government has offered this evidence to show the Accused's intent and absence of mistake, as well as a "common plan, or a design, or a system of testing the boundaries…" At the Article 39(a) the Government narrowed it down to intent and plan.

24.   The finder of fact could assess CF's or Sieana Mackiewicz credibility on the stand and determine that the uncharged acts occurred. Second, the evidence of prior uncharged acts is not being offered for the purpose of proving the Accused's criminal propensity. And third, the evidence is relevant to the offense charged in the Specification of Charge I and Specification 1 of Charge II for its tendency, if any, to prove the Accused's intent, for committing the alleged offenses.

25.   First, the Accused's prior act demonstrates the Accused's desire to direct the conversation or situation to one of a sexual nature to steer the relationship in an unprofessional direction or lower the professional barriers inherently in place between a SNCO and an airman. This act is alleged to have occurred "at most within months of the charged misconduct." This evidentiary rule does not have a temporal yardstick by which a trial judge is to gauge the evidentiary value of the other crimes, wrongs, or acts. *See* United States v. Tanksley, 54 M.J. 169, 175, 2000 CAAF LEXIS 1060, *17. Here, the act is offered for other reasons than to show the Accused predisposition to commit a crime.

26.   The evidence is indicative of the Accused's intent under the third prong of the *Reynolds* test. The law does not require the same exacting correlation between the charged and uncharged acts. *See Woodyard*, 16 M.J. at 718 ("other wrongs or acts need only be similar to the offense charged and not too remote therefrom."). Though it does require that the accused's "state of

Page 5 of 8

mind in the commission of both the charged and uncharged acts [be] sufficiently similar."
*McDonald*, 59 M.J. at 430.

27.   The prior act reasonably could be viewed as evidence that the Accused made the statements to CF in an effort—with the intent—to engage in sexual behavior that in this case ended in alleged abusive sexual contact, or to engage in an unprofessional relationship.  If the alleged uncharged act of asking CF if she had had a one-night was committed with the same intent to engage in an abusive sexual contact, it may be inferred that the Accused acted with a similar intent.[1]  There is no requirement that the uncharged acts be identical to the charged acts so long as there is sufficient similarity to logically conclude that a similar intent existed.[2]  Here, the act of directing the topic of conversation to one of a sexual nature indicates a deliberate state of mind consistent with the criminal intent required for Specification 1, Charge 2.  The act of directing conversations to a sexual nature in different situations indicate a deliberate state of mind consistent with the criminal intent required for that offense.

28.   Finally, the Court has applied the M.R.E. 403 balancing test to the proffered evidence, and finds that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.  The probative value is significant as to the Accused's state of mind as it relates to the Specification of Charge 1, and Specification 1 of Charge II.  The finder of fact will not be misled or confused by the proffered evidence, nor will they use it for an improper purpose.  Any evidence admitted under M.R.E. 404(b) will be accompanied by an appropriate instruction directing the members as to how they may properly consider the evidence.

*Accused's Alleged Statements to CF: Sexuality &  "Just haven't found the right dick yet"*

29.   The Accused discussed C.F.'s sexuality and suggested "she [had] just not found the right dick yet."  To be admissible under MRE 404(b), evidence of misconduct must be offered for a valid purpose and not to demonstrate the Accused's criminal propensities.  In its filing, (App Ex V) the Government has offered the following evidence to show the Accused's intent and absence of mistake, as well as a "common plan, or a design, or a system of testing the boundaries..." At the 39(a) session the Government narrowed it down to intent and/or plan.

30.   The finder of fact could assess CF's credibility on the stand and determine that the uncharged acts occurred.  Second, the evidence of prior uncharged acts is not being offered for the purpose of proving the Accused's criminal propensity.  And third, the evidence is relevant to the offenses charged in the Specification of Charge I and Specification I of Charge II for its tendency, if any, to prove the Accused's intent for committing the alleged offenses.

31.   First, the Accused's prior act, here, demonstrates the Accused's desire and intent to direct the conversation or situation to one of a sexual nature to engage in unprofessional relationships and/or test the boundaries of CF's willingness to engage in sexual activity.  Here, it culminated with an unlawful touching.  This prior act is alleged to have occurred on the same night as the charged misconduct.

---

[1] *United States v. Jenkins*, 48 M.J. 594, 599 (A.C.C.A. 1998)
[2] *United States v. Bender*, 33 M.J. 111 (C.M.A. 1991).

US v. Zier Military Record of Trial and Appellate Extracts 000638 of 902

32.    The evidence is indicative of the Accused's intent under the third prong of the *Reynolds* test. The law does not require the same exacting correlation between the charged and uncharged acts. *See Woodyard*, 16 M.J. at 718 ("other wrongs or acts need only be similar to the offense charged and not too remote therefrom.").

33.    The prior acts reasonably could be viewed as evidence that the Accused made the statements to CF in an effort to engage in an unprofessional relationship and/or sexual contact. If the uncharged act was committed with the same intent to engage in an unprofessional relationship, it may be inferred that the Accused acted with a similar intent.[3] There is no requirement that the uncharged acts be identical to the charged acts so long as there is sufficient similarity to logically conclude that a similar intent existed.[4] Here, the act of directing the topic of conversation to one of a sexual nature indicates a deliberate state of mind consistent with the criminal intent required for Specification of Charge I and Specification 1 of Charge II.

34.    The proffered evidence is also indicative of the Accused's intent under the third prong of the *Reynolds* test. Because these prior acts reasonably could be viewed as evidence of intent to engage in an unprofessional relationship or commit an unlawful touching with CF, and that the same motive existed at the time of the charged offenses, they survive the third prong of the *Reynolds* test.

35.    Considering the two prior acts, evidence is also indicative of the Accused's plan under the third prong of the *Reynolds* test. The prior acts reasonably could be viewed as evidence of the Accused's plan to direct the conversation to one of a sexual nature so as to engage in an unprofessional relationship or sexual touching. The Government has cited two occasions where the Accused directed the conversation with a junior airman to sex. This common plan—as evidenced by the two acts—is indictive of the Accused's intent. On these occasions, the Accused made inappropriate, sexual comments to CF (and Siena Mackiewicz once). The logical relevance is the Accused's repeated steering of the conversation with a junior airman to a sexual nature to test the boundaries, that ultimately to an alleged unlawful touching.

36.    Finally, the Court has applied the M.R.E. 403 balancing test to the proffered evidence, and finds that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. The probative value is significant as to the Accused's state of mind as it relates to the Specification of Charge 1 and Specification 1 of Charge II. The finder of fact will not be misled or confused by the proffered evidence, nor will they use it for an improper purpose. Any evidence admitted under M.R.E. 404(b) will be accompanied by an appropriate instruction directing the members as to how they may properly consider the evidence.

<u>RULING</u>

Therefore, the Defense motion *in limine* is **DENIED**. The Court, however, will consider any requests for reconsideration supported with additional evidence or argument if timely raised. This ruling also remains subject to revision and clarification until entry of judgment and I reserve the right to supplement the ruling as necessary and appropriate.

---

[3] *United States v. Jenkins*, 48 M.J. 594, 599 (A.C.C.A. 1998)
[4] *United States v. Bender*, 33 M.J. 111 (C.M.A. 1991).

Page 7 of 8

So ordered on this 10th day of August, 2020.

PENDLETON.STERL
ING.C.1259353102

Digitally signed by
PENDLETON.STERLING.C.12593
53102
Date: 2020.08.11 06:01:36
-05'00'

STERLING C. PENDLETON, Colonel, USAF
Military Judge

US v. Zier Military Record of Trial and Appellate Extracts 000640 of 902

**STATEMENT OF UNDERSTANDING REGARDING**
**RECOUPMENT OF EDUCATION ASSISTANCE, SPECIAL PAY, OR BONUSES**

I understand that the Air Force may be entitled to recoup a portion of education assistance, special pay, or bonus money which I received, if any, if I separate before completing the period of active duty I agreed to serve. I understand this recoupment applies regardless of whether I voluntarily separate or I am involuntarily discharged. I further understand: (1) the recoupment in all cases is an amount that bears the same ratio to the total amount or cost provided to me, as the unserved portion of active duty bears to the total period of active duty I agreed to serve; and (2) that if I dispute that I am indebted for educational assistance, a board or other authority will make findings and recommendations concerning the validity of the indebtedness.

Signed this 24 day of March 2020.

Signature: _____

Typed Name: JEREMY M. ZIER, SMSgt, USAF

# TRANSCRIPT

# PROCEEDING INDEX

### *United States v. SENIOR MASTER SERGEANT JEREMY M. ZIER*

Air Force Public Affairs Agency (AETC)

Held
10-14 August 2020

at
Joint Base San Antonio-Randolph, Texas

| INITIAL ARTICLE 39(a) SESSION | Page # | Volume |
|---|---|---|
| | | |
| Article 39(a) Session Called to Order | 1 | 3 |
| Convening Order (SO AB-1 and SO AB-2) | 1 | 3 |
| Introduction of Counsel | 2-3 | 3 |
| Detail of Trial Counsel | 3 | 3 |
| Detail of Defense Counsel | 3 | 3 |
| Rights to Counsel | 3 | 3 |
| Challenges to Military Judge (none) | - | 3 |
| Forum Rights Advisement | 5 | 3 |
| Forum Selection | 6 | 3 |
| Arraignment | 6 | 3 |
| Pleas | 16 | 3 |
| Proceedings of the Court | 19 | 3 |
| Court Assembled | 19 | 3 |
| Military Judge Preliminary Instructions | 19 | 3 |
| Group Voir Dire by Military Judge | 20 | 3 |
| Group Voir Dire by Government | -- | |
| Group Voir Dire by Defense | -- | |
| | | |
| | | |

FOR OFFICIAL USE ONLY
ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

| FINDINGS PORTION OF THE PROCEEDINGS | Starting Page | Volume Number |
|---|---|---|
| Opening Statement by Government | 31 | 3 |
| Opening Statement by the Defense | 31 | 3 |
| Government - Case-in-chief | 31-100 | 3 |
| The Government Rests | 100 | 3 |
| Defense - Case-in-chief | 104-118 | 3 |
| Defense Rests | 118 | 3 |
| Government Rebuttal Case-in-chief | 118-119 | 3 |
| Findings Instructions | 125 | 3 |
| Government Findings Argument | 125 | 3 |
| Defense Findings Argument | 127 | 3 |
| Government Findings Rebuttal Argument | 127 | 3 |
| Findings Announced | 144 | 4 |

| SENTENCING PORTION OF THE PROCEEDINGS | Page # | Volume |
|---|---|---|
|  |  |  |
| Unsworn Statement - SSgt C          F | 151-154 | 4 |
| Unsworn Statement - SMSgt Jeremy M. Zier | 159-161 | 4 |
| Military Judge Sentencing Instructions | 164 | 4 |
| Sentencing Argument - Government | 164 | 4 |
| Sentencing Argument - Defense | 164 | 4 |
| Post-Trial and Appellate Rights Advisement | 168 | 4 |
| Sentence | 170 | 4 |
| Court-Martial Adjourned | 170 | 4 |

FOR OFFICIAL USE ONLY

ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)

## TESTIMONY FOR THE PROSECUTION

| Name:  (Last, First, Middle Initial) | Direct/Redirect | Cross/Recross | Court |
|---|---|---|---|
| Ms. Mackiewicz, Sieana | 9-10 | 10-11 | -- |
| SSgt F          C | 11-12 | 12-13 | -- |
| Special Agent Misiniec, Lukasz | 31-32 | 32-33 | -- |
| SSgt Workman, Izabella | 33, 36-40/40,44 | 40/44 | 44-45 |
| SSgt Hagan, Kyle | 47-48/49 | 48-49 | -- |
| Captain McGann, Mickel | 49-51/51-52 | 51 | -- |
| 2d Lt P          E | 54-57, 59 | 59-60 | -- |
| Ms. W          T | 62-63 | 63-64 | -- |
| Ms. Gosier, Ciara | 64-65/65 | 65 | -- |
| Mr. Taylor, Scott | 65-68/69 | 68-69/69-70 | 70 |
| SSgt Wolff, Aaron | 72/73 | 72-73 | 73 |
| SSgt Moeller, Katelynn | 74-76/77 | 76-77 | -- |
| Ms. Mackiewicz, Sieana | 80-82/83 | 82-83 | -- |
| SSgt F          C | 86-97 | 97-100 | 100 |
| A1C Silva, Issey, J. | 118 | 118 | -- |

## TESTIMONY FOR THE DEFENSE

| Name:  (Last, First, Middle Initial) | Direct/Redirect | Cross/Recross | Court |
|---|---|---|---|
| SSgt O'Brien, Samuel, J | 104-105/106 | 105-106 | -- |
| MSgt Robertson, Jason | 106-108/109-110 | 108-109 | -- |
| MSgt Decook, Daniel | 110-112 | 112-113 | -- |
| Ms. Zier, Alejandra | 115-117/117 155-157 | 117 | -- |
| CMSgt Burris, Quinton | 154-155 | -- | -- |

FOR OFFICIAL USE ONLY

ANY AND ALL PERSONAL DATA CONTAINED IN THIS RECORD
IS PROTECTED UNDER THE PRIVACY ACT OF 1974 (5 U.S.C. 522a)




**DEPARTMENT OF THE AIR FORCE**
**Central Circuit – JBSA-Randolph**
**1 Washington Circle, Suite 2**
**Joint Base San Antonio-Randolph, TX 78150-4564**

1 April 2020

MEMORANDUM FOR   TC (MAJ MALEK, CAPT COLEMAN)
                 DC (MR. WOOD, CAPT EMMANUEL)
                 SVC (CAPT TEEPLE)

FROM:  CCMJ

SUBJECT:  *United States v. SMSgt Jeremy M. Zier (Joint Base San Antonio Randolph, TX)* –
Confirmation of "Initial Trial Date"

1. This will confirm that I have set the "initial trial date" in the case of *United States v. SMSgt Jeremy M. Zier* as *10 Aug 20,* following a docketing conference held on 1 Apr 20.  The court will convene at *0830* unless the trial judge sets a different start time.  Trial is estimated to last four (4) days.

2. I have detailed Col Sterling Pendleton as the military judge.

3. The following information is confirmed:

Referral Date: *25 Mar 20*          Date Charges Served: *27 Mar 20*
Date Docket Requested: *27 Mar 20*  Date of First Available Judge: *2 Apr 20*
Government Ready Date: *15 May 20*  Defense Ready Date: *10 Aug 20*
Date "Initial Trial Date" Set**:** *1 Apr 20*

4. The time period from 18 May 20 to 9 Aug 20 is excluded from speedy trial computation IAW RCM 707.

5. The detailed judge will schedule an RCM 802 conference and provide a scheduling order, consistent with the requirements found in the Uniform Rules of Practice before Air Force Courts-Martial, effective 1 Oct 19.

6. Counsel are required to file all motions, notices, and other matters with the Court on the SharePoint e-filing site: https://cs2.eis.af.mil/sites/10707/afja/jat/e-filing/Case%20Files/Forms/AllItems.aspx.

7. Please consider the established trial dates immutable, short of problems of a Constitutional dimension.

                          //signed//
                          JEFFERSON B. BROWN, Colonel, USAF
                          Chief Circuit Military Judge
                          Central Circuit

## TRIAL COUNSEL'S EXAMINATION OF THE RECORD

### in the case of

### *United States v. Senior Master Sergeant JEREMY M. ZIER*

I examined the transcript in the above styled case in accordance with AFI 51-201, paragraph 13.44.1.1.

COLEMAN.EDWA  Digitally signed by
RD.SEAN.1504605  COLEMAN.EDWARD.SEAN.150
4605899
899  Date: 2020.11.02 10:44:52
-06'00'

EDWARD S. COLEMAN, Capt, USAF
Assistant Trial Counsel

## <u>DEFENSE COUNSEL'S EXAMINATION OF THE RECORD</u>

**in the case of**

***United States v. Senior Master Sergeant JEREMY M. ZIER***

I examined the transcript in the above styled case in accordance with AFI 51-201, paragraph 13.44.1.2.


*J. Dillon Emmanuel*

IAMESIAN D. EMMANUEL, Capt, USAF
Defense Counsel

| ANNOUNCEMENT OF APPOINTMENT TO/ASSUMPTION OF COMMAND | | 1. DATE INITIATED Jun 1, 2020 |
|---|---|---|
| 2. NAME *(Last, First, Middle Initial)*, GRADE, AND DOD ID # MASONER, JAMES H. JR, COL | 3. UNIT OF ASSIGNMENT 502 SFG | 4. OFFICIAL STATION JBSA Randolph AFB |

**5. PERMANENT ASSUMPTION**

ASSUMES COMMAND OF THE

VICE _____ EFFECTIVE _____

AUTHORITY: AFI 51-509. MEMBER IS ELIGIBLE TO ASSUME COMMAND IAW AFI 51-509, IS ASSIGNED TO THE UNIT TO BE COMMANDED, IS PRESENT FOR DUTY AND IS SENIOR IN GRADE AND RANK TO ANY OTHER OFFICER IN THE ORGANIZATION WHO MEETS THE FIRST THREE REQUIREMENTS.

**6. TEMPORARY ASSUMPTION**

ASSUMES COMMAND OF THE

DURING THE TEMPORARY ABSENCE OF

EFFECTIVE _____ AUTHORITY: AFI 51-509 MEMBER IS ELIGIBLE TO ASSUME COMMAND UNDER AFI 51-509, IS ASSIGNED TO THE UNIT TO BE COMMANDED, IS PRESENT FOR DUTY, AND IS SENIOR IN GRADE AND RANK TO ANY OTHER OFFICER IN THE ORGANIZATION WHO MEETS THE FIRST THREE REQUIREMENTS.

**7. PERMANENT APPOINTMENT OF MEMBERS WHO ARE OF THE SAME GRADE BUT JUNIOR IN RANK TO OTHER ELIGIBLE OFFICERS**

BY DIRECTION OF THE PRESIDENT, IS APPOINTED COMMANDER OF THE

EFFECTIVE _____ AUTHORITY: AFI 51-509

**8. TEMPORARY APPOINTMENT OF MEMBERS WHO ARE OF THE SAME GRADE BUT JUNIOR IN RANK TO OTHER ELIGIBLE OFFICERS**

BY DIRECTION OF THE PRESIDENT, IS APPOINTED COMMANDER OF THE

DURING THE TEMPORARY ABSENCE OF

EFFECTIVE _____ AUTHORITY: AFI 51-509

**9. SECTION COMMANDER APPOINTMENTS**

BY DIRECTION OF THE PRESIDENT, IS APPOINTED COMMANDER OF THE

EFFECTIVE _____ AUTHORITY: AFI 51-509 AND AFI 38-101

**10. DETACHMENT OR ELEMENT COMMANDER APPOINTMENTS**

BY DIRECTION OF THE PRESIDENT, IS APPOINTED COMMANDER OF THE

SECTION EFFECTIVE _____ AUTHORITY: AFI 51-509 AND AFI 38-101

**11. PERMANENT APPOINTMENT TO COMMAND**

BY DIRECTION OF THE PRESIDENT, IS APPOINTED COMMANDER OF THE 502D SECURITY FORCES GROUP

EFFECTIVE Jul 1, 2020 _____ AUTHORITY: AFI 51-509

**12. TEMPORARY APPOINTMENT TO COMMAND**

BY DIRECTION OF THE PRESIDENT, IS APPOINTED COMMANDER OF THE

DURING THE TEMPORARY ABSENCE OF

EFFECTIVE _____ AUTHORITY: AFI 51-509

THIS ANNOUNCEMENT HAS BEEN REVIEWED FOR LEGAL SUFFICIENCY AND FOUND TO MEET CRITERIA OF AFI 51-509 and AFI 38-101

| 13. DATE Jun 9, 2020 | 14. A1 OR FSS REVIEWING OFFICIAL *(Typed Name, Grade, and Title)* AMANDA M. MARTINEZ, 1st Lt, 802 FSS MPS Chief | 15. SIGNATURE MARTINEZ.AMANDA.M.1515116466 *Digitally signed by MARTINEZ.AMANDA.M.1515116466 Date: 2020.06.09 18:30:11 -05'00'* |
|---|---|---|
| 16. DATE Jun 12, 2020 | 17. JA REVIEWING OFFICIAL *(Typed Name, Grade, and Title)* DAYNA V. CHEEK, Capt, Chief of Adverse Actions | 18. SIGNATURE CHEEK.DAYNA.VERONICA.1542899170 *Digitally signed by CHEEK.DAYNA.VERONICA.1542899170 Date: 2020.06.12 15:16:12 -05'00'* |
| 19. DATE | 20. ASSUMING COMMANDER/APPOINTING AUTHORITY *(Typed Name, Grade, and Title)* Caroline M. Miller, Brig Gen, CC, 502 ABW | 21. SIGNATURE MILLER.CAROLINE.M.1155078711 *Digitally signed by MILLER.CAROLINE.M.1155078711 Date: 2020.06.17 19:11:52 -05'00'* |

22. REMARKS/AUTHORITY

| 23. DESIGNATION & LOCATION OF HEADQUARTERS DEPARTMENT OF THE AIR FORCE 502d AIR BASE WING (AETC) JBSA-FORT SAM HOUSTON, TX 78234-1800 | 24. DISTRIBUTION 502D SFG, 502 SFG/JA, HO | |
|---|---|---|
| | 25. DATE ISSUED Jun 18, 2020 | 26. SPECIAL ORDER NO. G-0006 |

AF FORM 35, 20190114          *PREVIOUS EDITIONS ARE OBSOLETE.*

## PROCEEDINGS OF A SPECIAL COURT-MARTIAL

The military judge called the Article 39(a) session to order at 0843, 10 August 2020, Joint Base San Antonio-Randolph, Texas, pursuant to the following orders:

[The convening order, Special Order AB-1, Headquarters 502D Security Forces Group, dated 25 March 2020, as amended by Special Order AB-2, same headquarters, dated 31 July 2020, are located in the Record of Trial IAW with the JAJM assembly checklist.]

1

1

**PERSONS PRESENT**

2      **Colonel Sterling Pendleton,** military judge;

3      **Major John Malek,** trial counsel;

4      **Captain Edward Coleman,** assistant trial counsel;

5      **Captain Jamesian Emmanuel,** defense counsel;

6      **Mr. Lance Wood,** civilian defense counsel; and

7      **Senior Master Sergeant Jeremy M. Zier,** accused.

8

**PERSONS ABSENT**

9      The members named in the convening order were absent.

10      The trial counsel stated that the court-martial had been properly convened and that the convening

11      orders were correct.

12      The detailed reporter, **Technical Sergeant Mary I. Staats-Walker**, was present and had been

13      previously sworn.

14

**DETAIL AND QUALIFICATIONS OF TRIAL COUNSEL**

15      Trial counsel announced that he had been detailed to the court-martial by Lieutenant Colonel

16      Benjamin F. Martin, 502D Security Forces Group, Staff Judge Advocate; that he was qualified and

17      certified under Article 27(b) and sworn under Article 42(a), respectively, Uniform Code of Military

18      Justice; and that he had not acted in any manner that might tend to disqualify him in the court-martial.

19      Assistant trial counsel announced that he had been detailed to the court-martial by Lieutenant

20      Colonel Benjamin F. Martin, 502D Security Forces Group, Staff Judge Advocate; that he was qualified

21      but not certified under Article 27(b) or sworn under Article 42(a), Uniformed Code of Military Justice;

22      and that he had not acted in any manner that might tend to disqualify them in the court-martial.

23      Assistant trial counsel, Captain Coleman, was sworn under Article 42(a) by the military judge.

24      Assistant trial counsel confirmed all known victims of the relevant charged offenses had received

25      reasonable, accurate, and timely notice of this court-martial; that they were aware of their right to attend

2

1    in accordance with Article 6b, Uniform Code of Military Justice, and R.C.M. 806.

2    Assistant trial counsel identified the Article 6b victim, Staff Sergeant C          F          who

3    was represented by Special Victim's Counsel Captain Megan Teeple

4    Captain Megan Teeple Special Victim's Counsel, stated she was detailed by Lieutenant Colonel

5    Nora Rule, Chief Circuit Special Victim's Counsel, Eastern Circuit; that she had been qualified and

6    certified under Article 27(b) and sworn under Article 42(a); that she had not acted in any manner that

7    might tend to disqualify her in this court-martial.

8    ### ACCUSED'S RIGHT TO COUNSEL

9    The military judge informed the accused of his rights concerning counsel as set forth in Article

10   38(b) and R.C.M. 901(d). The accused responded that he understood the rights with respect to counsel

11   and that he chose to be defended by Captain Emmanuel and Mr. Lance Wood, and by them alone. The

12   accused confirmed that he had not been represented by any other counsel relating to the charged

13   offenses.

14   ### DETAIL AND QUALIFICATIONS OF DEFENSE COUNSEL

15   Defense counsel announced that he had been detailed to the court-martial by Lieutenant Colonel

16   Courtney Zuercher, then Chief Circuit Defense Counsel, Central Circuit; was qualified and certified

17   under Article 27(b) and sworn under Article 42(a), Uniform Code of Military Justice; and that he had

18   not acted in any manner that might tend to disqualify him in the court-martial.

19   Civilian defense counsel announced that he was an attorney licensed to practice in the states of

20   Arizona and Colorado; that he was active in Arizona and inactive in Colorado; that he was a member in

21   good standing with the bars of Arizona and Colorado; and that he had not acted in any manner that

22   might tend to disqualify him in the court-martial.

23   Civilian defense counsel, Mr. Lance Wood, was sworn by the military judge.

24   ### DETAIL AND QUALIFICATIONS OF MILITARY JUDGE

25   The military judge stated that he had been detailed to the court-martial by Colonel Jefferson

3

1  Brown, former Chief Circuit Military Judge of the Central Circuit; that he had been properly certified

2  under Articles 26(b) and (c), and previously sworn in accordance with Article 42(a), Uniform Code of

3  Military Justice.

4       The military judge summarized administrative emails between the court and the parties that were

5  related to the scheduling order, including deadlines for filing, and joint status updates.  Neither side felt

6  it was necessary to mark any of the email correspondence for the record.

<div align="center"><strong>R.C.M. 802 CONFERENCE SUMMARIES</strong></div>

8       The military judge explained to the accused what an R.C.M. 802 conference was; that just prior

9  to the initial Article 39(a), the parties discussed:  defense counsel's motion to reconsider the court's

10  ruling on the expert consultant in forensic psychology; witnesses associated with a 404(b) motion;

11  certification status of Captain Coleman; handling of appellate exhibits with the court reporter attending

12  via VTC; and if there was an SVC there; that he had not made any rulings or taken any evidence during

13  the R.C.M. 802 conference.

14       Assistant trial counsel had no objection to the summary provided of the R.C.M. 802 conference.

15       Defense counsel stated they also discussed defense and government witnesses stationed overseas,

16  which might impact order of testimony; and defense counsel had identified an issue with one of the

17  government *voir dire* questions.

18       The military judge thanked defense counsel for the reminder and stated *voir dire* questions would

19  be taken up as they got closer to that time.

20       Neither side had anything further to add to the military judge's summaries of the R.C.M. 802

21  conferences.

<div align="center"><strong>OPPORTUNITY TO CHALLENGE FOR CAUSE - N/A</strong></div>

23       The military judge further stated although he did not believe a basis had been formed, he

24  provided the following information that the parties might consider relevant to the question of

25  disqualification or recusal:  that he and civilian defense counsel, Mr. Wood, were stationed together as

<div align="center">4</div>

1  captains at F.E. Warren Air Force Base in 2003; that he had seen civilian defense counsel on one or two

2  occasions since then; that they had not kept in touch; and that prior to today he probably hadn't seen him

3  in 10 years.

4      Neither the prosecution nor the defense desired to *voir dire* or challenge the military judge for

5  cause.

6      The military judge stated that counsel for both sides appeared to have the requisite qualifications,

7  and all personnel required to be sworn had been sworn.

## GENERAL NATURE OF THE CHARGES

9      Assistant trial counsel announced the general nature of the charges in the case were:  one Charge,

10  with one Specification, willful dereliction of duty, in violation of Article 92, Uniform Code of Military

11  Justice; and one Charge, with three Specifications, abusive sexual contact, in violation of Article 120,

12  Uniform Code of Military Justice.  The charges were preferred by Colonel Todd M. Vician, and were

13  forwarded with recommendation as to disposition by the same.

## FORUM RIGHTS EXPLAINED AND FORUM SELECTION

15      The accused was then advised of his right to a trial with a court-martial composed of four

16  members and that no member would be junior in rank to him; that he may request a court-martial with

17  members be comprised entirely of commissioned officers, or with at least one-third enlisted

18  membership.  If such a request was not made, the court would be comprised of officer members in

19  accordance with the convening order.  The accused stated he understood.  The military judge further

20  stated if tried by court members, the members would vote by secret written ballot and three-fourths must

21  agree before he could be found guilty of any offense.  If found guilty in a trial with members, he would

22  also be sentenced by the members and three-fourths must agree in voting on the sentence; however, if he

23  elected to be sentenced under the sentencing rules effective on 1 January 2019, he also had the option to

24  elect to be sentenced by the military judge.  If he elected to be sentenced under the new sentencing rules,

25  and elected to be sentenced by the military judge following the conviction of any offense, the military

5

1   judge would decide an appropriate sentence.  Alternatively, he may request to be tried by military judge

2   alone, and if that request was approved there would be no court members, and the military judge alone

3   will decide whether he was guilty or not guilty, and if found guilty, the military judge would determine

4   his sentence.  The accused stated that he fully understood the difference between a trial by court-martial

5   composed of members and trial by military judge alone; and he requested trial before officer members.

6        The military judge advised the accused that because he was charged with offenses that allegedly

7   occurred both before 1 January 2019 and on or after 1 January 2019 that the applicable sentencing rules

8   for this court-martial were the sentencing rules in effect before 1 January 2019; that conviction of any

9   offense, no matter when the offense was committed, this court-martial would apply the sentencing rules

10  in effect before 1 January 2019; that he may elect to be sentenced under the sentencing rules in effect as

11  of 1 January 2019 and any conviction of any offense, no matter when the offense was committed, this

12  court-martial would apply the sentencing rules in effect on 1 January 2019; that selection must be made

13  prior to arraignment.  The military judge further stated his election regarding the applicable sentencing

14  rules was irrevocable unless there was good cause for a later request to withdraw the election.  The

15  accused affirmed had had discussed this with his defense counsel, that they fully explained his choices,

16  and that he had no questions about his rights; and requested the applicable rules in effect on 1 January

17  2019.

18                                    **ARRAIGNMENT**

19        The accused waived the reading of the charges and was arraigned.

20        Assistant trial counsel announced that the charges were signed by Colonel Todd M. Vician, a

21  person subject to the code, as accuser; were properly sworn to before a commissioned officer of the

22  armed forces authorized to administer oaths; and were properly referred to the court for trial by Colonel

23  Jeffrey F. Carter, the convening authority.

24        Civilian defense counsel stated there was an M.R.E. 404 motion and a motion to request

25  reconsideration of the court's ruling for an expert consultant.

6

1    Defense counsel stated they desired to defer entry of pleas until after motions.  The accused

2    concurred.

3    **DEFENSE MOTION FOR RECONSIDERATION TO COMPEL FORENSIC PSYCHOLOGIST**

4    Defense counsel laid out his argument of their original filing to compel the appointment of a

5    defense expert in forensic psychology; that in the allegation involving Lieutenant P        , she had been

6    heavily intoxicated on the night of the charged assault; that she  mentioned she did not remember events

7    that occurred that night; that in another incident with Sergeant F        , the allegation also involved

8    witnesses that had been consuming alcohol; and that in both incidents alleged Senior Master Sergeant

9    Zier was also intoxicated.

10    The military judge asked about defense's timeline in this request and stated he issued his ruling

11    on 4 June and there would have been ample time for reconsideration had this not been brought up the

12    first day of trial.  Defense counsel further stated in case preparation they wanted to interview the

13    complainants in person, but scheduling was not possible; that when requesting to interview Lieutenant

14    the logistics, her request for trial counsel presence, they were able to do so telephonically on

15    Friday; and that to answer the court, the plan was to have an interview in person.

16    Assistant trial counsel objected to reconsideration on the motion and stated the government's

17    position while arguing the third prong of *Gonzalez*.

18    The military judge asked if the government would object to scholarly articles if that's what

19    defense tried to introduce.  Assistant trial counsel responded they would want to review the article prior

20    to deciding.

21    The military judge asked defense counsel if based on trial counsel's point about being able to

22    educate themselves with regard to the effects of alcohol, they could help him understand; because this

23    was a situation where the alleged victim was saying she didn't remember, if that was consistent with

24    overcomsumption of alcohol.  Defense counsel responded how they would explain that to the members,

25    through cross-examination of the named complainant, that at that point defense counsel would be

7

1    testifying to the members on issues for which they were not fully specialized; that regarding the

2    scholarly articles they were not sure how they would be able to get that information in; and that what the

3    complaintant actually said was nondescript, and there were certain moments she did not remember; that

4    there was no dispute about the touching being witnessed; that the issue was the consent portion and that

5    she would not be able to say whether she recalled whether or not she remembers consenting, but that she

6    would say normally she wouldn't consent and was married at the time; that to the extent the defense

7    could then explain black outs to the members in testimonial fashion and then draw conclusions from the

8    witness on that same issue; and that it isn't to confuse the members and give a full account of what

9    blacking out is.

10    Neither side had anything further to take up on the defense motion for reconsideration.

**APPELLATE EXHIBITS MARKED**

12    The following exhibits were marked:

13    Appellate Exhibit I, Defense Motion for Appropriate Relief to Compel a Confidental Expert in

14    Forensic Psychology;

15    Appellate Exhibit II, Government Response to Defense Motion for Appropriate Relief to Compel

16    a Confidental Expert in Forensic Psychology;

17    Appellate Exhibit III, Ruling - Defense Motion for Appropriate Relief to Compel a Confidental

18    Expert in Forensic Psychology, dated 4 June 2020;

19    Appellate Exhibit IV, Defense Objection and Motion *in Limine* M.R.E. 404 Evidence;

20    Appellate Exhibit V, Government Response to Defense Objection and Motion *in Limine* M.R.E.

21    404(b) Evidence; and

22    Appellate Exhibit VI was reserved for the court's ruling on the defense request for

23    reconsideration.

24    Defense counsel updated the court on their objections; that there were five notices from

25    government counsel on the Government M.R.E. 304(b) and 404(b) Notices.  Originally, defense did not

8

1  object to notice number 4; that they no longer objected to notice number 5, and it was their

2  understanding the government was no longer offering notice number 3.  Assistant trial counsel

3  concurred with defense.  The military judge asked from the original filing, a ruling was needed only for

4  number 1 and 2, and defense counsel concurred that was correct.  Defense counsel further stated for

5  efficiency of the court that the government intended to offer testimony on both individuals identified in

6  number 1 and 2 of the notice; and to that extent the defense could offer argument after the offer of

7  testimony during the motions hearing, and the military judge concurred.  Assistant trial counsel had no

8  objection.

9  **SIEANA MACKIEWICZ,**

10  **civilian, called as a witness for the prosecution, being duly sworn, testified substantially as follows:**

11  **DIRECT EXAMINATION**

12  **BY ASSISTANT TRIAL COUNSEL:**

13  My name is Sieana Lee Mackiewicz.  I am a video producer.  In 2015, I was a member of the

14  United States Air Force stationed at Incirlik Air Base assigned to AFN Incirlik.  I was stationed there

15  from the end of January 2014 until April 2015.

16  The station manager at the time was Master Sergeant Jeremy Zier.  There would be times when I

17  would go to the enlisted club and I would see him there.  There was one interaction with him in

18  particular that stands out.  I was there with C        F        and Senior Master Sergeant Zier was there

19  as well.  I remember he was quite drunk.  He was talking to us and started to ask questions about our sex

20  lives.  I specifically remember him asking if we ever had a one night stand before.  That was the only

21  question I specifically remember.

22  He was visibly drunk.  He was slurring.  I'm sure that he had his drink with him, but I don't

23  specifically remember it.  The entirety conversation with him that evening with him wasn't sexually

24  charged, but when were at the smoke pit outside was the portion of the conversation was sexually

25  charged.  C        was there.  I believe he asked me the question first, but he asked us both.  I

9

1    specifically remember that question and it stands out to me because I made eye contact with C

2    and thinking what do we say.

3          At that time, I was a one stripe airman or an A1C, I'm not certain.  I reported to him through

4    AFN.  I didn't know what to say to his question.  I remember making eye contact with C         and

5    looking at her thinking what are you supposed to or I don't know how to react to this.  I do think I

6    answered, but I'm not certain.  I don't recall when specifically this conversation took place other than the

7    later half of 2014, maybe early 2015 time period.  I think it was during that time period because I was

8    dating an airman stationed there.  I didn't go out with                as much when he was still stationed

9    there.  When he PCS'd out we started to go out more.  I would guess it was after he left or around the

10   time he left which was towards the later half of 2014.  I left Incirlik in April of 2015 and there wouldn't

11   have been any interactions after then.  I remember that it happened.  I remember that moment clearly of

12   making eye contact with C          and that's why it really stands out in my mind.  I know there had been

13   other times that we had seen him at the E-Club.  I couldn't tell you the specifics of those.  But I do

14   remember that moment because of the nature of the comment.

15         Assistant trial counsel concluded his examination of the witness.

16         The military judge asked the witness to spell her name for the court reporter.

17                                    **CROSS-EXAMINATION**

18   **BY DEFENSE COUNSEL:**

19         There were other parts of that conversation, but I don't remember them.  I do remember that one

20   night stand question.  I don't remember specifically continuing to converse before we left.  I don't

21   remember immediately walking away.  I don't remember if we stayed or left.  I believe I did respond to

22   the question eventually.  I responded yes, because that was the truth.

23         The military judge stated to defense counsel not to go any further with that line of questioning.

24         Yes, I left in April 2015.  I don't remember writing Senior Master Sergeant Zier a letter saying

25   he as a great boss before I left.  After that night, I did continue to see Senior Master Sergeant Zier and I

10

1  did work with him.

2      Defense counsel concluded his examination of the witness.

3      Assistant trial counsel had no further questions.

4      [The witness was duly warned, temporarily excused, and withdrew from the courtroom.]

5                          **C                F                ,**

6  **civilian, called as a witness for the prosecution, being duly sworn, testified substantially as follows:**

7                          **DIRECT EXAMINATION**

8  **BY ASSISTANT TRIAL COUNSEL:**

9      I am Staff Sergeant C              F          and I'm stationed at Charleston Air Force Base,

10  South Carolina.

11      The military judge asked the witness to speak up because the court reporter was present via VTC

12  and it was difficult for her to hear and to also spell her name.

13      I am C              F              Yes, I was stationed at Incirlik Air Base in 2015.  I recall going

14  on a trip to Pamukkale, Turkey.  I do recall being in a hotel room at some point with Senior Master

15  Sergeant Zier.  We engaged in conversation.  It started off with questions about my involvement in the

16  LGBTQ committee on base and my identity as being bisexual.  It started out appropriate in nature and

17  then kind of turns into a bit more unprofessional and he started asking about partners.  So he was just

18  asking me the definition of bisexuality, what that means, how that's part of the LGBTQ committee, and

19  questions about why I'm involved in that.  I identify as bisexual.  The initial questions were not

20  uncomfortable for me to discuss.  People have questions regarding bisexual and it's not something I

21  mind talking to people about my involvement with the community, but not the detail of sexual acts.  At

22  some point he got into uncomfortable territory.

23      The military judge asked where trial counsel was going with this; that he didn't want to go too

24  far.  Assistant trial counsel responded they were asking for a general overview of the nature of the

25  statements.

11

1    **DIRECT EXAMINATION (Continued)**

2    **BY ASSISTANT TRIAL COUNSEL:**

3    Yes, so he was asking how two females have intercourse with each other, and then asking about

4    being bisexual and questions that were overtly inapproprirate.  He had just asked me if I have "had the

5    right dick yet" and that's why I'm bisexual or I have relationships with women.

6    [The court reporter stated she did not catch any of that stated.  Assistant trial counsel asked the

7    witness to speak up.]

8    He asked me how two females have intercourse together, and then asking if I'm with female

9    partners because I "just haven't found the right dick yet."  The statement about not having the right dick

10   yet was an exact quote.  It was a very uncomfortable conversation.  I don't even talk with my family and

11   friends about those types of conversations or topics, and being asked that by your superintendent was

12   very uncomfortable.  Unfortunately, it's not the first time someone asked some things like that, so I

13   always kind of divert the conversation back toward like the emotional connection you share with a

14   partner is what is important to me.  Senior Airman Scott Taylor was present during this conversation.

15   After that conversation ended, we later left the hotel room and went down to the hot tub.  That

16   conversation occurred about 15 to 20 minutes of when we went to the hot tub.

17   Assistant trial counsel concluded his examination of the witness.

18   **CROSS-EXAMINATION**

19   **BY CIVILIAN DEFENSE COUNSEL:**

20   Yes, Scott Taylor and I were sharing a room on that trip in Turkey in 2015.  Senior Master

21   Sergeant Zier came to our room which was before going down to the hot tub.  Yes, he was asking me

22   about working in the LGBTQ committee on base.  I was not the president of the committee.  I was one

23   of the volunteers.  Scott Taylor was the vice president.  Yes, Senior Master Sergeant Zier knew some of

24   my personal life based on what I shared with him before going on that trip in Turkey.  Yes, I had a bad

25   break up with a girl right before arriving to Turkey and it was common knowledge.  Yes, this isn't the

12

1  first time someone has asked me about straight, versus bisexual, versus gay. Yes, in my OSI interview I

2  said I told people I was accustomed to straight people asking questions because they might be curious of

3  something they're not familiar with. If it's my family, my parents, things like that, I came from a very

4  rural hometown so there's a lot of stigma against being part of that community at all. So I would say

5  there's a difference between why being with a male and female versus actually getting into sexual

6  details of intercourse. Yes, I try to steer the conversation to the emotional component rather than the

7  physical acts even though that's part of it too.

8      Civilian defense counsel concluded his examination of the witness.

9      Assistant trial counsel had no further questions.

10     [The witness was duly warned, temporarily excused, and withdrew from the courtroom.]

11     Assistant trial counsel had no further witnesses to call on the motion.

12                          **DEFENSE OBJECTION AND MOTION**

13     Defense counsel stated he would focus his argument on Notice 1 and 2 individually.

14     Defense counsel argued Notice 1 given by the government discussed the one night stand and

15  asked he them to walk him home while they were at the smoke pit at or near Incirlik. From just a

16  testimony perspective, what we got today was just a one night stand. The notice itself indicated May

17  2014 to end of September 2015. From the witness's testimony, she was talked about this being the end

18  of 2014, maybe early 2015. Under 403, which is what we're arguing, is was concerning if this court

19  would allow that sort of testimony to come in, that specific notice, it confuses.

20     The military judge asked what it would mislead the members about and confuse them. Defense

21  counsel continued that there were two things; that the conversation spanned more than just one

22  statement, arguing this was some sort of MO or some sort of plan by the accused was disingenuious; that

23  one comment even out of context was all that she remembered, and she responded yes, and didn't leave

24  for the evening right afterwards. Defense counsel further stated the notice included the same comment

25  was made to Sergeant F            but testimony about comment was not elicited from Sergeant F          .

1    The military judge stated defense counsel's argument was it would mislead the members because there

2    was more to conversation.  Defense counsel concurred and that specific comment being taken out of

3    context months before the charged allegation that it created some sort of confusion why we're here when

4    something that may have happened the end of 2014 when the charged allegation occurred in 2013.  The

5    military judge clarified with defense counsel that he was arguing the timing or temporal aspect of it.

6         Defense counsel further argued a second point with Sergeant F        was relevance; that her

7    testimony about what happened 15 to 20 minutes before the hot tub incident did not make anything more

8    or less probable from what happened on that same day.  For the same issues noted in Notice 1, it was a

9    403 issue as well.  This was a conversation with the LGBTQ community which was not relevant to the

10   charged allegations, and that a specific comment taken out of context.

11        Defense counsel further stated in regard to Notice 1, Ms. Mackiewicz was not named

12   complaintant and did not attend that trip and was irrelevant to argue; that she was not an eye witness to

13   what allegedly transpired at the hot tub; that she was not on the charge sheet; and that she didn't take

14   that trip with them.

15        Assistant trial counsel responded further with the government's position; that stated they most

16   often cited *Reynold's* for the three factors; the theory of admission, intent and plan.  The military judge

17   stated *modus operandi* was only appropriate if identity was an issue.  Assistant trial counsel responded

18   the government's position was in agreement with the assessment by the military judge as well as the

19   specific signature like nature of the crime.

20        The military judge asked trial counsel what fact of consequence did the government believe

21   made these statements made more or less likely.  Trial counsel responded the government's position was

22   the intent to gratify the sexual desire.

23        The military judge asked defense counsel if they were arguing the notice was untimely.  Defense

24   counsel responded they were not.

25        Neither side had anything further on the motion.

14

1    The military judge confirmed the members were on standby; that the members were to remain on
2    standby until after his consideration on the motion for reconsideration and 404(b).

3    Trial counsel stated, while it may not be timely at the moment, that the government would like to
4    make an oral motion *in limine* to exclude the line of questioning with then Airman F        now Second
5    Lieutenant F        regarding some minor misconduct.  Defense counsel objected that it was their intent
6    to get into the minor misconduct.

7    Trial counsel cited to *United States v. Johnson*, 23 CMA 534 and *United States v. Salas*, 2013
8    CCA Lexis 676, which summarized some of the elements from other case law regarding demonstrating
9    necessity for this type of impeachment testimony on cross-examination.

10   Defense counsel stated althought they submitted dsicovery for disciplinary records, the
11   government never fully disclosed the disciplinary records of Lieutenant        and it was through a
12   witness interview that they learned of an LOR she received.  Defense argued it went to the credibility
13   and potential impeachment.

14   Trial counsel argued that the records do not exist.  The military judge stated that he understood
15   and that defense was not asking for the records.  Trial counsel stated at the beginning of the defense
16   argument defense referenced it.  Trial counsel further stated it also went to the probative value of the
17   line of questioning; and that the records no longer exist and they wouldn't be relevant to support
18   effectiveness on anyone's part.

19   [The Article 39(a) session recessed at 1037, 10 August 2020.]

20   **[END OF PAGE]**

15

**ARTICLE 39(A) SESSION**

1  [The Article 39(a) session was called to order at 1412, 10 August 2020, with all parties present
2  when the court recessed again present.]
3

**R.C.M. 802 CONFERENCE SUMMARY**

4  The military judge summarized the R.C.M. 802 conference held during the recess where the
5  parties discussed the way ahead, how things were going to progress. That he had considered arguments
6  and proffer with regard to the motion to compel an expert forensic psychologist and that he would be
7  denying that request. He also reserved ruling on the 404(b) until after *voir dire* that the motion *in limine*
8  would be taken up before opening statements. They also discussed defense counsel's plan and ability to
9  address black out versus pass out issue with regard to the court's ruling on the expert forensic
10  psychologist.
11  Assistant trial counsel stated there had also been discussion regarding Appellate Exhibit VII, the
12  member excusal memorandum.
13  Appellate Exhibit VII, Excusal Memorandum - Enlisted Members, was marked.

**RULING ON MOTION IN LIMINE**

14  The military judge stated having considered the arguments regarding the defense motion for
15  reconsideration of the expert in forensic psychology, the court's ruling denying the expert stood and that
16  was marked as Appellate Exhibit III with the additional ruling incorporated.
17  Neither side objected nor had anything further to add to the military judge's summary of the
18  R.C.M. 802 conference.
19  [Begin verbatim transcript here.]

**PLEAS**

20  **DC:  The accused, Senior Master Sergeant Jeremy M. Zier, pleads as follows:**

21  **Of all Charges and Specifications:  NOT GUILTY.**

22  Trial counsel had no objections to the proposed *voir dire* questions by defense counsel; and that

16

1    the government withdrew question 31 from their proposed *voir dire* questions.

2          Civilian defense counsel had no objections to the proposed *voir dire* questions by the

3    government having now withdrawn question 31.

4          Neither side had anything further to take up before arrival of the members.

5          Assistant trial counsel stated a member seating chart was provided on the bench for the military

6    judge.  Trial counsel adjusted the members' chairs in accordance with the six foot distance requirement.

7          The military judge directed counsel for both sides to inspect member's folders contained the

8    required content.

9          [The Article 39(a) session recessed at 1422, 10 August 2020.]

10                                        **[END OF PAGE]**

17

**ARTICLE 39(A) SESSION**

1

2    [The Article 39(a) session was called to order at 1449, 10 August 2020, with all parties present

3    when the court recessed again present.]

4    Assistant trial counsel confirmed the members had arrived.  Counsel for both sides confirmed

5    they had inspected the member's folders and they contained the required content.

6    Appellate Exhibit VIII, Memorandum For Record, 502 SFG/CC, authorizing alternate members,

7    was marked.

8    Civilian defense counsel had an opportunity to review the Flyer also contained in the members'

9    folders and had no objection.

10    Appellate Exhibit IX, Flyer, was marked.

11    The military judge noted for the record that prior to court the members filled out a COVID-19

12    questionnaire; that all responses indicated no one tested positive or exhibited any symptoms within the

13    last 14 days, or been exposed to anyone who tested positive for COVID-19 within the last 14 days.

14    Neither side felt it was necessary to mark the questionnaires as an appellate exhibit.

15    Neither side had anything further to take up before calling the members.

16    [The Article 39(a) session terminated at 1454, 10 August 2020.]

17    **[END OF PAGE]**

18

1     [The court-martial was called to order at 1454, 10 August 2020, pursuant to the orders previously
2  inserted into the record.  All parties were present to include the members.]
3     The following members were present:
4  **Colonel Andrew C. Lattimore**,
5  **Colonel Nicole H. Francis,**
6  **Lieutenant Colonel Sammuel C. Berenguer,**
7  **Lieutenant Colonel Virgina S. Walker,**
8  **Captain Jeffrey A. Rueben,**
9  **Captain Jennifer L. Guion,**
10  **First Lieutenant Katelyn C. Kohn, and**
11  **Second Lieutenant Hai Y. Ricke**, members.
12     The members of the court-martial were sworn in accordance with R.C.M. 807.
13                              **COURT ASSEMBLED**
14     The military judge announced that the court-martial was assembled.
15     [The court-martial was assembled at 1458, 10 August 2020.]
16                         **PROCEEDINGS OF THE COURT**
17     The military judge discussed the unique operating environment due to COVID-19 mitigation
18  measures.
19     The military judge instructed the members concerning their duties, the conduct of the
20  proceedings, the fact that the accused had earlier pled not guilty of the charges and specifications,
21  matters regarding challenges and *voir dire* examinations, duties of counsel for both sides, conduct during
22  recesses or adjournments, and the order of events.
23     The military judge ensured all members reviewed the flyer and the convening orders provided in
24  their folders; and that no corrections were necessary to the convening orders.
25     Assistant trial counsel announced the general nature of the charges.

19

1    General *voir dire* examination was conducted of all members of the court-martial.

2    The military judge provided further instructions to the members.

3    The members were excused to the deliberation room.

4    [The court-martial recessed at 1627, 10 August 2020.]

5    **[END OF PAGE]**

20

**ARTICLE 39(A) SESSION**

1

2    [The Article 39(a) session was called to order at 1628, 10 August 2020, with all parties present

3    when the court recessed again present.  The members were absent.]

4    The military judge asked and counsel agreed they desired a recess before continuing with

5    individual voir dire.  The military judge further stated he would direct the bailiff to advise the members

6    the court was in recess for 10 minutes.

7    [The Article 39(a) session recessed at 1628, 10 August 2020.]

8    **[END OF PAGE]**

21

**ARTICLE 39(A) SESSION**

1

2    [The Article 39(a) session was called to order at 1639, 10 August 2020, with all parties present

3    when the court recessed again present.  The members were absent.]

4    The military judge stated he would intend to bring back Colonel Lattimore, Lieutenant Colonel

5    Walker, Lieutenant Colonel Berenguer, Captain Rueben, and First Lieutenant Kohn for individual *voir*

6    *dire*.  Defense counsel also requested to bring back Colonel Francis and Second Lieutenant Ricke.

7    The military judge provided instructions to the bailiff to bring back members for individual *voir*

8    *dire*.

9    Colonel Lattimore, Colonel Francis, Lieutenant Colonel Berenguer, Lieutenant Colonel Walker,

10   Captain Rueben, First Lieutenant Kohn, and Second Lieutenant Ricke were individually *voir dired*.

11   [The Article 39(a) session recessed at 1819, 10 August 2020.]

12   **[END OF PAGE]**

22

**ARTICLE 39(A) SESSION**

[The Article 39(a) session was called to order at 1820, 10 August 2020, with all parties present when the court recessed again present. The members were absent.]

The military judge stated trial counsel had provided a photograph of Lieutenant F        and asked if either sided believed Lieutenant Colonel Berenguer should be called to view the photograph. Counsel for both sides agreed to recall Lieutenant Colonel Berenguer.

Appellate Exhibit X, Photograph of Lieutenant P        , was marked.

Lieutenant Colonel Berenguer was recalled under individual *voir dire*. Trial counsel provided the Appellate Exhibit X to the member. The member did not recognize the individual in the photograph. Defense counsel had no follow up.

Trial counsel had no challenges for cause.

Defense counsel challenged Colonel Lattimore and First Lieutenant Kohn citing implied bias. Trial counsel objected to both challenges.

The military judge granted the challenge for cause against Colonel Lattimore; that he had concerns with regard to implied bias with regard to his testimony; that he found he didn't have a preoccupation to look up the JAG Corps website but certainly an interest in it; that in an of itself was not problematic, but when looking to the other issues in his testimony of his involvement in a forensic process was more advanced than a typical court member; that it was his responsibility to ensure the process worked; that also from his analysis was the mentor-mentee relationship he had with a victim of sexual assault; that it was particularly telling when he said being here made him wonder how she felt going through the process; that he was empathetic with her and keeps in touch with her on a regular basis and spoke last week; and that he considered actual bias, implied bias, and the liberal grant mandate and for those reasons mentioned the challegen for cause was granted.

The military judge stated in reference to Lieutenant Kohn, her best friend confided in her that she was raped; that she was shocked it happened; and that she did persuade her friend to take action.

23

1   Lieutenant Kohn stated she could separate facts of that case from this case; that she talks to her friend

2   every other week, which was quite substantial when discussing potential similiarties with the the facts of

3   this case with her situation; that his decision was based on similar cases, although more egregious than

4   the fact pattern of this case, citing *United States v. Terry*, 64 MJ 295, wherein a close relationship

5   existed with the victim of a similar crime, but not exactly the same facts here; that in that case the judge

6   did not consider or weigh enough he implied bias theory and the liberal grant mandate.  Finally, based

7   on the similiarties, a relationship with her friend who was the victim of a sexual assault, and considering

8   actual bias, implied bias and, in particular, the liberal grant mandate that she may project that situation

9   into the facts of this case, the challenge for cause against First Lieutenant Kohn was granted.

10          Neither side had anything further with regards to challenges for cause.

11          The military judge and court reporter discussed how the randomizer would run; that they would

12   recess for the name entry and process.

13          [The Article 39(a) session recessed at 1905, 10 August 2020.]

14                                    **[END OF PAGE]**

24

**ARTICLE 39(A) SESSION**

1

2    [The Article 39(a) session was called to order at 1922, 10 August 2020, with all parties present

3    when the court recessed again present.  The members were absent.]

4    Appellate Exhibit XI, Court Member Generator, was marked.

5    There were no objections to the randomly assigned numbers.

6    Trial counsel had no peremptory challenge.

7    Defense counsel stated they wished to exercise their preemptory challenge against Lieutenant

8    Colonel Walker.  The military judge stated Lieutenant Colonel Walker would be excused.

9    The military judge stated the remaining court members would be Colonel Francis [PRES],

10   Lieutenant Colonel Berenguer, Captain Guion, and Lieutenant Ricke, are the primary members, and

11   Captain Rueben would be the alternate.  Counsel for both sides agreed with the military judge.

12   Neither side had anything further before calling the members.

13   [The Article 39(a) session terminated at 1924, 10 August 2020.]

14                                                  **[END OF PAGE]**

1       [The court-martial was called to order at 1925, 10 August 2020.  All parties were present to

2   include the members.]

3       The challenged members, Colonel Lattimore, Lieutenant Colonel Walker, and First Lieutenant

4   Kohn, were excused.  The primary members were Colonel Francis, Lieutenant Colonel Berenguer,

5   Captain Guion, Second Lieutenant Ricke, and Captain Rueben would be an alternate member.

6       The military judge announced the primary and alternate members were empanelled.

7       Captain Rueben was advised of his duties as an alternate member of this panel.

8       Primry and alternate members were released for the remainder of the day with instructions to

9   report back tomorrow for a 0930 start time.

10      [The court-martial recessed at 1928, 10 August 2020.]

11                          **[END OF PAGE]**

12

26

1

2
## ARTICLE 39(A) HEARING

3
[The Article 39(a) hearing was called to order at 0900, 11 August 2020.  The parties were

4
present, the members were absent.]

5
## R.C.M. 802 SUMMARY

6
The military judge summarized an RCM 802 with counsel on 10 August 2020.  There the

7
military judge asked for clarification with regard to the government's position concerning their MRE

8
404(b) response to the defense motion.  Neither side had anything to add to the summary of the RCM

9
802 conference.

10
## APPELLATE EXHIBITS MARKED

11
Appellate Exhibit VI, the military judge's ruling on Defense Motion *in Limine* - MRE 404, dated

12
10 August 2020, an eight page document was marked.

13
The military judge stated he would defer on his ruling on the defense motion *in limine* regarding

14
Lieutenant P        prior to her testimony.

15
Trial Counsel asked to pre-admit the prosecution exhibits.  Civilian Defense Counsel asked for a

16
brief recess prior to the exhibits being offered.

17
[The Article 39(a) hearing recessed at 0907, 11 August 2020.]

18
## [END OF PAGE]

19

27

| | |
|---|---|
| 1 | **ARTICLE 39(A)** |
| 2 | [The Article 39(a) hearing was called to order at 0917, 11 August 2020.  The parties were |
| 3 | present, the members were absent.] |
| 4 | Trial Counsel stated the parties came to an agreement on exhibits for preadmission. |
| 5 | **PREADMISSION OF PROSECUTION EXHIBITS** |
| 6 | The following exhibits were offered into evidence: |
| 7 | Prosecution Exhibit 1, a photograph of four women standing together, undated, a one-page |
| 8 | document; |
| 9 | Prosecution Exhibit 2, a Uber Receipt, dated 7 December 2019, a one-page document; |
| 10 | Prosecution Exhibit 3, a photograph of a hotel with four swimming pools, undated, a one-page |
| 11 | document; |
| 12 | Prosecution Exhibit 4, a photograph of a pool with a waterfall, undated, a one-page document; |
| 13 | and |
| 14 | Prosecution Exhibit 5, a photograph of the inside of a hotel room, undated, a one-page document; |
| 15 | Without objection, Prosecution Exhibits 1, 2, 3, 4, and 5 were admitted into evidence. |
| 16 | **PREADMISSION OF DEFENSE EXHIBITS** |
| 17 | The following defense exhibits were offered into evidence: |
| 18 | Defense Exhibit A, a photograph of two individuals, undated, a one-page document; |
| 19 | Defense Exhibit B, a photograph of a woman holding a child, undated, a one-page document; |
| 20 | and |
| 21 | Defense Exhibit C, a photograph of three individuals, undated, a one-page document. |
| 22 | Without objection, Defense Exhibits A, B, and C admitted into evidence. |
| 23 | The military judge then asked for Trial Counsel to provide the order of their witnesses testimony |
| 24 | and which witnesses would be testifying via VTC.  Defense Counsel did not object to the government |
| 25 | witnesses testifying via VTC. |

1    Neither counsel for either side had anything further before recessing to await the members.

2    [The Article 39(a) hearing recessed at 0925, 11 August 2020.]

3                              **[END OF PAGE]**

4

29

**ARTICLE 39(A) HEARING**

[The Article 39(a) hearing was called to order at 0935, 11 August 2020.  The parties were present, the members were absent.]

The military judge asked the parties if they were ready for opening statement.  The parties stated they were.

[The Article 39(a) hearing recessed at 0936, 11 August 2020.]

**[END OF PAGE]**

30

1    [The court-martial was called to order at 0936, 11 August 2020.  The parties and the members

2 were present.]

3    The military judge informed the members that the accused plead not guilty at an earlier session.

4    **OPENING STATEMENTS**

5    Trial Counsel presented his opening statement followed by Civilian Defense Counsel's opening

6 statement.

7    **PROSECUTION CASE-IN-CHIEF**

8    **SPECIAL AGENT LUKASZ MISINIEC**

9 **U.S. Air Force, called as a witness for the prosecution, being duly sworn, testified substantially as**

10 **follows:**

11    **DIRECT EXAMINATION**

12 **BY ASSISTANT TRIAL COUNSEL:**

13    My name is Lukasz Misiniec.  I'm a Special Agent with the Office of Special Investigations

14 Detachment 404, Joint Base San Antonio-Randolph.  I've been an Special Agent for a little bit over a

15 year.  Prior to that I was in Security Forces for around nine years.  I have received investigative training.

16 We do basic investigative training at Lackland Air Force Base and once I cross-trained, I spent roughly

17 four and a half months at the Federal Law Enforcement Training Center in Georgia.

18    I am aware of an OSI investigation involving Senior Master Sergeant Jeremy Zier.  I was the

19 lead agent on the investigation.  My responsibility was to coordinate the investigation based on the

20 interviews and steps that we took.  Yes, there were other agents involved in the investigation.  Yes, they

21 acted under me, which is a common practice in OSI.  The involvement of other agents varies based on

22 the case.

23    As the lead agent, I am familiar with all aspects of the investigative process.  OSI became aware

24 of the allegation through the Charleston Air Force Base Detachment.  The nature of the allegation was

25 that Ms. Izabella Workman observed the accused grab Lieutenant P          during the Christmas party in

31

1   December 2019. The Christmas party took place at a hotel in North Charleston.

2         The standard process for OSI is that the unit where the member is stationed, that local OSI must

3   handle that investigation. Yes, after receiving the initial allegations, witness interviews were conducted.

4   The scope of the investigation did change during the interviews. During the interviews involving

5   Lieutenant P    , we were able to identify two different witness.

6         Sergeant Workman told OSI that she believed that Sergeant F      was a victim while she

7   was assigned in Turkey. OSI then coordinated with another detachment to interview her. The other

8   victim, Ms.      was at a different Christmas party when the accused brushed against her buttocks.

9   As a part of the process, we spoke to the accused's co-workers and were able to identify Ms. W

10   through her twin sister. Yes, it is common practice to interview coworkers as it gives us a full picture of

11   the accused's character to understand them better.

12         Yes, we conducted further investigation. We brought in Ms. W    and did a photo line-up

13   with her. No, none of the allegations were reported by the victims. No, I was unable to identify a prior

14   relationship between the victims.

15         Assistant Trial Counsel concluded his examination of the witness.

16   <div align="center">**CROSS-EXAMINATION**</div>

17   **BY DEFENSE COUNSEL:**

18         Yes, my office lead the investigation into the accused. I've been an OSI agent since 17 May,

19   2019. Yes, at the time of the investigation, I'd been an OSI agent for roughly seven months. Yes, there

20   were other leads sent out. A lead is where we coordinate with an OSI detachment that is nearest to the

21   witness or victim and we prepare a document with a synopsis of the case and we give specific questions

22   we want the detachment to ask the witness of victim and then build on those questions. Yes, it's

23   common practice.

24         Yes, I received the leads back directly to me where I reviewed and compiled them to complete

25   the investigation. Yes, every agent is expected to be accurate and thorough in their interviews.

<div align="center">32</div>

1     Typically the agent who conducts the interview will do a brief write-up and that comes back to me.  Yes,

2     it is on the case-agent to ensure everything is done thoroughly and accurately.  Correct, sometimes leads

3     don't ask all the questions and we have to go back to the lead agents to do follow-up investigations.  In

4     this case, there were several interviews we went back for follow-ups and clarifications.  If we get an

5     interview back from OSI detachment and I have further questions for that person, I'll then reach back

6     out and have the agent re-do the interview asking my follow-up questions.

7         That will all determine the next step in the investigation.

8         There was some clarifying information we needed to track down after Sergeant F          s

9     interview.  Yes, I've reviewed her interview with OSI.  Correct, Sergeant F          did not tell OSI that

10    she took off her clothes in the hot tub, but she did tell other witnesses that.  Yes, she told OSI that the

11    accused "kind of" grazed her genital area.  Yes, I believe she told other witnesses that it was her leg.  I

12    don't recall her telling OSI that there was hand fighting in the pool.  Yes, she told OSI that her breasts

13    were exposed after leaving the hot tub.  I believe one or two witnesses mentioned that her breasts were

14    exposed but I would have to reference the report to see which ones exactly.

15         Yes, we received the names of the individuals who were present during the allegations.  Yes, we

16    interviewed everyone we could identify.  There was a Staff Sergeant and Technical Sergeant that we

17    were unable to find.

18         Yes, there are allegations that occurred at the Marriott and the San Antonio Zoo.  We did ask for

19    video surveillance but we were told that there was none.  The inquiry into the video surveillance was

20    towards the end of the investigation.

21         Neither Trial Counsel nor any member had further questions for the witness.

22         [The witness was duly warned, temporarily excused, and withdrew from the courtroom.]

23               **STAFF SERGEANT IZABELLA WORKMAN,**

24    **U.S. Air Force, called as a witness for the prosecution, being duly sworn, testified substantially as**

25    **follows:**

33

1                              **DIRECT EXAMINATION**

2    **BY TRIAL COUNSEL:**

3          My name is Izabella Workman.  I'm stationed at Charleston Air Force Base, South Carolina.  I

4    am a Combat Broadcast Journalist where I document the locations I'm sent to as a videographer.  Yes, I

5    remember a holiday party in December 2019.  I was on the Booster Club, so that was a big deal for me.

6    I went through all the planning and picked the venue, decorations, everything.  I was there early that

7    night, around 6 pm.  Lieutenant P          was pretty late to the event, probably about 40 minutes late.  We

8    were about to start eating and everyone at the table was seated when she showed up.  Yes, I made

9    contact with her quickly after she arrived.  She made a b-line towards me because we're really close

10   friends and I had saved her a seat.

11         I noticed she was intoxicated when she showed up.  It was surprising to me because she was

12   obviously intoxicated when I talked to her.  She had just gotten back from a deployment in late October

13   and her husband deployed while she was gone so she was separated for about a year, so I know that was

14   a difficult time for her.  She was about to go to OTS and become an officer.  Our unit is pretty close.

15   Usually in a public affairs shop, you have about 12 people, but combat camera is a large squadron so it's

16   the only place in public affairs where you'll actually get to be around that many people and we're

17   constantly going TDY and deployment together.  It's like a huge family and you'll see the people you

18   work with almost every day.

19         Yes, people were letting their hair down at the party and Sergeant P          was one of those.

20   Because I planned the party, I didn't have a lot of fun.  Yes, I was busy that night.  In the weeks prior to

21   the holiday party.

22         Civilian Defense Counsel requested an Article 39(a) hearing

23         [The court-martial recessed at 1022, 11 August 2020.]

24                              **[END OF PAGE]**

25

34

1                              **ARTICLE 39(A) HEARING**

2          [The Article 39(a) hearing was called to order at 1022, 11 August 2020.  The parties were

3   present, the members were absent, and the witness remained on the witness stand.]

4          Civilian Defense Counsel stated that he wanted to know where the testimony was going

5   regarding the witness being on the lookout a few weeks prior.  Trial Counsel stated he expected the

6   witness to testify that a few weeks earlier, she was told that something had happened at a previous duty

7   station with Senior Master Sergeant Zier and that she should be on the lookout for him at a party and

8   that the testimony is for effect on the listener.  The military judge asked if this testimony fell under MRE

9   404(b).  Trial Counsel stated it did not and went further into the proffered testimony.  Civilian Defense

10  Counsel objected under hearsay and stated the testimony is misleading under MRE 403.  Trial Counsel

11  stated it's probative and will clear the 403 balancing test.

12         The military judge found that the probative value of the proffered testimony was substantially

13  outweighed by the danger of unfair prejudice, confusing the issues, and misleading the members.  He

14  then stated that although defense did not say there was an objection, the objection to the proffered

15  testimony was sustained.

16         Trial Counsel then stated he was worried about defense opening the door on cross-examination

17  to misconduct and asked that if that does happen, that the military judge reconsider his ruling.  The

18  military judge stated he would.

19         Neither party for either side had anything further before calling the members.

20         [The Article 39(a) hearing recessed at 1036, 11 August 2020.]

21                              **[END OF PAGE]**

22

35

1     [The court-martial was called to order at 1037, 11 August 2020.  The parties and the members

2     were present and the witness remained on the witness stand.]

3     **DIRECT EXAMINATION (Continued)**

4     **BY TRIAL COUNSEL:**

5     Yes, I observed Senior Master Sergeant Zier and Lieutenant P     that night as much as I could.

6     I noticed that Lieutenant F     was getting more and more intoxicated and was losing her balance and

7     herself.  She was all over the place.  I noticed that where she would go, he would follow her.  No, I

8     wasn't constantly observing them.  Yes, on several occasions when I checked in with her, he was there

9     as well.  Yes, I was concerned with how intoxicated she was.  I'd never seen her that intoxicated before,

10     even though we've had drinks together before.  I was concerned with how intoxicated she was because

11     she wasn't in her right mind and was being followed around at the party.  I knew she might not be able

12     to stop any situation if they arose.  Yes, I was worried about her not being fully there and present.  She

13     was wearing black heels.  We had a number of games and one of them was a dancing game.  She took

14     the shoes off and was dancing and trying to play games.

15     She had a wrist wallet and she kept leaving it at different tables and at one point, another friend

16     took it so she wouldn't lose it.  Yes, I saw the accused and Sergeant P     at a table.  During one of the

17     games after she lost her shoes, I grabbed her and had her sit down with the officers.  I figured it was a

18     safe spot for her to sit.  I glanced over while I was running the game and saw that Senior Master

19     Sergeant Zier was sitting there as well.  Yes, multiple people could tell that she was all over the place.

20     Yes, I saw the accused and Lieutenant P     together at the end of the night having a

21     conversation.  I was running around cleaning up and I walked over to some others.  While I was talking

22     to them,

23     The military judge asked if a Article 39(a) hearing was needed.  Trial Counsel stated no.

24     **DIRECT EXAMINATION (Continued)**

25     **BY TRIAL COUNSEL:**

36

1    I was standing with a group of friends, and one of them asked me, "Is that why his hand is on her
2    ass right now?"  I immediately looked up and saw Senior Master Sergeant Zier's hand on resting on her
3    butt.  It was the part where the butt curves.  It wasn't a grab, and it wasn't the lower back.

4    [The witness used her hands to demonstrate that the accused's hands were not cupping the
5    buttock but was below the lower back.]

6    I was shocked and had adrenaline and thought we needed to get out of here.  I went over and
7    grabbed her arm and took her outside with me.  Outside we were trying to figure out how we were going
8    to take P        home.

9    [Trial Counsel handed the witness Prosecution Exhibit 1.]

10    This is a picture of myself, Amy Phillips, E      P        and Taylor Harrison.

11    Trial Counsel requested to publish Prosecution Exhibit 1 and 2 to the members.  The military
12    judge stated his requirements for publishing the exhibits due to COVID-19 and stated a recess may be
13    necessary.

14    [The court-martial recessed at 1046, 11 August 2020.]

15    **[END OF PAGE]**

16

37

1  **ARTICLE 39(A) HEARING**

2  [The Article 39(a) hearing was called to order at 1057, 11 August 2020.  The parties were

3  present, the members were absent, and the witness remained on the witness stand.]

4  Trial Counsel stated that Prosecution Exhibits 1 and 2 were in folders at the members seats.

5  **R.C.M. 802 CONFERENCE SUMMARY**

6  The military judge stated that during the break there was a brief 802 where the way ahead

7  regarding lunch was discussed along with the witnesses who would be appearing via VTC and Microsoft

8  Teams.  Neither counsel for either side had anything to supplement or object to the summary of the

9  RCM 802 conference.

10  [The Article 39(a) hearing recessed at 1058, 11 August 2020.]

11  **[END OF PAGE]**

12

38

1       [The court-martial was called to order at 1058, 11 August 2020. The parties and the members
2   were present, the witness remained on the witness stand.]

3       The military judge informed the members that their area was sanitized and the documents were
4   placed in their folders by an individual wearing gloves as mitigation efforts of spreading COVID-19.

5                           **DIRECT EXAMINATION (Continued)**

6   **BY TRIAL COUNSEL:**

7       The individuals in Prosecution Exhibit 1 are myself, Hailey Phillips, E            and Taylor
8   Harrison. This picture was taken during the middle of the Christmas party outside of the venue in the
9   smoking area. Yes, this picture is from that night and the picture was taken by Senior Master Sergeant
10  Zier on my phone. I initially gave my phone to Master Sergeant Robertson but he kept taking blurry
11  photographs and then Senior Master Sergeant Zier offered to take the picture.

12      [Trial Counsel retrieved Prosecution Exhibit 1 from the witness.]

13      I got home that night by Uber. In my Uber vehicle, it was myself, my boyfriend, and
14  P        Also Senior Master Sergeant Zier and Sergeant Robertson were also taken home by a Uber or
15  Lyft. No, they weren't in my Uber. Yes, I saw them picked up before me. Their Uber came in and it
16  was a minivan with a sliding door. I was surprised because typically that's an UberXL and so I figured
17  there were other people going with them but they got into the car and when they got into the car, Senior
18  Master Sergeant Zier looked at P        and asked if she was coming.

19      [Trial Counsel handed the witness Prosecution Exhibit 2.]

20      This is my Uber receipt from the night of the holiday party. The final destination on the receipt
21  is my house and the date is the night of the holiday party. Yes, this is a screen shot from my phone and
22  my Uber account.

23      [Trial Counsel retrieved Prosecution Exhibit 2 from the witness.]

24      Yes, we dropped E   P        off at her home and I took her inside. We stopped at her home
25  because she was stumbling, my boyfriend and I helped her get into her house through her garage. No,

1  my boyfriend had to hold on to her because she was stumbling and I couldn't hold her up.  Then we

2  went upstairs and got her into bed.  Yes, she told me

3      Trial Counsel concluded his examination of the witness.

4                              **CROSS-EXAMINATION**

5  **BY CIVILIAN DEFENSE COUNSEL:**

6      Yes, P       was standing up in a semi-circle of other people when I saw Senior Master Sergeant

7  Zier's hand on her buttocks.  Yes, it was at the end of the night.  Yes the party was winding down and

8  people were going their separate ways and saying goodbye.  No, it wasn't a grope or grab of the

9  buttocks.  Yes, I was interviewed with OSI.  I don't know if P       felt okay, but it seemed that she

10 wasn't panicking or anything like that.  No, she didn't seem distressed.  I didn't see her push the hand

11 away or move away.  No, no one else in the group broke them apart.  Yeah, there were probably four to

12 five people in the semi-circle.  No, no one was holding her up and she wasn't now throwing up or passed

13 out in the corner.  Yes, she seemed very normal minus the fact that she was intoxicated.  She was sort of

14 walking, she was talking.

15     Yes, I remember the conversation P       was having with Senior Master Sergeant Zier.  The

16 flight leadership was seated at that table but that wasn't where P       was sitting earlier, I put her at that

17 table.  Senior Master Sergeant Zier wasn't there originally.  Yes, he's one of the highest ranking enlisted

18 person in our career field.  Yes, he was there for doing check rides.

19     [The court reporter stated she was having a difficult time hearing the answers.]

20     Yes, when Senior Master Sergeant Zier would come to Charleston he would do check rides.

21     Civilian Defense Counsel concluded his examination of the witness.

22                              **REDIRECT EXAMINATION**

23 **BY TRIAL COUNSEL:**

24     Yes, I know Lieutenant P       fairly well.

25                              **OBJECTION AND RULING**

40

1    Civilian Defense Counsel objected to Trial Counsel asking the witness if she had formed an

2    opinion as to Lieutenant P        s character for social propriety as it being speculation.  The military

3    judge called for an Article 39(a) hearing to discuss the objection.

4        [The court-martial recessed at 1112, 11 August 2020.]

5                                    **[END OF PAGE]**

6

41

**ARTICLE 39(A) HEARING**

[The Article 39(a) hearing as called to order at 1112, 11 August 2020.  The parties were present, the members were absent and the witness remained on the witness stand.]

The military judge asked trial counsel if this was on the fly as there was no previous notice with regard to character evidence.  Trial Counsel apologized and stated this notice was not sent.  The military judge asked what social propriety means.  Trial Counsel stated that the witness could testify the victim acts in a proper and socially appropriate manner.  Civilian Defense Counsel asked that the witness be excused.

[The witness stepped down from the witness stand and departed the court room.]

Defense objected to relevance and stated that if this is allowed in, they should be able to enter Lieutenant P       s PIF into evidence.  The military judge confirmed that defense would have the right to test the basis of the witness' knowledge.

The military judge called for a recess to consider the objection.

[The Article 39(a) hearing recessed at 1117, 11 August 2020.]

**[END OF PAGE]**

42

**ARTICLE 39(A) HEARING**

1

2      [The Article 39(a) hearing was called to order at 1122, 11 August 2020. The parties were

3  present, the members were absent.]

4      Trial counsel informed the military judge that the government wished to withdraw their question

5  regarding character evidence.

6      Counsel for both sides stated they were ready to proceed with members. Trail Counsel addressed

7  Sergeant Workman who was back on the witness stand.

8      [The Article 39(a) hearing recessed at 11123, 11 August 2020.]

9                                    **[END OF PAGE]**

10

43

1       [The court-martial was called to order at 1124, 11 August 2020.  The parties and the members
2  were present and the witness remained on the witness stand.]

3                        **REDIRECT EXAMINATION (Continued)**
4  **BY TRIAL COUNSEL:**

5       When I was talking to OSI about the incident, I didn't mean to imply that it was consensual, I
6  meant that I think she wasn't aware of what was going on because she was so intoxicated.

7       Trial Counsel concluded his examination of the witness.

8                             **RECROSS-EXAMINATION**
9  **BY CIVILAIN DEFENSE COUNSEL:**

10      Yes, my interview with OSI was a question and answer interview.  No, I wasn't a subject of the
11 investigation, I was the witness.  No, they didn't try to put words in my mouth.  No, I don't recall telling
12 OSI that F        seemed to be okay with Senior Master Sergeant Zier touching her; as I said before, I
13 recall saying she didn't seem to be saying no or anything because she seemed out of it.

14      She walked out of the hotel at the end of the night with me holding onto her.  She got into an
15 Uber with help.  I don't know if she threw up at any point.  She told me she took off her make up the
16 next day.

17      Civilian Defense Counsel concluded his examination of the witness.

18                      **FURTHER REDIRECT EXAMINATION**
19 **BY TRIAL COUNSEL:**

20      She texted me mid-afternoon the next day.  No, she wasn't up early the next morning.

21      Trial Counsel concluded his examination of the witness.

22      Defense had no further questions.

23      A question from Lieutenant Colonel Berenguer for the witness was marked as Appellate Exhibit
24 XII.

25                     **EXAMINATION BY THE COURT-MARTIAL**

44

**BY MILITARY JUDGE:**

Senior Master Sergeant Zier worked here at Randolph at AFCOM, but he comes to the squadron to assist with our flying program.  Combat Cameramen can be 9D flyers so he assists with training in that sense.  He's a Senior Master Sergeant, I don't think that his rank really has to do with his position, but I'm not aware of how that is in relation to others, I guess I don't understand the question.

Neither side had further questions for the witness.

[The witness being duly warned, was temporarily excused and departed the courtroom.]

Trial Counsel requested a 10 minute recess to prepare for the next few witnesses.

[The court-martial recessed at 1132, 11 August 2020.]

**[END OF PAGE]**

45

1     **ARTICLE 39(A) HEARING**

2         [The Article 39(a) hearing was called to order at 1143, 11 August 2020.  The parties were

3     present and the members were absent.]

4         The military judge noted that there was a witness on the VTC screen on Microsoft Teams.  The

5     military judge then confirmed that the court reporter could hear the court and would be able to hear the

6     witness.

7         Trial Counsel stated that due to connection issues, he would do a brief pause during his

8     questioning of the witness.

9         Neither counsel for either side had anything further to take up prior to calling the members.

10        [The Article 39(a) hearing recessed at 1144, 11 August 2020.]

11                    **[END OF PAGE]**

12

46

1          [The court-martial was called to order at 1144, 11 August 2020.  The parties and the members

2    were present.]

3                                    **STAFF SERGEANT KYLE HAGAN,**

4    **U.S. Air Force, called as a witness for the prosecution, being duly sworn, testified via Microsoft**

5    **teams substantially as follows:**

6                                         **DIRECT EXAMINATION**

7    **BY ASSISTANT TRIAL COUNSEL:**

8          I'm Kyle Patrick Hagan, I'm a Staff Sergeant assigned to the 1st Combat Camera Squadron,

9    assigned to Joint Base Charleston, South Carolina.  I've been here for about five years.  I did attend a

10   Christmas party in 2019.  I went with a coworker.  Yes, I saw then Staff Sergeant E     P        at the

11   Christmas party.  I know her because I worked with her while she was still a Staff Sergeant at the first

12   Combat Camera Squadron for a few years and got to know her also through other people in the

13   squadron.  Correct, we worked together.  We would socialize outside of work.

14         I walked in the Christmas party with Shelby, E      greeted her.  She seemed to have had a few

15   drinks but was still in control.  It seemed like she had a few drinks because she was a little more happy

16   and in a good mood.  Correct, I observed this when I first saw her that night.  She seemed to be having a

17   good time the entire time.

18         Yes, as the night progressed, she became increasingly outgoing and happy.  Yes, I drank that

19   night.  Yes, I was intoxicated and past the legal limit to drive.  Correct, I wouldn't have driven a car that

20   night.  No, I have no memory gaps from that night.

21         I know of Senior Master Sergeant Zier and I've met him a couple of times passing through the

22   squadron, but I've never worked with him nor do I know him on a personal level.  I believe I could pick

23   him out if I saw him in a room.  I did see him interacting with then Staff Sergeant P        the night of the

24   Christmas party.  This was when the party was winding down and people were leaving.

25         Myself, Sergeant Workman, her boyfriend, Shelby, Lieutenant P        and then Sergeant Zier

47

1    came up and we were talking.  Yes I started talking with Sergeant Workman.  During that conversation

2    something caught my eye.  I was talking with Sergeant Workman and her boyfriend, I noticed Sergeant

3    Zier come up to Lieutenant            and it seemed like he went from a side hug and Sergeant Zier rested

4    his hand on her butt.  I motioned to Sergeant Workman and she went directly over there.  I motioned to

5    Sergeant Workman to get a confirmation that what I was seeing was correct.  It was an eye movement

6    and a head nod.  Yes, it was noteworthy enough to point it out.  Yes, I wanted to fact check what I was

7    seeing.  I can't recall if I said anything to Sergeant Workman.

8            I don't even know if P        knew what was happening.  It wasn't like a push away, I'm not sure

9    if she was aware.  I would say that she was slightly impaired from the alcohol.  She was ambulatory and

10   talking but I would say slightly impaired.  I can't recall if Senior Master Sergeant Zier's hand moved.

11   As soon as I confirmed with Sergeant Workman, she was already moving so I turned around and I guess

12   she separated the two.

13           Assistant Trial Counsel concluded his examination of the witness.

14                                        **CROSS-EXAMINATION**

15   **BY DEFENSE COUNSEL:**

16           Correct, I don't really know Senior Master Sergeant Zier that well.  I've only interacted with him

17   when he was TDY to my unit, so just in passing.  Correct, I was drinking that night.  Correct, Lieutenant

18           was drinking.  I can't recall seeing Senior Master Sergeant Zier drinking, but I assumed he was.

19   Yes, it was a holiday party.  Correct, I had no memory gaps.  When I saw the side hug, I was about five

20   to 10 feet away.  Yes, there were other people at the holiday party.

21           Correct, this happened at the end of the night after the party dwindled down and everyone was

22   leaving.  Last call was already made and it was time to tear down.  Yes it was a side embrace.  When I

23   say side hug, I would say it's not a typical hug or embrace, it's more one-sided.  If you were hugging

24   someone you would go left shoulder to left shoulder so it would be more hinged open towards the group.

25           Yes, it was not a full embrace, it was one arm around.  Yes, his hand was really low during the

48

1    side hug.  Correct, I motioned to Sergeant Workman.  No, I didn't go in closer to see or stop the side-

2    hug.  I didn't say anything to either of them.  Yes, I just remember his hand being a little lower.  Correct,

3    she was still able to walk and talk.  No, now Lieutenant P        did not seem to be distressed.  I can't

4    make the assumption that it was friendly.  No, she did not scream, shout, run away, or start crying.  She

5    did not give any indication that that wasn't a side hug or that his hand was making her feel

6    uncomfortable.

7         I saw Lieutenant P        get into an Uber with Sergeant Workman and Sergeant Workman's

8    boyfriend.  Correct, she was able to get into the Uber on her own.  I didn't actually see Senior Master

9    Sergeant Zier leave but he didn't leave with them.

10        Defense Counsel concluded his examination of the witness.

11                              **REDIRECT EXAMINATION**

12   **BY ASSISTANT TRIAL COUNSEL:**

13        Yes, I believe a lot of people from work were hugging and saying goodbye.  No, I didn't point

14   out any of those instances.  Correct, I pointed out this one.  It stood out because I believe I saw Senior

15   Master Sergeant Zier's hand lower than it should have been and then confirmed it with Sergeant

16   Workman.  That's why I brought it up.  His hand was mid buttocks.  Yes, in my opinion, it was low for a

17   side hug.

18        Assistant Trial Counsel concluded his examination of the witness.

19        Defense had no further questions for the witness and neither did the members.

20        [The witness, being duly warned and temporarily excused, left the Microsoft Teams meeting.]

21                              **CAPTAIN MICKEL MCGANN,**

22   **U.S. Air Force, being called as a witness for the prosecution, being duly sworn, testified via**

23   **Microsoft Teams, substantially, as follows:**

24                              **DIRECT EXAMINATION**

25   **BY TRIAL COUNSEL:**

49

1      My name is Captain Mickel McGann.  I'm stationed at Joint Base Charleston and I'm currently

2  quarantining in Baltimore prior to my deployment.  I'm with the First Combat Camera unit in Joint Base

3  Charleston, South Carolina.  Yes, I was the MC at the unit holiday party last year.  Yes, that was in

4  December.  That party was fun.  That was the first time I got to MC with a friend.  We did a couple

5  routines for everyone that they'd never seen before so it was a fun experience.  Yes, people let their hair

6  down and people were definitely drinking.  I don't drink.

7      Yes, a couple of people over-indulged.  I was the designated driver for two members of the CGO

8  corps.  My wife, my best friend and I all made sure all those people got home properly.  Yes, there were

9  people who were clearly inebriated.  One person that I was watching, I had to chase a couple times to

10  make sure they didn't run out of the building.  Yes, that was another CGO.

11      Yes, I interacted with Senior Master Sergeant Zier that night.  I introduced him to my wife and

12  talked to him about his family.  Asked to see if everything was going well in San Antonio because he's

13  the evaluator for our unit.  It was small talk before everything started.  I haven't talked to him a lot, I've

14  met him once before at a Nikon event.  He pulled me aside there and talked to me.  He's our flight

15  evaluator for our flyers before they get their wings so he runs our program and I've talked to him

16  because of that.  Every year a base puts on an event where a camera company will come in and we'll test

17  new equipment to see what het Air Force is going to buy for the imagery specialists.  I haven't spent a

18  lot of time socializing with him.

19      I didn't have much interaction with Lieutenant P      that night.  I saw her walking back and

20  forth passing the dance floor.  She had people watching her throughout the night because she was

21  inebriated.  But there were other NCO's watching over her at the party.  Yes, I overheard a conversation

22  between Senior Master Sergeant Zier and Lieutenant

23      I was sitting at the table with my wife, other CGOs and a flight chief.  I was watching my CGO

24  friend because she kept getting up and running out of the door so I made sure she was sitting and

25  drinking water.  I was sitting and overheard a conversation of what now Lieutenant P     was going to

<center>50</center>

1    do to her husband when he got back form deployment.  Senior Zier was sitting next to her.  I didn't hear

2    any refuting of the conversation or anything to stop the conversation but before anything happened I had

3    to run out and go get the CGO because she ran out of the door again.  Yes, that was a mutual

4    conversation with dialogue back and forth.  Lieutenant P        was saying how she was going to "F her

5    husband" real hard when he gets back from deployment.

6         Trial Counsel concluded his examination of the witness.

7                                    **CROSS-EXAMINATION**

8    **BY DEFENSE COUNSEL:**

9         Yes, I was sitting at the table.  Yes, there were other officers at that table.  Yes, there was one

10   senior NCO to my right.  The officers at the table with me were Captain Domingo, Lieutenant

11   Mosquera, and Captain Haag.  Other than our wives, there were no civilians at that table.

12       Yes, I remember Senior Master Sergeant Zier coming and sitting at the table.  Yes, I remember

13   Lieutenant P        coming over.  Yes, Zier came in before P        Yes, it was at the table where P

14   started talking about sexual things regarding her husband.  I don't curse, but she said she would, "F her

15   husband."  Yes, F means fuck.  Yes, she said she was going to "have sex like rabbits."  Yes, from what I

16   observed, Senior Master Sergeant Zier just sat there, looked at her and smiled.  Yes, they appeared to be

17   comfortable and like they knew each other.  Yes, she appeared to be comfortable having that

18   conversation at the tale with him.

19       Yes, I saw them together before I left the party.  No, I didn't see anything inappropriate between

20   the two.

21       Civilian Defense Counsel concluded his examination of the witness.

22                                   **REDIRECT EXAMINATION**

23   **BY TRIAL COUNSEL:**

24       I just know both of them were at the table.  I don't recall who arrived at the table first.  Yes,

25   Lieutenant P        could have been there before Senior Master Sergeant Zier.  I didn't overhear the

1    conversation leading up to Lieutenant P      s comments.  The only thing I could clearly hear before

2    that was them talking about each other's families.

3           Yes, I saw him again at the end of the night.  As I said, I was the designated driver for an officer

4    who caused quite a commotion, so my wife and I decided to take her home.  Yes, just like I addressed

5    the other CGO, after the party we all went to the medical center to get immunizations.  It was myself, a

6    couple other NCOs and now-Lieutenant P    .  The conversation came up from another NCO and I

7    instructed her that she's a minority when she becomes and officer and things that she does might be

8    viewed in a different scope.  It was just general guidance.  I understand that commissioning as an officer

9    is a big deal and I chastised my other CGO and told her she needed to understand that she will be

10    perceived a little differently in the squadron.  No, I didn't intend for follow on repercussions after those

11    conversations.

12           Trial Counsel concluded his examination of the witness.

13           Neither defense nor any member had a question for the witness.

14           [The witness was duly warned, temporarily excused, and the video call on Microsoft Teams was

15    terminated.]

16           The military judge called for a lunch recess.

17           [The court-martial recessed at 1225, 11 August 2020.]

18                                     **[END OF PAGE]**

19

52

1

**ARTICLE 39(A) HEARING**

2    [The Article 39(a) hearing as called to order at 1342, 11 August 2020.  The parties were present,

3    the members were absent.]

4    Neither counsel from either side had anything before calling the members.

5    [The Article 39(a) hearing recessed at 1342, 11 August 2020.]

6    **[END OF PAGE]**

7

53

1       [The court-martial was called to order at 1342, 11 August 2020.  The parties and the members

2       were present.]

3       **SECOND LIEUTENANT E          P               ,**

4       **U.S. Air Force, called as a witness for the prosecution, being duly sworn, testified substantially as**

5       **follows:**

6       **DIRECT EXMAINATION**

7       **BY ASSISTANT TRIAL COUNSEL:**

8       My name is E                      P             I'm a Second Lieutenant assigned to the 315th TRS at

9       Hill Air Force Base, Utah.  I commissioned on 13 March 2020.  I joined the Air Force in January 2014

10      and was enlisted until this last March.  When I was enlisted, I was assigned to the First Combat Camera

11      Squadron in Charleston.

12      I do remember attending the Christmas party in December 2019.  That was in early December.  I

13      went to the event with some friends.  We met beforehand at a friend's apartment and then from there we

14      Uber'ed to the event.  While at my friend's apartment, we finished getting ready and had a couple of

15      drinks.  I came over with a bottle of prosecco and we opened it and shared it amongst ourselves.  There

16      were about six of us at the apartment.  Yes, I was feeling some effects of the alcohol but not a lot.  While

17      at the apartment, I think we took a shot or two of alcohol.

18      Yes, we went directly to the Christmas party from the apartment.  Staff Sergeant Workman was

19      already at the event because she was planning it.  Sergeant Workman and I have been good friends for a

20      while at the unit and we would spend times together hanging out outside of work.

21      At the beginning, my memory is pretty clear.  I got a gin and tonic after I arrived.  I remember

22      seeing Senior Master Sergeant Zier.  I know him because he was there to train the wing for the flying

23      program.  Yes, I'd met him prior to that night.  We'd see each other at the office and I can't remember if

24      we've flown together or not, but he was a large part of the training that we did for flyers.  Yes, I had a

25      professional relationship with him.  Yes, I see him here in the courtroom.

1    [The witness positively identified the accused.]

2    We had a couple of conversations throughout the course of the evening.  I remember three but I

3    don't remember anything other than that.  The first one's clearer but then later on in the evening, they

4    become fuzzier.

5    The first interaction, I was outside talking with some coworkers and he and another Master

6    Sergeant came up and we were all engaged in conversation.  Then we went our separate ways, I was

7    trying to hang out with as many people as possible.

8    The second interaction, I vaguely remember being at a table and talking to a Lieutenant in the

9    squadron and he came over and became a part of the conversation.  It's not 100% clear exactly, I just

10   remember I was talking about my husband being deployed and I think that's when he became a part of

11   the conversation.

12   I don't remember, but I probably had something to drink between the two encounters.  Yes, I was

13   talking to the other Lieutenant at the table and then Senior Zier came over. I don't remember any details

14   of the conversation about my husband's return.

15   The third interaction, it's not clear in my mind.  I just remember being on the other side of the

16   venue around the tables where we had been eating and then he was there and that's the gist of what I

17   remember from my last interaction.  This was late towards the end of the party.  Yes, I probably drank

18   alcohol between the second and third interaction.  Yes, I was impacted by alcohol consumption.

19   No, I don' t have a memory of him placing his hand on my buttocks.  No, I don't remember

20   consenting to him placing his hand on my buttocks.  No, don't generally consent to people touching me

21   on the buttocks.

22   My last memory of the evening was being at my garage door, but I know my friend Uber'd me to

23   the house and made sure I got in through the garage door.  The Monday after the party my friend told me

24   what she saw and then that's when Captain McGann advised me that once I commissioned, it would be

25   inappropriate to consume alcohol as I did at the Christmas party.

1    Yes, on Monday I spoke with Sergeant Workman.  We might have talked about it on Sunday

2    after the party, but I wasn't' feeling very well because I was hungover, so I don't remember any text

3    conversations specifically about it.  It wasn't until that Monday when she told me what she saw.  My

4    reaction to what she saw was immediately very negative and emotional.  A lot of emotions were

5    heightened during that time because my husband was getting ready to come home from deployment.

6    Hearing that news, it was very disconcerting to know that there was a potential of something like that

7    having happened with someone that I respected and held in high regards.  It was a very negative and

8    very strong emotional reaction.

9    I was embarrassed because I wasn't sure if my personal behavior had been seen in a negative

10   light by the rest of the unit and I didn't want that to be their last memory of me.  On top of that, there

11   was a loss of faith and what I saw as a safe environment with comradery and mutual respect.

12   The only person I spoke with about it was my husband.  It was important that I call him right

13   away because I didn't want to hear the news second hand.  That was a difficult conversation to have and

14   I felt like I was putting a lot on his plate considering he was getting ready to come home to an empty

15   house.  I regretted the whole situation.  I thought it was important for him to hear from me because I

16   didn't want the information to be misconstrued.

17   The idea of speaking to my command or law enforcement was tossed around in my head.  There

18   were a lot of considerations in regards to that with me because I was unsure as to how that would

19   potentially affect my career.  I understand reprisals are not legal, but as far as an investigation happening

20   if it would impact my position at OTS.  Also because I didn't remember anything happening, I wasn't

21   sure how that would play out.  I don't personally remember this happening and the only person who told

22   me about it afterwards was Sergeant Workman and I wasn't sure what value that had to anybody.

23   Yes, I was contacted by OSI.  Sergeant Workman reported it to the First Sergeant and the

24   investigation happened.  When I first heard Sergeant Workman reported it, I felt a little disconcerted

25   about not having a choice.  There was nothing I could do at that point, so I did the best that I could at

1   answering the questions from OSI.  The experience with OSI was mortifying because my behavior was

2   scrutinized.  I was so unclear as to what happened; so having that scrutiny and my decision to drink so

3   much being looked at so closely was not fun.  I understand its OSI's job to have all the information that

4   they could get so they ask everybody everything and everyone was talking about it and answering

5   questions about you.  In any work environment, you're wondering who knows about it and who might

6   talk about it.  So, it makes you wonder how people's perception of you might have changed.

7          Yes, OSI asked how much I drank that night.  I told them I wasn't comfortable answering the

8   question because I didn't know the answer.  My next interaction with an OSI office was when I was at

9   OTS.  They told me I could remove myself from participating any further and at that time, I elected to

10  do that because I felt like a lot of interactions with OSI was a very high vis situation with me and I

11  wasn't sure what role I could possibly play considering I don't remember this event happening.

12         Yes, when I met with OSI, I missed a little bit of instruction as a result of it.  I was concerned

13  about the time that would be required with me being an active part of the investigation and trial

14  proceedings.  It was a lot of stress considering my career was at the very beginning and surrounding the

15  transition.  I wanted to try and put everything behind me as much as possible and it seemed like signing

16  the document to preclude me from the investigation might have been the best course of action for me.

17         Yes, I decided to participate in the investigation.

18         Civilian Defense Counsel asked for an Article 39(a) hearing.

19         [The court-martial recessed at 1405, 11 August 2020.]

20                              **[END OF PAGE]**

57

**ARTICLE 39(A) HEARING**

1    [The Article 39(a0 hearing was called to order at 1405, 11 August 2020.  The parties were

2    present, the members were absent, and the witness remained on the witness stand.]

3        Civilian Defense Counsel stated that out of an abundance of caution, he was unsure of the

4    witness' answer to the trial counsels question where he asked what changed her mind to participate.

5    Assistant Trial Counsel stated he would proffer that Lieutenant P        had conversations and understood

6    the ability to provide additional context despite not having an active memory of the specific charge.

7        Defense stated there would be no objection to that line of questioning.

8        Neither counsel for either side had anything else to take up before the members were called back

9    in

10       [The Article 39(a) hearing recessed at 1407, 11 August 2020.]

11                                       **[END OF PAGE]**

12

58

1    [The court-martial was called to order at 1408, 11 August 2020. The parties and the members

2    were present and the witness remained on the witness stand.]

3                                **DIRECT EXAMINATION (Continued)**

4    **BY ASSISTANT TRIAL COUNSEL:**

5    My decision to participate in the investigation changed. It was mostly an education process and

6    understanding that what I offered, while it might not be my own personal memory, I could contextualize

7    the information.

8    This discussion was with you [Assistant Trial Counsel]. No, I never felt pressured to change my

9    decision. I was hesitant to participate because I was unsure about getting recycled in school but you

10   made it clear that it was my choice to be here and that at any point if I wanted to no longer participate,

11   that was also an option. No, your rank and position as a JAG did not influence me.

12   The conversation with Captain McGann was incredibly uncomfortable and out of left field. We

13   were waiting for our immunizations and he let me know that my behavior was unprofessional and would

14   not be tolerated as an officer and that I needed to be cautioned about my behavior. It wasn't that I didn't

15   understand that my behavior wasn't perfect, it was difficult to understand the context in which it

16   happened and the tone with which it was had. No, I didn't think it was going to go any further than that.

17   I had just talked to Sergeant Workman and my emotions were heightened and then hearing him say that,

18   I didn't respond at all whenever he advised me and so it just seemed like a lot of people were kind of

19   concerned about activities that had happened at the Christmas party that I was unaware of. So, I hope

20   that he was feeling strongly about situations that I was not yet privy to.

21   Assistant Trial Counsel concluded his examination of the witness.

22                                        **CROSS-EXAMINATION**

23   **BY CIVILIAN DEFENSE COUNSEL:**

24   No, I don't recall Senior Master Sergeant Zier touching me inappropriately during the holiday

25   party. He shook hands, it wasn't COVID times, so there was no social distancing. Yes, those three

59

1    interactions are the only ones I actually remember.  I personally do not remember him following me
2    around.

3        Yes, I don't recall leaving the party.  Yes, I was in a Uber with Sergeant Workman and her
4    boyfriend.  Yes, I got into my home through the garage.  Yes, I put in the four digit code to get in my
5    garage.  Yes, I took off my makeup and I went to bed.

6        Yes, I recall having the conversation with you where we discussed being passed out and blacked
7    out.

8                          **OBJECTION AND RULING**

9        Assistant Trial Counsel objected to a question regarding blacking out as it called for more than a
10    lay person's knowledge.  The military judge overruled the objection stated he would allow some leeway
11    but asked defense to tighten up his questions.

12                   **CROSS-EXAMINATION (Continued)**

13    **BY CIVILIAN DEFNSE COUNSEL:**

14        Yes, my understanding of being blacked out is people can do things and not remember it.  Yes,
15    being passed out is when you're out and not moving around.  Yes, it's my understanding that I may have
16    been blacked out for portions of the evening.  Yes, I remember certain things but not other things.

17        Civilian Defense Counsel concluded his examination of the witness.

18        Neither Assistant Trial Counsel nor any member had additional questions for the witness.

19        [The witness, being duly warned, was temporarily excused and departed the courtroom.]

20        The military judge called for a recess while awaiting the next witness.

21        [The court-martial recessed at 1418, 11 August 2020.]

22                           **[END OF PAGE]**

23

60

1

**ARTICLE 39(A) HEARING**

2  [The Article 39(a) hearing was called to order at 1440, 11 August 2020.  The parties were

3 present, the members were absent.]

4  Trial Counsel stated they were ready to proceed and were prepared to call the next four witnesses

5 with few delays.

6  [The Article 39(a) hearing recessed at 1442, 11 August 2020.]

7        **[END OF PAGE]**

8

61

1  [The court-martial was called to order at 1441, 11 August 2020.  The parties were present, the

2  members were absent.]

3  **MS. T          W          ,**

4  **civilian, called as a witness for the prosecution, being duly sworn, testified substantially as follows:**

5  **DIRECT EXAMINATION**

6  **BY TRIAL COUNSEL:**

7  My name is          W          .  I live here in San Antonio.  Yes, I went to a Christmas party with my

8  sister in December.  My sister is my identical twin.  Yes, we look similar.  When we got to the party we

9  took pictures.  It was her, me, and my nephew, her son.  The pictures were taken on a phone.  Next we

10  went in and started looking for a table, sat down for a minute and then saw the drink bar.  My sister

11  asked if I wanted something and I did, so I went and got in line to get us drinks.

12  The room was a little bigger than the courtroom.  I don't know how many people were in the

13  room.

14  [The witness gestured to the south west corner of the courtroom indicating that was where an

15  entrance would be.  Then gestured to the northwest corner of the courtroom gesturing that was where the

16  table was.]

17  The bar was located in the southeast corner of the room, opposite the entrance and where we

18  were sitting.  I'm not good at measurements, I can't say how far it was.  I stood in line for the drinks.

19  While I was standing in line, I was talking to two of my sister's coworkers, I don't know their

20  names.  While I was talking to them, I felt something go across my butt.  I turned around, made eye

21  contact and started talking to the guy who as behind me.  Then I turned back around and I felt it again.

22  At that point, I had my back facing the wall because there was no excuse for anything.

23  I felt it on the cheek, below my tailbone.  Yes, the rounded fleshy part of my butt.  I don't know

24  what part of the hand contacted my butt.  I know it wasn't a palm.  Yes, I felt pressure.  It was enough

25  pressure for me to feel it twice.  At first I thought it was accidental then when I felt it the second time, I

62

1   knew it couldn't have been accidental.

2        Yes, I see the person who was behind me in the courtroom.

3        [The witness positively identified the accused.]

4        I think he thought I was my sister so we were just kind of talking about laughing about that and I

5   cleared it up that I'm not Ciara, I'm T    and we made small talk.  Then another guy came up and

6   started talking about we were still joking and then I just kind of turned back around and had my back

7   facing the wall at that point and kept talking.

8        I told my sister about this.  The people in front of me, I was just having small talk because they

9   recognized that I wasn't Ciara.  After feeling the first touch, I just turned around, nothing else.  I believe

10   I moved forward.  No I wasn't crowding the people in front of me.  Yes, it was odd that the person

11   behind me was as close as he was.

12        Trial Counsel asked the military judge if Ms. W    twin sister could enter the courtroom for

13   the members to view them side-by-side.  Defense did not object to the request.  The military judge stated

14   that since the twin sister would testify next, it would be done at the end of the witness's testimony.

15                          **CROSS-EXAMINATION**

16   **BY CIVILIAN DEFENSE COUNSEL:**

17        Yes, I was initially the last person in line for a drink from the bar.  I can't remember how many

18   people were in front of me, there were a few.  The man was my sister's coworker, he and his wife were

19   in front of me.  Yes, the people in front of me were turned towards me.

20        Yes, your client came up behind me and was the last person in line.  I can't remember if there

21   was someone behind him.  But I remember a black guy came up and started talking to him.  I don't

22   remember his name.  I think that was after the confusion about who I was.

23        Yes, to the right there were a number of tables to the drink line.  I can't remember if people were

24   around the tables.  The tables were close together.  Yes, there were kids.  My nephew was there and we

25   took pictures when we first got to the party.  My nephew was almost two years old.  He's wild and he

1   was not running around.

2       I didn't feel something go across my buttocks, I could feel something touch my butt.  If I had to

3   assume, being that he wasn't holding anything in his hands, he was facing me, I would assume his hand

4   touched me.  No, didn't see him touch me but I could definitely feel it.  I had my back turned towards

5   him so there would be no way for me to see him.  It was his hand.  I know how knuckles on the back of

6   a hand feel because I have hands and knuckles.  I knew it was the back of his hand.  It wasn't a palm

7   because those are softer than the knuckle part of your hands.  Yes, I felt his knuckles go across me.

8       Yes, I remember speaking to the Office of Special Investigations.  No, the interactions of the

9   accused didn't come off as flirtatious.

10      Civilian Defense Counsel concluded his examination of the witness.

11      Neither trial counsel nor any member had additional questions.

12      [The military judge duly warned the witness and asked her not to leave quite yet.]

13      Ms. T     W        and her twin sister, Ms. Ciara Gosier, entered the center of the well and

14   removed their masks to allow the members to see them side-by-side.

15      [The witness, Ms. T     W        , departed the courtroom.]

16                              **MS. CIARA GOSIER,**

17   **civilian, being called as a witness for the prosecution, being duly sworn, testified substantially as**

18   **follows:**

19                              **DIRECT EXAMINATION**

20   **BY TRIAL COUNSEL:**

21      My name is Ciara Gosier.  I've recently retired from the Air Force.  While I was in the Air Force,

22   I worked in public affairs and I was previously in the same unit with the accused.

23      Yes, I remember going to the unit Christmas party.  I went to the party with my sister and my

24   son.  When we got there I went to get a table and my sister went to get drinks.  When she came back I

25   could see that she was visibly bothered.  Yes, I know my sister well.  I could tell by her expression on

1  her face that she was irritated.  She told me that someone had rubbed up against her in the line to get

2  drinks.  She said it happened once and she turned around and then it happened a second time in the same

3  line.  She told me it was Senior Master Sergeant Zier.

4        Trial Counsel concluded his examination of the witness.

5  <div align="center">**CROSS-EXAMINATION**</div>

6  **BY CIVILIAN DEFENSE COUNSEL:**

7        The room where the holiday party was held was larger than this courtroom.  The room was fairly

8  crowded with tables but not crowded with people.  Yes, there was around 55 to 60 people in the room

9  standing around the tables chit-chatting.

10        No, I didn't see Senior Master Sergeant Zier touch my sister and she didn't know who he was.

11  No, neither my sister nor I reported this to OSI.  Yes, I worked with Senior Zier for around 11 months

12  prior to the holiday party.  I had a lot of interactions with him, but I never had negative interactions with

13  him.  No, he never sexually harassed me or made jokes of a sexual nature to me.  No, he never touched

14  me inappropriately.

15        Civilian Defense Counsel concluded his examination of the witness.

16  <div align="center">**REDIRECT EXAMINATION**</div>

17  **BY TRIAL COUNSEL:**

18        My sister didn't know him.  But when I asked her who it was, she pointed him out.

19        Trial Counsel concluded his examination of the witness.

20        Neither defense nor the members had further questions for the witness.

21        [The witness, being duly warned and temporarily excused departed the courtroom.]

22  <div align="center">**MR. SCOTT TAYLOR,**</div>

23  **civilian, called as a witness for the prosecution, being duly sworn, testified substantially as follows:**

24  <div align="center">**DIRECT EXAMINATION**</div>

25  **BY TRIAL COUNSEL:**

<div align="center">65</div>

My name is Scott Taylor. I currently live in Virginia. There I am a park ranger where I make videos and manage social media for Shenandoah National Park. I was previously in the Air Force where I was a broadcast journalist.

In 2015, I was stationed at Incirlik Air Base, Turkey. I was there from July 2014 to October 2015. Yes, I worked with Senior Master Sergeant Zier and Sergeant F          while I was there. Sergeant F          was one of my closest friends that I've ever had. Yes, we took trips together.

We would travel together and on the weekend we would travel in to the cities. We would hang out every day after work. We would travel through ITT and Outdoor Rec and then personal travel as well. Yes, I remember a trip to Pamukkale, Turkey. It was an office trip planed by Sergeant Zier. Yes, I remember sightseeing and staying at a hotel.

That night after sightseeing, we got into the hot tub at the hotel. I was sharing a room with C          Sergeant F          . Yes, we were just friends. I'm gay and so there was no sexual tension between us. So we were all drinking. We were winding down after the day. I probably had two or three tops. We got to the hot tub and we were just relaxing and then I remember that Sergeant Shinzato left. I remember Sergeant Zier taking his swimsuit off.

I remember him taking it off and lifting it above the water. It was brown water so you couldn't see anything underneath. He lifted the swimsuit above the water and set it down to the side. I couldn't make out much underneath the surface of the water. He's the only one that I can specifically remember removing his clothing. I remember that because of everything that happened afterwards, I've processed that memory a lot. It also stood out as abnormal for your boss to do that. Personally, at that time, I was not uncomfortable. I'm very open and we were a very close-knit office. As a man, knowing there's no risk of interaction between me and Sergeant Zier, it didn't make me uncomfortable.

A short time after that, I remember him reaching over in-between C          and another female. I don't remember the reason he reached his body over. At that time, I saw his buttocks in the water and confirmed that he was totally naked. At this point, the only people I can specifically remember is

1  myself, C     , Sergeant Zier, and I think it was Sienna Mackiewicz.

2       So, he squeezed his way in-between C      and the other female.  We all shuffled and then I

3  started noticing body language of something going on under the water and C      singled to me

4  somehow, I don't remember if she told me or used eye motions, to notify me that something was

5  happening.  Later she told me that there was touching under the water.  I remember he was touching her

6  leg, rubbing it under the water.  I don't remember what part of the leg.

7       Sergeant Zier and I were pretty close.  I respected him a lot as a boss.  I felt he had a good set of

8  priorities and did a good job, outside of this event, keeping morale high.  We were pretty close, we'd

9  drink and hang out and I'd give personal details about who I was dating and things like that.  We were

10  pretty close.

11       Yes, I was the vice president of the Pride club.  Yes, I had conversations with Sergeant Zier

12  about that.  I can't say I remember specific details about the club.

13       I didn't have trouble reconciling the incident because I saw it happen.  It was very disappointing

14  and so I wished that it didn't happen.  No, I didn't want to participate in a case against Senior Master

15  Sergeant Zier at the time.

16       I knew C     F      extremely well.  Yes, a leg touch from her boss would have upset her.

17  A touch from any unwanted un-consensual source like that would upset her.  She was upset enough and

18  from what she described it was rubbing and actual caressing.  Yes, the rubbing and caressing made her

19  feel uncomfortable.  Yes, I believe it felt sexual nature.

20       We were a close knit group.  As a male, it didn't make me uncomfortable in a sexual sense but

21  only because it's my boss.  For C      since she's a woman, that crossed the line.  It was very

22  unprofessional and it made it more difficult for us to work the next week talking to him in a meeting.  It

23  made the interactions with him uncomfortable afterwards.

24       I remember getting a comp day after the vacation.  I got a day off.  The entire office got a comp

25  day.  It seemed to me to be a form of payment because he messed up.  I didn't understand getting a

67

1    comp day after a vacation. So it seemed like a reaction directly tied to that event.

2        Yes, Senior Master Sergeant Zier was drinking that night. The common drink that we had was

3    Crown Royal out of a flask. We would commonly pass it around the office. He drank an excessive

4    amount. His speech was slurred and he was stumbling around. The next morning on the trip home he

5    threw up on the ride back home. He was on the passenger seat and I was in the car behind. There were

6    a few times when we had to pull over on the side of the highway where he threw up.

7        Trial Counsel concluded his examination of the witness.

8                    **CROSS-EXAMINATION**

9    **BY CIVILIAN DEFENSE COUNSEL:**

10        Correct, I did not see Sergeant Zier touch Sergeant F          in an appropriate manner. Yes,

11    Sergeant             was my best friend in Turkey. Yes, she was one of the closest friends I've ever had

12    and we would talk about important and intimate moments in my life. Correct, after leaving the hot tub,

13    that's when I learned about Sergeant Zier touching her leg.

14        From the body language that I saw, I couldn't tell what was going on under the water then. I

15    don't remember if she told me specifics. The reason I'm assuming its caressing is because of how

16    uncomfortable it made her. I don't remember the specific details of what she said about the leg touch.

17        If I told you in an earlier interview that I didn't remember hearing specific details about the leg

18    touch, I'm sure I meant I don't remember because we were so close I'm sure we did have that specific

19    conversation, but like I said, I don't remember it. I do remember the feelings of the conversation. I

20    remember us being in the office and discussing how we felt about it. I remember the emotions behind

21    the conversation but as far as the specifics of location of touching, that memory has deleted.

22        Correct, I don't recall Sergeant F          telling me in the hot tub that Senior Zier touched her

23    leg. She communicated, but I don't remember exactly what happened. The best memory I have is her

24    kind of looking up at me and signaling with her eyes. She may have also said something or signaled it

25    in some other way, but I don't remember the specifics. No, I don't remember telling Sergeant F

1    I'd be a wingman and create a barrier.  I don't remember her telling me specifically where she was

2    touched.  I don't' specifically remember Sergeant F       saying Sergeant Zier grazed her genitalia.  I

3    don't' remember hearing Sergeant F      tell Senior Zier no or to stop.

4          Yes, Senior Zier taking off his swimsuit is the only specific memory in my head.  Yes, among

5    people that I trusted, in muddy water where you can't see anything, it would have been possible that I

6    took off my swimsuit, but I don't remember.  For me personally, as a man, him removing his swimsuit

7    didn't cross the line for me.  As a professional relationship or if I had been a woman who he had sexual

8    interest in that would have made me uncomfortable. I do not recall Senior Zier having a sexual

9    conversation with Sergeant F       prior to going down to the hot tub.

10         Civilian Defense Counsel concluded his examination of the witness.

11         **REDIRECT EXAMINATION**

12    **BY TRIAL COUNSEL:**

13         I was 22, 23 years old then.  I'd been in the Air Force at that point for three years.  I was a Senior

14    Airman.  The accused was a Master Sergeant.  I believe C      was also a Senior Airman, maybe an

15    A1C.  Yes, there's a difference between personal lines and professional lines.  It's totally different when

16    I'm a man without having sexual interest in that kind of environment and then as a boss, yes.  Yes, it

17    crossed professional lines and it made us uncomfortable and had us change the way we acted in the

18    office and the work place.

19         No. Sergeant F      wasn't the type of person to quickly take offense.  She's not

20    confrontational.  No, she would never attack somebody who offended her.

21         Trial Counsel concluded his examination of the witness.

22         **RECROSS EXAMINATION**

23    **BY CIVILIAN DEFENSE COUNSEL:**

24         It would not surprise me to know that there are other witness who said I took my swimsuit off.

25    No, it wouldn't surprise me if a witness would testify that I was the first person to take my swimsuit off.

<center>69</center>

1    Civilian Defense Counsel concluded his examination of the witness.

2    A question from Colonel Francis for the witness was marked as Appellate Exhibit XIII.

3    **EXAMINATION OF THE COURT-MARTIAL**

4    **BY MILITARY JUDGE:**

5    No, Senior Master Sergeant Zier and Sergeant          were not in a relationship while in

6    Turkey.  Yes, Senior Master Sergeant Zier was married while in Turkey.

7    Neither counsel for either side had any additional questions for the witness.

8    [The military judge duly warned and temporarily excused the witness who departed the

9    courtroom.]

10    [The court-martial recessed at 1540, 11 August 2020 for a 10 minute comfort break.]

11    **[END OF PAGE]**

12

70

1    **ARTICLE 39(A) HEARING**

2    [The Article 39(a) hearing was called to order at 1559, 11 August 2020.  The parties were

3 present the members were absent.]

4    The government dissed their upcoming witnesses and the logistics of getting them online.

5    [The Article 39(a) hearing recessed at 1600, 11 August 2020.]

6    **[END OF PAGE]**

7

71

1    [The court-martial was called to order at 1600, 11 August 2020. The parties and the members

2  were present.]

3                     **STAFF SERGEANT AARON WOLFF,**

4  **U.S. Air Force, called as a witness for the prosecution, being duly sworn, testified via video-**

5  **teleconference substantially as follows:**

6                            **DIRECT EXAMINATION**

7  **BY ASSISTANT TRIAL COUNSEL:**

8    I'm Staff Sergeant Aaron Wolff, 23rd Combat Communications Squadron. Yes, I was stationed

9  at Incirlik Air Base, Turkey in 2015. Yes, I went on a trip to Pamukkale Turkey in 2015. I went on that

10  trip with C        , Scott, Katie, Sergeant Zier, and I don't recall the other names of the people who were

11  there. At the time, I was dating A1C Katie Moeller. Yes, the people on the trip were from Katie's unit.

12  No, I wasn't a part of the AFN team. I'd never met Sergeant Zier prior to the trip.

13    Yes, I remember getting in a hot tub. The whole group I mentioned was in the hot tub minus a

14  female technical sergeant who was on the trip. Yes, I remember Sergeant Zier removing his swimsuit.

15    It started off when Scott Taylor took his off. He was sitting in the pool and just lifted it up above

16  the bubbles in the water and just sat it down on the side. One by one, others started joining. I don't

17  remember the order. Yes, I'm confident that Senior Zier also removed his swimsuit. He was fully nude.

18  At one point he got out of the pool to grab a drink and covered himself with his hands. Yes, I could see

19  he was fully nude.

20    I was surprised and tried to ignore it. I knew he was nude, but I was surprised that he got out.

21  Yes, I thought about his rank and position. I would not want to be in position that the airmen under him

22  were in. It seemed very odd to be naked in a hot tub with people that were assigned under him.

23  Especially nude. No, that isn't appropriate behavior for an NCO.

24    Assistant Trial Counsel concluded his examination of the witness.

25                            **CROSS-EXAMINATION**

72

1    **BY CIVILIAN DEFENSE COUNSEL:**

2         Yes, from what I recall, every person in the hot tub took off their swimsuits.  Yes, Scott Taylor

3    was the first person to take off the swimsuit.  Yes, he made it obvious when he took it off by laughing

4    and drawing attention to himself.  Yes, people followed suit.  No, Senior Zier didn't order anyone to

5    take off their suits.  I did not see Senior Zier touch Sergeant F           inappropriately nor did I see them

6    hand fighting with each other.  I didn't hear Sergeant F          tell Senior Zier no or to stop.

7         No, I didn't see him to try to undo Sergeant F          s swimsuit top and I didn't see her

8    swimsuit top come off as she was getting out of the hot tub.

9         Civilian Defense Counsel concluded his examination of the witness.

10                        **REDIRECT EXAMINATION**

11   **BY ASSISTANT TRIAL COUNSEL:**

12        Yes, from what I can recall, everyone took off their swimsuit while in the hot tub.  No, no one

13   else got out of the water while fully nude.  I believe Senior Zier was getting another alcoholic beverage

14   out of the hot tub.  Yes, he had been drinking that night, the whole group was.  That was my first time

15   being around him while he was drinking, so I would speculate that he was buzzed.  He wasn't

16   stumbling.  I'd assume buzzed because of the way he was acting and talking and the amount of alcohol I

17   saw him drink.  I know he drank several drinks, I don't have an exact number but it was between three

18   and six.

19        Assistant Trial Counsel concluded his examination of the witness.

20        A question from Lieutenant Colonel Berenguer for the witness was marked as Appellate Exhibit

21   XIV.

22                     **EXAMINATION BY THE COURT-MARTIAL**

23   **BY MILTIARY JUDGE:**

24         I don't recall seeing Senior Master Sergeant Zier moving closer to C          and Katie in the hot

25   tub.

73

1    Neither counsel nor any member had additional questions for the witness.

2    [The military judge duly warned and temporarily excused the witness who departed the

3    courtroom.]

4                    **STAFF SERGEANT KATELYNN MOELLER**

5    **U.S. Air Force, called as a witness for the prosecution, being duly sworn, testified via Microsoft**

6    **Teams substantially as follows:**

7                              **DIRECT EXAMINATION**

8    **BY TRIAL COUNSEL:**

9    I'm Staff Sergeant Katelynn Moeller.  I'm stationed at Sembach Air Base, Germany.  There I

10   work for AFN as a broadcaster.  At Incirlik in 2015, I did video as well as radio.  At the time, Master

11   Sergeant Zier was our Det Chief at Incirlik.  Working for Master Sergeant Zier was good.  We were a

12   small shop so we were pretty tight-knit and I have nothing bad to say about that.  Yes, I consider him a

13   mentor.

14   Halfway during my time there, the base was put on lockdown but before we were on lockdown,

15   we were allowed to go out and travel.  The first trip that I went on was to Pamukkale with some of the

16   people in my shop, to include Master Sergeant Zier.  If my memory serves me right, that was one of my

17   first big Turkey trips.  Later on I did go on different trips.  The other trips were planned by friends.  It

18   was a relatively small base.  So, the people I worked with were the first people in interacted with.  Later

19   on, as I started making my own friends, those were the people I started traveling with outside of work.

20   I want to say Master Sergeant Zier was one of the people who planned it out.  I can't say for

21   sure, but I believed I messaged him asking if my boyfriend at the time, Aaron Wolff, could come with

22   us.  That's what makes me think he was in charge of planning it.  Yes, besides Aaron, it was a AFN shop

23   trip.  Yes, AFN stands for Armed Forces Network.

24   We went and looked at some of the sites.  There's a natural spring there.  I was under the

25   assumption that they were hot springs, they were not hot.  They were freezing cold.  We looked at some

74

1  of the ruins.  I remember they had a beer cart at the top of the hike and I thought that was strange but

2  kind of neat.  It was one of those, you're getting out and seeing local history sites in Turkey.

3       Yes, people were drinking throughout the trip.  I can't say the extent drinking for each person but

4  I know I had a beer on the hike, at dinner, and continued drinking later on in the evening.  Yes, I recall

5  parts of being at the hotel that night.  Yes, we ended up in a hot tub.

6       After exploring that day we rallied in someone's room.  At this point, we all decided to go hang

7  down at the hot tub.  We grabbed our drinks, brought them down there and everyone just hung out in the

8  hot tub for a bit.  Yes, people were still drinking at the hot tub.

9       I don't' remember exactly how things progressed, but I know that Aaron, who was not in my

10 shop, as things started getting a bit more wild, he was uncomfortable.  The people at the hot tub were

11 myself, Aaron Wolff, Jeremy Zier, C          G          Scott Taylor, and Shinzato.

12      Yes, I saw Sergeant Zier and G      , now F            next to each other in the hot tub.  I think it

13 got a little wild.  I know we didn't bring board games down there but I know we were keeping ourselves

14 entertained; so it may have been with truth or dare.  Aaron was very unconformable and mentioned later

15 on in the evening that my shop was kind of weird and he didn't do that with his leadership.  I know from

16 conversations and interviews I may have said something to switch spots with C       but I don't recall

17 that directly.

18      After the hot tub, C       approached us, myself and Aaron.  I think I may have noticed

19 something at the hot tub, but I don't recall it anymore.  I believe I was uncomfortable with what was

20 going on but there was nothing overtly obvious that made me think I need to get out of there.  Yes,

21 Aaron was uncomfortable and told me after the fact.

22      I don't know who left the hot tub first, I want to say it was C       and Scott and then Aaron

23 said, "Come on Katie, let's go."  Because he thought this was his chance to leave the situation.

24      Yes, I remember having a conversation with Sergeant F         after the fact.  I can't remember

25 if it was right after we got out of the hot tub and were all walking back to our rooms.  I can't remember

75

1    if it was that night or the next morning. C          mentioned that something occurred at the hot tub that

2    made her feel uncomfortable and she said that Master Sergeant Zier touched her underneath the water in

3    a way that made her uncomfortable.  I can't say what part of her body it was, but it wasn't in a spot that

4    she directly said that she was uncomfortable by it.  I don't know too much beyond this.  She wasn't

5    crying and I feel guilty now, but at the time I was just like, "Whoa, what?"  And then asked if she was

6    all right or okay.  I don't think I asked further.  She seemed uncomfortable and maybe in shock.  I

7    couldn't say how she was internally feeling, I know she was upset, but she wasn't crying.

8        At the time I was an E-2.  It was my first time overseas.  I was new to the shop.  I'd never been

9    put in a situation where someone came up to me and said something happened to them, and I didn't

10   know what to do.  Now I know what I would do.  But at the time, I just asked if she was okay and that

11   was probably the extent of the conversation.

12       I think I was naïve about how this could affect shop dynamics.  I don't think I realized the extent

13   of what she may have been going through so I went back to the office like everything was normal.  I

14   don't know what that says about my character, but that was my mindset.

15       Trial Counsel concluded his examination of the witness.

16                                   **CROSS-EXAMINATION**

17   **BY DEFENSE COUSNEL:**

18       No, I didn't see Senior Master Sergeant Zier inappropriately touch anyone that night.  Yes, I

19   consider him a mentor.  Yes, in an interview I described him as a great man and a great leader.  I haven't

20   talked to him in a while, but yes, I still consider him to be a mentor.

21       Yes, before the hot tub, people rallied in Sergeant Zier's room.  The people there were myself,

22   Aaron, Shinzado, Zier, Scott, C          , and I can't really remember who else.  Yes, I believe people then

23   went down to the hot tub.  Yes, it was late at night.  Yes, there were mood lights around the hot tub and

24   it was not bright.  Yes, I think the hot tub had bubbles and jets.  I don't like hot tubs and I remember not

25   enjoying the hot tub and that's usually because there's bubbles going on.

1    No, the water wasn't clear. I don't know what color it was, I just remember it not being clear.

2 Yes, the formation of the hot tub was rocky. I can't say for sure if Shinzato and Scott Taylor were

3 drinking. I know everyone else was. I don't remember the trip being a closed invite, but not everyone

4 went.

5    If I remember right, Sergeant F          was wearing a tankini, a swimsuit that covered her

6 stomach with a strap around her neck. As far as in the hotel room, they were wearing robes over their

7 bathing suits. Yes, I provided a picture of what she was wearing.

8    [Defense counsel approached the camera and held up Defense Exhibit A for the witness to see.]

9    Yes, I recognize this photograph. It's a picture of us before we went down to the hot tub. From

10 my memory there weren't multiple nights we went down to the pool so I believe that's the night of when

11 we went down to the hot tub. Yes, I provided the picture to counsel after I was asked to provide any

12 photos from the trip.

13    [Defense requested to publish Defense Exhibit A to the members. The military judge granted the

14 defense's request.]

15    I believe I mentioned on direct that C          said it was somewhere on her leg and I think my

16 confusion on what it was is what I wrote down for OSI at Ramstein Air Base. Yes, I told OSI I didn't

17 remember when the conversation occurred even though I said it could have occurred the next day. Yes,

18 I was surprised to hear that from Sergeant F          .

19    Yes, I believe Sergeant F          and Scott Taylor got out of the hot tub first followed by

20 Sergeant Wolff and myself. I don't recall when Shinzato got up and left. I don't know if Sergeant Zier

21 was still in the hot tub. I don't think he was the first to leave, but I don't know exactly in what order we

22 all left.

23    I do not remember if anyone took off their swimsuits in the hot tub.

24    Defense Counsel concluded his examination of the witness.

25                    **REDIRECT EXAMINATION**

77

1 | **BY TRIAL COUNSEL:**

2        Yes, it's possible that Sergeant Shinzato could have left before C      and Mr. Taylor.  Yes,

3 it's possible that Sergeant Zier left at the same time as Sergeant F      and Mr. Taylor.

4        [Trial Counsel approached the VTC holding up Prosecution Exhibit 3.]

5        In that picture I see two hot tubs and possibly a pool or another hot tub in the back of the hotel.  I

6 believe this is where we stayed.  I thought I found a picture of the actual hotel we stayed at.  It's hard to

7 tell from this picture, I mostly recognize the front of the building and the hot tub.

8        [Trial Counsel held up Prosecution Exhibit 4 for the witness to see.]

9        Yes, I can see that photograph.  Yes, that's similar to the hot tub we were in at the hotel.  Yes,

10 the water was murky that night.

11        [Trial Counsel held up Prosecution Exhibit 5 for the witness to see.]

12        It's hard to say if that picture is familiar to me.  I believe the room I stayed in had two twin beds

13 and it's hard to tell from this photo, but yes, it looks similar to where I stayed that night.  Yes, this is a

14 fair representation of what a room there would have looked like.

15        Trial Counsel concluded his examination of the witness.

16        Trial counsel requested to publish Prosecution Exhibits 3 through 5 to the members.  Without

17 objection, the military judge granted the prosecution's request.

18        Neither defense counsel nor the members had any additional questions for the witness.

19        [The military judge duly warned, temporarily excused the witness.]

20        [The court-martial recessed at 1645, 11 August 2020.]

21                                  **[END OF PAGE]**

22

78

1

**ARTICLE 39(A) HEARING**

2     [The Article 39(a) hearing as called to order at 1706, 11 August 2020.  The parties were present

3     and the members were absent.]

4     Trial Counsel informed the military judge their way ahead and potential appellate exhibits to be

5     referenced during testimony.

6     Neither counsel for either side had anything further prior to calling the members.

7     [The Article 39(a) hearing recessed at 1708, 11 August 2020.]

8     **[END OF PAGE]**

9

79

1    [The court-martial was called to order at 1709, 11 August 2020.  The parties and he members

2    were present.]

3                              **MS. SIEANA MACKIEWICZ,**

4    **civilian, called as a witness for the prosecution, being duly sworn, testified substantially as follows:**

5                                  **DIRECT EXAMINATION**

6    **BY TRIAL COUNSEL:**

7        My name is Sieana Mackiewicz.  I live in Oklahoma City, Oklahoma.  There I'm a video

8    producer with the Oklahoma Department of Transportation.  Yes, I was previously in the Air Force for

9    one four year enlistment from 2013 until 2017.  While in the Air Force, I was a broadcast journalist.  In

10   2015, I started off the year in Incirlik Air Base and then went to Spangdahlem Air Base.  I was in

11   Incirlik for 15 months from January 2014 until April 2015.  My station manager was Master Sergeant

12   Jeremy Zier.  Yes, I was also stationed with C          G          now F          .

13       I didn't really know C          before she got there.  We met once briefly while in tech school but

14   we became very close friends.  Working in the office was fine, I didn't have a frame of reference.  I was

15   close to some of the airmen I worked with.  Sergeant F          and I became best friends over the course

16   of the time we were stationed there.

17       Yes we took trips together.  ITT and Outdoor Rec trips were really popular at Incirlik.  There

18   would be times when a few of us from the shop would go on these trips.  It's not that I went with her

19   alone, but yes, I went on trips with her.

20       I was not on the trip to Pamukkale.  I believe Master Sergeant Zier planned the trip, but I'm not

21   100% certain.  That trip was something that was planned by the leadership of the shop.  Yes, people who

22   went on it were mostly people who I worked with.  Yes, Sergeant F          and Senior Master Sergeant

23   Zier were on the trip.  That trip was right as I was leaving.  That's why I didn't go.  I was already in

24   lodging so it was within the last 10 days of my time at Incirlik.  It would have been around early April.

25       Sergeant Zier was my boss but it was also a small shop and I knew his wife, she was pregnant

80

during that time and I remember their infant child. I dog sat for them a couple of times. I was fairly close to them. Yes, I've been in their home.

Yes, I recall sending you messages I downloaded from Facebook. Yes, that was the early April time-frame when that trip occurred. Yes, Sergeant F            talked to me about that trip when she got back. I don't remember exactly when but from those messages, it appears it would have been 6 April. Yes the conversation where she said, "Thanks for the deep philosophical talks," that would have been around 6 April, in the evening. Yes the conversation referenced in that message would have happened that day. During that conversation C            told me that during the trip that everyone was drinking and they were in a hot tub. Master Sergeant Zier had been touching her and trying to touch her underneath the water. She told me that at one point she tried to move away to create distance. She also told me that her and Scott Taylor were trying to put Senior Zier to bed in his hotel room because he was very drunk and when they tried to put him to bed he acted like he was going to turn off a light switch but instead, he reached for her bathing suit top and pulled it down. It was obvious to her that that wasn't an accident even thought he was trying to make it seem like it was an accident.

Yes, I had been dating someone while I was in Turkey. Yes, he left in 2014, I'm not sure when. Yes, I remember socializing with Senior Master Sergeant Zier and Sergeant F            at the E-club on base after my boyfriend left. This wasn't the only time I'd seen him there. C            and I went to the E-club frequently and would see him there from time to time. One specific occasion that I remember, it took place before the trip to Pamukkale, we were at the smoke pit outside the E-club. He was visibly drunk and talking to us. I don't remember the entire conversation but I do remember that it was kind of sexual in nature. I specifically remember he asked if we'd ever had a one-night stand before. I believe he asked me first and then asked C            the question. I specifically remember him asking that question because I specifically remember making eye contact with her. Neither of us knew what to say. He persisted and eventually I did answer the question.

I turned 19 years old while I was stationed in Turkey. Yes, it was my first duty station. I

81

1  listened to Sergeant F            . She didn't feel like she had reporting as an option to her because Scott

2  Taylor was there and he wasn't willing to say what he'd seen. So she didn't' feel like she could do

3  anything about it because it's a he-said-she-said.

4      Yes, Master Sergeant Zier was a major authority to me. Yes, I would say I respected him. I

5  know that C            and I talked about his wife and how we felt bad for her because we knew her and his

6  child and we felt bad knowing how it would affect her.

7      Trial Counsel concluded his examination of the witness.

8  <center>**CROSS-EXAMINATION**</center>

9  **BY DEFENSE COUNSEL:**

10      Yes, the incident at the smoke pit happened in 2014. Yes, I knew that Sergeant Zier's wife was

11  there in 2014 because I'd met her. Yes, I'd been over to their house. Yes, there was the one question

12  about a one-night stand. Yes, the conversation continued. No, I didn't run away or stop the conversation

13  immediately.

14      No, I did not go on the trip. Yes, my understanding of the trip was through Sergeant F

15  No, I don't remember her telling me she took of her swimsuit. Yes, that conversation took place in early

16  April.

17      I don't remember writing a handwritten letter to Master Sergeant Zier, but you showed it to me a

18  moment ago and it does definitely look like something I wrote. Yes, seeing a copy of it would refresh

19  my recollection.

20      A handwritten letter was marked as Appellate Exhibit XV.

21      [Defense Counsel handed Appellate Exhibit XV to the witness who then read it.]

22  <center>**CROSS-EXAMINATION (Continued)**</center>

23  **BY DEFENSE COUNSEL:**

24      Absolutely, that is my handwritten. Yes, that's how I sign letters. Yes, that's my name at the

25  bottom. Yes, I wrote 6 April 2015 on the bottom. Yes, I told Senior Master Zier that he was a good

<center>82</center>

1    boss and that I wanted to let him know that I appreciated his personal and professional support and for

2    giving me a good example of what strong senior leadership should be.  Yes, I signed it thank you.  Yes,

3    it's dated 6 April 2015.

4          Defense Counsel concluded his examination of the witness.

5                                    **REDIRECT EXAMINATION**

6    **BY TRIAL COUNSEL:**

7          I usually interacted with Senior Master Sergeant Zier during the workday.  I probably would

8    have given him the letter during the duty day.  I'm sure I was getting ready to PCS, but I don't

9    specifically remember that.  I do write thank you notes, that's something I do for people who have been

10   kind or helpful to me.  It doesn't surprise me at all that I would have written a note.  I don't remember

11   writing that note, but I wouldn't be surprised if I had written another thank you note.

12         The conversation with Sergeant F          would have likely occurred later in the evening.  Yes,

13   it's possible I gave that letter to Sergeant Zier and then found out about the incident later that evening,

14   but I don't have a specific memory.  The date I wrote on the bottom is the only frame of reference I have

15   for that.  Yes, based on the messages with Sergeant F        , I found out about the alleged misconduct

16   on 6 April.

17         Trial Counsel concluded his examination of the witness.

18         Neither defense nor any member had additional questions for the witness.

19         [Being duly warned, temporarily excused.]

20         The military judge reminded the members to not research or discuss the case while on the over-

21   night recess.

22         [The court-martial recessed at 1738, 11 August 2020.]

23                                    **[END OF PAGE]**

24

1 **ARTICLE 39(A) HEARING**

2 [The Article 39(a) hearing as called to order at 1738, 11 August 2020.  The parties were present,

3 the members were absent.]

4 The military judge asked the parties on their way forward for the next day's proceedings.  He

5 then stated he would start working on the draft instructions

6 Neither counsel for either side had anything further before recessing for the evening.

7 [The Article 39(a) hearing recessed at 1740m 11 August 2020.]

8 **[END OF PAGE]**

9

84

1

**ARTICLE 39(A) SESSION**

2    [The Article 39(a) session was called to order at 0830, 12 August 2020, with all parties present

3 when the court recessed again present.  The members were absent.]

4

**R.C.M. 802 CONFERENCE SUMMARY**

5    The military judge summarized the R.C.M. 802 conference held last evening where the parties

6 discussed a potential instruction.  Neither side had anything to add to or objected to the summary.

7    The military judge directed the bailiff to call the members.

8    [The Article 39(a) session terminated at 0831, 12 August 2020.]

9

**[END OF PAGE]**

US v. Zier Military Record of Trial and Appellate Extracts 000734 of 902

1   [The court-martial was called to order at 0831, 12 August 2020. All parties were present to
2   include the members.]

3                              **STAFF SERGEANT C            F            ,**

4   **U.S. Air Force, called as a witness for the prosecution, being duly sworn, testified substantially as**
5   **follows:**

6                                      **DIRECT EXAMINATION**

7   **BY ASSISTANT TRIAL COUNSEL:**

8   My name is C            F        . I'm assigned to the 1st Combat Camera Squadron at Joint
9   Base Charleston, South Carolina. I grew up in a very small town called Corsica, South Dakota,
10  population 600. I didn't know any different growing up in Corsica. It was a very small world
11  community, farming family, so very isolated. I decided to enlist in the Air Force when I was a junior in
12  high school. I knew throughout high school that I wanted to be in the military. I have a brother-in-law
13  that's in the Air Force and he persuaded me to join. I went to basic training in November 2013. It was
14  my first time on an airplane. My mom wasn't happy or excited I decided to join. In my town has old
15  values so women don't join the military service. My dad was kind of indifferent. It was ultimately my
16  decision so they supported me and helped me enlist a little sooner to get the job I wanted and not get
17  stuck in something more dangerous. I wanted to be in broadcast journalism, which is public affairs.

18  Our tech school is at Fort Meade, Maryland. It was a joint enviornment. Our career field is
19  small we trained with Marines, Navy, and Army, and all of us were in the same schoolhouse doing the
20  same job. My follow on assignment after tech school was Turkey. I honestly had no idea where that
21  was at the time. They told me I would get a follow on assignment after Turkey and I would get make
22  another dream sheet for that assignment. I was assigned to AFN Incirlik, which was a tenant unit. AFN
23  is weird. We're not like public affairs at other bases. AFN being a tenant unit did serve the Wing
24  Commander and pushed out a lot of his messaging. For unit command, we report an overall
25  headquarters in Europe for all AFNs. The AFN shop at Incirlik was a small which are a lot smaller

86

1  teams than public affairs.  There are airmen who do the actual radio shows and make videos that we post

2  on social media.  The NCOs are for QC the actual content before it goes onto those platforms.  You have

3  a senior NCO who is the superintendent that oversees all operations at that point.  Senior Master

4  Sergeant Zier was the senior NCO at the time when I was at Incirlik.  He is in the courtroom sitting right

5  at the end of the table.  [The witness positively identified the accused.]

6        Senior Master Sergeant Zier reported to the headquarters in Europe which was in Germany.

7  Being a small shop, I did interact with him as part of my day to day job.  With that I think it came a lot

8  of different dynamics, people know each other a bit better than if you were in a bigger squadron, but for

9  the most part it was people interaction.  Yes, he was getting the mission done.  I was an Airman First

10  Class when stationed in Turkey.  I was the lowest ranking member in the unit.  I wasn't the only female.

11  There was one other female airman as well.  That was Sieana Mackiewicz.  We became friends really

12  quickly being a small unit and the only two females and we got along really well.  We were best friends

13  throughout the assignment.

14        We did interact with Senior Master Sergeant Zier outside of the duty hours frequently.  The

15  location varied.  Sometimes at dinner parties he would host at his house, or other NCOs would have

16  little dinners at their house, or game nights.  There were other times at the E-Club on base, especially on

17  Friday nights after work, everyone would go hang out at the club together and drink.  There are a few

18  interactions there that stand out.  The one I think of the most often is one night where Mackiewicz and I

19  were there, Senior Master Sergeant Zier was there as well, and we were all drinking.  He got very, very

20  hammered.  Mackiewicz and I both smoked and we went out to the smoke pit.  He followed us out kind

21  of stumbling his way over and asked us to walk him home because he was very intoxicated and thought

22  he would need assistance.  There were some uncomfortable moments at different various events and not

23  a good situation to be put in, a lot things combined that could get to a bad situation.  Just being put in

24  that position and being asked to take care of your senior NCO was just uncomfortable.

25        I did interact with Senior Master Sergeant Zier's family a lot.  I was very close with his wife.

87

1   She was very artistic, nurturing, warm and kind with us being the only females in the office.  She did a

2   lot by offering to help decorate our dorm rooms, checking up on us, so we were very close.  I do think

3   very fondly of her.  They had a child while there.  Her name was Zoe.  She was born two days after my

4   birthday.  I would go over, hang out, and babysit sometimes, or watch their dog if they were going on a

5   trip somewhere.  I did enjoy babysitting Zoe.  She was very cute.  I specificially remember multiple

6   times Mackiewicz and I would dog sit or babysit together.  There might have been a time or two where I

7   babysat alone.

8       I did continue spending time with Senior Master Sergeant Zier's family after the smoke pit

9   situation.  It didn't cause me to cut ties with them.  It was kind of the lifestyle where almost every senior

10  NCO is kind of at the E-Club drinking with the other lower ranking enlisted.  Kind of the culture of a

11  short tour.  I just assumed at tht timehe was very, very intoxicated and most likely wouldn't remember

12  he asked us to that the next day, so I didn't take it personal.

13      Yes, I did take a trip to Pamukkale.  That would have been in April shortly before I PCS'd from

14  Incirlik.  I was excited to go there.  Pamukkale is this really cool location where there's a lot of natural

15  springs and natural waterfalls, and one of the top tourist locations in Turkey.  I met a lot of people

16  throughout my assignment that talked about the location and I was excited to get the opportunity.  There

17  was a lot that went on this trip.  It was unit trip, sort of like a morale event.  I specifically remember

18  Senior Airman Scott Taylor, Katie Moeller had just PCS'd in at the time and her boyfriend,Sergeant

19  Shinzato went, Senior Master Sergeant Zier, and a handful of other people.  On the very last full day, we

20  went to one of the ancient ruins and go see some of the history of the location, had lunch and then we all

21  came back to the hotel did some day drinking and just hanging out.  Later that afternoon, we all went

22  down to a little hot tub party.  No one was especially intoxicated during the day.  It was kind of just on

23  the stop of little cart of beverages and you can grab a beer while you walk around.  It wasn't excessive.

24      We went sightseeing and then everyone kind of dispersed back to their rooms.  We took a long

25  break apart from everyone and then eventually that night we all agreed to meet up, Senior Master

1    Sergeant Zier stopped by and asked when we were going down, and then there was some conversation

2    that took place, and then we went down to the hot tub.  I was sharing the room with Scott Taylor and he

3    was my other best friend at the assignment.  We were both part of the LGBTQ community together on

4    base and were very close.

5           At first Senior Master Sergeant Zier was checking in with us, and he kind of came in and made

6    himself more comfortable and we started talking just in general about different stuff, just small talk.  We

7    started getting into conversations more about social issues and with being in the LGBTQ community,

8    don't ask don't tell, and he started to ask us questions about our opinions and thoughts on different

9    things that were happening in the military with that community.  Yes, I was active in LGBTQ groups.

10          I identify as bisexual.  When I first arrived to Turkey, it was something I was still in the closet

11   with, having grown up in a small hometown where it's not a safe place to have those conversations or

12   openly identify.  Once I got there was my first exposure to meeting other people who were out and

13   proud, which kind of gave me more courage and bravery to come out myself.  My family obviously was

14   not a fan.  That was difficult.  They cut me out for the duration of that assignment.  I didn't have a

15   support system back home, but I had this group of people who genuinely loved me for who I was fully.

16   I was very close with the group.

17          Originally, he was just asking more about generally what do bisexual people talk about, being

18   lesbian or gay.  Once it gets to bisexual people there are a lot of stigma and they don't understand what

19   that means.  The conversation started to get more into details of sexual acts, and explaining what it's like

20   to have intercourse with a female, and what you like about that compared to being with a man, and was

21   it just what you feel like sexually that day with your partners, just questions of that nature.  That

22   eventually led into me being asked if maybe I'm bisexual because I "haven't had the right dick yet."

23   Things of that nature that were very uncomfortable and inappropriate for someone in your leadership to

24   be saying.  Yes, Senior Master Sergeant Zier was asking me those questions.  Yes, I was quoting Senior

25   Master Sergeant Zier.  He asked me if I was bisexual because I "haven't had the right dick yet."  It was

US v. Zier Military Record of Trial and Appellate Extracts 000738 of 902

1  uncomfortable.  Unfortunately, it is not the first time I've been asked something of that nature.  It was

2  something I learned quite quickly once you identify as part of that community.  People feel they have

3  the right to ask you all kinds of inappropriate things they would never ask someone who was

4  heterosexual.  That is part of being out.  It's not okay, but is something I think keeps a lot of people from

5  fighting against the stigma of LGBTQ.  Yes, I felt it was inappropriate conversation and distinct from

6  what you would call appropriate LGBTQ questions.  It was different than asking questions to better

7  understand and get to know your troops and help along, those are very different conversations.  Once it

8  gets into the sexual realm to point where it's almost someone's playing out a fantasy in their head and

9  when it crosses that line and no longer about understanding.

10      After that conversation we talked about a few other things like social media apps, Snapchat, stuff

11  like that.  He was asking us to explain how it works.  Eventually we made our way down to the hot tub

12  with everyone else.

13      I was wearing a swimsuit with a robe over it.  At the hot tub I took off the robe to get into the hot

14  tub.  The swimsuit was a two-piece.  It was navy blue bikini bottom and the top was a blue and white

15  striped with spaghetti straps and tied at the back.  Scott Taylor, Senior Master Sergeant Zier and myself

16  all went down there together.  Katie Moeller, her boyfriend were already down there, and Sergeant

17  Shinzato.

18      At this specific resort, they actually had a natural stone hot tub.  It's actual natural water coming

19  off of the hill, a natural mineral hot tub with a circle pool for the water, and you're sitting in a cave-like

20  thing.  Yes, it was a big hot tub.  There were multiples of them at the resort.  Yes, there was drinking at

21  the hot tub.  That's when it started to get crazy.  There were liquor bottles brought down from

22  everyone's room, shot glasses surrounding the outside rim of the hot tub, and definitely alcohol heavy.

23  Katie and her boyfriend were drinking quite a bit by the time they got down there and had been hanging

24  out for a while.

25      As the night went on, everyone kept drinking, taking more shots.  I actually quit drinking once

90

1   the comments and questions in the room started that were inappropriate, that made me feel

2   uncomfortable.  Entering the hot tub from the front there was Scott Taylor to my right, and to my left

3   was Senior Master Sergeant Zier, then Sergeant Shinzato, then Katie and her boyfriend.  I was a little

4   uncomfortable sitting next to Senior Master Sergeant Zier because there was plenty of room to spread

5   out and give each other more space.

6        Yes, I became more uncomfortable because as more alcohol was being consumed people got

7   more free with their bodies, expressing, and touching you and invading your bubble.  That started

8   happening a lot with Senior Master Sergeant Zier, who kept trying to move closer to me.  He actually

9   rested his hand on my thigh at one point.  From there events just continued to get to more

10  uncomfortable.  I assumed with him moving closer it was because he was really drunk.  I wasn't taking

11  it personally.  Once it became clear to me he was trying to actually physically touch me is when I started

12  to scoot over to Scott Taylor and get his attention to try to help with in the situation.  After I'd scoot

13  over, he'd kind of sit back and wait, and as he kept drinking it kept happening.  The first time he touched

14  my thigh was lower down by my knee.  Nothing overtly sexual.  I didn't think that was necessarily crazy

15  because people sometimes lose their balance or don't mind their spacial boundries.  I shifted away.

16  Every time he would come back and touch my leg again it started to get higher and higher on my leg

17  closer to my inner thigh where it started to become clear to me what he was trying to do.  I thought he

18  was trying to touch me in a sexual way.  No, I did not consent to this touching.  I was clearly moving

19  away.  At one point, Scott Taylor did notice something was happening.  I don't know if he had all

20  situational awareness, but he did sit between me and Senior Master Sergeant Zier and help passively

21  intervene in the situation.  The touching stopped.  Scott Taylor got up to go to the bathroom and Senior

22  Master Sergeant Zier was sitting next to me and he rested his hand back on my thigh.  As I said before

23  he was getting higher up my leg closer to my inner groin area.  When Scott Taylor left to go to the

24  bathroom is when Senior Master Sergeant Zier put his hand into my bikini bottom at the leg opening and

25  touched my vaginal area.  At that point, I stood up and got out of the hot tub.  Yes, it very much seemed

91

1    like the touch was intentional.  No, it was not a clumsy movement.  Yes, I was acting on instinct and

2    didn't want to be a part of anything.  No, I did not consent to this touching.

3            I stood up and quickly left the hot tub area.  At that point, Zier called my name, and at that point,

4    my swimsuit top came untied and my breasts fell out below the swimsuit.  Senior Master Sergeant Zier

5    reached for me and pulled my swimsuit top tie as I was turning around and leaving the hot tub.  For the

6    past five years, I've assumed it was intentional.  Because at that point, there was no reason to invade that

7    space anymore.  If you're trying to talk or something there was no reason to reach or touch someone, so

8    I believe it was intentional.  In the OSI interview, I was asked if I had any other evidence to support his

9    intention of it being intentional, but I don't.  It was what I believed in the moment and still believe now.

10   Yes, I was inferring it was intentional from the hot tub touching.

11           After I got out of the hot tub, Scott Taylor came back down and saw I was upset and he did come

12   up to the room to check on me.  They others stayed down and kept drinking.  I don't know if it seemed

13   like as big of deal to everyone else as it was to me at the time.  I talked to Scott Taylor when he came up

14   to the room to check on me.  My boyfriend did not come with me on the trip.  I messaged him on

15   Facebook and told him I really needed to talk as soon as I got back to base.  Nothing had happened.  I

16   didn't follow up with anyone about what happened until we all got back the next week from the trip.

17           He [Scott Taylor] knew early in the night was uncomfortable to the point where he tried to

18   intervene, but he wanted to know more about what happened.  I was pretty shaken up at the time and I

19   kind of wanted to lock myself in the room and not see anyone.  I don't remember discussing it with

20   anyone else during the trip.  Scott Taylor and I are best friends.  I'm sure at some point we did discuss it

21   later, but I don't distinctly remember talking to anyone else.  The day after this we all went back to the

22   base.

23           After I got back, I went to my boyfriend's dorm and talked to him about what had happened.  I

24   talked to Sergeant Mackiewicz about it the following week.  I was still trying to process because I knew

25   there was a lot of alcohol involved, I was having a hard time figuring out how to go about it processing

92

1  everything.  I talked to Sieana Mackiewicz and Marcus, my boyfriend at the time, and talked to Scott

2  about.

3          When I did go back to work in the office, I did end up kind of trying to feel out with the different

4  NCO's that were on the trip how much of that night they remembered to see if they all  knew and were

5  just pretending that nothing happened because they didn't want to get in trouble or if they did or if they

6  were that drunk and they didn't remember.  I started to ask some questions about the hot tub and if they

7  remembered anything awkward happening.  Almost everyone said, "What are you talking about?"  At

8  that point, when talking to Scott, I told him other people were either like covering for Senior Master

9  Sergeant Zier, which was how I felt at the time, or genuinely just did not remember.

10         At that time, as an airman who didn't fully understand the chain of command, I only understood

11 it to a degree because we were a tenant unit and that was your only chain of command at that assignment

12 and that's who's writing your EPR's, putting you up for quarterly awards, and if you make that one

13 point of failure upset then you're done career wise.  It wasn't necessarily that I thought they were doing

14 it on purpose, or to maliciously hurt me, I was just trying to wrap my head around the system and how

15 this could be a place if that person at the top in your unit is the person doing these things, then at that

16 point there isn't an option for accountability for NCO's were also being put in difficult situations.  They

17 would also have to pick or choose whose word over who.  It was hard to figure out what to do.

18         Yes, Scott was there that night and he picked up on my cues in the tub.  I did have conversations

19 with him about reporting it.  He had some friends who had gone through some processes before and he

20 was being realistic with me saying if these other people are going to help be a part or won't be a part of

21 this, he didn't know what we could do.  I think ,at the time, I was really upset because I felt like it didn't

22 matter to anyone but me.  Maybe it did and they just didn't know how to handle it but I didn't feel that

23 way at the time.  I was 19 at the time.

24         I learned about SAPR and SARC and went over to their office and I shared with the SARC that I

25 talked to that I wanted to ask some questions but I wasn't at the point of deciding on reporting.  They

93

said if I was asking hypothetical question they could maybe give me some answers.  I had about an hour
long meeting with the SARC about hypothetically this happened on a trip and worst case scenario none
of the NCO's or the witnesses were willing to be honest what happened.  He was real with me and he
said well, I've seen before in a court where that just becomes a he said, she said argument and it doesn't
resolve too much, and was something to consider.  At that point, I decided that there was no point in
reporting.  I did feel confident that people would, not necessarily  not tell the truth; but not go against
their boss and risk it.  If he wasn't found guilty then they would have to go back to the same office and
work with that individual again.

I think my relationship with his family has been one of the hardest things to deal with over the
past couple of years.  As I learned more about assault, serving as a VA with the SAPR office, just to get
my knowledge on what people had as options because it felt pretty crappy and isolating at the time it
happened.  I just felt so bad because I loved his family.  I was super closed to his wife and I didn't know
how to have that conversation with his wife more so than calling Senior Master Sergeant Zier out and
having that conversation with him.  I was more so afraid of his wife not believing me and our friendship
being done, or breaking apart their marriage and their family when they just had a baby.  It was just a lot
of pressure to figure out and navigate.

I still don't even know the system and that kind became my family overseas.  That was really all
I had, so I was really disappointed he did something that I still somewhat regret to this day of at least not
having that conversation with her.  Even if it would have ended our friendship, I still think about if that
happened to my sister, I would want her to know that her husband is doing these things.  That's been
hard for me.

His wife was at Incirlik when this took place.  I know she went back to the states a lot with her
family and she had their child Zoe in the states.  There was a lot of flying and traveling back and forth.
Towards the end of the assignment, Turkey started become a more hostile area, and a lot of the
dependents were forced to go stateside and no longer allowed to be there.  It was complicated.

94

1  Throughout the time, different spouses in the office were slowly going home, volunteering before it

2  became mandatory.

3      Yes, I had a few brief interactions with Senior Master Sergeant Zier after leaving Turkey. It was

4  just over messages. I went TDY a couple of times to a location where he was supposed to be assigned to

5  and he asked me what I was doing there and where I was staying. A few other times he had reached out

6  to me and asked if I would consider applying to Com Cam, which I had just orders there. At that point,

7  that's when I reached out to my sponsor from Com Cam and asked what Senior Master Sergeant Zier's

8  involvement was with the squadron and they told me he was in charge of our flight program.

9      Yes, I was contacted by OSI regarding allegations about Senior Master Sergeant Zier. It sucked

10  getting that call because I think I convinced myself over the past five years that this had just happened to

11  me, and it was just that night, and it was just alcohol. To find out there were more victims, that I didn't

12  report it, it's something I struggle with still. Maybe if I would have reported it, even if they didn't

13  believe me, the court-martial would have been public and people would have at least had a heads up that

14  maybe he wasn't someone to trust being around. I know it's not my responsibility and not my fault, but

15  it's still hard not to feel that way when you didn't have your voice at that time. I would do things

16  differently now.

17      That OSI interview was something that I had been thinking about for a long time, and what is the

18  process like if I did ever actually report, and if I would have reported what would have happened.

19  Going through it was rough. It was hard. I thought I would go in, tell my story, they would take it or

20  leave it and that was kind of the end of it. I understand why they need to do what they do, but they have

21  to ask you the same things. You repeat your story like six or seven times. Every time you repeat it more

22  details typically come to mind especially when it's been that long of a duration between what happened

23  and now. It was hard because of the specifics of the incident. Yes, it was a little surreal. It brought

24  back more than I honestly remembered about everything happening.

25      Yes, OSI wanted a minute by minute accounting of what happened. It was very specific. I was

1   there for a very long time.  They want you from each scene of what happened to take a breath, think
2   about what were the colors, what you smelled, what you felt, and walk you through the process at every
3   point.  Because it had been so long, I wasn't too worried about going in, I learned a lot as an NCO, and
4   felt kind of empowered going in, but it was surprisingly more difficult than I realized.  There's a camera
5   recording you the whole time and it was a lot.  Never during that five year period was I asked to or sat
6   down and did a minute by minute accounting of everything that happened.  I became a VA and then
7   unfortunately, I've had some airmen that I supervise that have had some experiences with sexual assault
8   or harassment.  I think in those ways, I've had maybe found outlets to finally continuly healing what had
9   happened, especially to be volunteering with the SAPR office, but never actually going back to that
10   place.

11        Honestly, for the most part of that trip, that's all I can think about.  I don't really care about the
12   stupid waterfalls we saw.  I don't care about the ancient ruins.  History is cool, don't get me wrong, but
13   that's all that trip was to me at that point was what happened.  I think you're violated in ways by
14   someone who's supposed to help teach you, not only how to be an airman, but how to function as an
15   adult, and as someone who was just coming out of an environment that was so isolating and so closed
16   off.  Looking back, I was pretty naive in putting a lot of trust in people that I really didn't know.  I
17   learned more that having rank doesn't necessarily have anything to do with leadership for some people,
18   and I think that was just a lesson I hadn't learned at that point.

19        Yes, when I spoke with OSI, I thought the bikini top being untied was intentional.  I do still think
20   it was intentional today.  OSI asked me if it was accidental.  Honestly, that was the first time I ever even
21   considered that.  It is possible he was reaching for my arm and did accidentally grab the strings instead
22   of my arm, but that's not my memory of the event.  That's not how I remember feeling.  It was like I
23   was being violated again.  That's not how I remember how fast everything was happening.  Only he
24   would know in his head, but that is how I remember.

25        In some ways, it kind of feels like a weight off my chest by participating in this court-martial.

96

1   This was something I don't share with a lot of people.  That's why it's hard in this process because you
2   end up telling your story to everyone in the world.  I think in a way it's the last step of me being able to
3   finally at least close the door and not have anymore what if's.  I can't control the outcome as to what
4   happens, but at least as an NCO I can now help my airmen and not feel like a hypocrite by telling them
5   to talk someone about that, or there's things in place to help protect you and not feel like I'm lying to
6   them.  I genuinely mean it, and I genuinely want to help them every step of that way.  In some ways, I'm
7   learning lessons the hard way but I'm learning to be a better leader myself.  On the flipside, I'm also
8   getting increasing more angry when I learn about how many points of failure.  It wasn't just that night.
9   There were so many times where inappropriate comments were made by other people in the office too,
10  and they were never corrected.  It was more of a culture problem.  I think it's hard for me now realizing
11  it's not just one person or any one night, and I think it's just prevalent in the Air Force.

12          From five years ago to today, with the acts that took place, I had tried to convince myself that it
13  was an accident, or it was just alcohol, or whatever; so I started to repress those feelings, and try to
14  forgive, and try go through it.  As it is, I found out there were other people that something happened to
15  and at that point I became angry all over again.  Trying to convince myself was emotion driven.  In the
16  back of my head it wasn't, but going back to that environment, everyone acting normal like nothing
17  happened, it was just weird.  You go back to this normal robotic like behavior and everyone just wants
18  you to move on and you do just to kind of get through it.  After I PCS'd and got settled at my next
19  assignment, I did start talking to an MFLAC counselor to get some stuff off my chest.  Once going
20  through some of those process, I started to realize just how wrong it was.  It was hard in that
21  environment to identify that this wasn't the norm.  It also just seemed like well that's what happens on a
22  short tour.

23                          **CROSS-EXAMINATION**
24  **BY CIVILIAN DEFENSE COUNSEL:**

25          Yes, in the hotel room before going to the hot tub was myself, Scott Taylor, and Senior Master

97

1    Sergeant Zier came by.  Yes, Senior Master Sergeant Zier knew quite a bit about my personal life.  My

2    personal life was fairly known in the office, and he and the office knew I had a bad break up with a girl

3    before arriving in Turkey.  Yes, I had been in the office about a year before taking the trip.  The

4    conversation did turn from curosity to inappropriate discussions.  What I told OSI was that Scott Taylor

5    did step in and intervened in the conversation but it still stayed in the realm of some of the inappropraite

6    lingo.

7        I did not take off my bikini top in the hot tub.  I do know Master Sergeant O'Brien.  I don't recall

8    him being at the hot tub.  If he testifed he was there at the hot tub and that I took off my top and bottoms

9    he would be lying.  I did not take off any clothing.  I had my swimsuit on the whole time and did not

10   remove any item of clothing.  I was in a relationship at this time with Marcus F          He was back at

11   base and was unable to get approval to go on the trip.  Yes, I have spoken to the prosecutors multiple

12   times leading up to my testimony today.  Yes, in April I told the prosecutors Senior Master Sergeant

13   Zier had touched my thigh between six and eight times.  I believe some of the touchings were incidental

14   contact, but there's no way for me to know but the repetativeness of the touching is what started to make

15   me believe it wasn't just being clumsy and trying to get your balance.

16       Yes, he touched my vaginal lips and, when speaking to OSI, I did say he grazed my genital area.

17   I don't believe I told Scott Taylor he touched my genital area, just that Senior Master Sergeant Zier

18   touched me.  Scott Taylor and I were best friends and shared a room together.  He got out of the Air

19   Force and we haven't talked in a long time.  We're still friends but not best friends anymore.  Back then

20   we shared a lot of intimate details with one another.

21       I did tell OSI about Senior Master Sergeant Zier touching me while in the hot tub and that Scott

22   Taylor said he'd be my wingman and a barrier for me.  Scott came over and intervened and sat between

23   us.  Scott was in the hot tub when the touching initially began on my leg and he could tell that was

24   making me uncomfortable.  He did go to the bathroom and came back, but it was leading up to that.

25       There were mutliple times I was uncomfortable in the hot tub that night.  Once the touching

1  started to get higher on my leg, I started to look over at Scott and motioned that something was

2  happening.  He saw the touching of my inner thigh in real time.  Scott was in the bathroom when the

3  touching happened under my swimsuit, but he was in the hot tub for part of the touching of my thigh,

4  and that's when he sat in between as a barier to try and mitigate the situation.  Yes, when Scott Taylor

5  went to the bathroom is when Senior Master Sergeant Zier's hand went under my bikini bottom.  I did

6  have my bikini bottom on.  When he put his hand under my swimsuit is when I stood up to leave the hot

7  tub.  No one was helping me so far, so I didn't have reason to believe anyone would help me then.

8        Yes, I did tell OSI prior to this final touch I was sort of hand fighting with Senior Master

9  Sergeant Zier and trying to remove him from touching me.  At various points, yes, I told Senior Master

10  Sergeant Zier to stop or said no.  There was nonverbal and verbal wasy of saying no.  But, yes, at

11  multiple times it became clear that I was not okay with what he was trying to do.  I didn't get out and go

12  to one of the other pools there.  After the final touch, I got out of the hot tub and headed back to my

13  room.  I believe Scott and I crossed paths on my way back.

14        Yes, I believe Senior Master Sergeant Zier intentionally pulled down my top.  This would have

15  been around Scott as well.  I do believe this was an intentional act by Senior Master Sergeant Zier.  I've

16  been interviewed a lot, so I was possibly interviewed in April.  In the interview with the prosecutors,

17  they asked me how I knew that was his intent, and whether or not he could have just been reaching for

18  my arm.  I never really considered that until they pointed that out.  When it happened I believed it was

19  intentional and what I felt in that moment.  I still believe it was intentional but I don't have evidence that

20  that's what he was trying to accomplish.  No one told me they saw him intentionally untie my top.  They

21  told me to stay true to what I remembered and I do believe he intentionally did it.  I did tell OSI it could

22  have been a hey, wait up type of thing because he called my name and that's why I turned around.  I

23  don't know if obviously identified that he made me uncomfortable to the point of pushing me over and

24  wanted to apologize or what, but I was just trying to get out of the area.  I didn't care at that point and

25  just wanted to leave.

99

1    I did babysit Zoe on a couple of occasions.  Even after this trip I did babysit Zoe at their house.  I

2    did mention we were talking about a TDY which was at Fort Meade.  All training, beginning, advanced

3    and everything is there.  I don't believe I saw Senior Master Sergeant Zier at that training.  I do recall he

4    messaged me, but I don't recall seeing him.  I don't recall telling OSI I saw him in the commissary but

5    just ignored him.  No, that is incorrect.  I did not go to visit Senior Master Sergeant Zier, his wife and

6    Zoe at their hotel on that TDY in June 2016.  I do recall there being an invitation for me to go see them

7    and then I kind of had a mini panic attack thing and did not go see them.

8    Civilian Defense Counsel concluded his examination of the witness.

9    Assistant trial counsel had no redirect.

10    The question for the witness from Captain Rueben was later marked as Appellate Exhibit XVI.

11    The question for the witness form Seconed Lieutenant Ricke was marked as Appellate Exhibit

12    XVII.  There being no objection, the questions were asked by the military judge.

### EXAMINATION BY THE COURT-MARTIAL

**BY MILITARY JUDGE:**

15    I don't recall if Senior Master Sergeant Zier gave a compensatory day off after the trip to

16    Pamukkale, but I don't believe so.

17    I believe Senior Master Sergeant Zier had his swimsuit on when he pulled my swimsuit top tie.

18    Neither side had any further questions for this witness.

19    [The witness was advised, temporarily excused, and departed the courtroom.]

20    The prosecution rested.

21    [The court-martial recessed at 0938, 12 August 2020.]

22    **[END OF PAGE]**

100

**ARTICLE 39(A) SESSION**

[The Article 39(a) session was called to order at 0958, 12 August 2020, with all parties present the court recessed again present. The members were absent.]

Defense counsel stated prior to putting on evidence they raised an oral R.C.M. 917 motion as to Charge II, Specification 3, which alleged an Article 120 offense of abusive sexual contact of T W

[The military judge directed the bailiff to advise the members they would be longer than the anticipated 15 minute recess. The bailiff complied.]

Defense counsel argued briefly that the standard under an R.C.M. 917 motion for a finding of not guilty was the evidence was insufficient; that defense challenged the intent to gratify the sexual desire was accomplished; that there were three specific occurrences during the testimony of Ms. W         and Ms. Gosier that proved the government had not established that element; that the testimony of Ms. W         stated she did not view the contact as flirtatious; and that the way the allegation started was through Ms. Gosier who had prior contact with Senior Master Sergeant Zier with no any inappropriate verbal or physical contact with Senior Master Sergeant Zier. Lastly, the contact with the knuckles, was not an openhand cup, grope, or smack, but was the back of the hand's knuckles that may have gone across the buttocks of Ms.              Taking that into consideration, the contact and lack of communication or any language between Senior Master Sergeant Zier and Ms. Gosier or Ms. W         it did not appear the evidence was sufficient to satisfy this element of this offense. Defense counsel further stated understanding the rule cited in *U.S. v. Day*, 66 MJ 172, even looking in a light most favorable to the prosecution they have not established that element.

Trial counsel stated the government's position that the defense, the moving party, had not met their burden to show there wasn't sufficient evidence.

Defense counsel clarified they were not challenging the swimsuit area, swimsuit event, in the hot tub, or the hot tub area, but were speaking to the element in the particular occasion at the holiday party.

101

1    Trial counsel apologized and clarified swimsuit area referred to the buttocks, and continued with

2    the government's position on the R.C.M. 917 motion and relied on the circumstantial evidence to meet

3    the intent element and that the rule merely states that there must only be some evidence upon which to

4    place a finding.

5    The military judge stated having heard arguments from counsel and considered R.C.M. 917 that

6    in accordance with R.C.M. 917(a) Discussion, he would reserve ruling to anytime prior to entry of

7    judgment, and the trial would proceed.

8    Appellate Exhibit XVI, Questionnaire from Captain Rueben, was marked.

9    Appellate Exhibit XVII, Questionnaire from Second Lieutenant Ricke, was marked.

10    [The exhibits were retrieved by assistant trial counsel from the military judge.]

11    Defense articulated their way forward during their case-in-chief.

12    [The Article 39(a) session recessed at 1016, 12 August 2020.]

13    **[END OF PAGE]**

102

1     **ARTICLE 39(A) SESSION**

2     [The Article 39(a) session was called to order at 1026, 12 August 2020, with all parties present

3     when the court recessed again present.  The members were absent.]

4     The military judge asked the parties if they were prepared to proceed.

5     The military judge directed the bailiff to call the members.

6     [The Article 39(a) session terminated at 1026, 12 August 2020.]

7     **[END OF PAGE]**

103

1    [The court-martial was called to order at 1026, 12 August 2020. All parties were present to

2    include the members.]

### DEFENSE CASE-IN-CHIEF

### STAFF SERGEANT SAMUEL J. O'BRIEN,

**U.S. Air Force, called as a witness by the defense, being duly sworn, testified via Microsoft Teams**

**video-teleconference substantially as follows:**

**BY TRIAL COUNSEL:**

8    My name is Samuel John O'Brien. I'm a member of the Air Force currently stationed at

9    Sembach Air Base, Germany, an Army post and I'm part of AFN headquarters here.

10    [There were connection issues as well as visual view of the witness.]

### DIRECT EXAMINATION

**BY DEFENSE COUNSEL:**

13    Yes, I was in Turkey in 2015. I was working at the AFN affiliate on Incirlik Air Base rotating

14    through a few jobs. At the beginning of 2015, I was in radio and transitioned to news production at the

15    end of my tour there. Senior Master Sergeant Zier was my station manager. Yes, during my time there I

16    went with some other airmen on morale trips. They weren't mandatory. If people wanted to join and go

17    they were free to do so.

18    There is only one that I recall where we all got together and went as a group. Yes, it is the one

19    from April 2015. I wasn't one of the organizers so I don't know where the idea came from. We went

20    out to the west of the country as a group together from the office. Yes, this was the trip to Pamukkale.

21    There were naturally formed hot tubs adjacent to the hotel we were staying at. Along with myself, then

22    Master Sergeant Zier, then Tech Sergeant Shinzato, then Airman Moeller, and then Airman G            .

23    There may have been one or two others but I don't recall. Airman C         s first name was C

24    and Airman Moeller's first name was Katie. I believe that day we went to a contained park with several

25    different attractions like old ruins, old roman buildings, and the Pamukkale pools which might have

104

1　been a different location.  I don't recall if everyone met up at dinner.  I know we finished the sightseeing

2　and came back to the hotel.  I don't remember going to dinner with everyone.  Everyone might have

3　done their own thing and got back together later.  Everyone met up later at the back of the hotel at the

4　hot tubs.

5　　　The hot tub was like a big stone bowl that it was above ground.  Inside was natural water and a

6　dirt bottom.  I think the water flowed naturally through them.  The water wasn't clear.  When you get in

7　and jostle the bottom the dirt comes up a bit.  Yes, everyone got into the hot tub.  To my left was

8　Sergeant Zier.  I don't know if he was the next person directly to my left but he was kind of 90 degrees

9　from me.  I believe Airman G　　　and Moeller were more across from me.  I don't recall where

10　Sergeant Shinzato was.  Yes, people were drinking while in the hot tub.  I don't remember if everyone

11　was drinking.

12　　　Yes, people did take off their clothes while in the hot tub.  Everyone did.  We were sitting in

13　there for a while, and I don't know who was first or what order it happened, but one person decided

14　that's what they wanted to do and reached under the water and took the swimsuit out and placed it up

15　behind them.  It turned into one of those things where organically another person did it and others did it,

16　and everyone seemed they were comfortable.  By the end everyone had taken their bathing suits off and

17　placed them behind them on the ledge.

18　　　I believe everyone did take off their clothes.  To my recollection, yes, Airman G　　　now

19　Sergeant F　　　and then Airman now Sergeant Mueller took off their clothes.  Until we were getting

20　ready to leave that area they didn't put them back on.  I don't recall but I think we were out there two to

21　three hours maybe.  While I was in the hot tub I did not notice or observe any physical contact with then

22　Master Sergeant Jeremey Zier and now Sergeant F　　　.

23　　　　　　　　　　　　**CROSS-EXAMINATION**

24　**BY TRIAL COUNSEL:**

25　　　Yes, I knew Sergeant Zier for roughly a year while I was in Turkey.  I worked with him and

1  talked to him every day.  I think we were all pretty close there.  It was a small shop, small environment.

2  He was my boss and my friend.  Yes, it's fair to say the sightseeing and ruins are the things most

3  prominent in my mind from that trip.  Yes, much less prominent or important was anything that

4  happened in the hot tub.  I honestly had forgotten about it.  I do specifically remember then Master

5  Sergeant Zier disrobing in the hot tub because I saw him get out of the hot tub at one point and saw him

6  naked and exposed.  I didn't see anyone else exposed or naked in the hot tub that night.  No, I don't

7  recall seeing Senior Master Sergeant Zier interact with Airman C          , or now Sergeant F          that

8  night.  Yes, it doesn't mean it didn't happen, I just don't recall.

9        No, I wouldn't put myself in the situation of getting naked in the hot tub again, and I don't think

10  it was an appropriate thing for Senior Master Sergeant Zier to have done.  I was sitting closer to Senior

11  Master Sergeant Zier than Sergeant F          or Sergeant Moeller.

12        Trial Counsel concluded his examination of the witness.

13                              **REDIRECT EXAMINATION**

14  **BY DEFENSE COUNSEL:**

15        There was one group that did not contact me for an interview.  I think it was possibly JA.  Yes, I

16  had been interviewed by JA and OSI together before.  I was not interviewed by OSI by themselves.

17        Defense Counsel concluded his examination of the witness.

18        Trial counsel had no recross-examination.

19        The members had no questions for this witness.

20        [The witness was duly warned, temporarily excused, and the Microsoft Teams connection

21  terminated by defense counsel.]

22        Defense counsel requested and was granted a brief in place recess to check the next witness was

23  ready.

24                        **MASTER SERGEANT JASON ROBERTSON,**

25  **U.S. Air Force, called as a witness by the defense, being duly sworn, testified substantially as**

1    **follows:**

2    **BY TRIAL COUNSEL:**

3    My name is Jason Robertson.  I'm stationed at Hurlburt Field, Florida, and I'm the superintendent

4    of the 1st Combat Camera Squadron operating location Alpha, and I'm a combat cameraman with the

5    24th Special Operations Wing.

6    <div align="center">**DIRECT EXAMINATION**</div>

7    **BY CIVILIAN DEFENSE COUNSEL:**

8    I've been in the Air Force about 17 and a half years.  It will be 18 in January.  It's all been in the

9    career field of public affairs and combat camera.  I do know Senior Master Sergeant Zier.  We were

10   stationed together at MacDill during my first assignment when I was an A1C.  He had previously

11   worked in the office I was assigned and I PCA'd over to the SOCOM shop.  He would come over

12   occasionally and give us assignments or come over and hang out and talk to people.  I got to know him a

13   little bit then, and then we were both assigned to the 1st Combat Camera Squadron in Charleston and I

14   worked with him a little bit there.  From there I'd run into him just occasionally throughout my career.

15   I did attend the holiday party in Charleston in December 2019.  I did see Senior Master Sergeant

16   Zier at the party and we hung around most of the night together.  If I put a percentage of how long that

17   night it would be about 90 percent of it.  After dinner we were together until I watched him leave at the

18   end of the night.  We were both drinking that night.  We had enough to be intoxicated.  No, he wasn't

19   stumbling or slurring.  Neither one of us could drive and took an Uber home.  I believe that was the first

20   time I met Staff Sergeant P          that night.  I hadn't met her before.  No, I didn't see Senior Master

21   Sergeant Zier following Sergeant          around at the holiday party.  Towards the end of the night,

22   Sergeant P        made some inappropriate sexual comments.  I was at the table with Senior Master

23   Sergeant Zier, Sergeant P        , and another female came over, Kyle Hagan was directly across from me

24   and one of the girls he was dating, I can't remember her name.  Sergeant P        was talking about how

25   her and husband had been apart for some time and she was looking forward to them getting back

<div align="center">107</div>

1  together, and she blatantly said they were going to make a family together, but not said in that way.  She

2  said he's going to have sex with me and cum in my pussy and put a baby in it.  My first reaction was

3  really, what did you just say, and so she repeated herself.

4      At that point, I kind of said that's a little weird to say but I don't remember the exact phrase, and

5  then I got up and took myself out of the situation.  That conversation was not going to go anywhere

6  good.  To my best recollection, I do not remember seeing Senior Master Sergeant Zier touch Sergeant

7  P        that evening.  There might have been a holiday photo, but I honestly don't even know if that

8  happened.  We both left right about the same time together.  I was standing right next to him while he

9  was calling his Uber as I was calling one for myself.  He left.  My Uber took forever to show up, so I

10 was just hanging out by myself outside.  I don't know who Sergeant Workman is.  I saw Sergeant P

11 get carried out of the hotel bar or the holiday party.  No, I did not hear Senior Master Sergeant Zier ask

12 Sergeant P        if she was getting in his Uber.  I was standing next to Senior Master Sergeant Zier when

13 his Uber came up.  He shook my hand and said I'll see you again sometime soon.   He got in and left.

14      Civilian Defense Counsel concluded his examination of the witness.

15                              **CROSS-EXAMINATION**

16 **BY TRIAL COUNSEL:**

17      Yes, that night was the first time I met Lieutenant P        I did see her more than once that

18 night.  I did see her earlier in the evening and tried to take a picture of them and then the accused

19 stepped in and took a photo.  Yes, she was with some of her friends.  Yes, at towards the end of the night

20 I was a table where she was sitting.  The half circle standing around was the taking pictures probably

21 around the middle of the night.  I honestly don't remember if Senior Master Sergeant Zier was in that

22 picture.  I know the original picture was just the girls.  I don't remember if he actually got in the picture

23 or not.  I don't know why he would.

24      Lieutenant P        was drunk because at the end of the night she was drug out of the hotel.  Yes,

25 she was being carried out by other people.  Yes, it was obvious she was extremely intoxicated.  Senior

1    Master Sergeant Zier left before I did and took an Uber.  I have no idea what type of Uber he got into.

2    Yes, I waited around and I also took an Uber.  Neither I nor Senior Master Sergeant Zier turned around

3    and said anything to Lieutenant F        or any of her friends that night.

4        I believe Lieutenant P        was taken to Kyle Hagan's truck, a Dodge Ram, a blue or dark color.

5    It was not an Uber or a Nissan.  Yes, I recall speaking with you a couple of days ago here in this

6    courtroom, and we talked about the same stuff.  Senior Master Sergeant Zier got in his Uber and left

7    first.  I waited and got in my Uber.  I saw Lieutenant P       get carried out.  I believe Lieutenant F

8    has blonde hair.  I believe I could point her out if I saw a picture with Lieutenant        in it.

9        [Trial counsel provided the witness with Prosecution Exhibit 1.]

10        No, she's not blonde, but a brunette colored hair.

11        Defense counsel requested trial counsel to demonstrate because they couldn't see what the

12    witness identified.  Trial counsel stated he would describe it now.  Trial counsel stated the witness

13    picked out the dark haired individual in the center of the photo.  The military judge requested trial

14    counsel describe the position either right or left.  Trial counsel responded Lieutenant P       was the

15    second from the left.  Defense counsel stated that was helpful.

16                          **CROSS-EXAMINATION (Continued)**

17    **BY TRIAL COUNSEL:**

18        Yes, I do remember interviewing with Captain Coleman and a paralegal in June.  I've had a lot

19    of people call me and I don't remember who is who.  I am friends with Senior Master Sergeant Zier and

20    I've known him a long time, almost 17 years, and we would talk when we'd see each other.  Yes, if I ask

21    him for anything he's going to get it for me.  He's very reliable and I can count on him.  I believe he can

22    count on me too.

23        We left at the same time but took separate Ubers.  I don't remember saying I walked back to my

24    hotel and Senior Master Sergeant Zier took an Uber.  It was like a 10 mile walk and there was no way I

25    walked back.  Yes, if I was recorded and a witness was called on what I spoke to and they said I said I

1  walked they'd be wrong.  Yes, it is my testimony today that I did not walk back to my hotel.  I did not

2  take an Uber with Senior Master Sergeant Zier.  And to my recollection Senior Master Sergeant Zier did

3  not interact with Lieutenant P          outside of the hotel in anyway and absolutely did not indicate that

4  she should come with us in our Uber.  I stayed at the Hilton Hotel Suites.  I use those because they have

5  the point system.  It was off I-26 in Charleston, Sam Rittenberg I believe, in that area.  I don't know

6  what hotel Senior Master Sergeant Zier was staying in.  I never went to his hotel.

7       Civilian defense counsel had no further questions.

8       The members had no questions.

9       [The witness was duly warned, temporarily excused and withdrew from the courtroom.]

10       **MASTER SERGEANT DANIEL DECOOK,**

11  **U.S. Air Force, called as a witness by the defense, being duly sworn, testified substantially as**

12  **follows:**

13  **BY TRIAL COUNSEL:**

14       My name is Daniel Decook, Master Sergeant, Air Force Public Affairs Agency.

15       **DIRECT EXAMINATION**

16  **BY CIVILIAN DEFENSE COUNSEL:**

17       I've been in the Air Force for 17 years.  Currently, I'm working with Public Affairs.  I do help

18  with web design and fix website issues for the Air Force websites.  Yes, I'm stationed here in San

19  Antonio.  I do recall and did attend the holiday party at the San Antonio Zoo last December.  I was the

20  host that night.  At the beginning of the party, I gave a quick introduction speech and then turned it over

21  to the commander and the chief to each give a speech.  Sent everybody off for drinks and food after that,

22  and then held a raffle.  I do know Senior Master Sergeant Zier.  I first met him maybe 13 to 14 years ago

23  through mutual friends at a golf course, and again when I began working at SAF PA we worked together

24  there.  We were working in the same section.  Then we were both stationed again down here again.

25       I shared a table with Senior Master Sergeant Zier and his family that night at the holiday party.

1  The room of the event was a little bigger than this room [referring to the courtroom] with the same

2  rectangular shape with doors you enter on one side, two doors on another side and a balcony.  I would

3  say the width and length of this room is maybe 20 yards wide and 35 yards long.  I believe on the side

4  entry or the left side there were two doors, and there were two more doors on the right side that led out

5  to the balcony.

6        We were giving away prizes that night.  There wasn't enough room in the event space for the

7  prizes.  We did two prize giveaways.  The first was the little things such as shot glasses, coffee mugs,

8  things like that which I had in a bag at the front of the room.  The mass raffle of jackets, shirts, blankets,

9  stuff like that, we didn't have the room so I opened the door to the balcony with tables out there and

10  stood in the doorway to announce the raffle.  There was no real room to display all the prizes and tables

11  in the room because it was cramped as it was.  I don't know the exact number but I believe we had

12  between 50 and 80 attend that night.

13        The bar was set up in one of the corners, one table about chest height, not more than five feet

14  long and they operated from right behind that bar.  At one point we had two birds brought in to show off

15  to everybody there and they were standing near the bar.  The bar butted up to the end of the buffet line.

16  People sitting at tables on the wall with the doors couldn't sit with people in line for buffet.  People had

17  to get up and move over to the other side of the room or get in the buffet line.  No practicing of social

18  distancing and we know today.

19        I believe Senior Master Sergeant Zier was drinking that evening.  I know I had a drink, and I

20  believe at one point everybody at our table had a drink in front of them.  I did not see Senior Master

21  Sergeant Zier drink to an inappropriate level of intoxication.

22        I know Tech Sergeant Gossier.  She was my troop at the time, so I was her supervisor.  I knew

23  her pretty well.  I did meet her sister Ms. W      on several occasions.  I did not see Senior Master

24  Sergeant Zier around Ms. W        that evening.  A few months after that night, but not 100 percent on

25  the timeline, we had group PT set up and would PT once a month on Thursday afternoons.  An hour

1    before that PT session Tech Sergeant Gossier she came to me and told me that she needed to talk to me

2    in private.  We arranged to go about a half hour earlier than the PT session and sat down to talk.  We

3    went into a back corner of the gym and she started telling me a story but couldn't get into specifics or

4    mention names, but wanted to run me through a scenario.

5        I wasn't understanding at all what she was trying to say because my mother-in-law was at the

6    Christmas party.  She said what if something happened at the party with your mother-in-law and now

7    you worked with the person how to handle that.  I didn't understand where she was going.  It was very

8    vague.  She tried a couple of more times and then she said she would just tell me more about the

9    situation but not use any names.  She told me her sister was in line and felt somebody brush up against

10   her, and then her sister said they should get out of there.  After that Sergeant Gossier told me that didn't

11   think anything happened and didn't take anything too seriously or that something malicious happened,

12   but she was called for an interview by OSI.  After talking to OSI is when she thought okay maybe it was

13   something and not an accidental bump or something like that but a malicious act.  Senior Master

14   Sergeant Zier was there that night with his wife and kids.  I have met his wife and kids before.

15                                    **CROSS-EXAMINATION**

16   **BY TRIAL COUNSEL:**

17       Yes, I had MC duties that night.  I think with typical MC duties the thought would be you'd be

18   more preoccupied.  It was very laid back.  Very relaxed.  For the first 10 minutes I was occupied and

19   then for maybe 10 minutes during the raffle.  The rest of time I was free to walk around.  I talked to

20   people and it was really just 10 minutes of let's get it started and then 10 minutes of a raffle.  During that

21   free time I did not make a point of observing where Senior Master Sergeant Zier was and not something

22   I'd normally do.

23       There may have been a couple of stragglers that came in but from what I recall most of the

24   people I saw in the middle or towards the end were the same.  I didn't notice a lot of people coming in

25   later.  I would say by the first 15 minutes it was as full as it got.  I do remember seeing ones or twos

1    come in but I didn't see a large number of people coming in.

2         Sergeant Gossier and I have had a couple of different private meetings about different things that

3    she had been going through.  I think we did have a good supervisor-supervisee relationship where she

4    would call me aside to talk about a couple of different things.  I was concerned when she had that

5    conversation with me.  At the end, I expressed I was concerned thinking her family's going through

6    something so I told her that while I couldn't offer any help or give her advice on how to go forward I

7    said if she needed to go talk to several of the resources on base she should do that, and that if she felt

8    overwhelmed at work to come to me and say she needed a minute and I could cover any questions if

9    anyone was looking for her.  What she told me was her sister had mentioned it to her that night but

10   Sergeant Gossier herself didn't think anything of it because she didn't know if it was or wasn't anything

11   and that she wasn't concerned about it herself until she met with OSI and they told her of it.  I took her

12   saying she didn't think much of it to mean she wasn't sure if it was malicious or if it was an accident.

13   She didn't say the words that she didn't believe the touching occurred.

14         Civilian defense counsel had no further questions.

15         The members had no questions.

16         [The witness was duly warned, temporarily excused and withdrew from the courtroom.]

17         Defense counsel requested a recess to check on the arrival of the next witness.

18         [The court-martial recessed at 1120, 12 August 2020.]

19                                        **[END OF PAGE]**

113

**ARTICLE 39(A) SESSION**

[The Article 39(a) session was called to order at 1139, 12 August 2020, with all parties present when the court recessed again present.  The members were absent.]

**R.C.M. 802 CONFERENCE SUMMARY**

The military judge summarized the R.C.M. 802 conference held during the recess where the parties discussed the publishing of a couple of defense exhibits to the members; that they would be instructed not to open the folders until the appropriate time.

Defense counsel stated they were ready to proceed with their last witness; that time wise he spoke to trial counsel about anticipated rebuttal witness to take prior to lunch; and that defense counsel hoped they could get through the R.C.M. 917 ruling, instructions, and get to argue this afternoon.

The military judge stated he had deferred the ruling on the R.C.M. 917 motion and everything would go to the members; and that there wouldn't be a ruling because the rules allowed him to defer until the entry of judgment.

Defense counsel asked the military judge's expectations towards the instructions.  The military judge stated it would be discussed and that he still had some work to do on the instructions; that the members could be sent to lunch, put on telephone standby, and once instructions are done and both sides had the opportunity to review, make suggestions, or objections, then call the members back in.  The military judge further stated he could also envision a scenario, given the witnesses, where they may not start until tomorrow morning.  Trial counsel stated he was going to propose the members standby and instructions discussion.

Neither had anything further nor any objection or addition to the summary of the R.C.M. 802.

The bailiff was directed to call the members.

[The Article 39(a) session terminated at 1143, 12 August 2020.]

[The court-martial was called to order at 1143, 12 August 2020.  All parties were present to include the members.]

114

1    The military judge instructed the members not to open the folders that had been placed during

2    the recess until he had instructed them to do so.

3    **MS. ALEJANDRA ZIER,**

4    **civilian, called as a witness by the defense, being duly sworn, testified substantially as follows:**

5    **BY TRIAL COUNSEL:**

6    My name is Alejandra Zier.  I live in San Antonio in the Columbus area.

7    **DIRECT EXAMINATION**

8    **BY CIVILIAN DEFENSE COUNSEL:**

9    I am Senior Master Sergeant Jeremy Zier's wife.  We've been married for seven years and this

10   coming November will be eight years.  I'm a graphic designer and a mom of two.  I have a daughter

11   named Zoe and she is five, and I have a son named Noah and he's 2.  I was in the military for about 15

12   years.  It was a combination of Army active and reserve service.

13   I did attend the holiday party in December 2019 with my husband, daughter, and son.  The night

14   was very special for us because my son, when he was born, was diagnosed with CBH.  CBH is pretty

15   much a hernia in your diaphragm where your organs are not where they're supposed to be.  At the age of

16   five days he had his first surgery.  He's a very delicate baby.  He has respiratory issues.  His heart is in

17   the center of his chest.  He was in an incubator for a few months and he's a very health-delicate baby.

18   We never take him out and are always at home.  He has a feeding tube and can't eat by mouth.  We felt

19   comfortable enough to take him off the tube, feed him early, we'd have enough time and not carry the

20   pump and supplies.  It was like taking my miracle baby out of my comfort zone to go to this party with

21   the family to create Christmas memories.

22   It was the first time taking him to the zoo, first time taking him to see animals, to see Christmas

23   lights.  It was all about the kids.  We planned the evening perfectly so to not have to carry anything and

24   just let him be a two-year-old.  It was quite a memory for us as a family.  We planned together early so

25   we could look around and see the animals.  We waited until the last minute to go for dinner.  We ran

115

1    around with the kids and got some prizes.  After dinner we went back outside to the zoo and then headed

2    to see the Christmas light show.  Yes, my husband had a drink that night.  I only recall one drink.  He

3    was not drunk.  It was a very small room with a lot of people in it.  The small room had a lot of circular

4    tables, a buffet line, a bar, and a small balcony to see over the animals.  I would say there were about 50

5    people in that room.  There were a lot of kids running around including mine.

6           I did go with my husband on the move to Turkey.  Yes, I know Staff Sergeant C

7    F        .  She was at Incirlik with us.  She was part of my husband's office.  She worked for him.  I

8    saw her quite often, almost daily.  When I went to the office we'd just hang out, say hi, and talk just

9    regular things.  I'd see her at the gym and we'd work out together.  I'd bumped into her at the

10   commissary, the coffee shop, and our daily routines.

11          Yes, I made a trip back to the US in the summer of 2015 from 25 March to 19 April.  I didn't go

12   back to the states more than that one time while we were stationed in Turkey.  Sergeant F         did not

13   babysit Zoe before I left.  She did babysit after I returned.  I was very particular about who would

14   babysit.  I didn't really trust anyone with my kids, with her being the first one and being away from

15   home.  She gained my trust and I let her babysit Zoe because when I went to the office she always had a

16   welcoming smile, and went to hold Zoe and asked to babysit a few times, so I was secure with that.

17          [Civilian defense counsel provided the witness with Defense Exhibit B.]

18          This is a photo of C        and Kelly holding Zoe.  That was taken around June 2015.  I took this

19   picture in my house in Turkey.  I recognize it because I took it.  Yes, this is my house.

20          [Civilian defense counsel provided the witness Defense Exhibit C.]

21          Yes, I recognize this photograph.  This was our going away party in Turkey.  We PCS'd from

22   Turkey in July 2015.

23          There being no objection civilian defense counsel published Defense Exhibits B and C to the

24   members.

25          There was no difference in my relationship with Sergeant F        before April 2015 and after

116

1  April 2015.  Yes, the photograph, Defense Exhibit B, is of Sergeant F          babysitting Zoe after April

2  2015.  I did remain in contact with Sergeant F          after we left Turkey.  Yeah, it was pretty much all

3  Facebook messaging.  Yes, I did see Sergeant F          in the DC/Baltimore area after leaving Turkey.

4  My husband was taking some training and she came out and visited us at our hotel and we met with her

5  outside at the patio next to the parking lot.  My husband's training was at Fort Meade.  It was me, Zoe,

6  and Jeremy and usually you have your hotel lobby and outside there was a patio with a fire pit or tables

7  and that's where we visited.

8                                          **CROSS-EXAMINATION**

9  **BY TRIAL COUNSEL:**

10         Yes, I was pretty active with the unit in Turkey, I hosted events at my house, and welcomed

11  members of the unit into my home and Staff Sergeant F          was one of those.  We worked out in the

12  same gym.  Yes, I saw her nearly daily.  I allowed her to babysit for me.  Yes, we had some kind of a

13  friendship there.  I cared about her and members of the unit.  Yes, as far as I could tell she cared about

14  me and Zoe.

15         Yes, I was away 25 March to 19 April.  I was not in Turkey the weekend of 4 to 5 April of that

16  year.  Yes, I do work hard for my family.  My husband and I are a team and all work hard to take care of

17  our special needs son.  I have worked hard since day one to keep our marriage strong.  Yes, it is true that

18  I will not let this tear our family apart.

19                                          **REDIRECT EXAMINATION**

20  **BY CIVILIAN DEFENSE COUNSEL:**

21         Everything that I said was true.

22         Trial counsel had no further questions.

23         The members had no questions.

24         [The witness was duly warned, temporarily excused and withdrew from the courtroom.]

25         The defense rested.

1     **PROSECUTION REBUTTAL CASE**

2     **AIRMAN FIRST CLASS ISSEY J. SILVA,**

3     **U.S. Air Force, called as a rebuttal witness by the prosecution, being duly sworn, testified**

4     **substantially as follows:**

5     **DIRECT EXAMINATION**

6     **BY TRIAL COUNSEL:**

7     My name is Airman First Class Issey Jeorgina Silva.  I'm stationed at JBSA Randolph.  I work at

8     the 502 FSG JA Office, the Legal Office.  Yes, it is the legal office in this building.  I do remember

9     sitting in an interview on 26 June 2020 with Captain Coleman and Master Sergeant Robertson.  Yes, I

10    remember that interview discussing the matter of how Master Sergeant Robertson got home from a party

11    back in December 2019.  Master Sergeant Robertson mentioned that the accused got in an Uber and that

12    he, Master Sergeant Robertson, walked back to his hotel.  Yes, the accused took an Uber home that

13    night, and Master Sergeant Robertson walked back to his hotel.

14    **CROSS-EXAMINATION**

15    **BY CIVILIAN DEFENSE COUNSEL:**

16    No, I did not audio record the interview with Master Sergeant Robertson.  No one in the

17    interview asked what hotel he was staying at.  No, we wouldn't know the distance between the holiday

18    party location and his hotel because we didn't ask where he was staying.

19    Trial counsel had no further questions.

20    The members had no questions.

21    [The witness was duly warned, temporarily excused, and withdrew from the courtroom.]

22    The prosecution rested rebuttal.

23    The defense submitted no matters in surrebuttal.

24    The members were advised they had heard all the evidence in the case and that the parties would

25    have a hearing outside of their presence to discuss instructions; that given the lunch hour and this point

1    in the trial that they would be on telephone standby; and that it was anticipated they may not be needed

2    until the latter part of the afternoon, or possibly tomorrow morning, and provided instructions regarding

3    how they would be contacted.  The military judge reminded the members of the instructions they were

4    provided at the beginning of the proceeding.

5        [The court-martial recessed at 1209, 12 August 2020.]

6                              **[END OF PAGE]**

119

**ARTICLE 39(A) SESSION**

1

2     [The Article 39(a) session was called to order at 1208, 12 August 2020 with all parties present

3     when the court recessed again present.  The members were absent.]

4     The military judge stated by his estimation he would keep working on the draft instructions,

5     provide a copy to counsel via email, recess and have an R.C.M. 802 to discuss particular instructions the

6     parties thought the evidence might have raised.

7     [The Article 39(a) session recessed at 1209, 12 August 2020.]

8     **[END OF PAGE]**

120

**ARTICLE 39(A) SESSION**

1

2     [The Article 39(a) session was called to order at 0803, 13 August 2020, with all parties present

3     when the court recessed again present.  The members were absent.]

4     Counsel for both sides confirmed all exhibits they wanted to go to the members had been

5     published to the members.  The military judge asked if there were any lesser included offenses at issue

6     other than the one discussed of negligent - derelilction of duty.  Trial counsel and defense counsel

7     confirmed there were no additional lesser included offenses at issue in this case.  The military judge

8     asked if any defenses had been raised by the evidence and counsel responded there had not.

9     The military judge ascertained from trial counsel and defense counsel any proposed tailored

10    instructions they believed necessary to properly instruct the members.  Trial counsel stated in

11    yesterday's R.C.M. 802 they had recommended some verbage with respect to consent by competent

12    persons to augment that instruction; that it was not charged as by incapacitation in the case of Lieutenant

13    P          however, the facts raised the possibility the members may find lack of consent by incapacitation

14    that's inconsistent with the benchbook as charged.  The military judge stated it was discussed in the

15    R.C.M. 802 and asked trial counsel to provide the exact language wanted.

16    **R.C.M. 802 CONFERENCE SUMMARY**

17    The military judge summarized the R.C.M. 802 conference held following the recess yesterday

18    where the parties discussed basically the thoughts on instructions and logistically when they were going

19    to them and determined the following morning, which was today.  Neither side had anything to add to or

20    objected to the summary.

21    Trial counsel provided the military judge with the proposed language to instruct the members

22    regarding consent by competent persons to be provided with regard to the instruction for Specification 2

23    of Charge II, discussing a competent person.  Civilian defense counsel objected as to a different

24    charging scheme; that the standard definition of consent provided in the basic instruction, and sounded

25    as if they were trying to merge two different types of allegations into one; and that they had not hd

1    opportunity to confer with trial counsel and wasn't sure where that language comes from. Trial counsel

2    stated he didn't read the direct quote from the benchbook and the government wouldn't object to that

3    direct quote; and that the government was not requesting the second clause of the physical incapability

4    of declining participation. Civilian defense counsel had nothing further. The military judge stated he

5    would not give that instruction; that he would allow them to argue the facts as they saw them; that he

6    would keep it consistent with the benchbook under the charge and specification as charged.

7        Civilian defense counsel stated he knew the military judge had summarized the R.C.M. 802 from

8    yesterday; that there was an issue that came up on Charge II, Specification 2 and 3, the intent of sexual

9    contact; that he had some concerns as to whether that specific element was to be included in the

10   instructions and the government conceded that because it was on the charge sheet, just to make sure that

11   element would be included. The military judge stated unless defense could provide a case or some other

12   authority that the benchbook did not include that as an element; that he resolved it based on how it was

13   stated within the benchbook and intended to leave it as such. Civilian defense counsel stated he

14   understood the court's ruling; that for the record the defense does object to the placement of the intent,

15   and actually requested on the basis that it was in the model specification and was included on the charge

16   sheet; that the court just stated the government had a duty to prove each and every element of the

17   specification; and that the concern was by differentiating the way the instruction was read to the

18   members could potentially cause confusion. The military judge stated he understood the defense

19   argument but under what authority could he start adding elements; and that the defense objection was

20   preserved. Neither side had any further tailored instructions to offer.

21       The military judge continued the discussion held between he and counsel, in the presence of the

22   accused, with respect to proposed instructions in general on findings to be given to the members of the

23   court-martial. Counsel for both sides concurred they had reviewed the court's proposed instructions

24   provided earlier to counsel; that neither side and any objections to those proposed instructions other than

25   previously noted; and that they affirmed the instructions were a correct statement of the law and the best

1   of their understanding.

2       The accused stated it was his personal decision not to testify.  The defense counsel requested the

3   military judge instruct the members on the fact that the accused did not testify.

4       The military judge in conjunction with counsel reviewed the draft findings worksheet identified

5   typographical errors, duplicate notes, and lesser included notations for correction.  Appellate Exhibit

6   XVIII was reserved for the Findings Worksheet.

7       Appellate Exhibit XIX, Defense counsel beyond a reasonable doubt instruction, was marked.

8       [The Article 39(a) session terminated at 0832, 13 August 2020.]

9                                   **[END OF PAGE]**

123

**ARTICLE 39(A) SESSION**

1

2      [The Article 39(a) session was called to order at 0852, 13 August 2020, with all parties

3 previously present again present.  The members were absent.]

4      Appellate Exhibit XVIII, Findings Worksheet, was marked.

5      Neither side had anything further.

6      The military judge directed the bailiff to call the members.

7      [The Article 39(a) session terminated at 0854, 13 August 2020.]

8                                    **[END OF PAGE]**

124

1    [The court-martial was called to order at 0855, 13 August 2020.  All parties were present to
2    include the members.]
3    The military judge instructed the members of the court-martial in accordance with R.C.M. 920,
4    including the elements of the offense, the presumption of innocence, reasonable doubt, and the burden of
5    proof as required by R.C.M. 920(e), and on the procedures for voting on the findings worksheet.
6    **CLOSING ARGUMENT**
7    The assistant trial counsel presented closing argument.
8    [The court-martial recessed at 0958, 13 August 2020.]
9    **[END OF PAGE]**

125

**ARTICLE 39(A) SESSION**

1

2 [The Article 39(a) session was called to order at 1008, 13 August 2020, with all parties present

3 when the court recessed again present.  The members were absent.]

4 Neither side had anything to take up before calling the members.

5 The military judge directed the bailiff to call the members.

6 [The Article 39(a) session terminated at 1008, 13 August 2020.]

7 **[END OF PAGE]**

126

1    [The court-martial was called to order at 1008, 13 August 2020.  All parties were present to
2    include the members.]

3                                    **CLOSING ARGUMENT**

4        The civilian defense counsel made argument on findings (with the aid of the VTC presentation of
5    Appellate Exhibit XIX).

6        The assistant trial counsel made argument in rebuttal on findings.

7        The military judge instructed the members of the court-martial in accordance with R.C.M.
8    920(e)(5), including the elements of the offenses, reasonable doubt, and burden of proof, as required by
9    Article 51(c), and in accordance with R.C.M. 921.  The military judge further instructed the members
10   regarding procedural rules that applied to their deliberations.

11       Appellate Exhibit XVIII, the Findings Worksheet, was provided to the president with
12   instructions him and the members on its use.

13       The military judge further provided a correction and clarification to the instruction he read for
14   Charge II, Specification 2, which would be corrected on the copy of instructions provided to the
15   members.

16       Neither prosecution nor the defense had any objections to the instructions as given by the
17   military judge or any request for additional instructions.

18       The members requested a comfort break prior to closing for deliberations.

19       The military judge confirmed the members had received Prosecution Exhibits 1 through 5 and
20   Defense Exhibits A through C.

21       The military judge asked the alternate member, Captain Rueben, who would not be participating
22   in deliberations, if he desired to return for the announcement of findings.  Captain Rueben affirmed he
23   would like to return.

24       [The court-martial recessed at 1053, 13 August 2020.]

25                                      **[END OF PAGE]**

US v. Zier Military Record of Trial and Appellate Extracts 000776 of 902

**ARTICLE 39(A) SESSION**

[The Article 39(a) session was called to order at 1121, 13 August 2020, with all parties present when the court recessed again present. The members were absent.]

The military judge inquired if counsel wanted to do a pre-sentencing session after the members had departed to deliberate or to wait. Counsel requested to wait.

**R.C.M. 802 CONFERENCE SUMMARY**

The military judge summarized a brief R.C.M. 802 conference held during the recess where the defense counsel expressed a desire to have the members terminate their deliberations should anyone of them need a comfort break; that the military judge would stand with the instructions he provided where they would come in for the court to be convened, recess for the comfort break, then reconvene to return to deliberations.

Defense counsel reviewed and had no objection to folders that had been provided to the members that contained a copy of the findings instructions.

The military judge directed the bailiff to call the members.

[The Article 39(a) session terminated at 1125, 13 August 2020.]

**[END OF PAGE]**

128

1    [The court-martial was called to order at 1125, 13 August 2020. All parties were present to

2    include the members.]

3    The military judge agreed to the members leaving their cell phones at their seats instead of

4    having them collected; that it was a COVID-19 mitigation effort and all electronic devices would remain

5    secure at their seats in the courtroom.

6    The members were advised of the folders that contained a copy of the findings instructions and

7    to take with them into deliberations. Captain Rueben, the alternate, was released for call back when the

8    members had reached findings.

9    [The court-martial closed for deliberations at 1127, 13 August 2020.]

10    **[END OF PAGE]**

129

**ARTICLE 39(A) SESSION**

1

2    [The Article 39(a) session was called to order at 1314, 13 August 2020, with all parties present

3    when the court recessed again present.  The members were absent.]

4    The military judge stated the members requested a comfort break.

5    Neither side had anything before calling the members.

6    [The Article 39(a) session terminated at 1314, 13 August 2020.]

7    **[END OF PAGE]**

130

1    [The court-martial was called to order at 1314, 13 August 2020. All parties present when the

2    court closed for deliberations were again present including the members.]

3    The court president and members requested a 10 minute comfort break.

4    [The court-martial recessed at 1314, 13 August 2020.]

5    **[END OF PAGE]**

131

**ARTICLE 39(A) SESSION**

1

2      [The Article 39(a) session was called to order at 1324, 13 August 2020, with all parties present

3   when the court recessed again present.  The members were absent.]

4      The military judge directed the bailiff to call the members.

5      [The Article 39(a) session terminated at 1324, 13 August 2020.]

6                                    **[END OF PAGE]**

132

1    [The court-martial was called to order at 1325, 13 August 2020.  All parties present when the

2    court recessed were again present including the members.]

3    The president of the court and members were ready to return to their closed session deliberations.

4    The military judge confirmed all cell phones were back in the courtroom.

5    [The court-martial closed to continue deliberations at 1325, 13 August 2020.]

6    **[END OF PAGE]**

133

**ARTICLE 39(A) SESSION**

1

2       [The Article 39(a) session was called to order at 1520, 13 August, with all parties present when

3  the court recessed again present.  The members were absent.]

4       The military judge stated the members had a question.

5       The bailiff was directed to call the members.

6       [The Article 39(a) session terminated at 1521, 13 August 2020.]

7                                    **[END OF PAGE]**

134

1    [The court-martial was called to order at 1521, 13 August 2020. All parties present when the
2    court closed were again present including the members.]

3    The military judge stated it was his understanding the members had a question for the Court.
4    The president of the court had the question in writing regarding a definition. The written question was
5    retrieved from the president of the court.

6    The military judge stated to the members that he would need to discuss their question with
7    counsel on the best way to proceed. The military judge indicated the members would be recess at this
8    time since it had been some time since their last break.

9    [The court-martial recessed at 1523, 13 August 2020.]

10    **[END OF PAGE]**

135

**ARTICLE 39(A) SESSION**

[The Article 39(a) session was called to order at 1523, 13 August, with all parties present when the court recessed again present.  The members were absent.]

Appellate Exhibit XX, Member's Questionnaire, was marked.

The military judge asked if the parties had where or how to define what it meant to gratify sexual desire.  Civilian defense counsel responded that in a past court the military judge addressed the issue to the members stating they had everything and to rely on what they had received; that at this point they should continue by the book and not add or subtract.

Trial counsel requested the opportunity to do a bit of research; that he didn't disagree with defense counsel but did want to look into it.

[The Article 39(a) session recessed at 1526, 13 August 2020.]

**[END OF PAGE]**

136

**ARTICLE 39(A) SESSION**

1

2  [The Article 39(a) session was called to order at 1558, 13 August, with all parties present when

3  the court recessed again present.  The members were absent.]

4  The military judge stated with regard to the member's question marked as Appellate Exhibit XX

5  asking to define the term gratify sexual desire, that his intent was to instruct the members use their

6  common understanding of that phrase.  He based his opinion on *U.S. v. DeSilva*, 2020 CCA Lexis 213,

7  United States Air Force Court of Criminal Appeals, where they addressed the question of the definition

8  of making sexual advances.  In that case they cited *United States vs. Nelson*, 53 MJ 319, for the

9  proposition that sexual advances as words generally known and in the universe do not need judicial

10  definition; that by analogy the military judge found gratify sexual desire to be substantially similar to the

11  terms making sexual advances; and that therefore, the members would be told to use their common

12  understanding of the words.  Neither prosecution or defense had any objection.

13  Neither side had anything further to take up before calling the members.

14  The military judge directed the bailiff to call the members.

15  [The Article 39(a) session terminated at 1600, 13 August 2020.]

16  **[END OF PAGE]**

137

1       [The court-martial was called to order at 1601, 13 August 2020. All parties present when the

2       court closed were again present including the members.]

3       The military judge addressed the president of the court and members that he had considered their

4       request; that he would advise them and instructed them that they have all the instructions they were

5       going to receive and required; and that they were to use their common understanding of those terms.

6       The military judge stated the court would recess to allow a member to obtain his cell phone and

7       then come back to close for continued deliberations.

8       [The court-martial recessed at 1602, 13 August 2020.]

9       **[END OF PAGE]**

138

1      **ARTICLE 39(A) SESSION**

2      [The Article 39(a) session was called to order at 1603, 13 August 2020, with all parties present

3    when the court recessed again present.  The members were absent.]

4      The military judge directed the bailiff to call the members.

5      [The Article 39(a) session terminated at 1603, 13 August 2020.]

6      **[END OF PAGE]**

139

**DEFENSE COUNSEL**

SUMMARIZED

# RECORD OF TRIAL

(and accompanying papers)

**of**

ZIER, JEREMY, M.
*(Name: Last, First, Middle Initial)*

*(Social Security Number)*

Senior Master Sergeant (E-8)
*(Rank)*

Air Force Public Affairs Agency (AETC)
*(Unit/Command Name)*

United States Air Force
*(Branch of Service)*

JBSA-Randolph, TX
*(Station or Ship)*

**By**

**SPECIAL** **COURT-MARTIAL**

Convened by **COMMANDER**
*(Title of Convening Authority)*

AIR FORCE PUBLIC AFFAIRS AGENCY (AETC)

**Tried at**

JBSA-Randolph, TX
*(Place or Places of Trial)*

**on** 10 August 2020 – 14 August 2020
*(Date or Dates of Trial)*

Volume 4 of 4 Volumes

## TRANSCRIPT PAGES 140 - 170

**Personal Data – Privacy Act of 1974 (5 U.S.C. 552a)**

**DD FORM 490, MAY 2000**   PREVIOUS EDITION IS OBSOLETE   **Front Cover**

1      [The court-martial was called to order at 1604, 13 August 2020.  All parties present when the

2    court closed were again present including the members.]

3      The military judge confirmed the presence of all the members phones.

4      The president of the court stated they were ready to return to their closed session deliberations.

5      [The court-martial closed to continue deliberations at 1604, 13 August 2020.]

6                          **[END OF PAGE]**

140

1       **ARTICLE 39(A) SESSION**

2       [The Article 39(a) session was called to order at 1624, 13 August 2020, with all parties present

3   when the court recessed again present.  The members were absent.]

4       The military judge stated the members had a question.

5       The military judge directed the bailiff to call the members.

6       [The Article 39(a) session terminated at 1624, 13 August 2020.]

7       **[END OF PAGE]**

141

1    [The court-martial was called to order at 1624, 13 August 2020.  All parties present when the

2    court closed were again present including the members.]

3    The president of the court stated they were instructed not to write on Appellate Exhibit XVIII

4    and how were they to proceed.

5    The military judge responded that if it was said as part of the instruction, it was meant not to take

6    notes or make tallies on the form, but to use the form to document their findings; that to do so they

7    would select their findings and mark through what is inapplicable; and by doing that the decision of the

8    panel would be clear.

9    [The court-martial closed to continue deliberations at 1626, 13 August 2020.]

10    **[END OF PAGE]**

142

**ARTICLE 39(A) SESSION**

1

2      [The Article 39(a) session was called to order at 1704, 13 August 2020, with all parties present

3   when the court recessed again present.  The members were absent.]

4      Neither side had anything to take up before calling the members.

5      The military judge directed the bailiff to call the members.

6      [The Article 39(a) session terminated at 1704, 13 August 2020.]

7                                    **[END OF PAGE]**

143

1    [The court-martial was called to order at 1705, 13 August 2020.  All parties present when the
2 court closed were again present including the members.]

3    The military judge noted for the record Captain Rueben, alternate member, had returned and was
4 present in the courtroom when the members had returned from the deliberation room; and that he was
5 not in the deliberation room.

6    The military judge examined Appellate Exhibit XVIII, the Findings Worksheet, and determined
7 it was in proper form.

8    [Begin verbatim transcript here.]

9    **FINDINGS**

10   **PRES:  Senior Master Sergeant Jeremy M. Zier, this court-martial finds you:**

11   **Of Charge I and its Specification:  Guilty, and**
12   **Of Specification 1 of Charge II:  Guilty,**
13   **Of Specification 2 of Charge II:  Not Guilty,**
14   **Of Specification 3 of Charge II:  Not Guilty, and**
15   **Of Charge II:  Guilty.**

16   [End verbatim transcript here.]

17   Captain Rueben, alternate member, was advised he would need to return in the morning with all
18 other members for the sentencing proceedings.

19   [The court-martial recessed at 1711, 13 August 2020.]

20   **[END OF PAGE]**

144

**ARTICLE 39(A) SESSION**

[The Article 39(a) session was called to order at 1711, 13 August 2020, with all parties present when the court recessed again present.  The members were absent.]

**ALLOCUTION RIGHTS**

The military judge advised the accused of his rights with respect to extenuation and mitigation, including the right to make a sworn or unsworn statement, or to remain silent.  The accused stated that he understood his rights in this regard.

The military judge ascertained there was no illegal punishment under Article 13, and the accused was to be credited with zero days of pretrial confinement credit.

Prosecution Exhibit 6, PDS for the accused, was offered and admitted into evidence without objection.

Prosecution Exhibit 7, the accused's EPRs, were offered and admitted into evidence without objection.

Defense counsel requested to offer several defense exhibits tomorrow morning.

Assistant trial counsel indicated Staff Sergeant F          would be offering an unsworn victim impact statement.

The military judge stated to the accused, having chosen the new sentencing rules prior to arraignment, he was advised he had the right to elect sentencing by members or sentencing by the military judge.  The accused stated he had discussed this right with his defense counsel; that his defense counsel explained the difference between sentencing by members and by military judge alone; that he understood the difference between the two; and that he chose to be sentenced by members.

Neither side had anything further.

[The Article 39(a) session recessed at 1719, 13 August 2020.]

**[END OF PAGE]**

145

**ARTICLE 39(A) SESSION**

1

2   [The Article 39(a) session was called to order at 0843, 14 August 2020, with all parties present

3   when the court recessed again present.  The members were absent.]

4   The military judge stated he had asked where the court left off, was if there was a crime victim to

5   be heard under Article 6b; that he was informed there was; and asked counsel if it was by unsworn

6   statement.  Trial counsel confirmed the crime victim intended to give an unsworn statement and that a

7   copy had been provided to the defense.  The defense counsel requested a few moments to review.  The

8   military judge stated so as to not rush through that he would give defense sometime later and at this time

9   present any evidence they may have.

10  Defense counsel offered Defense Exhibits D through YYYYYYY for identification having

11  provided a summary of exhibits by section.  Trial counsel objected as to relevance, foundation, and

12  authenticity.  Defense counsel requested the rules be relaxed.   The military judge granted the rules be

13  relaxed.  Trial counsel had no further objection.  Defense Exhibits D through YYYYYYY were

14  admitted.  Defense counsel placed folders of defense exhibits to the member's box.

15  Trial counsel concurred with the military judge that they had taken up all that remained before

16  the members arrived.  Trial counsel confirmed they were not calling any witnesses.

17  Defense counsel stated following the closing of yesterday's hearing he briefly discussed with

18  trial counsel that defense intended to go into Tricare and its loss during its sentencing and wanted to

19  bring to the Court's attention to sort out.  Defense counsel argued this fact and cited to *U.S. v. Griffin*.

20  Assistant trial counsel responded as long as there was a standard collateral consequence

21  instruction the government would not object.

22  Defense counsel did not have issue with a collateral consequence instruction.  The military judge

23  stated then there was no issue for him to take up if defense had no issue with the instruction; and that the

24  Tricare issue was part in parcel if the members were to adjudge a punitive discharge.  Defense counsel

25  concurred.

146

1    Defense counsel stated they had two witnesses to call with in person testimony.

2    Assistant trial counsel asked the military judge a question regarding reduction in rank. The

3    military judge replied that the instructions he will provide describes the reduction in various ranks and

4    what the subsequent reduction in pay would be with those rank reductions. Defense counsel had no

5    objection.

6    Defense counsel requested prior to calling the members if the bailiff could check on the arrival of

7    a witness. There was an indication that the first witness had not yet arrived. The military judge stated

8    the court would recess while waiting for the witness arrival and for defense counsel to review the victim

9    impact statement.

10    [The Article 39(a) session recessed at 0859, 14 August 2020.]

11                    **[END OF PAGE]**

147

1 **ARTICLE 39(A) SESSION**

2 [The Article 39(a) session was called to order at 0903, 14 August 2020, with all parties present

3 when the court recessed again present.  The members were absent.]

4 Trial counsel had nothing further.

5 Defense counsel stated they had opportunity to review the victim impact statement and had no

6 further objections.

7 The military judge directed the bailiff to call the members.

8 [The Article 39(a) session terminated at 0904, 14 August 2020.]

9 **[END OF PAGE]**

148

1    [The court-martial was called to order at 0904, 14 August 2020.  All parties present when the

2    court recessed were again present including the members.]

3    ### SENTENCING PROCEEDINGS

4    The military judge again advised the accused of his rights with respect to extenuation and

5    mitigation, including the right to make a sworn or unsworn statement, or to remain silent.

6    The military judge stated he needed a brief recess.

7    [The court-martial recessed at 0906, 14 August 2020.]

8    **[END OF PAGE]**

149

**ARTICLE 39(A) SESSION**

[The Article 39(a) session was called to order at 0912, 14 August 2020, with all parties present when the court recessed again present.  The members were absent.]

Defense counsel had nothing further.

Assistant trial counsel requested to publish Prosecution Exhibits 6 and 7 to the members.  Defense counsel had no objection.  Prosecution Exhibits 6 and 7 were published to the members.

[The Article 39(a) session terminated at 0914, 14 August 2020.]

**[END OF PAGE]**

150

1        [The court-martial was called to order at 0914, 14 August 2020.  All parties present when the

2 court recessed were again present including the members.]

3        The military judge apologized for the technological issues with his computer and all was

4 operational now.  Further, at this time the court will enter the sentencing phase of the trial.  Prosecution

5 Exhibits 1 through 7 and Defense Exhibits A through YYYYYYY had been admitted; that those

6 exhibits would be available to them during their deliberations.  The military judge further stated any

7 crime victim had a right to be reasonably heard including the right to make a sworn, or unsworn

8 statement, or both; that the crime victim may exercise the right following the government's opportunity

9 to present evidence.  Assistant trial counsel stated evidence has already been published to the members.

10        The prosecution rested.

11        Assistant trial counsel stated Staff Sergeant F       would provide an oral unsworn statement.

12        The military judge provided an instruction for an unsworn statement to the members.

13               **STAFF SERGEANT C        F       ,**

14               **CRIME VICTIM ORAL UNSWORN STATEMENT**

15        Colonel Francis, jury members, Your Honor:  You've already heard my experience and I'm not

16 fond of repeating it, so instead I ask you to consider how this has impacted my life since PCSing from

17 Turkey.  It wasn't a brief moment or a chapter.  It was an awakening that for me that permeates my

18 perception of the Air Force every day I put on the uniform.  And tragically, I'm not alone in sharing one

19 of the most degrading experiences you can face as an E-3 at her first assignment.

20        I lost sleep then and I lose now, as an NCO, knowing leaders can act this way because of the

21 perception that their middle and lower ranks will turn a blind eye.  Senior Zier thought he was above

22 accountability, and the reality is he served his entire career even making the rank of Chief Master

23 Sergeant while walking unchecked and unscathed.  One question I was asked multiple times throughout

24 this investigation is if I felt Senior Zier was still a good leader despite this isolated incident.  These

25 behaviors do not align with the ideas of a good father, a good role model, or a good leader.  These

1  questions have made me angry and nauseous over the span of five years.

2        I've had plenty of time to reflect over the course of the PCS's, six different supervisors, and four

3  other superintendent leadership styles.  I eventually realized Zier's go to strategy is to manipulate and

4  deceive, to twist and contort minds into knots that take years to unravel.  So my answer to the question is

5  he still a good leader despite this incident is emphatically, no.

6        He is not a leader; rather this is how he chooses to abuse his power.  He taught me

7  superintendents can facilitate toxic work environments rather than be the ones to correct them.  He knew

8  alcohol was a perfect alibi in our institution for higher ranks to look consequence free regardless of their

9  routine choice to overindulge and overstep boundaries.  I learned damage to government property only

10  applies to metal scraps and weaponry, not the violated flesh or bruised self-worth of an airman.  What

11  happened in Pamukkale didn't start and stop that night.  This rendered me paranoid of every other NCO

12  and Senior NCO I've met since.

13        My ability to trust the chain of command was immediately slaughtered and I was left to pick up

14  the pieces of what serving in the military was supposed to be and reconcile it with the bleak reality

15  before me.  I survived by hiding my hurt and confusion.  Suffering in silence seemed like the safest

16  option, but I didn't anticipate the uphill battle of learning how to cope with the resulting anxiety,

17  depression, and other trauma related effects from the assault.  When you're a survivor the world does

18  not stop spinning around you.  Life just goes on in an erie way.  You keep busy and you try to forget as

19  best as you can, though it never truly leaves you.

20        I've asked myself so many times what if I came forward today would they be angry that I waited.

21  Is this somehow less relevant as time has passed?  Do my wingman ever think about the trip?  Does he

22  ever think about the trip?  Does his wife know?  Are his children safe?  What if we worked together

23  again?  What can I do to protect other females?  Does my pain matter or should I just let go?  These

24  questions create a prison in a person's mind.  For me, it became a cage with over a thousand telling

25  marks clawed into the floor.  The crippling self-doubt had me hoping for a long time that it was just me

1 second guessing everything.  Not just about that night, but about my job performance as an airman, and

2 my integrity as a human being keeping this toxic secret.

3   I think about the times his wife checked in on me, offered to help decorate my dorm room, and

4 invited me to their dining room table for supper.  Did he exploit our friendship knowing I wouldn't want

5 to hurt her?  What if this is a product of successful gas lighting and victim blaming.  And the bravest

6 question of all, what if I deserve justice?  Maybe the Air Force can't always be one big happy family

7 because some people get too comfortable getting too close and feel too powerful to be stopped.  The

8 secret is now off my conscience, but I don't feel relief.  Instead, I begin to face the guilt of not coming

9 forward sooner.

10   Reporting a predator does not ruin their lives.  It seeks justice for the lives of victims.  Reporting

11 a predator does not damage their reputation, it makes it more accurate.  Reporting a predator does not

12 harm their family, it arms them with the truth.  Reporting a predator aligns our core values in the United

13 States Air Force of always having integrity first.  I never wanted to be sitting in that chair.  I never

14 wanted this to be part of my story, and I never wanted this to be the reality of our military.  Being able to

15 survive and eventually thrive in my career doesn't mean what happened that day will ever be okay.

16   I'm not sorry for going on an office trip.  I'm not sorry for going to the hot tub.  I'm not sorry for

17 feeling uncomfortable.  I'm not sorry for turning away.  I'm not sorry for being upset.  And I'm not sorry

18 for seeking guidance.  I'm not sorry for setting boundaries.  I'm not sorry for continuing to recover.  I'm

19 not sorry for reporting unrestricted.  A person should not have to scream no for their presence, their

20 body, and their lack of consent to be heard.  Finally, I'm not sorry for asking the standards to be

21 enforced.

22   I want to have confidence in knowing my chain of command is about their people and are here to

23 grow us, not molest us.  Those fears need to be addressed for myself and the 300,000 other airmen in our

24 branch that he has had access to every single day.  We can call a Chief a leader based on stripes, but

25 regardless of smooth talking, networks of influential buddies, or fully stacked ribbon racks, true

US v. Zier Military Record of Trial and Appellate Extracts 000803 of 902

1  leadership is accountability no matter the rank.  I love what we envision our Air Force to be and my

2  work continues long after this trial to make it a place airmen can trust, a safer institution for survivors to

3  heal, an organization that stops empowering these predators, and I believe this work is not mine alone,

4  it's ours.  Thank you for your time.

5  **CHIEF MASTER SERGEANT QUINTON BURRIS,**

6  **U.S. Air Force, was called as a witness for the defense, was duly sworn, and testified substantially**

7  **as follows:**

8  **BY ASSISTANT TRIAL COUNSEL:**

9  My name is Quinton Burris.  I'm a Chief Master Sergeant at Air Force Public Affairs Agency

10  here Randolph Air Force Base.

11  **DIRECT EXAMINATION**

12  **BY DEFENSE COUNSEL:**

13  I work at the Air Force Public Affairs Agency here on Randolph Air Force Base.  I'm the Chief

14  Enlisted Manager.  It's a variety of duties and no one duty is set.  It's essentially trying to help manage

15  the health and welfare of the members of the Public Affairs Agency here at Randolph, the 1st Combat

16  Camera Squadron at Charleston Air Force Base, the 2nd Audiovisual Squadron at Hill, and the 3rd

17  Audiovisual Squadron at Lackland Air Force Base.

18  Yes, I do know Senior Master Sergeant Zier.  I met Jeremy in 2007-2008 timeframe.  We were at

19  a training course at Maxwell Air Force Base.  We just met in passing.  I met him again in 2011-2012 and

20  actually got to know him a lot better when I got assigned here in San Antonio where, at the time, the Air

21  Force Public Affairs Agency was down at Joint Base San Antonio Kelly Annex.  I worked in the Air

22  Force Public Affairs Agency in the Plans and Programs section and Zier at the 3rd Combat Camera

23  Squadron, at that time, which is now the 3rd Audiovisual Squadron.  We worked together daily on plans

24  and tried to develop the 3rd Combat Camera Squadron and its processes.  He then PCA'd over to the Air

25  Force Public Affairs Agency, so we worked together there.  If I recall correctly, I was his supervisor

154

1  when he came over.  From there we had a working relationship, largely professional.  He was an

2  excellent worker by meeting or exceeding every expatation that was placed upon him.  We rewrote the

3  Public Affairs AFI, and built a CBT training course for the consolidation and merging of career fields in

4  Public Affairs.

5      He was a football referee for the San Antonio football chapter officiating school football games.

6  I asked a lot of questions and eventually I got into officiating football.  We talked a lot about that.  He

7  got an assignment to be the AFN Station Manager at Incirlik.  I was at the 3rd Combat Camera Squadron

8  on loan from the Air Force Public Affairs Agency.  Myself and some others rallied around his wife Allie

9  to make sure she was good because she was waiting on some passport or other documentation.  I was

10  selected to be Station Manager at Aviano, which was outside of my expertise and skillset.  I reached out

11  to him on a number of occasions to get an understanding of what AFN should look like or how we could

12  improve AFN, basically share ideas of benchmarking.

13      Yes, I have been able to build an opinion of his rehabilitative potential.  My opinion is I do

14  believe he can be rehabilitated.

15      Assistant trial counsel had no questions.

16      The members had no questions.

17      [The witness was advised, temporarily excused, and departed the courtroom.]

18                              **ALEJANDRA ZIER,**

19  **civilian, called as a witness for the defense, reminded she was still under oath, testified**

20  **substantially as follows:**

21                          **DIRECT EXAMINATION**

22  **BY DEFENSE COUNSEL:**

23      I've known my husband over nine years.  We've been married for seven years, about to be eight

24  this November.  We have two children.  Noah is two and Zoe is five.  Jeremy is an exceptional father.  I

25  really couldn't ask for a better father to raise my kids with.  He's very involved in their lives when it

1    comes to teaching them respect, morals, values, their ABC's, playing with them, spending quality time

2    with them.  I don't have anything negative to say as a father.  I'm grateful to have him as a father to raise

3    my kids with.

4           It is a tough time for me to testify.  At first it was a shock with yesterday's findings outcome.  I

5    don't like public speaking.  English is my second language.  To be able to express myself is hard

6    especially around a bunch of people I don't even know and don't know me.  Yes, it's really hard.  At

7    first, when he was found guilty, I didn't really understand what happened so I was in shock.  I went to

8    the back and I talked to the lawyer and he really explained to me what was happening.

9           I do understand there's a potential he could get a bad conduct discharge and could lose his

10   retirement.  It would be devastating for our family.  Everybody thinks about retirement and we've talked

11   about it for years.  He hasn't retired yet and been in the Air Force for 23 years.  We can't afford our kid

12   without our benefits.  He kept serving because he put our kids first.  If retirement gets taken away is not

13   only his, it's also my job.  Every time he went TDY or multiple deployments to serve his country, I

14   stayed behind and took care of our home, kids, and bills.  Everything that had to be done, and he could

15   come back and say hey, it's okay, take over.  It's all my kids.  They're military kids.  Every time Jeremy

16   goes away, it was heartbreaking to put my crying five year old to bed because her dad is gone.  They

17   work for that retirement with pain with tears.

18          The benefits are very important for our family because my youngest son, Noah, is fragile.  He

19   has a small lung.  It's never going to grow.  His heart is in the middle of his chest.  Medical attention is

20   critical for him.  We weren't blessed with a healthy kid but we love him to death and the military we've

21   been very blessed to have our bills taken care of, his medical care, keeping him alive.  Noah's medical

22   needs began since in fetal.  I had some surgery when he was still in fetal and was the only chance he

23   had.  At 22 weeks he was diagnosed and I was told he had a 10 percent chance of survival and asked if I

24   wanted to abort.  I looked at Jeremy and said absolutely not.  What we were able to do was have this

25   surgery while he was in fetal that gave him the chance for survival.  Noah has undergone four surgeries

1  since birth.  He will need medical care for the rest of his life.  Tricare provides us the medical care

2  opportunity.

3         Trial counsel had no questions.

4         The members had no questions.

5         The military judge asked if the witness was to be held subject to recall.  Defense counsel

6  responded in the negative.

7         The witness stated at the end of the day she just has to get it out of her chest.

8         The military judge asked defense counsel if they needed a break.  Defense counsel concurred.

9         [The court-martial recessed at 0943, 14 August 2020.]

10                                    **[END OF PAGE]**

157

**ARTICLE 39(A) SESSION**

1

2     [The Article 39(a) session was called to order at 0949, 14 August 2020, with all parties present

3     when the court recessed again present.  The members were absent.  The witness was not on the stand.]

4     Defense counsel stated the witness was no longer on the stand and asked if the court would like

5     her back in before the members are called.

6     The military judge asked if defense wanted to ask the witness a question.  Defense counsel

7     responded they did not.

8     The military judge directed the bailiff to call the members.

9     [The Article 39(a) session terminated at 0951, 14 August 2020.]

10     **[END OF PAGE]**

158

1    [The court-martial was called to order at 0951, 14 August 2020. All parties present when the

2    court recessed were again present including the members. The witness had returned to the stand.]

3    The military judge stated he believed they left off with the witness not being subject to recall.

4    Defense counsel concurred.

5    [The witness was advised, permanently excused, and departed the courtroom.]

6    The military judge reminded the members of the unsworn statement instruction provided earlier which

7    applied here as well.

8    **UNSWORN STATEMENT**

9    **SENIOR MASTER SERGEANT JEREMY M. ZIER, the accused, made the following unsworn**

10    **statement***:*

11    Ma'am, members: I understand that the next stage of this trial the sentencing is necessary, the

12    necessary part based on your findings; that I would ask that you consider the following when

13    determining an appropriate sentence.

14    Over the course of my life, I've tried to overcome major obstacles. I didn't have an easy

15    childhood growing up, but my parents always did the best they could. I always tried to do the right

16    thing. I wanted to be more. I wanted to be a better person which is why I enlisted. Members, being in

17    the Air Force has meant everything to me. I joined when I was 17 years old, 17. I originally planned to

18    serve four years, but soon four became 23. On 28 November 2019, I was notified that I was selected to

19    the rank of Chief Master Sergeant. This meant the world to me and validated 22 plus years of hard

20    work, five deployments, thousands of days in the world, hundreds of days without my family. It meant

21    that my service mattered. It has mattered. But more important to me than any professional

22    achievements I've ever achieved has been my family.

23    For over eight years my wife has been my rock, my support, my partner, and honestly my life.

24    She is the strongest woman I know and I don't know what our family would do without her. Anyone

25    that knows me would know that my children mean the world to me as well. My five year old Zoe and

159

1    my two year old Noah.  Noah is our miracle child as you've already heard.  He was diagnosed in

2    utero with congenital diaphragmatic hernia, which meant that he had a hole in his organs, they got

3    pushed up, and we were pressured to do a late term abortion.  That wasn't his -- that wasn't going to be

4    the choice we chose.  This was the lowest point in my life.  Hearing a doctor telling a parent that their

5    baby is going to die, I wouldn't wish that on my worst enemy.  We chose not to have an abortion and

6    decided to have Noah.  He was put on an experimental procedure and he was born six weeks early.  He

7    immediately had tubes inserted into him.  We were told he had to stay in the hospital hooked up to

8    several machines.  We didn't get to hold him until two months.  His right lung is nonexistent and his left

9    lung was 50 percent of the size that it should be.  His heart was in the middle of his chest.  It just seems

10    to stay there.  I could still see him laying in the hospital incubator with morphine drips and several other

11    medications being pumped into his frail body.

12         To this day -- to this day, I still hear my wife crying as to whether or son is going to die which

13    was real.  If I didn't have the support of my wife, my enlisted and officer leadership, and my Air Force

14    family at that time, I do not know if I would have made it through.  Members, I understand that it's now

15    your duty to determine an appropriate sentence, but I beg you please consider my family when deciding

16    the appropriate punishment.

17         Confinement would devastate my family.  My wife is my superhero but to put the burden on

18    managing the household to taking care of her two children with one being incredibly sick is

19    unimaginable.  I don't know how I could look at my children and explain to them why dad is in jail.

20    Additionally, a punitive discharge would discredit my entire life's work.  It would take away my

21    retirement money that I was going to use to take of our family, my wife, and my sick child.

22         A bad conduct discharge would negatively affect my ability to find future employment.  It would

23    also make me ineligible for VA or any other benefits which would hinder the ability for my child to get

24    medical treatment.  Members, my family does not deserve that punishment.  I'm asking that you show

25    leniency in sentencing me.  I understand that I know I have convictions that will -- also I'll have to

160

1   register as a sex offender for the rest of my life.  The sacrifice to my family have been enormous.

2   Through these hardships my family has been steadfast in their love and dedication.  The Air Force is my

3   home and I want nothing to do but to continue to serve with these airmen.  Members, I thank you for

4   taking the time to listen to my statement.  I want to also thank my family and the members of my unit

5   that have been here to support me throughout this whole process.  Thank you.

6        [The accused resumed his seat at the defense table.]

7        The defense rested.

8        The members chose to stay in the deliberation room during the recess to review and familiarize

9   themselves with the exhibits.

10       [The court-martial recessed at 1000, 14 August 2020.]

11                    **[END OF PAGE]**

161

1       **ARTICLE 39(A) SESSION**

2       [The Article 39(a) session was called to order at 1000, 14 August 2020, with all parties present

3       when the court recessed again present.  The members were absent.]

4       The military judge ascertained from the accused that his decision not to provide sworn testimony

5       was his personal choice.

6       **MAXIMUM PUNISHMENT**

7       Trial counsel stated that the maximum punishment in this case, based on the findings of the

8       court, was:  reduction to the grade of E-1, total forfeitures, confinement of up to one year, a bad-conduct

9       discharge.  Counsel agreed that an instruction on a fine was not appropriate in this case.

10      Civilian defense counsel stated for the record if there was any rebuttal or surrebuttal.  Trial

11      counsel stated they had no rebuttal.

12      Appellate Exhibit XXI, the Sentencing Worksheet, was marked.  Defense counsel had no

13      objection to Appellate Exhibit XXI.

14      The military judge proposed to give the standard sentencing instructions.

15      Assistant trial counsel proposed the collateral consequence special instruction.  Defense counsel

16      had no request for special instructions.  The military judge read aloud the proposed collateral

17      consequence instruction to the parties.  The military judge asked defense counsel if they were requesting

18      a special instruction with regard to loss of benefits.  Defense counsel was not requesting that special

19      instruction.

20      The military judge stated he needed to finalize the sentencing instructions and would send them

21      to counsel once complete.

22      Neither side had anything further to take up.

23      [The Article 39(a) session recessed at 1006, 14 August 2020.]

24      **[END OF PAGE]**

162

**ARTICLE 39(A) SESSION**

[The Article 39(a) session was called to order at 1146, 14 August 2020, with all parties present when the court recessed again present.  The members were absent.]

There were no objections to the sentencing worksheet.  Both sides stated they had the opportunity to review the sentencing instructions.  Neither side had any objection to the sentencing instructions.

The defense had nothing further before calling the members.

Appellate Exhibit XXII, Sentencing Instructions, were marked.  Copies were made for each of the members.  The government had nothing further.

The military judge directed the bailiff to call the members.

[The Article 39(a) session terminated at 1148, 14 August 2020.]

**[END OF PAGE]**

163

1   [The court-martial was called to order at 1149, 14 August 2020.  All parties present when the
2   court recessed were again present including the members.]

3       The military judge advised the president of the court they were at another decision point with
4   regard to lunch; that the court and counsel were ready to proceed if the members were ready; that with
5   the lunch hour coming up they could recess now or press and break after instructions and argument
6   before beginning deliberations.  The president of the court stated the members were ready to press.

7       The military judge instructed the members of the court-martial that the maximum permissible
8   punishment which could be adjudged for the offenses of which the accused had been found guilty was a
9   reduction to the grade of E-1, forfeiture of two-thirds pay per month for 12 months, confinement for 12
10  months, and a bad-conduct discharge.

11      Assistant trial counsel made argument on sentence.

12      Defense counsel made argument on sentence.

13      The military judge also instructed the members of the court-martial concerning the procedures
14  for voting, the responsibility of the members, the matters the members should consider, including the
15  matters in extenuation and mitigation as well as aggravation, and further instructed with respect to the
16  specific facts of the case in accordance with R.C.M. 1005(e).

17      Captain Rueben, alternate member, would be excused from deliberations and would return for
18  announcement of sentence.

19      Appellate Exhibit XXI, the sentence worksheet, was provided to the president, and the members
20  were instructed on its use.

21      Neither prosecution nor the defense had any objections to the instructions as given by the
22  military judge or any request for additional instructions.  The members had no questions.

23      The military judge noted typographical errors in the sentencing instructions; that he would make
24  the necessary corrections; and then provide a copy to the members.

25      The president of the court requested a 20 minute recess before beginning deliberations.

164

1    [The court-martial recessed at 1242, 14 August 2020.]

2    **[END OF PAGE]**

165

1

**ARTICLE 39(A) SESSION**

2      [The Article 39(a) session was called to order at 1309, 14 August 2020, with all parties present

3   when the court recessed again present.  The members were absent.]

4      Neither side had anything to take up before calling the members.

5      The military judge directed the bailiff to call the members.

6      [The Article 39(a) session terminated at 1310, 14 August 2020.]

7                                        **[END OF PAGE]**

166

1    [The court-martial was called to order at 1310, 14 August 2020.  All parties present when the

2    court recessed were again present including the members.]

3    The president of the court stated the members were ready to begin deliberations.

4    [The court-martial closed for deliberations at 1310, 14 August 2020.]

5                                    **[END OF PAGE]**

**ARTICLE 39(A) SESSION**

1
2    [The Article 39(a) session was called to order at 1311, 14 August 2020, with all parties present
3    when the court recessed again present.  The members were absent.]

4    Civilian defense counsel stated he noticed that the alternate member went back; that if the bailiff
5    could just check that maybe he was just gathering his things and departing.  The bailiff stated the
6    alternate member had departed.

**POST-TRIAL AND APPELLATE RIGHTS ADVISEMENT**

7
8    Defense counsel confirmed that he had advised the accused of his Post-Trial and Appellate
9    Rights both orally and in writing, including the rights contained in R.C.M. 1010.

10    Appellate Exhibit XXIII, Post-Trial and Appellate Rights Advisement, was marked.

11    The military judge questioned the accused concerning his understanding of his post-trial and
12    appellate rights.  The accused confirmed:  that his signature appeared on page 11 of the document;
13    defense counsel had also signed on page 11 of the document; that his defense counsel explained his
14    post-trial and appellate rights to him; and, he had no questions about his post-trial and appellate rights.

15    Defense counsel, Captain Emmanuel, confirmed that he would be responsible for the post-trial
16    actions in the case; did not anticipate any upcoming reassignments, leave, deployments, or any other
17    scheduling concerns that might interfere with his post-trial representation of the accused.

18    Neither side had anything further to take up before the court recessed awaiting sentence.

19    [The Article 39(a) session recessed at 1315, 14 August 2020.]

20    **[END OF PAGE]**

168

**ARTICLE 39(A) SESSION**

1

2    [The Article 39(a) session was called to order at 1411, 14 August 2020, with all parties present

3    when the court recessed again present.  The members were absent.]

4    The military judge directed the bailiff to get Captain Rueben, alternate member, so he could

5    return to his seat.

6    The military judge directed the bailiff to call the members.

7    [The Article 39(a) session terminated at 1412, 14 August 2020.]

8    **[END OF PAGE]**

169

1    [The court-martial was called to order at 1310, 14 August 2020.  All parties present when the

2    court recessed were again present including the members.]

3                                **SENTENCE ANNOUNCED**

4    **MJ:  Senior Master Sergeant Jeremy M. Zier, this court-martial sentences you:**

5         **To be reduced to the grade of E-7.**

6    Both sides agreed that there were no further matters to be discussed.

7    [The court adjourned at 1416, 14 August 2020.]

8                                **[END OF TRANSCRIPT]**

170

# UNITED STATES AIR FORCE
## COURT OF CRIMINAL APPEALS

| | | |
|---|---|---|
| **United States** | ) | **No. ACM 21014** |
| *Appellee* | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **ORDER** |
| **Jeremy M. ZIER** | ) | |
| **Senior Master Sergeant (E-8)** | ) | |
| **U.S. Air Force** | ) | |
| *Applicant* | ) | **Panel 2** |

This order resolves Applicant's 4 October 2022 motion to attach and 6 October 2022 motion for leave to file a motion for appropriate relief and the underlying motion for appropriate relief. It also resolves the Government's 17 October 2022 response to the court's 5 October 2022 order to the Government to show good cause why the record should not be returned to The Judge Advocate General because the record appears to be incomplete after judgment was entered.

## I. BACKGROUND

A military judge sitting as a special court-martial convicted Applicant, contrary to his pleas, of one specification each of dereliction of duty and abusive sexual contact, in violation of Articles 92 and 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 920. The sentence adjudged on 14 August 2020, and entered on 2 September 2020, consisted of reduction to the grade of E-7.

On 29 September 2022, Applicant filed an application for a grant of review with the court citing Article 69(d)(1)(B), UCMJ, 10 U.S.C. § 869(d)(1)(B). Contemporaneously with that application, Applicant filed a brief that identified five assignments of error. As relevant to this order, Applicant's third assignment of error contends that the Under Secretary of the Air Force engaged in actual and apparent unlawful command influence, and that the court should set aside both convictions. The court docketed the application on 30 September 2022.

In Applicant's Statement of the Case in the brief in support of his application, he gives a procedural history of his case:

> On 23 September 2021, Applicant filed an initial petition for relief with [T]he Judge Advocate General of the Air Force [TJAG]

*United States v. Zier,* No. ACM 21014

> pursuant to R.C.M. [Rule for Courts-Martial] 1201. On 6 December 2021, [Applicant] filed a supplemental petition with TJAG pursuant to R.C.M. 1201. On 19 April 2022, Applicant filed a second supplemental petition with TJAG, also pursuant to R.C.M. 1201. On 11 August 2022, TJAG issued an action which denied all relief to Applicant and found that his second supplemental petition was untimely.
>
> Applicant states on information and belief that no review pursuant to R.C.M. 1201[ ] has ever been completed in his case.

After docketing, Applicant filed two motions that are pending ruling by this court. The first is a motion to attach filed on 4 October 2022, which the Government opposed on 11 October 2022. The second is a motion for leave to file a motion for appropriate relief submitted by Applicant on 6 October 2022. In this filing, Applicant moves this court for appropriate relief by requesting the "recusal of any Air Force military appellate judge" and "for the detailing of military appellate judges of another service" for (1) the purpose of adjudicating the Article 69, UCMJ, application, and (2) for such judges of another service to rule on the motion for appropriate relief. On 13 October 2022, the Government opposed the 6 October 2022 motion, contending that even if the court were to grant Applicant's motion for leave to file, the court should deny the underlying motion for appropriate relief because it is without merit.

## II. DISCUSSION

### A. Motion for Leave to File Motion for Appropriate Relief

Applicant's motion for appropriate relief requested recusal of "any Air Force Appellate Military Judge assigned to this case" and further moved for the chief appellate military judge of the United States Air Force Court of Criminal Appeals "to arrange for the detailing of military appellate judges of another service for the purposes of adjudicating this Article 69, UCMJ, application," and "for the same in this pleading." The motion is founded on professional responsibility standards that oblige military judges to avoid impropriety and the appearance of impropriety and to promote public confidence in the integrity and impartiality of the judiciary.

Applicant contends that,

> Here, in this Article 69, UCMJ[,] application, a reasonable observer would lack confidence in the decision of a panel asked to overturn the military justice decision of its military superior, the Judge Advocate General of the Air Force, when that military superior has the direct power to suspend the members of that panel

2

*United States v. Zier,* No. ACM 21014

as appellate military judges, with the resulting career and assignments consequences of an early termination of tenure.

Applicant contends, moreover, that "[t]his lack of confidence would be increased in light of Applicant's allegation that the Secretary and Undersecretary of the Air Force have committed unlawful command influence through their public pronouncements on this matter."

The UCMJ consigns to the Judge Advocate General of each department of the armed forces the responsibility to establish a Court of Criminal Appeals (CCA) and assign appellate military judges to those courts. Article 66(a), UCMJ, 10 U.S.C. § 866(a). In addition to assigning each Judge Advocate General with this responsibility, Congress authorized CCAs in certain cases to "review the action taken by the Judge Advocate General" upon timely application. Article 69(d)(1)(B), UCMJ; *see also* Article 66(b)(1)(D), UCMJ, 10 U.S.C. § 866(b)(1)(D) (conferring jurisdiction on a CCA to review "an application for review [filed] with the Court under section 869(d)(1)(B) of this title (article 69(d)(1)(B)) and the application has been granted by the Court").

Applicant's claim is couched by reference to a "reasonable observer," and does not therefore challenge the actual independence of the appellate judiciary. His challenge rests on a speculative premise that The Judge Advocate General might have a personal stake in the outcome of his appeal. It also rests on the assumption that appellate military judges might review the action taken by The Judge Advocate General in his case in light of perceived personal interests. In cases like this one "in which a major facet of the military justice system has been challenged," *United States v. Mitchell*, 39 M.J. 131, 135 (C.M.A. 1994), the predecessor to our superior court has exercised vigilance to "insure that servicemembers receive a fair court-martial in accordance with law." *Id.* at 146 (examining system for evaluating military judges). In *Weiss v. United States*, the United States Supreme Court considered a systemic due process challenge to the practice of appointment of military judges without a fixed term of office. 510 U.S. 163, 181 (1994). The Court rejected that claim by evaluating the "balance achieved by Congress" in creating a military judiciary, "the historical fact that military judges have never had tenure," and "safeguards in place to ensure impartiality." *Id.* at 179–81.

We have evaluated Applicant's appearance of impropriety claim in light of *Weiss*, and the admonition in *Mitchell* that a systemic claim like Applicant's is evaluated "from the perspective of 'a reasonable judge,'" and not "in terms of the views of a reasonable person." 39 M.J. at 141–42. Applicant does not couch his argument as a constitutional claim, but the premise of his argument is that the structure Congress created for him to exercise the right to appellate review of his court-martial convictions and sentence is untenable. As in *Mitchell*, Ap-

*United States v. Zier,* No. ACM 21014

plicant, "while maintaining a systemic challenge . . . proffers no particular reason why his appellate military judges might be otherwise biased." *Id.* at 145. On that basis, the Court of Military Appeals observed that "[t]he absence of such proof severely undermines appellant's argument that a reasonable person might question the impartiality of his judges." *Id.*

As regards the motions pending ruling by this court, we are not persuaded that disqualification is necessary under the rules of professional responsibility. We reach the same conclusion in our application of the Due Process Clause of the Fifth Amendment, U.S. CONST. amend. V. Accordingly, we grant Applicant's motion for leave to file and deny his motion for appropriate relief for the reasons stated above.

### B. Applicant's Motion to Attach

Applicant requested the court attach five exhibits in support of his fourth and fifth assignments of error. The fourth assignment of error alleges Applicant was subject to unlawful post-trial punishment. The fifth assignment of error alleges that The Judge Advocate General of the Air Force, in conducting an examination of the record pursuant to Article 69, UCMJ, 10 U.S.C. § 869, improperly found Applicant's second supplemental petition for relief was untimely. Citing *United States v. Jessie*, 79 M.J. 437 (C.A.A.F. 2020), the Government filed its opposition to the motion, noting that Applicant has not articulated how the relevance of the five exhibits is raised by materials already in the record or that they are necessary for resolving his assignments of error. The Government contends that these exhibits "fall outside the threshold requirements for extra-record materials and this Court should deny Applicant's request to attach them to the record."

The court considered Applicant's motion, the Government's opposition, and applicable law. We grant Applicant's motion; however, we specifically defer consideration of the attachments pursuant to the holding in *Jessie* until the court decides whether to grant the application.

### C. Government's Response to Court's Show Cause Order

The following is included in the appellate record docketed with the court:

> (1) An undated action of the TJAG stating that relief is denied under Article 69, UCMJ. The action notes that consideration was given to the record and Applicant's original and supplemental petitions.

> (2) An undated action of the TJAG stating that relief is denied under Article 69, UCMJ, noting that Applicant's second supplemental petition was untimely and good cause has not been shown for an extension of time.

4

*United States v. Zier,* No. ACM 21014

(3) An 11 August 2022 memorandum to Applicant stating that consideration was given to the record and the original and supplemental petition. The memorandum informs that relief under Article 69, UCMJ, is denied and that Applicant has 60 days to submit an application for grant of review with the court.

On 5 October 2022, and without the court identifying—on the court's own motion—the disqualification question that Applicant would raise the next day, the court *sua sponte* ordered the Government to show good cause why we should not return the record because it appears incomplete after judgment was entered. On 17 October 2022, the Government responded to that order, conceding there is no good cause why the record should not be returned because "Applicant's record is incomplete." In that regard, the Government raised concern about the conduct of the Article 65, UCMJ, 10 U.S.C. § 865, review of the case, which preceded examination of the record by The Judge Advocate General under Article 69, UCMJ. The Government stated two related points that it brought to the court's attention: (1) the Article 65, UCMJ, review was improper because the attorney who conducted that review did not respond in writing to each written allegation of error made by the accused; and (2) there is reason to believe that the reviewing attorney did not serve Applicant via certified mail with "the completed Article 65(d), UCMJ, review."

As a remedy, the Government requests that the court "return the record and order reviewing parties to conduct a proper Article 65(d), UCMJ, review, serve a copy of the completed review on Applicant via certified mail, and attach proof of service to the record." The Government suggests, moreover, that "[i]n the event Applicant re-applies for relief under Article 69, UCMJ," the court order the Government "to notify Applicant of [The Judge Advocate General]'s action via certified mail and attach a copy of the certified mail receipt to the record."

We decline at this time to return the case to The Judge Advocate General on the basis that the Article 65, UCMJ, review was incomplete or incorrect. Instead, we return the record because the court cannot determine if the allegations of error made by Applicant, if any, during that review, and the complete review, are included in the record. We also return the record because Applicant's original, supplemental, and second supplemental petitions are not included in the record, nor are the reasons for which The Judge Advocate General denied relief included in the record.

Accordingly, it is by the court on this 27th day of October, 2022,

**ORDERED:**

Applicant's motion for leave to file motion for appropriate relief is **GRANTED**, and motion for appropriate relief is **DENIED.**

5

*United States v. Zier,* No. ACM 21014

Applicant's motion to attach is **GRANTED**.

**It is further ordered:**

While the case remains docketed with the court, the record of trial is returned to The Judge Advocate General to include content missing from the record. Thereafter, the record will be returned to the court. Counsel for the Government shall inform the court not later than **17 November 2022**, in writing, of the status of compliance with the court's order unless the record has been returned to the court prior to that date.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

6

17 November 2022

**IN THE UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| *Appellee* | ) | **UNITED STATES' MOTION** |
| | ) | **TO ATTACH DOCUMENTS** |
| v. | ) | |
| | ) | |
| Senior Master Sergeant (E-8) | ) | |
| **JEREMY M. ZIER**, | ) | Before Panel No. 2 |
| USAF, | ) | |
| *Applicant.* | ) | No. ACM 21014 |

**TO THE HONORABLE, THE JUDGES OF
THE UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

Pursuant to Rule 23.3.(b) of this Court's Rules of Practice and Procedure, the United

States moves the Court to attach the following documents to the record of trial:

    A)    Applicant's original Article 69, UCMJ petition, dated 23 September 2021;
    B)    Applicant's supplemental Article 69, UCMJ petition, dated 6 December 2021;
    C)    Applicant's second supplemental Article 69, UCMJ petition, undated;
    D)    Memorandum from Maj McDermott-Winch, dated 1 November 2022;
    E)    Emails with current and former 502 ABW/JA personnel.

In its 27 October 2022 order, this Court identified four categories of information missing

from Appellant's record of trial: 1) the allegations of error made by Applicant, if any, during the

Article 65, UCMJ review; 2) the complete Article 65, UCMJ review of Applicant's allegations of

error; 3) Applicant's original, supplemental, and second supplemental Article 69, UCMJ

petitions; and 4) the reasons for which The Judge Advocate General denied relief.

Documents A-C are responsive to Category 3 of this Court's order. Document D is not

responsive to any category identified by this Court, but does provide the date on which TJAG

denied relief to Applicant's Article 69, UCMJ petitions.  Document E is responsive to Categories

1 and 2 of this Court's order.[1]

WHEREFORE, the United States respectfully requests this Court grant this Motion to

Attach documents to Applicant's record of trial.


JAY S. PEER, Maj, USAF
Appellate Government Counsel
Government Trial and Appellate Operations Division
United States Air Force
1500 W. Perimeter Rd., Ste. 1190
Joint Base Andrews, MD 20762
(240) 612-4800


MARY ELLEN PAYNE
Associate Chief
Government Trial and Appellate Operations Division
Air Force Legal Operations Agency
United States Air Force
1500 W. Perimeter Rd., Ste. 1190
Joint Base Andrews, MD 20762
(240) 612-4800

---

[1] The 502 ABW/JA conducted the Article 65, UCMJ review in this case.  Maj Johnathan Dial
was previously assigned to the 502 ABW/JA and conducted the Article 65, UCMJ review of
Applicant's case.  He is no longer assigned to the 502 ABW/JA.  Maj Elizabeth Schiavone is the
current Chief of Military Justice at the 502 ABW/JA.

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I certify that a copy of the foregoing was delivered to the Court, the Appellate Defense

Division, and Applicant's counsel on 17 November 2022.


JAY S. PEER, Maj, USAF
Appellate Government Counsel
Government Trial and Appellate Operations Division
United States Air Force
1500 W. Perimeter Rd., Ste. 1190
Joint Base Andrews, MD 20762
(240) 612-4800

# DOCUMENT A



# THE LAW OFFICES OF ROBERT FELDMEIER
## 3201 Edwards Mill Rd, Suite 141-454
## Raleigh, North Carolina 27612
## 336-416-2479

**Robert Feldmeier, Principal (Licensed in the State of North Carolina)**
**Rebecca Haney, Of Counsel (Licensed in the State of South Carolina only)**

September 23, 2021

AFLOA/JAJM
1500 West Perimeter Rd., Suite 1130
Joint Base Andrews, MD 20762

Gentlemen:

    Please see the attached petition for the review of the Judge Advocate General, filed pursuant to Article 69, UCMJ in the matter of *United States v. Zier*. **Please acknowledge receipt.** Please contact me at the address and number above or at robert.a.feldmeier@gmail.com with questions. Believe me, I am

Yours Very Truly,

Robert A. Feldmeier
Attorney-at-law

BEFORE THE JUDGE ADVOCATE GENERAL OF THE AIR FORCE

U N I T E D  S T A T E S,

APPLICATION FOR RELIEF FROM
COURT-MARTIAL FINDINGS
AND/OR SENTENCE UNDER THE
PROVISIONS OF TITLE 10, UNITED
STATES CODE, SECTION 869

v.

Senior Master Sergeant (E-8),
**Jeremy M. Zier**
United States Air Force

7238 Capricorn Way
Converse, Texas 78109
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
(Address and Social Security Number
of Applicant)

Tried at JBFSA-Randolph on 10-14
August 2020 before a special court-
martial appointed by Commander, Air
Force Public Affairs Agency, Colonel
Sterling C. Pendleton, Military judge,
presiding.

TO THE JUDGE ADVOCATE GENERAL OF THE AIR FORCE:

**I.**

**THE EVIDENCE IS LEGALLY INSUFFICENT AS
TO CHARGE I BECAUSE THE GOVERNMENT
PRESENTED NO EVIDENCE AS TO THE
EXISTENCE OF ANY DUTY.**

**II.**

**THE MILITARY JUDGE ERRED WHEN HE
PERMITTED THE GOVERNMENT TO PROVE
CHARGE II WITH INADMISSBLE PROPENSITY
EVIDENCE.**

Through counsel, Senior Master Sergeant (E-8) Jeremy M. Zier petitions for relief under Article 69, UCMJ on the grounds of substantial error and requests that the Judge Advocate General set aside and dismiss all findings and the sentence.

## Statement of the Case

On 10 August 2020 – 14 August 2020, a military judge sitting as a special court-martial tried Senior Master Sergeant (E-8) Jeremy M. Zier [hereinafter Applicant]. The court-martial convicted Applicant, contrary to his pleas, of one specification each of dereliction of duty and abusive sexual contact, in violation of Articles 92 and120, UCMJ; 10 U.S.C. §§ 892 and 920 (2012). The court-martial sentenced Applicant to be reduced to the grade of E-7. The convening authority approved the sentence as adjudged. (Action).

## Statement of Facts

The offense of which Applicant was convicted arose during a trip to Colossae Thermal Hotel in Pamukkale, Turkey in 2015. During that trip, Applicant and other airmen lounged in a hot tub. All persons present, to include other NCOs, decided to disrobe while in the hot tub. (R. at 73). One of the Airmen present, C.F., claimed that Applicant touched her genital area and her inner thigh. (R. at 76). This alleged touching occurred in the presence of at least five other people. (R. at 76). None saw the touch and none saw or heard any reaction from C.F. which would indicate that a non-consensual touching occurred. (R. at

2

68, 76). C.F. claimed that she felt what seemed to be Applicant's hand but did not actually see his hand touch her. (R. at 64). Despite this, C.F. did not allege in her initial version of events that Applicant grazed her genitalia with his hand, and merely indicated that he touched her inner thigh. (R. at 67).

On the basis of the events at the Colossae Thermal Hotel, the government charged Applicant with being derelict in the performance of his duty by not maintaining professional relationships with subordinates and with abusive sexual contact. (R. at Charge Sheet). No witness testified as to the existence of any duty which he owed to maintain professional relationships.

In order to prove abusive sexual contact, over objection, the Military Judge permitted the government to admit evidence that Applicant asked Sienna Mackiewicz whether she and C.F. had ever "had a one night stand." (R. at 80). The military judge further permitted, over objection, the government to introduce evidence that Applicant told C.F., during a conversation about C.F.'s open bisexuality, that she "hadn't had the right dick." (R. at 89). The Military Judge admitted both exchanges under Mil. R. Evid. 404(b). The Military Judge found that both exchanges were evidence of plan and of intent. App. Ex. VI.

## I.

### THE EVIDENCE IS LEGALLY INSUFFICENT AS TO DERELICTION OF DUTY OR IN THE ALTERNATIVE, FACTUALLY INSUFFICIENT.

3

## Summary of Argument

The government charged that Applicant's nudism while in a hot tub with his subordinates violated an alleged duty to maintain professional relationships with them but did not elicit any evidence to prove that such a duty existed. The government's evidence was therefore legally and factually insufficient.

## Law

The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citations omitted). A legal sufficiency analysis does not involve a "reweighing of the evidence afresh, but [ ] ascertain[s] whether there was some legal and **competent evidence** from which any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Sanders*, 37 M.J. 116, 118 (C.M.A. 1993) (citations and quotation marks omitted)(emphasis added).

"Article 92(3), UCMJ, requires proof of certain military duties . . . ." *United States v. Hayes*, 71 M.J. 112, 115 (C.A.A.F. 2012). Duty "may be imposed by treaty, statute, regulation, lawful order, standard operating procedure, or custom of the service." Manual for Courts-Martial, United States (2012 ed.) (MCM), pt. IV, ¶ 16.c.(3)(a).

4

Due process requires fair notice that an act is forbidden and subject to criminal sanction. *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998)). Sources of fair notice include military regulations. *United States v. Pope*, 63 M.J. 68, 73 (C.A.A.F. 2003). Where the record is silent as to the source of a duty or testimony concerning its existence, review authorities must set aside a conviction for dereliction of duty.

> "When a servicemember is tried for dereliction of duty, 'the existence of the duty must be demonstrated by the evidence.' Demonstrating a certain duty 'is not too difficult.' *United States v. Shelly*, 19 M.J. 325, 328 (DMA 1985). Nevertheless, the duty must be demonstrated in the record. See, e.g., *United States v. Wilson*, 33 M.J. 797, 798 n.1 (ACMR 1991).

*United States v. Tanks*, 36 M.J. 428, 430 (C.A.A.F. 1993).

Where the government elects to charge misconduct "…as a willful dereliction, the government (must) prove-up the duty… never mind that it may appear obvious or self-evident. (When) [i]t failed to put on any evidence of that duty… as a matter of law, his conviction for that offense must fail as well. *United States v. Worstell*, 44 M.J. 799, *14 (A.F. Ct. Crim. App. 1996).

### Argument

The government offered no evidence that Applicant had a duty to maintain professional relationships with his subordinates. There was no "legal and **competent evidence** from which any rational trier of fact could have found the

5

essential elements of the crime beyond a reasonable doubt." *Sanders*, 37 M.J. 118 (emphasis added). Although it may seem obvious that a non-commissioned officer has a duty to maintain professional relationships with subordinates, "never mind that it may appear obvious or self-evident. (When the government) failed to put on any evidence of that duty… as a matter of law, his conviction for that offense must fail as well." *Worstell*, 44 M.J. 799 at *14.

Here, the government did not admit the text of any Air Force Instruction to prove the existence of a duty to maintain professional relationships. Witnesses did spare over whether Applicant's charged conduct was or was not professional. (R. at 67-68). This proof is incomplete. The government was required to prove not only the Applicant was unprofessional, but also that he had a duty to be professional in a civilian, non-duty hours setting. No witness discussed the existence of such a duty based upon the customs of the service. The government did not admit any Air Force Instruction into evidence. The government therefore did not offer any proof as to the existence of a duty for Applicant to remain professional. Therefore, the government's proof as to Charge I was legally insufficient and you should set it aside.

In the alternative, based upon the foregoing you should apply a similar standard to Art. 66, UCMJ and to the dereliction of duty charge and set it aside as factually insufficient.

6

## II.

## THE MILITARY JUDGE ERRED WHEN HE PERMITTED THE GOVERNMENT TO PROVE CHARGE II WITH INADMISSBLE PROPENSITY EVIDENCE.

### Summary of Argument

The military judge improperly permitted the government to introduce highly prejudicial and inadmissible propensity evidence relevant to Charge II, Specification 1.  You should set aside the findings as to Charge II to correct this error.

### Law

There is a three-part test for determining admissibility of evidence offered under Mil. R. Evid. 404(b):

> (1) Whether the evidence reasonably supports a finding by the court members that appellant committed the prior crimes, wrongs, or acts;
> (2) Whether the evidence makes a "fact of consequence" more or less probable; and
> (3) Whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403.

*United States v. Reynolds*, 29 M.J. 105, 109 (CMA 1989).

Evidence may be admitted under Mil. R. Evid. 404(b) to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Mil. R. Evid. 404(b)(2).  Evidence cannot be admitted under

7

Mil. R. Evid. 404(b) to show an accused's predisposition to commit the charged offense. *United States v. Acton*, 38 M.J. 330, 333 (C.M.A. 1993).

Motive is not an element of an offense. but may be relevant to prove identity or lack of mistake. *United States v. Jenkins*, 48 M.J. 594, 598 (Army Ct. Crim. App. 1998). The government may not introduce evidence of motive or intent for general propensity purposes. *United States v. Spata*, 34 M.J. 284, 286 (C.M.A. 1992).

"Scheme, plan and design" involves mutually dependent acts. Mil R. Evid. 404(b). "Uncharged and charged acts are part of a common or continuing plan when they are mutually dependent or interlocking steps toward the accomplishment of the same final goal. It is the interconnectivity of the acts inspired by a singular purpose . . . that manifests a plan." *United States v. Jenkins*, 48 M.J. 594, 600 (A. Ct. Crim. App. 1998).

Opportunity is the existence of a set of circumstances that allow the criminal act to occur. Mil. R. Evid. 404(b). Knowledge is evidence that a court may admit evidence of an accused's knowledge to rebut an assertion that he did not understand the criminal nature of his conduct. *United States v. Harper*, 22 M.J. 157, 163 (C.M.A. 1986). Absence of mistake and lack of accident are, by definition, only relevant when an accused asserts mistake or accident.

8

The Mil. R. Evid. 403 balancing test requires that a court exclude evidence which, while nominally probative, is unfairly prejudicial. Evidence fails the Mil. R. Evid. 403 balancing test when it is of low probative weight, distracting to the factfinder and when other less prejudicial evidence is available. *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000). Past sexual acts which are dissimilar to the alleged offenses are of low probative value, pose significant risk of distraction to the factfinder and should not be admitted because they are only probative as to propensity. *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 156 (3rd. Cir. 2002).

### Argument

The Military Judge erred when he permitted evidence that Applicant asked Sienna Mackiewicz whether she and C.F. had ever "had a one night stand" and when he permitted the government to admit evidence that Applicant suggested to C.F. that she "hadn't had the right dick." (R. at 80, 89). The Military Judge erred when he permitted the government to admit these statements as evidence of plan and evidence of intent because they are neither within the meaning of Mil. R. Evid. 404(b). App. Ex. VI. Further, even if they were, the evidence still failed Mil. R. Evid. 403's balancing test.

The Military Judge erred when he found that this evidence was evidence of plan. "…[A] common or continuing plan (within the meaning of Mil. R. Evid. 404(b) requires)… mutually dependent or interlocking steps toward the

9

accomplishment of the same final goal. It is the interconnectivity of the acts

inspired by a singular purpose . . . that manifests a plan." *Jenkins*, 48 M.J. at 600.

Here, Applicant's ability to touch C.F.'s leg and pelvis was not dependent upon his

asking Sienna Mackiewicz whether she and C.F. "had a one night stand" and or

upon Applicant telling C.F. that she "hadn't had the right dick." (R. at 80, 89).

Therefore, the Military Judge erred when he admitted these statements as evidence

of plan.

The Military Judge further erred when he found that these statements were

admissible as evidence of intent concerning Charge II, Specification One.  App.

Ex. VI.  Evidence offered under Mil. R. Evid. 404(b) is only admissible to the

extent that the evidence of uncharged misconduct makes a fact of consequence

more or less probable. *United States v. Harrow*, 65 M.J. 190, 202 (C.A.A.F. 2007).

Here, the evidence that the government admitted indicated, at most, that Applicant

was inquisitive as to C.F.'s homosexual activities.  Evidence of Applicant's

interest in C.F.'s homosexual activities does not make his sexual gratification from

an alleged heterosexual touching more likely because the two types of activities are

discordant.  Therefore, the Military Judge erred in admitted them for intent

purposes as to Charge II, Specification 2 because they make no matter of

consequence more or less likely.

10

Even if evidence of Applicant's interest in C.F.'s homosexual activities nominally made an alleged heterosexual interest in C.F. more likely, it would still fail the Mil. R. Evid. 403 balancing test and the third *Reynolds* prong. Where the government charges overtly sexual acts, the issue of intent is not ordinarily in issue and extraneous evidence as to intent to obtain sexual gratification fails Mil. R. Evid. 403. *United States v. Morrison*, 52 M.J. 117, 123 (C.A.A.F. 1999).

In *Morrison*, an accused was charged with sexual acts involving a child to whom he was not related. *Id.* at 123. The government admitted testimony from the accused's daughter concerning alleged, uncharged sexual acts that were not similar to the charged offenses. *Id.* The government admitted this testimony to show the accused's intent to fulfill "unnatural sexual desire for young girls." *Id.* CAAF found that this evidence failed the third prong of *Reynolds* because the uncharged misconduct was of little probative value. The court found that if the charged sex act were proven, the act itself proved sexual intent. Therefore, the other sex act was of low probative value as to intent, was highly prejudicial and failed the third *Reynolds* prong.

Similar to *Morrison*, in which the government admitted another sexual act to prove sexual intent, here, the government admitted evidence of Applicant's sexualized conversations under Mil. R. Evid 404(b) to prove sexual intent. (R. at 80, 89). Further, similar to *Morrison*, in which the issue was not whether a sex act

11

involving a minor was for sexual purposes, but was whether the act occurred at all, here, the issue was of whether the act occurred, not whether it was in furtherance of a sexual urge. Therefore, as in *Morrison*, the admission of other sexualized behavior to prove the sexual intent of a sex act was more prejudicial than probative.

The Tipsy Coachman doctrine does not save the admission of these conversations because they were also inadmissible under Mil. R. Evid. 413. You should affirm findings based upon an improper admission of evidence only if another proper ground for admission of that evidence exists. *United States v. Heath*, 76 M.J. 576, 578 (Army Ct. Crim. App. 2017). Here, the improper evidence admitted under Mil. R. Evid. 404(b) was also inadmissible under Mil. R. Evid. 413. The government may only admit evidence of sexual misconduct under Mil. R. Evid. 413 where the underlying evidence constitutes a criminal sexual offense. *United States v. Fetrow*, 75 M.J. 574, 582-83 (A.F. Ct. Crim. App. 2016). Here, neither asking whether two Airmen have had a same-sex intimate encounter nor commenting roughly to C.F. about a potential cause of her bisexuality constitute a sexual crime. Therefore, the Tipsy Coachman doctrine does not save admission of these statements because these statements were neither admissible under Mil. R. Evid. 404(b) nor under Mil. R. Evid. 413.

Finally, the admission of these statements was not harmless by any standard.

12

C.F. claimed that Applicant touched her genital area in the presence of at least five other people. (R. at 76). None saw the touch and none saw or heard any reaction from C.F. which would indicate that a non-consensual touching occurred. (R. at 68, 76). C.F. did not allege in her initial version of events that Applicant grazed her genitalia with his hand. (R. at 67). She subsequently claimed that she felt what seemed to be Applicant's hand but did not actually see if that were in fact the case. (R. at 64). Under these circumstances, you should find that the improperly admitted Mil. R. Evid. 404(b) testimony was not harmless by any standard and set aside the remaining findings as to Charge II because the evidence proving the Charge was weak.

## Conclusion

Based upon the foregoing, you should set aside and dismiss the Charges and the Sentence. Pursuant to Air Force Instruction 51-201, para 14.20, I state on affirmation that I believe the foregoing to be true.

ROBERT FELDMEIER
Civilian Appellate Defense Counsel
THE LAW OFFICES OF
ROBERT FELDMEIER
3201 Edwards Mill Rd, Suite 141-454
Raleigh, North Carolina 27612
336-416-2479
robert.a.feldmeier@gmail.com

13

# DOCUMENT B

FIRST-CLASS MAIL
US POSTAGE
**PAID**
PALATINE, IL
PERMIT #459

MR. ROBERT FELDMEIER
LAW OFFFICES OF ROBERT FELDMEIER
2920 FORESTVILLE ROAD SUITE 100-1076
RALEIGH, NC 27616

000001

AFLOA/JAJM (ART. 69 PETITION)
1500 W PERIMETER RD STE 1130
JB ANDREWS, MD 20762-6604



**USPS CERTIFIED MAIL**

9214 8902 3589 0900 0012 7369 90

41126745-000001-36-36-00

41126745-000001-35-36-00



# THE LAW OFFICES OF ROBERT FELDMEIER

**2920 Forestville Road, Suite 100-1076**
**Raleigh, North Carolina 27616**
**336-416-2479**

Robert Feldmeier, Principal (Licensed in the State of North Carolina)
Rebecca Haney, Of Counsel (Licensed in the State of South Carolina only)

December 6, 2021

AFLOA/JAJM
1500 West Perimeter Rd., Suite 1130
Joint Base Andrews, MD 20762

Gentlemen:

Please see the attached additional petition for the review of the Judge Advocate General, filed pursuant to Article 69, UCMJ in the matter of *United States v. Zier.* **Please acknowledge receipt.** Please contact me at the address and number above or at robert.a.feldmeier@gmail.com with questions. Believe me, I am

Yours Very Truly,

Robert A. Feldmeier
Attorney-at-law

*Please note our new address.*

41126745-000001-34-36-00

BEFORE THE JUDGE ADVOCATE GENERAL OF THE AIR FORCE

U N I T E D   S T A T E S,

       v.

Senior Master Sergeant (E-8),
**Jeremy M. Zier**
United States Air Force

7238 Capricorn Way
Converse, Texas 78109
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
(Address and Social Security Number
of Applicant)

ADDITIONAL APPLICATION FOR
RELIEF FROM COURT-MARTIAL
FINDINGS AND/OR SENTENCE
UNDER THE PROVISIONS OF
TITLE 10, UNITED STATES CODE,
SECTION 869

Tried at JBSA-Randolph on 10-14
August 2020 before a special court-
martial appointed by Commander, Air
Force Public Affairs Agency, Colonel
Sterling C. Pendleton, Military Judge,
presiding.

TO THE JUDGE ADVOCATE GENERAL OF THE AIR FORCE:

**ADDITIONAL ASSIGNMENTS OF ERROR.**

**I.**

**THE UNDER SECRETARY OF THE AIR FORCE IS
ENGAGED IN APPARENT AND ACTUAL
UNLAWFUL COMMAND INFLUENCE WHILE
SMSGT ZIER'S CONVICTION IS PENDING
ARTICLE 69, UCMJ REVIEW.**

**II.**

## PETITIONER IS SUBJECT TO UNLAWFUL POST-TRIAL PUNISHMENT IN EXCESS OF THE SENTENCE.

Through counsel, Senior Master Sergeant (E-8) Jeremy M. Zier petitions for relief under Article 69, UCMJ on the additional grounds of substantial error and requests that the Judge Advocate General set aside and dismiss all findings and the sentence.

### Statement of the Case

On 10 August 2020 – 14 August 2020, a military judge sitting as a special court-martial tried Senior Master Sergeant (E-8) Jeremy M. Zier [hereinafter Applicant]. The court-martial convicted Applicant, contrary to his pleas, of one specification each of dereliction of duty and abusive sexual contact, in violation of Articles 92 and 120, UCMJ; 10 U.S.C. §§ 892 and 920 (2012). The court-martial sentenced Applicant to be reduced to the grade of E-7. The convening authority approved the sentence as adjudged. (Action).

### Additional Statement of Facts

The Honorable Gina Ortiz Jones is the incumbent Under Secretary of the Air Force. The Senate of the United States gave its advice and consent to President Biden's nomination of her on 22 July 21.[1] She took the statutorily prescribed oath of office on 26 July 21 and entered office at that time. Petitioner states upon

---

[1] Jay Gould, *Pentagon adding new China and tech chiefs*, Defense News (July 26, 2021).

2

information and belief that Under Secretary Jones received a reserve commission
in the Air Force in 2003 and has continued to hold that commission at all relevant
times.  Petitioner further states, upon information and belief, that during periods
relevant to this case, Under Secretary Jones has performed inactive duty for
training, annual training, or active duty for training, and has been subject to the
UCMJ while performing such duty as an Air Force Reservist.

Under Secretary Jones has maintained a Twitter account at all times relevant
to this matter.  Twitter is "an American microblogging and social networking
service on which users post and interact with messages known as 'tweets'.
Registered users can post, like, and retweet tweets, but unregistered users can only
read those that are publicly available."[2]  Under Secretary Jones has "tweeted"
about this case.  Specifically, she tweeted on 22 March 21 that Petitioner "should
not serve in our military" because he is a "convicted sex offender."  (R. at
Attachments).  This "tweet" has remained publicly visible at all times since its
posting, including after Under Secretary Jones entered office and at the time of the
filing of this Additional Assignment.  It has attracted media attention.  *See e.g.*,
Greg Piper, *Air Force to Revoke Bronze Star Recipient's Retirement Benefits for
Hot Tub Incident*, Just the News (8 NOV 21) available at

---

[2]  *About Twitter* available at https://about.twitter.com/en/who-we-are/our-company

3



https://justthenews.com/government/federal-agencies/air-force-revoke-bronze-star-recipients-retirement-benefits-hot-tub.

Under Secretary Jones is the second-highest ranked civilian in the Department of the Air Force. 10 U.S.C. 9015. The Assistant Secretary of the Air Force responsible for personnel matters reports directly to her. 10 U.S.C. 9016. Under Secretary Jones has the direct and indirect ability to affect the tenure in office, future assignments and career prospects of the Judge Advocate General and the judges of the Air Force Court of Criminal Appeals. *Id.*

On 10 December 2020, an administrative discharge board convened to consider whether to administratively discharge Petitioner. UP AFI 36-3208, the board determined that Petitioner should be retained. (R. at Attachments).

At all times from the completion of his court-martial sentence in August 2020, until present, Petitioner has been prevented from performing any meaningful military duty. (R. at Attachments). He has been informed this his place of duty is his living room. Despite numerous written requests by Petitioner, he has not been permitted to retire, because he has remained subject to pre-trial controls. (R. at Attachments). Specifically, a 2J code in his personnel records prevents any favorable action because of pending criminal or administrative separation action. Petitioner is not the subject of any further criminal action because he has completed his sentence. Furthermore, he is not the target of any new investigation.

4

He cannot be made the subject of a second administrative board for the same allegations.

Petitioner is presently assigned to the Air Force Public Affairs Agency, which is a Field Operating Agency of the Secretary of the Air Force. Petitioner's commander has a direct reporting relationship with Director of Public Affairs, Office of the Secretary of the Air Force, who serves as the personal Public Affairs Advisor to the Secretary and Under Secretary of the Air Force.

## I.

**THE UNDER SECRETARY OF THE AIR FORCE IS ENGAGED IN APPARENT AND ACTUAL UNLAWFUL COMMAND INFLUENCE WHILE SMSGT ZIER'S CONVICTION IS PENDING ARTICLE 69, UCMJ REVIEW.**

### Summary of Argument

Petitioner cannot receive a fair and unbiased consideration of his claims because the Under Secretary of the Air Force, who has the ability to terminate the tenure in office of the Air Force officials responsible for consideration of Petitioner's claims, had made abundantly clear her position on the appropriate disposition of Petitioner's case, to the prejudice of Petitioner.

### Law

"No person subject to [the UCMJ] may attempt to coerce ... the action of any convening, approving, or reviewing authority with respect to his judicial acts."

5



Art. 37(a), UCMJ. Military courts have long recognized that UCI deprives Servicemembers of their constitutional due process rights. *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986). It is therefore properly recognized as "the mortal enemy of military justice." *Id.* at 393.

The military justice system is tarnished by unlawful command influence whether the source of the influence intended the adverse effects on the case or not. Inquiry into the intentions behind an influencing action is both unfruitful and irrelevant. The only relevant inquiry is whether an action resulted in influence. *United States v. Jameson*, 33 M.J. 669, 673 (N.M.C.M.R. 1991).

UCI exists in two forms. Actual UCI occurs when a superior authority engages in actions or uses unauthorized means to influence the disposition of criminal charges. *United States v. Blaylock*, 15 M.J. 190, 193 (C.M.A. 1983). Apparent UCI, in contrast, deals with an appearance of impropriety, even if there was no actual influence or illegality. *United State v. Simpson*, 58 M.J. 368, 374 (C.A.A.F. 2003).

UCI may occur in the accusatory or the adjudicatory phase of a court-martial. *United States v. Weasler*, 43 M.J. 15, 17 (C.A.A.F. 1995). Adjudicative UCI is such a serious burden on the fairness of the military justice system that an accused neither waives nor forfeits it by the timing of when he raises the issue. *United States v. Valmont*, 73 M.J. 923, 933 (A. Ct. Crim. App. 2014).

41126745-000001-29-36-00



Civilian leadership can commit UCI. Although Article 37, UCMJ's language prohibits persons subject to the Code from committing UCI, the influencing actions of civilian leadership are subject to the same analysis as if they were subject to the UCMJ. This is a matter of military due process and stems from the due process clause, not Article 37, UCMJ. *United States v. Hutchins*, 72 M.J. 294, 312 (C.A.A.F. 2013).

### Actual UCI

The doctrine of actual UCI describes a situation wherein a superior attempts to control a subordinate decision-maker in his responsibility to make an independent and discretionary military justice decision. *United States v. Allen*, 31 M.J. 572, 584 (C.M.A. 1990). Actual UCI occurs when a superior interferes with the actions of his subordinate, including in his referral decisions. *United States v. Hamilton*, 41 M.J. at 36. A convening authority therefore may be the subject of actual UCI from his superior in rank.

A general officer who has been attacked repeatedly over his exercise of military justice discretion is unlawfully influenced where negative feedback causes him to face personal consequences concerning the outcome of military justice matters. *United States v. Thomas*, 22 M.J. at 394.

Although a superior may set military justice policy, he may not deprive a reviewing authorities of the ability to exercise independent judgement in military

7



justice matters. An action of a superior which invades the informed discretion of reviewing authorities constitutes actual unlawful command influence. *United States v. Rivera*, 31 C.M.R. 93, 95 (C.M.A. 1961). Indeed, an "improper manipulation of the criminal justice process, even if effectuated unintentionally," cannot be countenanced." *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017)

Superiors may commit actual UCI concerning a class or type of case. UCI occurs when an influencing action has a "logical connection to the court-martial in terms of the potential to cause unfairness in the proceedings." *Biagase*, 50 M.J. at 150.

Statements of an influenced person concerning independence from an influencing action are viewed with extreme skepticism. It is extremely difficult for a subordinate to assess the effects that a superior's influence has on him. *United States v. Gerlich*, 45 M.J. 309, 313 (C.A.A.F. 1996). "Military law has traditionally viewed such perfunctory statements from subordinates on the effects of command influence as inherently suspect ..." *United States v. Rosser*, 6 M.J. 267, 272 (C.M.A. 1979).

When reviewing authorities have been the subject of UCI, only extensive remedial action will cure the UCI and render it harmless beyond a reasonable doubt. *Thomas*, 22 M.J. at 400.

8

Apparent UCI

This court has long recognized that the preservation of public perception concerning the integrity and fairness of the military justice system is just as important as the actual substance of the proceedings. *United States v. Ayers*, 54 M.J. 85, 94-95 (C.A.A.F. 2000).

In considering whether an appearance of unlawful command influence exists, this court considers "the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public." *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006). Where an improper appearance places an "intolerable strain on public perception of the military justice system," reviewing authorities should restore public faith by firm measures, to include dismissal with prejudice. *United States v. Wiesen,* 56 M.J. 172, 175 (C.A.A.F. 2001). Dismissal is a harsh remedy, but one which is necessary when alternatives are insufficient to address the grave threat to military justice which is UCI. *United States v. Gore*, 60 M.J. 178, 188 (C.A.A.F. 2004).

In order to sustain a conviction in a case where there exists an appearance of UCI, "the disinterested public would now [have to] believe that [Appellant] received (processing) free from the effects of unlawful command influence." *Lewis*, 63 M.J. at 415.

9



41126745-000001-26-36-00

On appeal, Petitioner properly raises a claim of apparent unlawful command influence by showing:

1. Facts which, if true, would appear to constitute unlawful command influence;
2. That the proceedings would appear unfair to a disinterested observer;
3. And that appearances of unlawful command influence was the cause of the apparent unfairness.

*United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999).

## Argument

The Under Secretary of the Air Force has committed, and continues to commit, both actual and apparent UCI. Petitioner cannot receive an impartial consideration of the merits of his other claims because the Under Secretary continues to maintain in publication her view that Petitioner cannot and should not continue in the military service. (R. at Attachments). As a reviewing authority, you cannot countenance "an improper manipulation of the criminal justice process, even if effectuated unintentionally." *Boyce*, 76 M.J. at 247. You should therefore set aside and dismiss Petitioner's convictions.

The Under Secretary of the Air Force can commit UCI even though she is not subject to the code in her civilian capacity. *Hutchins*, 72 M.J. at 312. Further, based upon information and belief, the Under Secretary's influencing statements remained published during periods in which she performed Reservist duties in a

10



status which subjected her to the UCMJ and within the scope of Article 37, UCMJ. You must therefore apply a UCI analysis to her statements.

The application of a UCI analysis shows actual influence which you can only remedy by setting aside and dismissing the charges. Petitioner meets his burden here by showing "facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *Biagase,* 50 M.J. at 150. Here, the Under Secretary's tweets are classic UCI in which she, while in a position of great authority, continues to re-publish an outcome which she favors, termination of Petitioner's military status. She therefore explicitly disfavors any result of these or future proceedings beneficial to him. There can be no doubt as to the influence itself nor the potential for unfairness. Therefore, Petitioner has met his initial burden.

Once Petitioner has met his initial burden, he is due relief unless there is proof "beyond a reasonable doubt: (1) that the predicate facts do not exist; or (2) that the facts do not constitute unlawful command influence; or (3) that the unlawful command influence will not prejudice the proceedings or did not affect the findings and sentence." *Id.* Here, the Under Secretary's tweets indisputably exist, remain in publication, and are unlawful influence. There is no proof that they will not influence the proceedings. Rather, the extra-ordinary and unlawful

4112674S-000001-24-36-00



means which the government has employed to attempt to punish Petitioner in excess of the sentence is the result of influence. Undersigned counsel is unaware of the case of any other Servicemember who has been:

1. court-martialed.
2. completed his sentence.
3. recommended for administrative separation.
4. retained by a separation board.
5. despite recommended retention, been forwarded to the Secretary of the Air Force for separation.
6. ordered not to perform duties appropriate to rank.

The stubborn and unprecedented behavior of Petitioner's command is clear evidence of the Under Secretary's unlawful influence over Petitioner's post-trial processing. It is inconceivable that Petitioner's command would engage in such unparalleled efforts to unlawfully punish him except at the direction of higher authority. Petitioner cannot receive fair and impartial post-trial processing because he has not received fair and impartial administrative due process concerning the same underlying matter. You should find that the Under Secretary's comments constitute actual influence. You should further find that the administrative malprocessing to which Petitioner has been subject is evidence of the effects of that influence. Finally, you must set aside the findings and sentence here and such action must be with prejudice in order to remove the taint of the Under Secretary's influence from the military justice system.



In addition, you should find that the Under Secretary's tweets constitute apparent UCI. The Under Secretary's tweets present to the public an image of a system in which reviewing authorities are at risk for their jobs unless they grant no relief to Petitioner. This constitutes apparent UCI. A perceivable threat of adverse administrative action against a judicial officer constitutes apparent UCI when undertaken because a superior disagrees with the judicial officer's decisions. *United States v. Salyer*, 72 M.J. 415, 426 (C.A.A.F. 2013).

In *Salyer*, a trial counsel did not agree with the rulings which a military judge made on the admissibility of evidence. The trial counsel improperly accessed a military judge's personnel record and used the information contained in it to embarrass the military judge with a disqualification motion. This motion dealt with the fact that the military judge's wife was 17 when the military judge lawfully married her. *Id.*

Here, the Under Secretary's tweets are a far more blatant attempt to direct the result of a judicial function. In *Salyer,* improper governmental action forced the military judge to recuse himself from one case, but did not cause him to retire, loose rank or pay, or cease to be a military judge. *Id.* Here, the Under Secretary has the ability terminate the tenure and careers of judicial officials who reviews Petitioner's case. "[A]n objective member of the public would be left with the appearance and the impression that the Government obtained advantage from its

US v. Zier Military Record of Trial and Appellate Extracts 000860 of 902



actions." *Salyer*, 72 M.J. at 428. An objective member of the public would conclude that reviewing officials face massive personal and financial adverse consequences should they make a "bad" judicial decision in this case. Therefore, an objective member of the public would conclude that Petitioner's post-trial processing had been unlawfully influenced.

Petitioner need not prove up this public perception. The government must disprove it beyond a reasonable doubt. *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002). The record contains no evidence proving what members of the public would believe about the fairness of this case. Dismissal is therefore the only appropriate remedy here.

You should find that the doctrine of apparent UCI remains viable when it concerns civilian officials who are not presently subject to the code. UCI doctrine applies to civilian officials because of the due process clause, and not because of Article 37, UCMJ. *Hutchins*, 72 M.J. at 312. You should therefore find that changes to Article 37 mandated by the National Defense Authorization Act of 2020, Pub. L. No. 116-92, 133 Stat. 1198 (2019), do not affect the viability of the doctrine of apparent UCI as applied to civilian officials because civilian UCI is a constitutional, not a statutory doctrine. If you find that the proceedings here are not actually influenced, you should find that there is apparent UCI and set aside and dismiss the charges.

14

## II.

## PETITIONER IS SUBJECT TO UNLAWFUL POST-TRIAL PUNISHMENT IN EXCESS OF THE SENTENCE.

### Summary of Argument

Petitioner's command has imposed at all relevant times restrictions upon him which constitutes unlawful post-trial punishment.

### Law

Reviewing authorities have jurisdiction to remedy punishment which exceeds the approved sentence. *United States v. White*, 54 M.J. 469, 472 (C.A.A.F. 2001). The service courts and CAAF have jurisdiction derived from authority under Articles 66 and 67, UCMJ to take action with regard to the "findings and sentence." *Id*. A sentence which is executed in excess of that approved is inappropriate. *Id*. A Judge Advocate General similarly has authority to grant relief as to the "findings or sentence, in whole or in part" because of "error prejudicial to the substantial rights of the accused or the appropriateness of the sentence." Article 69(c)(1)(A), UCMJ.

Punishment occurs in the absence of proper reason for a governmental action. "Irrespective of any intent to punish... [punishment occurs] if the activity at issue serves no legitimate, nonpunitive purpose." *Howell v. United States*, 75 M.J. 386, 394 (C.A.A.F. 2016). "[I]f a restriction or condition is not reasonably

15

41126745-000001-20-36-00

related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment …". *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). Duties and work conditions which are inappropriate to a Servicemember's grade or are humiliating constitute punishment when there is no legitimate governmental purpose for them. *United States v. Quintero*, 54 M.J. 562, 567 (A. Ct. Crim. App. 2000). Public degradation through removal of the honor inherent to the performance of military duties is not a punishment which the Code authorizes, and constitutes punishment when unconnected to a legitimate, non-punitive military purpose. *United States v. Cruz*, 25 M.J. 326, 330-31 (C.M.A. 1987). Control measures such as personnel assignment actions can constitute unlawful punishment if lacking in non-punitive purpose, even is labeled "administrative." *United States v. Starr*, 53 M.J. 380, 382 (C.A.A.F. 2000).

## Argument

Petitioner has been subject to unlawful post-trial punishment because he has not been permitted to perform military duties suitable for his grade and experience for well over a year. Duties which are not grade appropriate or are humiliating constitute punishment when tethered to a UCMJ proceeding, absent a non-punitive purpose for them. *Cruz*, 25 M.J. at 330-31. Here, Petitioner has not been permitted to do his job, or any job, even though his sentence is complete. He is

16



denied the honor which attaches to the performance of duty. *Id.* There is no legitimate military purpose for Petitioner's total exclusion from the performance of any meaningful duty. It therefore constitutes punishment in excess of the sentence which you should remedy.

You should further find that Petitioner's continued administrative hold constitutes unlawful post-trial punishment. Assignment decisions and other "administrative" measures constitute punishment when undertaken without any legitimate non-punitive purpose. *Starr*, 53 M.J. at 382. Here, Petitioner's command has maintained him in a "2J" code, which prevents his retirement, even though he has completed his sentence and has been retained by an administrative separation board. A "2J" code is not appropriate after an Airman has completed his sentence and is to be retained because no "investigation" is pending. Air Force Instruction 26-2606, *Reenlistment and Extension of Enlistment in the United States Air Force* (26 JAN 21), Table 5-3. This therefore constitutes post-trial punishment because there is no legitimate purpose to prevent Petitioner's retirement. Instead, the clear purpose of this action is to deny Petitioner his pension by forcing him to ETS once his term of service expires because Petitioner's command believes that his sentence was too lenient. This action is undertaken as punishment, and for no legitimate governmental purpose. It therefore is unlawful post-trial punishment.

411126745-000001-18-36-00

17



You should set aside the findings and the sentence here to remedy the unlawful post-trial punishment to which Petitioner has been subject.

## Conclusion

Based upon the foregoing, you should set aside and dismiss the Charges and the Sentence. Pursuant to Air Force Instruction 51-201, para 14.20, I state on affirmation that I believe the foregoing to be true.

ROBERT FELDMEIER
Civilian Appellate Defense Counsel
THE LAW OFFICES OF
ROBERT FELDMEIER
2920 Forestville Road,
Suite 100-1076
Raleigh, North Carolina 27616
336-416-2479
robert.a.feldmeier@gmail.com



US v. Zier Military Record of Trial and Appellate Extracts 000865 of 902

# ATTACHMENTS

US v. Zier Military Record of Trial and Appellate Extracts 000866 of 902



41126745-000001-15-36-00

Twitter

\# Explore

⚙ Settings

🔍 Search Twitter

💬 4.2K    ⟲ 6.2K    ♡ 44.8K    ⬆

**President Biden** ✔ **@POTUS · 15h**
    United States government official
**Like I said, I'm a car guy.**

> **Justin Sink** ✔ @justinsink · 16h
> .@potus guns it in Hummer EV

💬 2.4K    ⟲ 3.9K    ♡ 36.3K    ⬆

**Sahil Kapur** ✔ **@sahilkapur · 17h**
GOSAR: "If I must join Alexander Hamilton, the first person attempted to be censured by this House, so be it. It is done."

CICILLINE: "Mr. Gosar, you are no Alexander Hamilton."

💬 332    ⟲ 3K    ♡ 32.1K    ⬆

**Don't miss what's happening**
People on Twitter are the first to know.

Log in    S

🐦

\# Explore

⚙ Settings

🔍 Search Twitter

**Don't miss what's happening**
People on Twitter are the first to know.

Log in    S

Twitter

# Explore

Settings

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

# Explore

⚙ Settings

🔍 Search Twitter

**Don't miss what's happening**
People on Twitter are the first to know.

Log in     S

Explore

Settings

**Don't miss what's happening**
People on Twitter are the first to know.

Log in



## Record Review/Update

### Reenlistment Eligibility

The information provided from MilPDS reflects that your reenlistment eligibility is as indicated below. If you are ineligible to reenlist, the condition that makes you ineligible may be waiverable. For second term and career airmen, unless you are required to obtain retainability for a service-directed event (i.e. assignment, PME, promotion, etc.), the earliest you can reenlist is 90 days prior to your Expiration Term of Service. For additional information, refer to *AFI 36-2606* ●, *Reenlistment and Extension of Enlistment in the United States Air Force*, or contact your servicing military personnel section.

**Name:** JEREMY M ZIER    **Rank:** MSG

**Date of Current Enlistment:**    30 JUN 2017

**Term of Enlistment:**    4

**Reenlistment Eligibility Status:**    Ineligible
'2J - Under investigation by military or civilian authority, the outcome of which may result in discharge or court-martial action.

**Waiverable:**    No

THIS DOCUMENT CONTAINS INFORMATION WHICH MUST BE PROTECTED IAW AFI 33-332 AND DOD REGULATION 5400.11. PRIVACY ACT OF 1974, AS AMENDED, APPLIES.

**Attention:** Using this system constitutes consent to monitoring.
See our Privacy and Security Notice for details. Technical Support ●
Date last reviewed: 15 MAR 2009

41126745-000001-09-36-00



**DEPARTMENT OF THE AIR FORCE**
OFFICE OF THE JUDGE ADVOCATE GENERAL
MILITARY JUSTICE AND DISCIPLINE

3 May 2021

MEMORANDUM FOR ALL REVIEWING AUTHORITIES

FROM: MSGT JEREMY M. ZIER

SUBJECT: Retirement in Lieu of Discharge

Please accept this memorandum as a reaffirmation of my intent to retire from the United States Air Force. In light of 502 ABW/CC's decision to refer the discharge board's recommendation for retention to the Secretary of the Air Force in accordance with AFI 36-3208, paragraph 1.2, I respectfully ask that my retirement in lieu of discharge submission from 28 September 2020 be routed for review and consideration. If you have any questions or concerns, please contact my defense counsel, Capt Daniel Adams or Capt Erica Medley.

Respectfully submitted,

ZIER.JEREMY.M.1022331023
Digitally signed by ZIER.JEREMY.M.10223
31023
Date: 2021.05.03 15:20:59 -05'00'

JEREMY M. ZIER, MSgt, USAF

41126745-000001-08-36-00

LA: Respondent, Respondent's Counsel, will you please rise and face the board? Sir, will you please read the Findings Recommendation to the Respondent?

PRES: Just read it verbatim?

LA: Yes sir.

PRES: Findings Recommendations. This board, after carefully considering all the evidence in this case, has in closed session by secret written ballot a majority of the voting members concurring, made the following Findings and Recommendations:

**Findings:**

**The Respondent, Master Sergeant Jeremy M. Zier, AFPAA; allegation was on 13 August 2020, in a Special Court-Martial consisting of officer members, found guilty of Abusive Sexual Contact in violation of Article 120, Uniform Code of Military Justice. The finding in the allegation does form a basis for discharge under AFI 36-3208, paragraph 5.55, Sexual Assault. The conduct surrounding and including the sexual is a departure from the member's usual and customary behavior. The conduct surrounding and including the sexual assault is not under all circumstances likely to recur. The sexual assault did not involve the penetration, however slight, of the vulva or anus or mouth of another body -- or mouth of another by any part of the body or by any object, with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person. The sexual assault was not committed by using force likely to cause death or grievous bodily harm to any person, threatening or placing the other person in fear that any person will be subjected to death, grievous bodily harm, or kidnapping, first rendering the other person unconscious, or administering to the other person by force or threat of force, or without the knowledge or consent of the person, a drug, intoxicant, or other similar substance and thereby substantially impairing the ability of the other person to appraise or control conduct. The sexual assault was not the result of an abuse of rank,**

266

US v. Zier Military Record of Trial and Appellate Extracts 000875 of 902

41126745-000001-07-36-00



grade, authority or position. Under the particular circumstances of this case, the member's continued presence in the Air Force is consistent with the Air Force in maintaining good proper discipline, good order, leadership and morale.

**Recommendations:**

**Despite the Respondent's conviction of a sexual assault, he meets all 6 retention criteria set out in the AFI 36-3208, paragraph 5.55.3.2, as we noted in our findings. The Respondent should therefore be retained in the United States Air Force.**

LA: Thank you, sir. If you'd like to leave that we will gather it. This board is adjourned [inaudible]. Thank you very much for your service and for your time. You guys are dismissed.

**[The board closed at 1529, on 10 December 2020]**

**[END OF PAGE]**

267

41126745-000001-06-36-00



**HON. LOUIE GOHMERT**
FIRST DISTRICT, TEXAS

**WASHINGTON OFFICE:**
2269 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-3035
FAX (202) 226-1230

COMMITTEES:
**NATURAL RESOURCES**
VICE RANKING MEMBER

SUBCOMMITTEE ON
OVERSIGHT AND INVESTIGATIONS

SUBCOMMITTEE ON
NATIONAL PARKS, FORESTS, AND PUBLIC
LANDS

**JUDICIARY**

SUBCOMMITTEE ON
CRIME, TERRORISM, AND HOMELAND
SECURITY

SUBCOMMITTEE ON
COURTS, INTELLECTUAL PROPERTY,
AND THE INTERNET

# Congress of the United States
## House of Representatives
### Washington, DC 20515

October 13, 2021

Honorable Frank Kendall III
Secretary of the Air Force
1670 Air Force Pentagon
Washington, DC 20330-1670

Lieutenant General Marshall B. Webb
Air Education and Training Command (AETC)
Joint Base San Antonio-Randolph
San Antonio, Texas 78150

Re: Accepting Master Sergeant Jeremy Zier's timely submitted retirement packet.

It has been brought to my attention that Master Sergeant Jeremy Zier has submitted a retirement request 75 times to the appropriate office. It is my primary concern that the Air Force is attempting to circumvent due process by not accepting the outcome of Master Sergeant Zier's Special Court-Martial nor the decision of the Administrative Discharge Board and punish him by withholding his duly earned retirement.

On 10 August 2020, then Senior Master Sergeant (SMSgt) Jeremy Zier was the subject of a Special Court-Martial at Joint Base San Antonio – Randolph. The allegations against him were associated with an off-duty office trip to Pamukkale, Turkey back in April 2015. After a full five-day trial, the panel heard all the facts and circumstances of the case and found him guilty of abusive sexual contact [touching a leg] and dereliction of duty. The panel sentenced him to what amounts to an Article 15 punishment – a single rank reduction from E-8 to E-7 and did *not* adjudge a punitive discharge.

Immediately following the trial – now Master Sergeant (MSgt) Zier made his first attempt to retire from the Air Force. However, he received a message that he was ineligible to retire due to "administrative codes." The code indicated he was being referred to an Administrative Separation Board. The aim of the board was to achieve the punitive separation the Court-Martial did not deem appropriate. The substance presented to the Administrative Separation Board was the exact materials covered by the previous Court-Martial.

LONGVIEW OFFICE
101 EAST METHVIN STREET, SUITE 302
LONGVIEW, TX 75601
PHONE (903) 236-8597

LUFKIN OFFICE
300 EAST SHEPHERD, SUITE 210
LUFKIN, TX 75901
PHONE (936) 632-3180

MARSHALL OFFICE
102 WEST HOUSTON STREET
MARSHALL, TX 75670
PHONE (903) 938-8386

NACOGDOCHES OFFICE
101 W MAIN, SUITE 160
NACOGDOCHES, TX 75961
PHONE (936) 715-0514

TYLER OFFICE
1121 ESE LOOP 323, SUITE 206
TYLER, TX 75701
PHONE (903) 561-6349
TOLL FREE (866) 535-6302

41126745-000001-05-36-00



US v. Zier Military Record of Trial and Appellate Extracts 000877 of 902

# Congress of the United States
## Washington, DC 20515

On September 28, 2020, upon notification of the command's decision to conduct the Administrative Discharge Board, MSgt. Zier submitted his second request for retire by submitting a request to Retirement in Lieu (RILO) of the pending Administrative Discharge Board. The RILO package was submitted to MSgt. Zier chain of command, but no action was taken as it was never routed up the chain of command until May 2021. This lack of action forced MSgt. Zier to defend himself at the Administrative Discharge Board without receiving the results of his RILO request. To our knowledge, this RILO request is still pending.

The Administrative Discharge Board was held on 10 December 2020, where a full panel heard all the facts and circumstances and found that MSgt. Zier fully met the retention criteria under AFI 36-3208, para. 5.55, and that it was in the best interests of the Air Force to retain MSgt. Zier.

At the conclusion of the Discharge Board and subsequent retention of MSgt. Zier, the Convening Authority took the unprecedented action of recommending that the Secretary of the Air Force overturn the decision of the Administrative Discharge Board to retain MSgt. Zier. The command is abusing AFI 36-3208, specifically 5.4.1.1 Limitations on Discharge Action: A member may not be discharged administratively based on conduct that has been the subject of judicial determination not going to the guilt or innocence of the respondent.

Since the conclusion of the Special Court-Martial in August 2020, MSgt. Zier's unit commander has made the decision to attempt to administratively separate him in clear violation of AFI 36-3208 5.4.1.1. The unit commander would rather keep him at home without any assigned duties rather than allow him the opportunity to move on with his life and retire with the benefits he's earned after 24 years of service. MSgt. Zier regrets attending the trip with his coworkers, and putting himself in a compromising position, but the jury panel and administrative discharge board both agreed that this one mistake should not cancel his entire career.

After a year sitting at his home and being cut off from his unit, the Air Force has now opted to employ a new strategy in contradiction to the ethos of integrity – to involuntarily roll back MSgt. Zier current service contract from 30 September 2022, to a new date of 30 November 2021. Because the Air Force refuses to accept MSgt. Zier many written requests to retire, this new action by the Air Force now forces MSgt. Zier to separate from the Air Force and involuntarily forfeit all retirement benefits. Please note this would be a significant abuse of his rights under federal statute 5 U.S. Code § 2302 and 10 U.S. Code § 932 - Art. 132, not to mention the abuse of his civil rights.

We request that you allow MSgt. Jeremy Zier to retire so that both the Air Force and MSgt. Zier may move on without need of further action by either. The Air Force has a responsibility to ensure due process for all Airmen and to abide by the decisions of the very system designed to

PRINTED ON RECYCLED PAPER

# Congress of the United States
## Washington, DC 20515

provide justice. The current effort of not allowing MSgt. Zier to retire runs counter to our core values of fairness and due process. The proposed action is clearly designed to achieve a retaliatory result that the normal legal and administrative processes flatly rejected. This effort, if carried out, will leave the public and future Airmen questioning the commitment of the Air Force in upholding the very principles that our men and women are fighting to maintain. It will also become an exhibit in our review of reforms needed within the Uniform Code of Military Justice.

Thank you for your prompt and wise use of your discretion to bring this matter to a just conclusion.

Respectfully submitted,

Rep. Louie Gohmert
Member of Congress

PRINTED ON RECYCLED PAPER

41126745-00001-03-36-00

# ENLISTED PERFORMANCE REPORT *(MSgt thru SMSgt)*

## PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force; AFI 36-2406, and Executive Order 9397 (SSN), as amended.
**PURPOSE:** Used to document effectiveness/duty performance history; promotion; school and assignment selection; reduction-in-force; control roster; reenlistment; separation; research and statistical analysis.
**ROUTINE USES:** May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3). DoD Blanket Routine Uses apply.
**DISCLOSURE:** Mandatory. Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.
**SORN:** F036 AF PC A, Effectiveness/Performance Reporting Records

## I. RATEE IDENTIFICATION DATA *(Refer to AFI 36-2406 for instructions on completing this form)*

| 1. NAME *(Last, First, Middle Initial)* | 2. SSN | 3. RANK | 4. DAFSC |
|---|---|---|---|
| ZIER, JEREMY, M | 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 | MSgt | 3N076 |

| 5. ORGANIZATION, COMMAND, AND LOCATION | 6. PAS CODE | 7. SRID |
|---|---|---|
| AF PUB AFFAIRS AG FO JBSA RANDOLPH TX | RJ12FWGM | PAZ02 |

| 8. PERIOD OF REPORT *(DD Mmm YYYY)* | 9. NO. DAYS NON-RATED | 10. NO. DAYS SUPERVISION | 11. REASON FOR REPORT |
|---|---|---|---|
| From: 01 Oct 2020 Thru: 30 Sep 2021 | 0 | 365 | ANNUAL |

## II. JOB DESCRIPTION

**1. DUTY TITLE**

Public Affairs Craftsman

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES** *(Primary and Additional Duties) (Minimum of 1 line, but limited to 4 lines)*

- Meet all required appointments; maintain military standards; prepare for administrative/legal hearings and reviews

## III. PERFORMANCE IN LEADERSHIP/PRIMARY DUTIES/FOLLOWERSHIP/TRAINING   *(Using AFI 36-2618, The Enlisted Force Structure, as the standard of performance expectations commensurate with the ratee's rank; assess to what degree the ratee complied with the following performance expectations.)*

**1. Mission Accomplishment:** Consider the Airman's ability to lead and produce timely, high quality/quantity, mission-oriented results. **Resource Utilization** *(e.g. time, management, equipment, manpower and budget)*: Consider how effectively the Airman leads their team to utilize their resources to accomplish the mission. **Team Building:** Consider the amount of innovation, initiative, and motivation displayed by the Airman and their subordinates *(collaboration)*.
**Mentorship:** Consider how well the Airman knows their subordinates, accepts personal responsibility for them, and is accountable for their professional development. **Communication Skills:** Describe how well the Airman communicates *(includes listening, reading, speaking, and writing skills)* in various mediums, translates superior's direction into specific tasks and responsibilities, fosters an environment for open dialogue, and enhances communication skills of subordinates. **Comply with/Enforce Standards:** Consider personal adherence and how the Airman fosters an environment where everyone enforces fitness standards, dress and personal appearance, customs and courtesies, and professional conduct. **Duty Environments:** Rate how well the Airman establishes and maintains caring, respectful, and dignified environments while valuing diversity; to include promoting a healthy organizational climate. **Training:** Describes how well the Airman and their team complies with upgrade, duty position, and certification requirements.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☐ | ☐ |

**2. COMMENTS** *(Minimum 1 line, but limited to 8 lines)*

- Advised AFPAA Flying Prgm; provided expertise f/ myriad PA flying issues--dlvr'd crit guidance & info f/ RIP/TOA

## IV. WHOLE AIRMAN CONCEPT

**Air Force Core Values:** Consider how well the Airman adopts, internalizes, demonstrates and insists on adherence of our Air Force Core Values of Integrity First, Service Before Self and Excellence in All We Do. **Personal and Professional Development:** Consider effort the Airman devoted to improve their subordinates, their work center/unit and themselves. **Esprit de corps and Community Relations:** Consider how well the Airman promotes camaraderie, enhances esprit de corps, and develops Air Force ambassadors.

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☐ | ☐ |

**2. COMMENTS** *(Minimum 1 line, but limited to 2 lines)*

- Edited/compiled inputs for career-field wide qtrly newsletter; met suspenses--important updates distributed to 5K+

41126745-000001-02-36-00

FORM 911, 20150731, V2     PREVIOUS EDITIONS ARE OBSOLETE

FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.
PRIVACY ACT INFORMATION: The information in this form is

## V. OVERALL PERFORMANCE ASSESSMENT (Overall assessment of performance during rating period commensurate with Sections III-IV.)

**RATEE NAME:** ZIER, JEREMY, M

| Not-Rated | Met some but not all expectations | Met all expectations | Exceeded some, but not all expectations | Exceed most, if not all expectations |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☐ | ☐ |

## VI. RATER INFORMATION (Signature signifies this is an unbiased assessment and all ACA feedback sessions were completed as required per AFI 36-2406)

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | | SSN | DATE |
|---|---|---|---|---|
| CHADWICK J. EIRING, GS-14, DAF<br>Air Force Public Affairs Agency (AFPAA)<br>Joint Base San Antonio-Randolph TX | Director of Operations | | 8918 | 01 Oct 2021 |
| | Type of Signature<br>Digital | SIGNATURE<br>EIRING.CHADWICK.J.1101960257 | Digitally signed by EIRING.CHADWICK.J.1101960257<br>Date: 2021.10.01 15:59:20 -05'00' | |

## VII. ADDITIONAL RATER'S COMMENTS (Comments are optional unless required for Referral; if not used state "This Section Not Used")     ☒ CONCUR     ☐ NON-CONCUR

**1. COMMENTS** (Comments are optional unless required for Referral; if not used, state "This Section Not Used") (Minimum of 1 line, but maximum of 2 lines)
- THIS SECTION NOT USED

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | | SSN | DATE |
|---|---|---|---|---|
| GREG A. HIGNITE, Lt Col, USAF<br>Air Force Public Affairs Agency (AFPAA)<br>Joint Base San Antonio-Randolph, TX | Commander | | 1475 | 08 Oct 2021 |
| | Type of Signature<br>Digital | SIGNATURE<br>HIGNITE.GREG.A.1081819820 | Digitally signed by HIGNITE.GREG.A.1081819820<br>Date: 2021.10.08 12:56:10 -05'00' | |

## VIII. UNIT COMMANDER/MILITARY OR CIVILIAN DIRECTOR/OTHER AUTHORIZED REVIEWER'S COMMENTS
(Comments are optional with a maximum of 1 line, if not used, state "This Section Not Used".)     ☒ CONCUR     ☐ NON-CONCUR

- THIS SECTION NOT USED

**1. FUTURE ROLES** (Recommend up to three roles/assignments that best serve the Air Force and continues the Airman's development)

1. N/A          2. N/A          3. N/A

| 2. EDUCATION<br>(as of closeout date) | 3. PROMOTION ELIGIBLE<br>(Promotion eligibility as-of closeout date) | 4. THIS IS A<br>REFERRAL REPORT | 5. QUALITY FORCE REVIEW (Ratee's personnel record has been reviewed for quality force indicators during the reporting period) |
|---|---|---|---|
| CCAF Conferred   PME Complete<br>YES                    YES | NO | NO | YES |

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | | SSN | DATE |
|---|---|---|---|---|
| GREG A. HIGNITE, Lt Col, USAF<br>Air Force Public Affairs Agency (AFPAA)<br>Joint Base San Antonio-Randolph, TX | Commander | | 1475 | 08 Oct 2021 |
| | Type of Signature<br>Digital | SIGNATURE<br>HIGNITE.GREG.A.1081819820 | Digitally signed by HIGNITE.GREG.A.1081819820<br>Date: 2021.10.08 12:56:41 -05'00' | |

## IX. FINAL EVALUATOR'S COMMENTS (Limit text to 1 optional line, if not used state "This Section Not Used")     ☒ CONCUR     ☐ NON-CONCUR

- THIS SECTION NOT USED

| A. FINAL EVALUATOR POSITION | B. SENIOR RATER STRATIFICATION: (This section restricted to Senior Rater only) |
|---|---|
| ☐ FORCED ENDORSEMENT | |

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | | SSN | DATE |
|---|---|---|---|---|
| GREG A. HIGNITE, Lt Col, USAF<br>Air Force Public Affairs Agency (AFPAA)<br>Joint Base San Antonio-Randolph, TX | Commander | | 1475 | 08 Oct 2021 |
| | Type of Signature<br>Digital | SIGNATURE<br>HIGNITE.GREG.A.1081819820 | Digitally signed by HIGNITE.GREG.A.1081819820<br>Date: 2021.10.08 12:57:59 -05'00' | |

## X. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR (Indicate applicable review by marking the appropriate box)     ☐ FUNCTIONAL EXAMINER     ☐ AIR FORCE ADVISOR

| NAME, RANK, BRANCH OF SERVICE, ORGN, CMD, AND LOCATION | DUTY TITLE | | SSN | DATE |
|---|---|---|---|---|
| | | | | |
| | Type of Signature<br>Digital | SIGNATURE | | |

## XI. REMARKS (Only use this section to spell out uncommon acronyms or to place required comments IAW AFI 36-2406.)

## XII. RATEE'S ACKNOWLEDGEMENT I acknowledge all required ACA feedback was accomplished during the reporting period and feedback was provided upon receipt of this report (unless otherwise stated above).

| Type of Signature<br>Digital | SIGNATURE<br>ZIER.JEREMY.M.1022331023 | Digitally signed by<br>ZIER.JEREMY.M.1022331023<br>Date: 2021.10.18 14:59:11 -05'00' | | DATE<br>18 Oct 2021 |
|---|---|---|---|---|

411126745-000001-01-36-00

PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

# DOCUMENT C

BEFORE THE JUDGE ADVOCATE GENERAL OF THE AIR FORCE

| | |
|---|---|
| U N I T E D  S T A T E S, | SECOND ADDITIONAL APPLICATION FOR RELIEF FROM COURT-MARTIAL FINDINGS AND/OR SENTENCE UNDER THE PROVISIONS OF TITLE 10, UNITED STATES CODE, SECTION 869 |
| v. | |
| Senior Master Sergeant (E-8), **Jeremy M. Zier** United States Air Force | Tried at JBFSA-Randolph on 10-14 August 2020 before a special court-martial appointed by Commander, Air Force Public Affairs Agency, Colonel Sterling C. Pendleton, Military judge, presiding. |
| 7238 Capricorn Way Converse, Texas 78109 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 (Address and Social Security Number of Applicant) | |

TO THE JUDGE ADVOCATE GENERAL OF THE AIR FORCE:

**SECOND ADDITIONAL ASSIGNMENT OF ERROR.**

**I.**

**THE SECRETARY OF THE AIR FORCE IS ENGAGED IN APPARENT AND ACTUAL UNLAWFUL COMMAND INFLUENCE WHILE SMSGT ZIER'S CONVICTION IS PENDING ARTICLE 69, UCMJ REVIEW.**

Through counsel, Senior Master Sergeant (E-8) Jeremy M. Zier petitions for relief under Article 69, UCMJ on the additional grounds of substantial error and requests that the Judge Advocate General set aside and dismiss all findings and the sentence.

**Statement of the Case**

On 10 August 2020 – 14 August 2020, a military judge sitting as a special court-martial tried Senior Master Sergeant (E-8) Jeremy M. Zier [hereinafter Applicant]. The court-martial convicted Applicant, contrary to his pleas, of one specification each of dereliction of duty and abusive sexual contact, in violation of Articles 92 and 120, UCMJ; 10 U.S.C. §§ 892 and 920 (2012). The court-martial sentenced Applicant to be reduced to the grade of E-7. The convening authority approved the sentence as adjudged. (Action).

**Additional Statement of Facts**

The Honorable Frank Kendall, III is the incumbent Secretary of the Air Force. The Senate of the United States gave its advice and consent to President Biden's nomination of him on 28 July 21.[1] He thereafter took the statutorily prescribed oath and entered into office at that time.

Secretary Kendall is the highest ranked civilian in the Department of the Air Force. 10 U.S.C. 9013. Secretary Kendall has the direct authority to affect the

[1] Rachel S. Cohen, *New Air Force Secretary Frank Kendall takes office*, Air Force Times (July 28, 2021).

2

future assignments and career prospects of the Judge Advocate General and the judges of the Air Force Court of Criminal Appeals and may, at will terminate the tenure in office of these officers for any reason, or none at all. *Id.*

On 10 December 2020, a discharge board convened to consider whether to administratively discharge Petitioner. UP AFI 36-3208, the board determined that Petitioner should be retained. Petitioner's Wing Commander forwarded the matter to the Secretary of the Air Force, who directed Petitioner's retirement as a technical sergeant, a one rank demotion beyond what the court-martial which tried Petitioner adjudged.[2] At the time of his decision, Secretary Kendall issued the following statement:

> "As a senior non-commissioned officer, Sergeant Zier had a special responsibility and duty to protect and look after the airmen under his authority. Sergeant Zier's misconduct against a fellow airman violated that trust and his duty as an Air Force leader. Such conduct is **unacceptable,** does not meet Air Force standards and **won't be tolerated**" (emphasis added).[3]

At all times from the completion of his sentence until present, Petitioner has been prevented from performing any meaningful military duty. He has been informed his place of duty is his living room. He has not been permitted to retire, because he has remained subject to pre-trial controls. Specifically, a 2J code in his

---

[2] Rachel S. Cohen, *Senior NCO convicted of sex crime will be allowed to retire at a lower rank,* Air Force Times (Mar. 9, 2022).
[3] *Id.*

3

personnel records prevents any favorable action because of pending criminal or administrative separation action. Petitioner is not the subject of any further criminal action because he has completed his sentence and is not the target of any new investigation. He cannot be made the subject of a second administrative board for the same allegations.

## I.

## THE SECRETARY OF THE AIR FORCE IS ENGAGED IN APPARENT AND ACTUAL UNLAWFUL COMMAND INFLUENCE WHILE SMSGT ZIER'S CONVICTION IS PENDING ARTICLE 69, UCMJ REVIEW.

### Summary of Argument

Petitioner cannot receive a fair and unbiased consideration of his claims because the Secretary of the Air Force, who has the ability to terminate the tenure in office of the Air Force officials responsible for consideration of Petitioner's claims, had made abundantly clear her position on the appropriate disposition of Petitioner's case, to the prejudice of Petitioner.

### Law

"No person subject to [the UCMJ] may attempt to coerce… the action of any convening, approving, or reviewing authority with respect to his judicial acts."

Art. 37(a), UCMJ. Military courts have long recognized that unlawful command

4

5

influence (UCI) deprives servicemembers of their constitutional due process rights. *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986). It is therefore properly recognized "the mortal enemy of military justice." *Id.* at 393.

The military justice system is tarnished by unlawful command influence whether the source of the influence intended the adverse effects on the case or not. Inquiry into the intentions behind an influencing action is both unfruitful and irrelevant. The only relevant inquiry is whether an action resulted in influence. *United States v. Jameson*, 33 M.J. 669, 673 (N.M.C.M.R. 1991).

UCI exists in two forms. Actual UCI occurs when a superior authority engages in actions or uses unauthorized means to influence the disposition of criminal charges. *United States v. Blaylock*, 15 M.J. 190, 193 (C.M.A. 1983). Apparent UCI, in contrast, deals with an appearance of impropriety, even if there was no actual influence or illegality. *United State v. Simpson*, 58 M.J. 368, 374 (C.A.A.F. 2003).

UCI may occur in the accusatory or the adjudicatory phase of a court-martial. *United States v. Weasler*, 43 M.J. 15, 17 (C.A.A.F. 1995). Adjudicative UCI is such a serious burden on the fairness of the military justice system that an accused neither waives nor forfeits it by the timing of when he raises the issue. *United States v. Valmont*, 73 M.J. 923, 933 (A. Ct. Crim. App. 2014).

9

Civilian leadership can commit UCI. Although Article 37, UCMJ's language prohibits persons subject to the Code from committing UCI, the influencing actions of civilian leadership are subject to the same analysis as if they were subject to the UCMJ. This is a matter of military due process and stems from the due process clause of the constitution, not Article 37, UCMJ. *United States v. Hutchins*, 72 M.J. 294, 312 (C.A.A.F. 2013).

Actual UCI

The doctrine of actual UCI describes a situation wherein a superior attempts to control a subordinate decision-maker in his responsibility to make an independent and discretionary military justice decision. *United States v. Allen*, 31 M.J. 572, 584 (C.M.A. 1990). Actual UCI occurs when a superior interferes with the actions of his subordinate, including in his referral decisions. *United States v. Hamilton*, 41 M.J. at 36. A convening authority therefore may be the subject of actual UCI from his superior in rank. A general officer who has been attacked repeatedly over his exercise of military justice discretion is unlawfully influenced where negative feedback causes him to face personal consequences concerning the outcome of military justice matters. *United States v. Thomas*, 22 M.J. at 394. Although a superior may set military justice policy, he may not deprive a reviewing authorities of the ability to exercise independent judgment in military justice matters. An action of a superior which invades the informed discretion of

reviewing authorities constitutes actual unlawful command influence. *United States v. Rivera*, 31 C.M.R. 93, 95 (C.M.A. 1961). An "improper manipulation of the criminal justice process, even if effectuated unintentionally," cannot be countenanced." *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017)

Superiors may commit actual UCI concerning a class or type of case. UCI occurs when an influencing action has a "logical connection to the court-martial in terms of the potential to cause unfairness in the proceedings." *Biagase*, 50 M.J. at 150.

Statements of an influenced person concerning independence from an influencing action are viewed with extreme skepticism. It is extremely difficult for a subordinate to assess the effects that a superior's influence has on him. *United States v. Gerlich*, 45 M.J. 309, 313 (C.A.A.F. 1996). "Military law has traditionally viewed such perfunctory statements from subordinates on the effects of command influence as inherently suspect..." *United States v. Rosser*, 6 M.J. 267, 272 (C.M.A. 1979).

When a reviewing authorities have been the subject of UCI, only extensive remedial action will cure the UCI and render it harmless beyond a reasonable doubt. *Thomas*, 22 M.J. at 400.

Apparent UCI

7

This court has long recognized that the preservation of public perception concerning the integrity and fairness of the military justice system is just as important as the actual substance of the proceedings. *United States v. Ayers*, 54 M.J. 85, 94-95 (C.A.A.F. 2000). In considering whether an appearance of unlawful command influence exists, this court considers "the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public." *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006). Where an improper appearance places an "intolerable strain on public perception of the military justice system," reviewing authorities should restore public faith by firm measures, to include dismissal with prejudice. *United States v. Wiesen*, 56 M.J. 172, 175 (C.A.A.F. 2001). Dismissal is a harsh remedy, but one which is necessary when alternatives are insufficient to address the grave threat to military justice which is UCI. *United States v. Gore*, 60 M.J. 178, 188 (C.A.A.F. 2004). In order to sustain a conviction in a case where there exists an appearance of UCI, "the disinterested public would now [have to] believe that [Appellant] received a trial free from the effects of unlawful command influence." *Lewis*, 63 M.J. at 415.

On appeal, the defense properly raises a claim of apparent unlawful command influence by showing:

1. Facts which, if true, would appear to constitute unlawful command influence;

8

6

2.  That the proceedings would appear unfair to a disinterested observer;

3.  And that appearances of unlawful command influence was the cause of the apparent unfairness.

*United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999) (quoting 50 M.J. at 150).

## Argument

The Secretary of the Air Force has committed both actual and apparent UCI.  Petitioner cannot receive an impartial consideration of the merits of his other claims because the Secretary has publicly commented on his view of Petitioner's guilt, as well as his view of the appropriate disposition of this case.  As a reviewing authority, you cannot countenance "an improper manipulation of the criminal justice process, even if effectuated unintentionally." *Boyce*, 76 M.J. at 247.  You should therefore set aside and dismiss Petitioner's convictions.

The application of a UCI analysis shows actual influence which you can only remedy by setting aside and dismissing the charges.  Petitioner meets his burden here by showing "facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *Biagase*, 50 M.J. at 150.  Here, the Secretary's comments are classic UCI in which he, while in a position of great authority, has published comments directly relevant to the matters under consideration which are unfavorable to

Petitioner. The Secretary therefore implicitly disfavors any result of these proceedings beneficial to Petitioner. There can be no doubt as to the influence itself nor the potential for unfairness. Therefore, Petitioner has met his initial burden.

Once Petitioner has met his initial burden, he is due relief unless there is proof "beyond a reasonable doubt: (1) that the predicate facts do not exist; or (2) that the facts do not constitute unlawful command influence; or (3) that the unlawful command influence will not prejudice the proceedings or did not affect the findings and sentence." *Id.* Here, the Secretary's comments are unlawful influence. There is no proof that they will not influence the proceedings. Rather, the extra-ordinary and unlawful means which the government has employed to attempt to punish Petitioner in excess of the sentence is the result of influence. Undersigned counsel is unaware of the case of any other Servicemember who has been:

1. court-martialed.
2. completed his sentence.
3. recommended for administrative separation.
4. retained by a separation board.
5. despite recommended retention, been forwarded to the Secretary of the Air Force for separation.
6. ordered not to perform duties appropriate to rank.
7. subsequently further reduced in rank.

The stubborn and unprecedented behavior of Petitioner's command is evidence of the Secretary's unlawful influence over Petitioner's post-trial

10

11

processing. It is inconceivable that Petitioner's command would engage in such unparalleled efforts to unlawfully punish him except at the direction of higher authority. Petitioner cannot expect to receive fair and impartial post-trial processing because he has not received fair and impartial administrative due process concerning the same underlying matter. You should find that the Secretary's comments constitute actual influence. You should further find that the administrative malprocessing to which Petitioner has been subject is evidence of the effects of that influence. Finally, you must set aside the findings and sentence here must be with prejudice in order to remove the taint of the Secretary's influence from the military justice system.

In addition, you should find that the Secretary's comments constitute apparent UCI. The Secretary's comments present to the public an image of a system in which reviewing authorities are at risk for their jobs unless they grant no relief to Petitioner. This constitutes apparent UCI. A perceivable threat of adverse administrative action against a judicial officer constitutes apparent UCI when undertaken because a superior disagrees with the judicial officer's decisions. *United States v. Salyer*, 72 M.J. 415, 426 (C.A.A.F. 2013).

In *Salyer*, a trial counsel did not agree with the rulings which a military judge made on the admissibility of evidence. The trial counsel improperly accessed a military judge's personnel record and used the information contained in

it to embarrass the military judge with a disqualification motion. This motion dealt with the fact that the military judge's wife was 17 when the military judge lawfully married her. *Id.*

Here, the Secretary's statements are a far more blatant attempt to direct the result of a judicial function. In *Salyer*, improper governmental action forced the military judge to recuse himself from one case, but did not cause him to retire, lose rank or pay, or cease to be a military judge. *Id.* Here, the Secretary who has the ability to terminate the tenure and careers of judicial officials reviews Petitioner's case. "[A]n objective member of the public would be left with the appearance and the impression that the Government obtained advantage from its actions." *Salyer*, 72 M.J. at 428. An objective member of the public would conclude that reviewing officials face massive personal and financial consequences should they make a "bad" judicial decision in this case. Therefore, an objective member of the public would conclude that Petitioner's post-trial processing had been unlawfully influenced.

Petitioner need not prove this public perception. The government must disprove it beyond a reasonable doubt. *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002). The record contains no evidence proving what members of the public would believe about the fairness of this case. Dismissal is therefore the only appropriate remedy here.

12

You should find that the doctrine of apparent UCI remains viable when it concerns civilian officials who are not presently subject to the code. UCI doctrine applies to civilian officials because of the due process clause, and not because of Article 37, UCMJ. *Hutchins*, 72 M.J. at 312. You should therefore find that changes to Article 37 mandated by the National Defense Authorization Act of 2020, Pub. L. No. 116-92, 133 Stat. 1198 (2019), do not affect the viability of the doctrine of apparent UCI as applied to civilian officials because civilian UCI is a constitutional, not statutory doctrine. If you find that the proceedings here are not actually influenced, you should find that there is apparent UCI and set aside and dismiss the charges.

**Conclusion**

Based upon the foregoing, you should set aside and dismiss the Charges and the Sentence. Pursuant to Air Force Instruction 51-201, para 14.20, I state on affirmation that I believe the foregoing to be true.

*Carol Longenecker Schmidt*

Carol Longenecker Schmidt, KS Bar No. #24828
Of Counsel
Civilian Appellate Defense Counsel
THE LAW OFFICES OF ROBERT FELDMEIER
2920 Forestville Road, Suite 100-1076
Raleigh, North Carolina 27616

13

316-452-0563
cls.law@outlook.com
Licensed in the State of Kansas only

# DOCUMENT D

(CUI)



**DEPARTMENT OF THE AIR FORCE**
OFFICE OF THE JUDGE ADVOCATE GENERAL
MILITARY JUSTICE AND DISCIPLINE

1 November 2022

MEMORANDUM FOR  AF/JAJM

FROM:  AF/JA – Military Justice and Discipline
1500 W Perimeter Rd, Ste 1130
Joint Base Andrews MD 20762

SUBJECT:  Applications for Relief (Article 69) US v. Zier

1. SMSgt Jeremy M. Zier (the Applicant) filed two applications for relief to The Judge Advocate General (TJAG) pursuant to Article 69, Uniform Code of Military Justice (UCMJ). Both applications were routed through the appropriate channels utilizing Task Management System (TMT) and were numbered HAF-220603-J87Z and HAF-220621-BV97, respectively.

2. A thorough review of the TMT database shows that both applications for relief were signed by TJAG on 27 June 2022.

3. Please do not hesitate to reach out to AF/JAJI if you have any additional questions.

JACQUELINE R. MCDERMOTT-WINTCH, USAF
Counsel, Justice Review & Secretarial Actions

(CUI)

Controlled Unclassified Information (CUI)
Controlled by: Dept of the Air Force, AF/JAJI
CUI Category: LEGAL PVLG PVCY
Limited Dissemination Control: FEDCON ONLY
POC: Maj Jacqueline McDermott-Wintch

# DOCUMENT E

**PEER, JAY S Maj USAF HAF AFLOA**

| | |
|---|---|
| **From:** | DIAL, JONATHAN P Maj USAF USAFE 31 FW/JA <jonathan.dial.3@us.af.mil> |
| **Sent:** | Thursday, November 3, 2022 6:23 AM |
| **To:** | SCHIAVONE, ELIZABETH T Maj USAF AETC 502 ABW/502 ABW/JA; STEELE, JULIE A GS-12 USAF HAF AF/JAJM |
| **Subject:** | RE: US v Zier (ACM 21014) |
| **Signed By:** | jonathan.dial.3@us.af.mil |

Ms. Steele,
You may receive two e-mails from me, we seem to be having some comms issues here.

As I should've expected, Maj Schiavone's search didn't shake much loose, but no assignment of error sounds right.

Regarding service, it was my standard practice during my tenure there to utilize the base legal offices for direct interactions with Defense or the Accused. Although I do not remember this specific instance, I see no reason I would have deviated from that standard practice. However, I also couldn't tell you if we, as the NAF, were required to serve this on the Accused, which also would have been something different than standard.

Again, I wish I could be more helpful on this, but please let me know if there's anything else I need to do to assist.

V/R,
Maj Dial

-----Original Message-----
From: SCHIAVONE, ELIZABETH T Maj USAF AETC 502 ABW/502 ABW/JA
<elizabeth.schiavone@us.af.mil>
Sent: Wednesday, November 2, 2022 10:22 PM
To: STEELE, JULIE A GS-12 USAF HAF AF/JAJM <julie.steele.3@us.af.mil>; DIAL,
JONATHAN P Maj USAF USAFE 31 FW/JA <jonathan.dial.3@us.af.mil>
Subject: RE: US v Zier (ACM 21014)

Ms. Steele,

Good afternoon, ma'am.  I apologize for the delayed response, but I wanted to ensure we were conducting a full search of our records before providing you a response.

1) Whether the member or his counsel submitted any allegations of error during the Art 65 process?:

502 ABW/JA has no electronic or physical record that defense counsel submitted any allegations of error.  502 SFG/JA also has no electronic or physical record that any allegations of error were submitted in this case. According to Lt Col Thomas Finley, 502 SFG/SJA,   the CMJ at the group legal

1

office during US v. Zier was, Capt Ted Coleman. Capt Coleman has email record of the defense submitting clemency materials on 18 Aug 20 and submitting a request for deferment of rank reduction on 24 Aug 20. He was unable to locate in his email any record of defense submitting allegations of error under the Article 65 process.

The only documentation the 502 ABW has on this matter is Maj Dial's Article 65(d) certification on the DD Form 490 that "where applicable, a response to each allegation of error was made in writing by the accused."

2) If they did submit allegations of error, were the errors addressed in writing?:

This office has no record of the defense submitting allegations of error.

3) Do you have any documentation that you notified the member once the Art 65 review was complete?:

No, ma'am. This office has no record of notification being made to the accused via certified mail. 502 SFG/JA reviewed their copy of the ROT and did not locate proof of service for the Article 65 review.

Please let me know if you have any follow-up questions. Thank you.

V/r,
Maj Schiavone

ELIZABETH T. SCHIAVONE, Maj, USAF
Chief, Military Justice
502 ABW/JA
JBSA-Fort Sam Houston, TX
Comm: 210-221-7416
DSN: 471-7416

-----Original Message-----
From: STEELE, JULIE A GS-12 USAF HAF AF/JAJM <julie.steele.3@us.af.mil>
Sent: Friday, October 28, 2022 2:02 PM
To: DIAL, JONATHAN P Maj USAF USAFE 31 FW/JA <jonathan.dial.3@us.af.mil>
Cc: SCHIAVONE, ELIZABETH T Maj USAF AETC 502 ABW/502 ABW/JA <elizabeth.schiavone@us.af.mil>
Subject: US v Zier (ACM 21014)

Good afternoon, sir,

I'm writing to you in regards to US v Zier as you were the Art 65 reviewing officer on the case back in January of 2021. AFCCA has sent the ROT back to TJAG to determine if 1) the member or his counsel submitted any allegations of error during the Art 65 process

2

and 2)if they did submit allegations of error, did you address them in
writing?

Maj Schiavone,

Do you have anything in your files in regards to the above and do you have
any documentation that you notified the member once the
Art 65 review was complete?

V/r

Julie A. Steele
Chief, Appellate Records Branch
AF/JA - Military Justice Law and Policy Division
DSN: 612-4820/Comm: 240-612-4820